# Exhibit 1

## Proposed Findings of Fact and Conclusions of Law

UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

Chapter 11

In re:

DURO DYNE NATIONAL CORP., et al.,[1]

Debtors

Case No. 18-27963 (MBK)

(Jointly Administered)

**REPORT AND RECOMMENDATION FOR ENTRY OF:**
**(A) FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO THE THIRD AMENDED PLAN OF REORGANIZATION; and**
**(B) CONFIRMATION ORDER**

This matter comes before the Court following the submission by the parties of proposed findings of fact and conclusions of law with respect to confirmation of the Plan Proponents' Proposed Third Amended Prenegotiated Plan of Reorganization ("Plan"). For reasons discussed below, the Court recommends confirmation of the Plan to the district court.

[1] The "**Debtors**" in these chapter 11 cases are: Duro Dyne National Corp., No. 18-27963-MBK; Duro Dyne Corporation, No. 18-27968-MBK, Duro Dyne Machinery Corp., No. 18-27969-MBK; Duro Dyne MidWest Corp., No. 18-27970-MBK; and Duro Dyne West Corp., No. 18-27971-MBK (collectively, the "Debtors").

**FINDINGS OF FACT and CONCLUSIONS OF LAW**

**I. Jurisdiction, Venue and Core Proceeding**

1. This Court has jurisdiction over the Debtors' chapter 11 cases in accordance with 28 U.S.C. §§ 157(d), 1334(a), and 1334(b). Venue of these chapter 11 cases is proper under 28 U.S.C. §§ 1408 and 1409. Each of the Debtors is qualified under § 109 of the Bankruptcy Code to be a debtor in a chapter 11 case and is a proper co-proponent of the Plan under § 1121(a) of the Bankruptcy Code.

**II. Background and Procedural History**

**A. Overview of the Debtors and their Business**

1. The Debtors (collectively, "**Company**") are a middle-market, family-owned business that has evolved into the leading manufacturer of sheet metal accessories and equipment for the heating, ventilating, and air conditioning industry. (Disclosure Statement at 7; Declaration of Randall S. Hinden in Support of Chapter 11 Petitions and First Day Pleadings ¶ 7 (Bankr. ECF No. 3) ("**Hinden Decl.**")). They employ approximately 170 people with sales and distribution channels throughout the United States, Canada, and internationally. (Disclosure Statement at 8; Hinden Decl. ¶ 13).

2. Duro Dyne National Corp. ("**Duro Dyne National**") is a holding company whose primary asset is all of the issued and outstanding capital stock of the other Debtors. Duro Dyne National is owned by members of the Hinden family and various trusts for the benefit of Hinden family members. (Disclosure Statement at 7). The Company's operations are conducted through Duro Dyne Machinery Corp ("**Duro Dyne**

**Machinery**"), Duro Dyne Corp. ("**Duro Dyne Corp.**"), Duro Dyne Midwest Corp. ("**Duro Dyne Midwest**") and Duro Dyne West Corp. ("**Duro Dyne West**"). (Hinden Decl. ¶ 8).

3. The Company has sales offices and over 200,000 square feet of manufacturing and warehousing facilities in Trenton, New Jersey; Bay Shore, New York; Fairfield, Ohio; and Fontana, California (Los Angeles area). The Company leases its Bay Shore and Fairfield facilities from non-debtor affiliates. In addition to its U.S. operations, the Company has a Canadian affiliate located in Quebec[2] and a licensee that manufactures under the "Duro Dyne" label in the United Arab Emirates. (Disclosure Statement at 7; Hinden Decl. ¶ 9).

4. Duro Dyne Machinery manufactures machines for the sheet metal industry, which are sold to third party customers by the affiliated Debtors. Duro Dyne Corp. manufactures and sells sheet metal parts and tools on the east coast of the United States. Duro Dyne Midwest manufactures and sells sheet metal parts and tools in the Midwestern part of the United States, and Duro Dyne West sells sheet metal parts and tools on the west coast of the United States. The Debtors operate as a consolidated and integrated entity. (Disclosure Statement at 8; Hinden Decl. ¶ 10).

[2] Duro Dyne Corp. owns all the stock of Duro Dyne Canada Inc., a Canadian corporation, which manufactures and distributes the most complete line of sheet metal accessories and equipment for the heating, ventilating, and air conditioning industry in Canada. Duro Dyne Canada is not a Debtor in these proceedings.

**B. Asbestos Litigation**

5. The primary reason for the filing of the Debtors' Chapter 11 Cases was the need to address the Company's asbestos liability. (Podgainy Cert. ¶ 3; Hr'g Tr. 41, 86–87, Mar. 6, 2019 (Podgainy Testimony)). As of the Petition Date, the Debtors were named as defendants in approximately 956 pending lawsuits asserting claims for personal injury or wrongful death resulting from alleged asbestos exposure. Prior to the Petition Date, the Debtors settled more than 650 asbestos claims that had been filed against them, and more than 8,100 asbestos claims were dismissed. (Disclosure Statement at 13; Podgainy Cert. ¶ 3). These claims were asserted in various jurisdictions, including California, New York, Michigan, Illinois, Massachusetts, Missouri, and West Virginia. (Disclosure Statement at 13). The alleged asbestos liability arose as a result of the Debtors having sold products that allegedly contained asbestos beginning in approximately 1952 until about 1978. (Disclosure Statement at 13; Hinden Decl. ¶ 21).

6. Since the first asbestos claims were filed against the Company in 1988, the Company worked with its insurance carriers to seek dismissal of a large portion of the claims and to settle the remaining claims in advance of trial. (Podgainy Cert. ¶ 4). At the rate the asbestos claims were being filed and settled by the Company and its insurance carriers, it originally appeared that the Company would be able to address all of the claims through proceeds of insurance and cash flow from operations. (*Id.*). However, in recent years, the Company has been forced to bear an increasing share of settlements and claims for reimbursement of indemnity and defense costs due to the insolvency of

one of the Company's insurance carriers, the exhaustion of the Company's primary insurance coverage, and disputes with insurance carriers providing excess level coverage. (*Id.*). In the past five years, the Debtors have paid millions of dollars to settle or resolve asbestos personal-injury claims against them. (Hr'g Tr. 42, Mar. 6, 2019 (Podgainy Testimony)).

**C. Insurance Coverage Litigation**

7. Beginning at least as early as 1968, the Company maintained comprehensive general liability insurance coverage applicable to asbestos personal injury claims. The Company purchased primary general liability policies from North River Insurance Company ("**North River**"), Hartford Accident & Indemnity Company ("**Hartford**"), Federal Insurance Company ("**Federal**"), Aetna Insurance Company of Connecticut, and Insurance Company of North America, covering the policy periods from August 1, 1968 through June 23, 1991. (Disclosure Statement at 14). Additionally, Duro Dyne purchased umbrella or excess insurance policies from Hartford, North River, Federal, MidStates Reinsurance Corporation ("**MidStates**"), Munich Reinsurance America, Inc. ("**Munich**"), and Great Atlantic Insurance Company of Delaware, covering the policy periods from May 15, 1972 through June 23, 1989. (*Id.*).

8. The comprehensive general liability insurance policies described above are "occurrence-based" policies which, subject to other policy terms, generally insure against liability arising from bodily injury or property damage during the policy period, even if the injury or damage does not manifest itself until after the policy period. The

Company's pre-1991 "occurrence" policies provide insurance coverage for asbestos and other "long tail" claims, which are commonly asserted years or decades after the underling injuries are alleged to have occurred. After 1991, the policies purchased by the Company contain various exclusions for asbestos and asbestos-related claims.

9. On September 19, 2013, North River commenced an action against the Company and the Company's other primary and umbrella/excess insurance companies in New York state court, seeking to limit its coverage obligations to the Company in connection with asbestos-related claims against the Debtors ("**Coverage Action**"). (Disclosure Statement at 15). The Coverage Action remains pending, although, as discussed below, the Debtors have entered into proposed settlements with Hartford, Federal, MidStates, and Munich that would resolve the coverage disputes with those insurers. To date, the parties have not undertaken any discovery but have filed motions for summary judgment on a variety of presently known legal issues. (*Id.*). Critical issues in the coverage case include the insurance companies' argument, contested by the Company, that the Company is obligated to reimburse Asbestos Insurers for a share of the defense and indemnity costs incurred in asbestos tort litigation against the Debtors, and an argument by North River that one of its policies contains an absolute exclusion for asbestos liability. (*Id.*).

10. The Bankruptcy Court has lifted the automatic stay to permit the Coverage Action to proceed. (Bankr. ECF No. 350).

**D. PrePetition Negotations**

11. In the spring of 2015, the Debtors' counsel began discussions with tort plaintiffs' counsel who represent numerous existing holders of Asbestos Personal Injury Claims against the Debtors in order to explore the feasibility of and the potential for a prenegotiated chapter 11 plan of reorganization that would include a settlement trust and a permanent channeling injunction pursuant to 11 U.S.C. § 524(g). Tort plaintiffs' counsel, without the involvement of the Debtors, formed an ad hoc committee ("**Ad Hoc Committee**") for the purpose of negotiating the terms of a possible plan of reorganization. (Podgainy Cert. ¶ 5).

12. The Debtors and the Ad Hoc Committee determined that, in furtherance of discussions toward a potential plan of reorganization under 11 U.S.C. § 524(g), it was necessary and appropriate to engage an independent third-party representative ("**Prepetition Legal Representative**") for the purpose of protecting the shared interests of persons that might assert asbestos-related personal-injury or wrongful-death claims against the Debtors in the future. Lawrence Fitzpatrick was ultimately selected to serve as the Prepetition Legal Representative. (Podgainy Cert. ¶¶ 7-8).

13. The Ad Hoc Committee and the Prepetition Legal Representative, either personally or through their representatives, conducted due diligence concerning the background, nature, and scope of the Debtors' liabilities for asbestos claims. (Podgainy Cert. ¶ 10; Hr'g Tr. 47:12–15, Mar. 6, 2019 (Podgainy Testimony)). The investigation included, among other things, review of the facts concerning the Debtors' historical involvement

with asbestos; the nature and extent of past and pending asbestos litigation against the Debtors, including the types of claims asserted and the legal issues raised; the projected value of present and future Asbestos Claims and Demands; and the extent to which insurance and other assets may be available to satisfy these liabilities in whole or in part. (Podgainy Cert. ¶ 10). The Ad Hoc Committee and Prepetition Legal Representative also examined the potential for recovery by claimants asserting asbestos-related claims against the Debtors' Affiliates based on a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and fraudulent conveyance. (*Id*.).

14. Following due diligence, representatives of the Debtors, the Ad Hoc Committee, and the Prepetition Legal Representative spent considerable time negotiating the terms of a possible plan of reorganization. (Podgainy Cert. ¶ 11). These negotiations addressed all the material provisions of a plan, including the funding for a trust to be established by the plan, the contributions to be made by or on behalf of the Debtors, the terms of a channeling injunction, issues relating to insurance coverage, and indemnification provisions. (*Id*.). Ultimately, the Debtors, the Ad Hoc Committee, and the Prepetition Legal Representative reached an agreement on the terms for a proposed plan of reorganization, which were incorporated into a term sheet dated January 6, 2018. (*Id*.). Following execution of the term sheet, the Debtors, the Ad Hoc Committee, and the Prepetition Legal Representative negotiated the terms of a prenegotiated plan of reorganization for the Debtors. (*Id*.).

## III. The Chapter 11 Cases

15. On September 7, 2018, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. On the same date, the Debtors filed the prenegotiated plan of reorganization and a disclosure statement relating thereto. The prenegotiated plan was subsequently amended and eventually became the Plan now being considered by this Court. (Podgainy Cert. ¶ 12).

16. On September 26, 2018, the Office of the United States Trustee for Region Three ("UST") formed the Committee in accordance with § 1102(a)(1) of the Bankruptcy Code. On October 17, 2018, after a contested hearing, the Bankruptcy Court entered the *Order Appointing a Legal Representative for Future Asbestos Personal Injury Claimants Effective as of the Petition Date* (ECF No. 191), which appointed Lawrence Fitzpatrick as the Legal Representative and overruled the objections to his appointment.

17. The Plan Proponents filed their initial Chapter 11 Plan on September 7, 2018 (ECF No. 19). Their Second Modified Chapter 11 Plan was filed on November 16, 2018 (ECF No. 279). Shortly before the scheduled Confirmation Hearing on March 6 and 7, the Plan Proponents reached settlements with several of their insurance carriers. The settlements, which will be discussed in greater detail in section V, *infra*, provide for the purchase of the policies for sums to be employed to fund the asbestos trust.

18. The Court held a Confirmation Hearing regarding the Second Modified Plan on March 6 and 7, 2019. Prior to the hearing, the Court announced a tentative ruling in which it stated that it was "prepared to rule that the plan complies with all of the requisite §

1129(a) and 1129(b) criteria." March 6, 2019 Confirmation Hrn'g Tr. ( "Mar. 6 Tr.") at 15. The Court cautioned, however, that this preliminary view was not based on a review of the evidence or argument.

19. During the Confirmation Hearing, the Court admitted a number of documents into evidence, and the Plan Proponents offered testimony by two witnesses: the Debtors' financial advisor, Mark Podgainy; and the Future Claimants' Representative, Lawrence Fitzpatrick. At the conclusion of the Confirmation Hearing, the Court requested that the parties submit proposed findings of fact and conclusions of law.

20. On April 15 and 16, 2019, the United States Trustee, the Plan Proponents, and North River submitted their respective proposed findings of fact and conclusions of law. On May 22, 2019, the Court held a hearing during which it issued certain rulings with respect to the Second Amended Plan and noted several deficiencies which the Court needed the Plan Proponents to address. The Court then suggested changes which, if accepted by the Plan Proponents, would render the Plan confirmable in the Court's opinion. The Plan Proponents subsequently accepted these changes and the revisions were incorporated into a Third Amended Prenegotiated Plan of Reorganization (ECF No. 729) which was filed on the docket on June 7, 2019. The Third Amended Plan (the "Plan") is the subject of this Report and Recommendation.

21. This Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of this Court or its duly-appointed agent. The Court has thoroughly reviewed the record in this case and has fully considered the arguments, testimony, and evidence

presented during the Confirmation Hearing as well as the competing proposed findings of fact and conclusions of law submitted by the Plan Proponents, North River Insurance Company, and the United States Trustee.

## IV. Plan Overview

22. The Plan divides the Claims against and Equity Interests in the Debtors into separate classes that will determine their treatment thereunder. (Plan §§ 3.02, 3.03). A summary of the Plan's classification scheme is as follows:

| Class | Claim / Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | Employee Benefit Claims | Unimpaired | Not Entitled to Vote |
| 4 | Worker Compensation Claims | Unimpaired | Not Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote |
| 6 | Prepetition Defense-Cost Contribution Claims | Impaired | Entitled to Vote |
| 7 | Channeled Asbestos Claims | Impaired | Entitled to Vote |
| 8 | Bonded Claims | Unimpaired | Not Entitled to Vote |

| Class | Claim / Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 9 | Intercompany Claims | Impaired | Not Entitled to Vote |
| 10 | Related-Party Claims | Impaired | Not Entitled to Vote |
| 11 | Equity Interests in Duro Dyne National Corp. | Impaired | Not Entitled to Vote |
| 12 | Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp. | Impaired | Not Entitled to Vote |

23. Central to the Plan is Class 7, which contains the Channeled Asbestos Claims, including current Asbestos Claims and future Demands. Under the Plan, these Channeled Asbestos Claims will be enjoined against the Protected Parties and channeled under Bankruptcy Code § 524(g) to the Asbestos Trust ("**Trust**") that will be formed under the Plan. (Plan §§ 3.03(g)(ii), 4.01, 9.05). Once channeled to the Trust, the Channeled Asbestos Claims will be resolved, liquidated, and (if eligible) paid in accordance with the Asbestos Trust Agreement and the Trust Distribution Procedures or "**TDP**." (Plan §§ 3.03(g)(ii), 4.01).

24. To fund its operations and pay eligible asbestos claims, the Trust will receive $26 million from non-insurance assets in the following form:

- Cash in the amount of $10.5 million paid on the Effective Date by or on behalf of the Debtors, their shareholders, and their nondebtor affiliates.
- The Trust Note, in the original principal amount of $13.5 million, payable in installments over roughly 20 years, at an interest rate of 7.15% per annum.

- Rights to "Earn Out Payments," not to exceed $2 million, from the Reorganized Debtor's post-Consummation earnings.

(Plan § 4.08).

25. Additionally, the Plan provides for the transfer of the Debtors' rights to asbestos-related insurance coverage, defined in the Plan as "Asbestos Insurance Rights," to the Trust. (Plan § 4.07). The Asbestos Insurance Rights include the proceeds from the Asbestos Insurance Settlements reached between the Debtors and their Asbestos Insurers, which have been submitted for approval by the Bankruptcy Court. (Plan § 1.01(14)). The details concerning the Asbestos Insurance Rights, the Asbestos Insurance Settlements, and the Plan's treatment of the disputed claims of any Non-Settling Asbestos Insurers are addressed below. *See infra* parts IX and X.D.

26. The Plan provides for the issuance of the Asbestos Permanent Channeling Injunction under 11 U.S.C. § 524(g) that will shield the designated Protected Parties (*e.g.*, the Debtors, their Affiliates, the Hinden Family Members, the Hinden Family Entities, and the Settling Asbestos Insurers) from all Channeled Asbestos Claims on and after the Plan's Effective Date. (Plan §§ 1.01(17), (102), 9.05). In addition, the Settling Asbestos Insurers will receive the protection of the Settling Asbestos Insurer Injunction and the Asbestos Insurer Injunction that will be issued in accordance with §§ 105(a) and 524(g) of the Bankruptcy Code. (Plan §§ 1.01(16), (115), (116), 9.06, 9.07).

27. On the Plan's Effective Date, the Debtors and their respective Estates will be substantively consolidated and merged into Debtor Duro Dyne National Corp., and

Duro Dyne National Corp. will be the surviving entity and Reorganized Debtor on and after the Effective Date. (Plan § 1.01(108), 5.01

## V. Settlements with Asbestos Insurers

28. Prior to the Confirmation Hearing, the Debtors, with the consent of the Committee and the Legal Representative, entered into Asbestos Insurance Settlements with the following Asbestos Insurers: Hartford, Federal, MidStates, and Munich. The Plan Proponents filed motions to approve these Asbestos Insurance Settlements under §§ 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9019(a). (*See* Bankr. ECF Nos. 468, 500, 518, 522). The Bankruptcy Court held a hearing to consider these motions on May 22, 2019. In terms of substance, the proposed Asbestos Insurance Settlements resolve the outstanding coverage disputes between the Debtors and the aforementioned Asbestos Insurers. The proceeds of these Asbestos Insurance Settlements will be contributed to the Trust, and the Settling Asbestos Insurers will receive the protection of the Asbestos Permanent Channeling Injunction and the other Plan-related Injunctions. Accordingly, at the conclusion of the May 22 hearing, the Court approved the compromises and sales of the policies. Specifically, this Court found that the settlements are integral to the funding the estate and are for the benefit of the personal injury asbestos victims who are to be protected under a §524(g) injunction. However, this Court's approval of Asbestos Insurance Settlements is conditioned upon approval of the Plan by the district court.[3] Therefore, the orders

[3] Indeed, the settlements with the Settling Insurers presented to this Court require confirmation of a chapter 11 plan which incorporates the terms of the Asbestos Insurance Settlements.

granting the Plan Proponents' motions will dictate that approval of the Asbestos Insurance Settlements is contingent upon confirmation of the Plan. Those orders will be issued contemporaneously with the instant Proposed Findings of Fact and Conclusions of Law.

29. The only known, remaining solvent Non-Settling Asbestos Insurer is North River.

30. Prior to entering into their respective Asbestos Insurance Settlements with the Debtors, Federal and MidStates, together with North River, filed a joint objection to confirmation of the Plan. (Bankr. ECF No. 445). MidStates also filed a separate objection to confirmation. (Bankr. ECF No. 446). The Bankruptcy Court has stated that the confirmation objections of Federal and MidStates are preserved while the motions to approve their respective Asbestos Insurance Settlements and confirmation of the Plan remain pending. (Hr'g Tr. 10:6–17, Mar. 6, 2019). Nevertheless, for ease of reference and in light of the Asbestos Insurance Settlements reached with Federal and MidStates, this Court will refer to the objections of Federal, MidStates, and North River as the objections of North River.

## VI. North River's Objections

31. North River objects to confirmation of the Plan based on the following:

- The Plan improperly classifies North River's claims in violation of 11 U.S.C. § 1122(a).
- The Plan provides for improper treatment of North River's claims in violation of 11 U.S.C. §1123(a)(4) and § 524(g)(2)(B)(ii)(V).

- The Plan is not fair and equitable in violation of 11 U.S.C. § 1129(b).
- The Plan does not provide adequate protection under 11 U.S.C. § 363(e).
- The Plan fails to satisfy 11 U.S.C. § 524(g)(2)(B)(i)(III).
- The Plan improperly alters insurers' rights in violation of 11 U.S.C. § 1129(a)(3).
- The Plan does not satisfy the "Best Interests of Creditors" Test as required by 11 U.S.C. § 1129(a)(7).
- The Plan is not filed in good faith in violation of 11 U.S.C. § 1129(a)(3).
- The Plan seeks to evade review by improperly redefining "substantial consummation" in violation of 11 U.S.C. § 1102(2).

## VII. United States Trustee's Objections

32. The UST objects to the Plan based on the following:

- The Plan is unconfirmable because it was not filed in good faith as required by 11 U.S.C. § 1129(a)(3).
- The Plan is violative of 11 U.S.C. § 524(g)(2)(B)(ii)(V) because there is no reasonable assurance that present claims and future demands that involve similar claims will be treated in substantially the same manner.
- The Plan fails to comply with 11 U.S.C. § 1129(a)(11).

## VIII. Analysis of the Plan

### A. Good Faith – Threshold Issue

33. Challenges to confirmation rooted in an absence of good faith can have multiple bases. An objecting party can challenge the overall good faith of the plan or bankruptcy filing itself, or the good faith required by a particular statutory provision. The Third Circuit elaborated on this concept in *In re Combustion Engineering, Inc.*:

> There are numerous "good faith" requirements associated with the bankruptcy reorganization process. In addition to § 1129(a)(3), a court may "designate" (i.e., disqualify from voting) the ballot of "any entity whose acceptance or rejection" of the plan "was not in good faith, or was not solicited or procured in good faith." 11 U.S.C § 1126(e); *see also Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.*), 118 F.3d 635, 638 (9th Cir.1997). We have also recognized good faith as a threshold requirement for filing a Chapter 11 bankruptcy petition. *See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.*), 384 F.3d 108, 112 (3d Cir. 2004) (holding bankruptcy petition was not filed in good faith); *In re SGL Carbon Corp.*, 200 F.3d 154, 167 n. 19 (3d Cir. 1999).

*In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 n.67 (3d Cir. 2004), *as amended* (Feb. 23, 2005).

34. In this case, North River has raised both the threshold issue of whether the Debtor's chapter 11 petition was filed in good faith as well as challenges to the good faith requirements imposed by statute. Prior to engaging in an analysis of the statutory requirements for confirmation, this Court will first address the threshold issue of the appropriateness of the bankruptcy. *See In re SGL Carbon Corp.*, 200 F.3d 154, 167 (3d Cir. 1999) ("Although it is true the proposed plan would be subject to a separate 'good faith' determination by the bankruptcy court before it could implemented, *see* 11

U.S.C. § 1129(a)(3), that is only appropriate if the bankruptcy petition properly belongs before the bankruptcy court.").

35. With respect to the the good faith obligation imposed by chapter 11 in general ("threshold" good faith) North River asserts that the Debtor is not a financially troubled business seeking valid reorganization through a chapter 11 plan, but instead filed the bankruptcy to gain a tactical litigation advantage over its legal opponents. This Court recognizes that, ordinarily, chapter 11 is intended to reorganize financially troubled businesses and that, at the time they filed the instant bankruptcy, the Debtors were solvent, operating company. However, § 524(g) is somewhat of an exception to the general rule.

36. This Court must be mindful of the goals and purpose of §524(g):

> Section 524(g) is a special provision of the Bankruptcy Code created by Congress to provide 'supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability.' Under this law, a debtor's reorganization centers around a statutorily-created trust. The purpose of the trust is to preserve and facilitate the resolution of current asbestos claims, while simultaneously relieving the insolvent debtor from the uncertainty associated with impending future asbestos litigation. It is funded by the reorganized debtor's assets, stock, and any funds from contributions and settlements with third parties. The trust assumes the debtor's liabilities, which in turn gives the debtor the opportunity to restructure itself as an economically-viable entity able to satisfy its present and future asbestos-related liabilities.
>
> *In re W.R. Grace & Co.*, 475 B.R. 34, 91 (D. Del. 2012) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004)).

37. Although the Debtors in this case are a solvent company, they face the uncertainty of future asbestos liability—which includes not just the liabilities to asbestos personal

injury victims, but potential contribution obligations to co-defendants and insurers for both indemnity and defense costs. By its own admission, North River asserts that the Debtors face potential liability for their share of defense costs which aggregate well north of $30,000,000; which means that Debtors' total potential liability to all insurers is a contingent uncertain sum, far in excess of that figure. Ironically and tragically, these Debtors' very survival is threatened by the costs of their own defense attorneys retained under their insurance policies. A bankruptcy filed pursuant to § 524(g) removes that uncertainty and "facilitates the company's ongoing viability, which in turn provides the trust 'with an "evergreen" source of funding to pay future claims.'" *In re W.R. Grace & Co.*, 729 F.3d 311, 320 (3d Cir. 2013) (quoting *Combustion Eng'g*, 391 F.3d at 234). It defies logic to conclude that a bankruptcy under § 524(g) should only be available to financially troubled businesses because § 524(g) specifically contemplates a substantial ongoing business that can make continuous payments to the trust. This interpretation is adopted by many courts, discussed in scholarly articles, and finds support in the statute's legislative history. *See, e.g.*, 140 Cong. Rec. 6, 8,021 (1994) (statement of senator Brown); Sander L. Esserman & David J. Parsons, *The Case for Broad Access to 11 U.S.C. § 524(g)*, NYU ANNUAL SURVEY OF AMERICAN LAW, Aug. 7, 2006 at 201-202; *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004). In light of the structure of a § 524(g) injunction, it would be nonsensical to limit its use to companies on the brink of financial collapse when, in fact, the ideal candidate

for a § 524(g) injunction is a healthy business that is, and will remain, a viable operation that can maximize the trust's assets to pay claims.

38. In this case, the Plan Proponents set forth this Plan with the legitimate purpose of restructuring so that the Debtors can emerge from bankruptcy able to operate as a going concern and continuously fund the trust. This benefits the Debtors as well as future claimants and comports with the objectives and goals of § 524(g) of the Bankruptcy Code. Accordingly, the Court finds that the Plan was filed in good faith.

39. Additionally, in support of its argument for lack of good faith, North River cites to *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999)—in which the Third Circuit dismissed a bankruptcy case because it had been filed without a valid reorganizational purpose. However, this Court determines that the holding in *SGL* actually weighs in favor of a finding of good faith in the instant case. *SGL* did not involve a company facing comprehensive asbestos litigation. Nevertheless, the debtor in *SGL* attempted to rely on an asbestos bankruptcy case called *In re Johns-Manville* to demonstrate the necessity for—and good faith of—its bankruptcy filing. *See Matter of Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd sub nom. In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). The Third Circuit rejected that argument because it found *SGL* to be factually distinguishable from the *Johns-Manville* case. This is significant because the case presently before the Court is factually *similar* to *Johns-Manville*—which is the predecessor for modern-day asbestos bankruptcy cases. Specifically, the debtor in

*Johns-Manville* was also facing asbestos litigation and proposed a plan that included a procedure for dealing with the asbestos-related liability. The procedural mechanism set forth in *Johns-Manville* was eventually codified in § 524(g). *See In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 359 (3d Cir. 2012). Accordingly, North River's reliance on *SGL*—which is factually inapposite to both *Johns-Manville* and the instant case—is misplaced.

40. For the foregoing reasons, this Court determines that the Plan Proponents have satisfied the threshold good faith requirement.

**B. Standard for Confirmation**

41. In order to be confirmable, a chapter 11 plan of reorganization (whether consensual or nonconsensual) must satisfy specific requirements of the Bankruptcy Code. A nonconsensual chapter 11 plan requires the proponent to satisfy all but one of the enumerated elements of § 1129(a)— that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8)—plus the additional requirements of § 1129(b), including that the plan does not unfairly discriminate against dissenting classes and that the dissenting classes are treated fairly and equitably. The Plan Proponents have the burden of proving that they have satisfied the elements of §§ 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

42. With respect to the statutory requirements of § 1129(a), the Plan Proponents must demonstrate: (1) the plan's compliance with Bankruptcy Code, (2) the proponent's compliance with the Bankruptcy Code, (3) good faith proposal of plan, (4) disclosure

of payments, (5) identification of management, (6) regulatory approval of rate changes, if applicable, (7) satisfaction of the "best interest" test, requiring that each claim holder in impaired class accept plan or receive no less than would be received in chapter 7 liquidation, (8) acceptance of plan by each impaired class, (9) treatment of administrative and priority claims in accordance with statute, (10) acceptance by at least one impaired class of claimants, (11) feasibility of plan, (12) payment of bankruptcy fees, and (13) payment of retiree benefits. 11 U.S.C. §1129(a); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005).

**C. § 1129(a)(1) – Compliance with the Bankruptcy Code**

43. Section 1129(a)(1) of the Code requires a plan's compliance with the Bankruptcy Code. In this case, North River asserts that the Plan is violative of several Code provisions. The mainstay of North River's arguments is that the Plan misclassifies North River's future contribution claims for indemnity and defense costs in a class with all other asbestos personal injury claims, and also improperly discriminates against North River in its treatment of such claims in violation of § 1122(a) and § 1123(a)(3). For the reasons that follow, the Court finds that the classification and treatment of North River's claims under these provisions is appropriate.

**i) § 1122(a) – Proper Classification of Claims**

44. Under § 1122(a) of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class *only if* such claim or interest is *substantially similar* to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added). To determine

whether claims are "substantially similar" for purposes of § 1122(a) in the context of a § 524(g) channeling injunction, the Third Circuit stated that "the proper focus is on 'the legal character of the claims as it relates to the assets of the debtor.'" *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986)); *see also In re Congoleum Corp.*, 362 B.R. 198, 203 (Bankr. D.N.J. 2007) ("the foremost consideration in bankruptcy classification 'is the legal character of the claim as it relates to the assets of the debtor'" (quoting *AOV Indus*, 792 F.2d at 1150)). "Claims are similar if they have substantially similar rights to the debtor's assets." *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007). "The Bankruptcy Court has 'broad discretion' to decide if a plan satisfies that requirement, and we will uphold a plan's classification scheme so long as it is 'reasonable' and does not 'arbitrarily designate classes.'" *In re W.R. Grace*, 729 F.3d at 326 (quoting *In re Jersey City Med. Ctr.*, 817 F.3d 1055, 1061 (3d Cir. 1987)); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (holding that a plan's classification scheme will not be upheld if it is unreasonable or arbitrarily designates classes in a manner that "would not serve any legitimate purpose").

45. In the case presently before the Court, Class 7 of the Plan is titled "Channeled Asbestos Claims" and includes, in pertinent part, "any (a) Asbestos Personal Injury Claim, [or] (b) Indirect Trust Claim." Plan § 1.01(7). The Plan defines an "Asbestos Personal Injury Claim" as:

> any Claim . . . asserted against a Debtor, or for which a Debtor is liable, whether in the nature of or sounding in tort, ***contract***, warranty, or any other theory of law . . . arising by reason of, directly ***or indirectly***, . . . bodily, or other personal injury, death, or damages arising from personal injury or death (including any claim or demand for . . . ***reimbursement***, indemnity, ***contribution***, or subrogation), . . . caused or allegedly caused, in whole or in part, directly or indirectly, . . . by asbestos or asbestos-containing products [for which a Debtor is legally responsible].

Plan § 1.01(18) (emphasis added).

The Plan further defines an "Indirect Trust Claim" as:

> any Claim, now existing or hereafter arising, that is (a) held by a Non-Settling Asbestos Insurer . . . to the extent based on, arising out of, or attributable to an Asbestos Personal Injury Claim, and (b) on account of alleged liability of a Debtor for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay . . . on account of . . . personal injury . . . caused or allegedly caused . . . by asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by a Debtor.

Plan § 1.01(79).

46. The Plan Proponents contend that both the Asbestos Personal Injury Claims and North River's claims for reimbursement of post-petition defense expenses and pre- and post-petition indemnity expenses belong in Class 7. North River asserts that its post-petition defense costs do not meet the definitional requirements to be considered "Indirect Trust Claims" under the Plan and, therefore, are improperly classified in Class 7 in violation of § 1129(a). North River additionally argues that its reimbursement claims arise from their contractual relationship with Debtors and, thus, are not substantially similar to the Asbestos Personal Injury Claims, which are tort claims.

47. This Court is guided by the holding in *W.R. Grace* and determines that North River's claims are properly classified in Class 7 along with the personal injury tort claims. *See In re W.R. Grace & Co.*, 729 F.3d 311. North River's arguments to the contrary are unavailing and overlook the purpose of § 524(g), which "evinces an intent to include *all* potential asbestos-related liability of a debtor, regardless of when such liability arose." *Id.* at 322 (emphasis in original). As a practical matter, any claim that North River may have against the Debtors arises from the "same events as do all the other claims and demands covered by the channeling injunction, namely [the Debtor's] production of asbestos-containing materials." *Id.* North River's claims arise *indirectly* from bodily or personal injury resulting from exposure to asbestos or asbestos-containing products. This Court observes, as did the bankruptcy court in *W.R. Grace*, that "[b]oth indirect and direct claims under the Plan exhibit a similar effect on [the] bankruptcy estate—they seek recovery from the trust for actions related to [the Debtor's] asbestos liability." *In re W.R. Grace & Co.*, 475 B.R. 34, 110 (D. Del. 2012). It is unimportant whether North River's claims are for "damages" or "defense costs" or whether their claims are rooted in tort or contract law because the Debtor's liability for such claims depends solely on its asbestos-related activities. *See id.* at 326. The root element common to all Class 7 claims is asbestos; therefore, the Plan reasonably classified North River's claims in Class 7 together with direct personal injury claims. *See, e.g.*, *W.R. Grace*, 729 F.3d 311; *In re Armstrong World Indus., Inc.*, 348 B.R. 136,

160 (D. Del. 2006) (finding that a reasonable basis exists for the classification of asbestos claims together in a single class whether arising under tort law or contract).

**ii) Compliance with § 1123(a)**

**a. § 1123(a)(1)**

48. The Plan satisfies § 1123(a)(1) because it adequately and properly identifies and classifies all claims and interests. (*See* Plan art. III).

**b. § 1123(a)(2)**

49. Section 1123(a)(2) of the Bankruptcy Code requires that the Plan specify any class of claims or interests that are not impaired under the plan. The Plan identifies Classes 1, 2, 3, 4, 5, and 8 as being unimpaired. (*See* Plan art. III). Accordingly, the Plan satisfies § 1123(a)(2).

**c. § 1123(a)(3)**

50. The Plan complies with § 1123(a)(3) of the Bankruptcy Code, which requires that the Plan identify the treatment of each impaired class of claims and interests. The Plan identifies Class 6 (Prepetition Defense-Cost Contribution Claims), Class 7 (Channeled Asbestos Claims), Class 9 (Intercompany Claims), Class 10 (Related-Party Claims), Class 11 (Equity Interests in Duro Dyne National Corp.), and Class 12 (Equity Interests in the other Debtors), and sets forth the treatment of each such impaired class of claims or interests. (*See* Plan art. III).

**d. § 1123(a)(4) – Equal Treatment of Class 7 Claims**

51. Section 1123(a)(4) of the Code requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class. *See* 11 U.S.C. § 1123(a)(4). Indeed, the Supreme Court has said that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58, 110 S. Ct. 2258, 110 L.Ed.2d 46 (1990). Here, North River objects to confirmation alleging noncompliance with this provision and discriminatory treatment of its claims. For the reasons that follow, the Court overrules North River's objection and finds that the Plan satisfies § 1123(a)(4).

52. North River asserts that its Class 7 claims fare far worse under the Plan than other similarly situated creditors because its Class 7 claims are ineligible for any payment whatsoever. However, North River's objection overlooks that the Bankruptcy Code's equal treatment requirement does not mandate that class members receive the same type of benefit—in this case, a benefit in the form of monetary distributions—or even that all creditors in the class receive the same distribution percentage or payment at the same time intervals. Rather, equal treatment has been interpreted "to mean that all claimants in a class must have the same opportunity for recovery." *In re W.R. Grace & Co.*, 729 F.3d at 327. Thus, the fact that North River is ineligible for a cash distribution while other Class 7 creditors are eligible is not dispositive of this issue. The focus for purposes of equal treatment under § 1123 remains on whether North

River has an equal opportunity to recover value on their claims. Value comes in many different forms.

53. Here, it is undisputed that the Plan affords North River the opportunity to receive benefits in the form of Trust-Payment Credits and Judgment-Reduction Credits. Although these benefits are a different type of benefit and offer different value than other members of Class 7 might receive in that they are not cash payments, Trust-Payment Credits and Judgment-Reduction Credits are an undeniable benefit and serve as legitimate compensatory value for North River's claims. Thus, the Plan does not unfairly limit North River's opportunity for recovery, it merely distinguishes the type of recovery available to North River. In fact, depending on the factual circumstances, many other Class 7 claimants under the TDP will receive different types of compensation for their claims— including varying payment amounts depending on the particular disease at issue, payment at different time intervals, or no distributions at all — all in the discretion provided the trustee under the TDP adopted as part of the Plan. Indeed (as an example), claimants who seek recovery for punitive damages, personal property or less serious injuries will be channeled to the Trust as part of their Plan treatment in Class 7, but will not likely see any monetary distributions. These procedural variations, and specifically the differences in the form and nature of value provided to creditors for their claims, have a legitimate basis and do not produce a substantive difference in North River's opportunity to recover. Accordingly, the Court

rejects North River's argument regarding disparate treatment and finds that the Plan satisfies § 1123(a)(4).

54. Further, this Court notes that in considering equality of treatment among creditors, the Third Circuit instructs courts to "consider the bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted." *In re Combustion Eng'g, Inc.*, 391 F.3d at 241. "Courts are also in agreement that § 1123(a)(4) does not require precise equality, only approximate equality." *In re W.R. Grace & Co.*, 729 F.3d at 327 (quotations and citations omitted). As set forth above, North River is eligible to receive value for its claims in the form of Trust-Payment Credits and Judgment-Reduction Credits under the Plan. Although they are not cash distributions, these credits have undeniable value and nothing about the TDP unfairly restricts North River's ability to recover.

**e. § 1123(a)(5)**

55. Section 1123(a)(5) of the Bankruptcy Code requires that the Plan include adequate means for implementation. The Plan complies with § 1123(a)(5) by, among other things, providing for (a) the substantive consolidation and merger of the Debtors into the surviving Reorganized Debtor (Plan § 5.01); (b) appropriate amendment of the Debtors' organizational documents (Plan § 5.02); (c) the creation of the Asbestos Trust (Plan § 4.01); (d) the transfer and channeling of Channeled Asbestos Claims to the Asbestos Trust (Plan § 4.06); (e) the Debtors' transfer of the Asbestos Insurance Rights

to the Asbestos Trust (Plan § 4.07); and (f) the funding of, and vesting of assets in, the Asbestos Trust.

**f. § 1123(a)(6)**

56. Section 1123(a)(6) of the Bankruptcy Code requires a plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation to which the debtor transfers all or any part of the debtor's estate or with which the debtor has merged or consolidated, a provision prohibiting the issuance of non-voting equity securities. The Plan complies with § 1123(a)(6) in that it prohibits the issuance of nonvoting securities of the Reorganized Debtor.

**g. § 1123(a)(7)**

57. In compliance with § 1123(a)(7), the Plan contains provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the initial Asbestos Trustee and his successors, the initial Delaware Trustee and its successors, the Trust Advisory Committee (TAC), and the Legal Representative. The Asbestos Trust Agreement (at the signature page) and the Disclosure Statement (at page 37) identify Alan B. Rich as the Asbestos Trustee. The Disclosure Statement (at page 38) identifies the Delaware Trustee as Wilmington Trust, N.A. The initial members of the TAC are identified on the signature pages of the Asbestos Trust Agreement. In addition, the Disclosure Statement (at pages 9 and 47) identifies the persons who will serve as directors and officers of the Reorganized Debtor.

58. Finally, pursuant to the dictates of this Court's ruling, the TDP and asbestos Trust Agreement now provide the UST with notice and a direct opportunity to be heard with respect to all significant actions and decisions relative to the Asbestos Trust. *See* Section VIII(R), *infra*.

**h. § 1123(a)(8)**

59. Section 1123(a)(8) of the Bankruptcy Code is inapplicable because the Debtors are not individuals.

**iii) Compliance with § 1123(b)**

60. The Plan complies with the relevant and applicable sections of § 1123(b).

**a. § 1123(b)(2)**

61. Section 1123(b)(2) provides for assumption or rejection of executory contracts and unexpired leases. Article VIII of the Plan complies with the requirements of § 365 of the Bankruptcy Code and thus satisfies § 1123(b)(2).

**b. § 1123(b)(3)(A)**

62. Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan to provide for the settlement of any claim or interest belonging to the Debtors or their Estates. The Plan contemplates partial or complete settlement of the Asbestos Insurance Litigation and any related disputes. (*See* Plan § 1.01(13)). In addition, section 9.11 of the Plan provides for the settlement and release of certain Avoidance Actions and Estate Causes of Action in accordance with Fed. R. Bankr. P. 9019(a). The Court finds that the settlement and releases provided for in section 9.11 of the Plan represent a good-faith

compromise; are in the best interest of the Debtors, their Estates, and the holders of Claims and Equity Interests; are within the reasonable range of possible litigation outcomes; are fair and equitable; and are an essential element to the resolution of these Chapter 11 Cases in accordance with this Plan. (Podgainy Cert. ¶¶ 5-11, 54; Fitzpatrick Decl. ¶¶ 12-14, 22). Accordingly, the settlements and releases described in section 9.11 of the Plan are approved pursuant to Fed. R. Bankr. P. 9019(a) and § 105(a) of the Bankruptcy Code.

**iv) Fed. R. Bankr. P. 3016**

63. The Court finds that the Plan satisfies the requirements of Fed. R. Bankr. P. 3016. As required by Fed. R. Bankr. P. 3016(a), the Plan is dated and identifies the Plan Proponents. Next, the filing of the Disclosure Statement with the Court satisfies Fed. R. Bankr. P. 3016(b) in all the Chapter 11 Cases. The Disclosure Statement was approved as containing adequate information within the meaning of § 1125 of the Bankruptcy Code. (*See* Solicitation Procedures Order ¶ 4). The Plan was transmitted in accordance with the Solicitation Procedures Order, a reasonable time was given to holders of Class 6 and Class 7 claims to accept or reject the Plan, and the solicitation complied with § 1126(b) of the Bankruptcy Code. Finally, the Plan and Disclosure Statement satisfy Fed. R. Bankr. P. 3016(c) by identifying, in specific and conspicuous language, both the acts to be enjoined by the Asbestos Permanent Channeling Injunction and the other Injunctions contained in the Plan, and the entities that are

subject to the Asbestos Permanent Channeling Injunction and the other Injunctions contained in the Plan.

**v) § 524(g)**

64. The Court additionally finds—over North River's objections—that the Plan complies with the requirements of § 524(g). Section 524(g)(1)(A) authorizes a court to enter, in connection with confirmation of a plan of reorganization, an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment on account of asbestos-related claims or demands if the plan of reorganization establishes a trust to resolve and pay such claims. 11 U.S.C. § 524(g)(1)(A). Under § 524(g)(1)(B), the channeling injunction may enjoin any entity from "indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust." In this case, North River attempts to argue that its claims may not be enjoined because its claims are not the type of claim contemplated in § 524(g)(1)(B) because they are in the nature of defense costs and because North River says it's not being provided with any recovery whatsoever. However, as previously discussed, the Plan provides North River value for its claims in the form of Trust-Payment and Judgement-Reduction Credits. Also as discussed, the fact that a portion of North River's claims comes from defense costs does not disassociate those claims from the underlying root cause of *all* of the claims at issue in this case – namely, asbestos liability. Accordingly, the Plan is not overly broad as North River suggests and North Rivers claims are properly channeled to the Trust in

compliance with § 524(g)(1)(B). To be entitled to such an injunction, the trust must meet the structure and funding requirements of § 524(g)(2)(B)(i). For the reasons that follow, the proposed Trust satisfies those requirements.

**a. § 524(g)(2)(B)(i)(I)**

65. First, § 524(g)(2)(B)(i)(I) requires that an asbestos settlement trust assume the liabilities of a debtor that, as of the petition date, has been named as a defendant in actions to recover damages for asbestos-related claims. *Id.* § 524(g)(2)(B)(i)(I). The Trust meets this requirement because, on the Effective Date, the Trust will assume liability and responsibility for Channeled Asbestos Claims.

**b. § 524(g)(2)(B)(i)(II)**

66. Section 524(g)(2)(B)(i)(II) requires that an asbestos settlement trust "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." This is the portion of the statute which contemplates the "evergreen" source of funding for future asbestos claimants. With respect to this section, North River argues that the Plan Proponents have failed to demonstrate that the Trust is funded by securities of any sort. North River specifically emphasizes that the Trust will not be funded by future dividends as envisioned by the statute. However, § 4.08(d) of the Plan dictates that on the Effective Date, the Reorganized Debtor will issue and deliver the Trust Note to the Trust. The Trust Note will be a promissory note in the original principal amount of $13.5 million, payable in installments over roughly 20 years at an interest rate of 7.15%

per annum. Moreover, as the Plan Proponents point out, there is no mandatory requirement that dividends be used to fund the trust. Therefore, the Trust Note constitutes an "obligation . . . to make to make future payments," and satisfies § 524(g)(2)(B)(i)(II).

**c. § 524(g)(2)(B)(i)(III)**

67. Section 524(g)(2)(B)(i)(III) requires that an asbestos settlement trust have the ability to own, if specified contingencies occur, "a majority of the voting shares of—(aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor." North River asserts that the Plan violates this provision because no realistic possibility exists of the Trust owning a majority of the voting shares. Pursuant to the Plan, the Trust will receive a pledge of, and possessory security interest in, 50.1% of the Reorganized Debtor's voting stock and 50.1% of the voting stock of Duro Dyne Canada. Under the Pledge and Security Agreement, which the Reorganized Debtor will execute and deliver on the Effective Date, the Trust will be entitled to own the pledged shares if an "Event of Default" occurs. North River asserts that the note-default provision is insufficient and cites to *Congoleum Corp* and the *Plant Insulation* case out of the Ninth Circuit in support of this position. However, this Court notes that since the decision in *Congoleum*, at least one other case in this Circuit, *Burns & Roe*, approved a Plan which pledged to the trust 51% of stock in the event of a default.

68. Moreover, North River's argument requires an assumption that the shares become worthless in the event of a default—or at least that the shares' value will drop to a negligible amount. This Court is unwilling to make that leap and declines to conclude that a default on trust payment means that the Debtor-companies are insolvent and their shares worthless. The Court must point out that North River previously argued that the Debtor-companies were too healthy for chapter 11 bankruptcy at all (*see supra* section VIII (A) addressing the threshold issue of good faith), but now in the context of § 524(g)(2)(B)(i)(III) asks the Court to predetermine that the companies are so unstable that their stock becomes worthless in the event of a default. These positions are untenable.

69. Further, this Court questions what benefit ownership of the stock in advance of a default would confer. As noted by the courts in *Congoleum* and *Plant Insulation* (the cases cited by North River), the purpose of this section is to ensure that the reorganized debtor continues to operate for the benefit of asbestos claimants. If a debtor is making payments on the note, then the trust is funded and there is no basis for concern. Even if the trust were to have ownership of the shares, it would not take any action with respect to those shares while payments are being made because the goal of § 524(g) are being met. It is only when payments to the trust stop that the reorganized debtor is no longer operating for the benefit of the asbestos claimants. Thus, a transfer of control upon default does not appear to impair the rights of the trust and future asbestos claimants or otherwise place them at a disadvantage.

70. The Court further takes this opportunity to distinguish the facts of this case from those of the *Congoleum* case. In *Congoleum*, the payment obligations consisted of semiannual payments in the amount of approximately $121,500 and it was not a 100% dividend case—meaning that the creditors' claims in *Congoleum* were not being paid in full. The *Congoleum* court viewed the payment obligations to be so insubstantial and nominal that if a default occurred, it would essentially mean that the company was insolvent and there would be little value in the stock. *See In re Congoleum Corp.*, 362 B.R. at 179. Indeed, the *Congoleum* decision references deposition testimony from the company's CFO in which he acknowledged that if Congoleum couldn't make the $121,500 semiannual payment when it became due, then it was likely that the stock was valueless. *See id*. That is not the situation presented here. In this case, the payment obligations are substantially greater than in *Congoleum*. As stated above, the Plan provides for payment of a $13.5 million Note, payable in installments over roughly 20 years, at an interest rate of 7.15% per annum. This Plan also provides for 100% distribution—meaning that, unlike *Congoleum*, the claims in this case will be paid in full.

71. This Court agrees with the court in *Congoleum* that, if a debtor defaults because it cannot make a meaningless payment, then the stock may well be deemed worthless. However, a default in payments where there are demanding payment obligations does not necessarily mean that the debtor is insolvent, nor that the stock is worthless. Those are two completely different fact scenarios. The court in *Congoleum* recognized as

much when distinguishing its case from other cited cases. *See In re Congoleum Corp.*, 362 B.R. at 178 (citing *In re ABB Lummus Global Inc.*, 2006 WL 2052409 (Bankr. D. Del. 2006) and noting that *Lummus* was "an inapt comparison" to *Congoleum* because the *Lummus* case involved substantial trust contribution payments and allowed for all creditors to be paid in full).

72. Finally, the Court notes that the Plan in this case provides for a number of circumstances other than a payment default in which the Trust could exercise its rights to the voting stock. For all of these reasons, this Court determines that the Plan satisfies § 524(g)(2)(B)(i)(III).

**d. § 524(g)(2)(B)(i)(IV)**

73. The last subsection of § 524(g)(B)(i), subsection (IV), requires an asbestos settlement trust "to use its assets or income to pay claims and demands." 11 U.S.C. §524(g)(B)(i)(IV). The Plan satisfies this requirement because, on the Effective Date, the Trust will assume liability and responsibility for Channeled Asbestos Claims and will use its assets to resolve and, if eligible, pay those Channeled Asbestos Claims in accordance with the Plan, the Confirmation Order, the Asbestos Trust Agreement, and the TDP.

**vi) § 524(g)(2)(B)(ii)**

74. As to § 524(g)(2)(B)(ii), this section requires courts to make certain factual findings to support the issuance of a § 524(g) injunction. In this case, the Debtors' history as defendants in the tort system, the nature of asbestos litigation, and the facts of these

chapter 11 Cases support the findings required for the issuance of the Asbestos Permanent Channeling Injunction under § 524(g):

**a. § 524(g)(2)(B)(ii)(I)**

75. First, this Court finds pursuant to § 524(g)(2)(B)(ii)(I) that, without the protection of § 524(g), the Debtors will be subject to substantial asbestos-related demands in the future.

**b. § 524(g)(2)(B)(ii)(II)**

76. Section 524(g)(2)(B)(ii)(II) requires a court to find that "the actual amounts, numbers, and timing of such future demands cannot be determined." 11 U.S.C. §524(g)(2)(B)(ii)(II). Due to the long latency period for asbestos-induced diseases and the substantial number of asbestos personal-injury lawsuits that had been asserted in the past and remained unresolved on the Petition Date, the actual number and amounts of future Demands, and the timing of assertion of such Demands, cannot be determined by the Debtors or their advisors with precise specificity. This finding is supported by statements made in Mr. Fitzpatrick's Declaration. Accordingly, §524(g)(2)(B)(ii)(II) of the Bankruptcy Code is satisfied.

**c. § 524(g)(2)(B)(ii)(III)**

77. Section 524(g)(2)(B)(ii)(III) requires a finding that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands." North River contends that the Court has insufficient evidence to make a determination on this issue. Specifically, North River

alleges that the Plan Proponents did not conduct an analysis of the future claims against the Debtors, nor did they consider the insurance available to the Debtors or the Debtors' projected net income in considering how asbestos creditors would be treated outside of the Plan. Contrary to North River's arguments, evidence on this subject was, in fact, produced through the declaration of Mr. Fitzpatrick. As the Plan Proponents point out, Mr. Fitzpatrick has more than 30 years' experience dealing with asbestos claims. In his declaration, he indicated that without the creation of the trust, claim holders would be forced to litigate their claims in the tort system as they arise. This would devolve into a race to the courthouse and result in the consumption of resources by those claimants who are first to file suit – leaving little or nothing for future claimants. Thus, Mr. Fitzpatrick certified that the equitable treatment of both present and future claim holders depends on all claimants being subject to the same rules and procedures as provided under the TDP. This Court affords Mr. Fitzpatrick's informed opinion considerable weight and concludes that this evidence supports the finding required under § 524(g)(2)(B)(ii)(III).

**d. § 524(g)(2)(B)(ii)(IV)**

78. Section 524(g)(2)(B)(ii)(IV) requires a court to find that, as part of the confirmation process, the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the related disclosure statement. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa). In addition, a court must find that "a separate class or classes of the claimants whose claims are to be

addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan." *Id.* § 524(g)(2)(B)(ii)(IV)(bb). As part of the confirmation process here, the Plan Proponents included the terms of the Asbestos Permanent Channeling Injunction, including provisions barring actions against third parties (including Protected Parties) in conspicuous language in both the Plan and the Disclosure Statement. (Plan §§ 9.05–9.07; Disclosure Statement at 57–60). The Plan Proponents designated in Class 7 a separate class of Channeled Asbestos Claims that are to be addressed by the Trust and subject to the Asbestos Permanent Channeling Injunction. (Plan § 3.03(g)). More than 75% of the Class 7 creditors who voted on the Plan voted in favor of the Plan.

**e. § 524(g)(2)(B)(ii)(V)**

79. Finally, § 524(g)(2)(B)(ii)(V) requires a court to find that

> the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

80. In this case, North River asserts that the Plan fails to satisfy this provision for the same reasons that it argues its claims are improperly discriminated against in violation of § 1123(a)(4). As discussed, this Court overruled North River's allegations of discrimination and determined that the Plan was in compliance with §1123(a)(4). For substantially the same reasons this Court rejects North River's objections under §

524(g)(2)(B)(ii)(V). This provision requires reasonable assurance that the Trust will be "*in a financial position*" to pay present claims and future demands in substantially the same manner. And, as to North River, the Trust will "value" claims and demands in substantially the same manner because the dollar amount of the Trust-Payment Credits will be tied directly to the dollar amount of the Trust distributions awarded to claimants who choose to litigate their claims in the tort system. This determination finds further support in Mr. Fitzpatrick's declaration.

81. The United States Trustee ("UST") also objects to the Plan under § 524(g)(2)(B)(ii) and argues that the Plan Proponents have not established reasonable assurance that the Trust will be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner. Specifically, the UST takes issue with the fact that the TDP does not provide any mechanism for clawback of payments if initial payments are too high. Without the ability to take back payments, the UST asserts that future claimants are left unprotected against fraudulent or invalid claims and, as a result, may not be paid in substantially the same manner as earlier-submitted claims. Given the volume of payments and relatively small payment amounts, a "clawback" mechanism would be costly, impractical, and burdensome on the Trust, and would possibly expose victims and families to further unnecessary financial challenges. In its submissions and throughout the course of these proceedings, it has become evident to the Court that the UST's primary objection to the Plan is rooted in its concern that the TDP lacks safeguards to prevent fraud and

abuse and, in some provisions, facilitates fraud and abuse. The Court will address this concern—which encompasses the UST's argument under § 524(g)(2)(B)(ii)(V)—in due course. *See* Section VIII(R), *infra*.

**vii) § 524(g)(4)**

**a. § 524(g)(4)(A)(ii)**

82. Section § 524(g)(4)(A)(ii) provides that a channeling injunction entered in accordance with § 524(g)

> may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—
>
> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; or
>
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . . .

83. Consistent with that section, the Plan contemplates that, in addition to protecting the Debtors and the Reorganized Debtor, the Asbestos Permanent Channeling Injunction will be extended to protect each Protected Party, as defined in the Plan. Each Protected Party is identifiable from the terms of the Plan by name or as part of an identifiable

group. (Plan § 1.01(102) (defining "Protected Parties")). Accordingly, the Court authorizes and approves the application of the Asbestos Permanent Channeling Injunction to protect all Protected Parties from liability for any Channeled Asbestos Claims, including future Demands, in accordance with the terms and conditions of the Plan.

**b. § 524(g)(4)(B)(i)**

84. In accordance with § 524(g)(4)(B)(i), this Court has appointed a Legal Representative—Mr. Fitzpatrick—as part of the proceedings leading to the issuance of the Asbestos Permanent Channeling Injunction for the purpose of, among other things, protecting the rights of persons who might subsequently assert future Demands of the kind that are addressed in the Asbestos Permanent Channeling Injunction and transferred to the Asbestos Trust. This Court has previously determined, and reiterates now, that Mr. Fitzpatrick is knowledgeable about the asbestos liabilities of the Debtors, the procedures that will govern the Trust, and matters that remain to be done on behalf of the future claimants with respect to establishment of the Trust. Mr. Fitzpatrick's continued service as the Legal Representative will benefit the future claimants in the form of providing them an experienced and knowledgeable fiduciary to represent their interests and to counter the experienced professionals of the Trust Advisory Committee representing the current claimants.

**c. § 524(g)(4)(B)(ii)**

85. Section 524(g)(4)(B)(ii) requires a court to determine that entry of the channeling injunction, and the protection from liability of the third parties named therein, "is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to [the] trust on behalf of such debtor or debtors or such third party." 11 U.S.C. § 524(g)(4)(B)(ii). Here, North River argues that the Plan is not "fair and equitable" because of the disparity in the Debtors' projected income and their contribution to the Trust. North River also asserts that the Plan is not "fair and equitable" because it seeks to eliminate the Debtors' share of future defense costs and provide more favorable treatment to asbestos claimants by shifting liability to North River.

86. As an initial matter, North River is not a future asbestos claimant whose interest must be taken into account under § 524(g)'s "fair and equitable" standard. The "demand" holder contemplated in § 524(g)(4)(B)(ii) is an unknown and unknowing entity—meaning that it is someone who has not yet manifested an asbestos-induced disease and is therefore unknown to, and cannot be ascertained by, the debtor; and also that because he/she has not manifested disease symptoms, he/she does not have the information necessary to protect his or her interests in a bankruptcy case. However, North River is a known party with contingent, unliquidated and disputed claims. Unlike the demand holders, North River has appeared through its own counsel and was able to take steps

to protect its interests. Therefore, North River's interests are not relevant to the "fair and equitable" standard under § 524(g).

87. Additionally, there is insufficient foundation for North River's projections regarding the Debtors' future income and therefore the Court declines to give any evidentiary weight to North River's projection that the Debtor-companies will have "at least $100 million in net income." The Court is instead persuaded by the Plan Proponents' illustrative cash-flow projection of $23 million (present value). When that figure is added to the $3 million Hinden Contribution, the total would be $26 million, which matches the total contributions to be made by the Debtors and the Hindens (in addition to the interest to be paid under the Trust Note).

88. In its final objection under this sub-section, North River revives its argument that the Plan was designed to "put leverage" on insurers and otherwise give the Debtors a tactical advantage. For the same reasons discussed in this Court's rulings regarding good faith and equal treatment of creditors (*see* sections VIII(E) *infra* and VIII(C)(ii)(d) *supra*), the Court rejects North River's objections as it has attempted to apply them under § 524(g).

**viii) § 363 – Adequate Protection**

89. North River also argues that the Plan does not provide adequate protection of North River's alleged interests in the insurance policies that the Settling Asbestos Insurers are buying back under § 363 as part of their settlements with the Debtors. However, as the Plan Proponents point out, North River is not a lien creditor; instead, it is an unsecured

creditor (to the extent of any allowed claim), and courts uniformly hold that unsecured creditors are not eligible for adequate protection. North River simply does not hold any *interest* that is entitled to adequate protection under the Bankruptcy Code. Importantly, North River does not hold any interest in the insurance policies that the Settling Asbestos Insurers will buy back under their settlements with the Debtors. North River's contribution claims against the Settling Asbestos Insurers, whether they are for indemnity or defense costs, arise as a matter of equity. They do not involve property of the estate and will not erode limits on those policies.

90. In support of its position, North River cites to an adversary proceeding: *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988). However, North River's reliance on this case is misplaced. North River—as a provider of asbestos-related insurance to the Debtors—is not similarly situated to the plaintiff in the *Manville* case—who alleged it was a coinsured entity with rights to, and an interest in, the debtor's insurance coverage. Thus, North River cannot use the *Manville* case to argue that it has an interest in the policies of the settling insurers or that it is entitled to adequate protection under § 363(e).

91. Moreover, the statutory basis for enjoining North River's contribution claims against the Settling Asbestos Insurers is § 524(g), not § 363(f). North River's contribution claims against the Settling Asbestos Insurers, which fall within the Plan's definition of "Asbestos Insurance Policy Claims," will be enjoined by the Settling Asbestos Insurer Injunction, to be issued in accordance with § 524(g), and supplemented by §105(a).

Under § 524(g), a court may enjoin "*any* action directed against" an identifiable third party, such as a settling insurer, who "is alleged to be . . . ind*irectly liable* for the conduct of, *claims against, or demands on the debtor* to the extent such alleged liability . . . arises *by reason of* . . . the *third party's provision of insurance* to the debtor . . . ." 11 U.S.C. § 524(g)(4)(A)(ii)(II) & (III) (emphasis added). As previously discussed, North River's contribution claims arise by reason of the Settling Asbestos Insurers' provision of insurance to the Debtors. Accordingly, North River's arguments based on § 363 are irrelevant and unavailing.

92. In sum, North River's contribution claims against the Settling Asbestos Insurers will be enjoined under § 524(g)—not § 105—by the Settling Asbestos Insurer Injunction. The Settling Asbestos Insurer Injunction properly enjoins North River's contribution claims against the Settling Asbestos Insurers because those claims fall within one of the "by reason of" categories in § 524(g)(4)(A)(ii) and are thus derivative of the Debtors' asbestos liabilities. North River's reliance on the *Combustion Engineering* and *Johns-Manville* cases to support its "discharge" argument is misplaced. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190; *Johns-Manville Corp.*, 843 F.2d 636. Those cases involved § 105 injunctions that shielded nondebtors from their own independent asbestos liabilities, not liabilities that were derivative of the debtors' asbestos torts and enjoined under § 524(g).

93. North River asks this Court to find, in the alternative, that, if North River does not have "interests" warranting adequate protection, then this Court lacks jurisdiction to enjoin

North River's contribution claims against the Settling Asbestos Insurers. As previously discussed, North River's argument presumes that the Plan Proponents are seeking relief solely under § 363 or § 105, and therefore overlooks the Settling Asbestos Insurer Injunction to be issued under § 524(g).

94. Finally, the Court notes that without the § 524(g) injunction, there would be no settlement with the Settling Asbestos Insurers. If the Settling Asbestos Insurers do not contribute to the funding of the Trust, then the asbestos personal injury victims suffer—which is contrary to the underlying purposes of § 524(g).

**D. § 1129(a)(2)**

95. The Plan satisfies § 1129(a)(2) of the Bankruptcy Code, which requires that the Plan Proponents comply with all applicable provisions of the Bankruptcy Code, including §1125. The Plan Proponents have satisfied this requirement. The Disclosure Statement distributed to creditors contained adequate information about the Plan. (*See* Solicitation Procedures Order). The mailing and publication of notice of the Disclosure Statement and Plan provided adequate notice of the Disclosure and Plan to creditors entitled to vote as required by Bankruptcy Rules 2002 and 3017. The voting procedures utilized by the Plan Proponents and approved by the Bankruptcy Court in the Solicitation Procedures Order satisfy all requirements of the Bankruptcy Code and Bankruptcy Rules, including §§ 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 2002, 3017, and 3018. The solicitation of votes was conducted in

accordance with procedures approved by the Bankruptcy Court. (Podgainy Cert. ¶¶ 46-50, 63, 83).

**E. § 1129(a)(3) – Statutory Good Faith**

96. Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Combustion Eng'g*, 391 F.3d at 246–47 (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 241 (3d Cir. 2000)); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986).

97. Furthermore, a plan must be fundamentally fair, which requires that "the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re AC and S, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (citation omitted); *see also In re New Valley Corp.*, 168 B.R. 73, 80–81(Bankr. D.N.J. 1994) ("A further refinement of the test for whether a plan is proposed in good faith is found in the notion that the plan must provide for fundamental fairness in dealing with creditors." (citation omitted)). The good faith requirement also applies to the classification and treatment of classes of claims. *Combustion Eng'g*, 391 F.3d at 246 (collecting cases); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[10][a], at 1129–51 (Richard Levin & Henry J. Sommer eds., 16th ed.) (noting that "better-reasoned cases

. . . treat claims of improper classification" in the form of "attempts to manufacture artificially, or to gerrymander, classes to obtain an accepting impaired non-insider class" as "raising questions of good faith").

98. The Plan Proponents bear the burden of establishing good faith and fundamental fairness. *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000) ("The proponent bears the burden of establishing the plan's compliance with each of [the] requirements [of § 1129(a)]."); *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000) (debtor bears the burden of establishing "good faith" and fundamental fairness), aff'd, 336 F.3d 864 (9th Cir. 2003). In determining whether the Plan Proponents have satisfied this burden, the Court must examine "the totality of the circumstances surrounding the confection of the plan." *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also Combustion Eng'g*, 391 F.3d at 242 n.55 ("Only after analyzing the totality of circumstances surrounding a reorganization plan can the court exercise the informed, independent judgment which is an essential prerequisite for the confirmation of a plan." (citation omitted)). "If the good faith of a debtor's proposed Chapter 11 plan is contested, then the debtor bears the burden of proof on the issue, and the standard of proof is the preponderance of the evidence standard." *In re W.R. Grace & Co.*, 475 B.R. 34, 89 n.42 (D. Del. 2012) (citations and quotations omitted).

99. In this case, North River asserts that the Plan does not satisfy the good faith requirement of § 1129(a)(3) because it is an attempt by the Debtors to manipulate votes and classes.

These arguments implicate and are inextricably intertwined with North River's other objections—namely, that Plan is violative of § 1122 and § 1123 because it improperly classifies and discriminates against North River's claims. As previously discussed, the Court finds that the classification and treatment of North River's claims under the Plan is appropriate. For substantially the same reasons, the Court determines that the Plan satisfies the good faith requirement of § 1129(a)(3).

100. Additionally, North River argues that the Plan was not filed in good faith because it alleges that the Debtors seek to evade review of their Plan by altering the definition of "substantial consummation" set forth in § 1102(2). North River explains that nothing in the Plan indicates that distributions will commence on the Effective Date; therefore, the Plan cannot be deemed substantially consummated at that time. Further, North River contends that the Plan improperly accelerates substantial confirmation.

101. As an initial matter, the argument that the Plan Proponents have sought to evade judicial review is without merit. This Court has carefully reviewed the Plan and issues these proposed findings of fact and conclusions of law to the district court—at which point North River will have the opportunity to again present its objections to the Plan to the district court, which will conduct its de novo review. Furthermore, in the event the Plan is confirmed over North River's objections, North River will have the opportunity to appeal to the Third Circuit—a strategic move to which it has alluded several times.

102. Finally, this Court notes that § 13.05 of the Plan serves to clarify that the point of "substantial consummation" for purposes of modifying the Plan under § 1127(b), will be the Effective Date and this Court further has required that the Plan Proponents must file on the docket a certification that all of the requirements under 11 U.S.C. § 1102(2) have been satisfied in order for the Plan to be deemed "substantially consummated." North River is in no way constrained from presenting its objections to confirmation to the district court, filing an appeal before the Third Circuit in the event of confirmation, or seeking a stay to preserve its appeal.

**F. § 1129(a)(4)**

103. Section 1129(a)(4) of the Bankruptcy Code provides that payments to be made to professionals for costs and expenses must be approved by the Bankruptcy Court. The Plan complies with this requirement in section 2.01, which sets a bar date for Administrative Claims and Professional Claims. The Plan further provides for payment of Allowed Administrative Claims in accordance with the terms and subject to any conditions of any agreements governing, instruments evidencing, or other documents relating to transactions in the ordinary course of business. (Plan §2.01(a)). All payments made or to be made by the Debtors or Reorganized Debtor, for services or for costs and expenses in connection with the Chapter 11 Cases or the Plan, thus have been approved by or are subject to approval by the Bankruptcy Court.

**G. § 1129(a)(5)**

104. The Plan complies with § 1129(a)(5 because the Debtors have disclosed in the Disclosure Statement the identities and affiliations of the individuals who will act as a director or officer of the Debtors and the Reorganized Debtor after Confirmation. (*See* Disclosure Statement at 9, 47). The identities of the individuals proposed to serve, after Confirmation, as directors, officers, or managers of the Reorganized Debtor are disclosed in the Disclosure Statement, and the appointment to, or continuance in, such offices of such individuals, is consistent with the interests of creditors, equity security holders, and public policy. In addition, the name of the initial Asbestos Trustee, Alan B. Rich, is disclosed in the signature pages of the Asbestos Trust Agreement, as are the names of each member of the TAC and the Legal Representative. (See also Disclosure Statement at 37–38; Podgainy Cert. ¶ 66).

**H. § 1129(a)(6)**

105. Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any change in rates over which a governmental regulatory commission has jurisdiction. (Podgainy Cert. ¶ 67).

**I. § 1129(a)(7) – the "Best Interests of Creditors" Test**

106. The Court also overrules North River's objections based on § 1129(a)(7). Section 1129(a)(7) requires that those in possession of a claim or interest in an impaired class

> receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(ii). This is commonly known as the "best interests of creditors" test. In this case, North River argues that the proposed plan fails this test because the Plan does not propose to pay North River anything, whereas North River could possibly receive a distribution in a chapter 7 liquidation. North River cites Mr. Podgainy's testimony in support of its argument. On direct examination, Mr. Podgainy admitted that he could not testify as to whether the proposed plan satisfied § 1129(a)(7). On cross examination Mr. Podgainy further testified that North River might indeed receive a distribution in a chapter 7 liquidation. Therefore, North River posits that the possibility of distribution in a chapter 7 is more valuable than nothing, and the Plan cannot be confirmed.

107. As an initial matter, North River's argument ignores the fact it will receive full payment of its allowed Class 6 claims and that it will receive value for its Class 7 claims in the form of Trust-Payment Credits and the Judgment-Reduction Credits. Again, North River improperly conflates payment with value. The Code does not entitle creditors to cash distributions—it merely requires that creditors receive value for their claims.

108. Moreover, a firm liquidation analysis is an illusory proposition at this juncture. North River's asserted claims could not have been calculated by Mr. Podgainy because they are disputed and unliquidated, and the coverage lawsuit remains pending in New York state court. Even assuming that North River is successful in the coverage action, the extent and amount of North River's chapter 7 claims would depend in large part on

North River's defense and indemnity costs and, thus, are too variable to calculate. North River further ignores the potential substantial costs and work facing a chapter 7 trustee and professionals in both addressing and fixing the deluge of future asbestos claims which would be filed in a chapter 7, as well as the costs of continued insurance coverage litigation. Any suggestions that there would be a meaningful distribution, exceeding the value provided creditors under this Plan, amounts to little more than unsupported speculation or whimsy.

109. North River also asks this Court to consider creditor's rights against third parties. Specifically, North River contends that the Plan enjoins it from receiving the full value of third-party claims against non-debtors; whereas it would retain those rights in a chapter 7 proceeding. North River cites to *In re Quigley Co., Inc.*, 437 B.R. 102, 118 (Bankr. S.D.N.Y. 2010), in which a New York bankruptcy court found that a plan failed the best interests of creditors test because dissenting claimants would not receive the full value of their third-party claims against the debtor's parent company. However, the *Quigley* case is factually distinguishable from the case sub judice. There, the objecting parties were asbestos claimants—not non-settling insurers as in this case. In addition to the difference between the type of claimholder, the values of the derivative claims at issue in *Quigley* were more easily estimated and predictable based on historical payments made by the parent company. As just discussed, the insurers' claims amounts are highly contingent and speculative in this case. Even setting the factual differences aside, this Court notes that *Quigley* is an out-of-Circuit decision and

is not binding. This Court finds that the more persuasive case law limits the best interests analysis to the dividend that a creditor would receive from the chapter 7 trustee only—and not from third-party non-debtors. *See e.g., Plant Insulation*, 469 B.R. at 887; *In re Dow Corning Corp.*, 237 B.R. 380, 411-12 (Bankr. E.D. Mich. 1999); *accord In re W.R. Grace & Co.*, 475 B.R. at 149.

110. For the foregoing reasons, the Court determines that the Plan satisfies the best interests of creditors test articulated in § 1129(a)(7).

**J. § 1129(a)(8)**

111. Class 7 voted to accept the Plan, but Class 6 voted to reject the Plan. (Podgainy Cert. ¶¶ 48-49; Tabulation Report). Nevertheless, this Court may still confirm the Plan because at least one class of impaired noninsider claims (Class 7) has voted to accept the Plan, and the Plan satisfies the cramdown requirements with respect to Class 6 under § 1129(b). *See* section VIII(O), *infra*.

**K. § 1129(a)(9)**

112. The Plan's treatment of Claims of the type specified in §§ 507(a)(2) through (a)(8) of the Bankruptcy Code, if any, complies with § 1129(a)(9) of the Bankruptcy Code. (Plan §§ 2.01, 2.02, 3.03(a)). The Plan is sufficiently funded to pay all administrative and priority claims, and all priority claims will be treated as required under § 1129(a)(9) of the Bankruptcy Code. (Podgainy Cert. ¶¶ 15-21).

**L. § 1129(a)(10)**

113. The Plan satisfies § 1129(a)(10) because at least one impaired class of claims (Class 7) has voted to accept the Plan. (Podgainy Cert. ¶¶ 49, 73; Tabulation Report).

**M. § 1129(a)(11)**

114. Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that confirmation of the Plan "is not likely to be followed by the liquidation, or the need for further reorganization" of the Debtors. 11 U.S.C. § 1129(a)(11). Courts have interpreted § 1129(a)(11) to mean that a debtor need only demonstrate a reasonable assurance of commercial viability. See, e.g., *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d. Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

115. Courts consider a series of factors in determining whether a debtor's plan is feasible under § 1129(a)(11). These factors, while varying from case to case, traditionally include: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984). The United States Trustee asserts that the Plan does not satisfy the §1129(a)(11) factors. This Court disagrees and, for the reasons set forth below, determines that the Plan is feasible.

116. First, the Debtors' board and current management have demonstrated their effectiveness through the successful operation of the Debtors for many years. These key members of the board and the management team intend to stay on post-Confirmation. (Disclosure Statement at 9, 47).

117. The Debtors' financial advisor, Getzler Henrich, prepared revised long-term and short-term cash flow projections of the Debtors' expected financial performance for fiscal years 2019 through 2024 (together, "Projections"). (Podgainy Cert., Exs. A & D). The Projections indicate that the Reorganized Debtor will generate sufficient cash flow to service and pay its debt obligations and fund its operations. The Debtors estimate that as of the Plan's Effective Date, the approximate amount of cash on hand will be $2.48 million. (Podgainy Cert., Ex. A). In addition, on or before the Plan's Effective Date, the Debtors will close on the Senior Lending Facility with Bank of America whereby Bank of America will extend a line of credit to the Reorganized Debtor in the aggregate sum of $9,950,000 to fund distributions under the Plan and the post-Effective Date working capital needs. (Podgainy Cert. ¶ 44). By the end of 2020, it is projected that the Reorganized Debtor will have fully repaid the Senior Lending Facility. (Podgainy Cert., Ex. D).

118. The Projections show that the Debtors will not only have sufficient cash to meet all of their obligations under the Plan, but they are also projected to have a positive cash flow and net income for each of the projected years. (Podgainy Cert., Exs. A & D). Moreover, other evidence adduced at the Confirmation Hearing, including Mr.

Podgainy's testimony, support the Court's conclusion that the Reorganized Debtors will be able to effectuate the Plan. (Podgainy Cert., Ex. E). Mr. Podgainy also concluded the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors not contemplated in the Plan. (Podgainy Cert. ¶¶ 45, 74; Hr'g Tr. 57–64, Mar. 6, 2019 (Podgainy Testimony)).

119. In addition to the foregoing, the Hinden Family Members and the Hinden Family Entities have already paid in their $3 million contribution, and the contribution is currently held in a segregated bank account by the Debtors, pending Confirmation and Consummation of the Plan. (Exs. P-5 & P-6).

120. As reflected in the Projections and based on the available cash on hand, the proceeds from the Senior Lending Facility, and cash flow from operations, the Reorganized Debtor will have sufficient funds available to pay all obligations due under the Plan and to operate its business after the Effective Date. (Podgainy Cert. ¶¶ 43-45, Exs. A & D).

121. Section 1129(a)(11) does not require a guarantee of a plan's success; rather the proper standard is whether the plan offers a "reasonable assurance" of success. *See Johns-Manville Corp.*, 843 F.2d at 649; *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994) (noting that, to establish feasibility, "a [plan] proponent must demonstrate that its plan offers a 'reasonable prospect of success' and is workable"). Based on Mr. Podgainy's certification and testimony, and the evidence adduced at the Confirmation Hearing, the Court finds and concludes that Confirmation

of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereof. The Court has no concern that the Senior Lending Facility will not close after Confirmation. The Senior Lending Facility was approved by Bank of America's credit committee and there is no reason to suspect that the approval will not be extended if necessary. The testimony of Mr. Podgainy confirms that the Debtors have the financial wherewithal to make all other Plan payments and to fund operations on an ongoing basis. The Debtors will be in a position to consummate the Plan and to meet all of their obligations under the Plan. Accordingly, the Plan is feasible and satisfies § 1129(a)(11).

**N. Remaining Subsections of § 1129(a): § 1129(a)(12) – (16)**

122. Section 1129(a)(12) of the Bankruptcy Code is satisfied because the fees payable under 28 U.S.C. § 1930 have been paid or will be paid under the Plan (Plan § 2.03; Podgainy Cert. ¶ 75). Section 3.03(c) of the Plan provides for the Reorganized Debtor to continue making payments to retiree benefit plans, funds, or programs, including Allowed Withdrawal Liability Claims, as defined in § 1114 of the Bankruptcy Code. Accordingly, the Plan complies with § 1129(a)(13) of the Bankruptcy Code. (Podgainy Cert. ¶ 76). Section 1129(a)(14) of the Bankruptcy Code is inapplicable because the Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Section 1129(a)(15) is inapplicable because the Debtors are not individuals. Section 1129(a)(16) of the Bankruptcy Code is inapplicable

because the Plan provides for no transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. (Podgainy Cert. ¶ 79).

**O. § 1129(b)**

123. As previously noted, Class 7 voted to accept the Plan, but Class 6 voted to reject the Plan. (Podgainy Cert. ¶¶ 48-49; Tabulation Report). Nevertheless, the Court may still confirm the Plan because at least one class of impaired noninsider claims (Class 7) has voted to accept the Plan, and the Plan satisfies the cramdown requirements with respect to Class 6 under § 1129(b).

**i) Absolute Priority Rule**

124. In order for shareholders to retain their shares or equity interests, a plan must provide that each creditor in the class of unsecured claims "receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. § 1129(b)(2)(B)(i). North River contends that the Plan is not fair and equitable as required by § 1129(b) because it fails to satisfy the absolute priority rule with respect to its Class 6 claims. Specifically, North River complains that the shareholders of Duro Dyne National (the Reorganized Debtor on and after the Effective Date) will be retaining their equity interests in that entity. (Jt. Obj. at 11). However, this argument fails because, under the Plan, Allowed Class 6 claims will be paid in full, albeit over time with interest in effect as of the Petition Date. (Plan § 3.03(f)(ii)). This Court finds that the interest rate fixed by the Court and now

proposed by the Plan Proponents is sufficient to compensate North River for the present value of its claims.

125. In determining whether the interest rate set forth in the Plan is appropriate, this Court is guided by the Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). In that case, the Supreme Court observed that "[a] debtor's promise of future payments is worth less than an immediate lump-sum payment because the creditor cannot use the money right away, inflation may cause the dollar's value to decline before the debtor pays, and there is a nonpayment risk." *Id*. at 466. This Court is cognizant that *Till* dealt with cramdown of a Plan under § 1129(a)(b)(2)(B)(i) in a chapter 13 bankruptcy; however, the underlying concepts are applicable in the present chapter 11 case. In this case, the rate fixed by the Court was reached by adding 1% (to account for the risk of non-payment) to the prime rate of 5.5%, for a total of 6.5%. This Court determines that an interest rate of 6.5% adequately compensates North River for the time value of its money and the risk of default.

126. To reiterate, under the Plan, holders of allowed Class 6 claims (Prepetition Defense-Cost Contribution Claims) will receive "payment in full" of the allowed amount of their claims, over time with an appropriate interest rate. (Plan § 3.03(f)(ii) (emphasis added)). Thus, holders of allowed Class 6 claims will be receiving "value, as of the effective date of the plan, equal to the allowed amount" of their claims. 11 U.S.C. §1129(b)(2)(B)(i) (emphasis added). This treatment satisfies the requirements of §1129(b).

127. The fact that the Reorganized Debtor's shareholders will be retaining their shares before North River receives full payment of any allowed Class 6 claims does not change the analysis. "[T]he absolute priority rule does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan." *In re Penn Cent. Transp. Co.,* 458 F. Supp. 1234, 1283 (E.D. Pa. 1978). Thus, courts have held that the absolute priority rule "merely means that senior classes must be fully provided for in order for junior classes to receive anything." *In re Arden Props., Inc.*, 248 B.R. 164, 174 (Bankr. D. Ariz. 2000). The Plan provides for full payment of any allowed Class 6 claim. Accordingly, the Reorganized Debtor's shareholders are permitted to retain their shares under the absolute priority rule. Because the Plan as written satisfies the absolute priority rule, it is not necessary to address North River's arguments regarding the "new value exception." (*See* Jt. Obj. at 12-16). Accordingly, North River's objections here are overruled.

**ii) North River is not entitled to "Cramdown" Protection Under § 1129(b) with Respect to its Class 7 claims**

128. North River contends that it is a secured creditor by virtue of allegedly holding "setoff rights" under § 553 of the Bankruptcy Code. (Jt. Obj. at 16). Because the Plan would allegedly "strip" North River of its setoff rights, North River argues that the Plan cannot be confirmed because it is not receiving the "indubitable equivalent" of its setoff

claims, as required by § 1129(b). (Id.) These arguments are unavailing. As noted above, the Plan provides that any allowed Class 6 claims (Prepetition Defense-Cost Contribution Claims) will be paid in full, so these claims will not be "stripped" or extinguished. As for its claims in Class 7, North River cannot invoke the cramdown protections under § 1129(b), such as the "indubitable equivalent" requirement, because Class 7 voted to accept the Plan. The cramdown protections under § 1129(b) apply only to a "class of claims or interests that is impaired under, *and has not accepted*, the plan . . . ." 11 U.S.C. § 1129(b)(1) (emphasis added). Thus, even if its Class 7 claims were "secured" by virtue of "setoff rights," North River still could not invoke the "indubitable equivalent" requirement under § 1129(b)(2)(A)(iii).

129. In addition, North River has no setoff rights under New York law, so its claims are not "secured" under 11 U.S.C. §§ 506 and 553. Section 553 does not create a right of setoff; it merely preserves "whatever right of setoff otherwise exists" under applicable nonbankruptcy law. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995). "In order to establish a right to setoff under § 553, a creditor must first demonstrate a preexisting right of setoff under nonbankruptcy or state law." *In re Corp. Res. Servs., Inc.*, 564 B.R. 196, 203 (Bankr. S.D.N.Y. 2017) (footnote and citations omitted). "New York law does not recognize a right to setoff for contingent claims." *Id.* at 204. "A claim is contingent and ineligible to be set off under New York law when it is dependent on some future event that may never happen or has not yet accrued." *Id.* at 201. North River's claims for future indemnity and defense costs are contingent claims and are

therefore ineligible for setoff under New York law. Moreover, even "when a lawsuit has been filed, claims that are not finally adjudicated are contingent." *Id.* (citations omitted). North River's claims for prepetition indemnity and defense costs are disputed and have not been finally adjudicated in the New York coverage action. As a result, they are ineligible for setoff, and the North River has no such right. Accordingly, North River's claims are not "secured" under §§ 506 and 553, and its related arguments are rejected.

**P. Remaining Requirements of § 1129 are Inapplicable or Satisfied**

130. Section 1129(c) of the Bankruptcy Code is inapplicable because no other chapter 11 plan has been proposed for confirmation. (Podgainy Cert. ¶ 80).

131. The principal purpose of the Plan is not avoidance of taxes or the requirements of section 5 of the Securities Act of 1933, and there has been no request by any governmental unit alleging such avoidance. (Podgainy Cert. ¶ 81). Accordingly, the Plan satisfies § 1129(d).

132. As set forth above, the Plan complies in all respects with the applicable requirements of § 1129 of the Bankruptcy Code.

**Q. Substantive Consolidation**

133. This Court recommends substantive consolidation and merger of all of the Debtors into Duro Dyne National Corp., which will emerge as the reorganized Debtor if the request is granted. The United States Trustee objects to consolidation and asserts that the Plan Proponents have failed to establish their case for substantive consolidation

because Mr. Podgainy's testimony demonstrates his lack of personal knowledge regarding whether any creditor actually viewed the Debtors as a single entity. Furthermore, the UST contends that the Plan Proponents were unable to cite a single example of a creditor negotiating an agreement with the Debtors as a whole. However, as the Plan Proponents point out, the evidentiary record—specifically the certification provided by the Debtor's financial advisor, Mr. Podgainy, and the testimony given by Mr. Hinden, the Debtor's CEO—supports a finding that the Plan Proponents have satisfied the standard for substantive consolidation established by the Third Circuit. *See In re Owens Corning,* 419 F.3d 195, 211 (3d Cir. 2005), *as amended* (Aug. 23, 2005), *as amended* (Sept. 2, 2005), *as amended* (Oct. 12, 2005), *as amended* (Nov. 1, 2007).

134. Although the Court agrees with the UST that the proofs presented by the Plan Proponents are somewhat lacking, as the Plan Proponents point out, the creditors in this case voted to accept a plan that provides for substantive consolidation of the debtor's estates. Case law indicates that the test for consolidation articulated by the Third Circuit in *Owens Corning* applies only "absent consent." *In re Owens Corning*, 419 F.3d at 211 (establishing the showing that must be made to warrant consolidation "absent consent"). Therefore, the Court sees no reason to impede the Plan Proponents efforts absent a more applied objection.

135. "A bankruptcy court may order substantive consolidation of debtors' estates upon an evaluation of whether the economic prejudice of continued debtor separateness outweighs the economic prejudice of consolidation." *In re Pearlman*, 450 B.R. 219,

223 (Bankr. M.D. Fla. 2011) (citing *Eastgroup Properties v. Southern Motel Assoc, Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991); *see also In re Snider Bros., Inc.*, 18 Bankr. 230, 234 (Bankr. D. Mass. 1982)). In other words, "a court must 'conduct an inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties.'" *In re Auto-Train Corp., Inc.*, 810 F.2d 270, 276 (D.C. Cir. 1987).

136. Here, no other creditors have joined the UST in its objection or asserted any prejudice or reliance on the credit worthiness of a single debtor. Indeed, the UST cites no harm that will befall any party in interest as a result of substantive consolidation. Additionally, the cost and time savings to be realized by the Debtors through a substantive consolidation, however modest they may be, weighs in favor of consolidation. For the reasons discussed, on this record, the parties are deemed to have consented to substantive consolidation and this Court determines that it is warranted.

**R. Trust Disbursement Procedures ("TDP")**

137. As stated previously, the United States Trustee's primary objection to the Plan encompasses its argument under § 524(g)(2)(B)(ii)(V) and stems from concerns that the TDP lacks safeguards to prevent fraud and abuse and, in certain respects, facilitates fraud and abuse. To the extent these concerns have merit, the Court determines that the revisions which the Plan Proponents incorporated into the current version of the Plan and TDP provide adequate safeguards and the Court recommends confirmation. As to the remainder of the UST's arguments, this Court overrules the UST's challenges

for the reasons set forth by the Plan Proponents and rejects the changes suggested by the UST as being too costly, impractical and ineffective.

138. As an initial matter, this Court observes that the UST's concerns are bottomed on alarms raised in industry studies and academic works. Indeed, apart from the *Garlock* case (which this Court deems to be premised on a different factual scenario and involved unrelated concerns), the UST has not been able to point to any concrete illustrations or to identify any actual harms which have manifested in the extended history of asbestos cases in our bankruptcy courts. Nevertheless, this does not mean to suggest that the UST's concerns are misplaced or that oversight is not needed—either by the Court or the UST—to ensure that the potential problems discussed do not materialize. Accordingly, in an effort to address the bulk of the concerns relative to transparency, the Plan Proponents, at the Court's direction, made changes to the TDP and the Trust Agreement.

139. First, language was added to the TDP to include a notice requirement to the office of the UST. Specifically, whenever the TDP or the Trust Agreement requires notice to the Futures Representative or the TAC, or requires consent or actions, or provides information to the Futures Representative or the TAC, the UST for Region 3 (or his or her designee) must also be given notice. These changes do not burden the UST with any obligation to actually give consent or take any action; nor do these changes burden the Trust with any responsibility to obtain consent from the UST. Rather, this language simply requires that Trust keep the UST equally informed as the Futures Representative

and the TAC. Armed with this information, the UST can then determine whether to take action. In this same vein, the Trust Agreement before the Court also now includes language which allows the UST to bypass the alternative dispute resolution process and bring perceived issues or disputes directly to this Court.

140. Additionally, § 6.3 of the TDP deals with the withdrawal and deferral of claims. The version of the Plan presently before the Court now eliminates the ability of claimants to withdraw claims without statute of limitations consequences. As stated during the hearing on confirmation, the Court does not take issue with keeping claims on deferred status, but sees no reason why claimants should be entitled to withdraw a claim and not be impacted by the statute of limitations. The Plan before the Court removes that entitlement and resolves the UST's and the Court's shared concern regarding this potential area of abuse.

141. Finally, this Court concludes the current version of the TDP addresses the UST's critical objections regarding the alleged lack of independent oversight by a neutral third party and the public interest in access to information regarding the claims. In addition to the elements discussed above, the TDP now delineates a procedure by which an interested party may request information relating to any payment, and any demand for payment, from the trust to a party to an action at law or equity if the action relates to liability for asbestos exposure. This application for information may be sought before a court of competent jurisdiction, as well as this Court. Accordingly, this provision of the TDP serves as an added layer of oversight by neutral third parties, helps to ensure

that the trust is not deceived into paying erroneous or false claims, and also addresses the public interest in having the information on claims and claim disposition available for review in appropriate situations.

142. For the foregoing reasons, the Court finds the terms of the TDP sufficient and recommends the Plan for confirmation.

## IX. CONCLUSION

143. For the foregoing reasons, this Court submits the within proposed findings of fact and conclusions of law to the district court and recommends confirmation of the Third Amended Prenegotiated Plan of Reorganization.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: July 15, 2019