# Exhibit 2

## Third Amended Prenegotiated Plan of Reorganization

## and Plan Exhibits A-F

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Case No. 18-27963 (MBK) |
| DURO DYNE NATIONAL CORP., *et al.*, | : | Chapter 11 |
| Debtors.[1] | : | Jointly Administered |

# THIRD AMENDED PRENEGOTIATED PLAN OF REORGANIZATION FOR DURO DYNE NATIONAL CORP., *ET AL.*, UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
krosen@lowenstein.com
jprol@lowenstein.com

*Counsel to the Debtors and Debtors in Possession*

CAPLIN & DRYSDALE, CHARTERED
James P. Wehner, Esq.
Jeffrey A. Liesemer, Esq.
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
jwehner@capdale.com
jliesemer@capdale.com

*Counsel to the Official Committee of Asbestos Claimants*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Edwin J. Harron, Esq.
Sara Beth A. R. Kohut, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6703
Facsimile: (302) 576-3298
eharron@ycst.com
skohut@ycst.com

*Counsel to the Legal Representative*

Dated: June 6, 2019

***This Third Amended Prenegotiated Plan of Reorganization provides for an "Asbestos Permanent Channeling Injunction," a "Settling Asbestos Insurer Injunction," and an "Asbestos Insurer Injunction." For a description of the causes of action to be enjoined and the identities of the entities that would be subject to these injunctions, see Article IX of this Plan.***

---

[1] The Debtors subject to this Amended Prenegotiated Plan of Reorganization are Duro Dyne National Corp., Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I. | DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW | 1 |
| Section 1.01. | *Defined Terms* | 1 |
| Section 1.02. | *Rules of Interpretation* | 18 |
| Section 1.03. | *Computation of Time* | 19 |
| Section 1.04. | *Governing Law* | 19 |
| Section 1.05. | *Reference to Monetary Figures* | 19 |
| Section 1.06. | *Reference to the Debtors or the Reorganized Debtor* | 19 |
| ARTICLE II. | ADMINISTRATIVE CLAIMS,PRIORITY TAX CLAIMS, AND STATUTORY FEES | 19 |
| Section 2.01. | *Administrative Claims* | 19 |
| Section 2.02. | *Priority Tax Claims* | 20 |
| Section 2.03. | *Statutory Fees* | 20 |
| ARTICLE III. | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | 20 |
| Section 3.01. | *Classification of Claims and Interests* | 20 |
| Section 3.02. | *Summary of Classification* | 21 |
| Section 3.03. | *Classification and Treatment of Claims and Interests* | 21 |
| ARTICLE IV. | THE ASBESTOS TRUST | 25 |
| Section 4.01. | *Creation and Purposes of the Asbestos Trust* | 25 |
| Section 4.02. | *Appointment of Asbestos Trustee* | 26 |
| Section 4.03. | *Appointment of Delaware Trustee* | 26 |
| Section 4.04. | *Trust Advisory Committee* | 26 |
| Section 4.05. | *Legal Representative for Demand Holders* | 26 |
| Section 4.06. | *Assumption of Certain Liabilities by the Asbestos Trust* | 27 |
| Section 4.07. | *Transfer of Asbestos Insurance Rights* | 27 |
| Section 4.08. | *Funding of the Asbestos Trust* | 27 |
| Section 4.09. | *Securing Payment and Performance Under the Trust Note* | 28 |
| Section 4.10. | *Vesting of Asbestos Trust Assets* | 28 |
| Section 4.11. | *Earn Out Payments* | 28 |
| Section 4.12. | *Financial Reporting and Disclosures* | 30 |

| | | |
|---|---|---|
| Section 4.13. | *Actions Against the Reorganized Debtor to Obtain the Benefits of Asbestos Insurance Coverage* | 30 |
| Section 4.14. | *Actions Against Non-Settling Asbestos Insurers to Obtain the Benefits of Asbestos Insurance Coverage* | 31 |
| Section 4.15. | *Limitations on Recoveries of Insurance Coverage from Non-Settling Asbestos Insurers* | 32 |
| Section 4.16. | *Subordination of Related-Party Payments and Related-Party Claims* | 32 |
| Section 4.17. | *Preservation of Asbestos-Related Defenses* | 33 |
| Section 4.18. | *Books and Records* | 33 |
| ARTICLE V. | IMPLEMENTATION OF THE PLAN | 33 |
| Section 5.01. | *Substantive Consolidation* | 33 |
| Section 5.02. | *Corporate Governance* | 34 |
| Section 5.03. | *Supersedeas Bonds and Payment Assurances* | 35 |
| Section 5.04. | *Withholding of Taxes* | 35 |
| Section 5.05. | *Transfer Taxes* | 36 |
| Section 5.06. | *Recordable Order* | 36 |
| Section 5.07. | *Authority of the Debtors* | 36 |
| ARTICLE VI. | VOTING AND DISTRIBUTIONS UNDER THE PLAN | 36 |
| Section 6.01. | *Classes Eligible to Vote* | 36 |
| Section 6.02. | *Class 6 and 7 Acceptance Requirements* | 36 |
| Section 6.03. | *Voting on Basis of Substantive Consolidation* | 37 |
| Section 6.04. | *Issuance of Asbestos Permanent Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code* | 37 |
| Section 6.05. | *Nonconsensual Confirmation* | 37 |
| Section 6.06. | *Distributions Under the Plan* | 37 |
| Section 6.07. | *Time Bar to Distributions by Check* | 38 |
| Section 6.08. | *Distributions After the Effective Date* | 38 |
| Section 6.09. | *Setoffs* | 38 |
| Section 6.10. | *Cancellation of Existing Instruments and Other Documents Evidencing Claims* | 39 |
| Section 6.11. | *Allocation of Plan Distributions Between Principal and Interest* | 39 |
| Section 6.12. | *Tax Obligations and Reporting Requirements* | 39 |
| ARTICLE VII. | TREATMENT OF DISPUTED, CONTINGENT, OR UNLIQUIDATED NON-ASBESTOS CLAIMS UNDER THE PLAN | 39 |

Section 7.01. *Objections to Claims; Prosecution of Disputed Claims* ....39

Section 7.02. *Estimation of Individual Claims* ....39

Section 7.03. *Cumulative Remedies* ....40

Section 7.04. *No Distributions Pending Allowance or Motion* ....40

Section 7.05. *Distributions After Allowance* ....40

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....40

Section 8.01. *General Treatment* ....40

Section 8.02. *Assumption of Insurance Policies* ....41

Section 8.03. *Letters of Credit, Surety Bonds, and Guaranties* ....41

Section 8.04. *Cure of Defaults and Survival of Contingent Claims* ....41

Section 8.05. *Deadline for Filing Rejection Damages Claims* ....42

Section 8.06. *Contracts and Leases with Related Parties* ....42

Section 8.07. *Effect of Confirmation* ....42

ARTICLE IX. DISCHARGE, RELEASES, AND INJUNCTIONS ....43

Section 9.01. *Binding Effect* ....43

Section 9.02. *Title to Assets* ....43

Section 9.03. *Discharge of Claims* ....43

Section 9.04. *Discharge Injunction* ....43

Section 9.05. *Asbestos Permanent Channeling Injunction* ....43

Section 9.06. *Settling Asbestos Insurer Injunction* ....45

Section 9.07. *Asbestos Insurer Injunction* ....45

Section 9.08. *Term of Existing Injunctions or Stays* ....47

Section 9.09. *Injunction Against Interference with Plan of Reorganization* ....47

Section 9.10. *Exculpation* ....47

Section 9.11. *Settlement and Release of Certain Avoidance Actions and Estate Causes of Action* ....47

Section 9.12. *Reservation of Rights* ....47

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....48

Section 10.01. *Conditions to Confirmation* ....48

Section 10.02. *Conditions Precedent to Effective Date of the Plan* ....50

Section 10.03. *Completed Delivery of the Asbestos Trust Assets* ....51

| | | |
|---|---|---|
| Section 10.04. | *Waiver of Conditions Precedent* | 52 |
| ARTICLE XI. | RETENTION OF JURISDICTION | 52 |
| Section 11.01. | *Retention of Jurisdiction* | 52 |
| Section 11.02. | *Non-Core Proceedings* | 54 |
| Section 11.03. | *Other Proceedings* | 54 |
| ARTICLE XII. | MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN | 54 |
| Section 12.01. | *Plan Modification* | 54 |
| Section 12.02. | *Revocation, Withdrawal, or Non-Consummation* | 54 |
| ARTICLE XIII. | MISCELLANEOUS PROVISIONS | 55 |
| Section 13.01. | *Expedited Tax Determination* | 55 |
| Section 13.02. | *Exemption from Registration* | 55 |
| Section 13.03. | *Statutory Committee and Legal Representative* | 55 |
| Section 13.04. | *Effective Date Actions Simultaneous* | 56 |
| Section 13.05. | *Substantial Consummation* | 56 |
| Section 13.06. | *Sections 1125 and 1126 of the Bankruptcy Code* | 56 |
| Section 13.07. | *Deemed Acts* | 56 |
| Section 13.08. | *Binding Effect* | 56 |
| Section 13.09. | *Exhibits/Schedules* | 56 |
| Section 13.10. | *Entire Agreement* | 56 |
| Section 13.11. | *Reservation of Rights* | 57 |
| Section 13.12. | *Further Assurances* | 57 |
| Section 13.13. | *Further Authorizations* | 57 |
| Section 13.14. | *Notices and Deliveries* | 57 |
| Section 13.15. | *Asbestos Trust Annual Report* | 57 |
| Section 13.16. | *Inconsistencies* | 57 |

EXHIBIT A: ASBESTOS TRUST AGREEMENT

EXHIBIT B: COOPERATION AGREEMENT

EXHIBIT C: LOAN AND SECURITY AGREEMENT

EXHIBIT D: NOTE ISSUANCE AGREEMENT

EXHIBIT E: PLEDGE AND SECURITY AGREEMENT

EXHIBIT F: TRUST DISTRIBUTION PROCEDURES

## INTRODUCTION

The Plan Proponents hereby propose the following prenegotiated chapter 11 plan of reorganization for the Debtors in accordance with section 1121(a) of title 11 of the United States Code. Capitalized terms used in this prenegotiated plan of reorganization and not otherwise defined shall have the meanings ascribed to them in Section 1.01 hereof.

**This Plan provides, among other things, for the issuance of Injunctions under section 105(a) or section 524(g) of the Bankruptcy Code that will, among other things, result in the channeling of certain asbestos-related liabilities of the Debtors (excluding liabilities for worker compensation claims) to a newly created Asbestos Trust, as more fully described herein. The terms, conditions, and Entities subject to the Injunctions are set forth in Article IX of this Plan. Except as expressly permitted under the terms of the Injunctions, the Injunctions will prohibit any acts to collect, recover, or offset any asbestos-related liabilities of the Debtors against any Debtor, the Reorganized Debtor, certain specified third parties, and various persons or entities related to such parties. Under section 524(g), all distributions paid under this Plan to holders of Asbestos Claims and Demands will be the responsibility of the Asbestos Trust, and the Debtors and Reorganized Debtor shall have no further personal liability for such claims. In addition, subject to the conditions set forth in Article IV of this Plan, holders of Asbestos Claims and Demands may bring an action against the Reorganized Debtor or a Non-Settling Asbestos Insurer solely to obtain the benefits of Asbestos Insurance Coverage. All other claims against the Debtors, with only certain exceptions, will receive distributions from a Disbursing Agent appointed in accordance with this Plan. The general description of this Plan is qualified in its entirety by the terms, conditions, and definitions set forth below.**

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

Section 1.01. ***Defined Terms***. As used in the Plan, capitalized terms have the meanings ascribed to them below. Any capitalized term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

(1) "*Adjusted EBITDA*" means the consolidated earnings of the Reorganized Debtor and Duro Dyne Canada (a) before interest, taxes, depreciation, and amortization; (b) before deduction of losses or addition of gains associated with non-cash extraordinary, non-recurring, and legacy items; and (c) before deduction of Related-Party Payments. The components of "Adjusted EBITDA," as defined herein, shall be calculated with respect to the Reorganized Debtor and Duro Dyne Canada on a consolidated basis in accordance with generally accepted accounting principles as in effect in the United States of America from time to time, consistently applied in the period in which a calculation is performed.

(2) "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:

(a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial, advisory, accounting, and other services, and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331, or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code. For the avoidance of doubt, the term "Administrative Claim" includes Professional Claims, as defined herein.

(3) "*Affiliate*" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

(4) "*Agent*" means any shareholder, director, officer, employee, partner, principal, member, agent, attorney, accountant, advisor, or other representative of any person or Entity, but solely in their respective capacities as such and not in any other capacity.

(5) "*Allowed*" means:

(a) with reference to any Claim (other than an Administrative Claim, Asbestos Claim or Bonded Claim), (i) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (ii) any Claim allowed pursuant to the terms hereof for the purpose of granting the holder of such Claim the right to receive a Distribution on account of such Claim; (iii) any timely filed Claim that is not disputed or as to which no objection to allowance has been timely interposed in accordance with Section 7.01 of the Plan; or (iv) any Claim that, if disputed or listed on the Schedules as contingent or unliquidated, has been allowed under section 502 of the Bankruptcy Code by Final Order; *provided, however*, that Claims allowed solely for the purpose of voting on the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder; and *provided further* that unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from or after the Petition Date;

(b) with reference to any Administrative Claim, any such Claim that is allowed pursuant to the terms of (i) a Final Order; (ii) an agreement by and between the holder of such Claim and the Debtors or Reorganized Debtor, as applicable; or (iii) the Plan;

(c) with reference to any Bonded Asbestos Personal Injury Claim, or any Claim that qualifies as a Bonded Asbestos Personal Injury Claim under the applicable definitions of the Plan, but only to the extent that the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or each of the Plan Proponents and the holder of such Claim agree, that such holder is entitled to some or all of the proceeds of the applicable supersedeas bond or other payment assurance; or

(d) with reference to any Bonded Non-Asbestos Claim, or any Claim that qualifies as a Bonded Non-Asbestos Claim under the applicable definitions of the Plan, but only to the extent that the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or the applicable Debtor and the holder of such Claim agree, that such holder is entitled to some or all of the proceeds of the applicable supersedeas bond or other payment assurance.

(6) "*Allowed Amount*" means the liquidated amount of an Allowed Claim (other than an Asbestos Claim).

(7) "*Asbestos Claim*" means any (a) Asbestos Personal Injury Claim, (b) Indirect Trust Claim, or (c) any deficiency portion of a Bonded Asbestos Personal Injury Claim remaining after crediting the proceeds of any supersedeas bond or other payment assurance to which the holder of such Claim is determined to be entitled by (i) Final Order of the Bankruptcy Court or other court of competent jurisdiction or (ii) agreement of each of the Plan Proponents and the holder of such Claim; *provided, however*, that, for the avoidance of doubt, the term "Asbestos Claim" shall not include or pertain to an Administrative Claim, a Bonded Claim, an Employee Benefit Claim, a General Unsecured Claim, an Intercompany Claim (even if such Claim would constitute an Indirect Trust Claim if it arose in favor of a non-Affiliate), a Priority Non-Tax Claim, a Priority Tax Claim, a Related-Party Claim, or a Worker Compensation Claim; and *provided further* that the term "Asbestos Claim" shall not include a Prepetition Defense-Cost Contribution Claim.

(8) "*Asbestos Claimants Committee*" means, as applicable, (a) the group of law firms organized prior to the Petition Date to represent certain current asbestos personal injury claimants in connection with the negotiation of the Plan; or (b) after the Petition Date, the official committee of unsecured asbestos creditors appointed by the United States Trustee in the Chapter 11 Cases that is composed of asbestos personal injury claimants or their representatives. Prior to the Petition Date, the Asbestos Claimants Committee consisted of the following law firms: Brayton Purcell, LLP; Cooney & Conway; Early Lucarelli Sweeney & Meisenkothen; The Ferraro Law Firm; Gori Julian & Associates, PC; Simmons Hanly Conroy LLC; and Weitz & Luxenberg PC.

(9) "*Asbestos Insurance Coverage*" means all rights, title, privileges, interests, claims, demands, benefits, entitlements to Proceeds, or payments under any Asbestos Insurance Policy relating to any Channeled Asbestos Claim.

(10) "*Asbestos Insurance Litigation*" means any claims, counterclaim, demand, or cause of action of any of the Debtors or the Asbestos Trust against an Asbestos Insurer, including any Asbestos Insurance Policy Claims of a Debtor, and shall include *North River Insurance Co. v. Duro Dyne National Corp.*, No. 13-62947 (N.Y. Sup. Ct. Suffolk Cnty. Sept. 19, 2013).

(11) "*Asbestos Insurance Policy*" means any insurance policy that provides or potentially provides for Asbestos Insurance Coverage; *provided, however*, that the term "Asbestos Insurance Policy" shall not include any rights or obligations under any insurance

policy to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for Worker Compensation Claims.

(12) "*Asbestos Insurance Policy Claim*" means any claim against any Asbestos Insurer based on, arising under, or attributable to any Asbestos Insurance Policy or Asbestos Insurance Settlement, including any claim (a) for declaratory relief, (b) for "bad faith" or extra-contractual liability, (c) under section 11580 of the California Insurance Code, its subdivisions, or any related or similar statute in any jurisdiction, (d) for Asbestos Insurance Coverage, damages, or equitable relief attributable to any Asbestos Insurance Policy, or (e) for contribution, reimbursement, indemnity, or subrogation based on, arising from, or attributable to any Asbestos Insurance Policy.

(13) "*Asbestos Insurance Settlement*" means (a) each agreement between any Debtor and an Asbestos Insurer that is listed in Schedule 1.01(13) of the Plan Supplement, including any ancillary agreements to such agreements; and (b) each agreement (i) that an Asbestos Insurer and one or more of the Debtors have entered into within fourteen (14) days after entry of an order by the District Court (A) confirming the Plan, or (B) affirming on appeal an order of the Bankruptcy Court confirming the Plan; (ii) that the Asbestos Claimants Committee and the Legal Representative have consented to and determined in writing to be sufficiently comprehensive to warrant that such Asbestos Insurer receive the protections provided under section 105(a) or section 524(g) of the Bankruptcy Code; and (iii) that is approved by a Final Order of the Bankruptcy Court.

(14) "*Asbestos Insurance Rights*" means any and all of each Debtor's rights, title, privileges, interests, claims, demands, or entitlements to any Proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, state guaranty fund payments, causes of action, and choses in action under, for, or related to the following: (a) the Asbestos Insurance Settlements; (b) the Asbestos Insurance Policies; (c) Asbestos Insurance Litigation; or (d) Asbestos Insurance Coverage. For the avoidance of doubt, the term "Asbestos Insurance Rights" shall *not* include any cause of action or right to bring a cause of action held by any Channeled Asbestos Claimant directly against any Asbestos Insurer on account of such claimant's Channeled Asbestos Claim, all of which shall be retained by the Channeled Asbestos Claimants (subject, however, to the applicable terms of the Injunctions), and shall not be transferred to the Asbestos Trust.

(15) "*Asbestos Insurer*" means any Entity that has issued or is responsible for or liable to pay under an Asbestos Insurance Policy, and each of its Affiliates, predecessors in interest, and Agents, but only in relation to such Asbestos Insurance Policy.

(16) "*Asbestos Insurer Injunction*" means the supplemental injunction issued under section 105(a) of the Bankruptcy Code that is set in Section 9.07 hereof.

(17) "*Asbestos Permanent Channeling Injunction*" means the injunction issued under section 524(g) of the Bankruptcy Code that is set forth in Section 9.05 hereof.

(18) "*Asbestos Personal Injury Claim*" means any Claim whenever and wherever arising or asserted against a Debtor, or for which a Debtor is liable, whether in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, for or arising by reason of, directly or indirectly, physical, emotional, bodily, or other personal injury, death, or damages arising from personal injury or death (including any claim or demand for compensatory damages; loss of consortium; proximate, consequential, general, special, or punitive damages; or reimbursement, indemnity, contribution, or subrogation), whether or not diagnosable or manifested before Confirmation or the close of the Chapter 11 Cases, caused or allegedly caused, in whole or in part, directly or indirectly, (a) by asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by a Debtor or (b) by services, actions, or operations provided, completed, or taken by a Debtor with respect to asbestos or asbestos-containing products; *provided, however*, that, for the avoidance of doubt, the term "Asbestos Personal Injury Claim" shall not include or pertain to an Administrative Claim, a Bonded Claim, an Employee Benefit Claim, a General Unsecured Claim, an Intercompany Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Related-Party Claim, or a Worker Compensation Claim; and *provided further* that the term "Asbestos Personal Injury Claim" shall not include a Prepetition Defense-Cost Contribution Claim.

(19) "*Asbestos-Related Defenses*" means any legal, equitable, or contractual defense that a Debtor has or may have under applicable nonbankruptcy law to the validity or amount of, or liability for, any Channeled Asbestos Claim, including any applicable statutes of limitation or repose.

(20) "*Asbestos Trust*" means the Duro Dyne Asbestos Personal Injury Trust established pursuant to the Plan and the Asbestos Trust Agreement.

(21) "*Asbestos Trust Agreement*" means the agreement, effective as of the Effective Date, in substantially the form attached hereto as Exhibit A, to be entered into by and among the Debtors, the Asbestos Claimants Committee, the Legal Representative, the Trust Advisory Committee, and the Asbestos Trustee in connection with the formation of the Asbestos Trust.

(22) "*Asbestos Trust Assets*" means, collectively, (a) the Debtors' Contribution; (b) the Hinden Contribution; (c) the Asbestos Trust's rights under the Trust Note, the Note Issuance Agreement, the Pledge and Security Agreement, the Bay Shore Mortgage, and the Fairfield Mortgage; (d) the Asbestos Trust's rights in and to the Earn Out Payments; (e) the Asbestos Insurance Rights; (f) the Asbestos-Related Defenses; and (g) following the transfer and vesting of the foregoing pursuant to Article IV hereof, any Proceeds thereof and earnings and income thereon.

(23) "*Asbestos Trust Expenses*" means any liabilities, costs, taxes, or expenses of, imposed upon, or in respect of the Asbestos Trust or, on and after the Effective Date, the Asbestos Trust Assets, except for payments to Channeled Asbestos Claimants on account of such Channeled Asbestos Claims.

(24) "*Asbestos Trustee*" means any individual appointed by the Bankruptcy Court to serve as a trustee of the Asbestos Trust, pursuant to the terms of the Plan, the Confirmation

Order, and the Asbestos Trust Agreement, or who subsequently may be appointed pursuant to the terms of the Asbestos Trust Agreement.

(25) "*Avoidance Actions*" means any avoidance or recovery action under any of sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, whether or not litigation has been commenced with respect to such action as of the Effective Date.

(26) "*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time.

(27) "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the District Court.

(28) "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075, as well as the general and local rules of the Bankruptcy Court.

(29) "*Bay Shore Lease*" means that certain Agreement of Lease pertaining to the Bay Shore Property, dated as of June 1, 2015, by and between Duro Dyne Spence LLC as owner and landlord and Duro Dyne Corporation as tenant.

(30) "*Bay Shore Mortgage*" means that certain instrument, in substantially the form attached as Exhibit 1 to the Note Issuance Agreement, that will evidence and constitute a Lien on the Bay Shore Property to secure payment and performance under the Trust Note.

(31) "*Bay Shore Property*" means that certain real property owned by Duro Dyne Spence LLC and located at 81 Spence Street, Bay Shore, New York, and all buildings, structures, improvements, and fixtures thereon, now and hereafter existing.

(32) "*Bonded Asbestos Personal Injury Claim*" means an Asbestos Personal Injury Claim evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was given or posted by a Debtor or an Affiliate as security for such Claim.

(33) "*Bonded Claim*" means any Bonded Asbestos Personal Injury Claim or Bonded Non-Asbestos Claim, but shall not include the deficiency portion, if any, of any such Claims.

(34) "*Bonded Non-Asbestos Claim*" means any Claim, other than an Asbestos Personal Injury Claim or Bonded Asbestos Personal Injury Claim, evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was posted by a Debtor or by an Affiliate as security for such Claim.

(35) "*Business Day*" means a day other than a Saturday, a Sunday, or any other day on which the commercial banks in New York, New York are required or authorized to close by law or executive order.

(36) "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

(37) "*Catch-Up Amount*" shall have the meaning ascribed to such term in the Note Issuance Agreement.

(38) "*Catch-Up Payment*" shall have the meaning ascribed to such term in the Note Issuance Agreement.

(39) "*Channeled Asbestos Claimant*" means a holder of a Channeled Asbestos Claim.

(40) "*Channeled Asbestos Claims*" means, collectively, the Asbestos Claims and the Demands.

(41) "*Chapter 11 Cases*" means, (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court or, (b) when used with reference to all Debtors, the jointly administered cases pending for the Debtors in the Bankruptcy Court under Case No. 18-27963(MBK).

(42) "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor or an Estate.

(43) "*Class*" means a category of Claims or Equity Interests as set forth in Article III hereof.

(44) "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

(45) "*Confirmation Date*" means the date on which the Confirmation Order is entered on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021 or on the docket of the District Court.

(46) "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1129 of the Bankruptcy Code and granting other related relief.

(47) "*Confirmation Order*" means the order or orders of the Bankruptcy Court or the District Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which will contain, *inter alia*, the Asbestos Permanent Channeling Injunction; *provided, however*, that if the District Court does not enter such an order confirming the Plan, then the term "Confirmation Order" shall include an order of the District Court affirming the Confirmation Order entered by the Bankruptcy Court.

(48) "*Consummation*" means the occurrence of the Effective Date.

(49) "*Cooperation Agreement*" means the Asbestos Trust Cooperation Agreement to be dated as of the Effective Date, substantially in the form attached hereto as Exhibit B.

(50) "*DDC Pledge*" means the possessory Lien on or possessory security interest in 50.1% of the Duro Dyne Canada Stock, which Lien or security interest shall be granted to the Asbestos Trust in accordance with the Pledge and Security Agreement.

(51) "*Debtor*" means any of the Debtors, each in its individual capacity as a debtor and debtor-in-possession in the Chapter 11 Cases.

(52) "*Debtors*" means, collectively, Duro Dyne National Corp., Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.

(53) "*Debtors' Contribution*" means the Cash contribution to the Asbestos Trust, to be made by or on behalf of the Debtors in the amount of $7,500,000.

(54) "*Deferral Amount*" shall have the meaning ascribed to such term in the Note Issuance Agreement.

(55) "*Delaware Trustee*" means the Entity appointed in accordance with Section 4.03 hereof to serve as the "Delaware Trustee" under the Plan and the Asbestos Trust Agreement.

(56) "*Demand*" means a demand for payment, present or future, on or against a Debtor, which is referred to in section 524(g)(5) of the Bankruptcy Code, and that (a) was not a Claim during the Chapter 11 Cases, and (b) arises out of the same or similar conduct or events that gave rise to Asbestos Personal Injury Claims and is based on, arises from, or is attributable to asbestos-related personal injury or wrongful death.

(57) "*Disbursing Agent*" means the Reorganized Debtor or the Entity or Entities chosen by the Reorganized Debtor to make or facilitate Distributions under the Plan.

(58) "*Disclosure Statement*" means the written disclosure statement that relates to the Plan, including the exhibits and schedules thereto, as approved by the Bankruptcy Court after the Petition Date as containing adequate information pursuant to section 1125 of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules, as such disclosure statement may be amended, modified, or supplemented from time to time.

(59) "*Distribution*" means any payment or other distribution of Cash or other consideration made by the Disbursing Agent to the holder of an Allowed Claim on account of such Claim pursuant to the terms and provisions of the Plan; *provided, however*, that the term "Distribution" shall not include or pertain to any payment, transfer, or delivery of Cash, property,

or other consideration to the Asbestos Trustee, the Asbestos Trust, or any Channeled Asbestos Claimant.

(60) "*District Court*" means the United States District Court for the District of New Jersey.

(61) "*Duro Dyne Canada*" means Duro Dyne Canada Inc.

(62) "*Duro Dyne Canada Stock*" means the "Voting Stock" (as defined in the Pledge and Security Agreement) of Duro Dyne Canada.

(63) "*Duro Dyne Pension Plan*" means the frozen defined benefit single-employer pension plan for non-union employees sponsored by Debtor Duro Dyne National Corp. and known as the Duro Dyne National Corp. Pension Plan.

(64) "*Earn Out Payments*" means the Cash payments made by the Reorganized Debtor to the Asbestos Trust, in accordance with Section 4.11 hereof.

(65) "*Effective Date*" means the date specified by the Plan Proponents in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be not more than ten (10) Business Days after the date on which the all conditions precedent specified in Section 10.02 of this Plan have been satisfied (or waived in accordance with Section 10.04 of the Plan).

(66) "*Employee Benefit Claim*" means any Claim, including accrued but unpaid pension Claims from and after the Petition Date, for compensation or benefits arising out of a claimant's employment with a Debtor, but only to the extent and amount provided for under a written benefit plan sponsored by a Debtor or an Affiliate on or before the Petition Date, including any Claims and liabilities owed or owing as Withdrawal Liability Claims or pursuant to the Duro Dyne Pension Plan or the Sheet Metal Workers' National Pension Fund (including, for the avoidance of doubt, Sheet Metal Workers' National Pension Fund Withdrawal Liability Claims); *provided, however,* that the term "Employee Benefit Claim" shall not include or pertain to Channeled Asbestos Claims, Prepetition Defense-Cost Contribution Claims, Priority Non-Tax Claims, Worker Compensation Claims, and any other Claims for damages or other relief asserted by a current or former employee of a Debtor that is not for compensation or benefits in an amount permitted pursuant to a written benefit plan sponsored by a Debtor or an Affiliate on or before the Petition Date.

(67) "*Entity*" means an individual, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association, a Governmental Unit or subdivision thereof, including the United States Trustee, or any other entity, whether acting in an individual, fiduciary, or other capacity.

(68) "*Equity Interest*" means shares of capital stock or equity, equity securities, membership interests, or ownership interests in any Entity or any rights arising out of, attributable to, or based upon any of the foregoing, including any (a) options, warrants, or other rights to purchase or acquire any such stock, equity, or interests (whether or not at the time exercisable) or (b) securities by their terms convertible or exchangeable for any such stock, equity, or interests (whether or not at the time so convertible or exchangeable) or options, warrants, or rights to purchase such convertible or exchangeable securities.

(69) "*Estate*" means the estate created for each Debtor by section 541 of the Bankruptcy Code upon the commencement of its Chapter 11 Case.

(70) "*Estate Causes of Action*" means (a) any and all claims that are or would have been property of a Debtor's Estate or which a Debtor is or would have been entitled to prosecute as a debtor-in-possession arising under nonbankruptcy law based on or attributable to any allegedly preferential or fraudulent transfers or based on or attributable to any allegedly unlawful payments or transfers or distributions of property made by or on behalf of any Debtor; (b) any and all claims that are or would have been property of a Debtor's Estate or which a Debtor is or would have been entitled to prosecute as a debtor-in-possession, regardless of the legal theory upon which such claims may be predicated, for which an Entity is asserted to be or to have been derivatively liable for any Asbestos Claim, including any claims based on a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud, or conspiracy; and (c) any and all claims in clauses (a) and (b) above where, in the absence of the Chapter 11 Cases, such claims might, under the substantive law of any jurisdiction, have been treated as claims maintainable not only by a Debtor or a Debtor's Estate, but by creditors of or claimants against a Debtor.

(71) "*Fairfield Lease*" means that certain lease pertaining to the Fairfield Property, dated as of August 1, 1991, by and between ISWR Ohio LLC as owner and landlord and Duro Dyne Midwest Corp. as tenant, as modified by that certain Lease Modification Agreement, dated January 18, 2011, by and between the same aforesaid parties.

(72) "*Fairfield Mortgage*" means that certain instrument, in substantially the form attached as Exhibit 2 to the Note Issuance Agreement, that will evidence and constitute a Lien on the Fairfield Property to secure payment and performance under the Trust Note.

(73) "*Fairfield Property*" means that certain real property owned by ISWR Ohio LLC and located at 3825 Symmes Road, Fairfield, Ohio 45011, and all buildings, structures, improvements, and fixtures thereon, now and hereafter existing.

(74) "*Final Order*" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as to which the time to appeal; petition for certiorari; or move for reconsideration, rehearing, or retrial has expired and as to which no appeal; petition for a writ of certiorari; or other proceedings for reconsideration, rehearing, or retrial shall have been filed; and if an appeal; writ of certiorari; or reconsideration, rehearing, or retrial thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed or

certiorari, reconsideration, rehearing, or retrial shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal; petition for a writ of certiorari; or move for reconsideration, rehearing, or retrial shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 60 of the Federal Rules of Civil Procedure (made applicable by Bankruptcy Rule 9024), or any analogous rule under the Bankruptcy Rules, may be but has not then been filed with respect to such order or judgment shall not cause such order or judgment not to be a "Final Order" hereunder; and *provided further, however*, that notwithstanding the filing of a motion under Rule 59 of the Federal Rules of Civil Procedure (made applicable by Bankruptcy Rule 9023) with respect to such order or judgment, the Plan Proponents shall be authorized jointly to deem any such order or judgment a Final Order.

(75) "*General Unsecured Claim*" means any Claim, regardless of whether such Claim is covered by insurance, to the extent that such Claim is neither secured nor entitled to a priority under applicable law, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code; (b) any portion of a Claim that is not a Secured Claim (*i.e.*, a deficiency claim); (c) any deficiency portion of a Bonded Non-Asbestos Claim remaining after crediting the proceeds of a supersedeas bond or other payment assurances to which the holder of such Claim is determined to be entitled by Final Order or by agreement of the holder of such Claim and the applicable Debtor or Reorganized Debtor; and (d) any Claim arising from the provision of goods or services to the Debtors prior to the Petition Date, including any Claim of a commercial trade creditor; *provided however*, that unless otherwise specifically provided herein, the term "General Unsecured Claim" shall not include or pertain to an Administrative Claim, an Asbestos Claim, a Bonded Claim, an Employee Benefit Claim, an Intercompany Claim, a Prepetition Defense-Cost Contribution Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Related-Party Claim, or a Worker Compensation Claim.

(76) "*Hinden Contribution*" means the Cash contribution to the Asbestos Trust, to be made by or on behalf of the Hinden Family Members and the Hinden Family Entities in the total amount of $3,000,000.

(77) "*Hinden Family Entities*" means Duro Dyne Canada, Inc., 4 Site LLC, Rize Enterprises LLC, Rize Enterprises Canada Inc., Pro4ma LLC, Pro4ma II LLC, Foma LLC, ISWR Ohio LLC, Duro Dyne Spence LLC, The Irene Lee Hinden Trust, The Wendy Lynn Geller Trust, The Randall Scott Hinden Trust, and The Hinden Grandchildren Trust, the estate of Sheryl Blumenthal, and the trusts created under the will of Sheryl Blumenthal.

(78) "*Hinden Family Members*" means Randall Hinden, Wendy Hinden, Irene Hinden, David Brett Krupnick, Lindsay Jill Trant, Tobey Hinden Geller, Joshua Blumenthal, Jessie Geller Cawley, Abby Beth Wein, Hayley Rebekah Geller, and Max Hinden.

(79) "*Indirect Trust Claim*" means any Claim, now existing or hereafter arising, that is (a) held by an Entity that has been, is, or may be a defendant in an action seeking damages for death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent based on, arising out of, or attributable to an Asbestos Personal Injury Claim, and (b) on account of alleged liability of a Debtor for reimbursement, indemnification,

subrogation, or contribution of any portion of any damages such Entity has paid or may pay on account of physical, emotional, bodily, or other personal injury, death, or damages arising from personal injury or death (including any claim or demand for compensatory damages; loss of consortium; proximate, consequential, general, special, or punitive damages; or reimbursement, indemnity, contribution, or subrogation), whether or not diagnosable or manifested before Confirmation or the close of the Chapter 11 Cases, caused or allegedly caused, in whole or in part, directly or indirectly (i) by asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by a Debtor or (ii) by services, actions, or operations provided, completed, or taken by a Debtor with respect to asbestos or asbestos-containing products; *provided, however*, that, for the avoidance of doubt, the term "Indirect Trust Claim" shall not include or pertain to an Administrative Claim, a Bonded Claim, an Employee Benefit Claim, a General Unsecured Claim, an Intercompany Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Related-Party Claim, or a Worker Compensation Claim; and *provided further* that the term "Indirect Trust Claim" shall not include a Prepetition Defense-Cost Contribution Claim.

(80) "*Injunctions*" mean the Asbestos Channeling Injunction, the Asbestos Insurer Injunction, and the Settling Asbestos Insurer Injunction.

(81) "*Impaired*" means a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

(82) "*Intercompany Claim*" means (i) any account reflecting intercompany book entries by one Debtor with respect to any other Debtor, or (ii) any Claim that is not reflected in such book entries and is held by a Debtor against any other Debtor, in each case accruing before or after the Petition Date through the Effective Date, including any Claim for reimbursement, payment as guarantor or surety, or any Claim for contribution or expenses that were allocable between the Debtors.

(83) "*Intercreditor Agreement*" means an intercreditor agreement between the Asbestos Trust and the Senior Lender, relating to the respective rights of the Asbestos Trust and the Senior Lender in connection with the Trust Note and the Senior Lending Facility.

(84) "*Legal Representative*" means Lawrence Fitzpatrick, who was engaged by the Debtors to represent the holders of Demands prior to the Petition Date for the purposes of negotiating the Plan. After the Petition Date, the "Legal Representative" shall mean Mr. Fitzpatrick (or any court-appointed alternative or successor), in his capacity as the court-appointed legal representative for all holders of Demands pursuant to section 524(g) of the Bankruptcy Code.

(85) "*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, encumbrance, hypothecation, security interest, or assignment of any kind or nature in respect of such asset, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

(86) "*Loan and Security Agreement*" means that certain loan and security agreement dated as of the Effective Date, between the Reorganized Debtor (as Borrower thereunder) and the Senior Lender, setting forth the terms and provisions governing the Senior Lending Facility, together with all of the exhibits and schedules thereto and all documents necessary to implement or secure the Senior Lending Facility in substantially the form attached hereto as Exhibit C

(87) "*Local 210 Unity Pension Fund*" means the Unity Pension Fund-Local 210, a multiemployer pension plan.

(88) "*LTM Adjusted EBITDA*" means Adjusted EBITDA during the immediately preceding twelve (12) calendar months.

(89) "*Non-Settling Asbestos Insurer*" means an Asbestos Insurer that is not a Settling Asbestos Insurer.

(90) "*Note Issuance Agreement*" means the Note Issuance and Security Agreement, in substantially the form attached hereto as Exhibit D, to be dated as of the Effective Date, by and among the Reorganized Debtor, Duro Dyne Spence LLC, ISWR Ohio LLC, and the Asbestos Trust

(91) "*Petition Date*" means the date on which the Debtors file their respective voluntary petitions under section 301 of the Bankruptcy Code to commence their respective Chapter 11 Cases.

(92) "*Plan*" means this Third Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the Bankruptcy Code, as the same may be amended, modified, or supplemented from time to time in accordance with the terms and provisions hereof.

(93) "*Plan Documents*" means, collectively, (a) the Plan, (b) the Disclosure Statement, (c) the Asbestos Trust Agreement, (d) the Trust Distribution Procedures, (e) the Plan Supplement, (f) all of the exhibits and schedules attached to any of the foregoing, and (g) any other document or instrument necessary to implement the Plan.

(94) "*Plan Proponents*" means the Debtors, the Asbestos Claimants Committee, and the Legal Representative.

(95) "*Plan Supplement*" means the supplement to the Plan containing exhibits and schedules to the Plan, which will be served with the Disclosure Statement in connection with the solicitation of votes on the Plan.

(96) "*Pledge and Security Agreement*" means the Pledge and Security Agreement, in substantially the form attached hereto as Exhibit E, to be dated as of the Effective Date, by and among the shareholders of the Reorganized Debtor and Duro Dyne Canada and the Asbestos Trust.

(97) "*Prepetition Defense-Cost Contribution Claim*" means a Claim asserted by an Asbestos Insurer for reimbursement for one or more of the Debtors' share of defense costs (a) that arise from or are attributable to an Asbestos Personal Injury Claim and (b) that were incurred prior to the Petition Date.

(98) "*Priority Non-Tax Claim*" means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code.

(99) "*Priority Tax Claim*" means any Claim of a Governmental Unit against the Debtors entitled to a priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

(100) "*Proceeds*" means all cash, interest, profits, dividends, proceeds, products, and rents earned, accrued, collected, derived, received, or recovered on account of the liquidation, sale, transfer, enforcement, or other disposition of property, including all "proceeds" as defined under section 9-102(64) of the Uniform Commercial Code, and all proceeds on proceeds.

(101) "*Professional Claim*" means any Claim for an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

(102) "*Protected Parties*" means each of the following:

(a) the Debtors;

(b) the Reorganized Debtor;

(c) any current or former Affiliate of each of the Debtors or Reorganized Debtor, only to the extent that any liability is asserted to exist as a result of such Entity's being or having been an Affiliate;

(d) each of the Hinden Family Members, only to the extent that any liability is asserted to exist as a result of such Hinden Family Member (i) being or having been an Affiliate of a Debtor or the Reorganized Debtor, (ii) owning or having owned a financial interest in a Debtor or the Reorganized Debtor, (iii) being or having been involved in the management of a Debtor or the Reorganized Debtor, or (iv) serving or having served as an officer, director, or employee of a Debtor or the Reorganized Debtor;

(e) each of the Hinden Family Entities, only to the extent that any liability is asserted to exist as a result of such Hinden Family Entity (i) being or having been an Affiliate of a Debtor or the Reorganized Debtor, (ii) owning or having owned a financial interest in a Debtor or the Reorganized Debtor, or (iii) being or having been involved in the management of a Debtor or the Reorganized Debtor; and

(f) each Settling Asbestos Insurer identified on Schedule 1.01(102)(f) of the Plan Supplement, but only to the extent (i) provided by section 524(g) of the Bankruptcy Code in respect of any claim that arises by reason of one of the activities or relationships enumerated under section 524(g)(4)(A)(ii) of the Bankruptcy Code; and (ii) that the liability asserted to exist against such Settling Asbestos Insurer is the subject of a release in an Asbestos Insurance Settlement.

(103) "*RDD Pledge*" means the possessory Lien on or possessory security interest in 50.1% of the Reorganized Duro Dyne Stock, which Lien or security interest shall be granted to the Asbestos Trust in accordance with the Pledge and Security Agreement.

(104) "*Record Date*" means the record date for Distributions, as set forth in the Confirmation Order.

(105) "*Related Parties*" means the Hinden Family Members, the Hinden Family Entities, any Affiliates of any of the foregoing, and any Affiliates of any of the Debtors or Reorganized Debtor.

(106) "*Related-Party Claim*" means any Claim held by one or more Related Parties, including any such Claim that is based on, arises from, or is attributable to a lease or contract with a Debtor.

(107) "*Related-Party Payment*" means any transfer of assets or cash made or to be made in the form of a dividend, redemption, or other distribution or payment to a Related Party or on account of any debt or obligation owed to, or Equity Interest held by, a Related Party, including (a) any base rental payment made on account of the Bay Shore Lease or the Fairfield Lease and (b) any other lease or rent payment made to a Related Party on account of or with respect to any property, plant, or equipment, but specifically excluding (i) Tax Distributions so long as, prior to and after giving effect to such Tax Distributions, no "Event of Default" (as defined in the Note Issuance Agreement) exists or is caused thereby; and (ii) other payments that are not retained at the discretion of a Related Party and as to which a Related Party serves or functions as a conduit for a transferee that is not a Related Party, including tax payments that are designated as "additional rent" under the Bay Shore Lease or the Fairfield Lease.

(108) "*Reorganized Debtor*" means the Duro Dyne National Corp., as it exists on and after the Effective Date.

(109) "*Reorganized Duro Dyne Stock*" means the "Voting Stock" (as defined in the Pledge and Security Agreement) of the Reorganized Debtor.

(110) "*Schedules*" means the schedules, statements, and lists filed by each of the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been amended or supplemented from time to time.

(111) "*Secured Claim*" means any Claim that is (a) secured, as of the Petition Date, by a Lien that is valid, perfected, and enforceable under applicable law and is not subject to avoidance

under the Bankruptcy Code or applicable nonbankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but with respect to both (a) and (b) above, only to the extent of the value, net of any senior Lien, of the Estate's interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be; *provided, however,* that the term "Secured Claim" shall not include or pertain to a Related-Party Claim even if the Related-Party Claim is secured by a Lien, is subject to setoff under section 553 of the Bankruptcy Code, or would otherwise satisfy this definition of "Secured Claim" if such Claim were not held by a Related Party.

(112) "*Semiannual Payment Date*" shall have the meaning ascribed to such term in the Note Issuance Agreement.

(113) "*Senior Lending Facility*" means an asset-based secured lending facility to be provided by Bank of America, N.A. on or before the Effective Date in the approximate sum of $9,950,000.

(114) "*Senior Lender*" means Bank of America, N.A., in its capacity as lender under the Senior Lending Facility.

(115) "*Settling Asbestos Insurer*" means an Asbestos Insurer that has entered into an Asbestos Insurance Settlement.

(116) "*Settling Asbestos Insurer Injunction*" means the supplemental injunction issued under sections 105(a) and 524(g) of the Bankruptcy Code that is set forth in Section 9.06 hereof.

(117) "*Sheet Metal Workers' National Pension Fund*" means the Sheet Metal Workers' National Pension Fund, a multiemployer pension plan.

(118) "*Sheet Metal Workers' National Pension Fund Withdrawal Liability Claims*" means Claims (if any) for full or partial withdrawal liability or otherwise to the extent due and owing to or asserted by the Sheet Metal Workers' National Pension Fund, the International Association of Sheet Metal, Air, Rail and Transportation Workers or SMART Local Union No. 170 of the Sheet Metal Workers' International Union in connection with the Debtors' termination of all remaining SMART Local Union No. 170 of the Sheet Metal Workers' International Union employees on or about June 15, 2018 which thereby relieved the Debtors of any further employee contribution obligations on behalf of the SMART Local Union No. 170 of the Sheet Metal Workers' International Union to the Sheet Metal Workers' National Pension Fund.

(119) "*Supersedeas Bond Action*" means any rights, defenses, counterclaims, or affirmative causes of action of any of the Debtors or their respective Estates with respect to a Bonded Claim, or with respect to any supersedeas bond or other form of security or payment assurance issued in connection with a Bonded Claim, or against the issuer or insurer of any payment assurance issued in connection with a Bonded Claim.

(120) "*Tax Distribution*" means a distribution or dividend by the Reorganized Debtor to holders of Equity Interests in the Reorganized Debtor solely to the extent necessary to permit such holders to discharge their respective federal, state, and local income tax liabilities arising directly with respect to their Equity Interests in the Reorganized Debtor (and not in any Affiliate of the Reorganized Debtor), determined (a) based on the assumption that such holders are subject to the highest federal, state, and local income tax rates in effect at the time of such distribution; and (b) after taking into account all tax deductions, credits, refunds, or other benefits reasonably available or attributable to the Reorganized Debtor, including any such deductions, credits, refunds, or benefits arising from contributions to the Asbestos Trust or from net operating loss carrybacks or carryforwards resulting from such contributions.

(121) "*Trust Advisory Committee*" or "*TAC*" means the committee established pursuant to Section 4.03 hereof and having the powers, duties and obligations set forth in the Asbestos Trust Agreement.

(122) "*Trust Distribution Procedures*" or "*TDP*" means the procedures, in substantially the form attached hereto as Exhibit F, to be implemented by the Asbestos Trustee pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement to resolve, liquidate, and pay (if entitled to payment) Channeled Asbestos Claims as and to the extent set forth in such procedures.

(123) "*Trust Note*" means that certain promissory note to be issued by the Reorganized Debtor to the Asbestos Trust, in the principal amount of $13,500,000, bearing interest at 7.15% per annum with a 20-year maturity, in substantially the form attached as Exhibit D to the Note Issuance Agreement.

(124) "*Unimpaired*" means a Claim or Equity Interest, or a Class of Claims or Equity Interests, that is not Impaired under this Plan.

(125) "*United States Trustee*" means the United States Trustee appointed under section 591 of title 28 of the United States Code to serve in the District of New Jersey.

(126) "*Withdrawal Liability Claim*" means (i) any Sheet Metal Workers' National Pension Fund Withdrawal Liability Claim and (ii) any Claim for withdrawal liability asserted by the Local 210 Unity Pension Fund and/or Local 210, Warehouse & Production Employees Union, AFL-CIO against Debtors related to the withdrawal of the Debtors from the Local 210 Unity Pension Fund on or about November 30, 2017.

(127) "*Worker Compensation Claim*" means any Claim (a) for benefits under a government-mandated workers' compensation system, which a past, present, or future employee of any of the Debtors or their respective predecessors is receiving, or may in the future have a right to receive, or (b) for reimbursement, contribution, subrogation, or indemnity brought by any insurer or Governmental Unit as a result of payments made to or for the benefit of such employees under such a system and the fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims.

Section 1.02. ***Rules of Interpretation.*** For purposes of this Plan:

(a) in the appropriate context, each term, whether stated in the singular or in the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, or neuter gender;

(b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions;

(c) any definition or reference to any agreement, instrument, or other document, including the Bay Shore Lease and the Fairfield Lease, shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, substituted, replaced, or otherwise modified (subject to any restrictions on such amendments, supplements, substitutions, replacements, or modifications set forth herein);

(d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto;

(e) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(f) the word "will" is to be construed to have the same meaning and effect as the word "shall," and vice-versa;

(g) the words "includes" and "including" are not limiting;

(h) captions and headings are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof;

(i) unless otherwise specified, the rules of construction in section 102 of the Bankruptcy Code shall apply hereto;

(j) for purposes of computing time periods, whenever the Plan provides for an event to occur "*within*" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computed in the computation of days elapsed. In addition, the word "*from*" means "from and including"; "*after*" means "after and excluding"; and "*to*" or "*until*" mean "to and including"; and

(k) any immaterial effectuating provisions may be interpreted by the Plan Proponents in a manner that is consistent with the overall purpose and intent of the Plan, all without further notice or order of the Bankruptcy Court.

Section 1.03. ***Computation of Time.*** Unless otherwise stated, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

Section 1.04. ***Governing Law.*** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

Section 1.05. ***Reference to Monetary Figures.*** All references in the Plan to dollar amounts or other monetary figures refer to the currency of the United States of America, unless otherwise expressly provided.

Section 1.06. ***Reference to the Debtors or the Reorganized Debtor.*** Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtor shall mean the Debtors and the Reorganized Debtor, as applicable, to the extent the context requires.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND STATUTORY FEES

Section 2.01. ***Administrative Claims***

(a) *Administrative Claims Other Than for Professional Compensation and Reimbursement.* Except to the extent that any Entity entitled to payment of any Allowed Administrative Claim agrees to less favorable treatment with the Reorganized Debtor, each holder of an Allowed Administrative Claim (other than a Professional Claim) shall receive Cash in an amount equal to such Allowed Administrative Claim on the later of the Effective Date and the date on which such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as reasonably practicable; *provided, however*, that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the applicable Debtor shall be paid in full and performed by the applicable Reorganized Debtor in accordance with the terms and subject to any conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

(b) *Bar Date for Administrative Claims Other Than Professional Claims.* All parties seeking payment of an Administrative Claim (other than a Professional Claim) must file with the Bankruptcy Court and serve upon the Reorganized Debtor a request for payment of such Administrative Claim prior to the applicable deadline set forth below; *provided, however*, that parties seeking payment of postpetition ordinary course trade obligations, postpetition payroll obligations incurred in the ordinary course of a Debtor's postpetition business, and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not file such a request. All holders of Administrative Claims (other than Professional Claims) must file with

the Bankruptcy Court and serve on the Debtors or the Reorganized Debtor, as applicable, a request for payment of such Claims so as to be received on or before 4:00 p.m. (Eastern Time) on the first Business Day after the date that is sixty (60) days after the Effective Date, unless otherwise agreed to by the appropriate Debtor or Reorganized Debtor, without further approval by the Bankruptcy Court. ***Failure to comply with these deadlines shall forever bar the holder of an Administrative Claim (other than a Professional Claim) from seeking payment thereof.*** Any holder of an Administrative Claim (other than a Professional Claim) that does not assert such Claim in accordance with this Section 2.01 shall have its Claim deemed disallowed under this Plan and be forever barred from asserting such Claim against any of the Reorganized Debtor, the Debtors, their Estates, or their assets. Any such Claim and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim.

(c) *Professional Claims.* Holders of Professional Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by the first Business Day after the date that is thirty (30) calendar days after the Effective Date or by such other date as may be fixed by the Bankruptcy Court, and (ii) be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) within seven (7) calendar days after such Professional Claim becomes an Allowed Administrative Claim, or (B) upon such other terms as may be mutually agreed upon between the holder of such Allowed Professional Claim and the Reorganized Debtor.

Section 2.02. ***Priority Tax Claims***. Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as reasonably practicable, one of the following treatments, at the option of the Reorganized Debtor: (a) Cash in the amount of such Allowed Priority Tax Claim; (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such holder and the Reorganized Debtor or otherwise determined by order of the Bankruptcy Court.

Section 2.03. ***Statutory Fees***. The Debtors shall pay in full, in Cash, any fees due and owing to the United States Trustee, including quarterly fees payable under 28 U.S.C.§ 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including disbursements in and outside the ordinary course of the Debtors' businesses at the time of Confirmation. On and after the Effective Date, the Reorganized Debtor shall pay the applicable fees to the United States Trustee for the Reorganized Debtor when due in the ordinary course in accordance with applicable law.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 3.01. ***Classification of Claims and Interests***. Pursuant to section 1122 of the Bankruptcy Code, set forth below is the designation of Classes of Claims and Equity Interests under this Plan. A Claim or Equity Interest is placed in a particular Class for the purpose of

voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest has not been paid, released, withdrawn, or disallowed before the Effective Date.

Section 3.02. ***Summary of Classification.*** This Plan constitutes a chapter 11 plan of reorganization for each of the Debtors. The Plan's classifications of Claims and Equity Interests are set forth below and described in more detail in Section 3.03.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | Employee Benefit Claims | Unimpaired | Not Entitled to Vote |
| 4 | Worker Compensation Claims | Unimpaired | Not Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote |
| 6 | Prepetition Defense-Cost Contribution Claims | Impaired | Entitled to Vote |
| 7 | Channeled Asbestos Claims | Impaired | Entitled to Vote |
| 8 | Bonded Claims | Unimpaired | Not Entitled to Vote |
| 9 | Intercompany Claims | Impaired | Not Entitled to Vote |
| 10 | Related-Party Claims | Impaired | Not Entitled to Vote |
| 11 | Equity Interests in Duro Dyne National Corp. | Impaired | Not Entitled to Vote |
| 12 | Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp. | Impaired | Not Entitled to Vote |

Section 3.03. ***Classification and Treatment of Claims and Interests.*** To the extent a Class contains Claims or Equity Interests with respect to one or more of the Debtors, the classification of Claims and Equity Interests and their respective treatment hereunder are specified below.

(a) *Class 1 – Priority Non-Tax Claims*

(i) *Classification:* Class 1 shall consist of all Priority Non-Tax Claims.

(ii) *Treatment:* Except to the extent that a holder of an Allowed Priority Non-Tax Claim and the Debtors shall have agreed in writing to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash, without interest, in the Allowed Amount of such Allowed Priority Non-Tax Claim as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date when such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

(iii) *Impairment and Voting:* Class 1 is Unimpaired. Holders of Allowed Class 1 Priority Non-Tax Claims are deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and their votes will not be counted.

(b) *Class 2 – Secured Claims*

(i) *Classification:* Class 2 shall consist of all Secured Claims.

(ii) *Treatment:* Each holder of an Allowed Secured Claim shall be paid the Allowed Amount of such Claim either, at the option of the Reorganized Debtor, (A) in full, in Cash, on the later of (1) the Effective Date, or as soon as reasonably practicable thereafter, or (2) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as reasonably practicable thereafter; (B) upon such other terms as may be agreed upon between the Reorganized Debtor and the holder of an Allowed Secured Claim and approved by the Bankruptcy Court; (C) by the surrender to the holder or holders of any Allowed Secured Claim of the property securing such Secured Claim; or (D) notwithstanding any contractual provision or applicable law that entitles a holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity upon and after the occurrence of a default, by reinstatement in accordance with section 1124(2)(B) of the Bankruptcy Code.

(iii) *Impairment and Voting:* Class 2 Secured Claims are Unimpaired, and holders of Class 2 Secured Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 2 Secured Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

(c) *Class 3 – Employee Benefit Claims*

(i) *Classification:* Class 3 shall consist of all Employee Benefit Claims.

(ii) *Treatment:* This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Allowed Employee Benefit Claim entitles the holder of such Claim, including, for the avoidance of doubt, quarterly installment payments on account of any Allowed Withdrawal Liability Claims as provided pursuant to Title IV of ERISA.

(iii) *Impairment and Voting:* Class 3 Employee Benefit Claims are Unimpaired, and holders of Class 3 Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 3 Employee Benefit Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

(d) *Class 4 – Worker Compensation Claims*

(i) *Classification:* Class 4 shall consist of all Worker Compensation Claims.

(ii) *Treatment:* This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Allowed Worker Compensation Claim entitles the holder of such Claim.

(iii) *Impairment and Voting:* Class 4 Worker Compensation Claims are Unimpaired, and holders of Class 4 Worker Compensation Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 4 Worker Compensation Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

(e) *Class 5 – General Unsecured Claims*

(i) *Classification:* Class 5 shall consist of all General Unsecured Claims.

(ii) *Treatment*: Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of the applicable Debtors' business or in accordance with applicable court order or applicable law, or (ii) such other treatment that renders such holder Unimpaired.

(iii) *Impairment and Voting:* Class 5 General Unsecured Claims are Unimpaired. Therefore, holders of General Unsecured Claims in Class 5 are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

(f) *Class 6 – Prepetition Defense-Cost Contribution Claims*

(i) *Classification:* Class 6 shall consist of all Prepetition Defense-Cost Contribution Claims.

(ii) *Treatment*: Except to the extent that a holder of an Allowed Prepetition Defense-Cost Contribution Claim agrees to different treatment, each holder of an Allowed Prepetition Defense-Cost Contribution Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for such Claim, payment in full of the Allowed Amount of such Prepetition Defense-Cost Contribution Claims, to be payable as follows: (a) annual payments of principal based on a twenty (20) year amortization schedule plus interest at the rate of 6.5% per annum to be made on the first (1st) through seventh (7th) year anniversaries of the Effective Date; and (b) a balloon payment of all outstanding principal and interest on the eighth (8th) anniversary of the Effective Date.

(iii) *Impairment and Voting:* Class 6 Prepetition Defense-Cost Contribution Claims are Impaired. Therefore, holders of Prepetition Defense-Cost Contribution Claims in Class 6 are entitled to vote on the Plan, and their votes will be solicited.

(g) *Class 7 – Channeled Asbestos Claims*

(i) *Classification:* Class 7 shall consist of all Channeled Asbestos Claims.

(ii) *Treatment:* All Class 7 Channeled Asbestos Claims shall be resolved in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the TDP. All Class 7 Channeled Asbestos Claims that are eligible for payment shall be paid by the Asbestos Trust out of the Asbestos Trust Assets, as and to the extent provided in the Asbestos Trust Agreement and the TDP.

(iii) *Impairment and Voting:* Class 7 Channeled Asbestos Claims are Impaired. Therefore, holders of Asbestos Claims in Class 7 are entitled to vote on the Plan, and their votes will be solicited.

(h) *Class 8 – Bonded Claims*

(i) *Classification:* Class 8 shall consist of all Bonded Claims.

(ii) *Treatment:* On the later of (A) the Effective Date or (B) the date on which a Bonded Claim becomes an Allowed Bonded Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Bonded Claim shall receive in full and final satisfaction of such Allowed Bonded Claim, Cash in the Allowed Amount of the Allowed Bonded Claim; *provided, however,* that (1) in no event shall such Cash distribution exceed the amount of the bond or other payment assurance securing such Allowed Bonded Claim and (2) each such holder of an Allowed Bonded Claim shall look solely to the bond or other payment assurance securing its Claim for such Cash distribution with respect to such Allowed Bonded Claim, and shall receive no property or Distribution from the applicable Debtor, the Reorganized Debtor, or the Asbestos Trust on account of such Allowed Bonded Claim. If (x) the holder of a Bonded Asbestos Personal Injury Claim and the Plan Proponents or (y) the holder of a Bonded Non-Asbestos Claim and the applicable Debtor or Reorganized Debtor, do not agree on the Allowed Amount of such Bonded Claim, the Bankruptcy Court or other court of competent jurisdiction shall determine the Allowed Amount of such Claim.

(iii) *Impairment and Voting:* Class 8 Bonded Claims are Unimpaired, and holders of Class 8 Bonded Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 8 Bonded Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

(i) *Class 9 – Intercompany Claims*

(i) *Classification:* Class 9 shall consist of all Intercompany Claims.

(ii) *Treatment:* Intercompany Claims shall be expunged and no Distributions shall be made on account of any Allowed Intercompany Claim

(iii) *Impairment and Voting:* Class 9 is Impaired by this Plan. Because the holders of Class 9 Intercompany Claims are Insiders of the Debtors, Class 9 is not entitled to vote to accept or reject this Plan.

(j) *Class 10 – Related-Party Claims*

(i) *Classification:* Class 10 shall consist of all Related-Party Claims.

(ii) *Treatment:* Related-Party Claims shall be paid in the ordinary course according to any terms or agreements governing such Claims, except that all Related-Party Claims shall be subordinated to the Trust Note in accordance with Section 4.16 hereof and shall be subject to any other applicable terms or provisions set forth in the Plan Documents. Any personal property or equipment securing any Related-Party Claim as of the Effective Date shall revert to, or be held by, the Reorganized Debtor free and clear of any Lien, interest, or other encumbrance, upon the maturity or satisfaction of such Related-Party Claim.

(iii) *Impairment and Voting:* Class 10 is Impaired by this Plan. Because holders of Class 10 Related-Party Claims are Insiders of the Debtors, Class 10 is not entitled to vote to accept or reject this Plan.

(k) *Class 11 – Equity Interests in Duro Dyne National Corp.*

(i) *Classification:* Class 11 shall consist of all Equity Interests in Duro Dyne National Corp.

(ii) *Treatment:* Subject to the provisions of Section 5.02(c), holders of Equity Interests in Debtor Duro Dyne National Corp. shall receive and retain their Equity Interests in Reorganized Duro Dyne National Corp. to the same extent held in the Debtor Duro Dyne National Corp. on the Petition Date.

(iii) *Impairment and Voting:* Class 11 Equity Interests are Impaired by this Plan. Because the Holders of Class 11 Equity Interests are Insiders, holders of Class 11 Equity Interests are not entitled to vote to accept or reject this Plan.

(l) *Class 12 – Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.*

(i) *Classification:* Class 12 shall consist of all Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.

(ii) *Treatment:* All Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. shall be cancelled and extinguished on the Effective Date and Holders of Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. shall receive no distributions on account of such Equity Interests.

(iii) *Impairment and Voting:* Class 12 Equity Interests are Impaired by this Plan. Because each holder of Class 12 Equity Interests is an Insider, holders of Class 12 Equity Interests are not entitled to vote to accept or reject this Plan.

## ARTICLE IV.

## THE ASBESTOS TRUST

Section 4.01. ***Creation and Purposes of the Asbestos Trust.*** Effective upon Consummation, the Asbestos Trust shall be created and established without further notice, action, or deed, except as provided in the Plan Documents. The Asbestos Trust shall be a "qualified settlement fund" within the meaning of 26 U.S.C. § 468B. The purposes of the Asbestos Trust shall be, *inter alia*, (a) to assume and succeed to all liabilities and responsibility for Channeled Asbestos Claims; (b) to direct the processing, resolution, liquidation, and payment of all Channeled Asbestos Claims in accordance with section 524(g) of the Bankruptcy Code, the Plan, the Asbestos Trust Agreement, the TDP, and the Confirmation Order; (c) to preserve, hold, manage, and maximize the Asbestos Trust Assets for use in paying or satisfying Channeled

Asbestos Claims; and (d) to comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code, all in accordance with the Plan and the Asbestos Trust Agreement in such a way that all holders of Channeled Asbestos Claims are treated substantially in the same manner. ***On the Effective Date, except as provided in <u>Sections 4.13 and 4.14</u> hereof, all Channeled Asbestos Claims shall be channeled to the Asbestos Trust pursuant to the Asbestos Permanent Channeling Injunction, and shall be resolved, liquidated, and (if entitled to payment) paid in accordance with the Asbestos Trust Agreement and the TDP.***

Section 4.02. *Appointment of Asbestos Trustee.* On the Confirmation Date, the Bankruptcy Court shall appoint an individual designated by the Asbestos Claimants Committee and the Legal Representative to serve as the initial Asbestos Trustee pursuant to the terms of the Asbestos Trust Agreement and the TDP. Such appointment shall be effective as of the Effective Date. The Asbestos Claimants Committee and the Legal Representative have designated Alan Rich to serve as the initial Asbestos Trustee. Upon termination of the Asbestos Trust, or as otherwise provided in the Asbestos Trust Agreement, the Asbestos Trustee's employment shall be deemed terminated, and the Asbestos Trustee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Asbestos Trust and the Chapter 11 Cases.

Section 4.03. *Appointment of Delaware Trustee.* Wilmington Trust has been selected by agreement of the Asbestos Claimants Committee and the Legal Representative to serve as the initial Delaware Trustee and will be appointed pursuant to the Confirmation Order. All subsequent Delaware Trustees shall be appointed in accordance with the terms of the Asbestos Trust Agreement.

Section 4.04. *Trust Advisory Committee.* Effective on the Effective Date, the TAC shall be established pursuant to the terms of the Asbestos Trust Agreement. The TAC shall have five members and shall have the functions, duties, and rights provided in the Asbestos Trust Agreement. The initial members of the TAC selected by the Asbestos Claimants Committee are James Ferraro, Esq of Kelley & Ferraro, LLP, Al Brayton, Esq. of Brayton Purcell, LLP, Kathy Byrne, Esq. of Cooney & Conway, Joseph Belluck of Belluck & Fox LLP, and Perry Browder of Simmons Hanly Conroy LLC. Each of the foregoing law firms represents a member of the Asbestos Claimants Committee. Upon termination of the Asbestos Trust, or as otherwise provided in the Asbestos Trust Agreement, the TAC shall be deemed dissolved and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Asbestos Trust and the Chapter 11 Cases.

Section 4.05. *Legal Representative for Demand Holders.* Effective on the Effective Date, the Legal Representative shall serve in such capacity under the terms of the Asbestos Trust Agreement, and shall have the functions, duties, and rights provided in the Asbestos Trust Agreement. Upon termination of the Asbestos Trust, or as otherwise provided in the Asbestos Trust Agreement, the Legal Representative shall be discharged of and from all further authorities, duties, responsibilities, and obligations with respect to or in connection with the Asbestos Trust and the Chapter 11 Cases.

Section 4.06. ***Assumption of Certain Liabilities by the Asbestos Trust.*** On the Effective Date, subject to the terms of the Plan Documents and in accordance with sections 524(g) and 1141 of the Bankruptcy Code, the Asbestos Trust shall assume and succeed to all liability and responsibility for all Channeled Asbestos Claims. Notwithstanding the Asbestos Trust's assumption of liability and responsibility for all Channeled Asbestos Claims, such assumption shall not itself operate or be construed as a release, accord, or novation of each Debtor's obligations on account of such Claims for purposes of any Asbestos Insurance Rights solely to the extent of suits against the Reorganized Debtor directly in accordance with Section 4.13 hereof (subject, however, to the discharge of any "personal liability" of the Debtors as that term is used in section 524(a) of the Bankruptcy Code and as provided in Section 9.03 hereof).

Section 4.07. **Transfer of Asbestos Insurance Rights**

(a) On the Effective Date, by virtue of Confirmation, without further notice, action, or deed, the Asbestos Insurance Rights shall be automatically transferred to, and indefeasibly vested in, the Asbestos Trust, and the Asbestos Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, with the exclusive right to enforce any and all of the Asbestos Insurance Rights against any Entity, and the Proceeds of the recoveries of any such Asbestos Insurance Rights shall be the property of, and shall be deposited in, the Asbestos Trust. The Asbestos Insurance Rights shall be vested in the Asbestos Trust free and clear of all Liens, encumbrances, interests, claims, and causes of action of any Entity.

(b) If a court of competent jurisdiction determines the transfer of the Asbestos Insurance Rights pursuant to Section 4.07(a) hereof to be invalid, non-binding, or unenforceable, in whole or in part, then the Reorganized Debtor shall (1) upon request by the Asbestos Trust and at the reasonable expense of the Asbestos Trust, take all reasonable actions to pursue any of the Asbestos Insurance Rights for the benefit of, and to the extent required by, the Asbestos Trust; and (2) immediately transfer any Proceeds or property recovered under or on account of any Asbestos Insurance Rights to the Asbestos Trust; *provided, however*, that while any such Proceeds or property are held by or under the control of the Reorganized Debtor, such amounts shall be held in trust solely for the benefit of the Asbestos Trust.

Section 4.08. ***Funding of the Asbestos Trust***

(a) On the Effective Date, the Debtors shall pay in full and in Cash the Debtors' Contribution to the Asbestos Trust.

(b) On the Effective Date, the Hinden Contribution shall be paid in full and in Cash to the Asbestos Trust by or on behalf of the Hinden Family Entities and the Hinden Family Members.

(c) On the Effective Date, any Proceeds held by the Debtors on account of Asbestos Insurance Rights shall be paid in full and in Cash to the Asbestos Trust.

(d) On the Effective Date, the Reorganized Debtor shall issue and deliver the Trust Note to the Asbestos Trust.

(e) The Earn Out Payments in the aggregate amount of $2 million will be paid in accordance with Section 4.11; and

(f) Effective on the Effective Date, by virtue of Confirmation, any and all other Asbestos Trust Assets shall be transferred to and be vested in the Asbestos Trust, without further notice, deed, or order.

Section 4.09. ***Securing Payment and Performance Under the Trust Note***

(a) Effective on the Effective Date, the Trust Note shall be secured by the RDD Pledge, the DDC Pledge, the Bay Shore Mortgage, and the Fairfield Mortgage.

(b) The Bay Shore Mortgage shall be a recorded and first-priority Lien on the Bay Shore Property. The Fairfield Mortgage shall be a recorded and first-priority Lien on the Fairfield Property.

(c) The DDC Pledge shall be a first-priority Lien and perfected in a manner such that it will not be subordinate to, or *pari passu* with, any other Lien, security interest, pledge, hypothecation, or other encumbrance or interest prior to the release of the DDC Pledge pursuant to the terms of the Pledge and Security Agreement. On the Effective Date, Duro Dyne Canada shall deliver certificates representing 50.1% of the Duro Dyne Canada Stock, together with stock power executed in blank, to the Asbestos Trust to be held by the Asbestos Trustee in accordance with the Pledge and Security Agreement.

(d) The RDD Pledge shall be a first-priority Lien and perfected in a manner such that it will not be subordinate to, or *pari passu* with, any other Lien, security interest, pledge, hypothecation, or other encumbrance or interest prior to the release of the RDD Pledge pursuant to the terms of the Pledge and Security Agreement. On the Effective Date, the Reorganized Debtor shall deliver certificates representing 50.1% of the Reorganized Duro Dyne Stock, together with stock power executed in blank, to the Asbestos Trust to be held by the Asbestos Trustee in accordance with the Pledge and Security Agreement.

Section 4.10. ***Vesting of Asbestos Trust Assets***. Upon the transfer of the Asbestos Trust Assets to the Asbestos Trust, all right, title, and interest in and to the Asbestos Trust Assets, and any proceeds thereof, shall be indefeasibly and irrevocably vested in the Asbestos Trust free and clear of all Claims, Demands, Liens, Equity Interests, other interests, and causes of action of any Entity, without any further action of the Bankruptcy Court or any Entity, subject to the Asbestos Permanent Channeling Injunction and other provisions of this Plan; *provided, however*, that to the extent that certain Asbestos Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to and vested in the Asbestos Trust on the Effective Date, such Asbestos Trust Assets shall be transferred to and irrevocably and indefeasibly vested in the Asbestos Trust, free and clear of Claims, Demands, Liens, Equity Interests, other interests, and causes of action of any Entity, as soon as practicable after the Effective Date.

Section 4.11. ***Earn Out Payments***. The Reorganized Debtor shall annually pay to the Asbestos Trust, by no later than March 31 of each year, a sum of Cash equal to thirty percent (30%) of the amount of LTM Adjusted EBITDA (as measured at December 31 of each year) that

is in excess of the Earn Out Threshold (defined below), subject to and in accordance with the terms of this Section 4.11.

(a) For purposes of this Section, the term "*Total Scheduled Rent*" means the total amount of rent scheduled under the Bay Shore Lease and the Fairfield Lease and paid on account of the Bay Shore Lease and the Fairfield Lease during the twelve (12) calendar months immediately preceding January 1 of each year; and the term "*Earn Out Threshold*" means an amount equal to $3,000,000 *plus* Total Scheduled Rent.

(b) For purposes of calculating the Earn Out Payments under this section, LTM Adjusted EBITDA and Total Scheduled Rent shall be measured at December 31 of the same calendar year.

(c) By way of illustration and not limitation, if LTM Adjusted EBITDA, as measured at December 31 of a given year, is $7,000,000, and if Total Scheduled Rent, as measured at December 31 of the same year, is $1,100,000, then the Reorganized Debtor shall pay to the Asbestos Trust the sum of $870,000 (*i.e.*, 30% ($7,000,000 *less* ($3,000,000 *plus* $1,100,000))) by March 31 of the immediately following year.

(d) If the amount of LTM Adjusted EBITDA, as measured at December 31 of a given year, is equal to or less than the Earn Out Threshold, as calculated at December 31 of the same year, there shall be no Earn Out Payment in that same year.

(e) If a Catch-Up Payment and an Earn Out Payment are due and payable on the same Semiannual Payment Date, then the Reorganized Debtor shall pay the holder of the Trust Note the greater of the Catch-Up Amount and the amount of the Earn Out Payment, and such payment shall be applied first to any accrued and unpaid interest and outstanding Deferral Amounts in accordance with section 3(b)(5) of the Note Issuance Agreement and then, after such interest and Deferral Amounts have been paid in full in accordance with such section, to the amount of the Earn Out Payment that is outstanding. To the extent all or part of the Earn Out Payment would have been paid to the Asbestos Trust but for the application of the Catch-Up Payment to the unpaid accrued interest and Deferral Amount in accordance with this subsection (e), such unpaid Earn Out Payment shall be deemed a "*Deferred Earn Out Amount*," and no Related-Party Payments shall be made unless and until the Deferred Earn Out Amount is indefeasibly paid in Cash and in full to the Asbestos Trust.

(f) Notwithstanding any provision in this Section, the Reorganized Debtor shall have no duty or obligation to pay an Earn Out Payment on March 31, 2019 based on LTM Adjusted EBITDA measured at December 31, 2018.

(g) Once the cumulative total of Earn Out Payments irrevocably and indefeasibly paid to the Asbestos Trust equals $2,000,000, the Reorganized Debtor shall have no duty or obligation to pay further Earn Out Payments to the Asbestos Trust.

(h) Unless and until the cumulative total of Earn Out Payments irrevocably and indefeasibly paid to the Asbestos Trust equals $2,000,000, the Reorganized Debtor shall not (1) transfer any assets to a Related Party (other than payments authorized under any of the Plan Documents or payments in the ordinary course of the Reorganized Debtor's business to Duro Dyne Canada in exchange for reasonably equivalent value) or to any Entity, the majority of

whose Equity Interests are owned directly or indirectly by the Reorganized Debtor or one or more of the Related Parties; (2) acquire a business, division, or substantially all the assets of any Entity; or (3) acquire fifty percent (50%) or more of the Equity Interests in any Entity, unless, before any asset transfer or acquisition is effectuated, such Related Party or Entity (i) expressly assumes joint and several liability for the Earn Out Payments, (ii) agrees in writing that its books, records, and financial statements, including the calculation of LTM Adjusted EBITDA under this Section, shall be kept and done on a consolidated basis with the Reorganized Debtor and Duro Dyne Canada, (iii) executes and delivers to the Asbestos Trust an assumption agreement that is satisfactory in form and substance to the Asbestos Trust, and (iv) takes all other actions as the Asbestos Trust deems appropriate to ensure payment of the Earn Out Payments hereunder.

Section 4.12. ***Financial Reporting and Disclosures***. On and after the Effective Date, and up to and through the maturity date of the Trust Note, the Reorganized Debtor shall furnish the Asbestos Trust with all financial reporting in the same form and at the same time as required by the lender under the Senior Lending Facility or any senior or secured credit agreement in replacement thereof, and any additional information reasonably required to monitor Adjusted EBITDA for purposes of payments under the Trust Note and the Earn Out Payments. All such financial reporting and additional information shall conform to generally accepted accounting principles, consistently applied in each period in which a calculation is performed, if such conformity is not required by the lender under the Secured Lender Facility or any senior or secured credit agreement in replacement thereof. If the Senior Lending Facility is terminated or not renewed or replaced, the Reorganized Debtor shall furnish the Asbestos Trust with such financial reporting at the same time and with the same level of detail and disclosure previously required under the Senior Lending Facility.

Section 4.13. ***Actions Against the Reorganized Debtor to Obtain the Benefits of Asbestos Insurance Coverage***. In addition to the potential for recoveries from the Asbestos Trust under the TDP, and not as an alternative thereto, Channeled Asbestos Claimants shall have the right to commence an action against the Reorganized Debtor and pursue their claims in the tort system to obtain the benefit of Asbestos Insurance Coverage provided by Non-Settling Asbestos Insurers, subject to the applicable provisions of section 5.10 of the TDP. If a holder of a Channeled Asbestos Claim commences such an action on account of such Claim, any complaint commencing such an action shall name the Reorganized Debtor as a defendant, in lieu of the Debtors, *provided, however*, that, consistent with the Injunctions, no party may identify the Reorganized Debtor using the term "Duro Dyne" or any variation thereof in the caption of any pleading or other filing in connection with the action commenced by such complaint and shall only identify the Reorganized Debtor in such caption as "RDD Company" or such other name for the Reorganized Debtor as may be specified in the Confirmation Order. Such action may be filed in any court where any Debtor was subject to *in personam* jurisdiction as of the Petition Date and shall be deemed by operation of law to be an action against the Debtors, except that any judgment that may be obtained in such action may not be enforced against the assets of the Reorganized Debtor or the Asbestos Trust, other than the Asbestos Insurance Policies issued by Non-Settling Asbestos Insurers. Any such action may be served on the Asbestos Trust, who shall tender such actions to Non-Settling Asbestos Insurers. The Reorganized Debtor shall have no obligation to defend or otherwise appear or incur any costs or expenses in connection with any action brought under this Section 4.13, and any liability of the Reorganized Debtor to any Entity, including any Channeled Asbestos Claimant or Asbestos Insurer, that is based on, arises from, or is attributable

to any action commenced pursuant to this Section 4.13 shall be enforceable only against the Asbestos Insurance Coverage provided by Non-Settling Asbestos Insurers, as set forth in Section 4.14 below. The Asbestos Trust shall continue to process the Channeled Asbestos Claim of any Channeled Asbestos Claimant who brings an action under this Section 4.13, including by making payment thereon to such Channeled Asbestos Claimant as and when provided under the TDP. Subject to the Injunctions, nothing in this Section 4.13 is intended to bar any cause of action, or right to bring a cause of action, held by any Channeled Asbestos Claimant directly against any Asbestos Insurer if a Channeled Asbestos Claimant obtains a judgment in any action permitted under this Section 4.13, with such actions governed by the procedures set forth in Section 4.14 hereof.

Section 4.14. ***Actions Against Non-Settling Asbestos Insurers to Obtain the Benefits of Asbestos Insurance Coverage***. Any Channeled Asbestos Claimant that has obtained a judgment against the Reorganized Debtor pursuant to Section 4.13 hereof, or that would otherwise have the right under applicable nonbankruptcy law to join or substitute an Asbestos Insurer in an action filed on account of his Channeled Asbestos Claim, may, in order to obtain the benefits of Asbestos Insurance Coverage, make a request to the Asbestos Trust that the Asbestos Insurer Injunction be lifted so as to permit such Claimant to commence a judgment-enforcement action or direct action against a Non-Settling Asbestos Insurer (an "*Enforcement Request*"). Such an Enforcement Request shall be made in the form of a written request directed to the Asbestos Trust, containing such information as the Asbestos Trust may, in its sole discretion, require as part of any such request. The Asbestos Trust may require or impose appropriate terms and conditions on Channeled Asbestos Claimants in exchange for the Asbestos Trust's agreement to lift the Asbestos Insurer Injunction with respect to their claims; *provided, however*, that to the extent a Channeled Asbestos Claimant makes an Enforcement Request, the Asbestos Trust shall not lift the Asbestos Insurer Injunction unless the Channeled Asbestos Claimant agrees in writing to stipulate and agree to the following conditions:

(a) *Judgment Reduction*. If any Non-Settling Asbestos Insurer against whom a judgment-enforcement action or direct action is brought asserts as a defense that it would have an Asbestos Insurance Policy Claim as a result of contribution rights against one or more Settling Asbestos Insurers with respect to the Channeled Asbestos Claimant's claim that it could have asserted but for the Injunctions (hereinafter, "*Contribution Claims*"), the liability, if any, of the Non-Settling Asbestos Insurer to the Channeled Asbestos Claimant shall be reduced dollar-for-dollar by the amount, if any, of any judgment establishing the Contribution Claims in accordance with Section 4.14(b).

(b) *Assertion of Settling Asbestos Insurers' Rights*. In determining the amount of any Contribution Claim that operates to reduce the amount of liability of a Non-Settling Asbestos Insurer in a judgment-enforcement action or direct action, the Channeled Asbestos Claimant may assert the legal or equitable rights, if any, of the Settling Asbestos Insurers with respect to such Contribution Claims, provided that the Channeled Asbestos Claimant shall not be permitted to argue that any Contribution Claims are not properly asserted against the Channeled Asbestos Claimant, or that the Injunctions bar or affect in any way such Contribution Claims in connection with the Channeled Asbestos Claimant's claim against a Non-Settling Asbestos Insurer.

Section 4.15. ***Limitations on Recoveries of Insurance Coverage from Non-Settling Asbestos Insurers.***

(a) *No Coverage for Trust Payments or Claims Resolutions.* No Non-Settling Asbestos Insurer that has paid a Channeled Asbestos Claim pursuant to the provisions of Section 4.13 or Section 4.14 above shall be required or requested by the Asbestos Trust, the Debtors, the Reorganized Debtor, or any other Entity to make any payment whatsoever, based on or for (i) amounts paid by the Asbestos Trust to that Channeled Asbestos Claimant in accordance with the TDP or otherwise; (ii) the liquidated value of that Channeled Asbestos Claim resolved by the Asbestos Trust, whether or not paid in whole or in part by the Asbestos Trust; (iii) any amounts that the Asbestos Trust promises or proposes to pay to that Channeled Asbestos Claimant under the TDP or otherwise; or (iv) the amounts set forth in the scheduled values matrix of the TDP that would otherwise be applicable to the paid Channeled Asbestos Claim. For the avoidance of doubt, this Section does not preclude actions, or recoveries or payments from actions authorized by Section 4.13 or Section 4.14 hereof, and all Asbestos Insurance Litigation and Asbestos Insurance Policy Claims (including all claims for contribution, reimbursement, indemnity, or subrogation against Non-Settling Asbestos Insurers) are subject to the preceding two sentences of this subsection (a) and to Section 4.14(b). No Non-Settling Asbestos Insurer may argue or contend, in any action authorized by Section 4.13 or Section 4.14 hereof, that a Channeled Asbestos Claimant is barred by this Section from obtaining the benefits of Asbestos Insurance Coverage simply because such Claimant either could or did have his Channeled Asbestos Claim resolved, valued, or paid by the Asbestos Trust.

(b) *Determination of Credit, Reduction, or Offset*

(i) The amount of any payments actually received by a Channeled Asbestos Claimant from the Asbestos Trust on account of his Channeled Asbestos Claim shall be credited dollar-for-dollar against the liability of the Reorganized Debtor in any action brought by such Channeled Asbestos Claimant under Section 4.13 hereof, and following the full satisfaction of a judgment obtained in such an action or in an action brought under Section 4.14 hereof, the Channeled Asbestos Claimant that receives full payment under such a judgment shall be deemed to have assigned the right to payment of any further amounts due from the Asbestos Trust to the Entities that satisfied that judgment.

(ii) Notwithstanding anything in the Plan to the contrary, if a Non-Settling Asbestos Insurer asserts a claim that it is entitled to a credit, offset, or reduction of damages based on any payment made by the Asbestos Trust or any Debtor, then nothing in this Plan or the TDP shall restrict any right of such Non-Settling Asbestos Insurer to introduce in any action otherwise admissible evidence in support of such claim. All parties' rights to make arguments as to the admissibility of such evidence under the applicable rules of evidence are reserved.

Section 4.16. ***Subordination of Related-Party Payments and Related-Party Claims.*** Upon the occurrence and continuance of a default under the Trust Note or an "Event of Default" as defined in the Note Issuance Agreement or in the Pledge and Security Agreement, (a) all obligations under the Trust Note, including principal and accrued interest, shall be paid in Cash and in full before any Related-Party Payment or any payment, whether in cash, property, or securities, on account of a Related-Party Claim is made; and (b) any Related Party receiving a Related-Party Payment or any payment, whether in cash, property, or securities, made on account

of a Related-Party Claim shall be paid or delivered directly to the holder of the Trust Note for application in payment of the same unless and until all obligations under the Trust Note, including principal and accrued interest, are paid in Cash and in full.

Section 4.17. ***Preservation of Asbestos-Related Defenses.*** In any action commenced against the Reorganized Debtor under Section 4.13 hereof or against a Non-Settling Asbestos Insurer under Section 4.14, (a) subject to Section 4.15(b) hereof, any payments made by the Asbestos Trust to the Channeled Asbestos Claimant commencing such action shall be taken into account in such action in accordance with rule of law or evidence related to any credit, offset, or reduction of damages allowed by applicable nonbankruptcy law; and (b) nothing pertaining to this Plan, the confirmation of this Plan, the entry of the Confirmation Order, the creation of the Asbestos Trust, and the implementation of the TDP shall be construed as a waiver or admission with respect to any Asbestos-Related Defenses, and all parties (including the Asbestos Insurers) shall be free to make any contention permitted by applicable nonbankruptcy law with respect to such defenses.

Section 4.18. ***Books and Records.*** On the Effective Date, the Cooperation Agreement shall become effective, and the Asbestos Records (as defined in the Cooperation Agreement) shall be treated in accordance therewith.

## ARTICLE V.

## IMPLEMENTATION OF THE PLAN

Section 5.01. ***Substantive Consolidation***

(a) Confirmation shall constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective upon Consummation, of the substantive consolidation and merger of each of the Debtors and their respective Estates with and into Debtor Duro Dyne National Corp. in accordance with the merger documents substantially in the form contained in Schedule 5.01(a) of the Plan Supplement such that the Reorganized Debtor shall be the surviving Entity on the Effective Date. As a result of such substantive consolidation and merger,

(i) the assets and liabilities of the Debtors will be deemed to be the assets and liabilities of the Reorganized Debtor;

(ii) each and every Claim listed on the Schedules or filed in the Chapter 11 Cases against any Debtor shall be considered filed against the Reorganized Debtor and shall be considered one Claim against and obligation of the Reorganized Debtor on and after the Effective Date;

(iii) all joint obligations of two or more Debtors, and all multiple Claims against such Entities on account of such joint obligations, shall be considered a single Claim against the Reorganized Debtor;

(iv) all guaranties by any of the Debtors of the obligations of any Debtor arising prior to the Effective Date shall be deemed cancelled and eliminated under the Plan so that any Claim against any Debtor and any guaranty thereof executed by any other

Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the Reorganized Debtor; and

(v) all Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. shall be cancelled and extinguished on the Effective Date in accordance with Section 3.03(k)(ii); and

(vi) all Intercompany Claims shall be cancelled and extinguished on the Effective Date.

(b) Notwithstanding the terms and provisions of Section 5.01(a), such substantive consolidation and merger shall not (other than for purposes related to funding Distributions under the Plan) affect (i) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, assumed and assigned, or rejected; (ii) any agreements entered into by the Reorganized Debtor on or after the Effective Date; and (iii) the Debtors' or the Reorganized Debtor's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis.

Section 5.02. ***Corporate Governance***

(a) *Amendment of Certificate of Incorporation of the Reorganized Debtor.* The certificate of incorporation of each Reorganized Debtor that is a corporation on the Effective Date shall, as of the Effective Date, be amended in its entirety to read substantially in the form that will be included as Schedule 5.02(a) of the Plan Supplement. Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the amended certificates of incorporation of such Reorganized Debtor shall, *inter alia*, prohibit the issuance of non-voting equity securities.

(b) *Amendment of Bylaws of the Reorganized Debtor.* The bylaws of the Reorganized Debtor shall be amended as of the Effective Date to read substantially in the form that will be included as Schedule 5.02(b) of the Plan Supplement and, *inter alia*, to effectuate the provisions of this Plan.

(c) *Exchange of Equity Interests in Duro Dyne National Corp.* Prior to the Effective Date, each of the three outstanding shares of voting stock in Debtor Duro Dyne National Corp. shall be exchanged for 1,000 shares of voting stock in Debtor Duro Dyne National Corp., so as to result in a total of 3,000 outstanding shares of voting stock in Debtor Duro Dyne National Corp., and the three holders of voting shares in Duro Dyne National Corp. shall each receive certificates evidencing a total of 1,000 shares of such voting stock.

(d) *Management of the Reorganized Debtor.* On and after the Effective Date, the business affairs of the Reorganized Debtor will be managed by the same board of directors and same management that was in place prior to the Petition Date.

(e) *Effectuating Documents and Further Transactions.* Each of the officers of the Reorganized Debtor is authorized, in accordance with his or her authority under the resolutions of the applicable governing body of such Reorganized Debtor, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take

such action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the other Plan Documents.

(f) *Corporate Action.* All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Debtor, or any corporate or limited liability company action to be taken by, or required of the Debtors or Reorganized Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by or notice to the holders of Equity Interests in, or the directors or managers of, any of the Debtors or the Reorganized Debtor.

Section 5.03. ***Supersedeas Bonds and Payment Assurances***

(a) *Preserved Actions.* All Supersedeas Bond Actions and the rights and Claims asserted or to be asserted therein shall be preserved and shall be prosecuted or defended, as the case may be, by the Reorganized Debtor on and after the Effective Date.

(b) *Assumption by the Asbestos Trust.* As of the Effective Date, the Asbestos Trust shall assume, and shall have exclusive liability for, any deficiency portion of a Bonded Asbestos Personal Injury Claim remaining after crediting the proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled. To the extent the Reorganized Debtor successfully prosecutes or defends against a Supersedeas Bond Action resulting in the discharge or release of the relevant supersedeas bond or other payment assurance provided in connection therewith, any such recoveries shall inure to the benefit of such Reorganized Debtor.

(c) *Reservation of Rights of Issuers and Insurers of Payment Assurances.* Notwithstanding anything to the contrary contained herein, nothing in the Plan shall be deemed to impair, prejudice, compromise, or otherwise affect any defense or counterclaim asserted by an issuer or insurer of any supersedeas bond or other payment assurance issued on behalf of any of the Debtors, including any defense based on an asserted right of setoff or recoupment, or other defense under applicable nonbankruptcy law. Any right of setoff or recoupment shall be satisfied out of the assets in the possession of the sureties or insurers providing such supersedeas bond or payment assurance.

(d) *Compromise and Settlement.* The Reorganized Debtor shall be entitled to compromise or settle any of the Supersedeas Bond Actions; *provided, however*, that any such compromise or settlement shall require the consent of the Asbestos Trust to the extent the compromise or settlement results in a deficiency portion of a Bonded Asbestos Personal Injury Claim after applying the proceeds of any supersedeas bond or equivalent form of payment assurance.

Section 5.04. ***Withholding of Taxes.*** The Reorganized Debtor or the Asbestos Trust, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld for foreign, federal, state, or local taxes payable with respect thereto or payable by the Entity entitled to such assets or property to the extent required by applicable law.

Section 5.05. ***Transfer Taxes***. The issuance, transfer, or exchange of any of the securities issued under, or the transfer of any other assets or property pursuant to or in connection with the Plan, or the making or delivery of an instrument of transfer under or in connection with the Plan shall not, pursuant to section 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp tax, transfer tax, or other similar tax.

Section 5.06. ***Recordable Order***. Upon Confirmation, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

Section 5.07. ***Authority of the Debtors***. Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement their respective obligations under the Plan and the other Plan Documents.

## ARTICLE VI.

## VOTING AND DISTRIBUTIONS UNDER THE PLAN

Section 6.01. ***Classes Eligible to Vote.***

(a) *Deemed Acceptance of Plan by Unimpaired Classes*. Class 1 Priority Non-Tax Claims, Class 2 Secured Claims, Class 3 Employee Benefit Claims, Class 4 Worker Compensation Claims, Class 5 General Unsecured Claims and Class 8 Bonded Claims are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, solicitation of votes of holders of Claims in Classes 1, 2, 3, 4, 5, and 8 is not required.

(b) *Insider Claims Not Entitled to Vote.* Class 9 Intercompany Claims, Class 10 Related-Party Claims, Class 11 Equity Interests in Duro Dyne National Corp., and Class 12 Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. are Claims of Insiders and are not entitled to vote on the Plan. Therefore, solicitation of votes of holders of Claims in Classes 9, 10, 11, and 12 is not required.

(c) *Only Class 6 Prepetition Defense-Cost Contribution Claims and Class 7 Channeled Asbestos Claims Eligible to Vote*. Class 6 Prepetition Defense-Cost Contribution Claims and Class 7 Channeled Asbestos Claims are Impaired under the Plan. Only holders of Class 6 and Class 7 Claims are entitled to vote to accept or reject the Plan. Accordingly, the solicitation of votes of holders of Prepetition Defense-Cost Contribution Claims in Class 6 and Asbestos Claims in Class 7 is required.

Section 6.02. ***Class 6 and 7 Acceptance Requirements***. Class 6 shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the holders of Class 6 Claims actually voting on the Plan. Class 7 shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount of those holders of Class 7 Claims actually voting on the Plan, in accordance with section 1126(c) of the Bankruptcy Code, and if at least seventy-five percent (75%) of those holders of Class 7 Claims

actually voting on the Plan vote in favor of the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

Section 6.03. ***Voting on Basis of Substantive Consolidation***. Voting on the Plan shall be conducted on a substantively consolidated basis with respect to the Debtors, consistent with Section 5.01 hereof. If the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Debtors' Estates, (a) the Plan shall be treated as a separate plan of reorganization for each Debtor not substantively consolidated, and (b) the Debtors shall not be required to resolicit votes with respect to the Plan. Notwithstanding the foregoing, the Debtors reserve the right to seek confirmation of the Plan on an Entity-by-Entity basis.

Section 6.04. ***Issuance of Asbestos Permanent Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code***. The Bankruptcy Court or the District Court, as applicable, shall be asked to issue the Asbestos Permanent Channeling Injunction if at least seventy-five present (75%) in number of the holders of Class 7 Claims that have voted on the Plan have voted in favor of the Plan in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code and Section 6.02 hereof.

Section 6.05. ***Nonconsensual Confirmation***. If any Impaired Class of Claims or Equity Interests, other than Class 7, fails to accept this Plan in accordance with sections 1126 and 1129 of the Bankruptcy Code, the Plan Proponents will request, to the extent consistent with applicable law, that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class of Claims or Equity Interests (other than Class 7), and this Plan constitutes a motion for such relief.

Section 6.06. ***Distributions Under the Plan***. Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due. The Distributions shall be made to the holders of Allowed Claims as of the Record Date and the Debtors and the Reorganized Debtor shall have no obligation to recognize any transfer of a Claim occurring after the Record Date.

(a) *Distribution Deadlines*. Any Distribution to be made by the Disbursing Agent pursuant to the Plan shall be deemed to have been timely made if made within twenty-one (21) calendar days after the time therefor specified in the Plan or such other agreements. No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

(b) *Distributions with Respect to Allowed Claims*. Subject to Bankruptcy Rule 9010, all Distributions under the Plan to holders of Allowed Claims shall be made by the Disbursing Agent to the holder of each Allowed Claim in such Classes at the address of such holder as noted on the Schedules as of the Record Date, unless the Debtors or, on and after the Effective Date, the Reorganized Debtor have been notified in writing of a change of address, including by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address noted on the Schedules. If any Distribution to any such holder is returned as undeliverable, then no further Distributions to such holder shall be made unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed

Distributions shall be made to such holder without interest. At the expiration of six (6) calendar months after the date on which an undeliverable Distribution was originally sent, mailed, or otherwise transmitted, such undeliverable Distribution will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will revest in the Reorganized Debtor, and any entitlement of a holder of any Claim to the re-vested Distribution shall be extinguished, discharged, and forever barred. Nothing contained in the Plan shall require the Reorganized Debtor or the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(c) *Responsibility for Transfers and Distributions*. The Reorganized Debtor and the Disbursing Agent shall be responsible for Distributions required by the Plan, other than distributions to holders of Class 7 Channeled Asbestos Claims. The Asbestos Trust and only the Asbestos Trust shall be responsible for resolving, liquidating, and paying Class 6 Channeled Asbestos Claims in accordance with the Asbestos Trust Agreement and the TDP, except as provided in Sections 4.13 and 4.14 hereof.

(d) *Manner and Method of Payment Under the Plan*. Unless the Entity entitled to receive a Distribution agrees otherwise, any payment of such Distribution in Cash shall be made by a check drawn from a domestic bank or wire transfer from a domestic bank; *provided, however*, that no Cash payment of less than one hundred dollars ($100) shall be made to a holder of an Allowed Claim unless a request therefor is made in writing to the Disbursing Agent.

Section 6.07. ***Time Bar to Distributions by Check.*** Checks issued by the Reorganized Debtor in respect of Distributions on account of Allowed Claims shall be null and void if not presented for payment within ninety (90) calendar days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to the Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) calendar days after the expiration of the ninety (90) day period following the date of issuance of such check. After the expiration of the thirty (30) day period, all funds held on account of such void check shall be used to satisfy the costs of administering and fully consummating the Plan or become the property of the Reorganized Debtor, and the Claim of any holder to such Distributions shall be extinguished, discharged, and forever barred.

Section 6.08. ***Distributions After the Effective Date.*** Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of the Plan.

Section 6.09. ***Setoffs.*** Pursuant to applicable nonbankruptcy law, and before any Distribution is made on account of any Allowed Claim, the Reorganized Debtor may, but shall not be required to, setoff the claims, rights, and causes of action of any nature that the Reorganized Debtor holds against the holder of such Allowed Claim, other than a Channeled Asbestos Claim, against any Allowed Claims and the Distributions to be made pursuant to the Plan on account thereof; *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claims, rights, and causes of action that the Reorganized Debtor may possess on and after the Effective Date against such holder.

Section 6.10. ***Cancellation of Existing Instruments and Other Documents Evidencing Claims.*** On the Effective Date, any document, agreement, or instrument evidencing any Claim, other than an Asbestos Claim or any Claim that is Unimpaired, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged.

Section 6.11. ***Allocation of Plan Distributions Between Principal and Interest.*** To the extent that an Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

Section 6.12. ***Tax Obligations and Reporting Requirements.*** Notwithstanding any provision herein, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution. Any Entity issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to refrain from making a Distribution, until such holder has made arrangements satisfactory to such Entity for payment of any such tax obligations.

## ARTICLE VII.

## TREATMENT OF DISPUTED, CONTINGENT, OR UNLIQUIDATED NON-ASBESTOS CLAIMS UNDER THE PLAN

Section 7.01. ***Objections to Claims; Prosecution of Disputed Claims.*** The Reorganized Debtor shall object to the allowance of Claims (other than Channeled Asbestos Claims) filed with the Bankruptcy Court or with a duly appointed claims agent, as applicable, with respect to which the Reorganized Debtor disputes, in whole or in part, liability or the amount of the Claim. All objections filed by the Reorganized Debtor as provided herein shall be litigated to Final Order by the Reorganized Debtor, as applicable; *provided, however,* that the Reorganized Debtor may compromise, settle, or resolve by any other method any objections to Claims, subject to approval of the Bankruptcy Court. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims shall be served and filed on or before the later of (a) one hundred and eighty (180) calendar days after the Effective Date, or (b) such date as may be fixed by the Bankruptcy Court, after notice and hearing, whether fixed before or after the date specified in clause (a) above.

Section 7.02. ***Estimation of Individual Claims.*** Unless otherwise limited by an order of the Bankruptcy Court, the Reorganized Debtor may at any time request that the Bankruptcy Court estimate for final Distribution purposes any contingent, unliquidated, or disputed Claim (other than Channeled Asbestos Claims) pursuant to section 502(c) of the Bankruptcy Code or other applicable law, regardless of whether any of the Debtors or the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on such objection, and the Bankruptcy Court will retain jurisdiction to consider any such request

at any time, including during the pendency of any appeal relating to an objection to any Claim. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or disputed Claim (other than Channeled Asbestos Claims), the estimated amount shall constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however*, that, if the estimate constitutes the maximum limitation on such Claim, the Reorganized Debtor may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and *provided further* that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.

Section 7.03. ***Cumulative Remedies***. All of the aforementioned Claims objection, motion, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

Section 7.04. ***No Distributions Pending Allowance or Motion***. Notwithstanding any provision hereof, if any portion of a Claim is disputed, contingent, or unliquidated, no Distribution provided for hereunder shall be made on account of any portion of such Claim unless and until such disputed, contingent, or unliquidated Claim becomes an Allowed Claim. No interest shall be paid on account of disputed, contingent, or unliquidated Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code.

Section 7.05. ***Distributions After Allowance***. To the extent a disputed, contingent, or unliquidated Claim ultimately becomes an Allowed Claim, a Distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction (including any appeal therefrom) allowing any previously disputed, contingent, or unliquidated Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Allowed Claim the Distribution to which such holder is entitled hereunder on account of or in exchange for such Allowed Claim.

## ARTICLE VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 8.01. ***General Treatment***. The Debtors shall assume, as of the Effective Date, all executory contracts to which they are a party, respectively, except for (a) the executory contracts specifically listed on Schedule 8.01 of the Plan Supplement; or (b) the executory contracts or unexpired leases specifically addressed herein or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date. The Debtors may, at any time on or before the Effective Date, amend Schedule 8.01 to delete therefrom, or add thereto, any executory contract or unexpired lease. The Debtors shall provide notice of any such amendments to the parties to the executory contract or unexpired lease affected thereby and to parties on any master service list established by the Bankruptcy Court in the Chapter 11 Cases. The fact that any contract or lease is listed in Schedule 8.01 shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the

meaning of section 365 of the Bankruptcy Code or that any of the Debtors or any successors in interest to the Debtors (including the Reorganized Debtor) has any liability thereunder. The Plan shall constitute a motion to assume the executory contracts and unexpired leases not listed in Schedule 8.01 and to reject those executory contracts and unexpired leases that are listed on Schedule 8.01. Any and all claims held by a Related Party against the Reorganized Debtor that are based on, arise from, or are attributable to a contract or lease assumed under this Section shall be subject to Section 4.16 and Section 8.06.

Section 8.02. ***Assumption of Insurance Policies.*** Notwithstanding anything contained in the Plan to the contrary, to the extent any Debtor's insurance policies and any agreements, documents, or instruments relating thereto, including Asbestos Insurance Policies or prepetition Asbestos Insurance Settlements, are executory contracts, such policies, agreements, documents, or instruments shall be treated as executory contracts under the Plan and shall be assumed pursuant to the Plan, effective as of the Effective Date, regardless of whether any such policy, agreement, document, or instrument is listed on Schedule 8.01. The Plan shall constitute a motion to assume such policies, agreements, documents, and instruments. Nothing contained in this Section 8.02 shall constitute or be deemed a waiver of any cause of action that the Debtors, the Reorganized Debtor, or the Asbestos Trust may hold against any Entity, including the insurer, under any Asbestos Insurance Policy or prepetition Asbestos Insurance Settlements, or any of the Debtors' policies of insurance or insurance-related agreements.

Section 8.03. ***Letters of Credit, Surety Bonds, and Guaranties***

(a) *Assumption Under Section 365(a).* Unless otherwise designated by the Plan Proponents in Schedule 8.03 of the Plan Supplement, agreed to in writing by the affected parties, or modified by order of the Bankruptcy Court, the Debtors' obligations under letters of credit, surety bonds, guaranties (which, for purposes of this Section include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or written indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan, effective as of the Effective Date. In addition, the Debtors' obligations under such letters of credit, surety bonds, guaranties, and written indemnity agreements shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date. The Plan shall constitute a motion to assume such letters of credit, surety bonds, guaranties, and written indemnity agreements.

(b) *Reservation of Rights.* The Plan Proponents reserve the right, at any time prior to the Effective Date, to amend or modify the list included in Schedule 8.03 of the Plan Supplement to add or remove letters of credit, surety bonds, guaranties, and indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date, *provided* that the Plan Proponents shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

Section 8.04. ***Cure of Defaults and Survival of Contingent Claims.*** Except as may otherwise be agreed to by the applicable parties, on or before the thirtieth (30th) calendar day after the Effective Date, provided the non-Debtor party to any executory contract or unexpired lease that is assumed pursuant to this Article VIII has filed a proof of claim with respect to a cure

amount, the Reorganized Debtor shall cure any and all undisputed defaults under each executory contract or unexpired lease assumed pursuant to this Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of a Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the applicable parties. Unless a proof of claim was timely filed with respect thereto, all cure amounts and all contingent reimbursement or indemnity claims for prepetition amounts expended by the non-Debtor parties to assumed executory contracts and unexpired leases shall be discharged upon Consummation.

Section 8.05. ***Deadline for Filing Rejection Damages Claims***. If the rejection of a contract or lease pursuant to Section 8.01 or Section 8.03 hereof results in damages to the non-Debtor party to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall forever be barred and shall not be enforceable against the Debtors, or their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court or with a duly appointed claims agent, as applicable, and served upon the Debtors or the Reorganized Debtor on or before thirty (30) calendar days after the later to occur of (a) the Confirmation Date, or (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of such contract or lease.

Section 8.06. ***Contracts and Leases with Related Parties***.

(a) The Reorganized Debtor shall not make any Related-Party Payments if there is any arrearage, breach, or default with respect to any debt or obligation of the Reorganized Debtor.

(b) Any contract or personal-property lease with a Related Party, including the contracts and leases assumed under Section 8.01 or listed on Schedule 8.06 of the Plan Supplement, shall terminate in accordance with their respective terms, including on the dates noted on Schedule 8.06 of the Plan Supplement, and shall not be renewed. Any personal property or equipment that is the subject of such contracts or personal-property leases shall, upon the aforesaid termination, be transferred or delivered to the Reorganized Debtor, which shall thereupon assume or acquire ownership of such personal property or equipment, free and clear of any Lien, interest, or other encumbrance.

(c) The Reorganized Debtor shall not enter into any contract or personal-property lease (whether an operating lease or a capital lease) with a Related Party that pertains to personal property or equipment, unless such contract or personal-property lease provides that the Reorganized Debtor shall own such personal property or equipment free and clear of any Lien, interest, or other encumbrance after such Related Party has recouped its investment in such personal property or equipment, plus an eight-percent (8%) return.

Section 8.07. ***Effect of Confirmation***. Entry of the Confirmation Order shall constitute approval of the (a) rejections, (b) assumptions, or (c) assumptions and assignments, as the case may be, that are provided for in this Article VIII, in accordance with sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, and a finding by the Bankruptcy Court that each such rejection, assumption, or assumption and assignment is in the best interests of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.

## ARTICLE IX.

## DISCHARGE, RELEASES, AND INJUNCTIONS

Section 9.01. *Binding Effect.* This Plan shall be binding upon, and enforceable against, the Debtors and all holders of Claims, Demands, Equity Interests, or other interests (regardless of whether such holders agree to the Plan or whether such Claims, Demands, Equity Interests or other interests are impaired by the Plan), and their respective successors and assigns, including the Reorganized Debtor.

Section 9.02. *Title to Assets.* Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Estates shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests created prior to the Effective Date, except as provided in this Plan and the other Plan Documents. On and after the Effective Date, the Reorganized Debtor may operate its businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

Section 9.03. ***Discharge of Claims.*** ***In accordance with and not in limitation of sections 524(a) and 1141(d) of the Bankruptcy Code, and except as provided in the Plan, upon the occurrence of the Effective Date, all Claims, including, to the fullest extent permitted by law, Channeled Asbestos Claims, shall be, and shall be deemed to be, discharged in full, and all holders of Claims shall be, to the fullest extent permitted by law, precluded and enjoined from asserting against the Debtors and the Reorganized Debtor, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim.***

Section 9.04. ***Discharge Injunction.*** ***Except as specifically provided in this Plan or any of the Plan Documents, the discharge set forth in Section 9.03 hereof shall also operate, upon the occurrence of the Effective Date, as an injunction pursuant to sections 105(a), 524(a), and 1141(d) of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process, or any act to collect, recover from, or offset (a) any Claim, including, to the fullest extent permitted by law, any Channeled Asbestos Claim, against or interest in any of the Debtors or the Reorganized Debtor by any Entity, and (b) any cause of action, whether known or unknown, against the Debtors or the Reorganized Debtor arising out of, attributable to, or based on any Claim, including, to the fullest extent permitted by law, any Channeled Asbestos Claim, or interest described in clause (a) of this Section 9.04.***

Section 9.05. *Asbestos Permanent Channeling Injunction.* Pursuant to sections 105(a) and 524(g) of the Bankruptcy Code, the Confirmation Order shall provide for the issuance of the following injunction to take effect upon the occurrence of the Effective Date:

(a) ***Scope of Injunction.*** *All Entities that have held or asserted, or hold or assert, or may in the future hold or assert any Channeled Asbestos Claim against one or more of the Protected Parties shall be permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on account of any Channeled Asbestos Claim, including:*

(i) *commencing or continuing in any manner any action or other proceeding of any kind on account of any Channeled Asbestos Claim against any of the Protected Parties, or against the property of any Protected Party on account of any such Channeled Asbestos Claim;*

(ii) *enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Protected Parties or against the property of any Protected Party on account of any Channeled Asbestos Claim;*

(iii) *creating, perfecting, or enforcing any Lien of any kind against any Protected Party or the property of any Protected Party on account of any Channeled Asbestos Claim;*

(iv) *except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due any Protected Party or against the property of any Protected Party on account of any Channeled Asbestos Claim; and*

(v) *taking any act, in any manner, in any place whatsoever, against any of the Protected Parties or their property, that does not conform to, or comply with, the provisions of the Plan Documents applicable to a Channeled Asbestos Claim.*

(b) ***Reservations.*** *Notwithstanding anything to the contrary above, this Asbestos Permanent Channeling Injunction shall not enjoin:*

(i) *the rights of Entities to the treatment accorded them under Articles II and III of the Plan, as applicable, including the rights of holders of Channeled Asbestos Claims to have such Channeled Asbestos Claims resolved in accordance with the TDP;*

(ii) *the rights of Entities to assert any Channeled Asbestos Claim against the Asbestos Trust in accordance with the TDP, or any debt, obligation, or liability for payment of Asbestos Trust Expenses against the Asbestos Trust;*

(iii) *the rights of the Asbestos Trust or, if applicable, the Reorganized Debtor to prosecute any claim or cause of action based on or arising from any of the Asbestos Trust Assets against any Entity that is not a Protected Party;*

(iv) *any action under Section 4.13 hereof against the Reorganized Debtor that strictly conforms to the pleading requirements of Section 4.13; or*

(v) *any action against any Asbestos Insurer that is neither a Settling Asbestos Insurer nor an Asbestos Insurer protected, at the time such action is brought, by the Asbestos Insurer Injunction.*

Section 9.06. Settling Asbestos Insurer Injunction. *In accordance with sections 105(a) and 524(g) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Asbestos Insurance Policy Claim shall be, and hereby are, permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim from or against any Settling Asbestos Insurer, only to the extent that such Settling Asbestos Insurer has been released from any claim under one or more Asbestos Insurance Policies in accordance with one or more Asbestos Insurance Settlements, including:*

(a) *commencing, conducting, or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternative dispute resolution) against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;*

(b) *enforcing, attaching, levying, collecting, or recovering, by any manner or means, any judgment, award, decree, or other order against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;*

(c) *creating, perfecting, or enforcing in any manner any Lien of any kind against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;*

(d) *asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation due any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim; and*

(e) *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Asbestos Insurance Policy Claim.*

Section 9.07. *Asbestos Insurer Injunction*

(a) *Scope of Injunction. In accordance with section 105(a) of the Bankruptcy Code, in order to carry out the provisions of section 524(g) of the Bankruptcy Code, upon the occurrence of the Effective Date, except as expressly allowed in subsection (b) below, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Asbestos Insurance Policy Claim or Channeled Asbestos Claim shall be, and hereby are, permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim or Channeled Asbestos Claim from or against any Asbestos Insurer, including:*

(i) *commencing, conducting, or continuing in any manner any action or proceeding of any kind (including an arbitration or other form of alternative dispute resolution) against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;*

(ii) *enforcing, attaching, levying, collecting, or recovering, by any manner or means, any judgment, award, decree, or other order against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;*

(iii) *creating, perfecting, or enforcing in any manner any Lien of any kind against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;*

(iv) *asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly against any obligation due any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim; and*

(v) *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Asbestos Insurance Policy Claim or Channeled Asbestos Claim.*

(b) *Reservations. The provisions of this Asbestos Insurer Injunction shall not preclude the Reorganized Debtor or the Asbestos Trust, to the extent either has the right to do so, from pursuing any claim for Asbestos Insurance Coverage or any claim that may exist under any Asbestos Insurance Policy against any Asbestos Insurer. The provisions of this Asbestos Insurer Injunction shall not bar, impair, or affect (i) any Asbestos Insurance Litigation brought by the Asbestos Trust or any Debtor against any Asbestos Insurer, by the Asbestos Trust on behalf of the Reorganized Debtor, or by the Reorganized Debtor on behalf of the Asbestos Trust; (ii) any Asbestos Insurance Rights held or acquired by the Asbestos Trust or the Reorganized Debtor; or (iii) the rights of the Asbestos Trust to tender any Channeled Asbestos Claim or any action commenced under Section 4.13 hereof to a Non-Settling Asbestos Insurer for coverage, indemnity, or defense, or otherwise to invoke Asbestos Insurance Coverage with respect to a Non-Settling Asbestos Insurer. Except for the penultimate sentence of this subsection (b), the provisions of this Asbestos Insurer Injunction are not issued for the benefit of any Asbestos Insurer and no such insurer is a third-party beneficiary of this Asbestos Insurer Injunction. The Asbestos Trust shall have the sole and exclusive authority at any time, upon written notice to any affected Asbestos Insurer, to terminate, or reduce or limit the scope of this Asbestos Insurer Injunction with respect to any Asbestos Insurer, including for the purpose of allowing any Channeled Asbestos Claimant to bring any Asbestos Insurance Policy Claim or Channeled Asbestos Claim against such Asbestos Insurer; provided, however, that the Asbestos Trust may not permit the assertion of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim by a Channeled Asbestos Claimant against a Non-Settling Asbestos Insurer unless and until such Channeled Asbestos Claimant agrees in writing to stipulate to and be bound by the provisions of Section 4.14 hereof pertaining to the right of Non-Settling Asbestos Insurers to obtain a dollar-for-dollar reduction of any liability to such Channeled Asbestos Claimant based on the Non-Settling*

***Asbestos Insurer's Asbestos Insurance Policy Claims against any and all Settling Asbestos Insurers that could have been asserted against such Settling Asbestos Insurers but for the Injunctions. For the avoidance of doubt, the provisions of this Asbestos Insurance Injunction shall not impair or affect any claims between or among Non-Settling Asbestos Insurers. Notwithstanding any provision of the Plan to the contrary, including this Asbestos Insurer Injunction, no new equitable contribution rights are created in favor of the Non-Settling Asbestos Insurers.***

Section 9.08. *Term of Existing Injunctions or Stays.* Unless otherwise provided in the Plan, all injunctions or stays issued or rendered in the Chapter 11 Cases, or in any adversary proceeding relating thereto, pursuant to section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Section 9.09. ***Injunction Against Interference with Plan of Reorganization. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, on and after the Confirmation Date, all holders of Claims and Equity Interests, Affiliates, and other parties in interest, along with their respective present or former Agents shall be enjoined from taking any action to interfere with the implementation and Consummation of the Plan, except for actions necessary to attain judicial review.***

Section 9.10. ***Exculpation. None of the Plan Proponents, the members of the Asbestos Claimants Committee, or any of their respective employees, advisors, attorneys, financial advisors, accountants, agents, or other professionals retained with Bankruptcy Court approval, in their capacities as such, shall have or incur any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Cases, including the negotiation of the Plan, pursuit of confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Plan.***

Section 9.11. *Settlement and Release of Certain Avoidance Actions and Estate Causes of Action.* Effective upon Consummation, each Debtor and the Reorganized Debtor hereby settle and fully, finally, and forever release, relinquish, and discharge (a) each and every Avoidance Action against a Protected Party; (b) each and every Avoidance Action against any holder of a Channeled Asbestos Claim (satisfied or pending) or any such holder's Agents; (c) each and every Avoidance Action against holders of Allowed Class 5 Claims; and (d) any and all Estate Causes of Action against any Protected Party, holder of a Channeled Asbestos Claim (satisfied or pending), or any Agent of such holder. Such released Claims and Avoidance Actions shall in no event be asserted against or paid by the Asbestos Trust. This Plan constitutes a motion to approve the settlement of the foregoing Claims and Avoidance Actions pursuant to Bankruptcy Rule 9019(a).

**Section 9.12.** *Reservation of Rights.* Except as otherwise specifically provided in the Plan, nothing herein shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtor, or the Asbestos Trust may have against any Entity other than a Protected Party in connection with or arising out of a Channeled Asbestos

Claim, and the Injunctions shall not apply to the assertion of any such claim, right, or cause of action by the Debtors, the Reorganized Debtor, or the Asbestos Trust.

## ARTICLE X.

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

Section 10.01. ***Conditions to Confirmation.*** The Confirmation Date shall not occur unless and until each of the following conditions has been satisfied or duly waived in accordance with Section 10.04 hereof:

(a) at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of holders of Asbestos Claims actually voting on the Plan have voted in favor of the Plan;

(b) at least two-thirds (2/3) in amount and more than fifty percent (50%) in number of the holders of Prepetition Defense-Cost Contribution Claims actually voting on the Plan have voted to accept the Plan or the Bankruptcy Court has determined that the requirements of section 1129(b)(1) of the Bankruptcy Code have been satisfied with respect to Class 6 (Prepetition Defense-Cost Contribution Claims);

(c) the Confirmation Order shall be in form and substance acceptable to each of the Plan Proponents and shall have been entered by (i) the District Court or (ii) the Bankruptcy Court and affirmed by the District Court; and

(d) the Confirmation Order shall contain the following findings of fact and conclusions of law, and shall approve the following relief, among others:

(i) the Asbestos Permanent Channeling Injunction is issued in accordance with the Plan and section 524(g) of the Bankruptcy Code;

(ii) the Plan Documents comply with section 524(g) of the Bankruptcy Code for the issuance of an irrevocable injunction against Claims and Demands subject to the exclusive subject-matter jurisdiction of the District Court;

(iii) as of the Petition Date, the Debtors have been named as a defendant in personal injury and wrongful death actions seeking recovery for damages allegedly caused by exposure to asbestos or asbestos-containing products;

(iv) the Asbestos Trust, as of the Effective Date, will assume all the liabilities of the Debtors and the Reorganized Debtor for all Channeled Asbestos Claims, except as provided in Sections 4.13 and 4.14 of the Plan;

(v) the Asbestos Trust is to hold, for purposes of section 524(g) of the Bankruptcy Code, a pledge of 50.1% of the voting stock of the Reorganized Debtor and 50.1% of the voting stock of Duro Dyne Canada;

(vi) the Debtors (and the Reorganized Debtor in the absence of the Asbestos Permanent Channeling Injunction) are likely to be subject to substantial future Demands

for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Claims that are addressed by the Asbestos Permanent Channeling Injunction;

(vii) the actual amounts, numbers, and timing of the future Demands referenced in Section 10.01(e)(vii) above cannot be determined;

(viii) pursuit of the Demands referenced in Section 10.01(e)(vii) above outside the procedures described by the Plan is likely to threaten the Plan's purpose to deal equitably with Asbestos Claims and Demands;

(ix) the terms of the Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and the Disclosure Statement;

(x) the Plan establishes in Class 7 (Channeled Asbestos Claims) a separate class of claimants whose Claims are to be addressed by the Asbestos Trust;

(xi) the Legal Representative was appointed as part of the proceedings leading to the issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of persons that might subsequently assert unknown Asbestos Claims and Demands that are addressed in the Asbestos Permanent Channeling Injunction and channeled to the Asbestos Trust;

(xii) applying the Asbestos Permanent Channeling Injunction to each Protected Party is fair and equitable with respect to persons that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Trust by or on behalf of any such Protected Party;

(xiii) Class 7 (Channeled Asbestos Claims) has voted, by at least seventy-five percent (75%) of those voting on the Plan, in favor of the Plan;

(xiv) pursuant to court orders or otherwise, the Asbestos Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust will liquidate, and be in a financial position to pay, Asbestos Claims and Demands that involve similar Claims in substantially the same manner;

(xv) the Settling Asbestos Insurer Injunction is issued in accordance with the Plan and sections 105(a) and 524(g) of the Bankruptcy Code;

(xvi) to carry out the provisions of section 524(g) of the Bankruptcy Code, the Asbestos Insurer Injunction is issued in accordance with section 105(a) of the Bankruptcy Code; and

(xvii) each of the Plan Documents shall be a valid and binding instrument, in full force and effect, and enforceable in accordance with its terms, as of the Effective Date;

(e) the Loan and Security Agreement and all documents related thereto shall be in form and substance acceptable to the Asbestos Claimants Committee and the Legal Representative, and the Asbestos Claimants Committee and the Legal Representative shall have registered such acceptance in writing; and

(f) the Intercreditor Agreement and all documents relating thereto, including exhibits, schedules, and implementing documents, shall be in form and substance acceptable to the Asbestos Claimants Committee and the Legal Representative, and the Asbestos Claimants Committee and the Legal Representative shall have registered such acceptance in writing.

Section 10.02. ***Conditions Precedent to Effective Date of the Plan.*** The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived in accordance with Section 10.04 hereof:

(a) the Confirmation Order shall have been entered and shall have become a Final Order;

(b) the Bankruptcy Court or the District Court, as required, shall have entered or affirmed the Asbestos Permanent Channeling Injunction (which may be included in the Confirmation Order), which shall contain terms satisfactory to the Plan Proponents;

(c) the Asbestos Trust Agreement shall have been fully executed, and the Asbestos Trust shall have been established;

(d) the Asbestos Trust shall have received full payment of the Debtors' Contribution in accordance with Section 4.08(a);

(e) the Asbestos Trust shall have received full payment of the Hinden Contribution in accordance with Section 4.08(b);

(f) the Asbestos Trust shall have received full payment of the Asbestos Insurance Settlement Proceeds in accordance with Section 4.08(c);

(g) the Cooperation Agreement shall have been fully executed and be held in escrow, to be released therefrom and delivered to each of the parties thereto upon Consummation;

(h) the Note Issuance Agreement shall have been fully executed and be held in escrow, to be released therefrom and promptly delivered to each of the parties thereto upon Consummation;

(i) the Trust Note shall have been duly executed and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

(j) the Pledge and Security Agreement shall have been fully executed and be held in escrow, to be released therefrom and promptly delivered to each of the parties thereto upon Consummation;

(k) the three outstanding shares of voting stock in Duro Dyne National Corp. shall have been exchanged for 3,000 outstanding shares of voting stock in Duro Dyne National Corp. and delivered to the holders of such voting stock in accordance with Section 5.02(c).

(l) certificates representing 50.1% of the Duro Dyne Canada Stock, together with stock power executed in blank, shall have been issued and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

(m) certificates representing 50.1% of the Reorganized Duro Dyne Stock, together with stock power executed in blank, shall have been issued and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

(n) the Bay Shore Mortgage shall have been duly executed and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

(o) the Fairfield Mortgage shall have been duly executed and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

(p) the Loan and Security Agreement shall have been duly executed and delivered, and the financing contemplated under the Senior Lending Facility shall be available to the Reorganized Debtor in an amount that will provide the Reorganized Debtor with sufficient Cash, when combined with other available sources, to make all payments due under the Plan as of the Effective Date and to provide sufficient working capital to fund the operation of the Reorganized Debtor;

(q) the Debtors shall have delivered to the other Plan Proponents a copy of any loan commitment pertaining to the Senior Lending Facility and any pre-closing approvals received from the Senior Lender within two (2) Business Days of the Debtors' receipt of same;

(r) the Debtors shall have delivered to the other Plan Proponents a copy of any pre-closing "Borrowing Base Report" (as defined in the Loan and Security Agreement) and other pre-closing documents required by the Senior Lender at the same time that such documents are delivered to the Senior Lender;

(s) all other agreements and instruments that are exhibits to the Plan or included in the Plan Supplement that require execution shall have been fully executed and held in escrow, to be released therefrom and promptly delivered to the applicable parties upon Consummation;

(t) such other actions and documents as the Plan Proponents deem necessary to implement the Plan shall have been effected or executed; and

(u) all conditions to closing set forth in any of the Plan Documents shall have been fulfilled to the reasonable satisfaction of the Plan Proponents.

Section 10.03. ***Completed Delivery of the Asbestos Trust Assets.*** For the avoidance of doubt, notwithstanding any term or provision to the contrary in the Plan or the other Plan Documents, the Effective Date shall not occur, and the discharge, injunctions, exculpations, and releases set forth in Article IX hereof or the Confirmation Order, shall not become effective or enforceable unless and until the Asbestos Trust Assets are transferred or delivered, and the Debtors' Contribution and the Hinden Contribution are paid in full to the Asbestos Trust, as provided in Section 4.08, and all other conditions precedent to the Effective Date set forth in Section 10.02 are satisfied or waived.

Section 10.04. ***Waiver of Conditions Precedent***. To the extent practicable and legally permissible, each of the conditions precedent in Section 10.01 or Section 10.02 may be waived, in whole or in part, by the Plan Proponents, acting jointly. Any such waiver of a condition precedent may be effected at any time in a writing executed by, or on behalf of, each of the Plan Proponents. If any Plan Proponent desires to waive a condition precedent to facilitate Confirmation or Consummation of the Plan, the other Plan Proponents shall confer promptly with it as to whether or not the suggested waiver should be given, in recognition that time is of the essence.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Section 11.01. ***Retention of Jurisdiction***. The Bankruptcy Court shall retain the jurisdiction it has over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, including the following:

(a) to interpret, enforce, and administer the terms of the Plan, the other Plan Documents (including all annexes, schedules, and exhibits thereto), and the Confirmation Order;

(b) to resolve any matters related to the assumption, assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable; to hear, determine, and, if necessary, liquidate, any Claims arising therefrom;

(c) to enter such orders as may be necessary or appropriate to implement or consummate the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided, however,* that nothing in the Plan Documents shall detract from or contravene any jurisdictional or other provisions therein, including Sections 4.13 and 4.14 of this Plan, that permit or require legal actions or proceedings to be brought in another court;

(d) to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor, the Asbestos Claimants Committee, the Legal Representative, or the Asbestos Trust, after the Effective Date, including any claims to recover assets for the benefit of the Estates or the holders of Channeled Asbestos Claims, except for matters waived or released under this Plan;

(e) to ensure that Distributions to holders of Allowed Claims (other than Channeled Asbestos Claims) are accomplished as provided herein;

(f) to hear and determine any timely objections to Administrative Claims or to proofs of Claim (other than Channeled Asbestos Claims), both before and after the Confirmation Date, including any objections to the classification of any Claim (other than Channeled Asbestos Claims), and to allow, disallow, determine, designate, liquidate, classify, estimate, or establish the priority of or the secured or unsecured status of, any Claim (other than Channeled Asbestos Claims), in whole or in part;

(g) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(h) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i) to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(j) to hear and determine all applications for allowance and payment of compensation and reimbursement of expenses of professionals under sections 330 and 331 of the Bankruptcy Code, and any other fees and expenses authorized to be paid or reimbursed under the Plan, except as provided in Section 13.03 hereof;

(k) to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

(l) to issue or enforce injunctions, enter or implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan or Confirmation Order;

(m) to recover all assets of the Debtors and property of the Estates, wherever located;

(n) to resolve any disputed Claims;

(o) to determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(p) to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, agreement, or document created in connection with the Plan or the Disclosure Statement, including any of the Plan Documents;

(q) to the extent that the Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim (excluding any Channeled Asbestos Claim) or cause of action by or against any of the Estates;

(r) to hear and determine any other matters that may be set forth in the Plan, the Confirmation Order, or any of the Injunctions, or that may arise in connection with the Plan, the Confirmation Order, or any of the Injunctions;

(s) to hear and determine any proceeding that involves the validity, application, construction, or enforceability of any of the Injunctions, or that may arise in connection with the Plan, the Confirmation Order, or any of the Injunctions;

(t) to hear and determine matters concerning federal, state, and local taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including the expedited determination of tax under section 505(b) of the Bankruptcy Code;

(u) to enter a final decree closing the Chapter 11 Cases; and

(v) to hear and determine all objections to the termination of the Asbestos Trust.

Section 11.02. ***Non-Core Proceedings***. To the extent any of the foregoing matters described in Section 11.01 hereof does not qualify as a core proceeding under 28 U.S.C.§ 157(b), or to the extent the Bankruptcy Court is otherwise not permitted to render dispositive orders or judgments in any such matters, the reference to the "Bankruptcy Court" in Section 11.01 hereof shall be deemed to be replaced by the "District Court."

Section 11.03. ***Other Proceedings***. Except as provided in Section 4.13 and Section 4.14 hereof, (a) the resolution and payment of Channeled Asbestos Claims, and the forum in which such resolution and payment will be determined, will be governed exclusively by and in accordance with the Asbestos Trust Agreement or the TDP; and (b) the Bankruptcy Court and the District Court shall have concurrent rather than exclusive jurisdiction with respect to disputes relating to the Debtors' rights to insurance with respect to Worker Compensation Claims.

## ARTICLE XII.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

Section 12.01. ***Plan Modification***. Prior to the Confirmation Date, the Plan Proponents, in their sole discretion, acting jointly, may amend, modify, or supplement the terms and provisions of the Plan or any of the other Plan Documents, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. After the Confirmation Date but prior to the Effective Date, the Plan Proponents, acting jointly, may alter, amend or modify the Plan or any of the other Plan Documents in accordance with section 1127 of the Bankruptcy Code. If any Plan Proponent suggests a modification of the Plan to facilitate Confirmation, the other Plan Proponents shall confer promptly with it as to whether or not to modify the Plan, accordingly, in recognition that time is of the essence.

Section 12.02. ***Revocation, Withdrawal, or Non-Consummation***

(a) If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings pending in, arising in, or relating to the Chapter 11 Cases.

(b) In the event that the Confirmation Order has been entered but the Effective Date does not occur within a time period thereafter as may be agreed to by the Plan Proponents acting jointly, the Plan Proponents may revoke or withdraw the Plan, in which case the parties shall be returned to the position they would have held had the Confirmation Order not been entered, and nothing in the Plan, the Disclosure Statement, any of the Plan Documents, or any pleading filed or statement made in court with respect to the Plan or any of the Plan Documents shall be

deemed to constitute an admission or waiver of any sort or in any way limit, impair, or affect the rights of any Entity.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

Section 13.01. *Expedited Tax Determination*. The Reorganized Debtor may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Section 13.02. *Exemption from Registration*. Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of any securities pursuant to the Plan shall be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and all other applicable nonbankruptcy laws and regulations.

Section 13.03. *Statutory Committee and Legal Representative*

(a) Except as provided below, the Asbestos Claimants Committee and the Legal Representative shall continue in existence until the Effective Date.

(b) Except as provided below, on and after the Effective Date, the rights, duties, and responsibilities of the Legal Representative shall be as set forth in the Asbestos Trust Agreement.

(c) On and after the Effective Date, the Asbestos Claimants Committee and the Legal Representative shall continue in existence and shall have post-Effective Date standing and capacity (i) to complete matters, if any, including litigation, appeals, or negotiations pending as of the Effective Date that are not released pursuant to the Plan; (ii) to grant or withhold, in their sole discretion, any consent contemplated or required under the Plan; (iii) to object to or defend any Professional Claims; (iv) to oppose any appeals of the Confirmation Order; and (v) to prepare and prosecute applications for the payment of fees and reimbursement of expenses of their respective professionals.

(d) In all events, the Asbestos Claimants Committee's professionals, and the Legal Representative and his professionals, shall have the right to seek, and shall be entitled to, reasonable fees and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code for services rendered, including those services arising from or connected with any matter authorized or described in Section 13.03(c) hereof. The Debtors shall pay such reasonable fees and expenses incurred through the Effective Date, in accordance with the fee and expense procedures set forth in the Bankruptcy Code and Bankruptcy Rules or otherwise promulgated during the Chapter 11 Cases. The Reorganized Debtor shall pay such reasonable fees and expenses relating to any post-Effective Date activities authorized or described in Section 13.03(c) hereof without the necessity of approval by the Bankruptcy Court.

(e) Upon (i) the completion of all matters authorized and described in Section 13.03(c) hereof and (ii) the irrevocable and indefeasible payment in full by the Reorganized Debtor of all Allowed Professional Claims, the Asbestos Claimants Committee shall be

dissolved, and the members thereof shall be discharged of and from all further authority, duties, responsibilities, liabilities, and obligations related to, or arising from, the Chapter 11 Cases. Upon dissolution of the Asbestos Claimants Committee, the Trust Advisory Committee shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Asbestos Claimants Committee and shall enjoy the work product protections that were applicable or available to the Asbestos Claimants Committee before its dissolution.

Section 13.04. ***Effective Date Actions Simultaneous.*** Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. Actions required to be taken after the Effective Date or as soon thereafter as is reasonably practicable shall be deemed to have been taken on the Effective Date.

Section 13.05. ***Substantial Consummation.*** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

Section 13.06. ***Sections 1125 and 1126 of the Bankruptcy Code.*** As of and subject to the occurrence of the Confirmation Date: (a) the Plan Proponents shall be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125(a) and (e) of the Bankruptcy Code, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with solicitation; and (b) the Reorganized Debtor and the Plan Proponents and each of their respective members, attorneys, advisors, and agents shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

Section 13.07. ***Deemed Acts.*** Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

Section 13.08. ***Binding Effect.*** The Plan shall be binding upon and inure to the benefit of the Plan Proponents, the Debtors, the holders of Claims, Demands (to the fullest extent permitted by law), and interests, and their respective successors and assigns, including the Reorganized Debtor.

Section 13.09. ***Exhibits/Schedules.*** All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if set forth in full herein.

Section 13.10. ***Entire Agreement.*** On the Effective Date, the Plan, the other Plan Documents, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Section 13.11. ***Reservation of Rights***. If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Cases are and shall be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement. Moreover, if the Plan does not become effective, no party in interest in the Chapter 11 Cases shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including the representations made in the Plan, the Disclosure Statement, the other Plan Documents, or the Confirmation Order.

Section 13.12. ***Further Assurances***. The Debtors, the Reorganized Debtor, the Protected Parties, the Asbestos Trust, all Entities receiving Distributions under this Plan, and all other parties in interest shall, and shall be authorized to, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of this Plan as may be necessary to effectuate the provisions and intent of this Plan, with each such Entity to bear its own costs incurred after the Effective Date in connection therewith.

Section 13.13. ***Further Authorizations***. Prior to the Effective Date, the Plan Proponents may seek such orders, judgments, injunctions, and rulings that they, by unanimous agreement, deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan or any of the other Plan Documents, and any costs incurred in connection therewith shall be borne by the Debtors' Estates. On and after the Effective Date, the Reorganized Debtor and the Asbestos Trust may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan or any of the other Plan Documents, with each such Entity to bear its own costs in connection therewith.

Section 13.14. ***Notices and Deliveries***. Any notice, request, or other communication required or permitted to be given under this Plan shall be in writing and deemed to have been properly given (a) when delivered in person or when sent by facsimile or other electronic means and electronic confirmation of error-free receipt is received, or (b) three (3) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, and addressed to the Entity at the address listed in Schedule 13.14 of the Plan Supplement. Any Entity may change its address for notices by giving notice of such change to the other Entities in the manner set forth in this Section 13.14.

Section 13.15. ***Asbestos Trust Annual Report***. Notwithstanding the closing of the Chapter 11 Cases under section 350 of the Bankruptcy Code, the Clerk of the Bankruptcy Court shall accept for filing the Asbestos Trust's annual report without the requirement that any party in interest file a request to reopen the case.

Section 13.16. ***Inconsistencies***. To the extent of any inconsistencies between the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern.

Dated: June 6, 2019

Respectfully Submitted,

Duro Dyne National Corp., et al.

By: /s/Randall Hinden
Randall Hinden, CEO

Legal Representative

By: /s/Lawrence Fitzpatrick
Lawrence Fitzpatrick

Caplin & Drysdale, Chartered

By: /s/Jeffrey Liesemer
Jeffrey A. Liesemer
Counsel to the Official Asbestos Claimants Committee

# Plan Exhibit A

## Asbestos Trust Agreement

(Asbestos Trust Agreement is attached as Exhibit 4 to the Transmittal Form)

# Plan Exhibit B

## Cooperation Agreement

(Cooperation Agreement to be supplied subsequent to Confirmation)

# Plan Exhibit C

## Loan and Security Agreement

**EXHIBIT C**

**Draft**

# LOAN AND SECURITY AGREEMENT

Dated as of August __, 2018

**DURO DYNE NATIONAL CORP.,**

as Borrower

and

**BANK OF AMERICA, N.A.,**
as Lender

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| Section 1. | DEFINITIONS; RULES OF CONSTRUCTION | 1 |
| 1.1. | Definitions | 1 |
| 1.2. | Accounting Terms | 13 |
| 1.3. | Uniform Commercial Code | 14 |
| Section 2. | CREDIT FACILITIES | 14 |
| 2.1. | Revolver Commitment. | 14 |
| 2.2. | Reserved | 15 |
| 2.3. | Letter of Credit Facility | 15 |
| Section 3. | INTEREST, FEES AND CHARGES | 16 |
| 3.1. | Interest. | 16 |
| 3.2. | Fees. | 16 |
| 3.3. | Computation of Interest, Fees, Yield Protection | 17 |
| 3.4. | Reimbursement Obligations | 17 |
| 3.5. | Illegality | 17 |
| 3.6. | Inability to Determine Rates | 18 |
| 3.7. | Increased Costs; Capital Adequacy | 18 |
| 3.8. | Maximum Interest | 19 |
| Section 4. | LOAN ADMINISTRATION | 20 |
| 4.1. | Manner of Borrowing and Funding Revolver Loans | 20 |
| 4.2. | Effect of Termination | 20 |
| 4.3. | Reserved | 21 |
| 4.4. | One Obligation | 21 |
| Section 5. | PAYMENTS | 21 |
| 5.1. | General Payment Provisions | 21 |
| 5.2. | Repayment of Revolver Loans | 21 |
| 5.3. | Reserved | 21 |
| 5.4. | Payment of Other Obligations | 21 |
| 5.5. | Marshaling; Payments Set Aside | 21 |
| 5.6. | Application of Payments; Dominion Account | 21 |
| 5.7. | Account Stated | 22 |
| Section 6. | CONDITIONS PRECEDENT | 22 |
| 6.1. | Conditions Precedent to Initial Loans | 22 |
| 6.2. | Conditions Precedent to All Credit Extensions | 24 |
| Section 7. | COLLATERAL | 25 |
| 7.1. | Grant of Security Interest | 25 |
| 7.2. | Lien on Deposit Accounts; Cash Collateral | 25 |
| 7.3. | Reserved | 26 |
| 7.4. | Other Collateral | 26 |
| 7.5. | Limitations | 26 |
| 7.6. | Further Assurances; Extent of Liens | 26 |
| Section 8. | COLLATERAL ADMINISTRATION | 26 |
| 8.1. | Borrowing Base Reports | 26 |
| 8.2. | Accounts | 27 |
| 8.3. | Inventory | 28 |
| 8.4. | Equipment | 28 |
| 8.5. | Deposit Accounts | 29 |
| 8.6. | General Provisions | 29 |
| 8.7. | Power of Attorney | 30 |
| Section 9. | REPRESENTATIONS AND WARRANTIES | 31 |

9.1. General Representations and Warranties ........ 31
9.2. Complete Disclosure ........ 35
Section 10. COVENANTS AND CONTINUING AGREEMENTS ........ 35
10.1. Affirmative Covenants ........ 35
10.2. Negative Covenants ........ 37
10.3. Financial Covenants. ........ 41
10.4. Equity Cure Right ........ 41
Section 11. EVENTS OF DEFAULT; REMEDIES ON DEFAULT ........ 42
11.1. Events of Default ........ 42
11.2. Remedies upon Default ........ 43
11.3. License ........ 44
11.4. Setoff ........ 44
11.5. Remedies Cumulative; No Waiver ........ 44
Section 12. MISCELLANEOUS ........ 45
12.1. Amendments and Waivers ........ 45
12.2. Indemnity ........ 45
12.3. Notices and Communications ........ 45
12.4. Performance of Borrower's Obligations ........ 46
12.5. Credit Inquiries ........ 46
12.6. Severability ........ 46
12.7. Cumulative Effect; Conflict of Terms ........ 47
12.8. Counterparts ........ 47
12.9. Entire Agreement ........ 47
12.10. No Control; No Fiduciary Responsibility ........ 47
12.11. Waiver of Confidentiality ........ 47
12.12. Governing Law ........ 47
12.13. Consent to Forum ........ 47
12.14. Waivers by Borrower ........ 48
12.15. Patriot Act Notice ........ 48
12.16. NO ORAL AGREEMENT ........ 49

**LIST OF SCHEDULES**

| | |
|---|---|
| Schedule A | List of Chapter 11 Plan Documents |
| Schedule 8.5 | Deposit Accounts |
| Schedule 8.6.1 | Business Locations |
| Schedule 9.1.4 | Names and Capital Structure |
| Schedule 9.1.11 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 9.1.14 | Environmental Matters |
| Schedule 9.1.15 | Restrictive Agreements |
| Schedule 9.1.16 | Litigation |
| Schedule 9.1.18 | Pension Plans |
| Schedule 10.2.2 | Existing Liens |
| Schedule 10.2.14 | Restrictive Agreements |
| Schedule 10.2.17 | Existing Affiliate Transactions |

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this "Agreement") is dated as of August __, 2018, among **DURO DYNE NATIONAL CORP.** , a New York corporation ("Borrower") and **BANK OF AMERICA, N.A.**, a national banking association ("Lender").

## RECITALS:

A. Borrower, Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. (collectively, "Chapter 11 Debtors") were debtors and debtors-in-possession in chapter 11 cases filed in the U.S. Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") and jointly administered under Case No. ______________ (the "Cases").

B. Pursuant to the Confirmation Order (defined below), the Bankruptcy Court confirmed that certain Prenegotiated Plan of Reorganization for Duro Dyne National Corporation et al. under Chapter 11 of the Bankruptcy Code (as amended, modified, and supplemented, the "Chapter 11 Plan"), which provides, *inter alia*, for the creation and funding of the Asbestos Trust (defined below) and the substantive consolidation and merger of the Debtors with and into Borrower, with Borrower being the surviving entity.

C. Borrower has requested that Lender provide a credit facility to Borrower to finance its business enterprise and, in connection with the Chapter 11 Plan, to fund a portion of the Asbestos Trust for the purposes of, among other things, processing, resolving, and paying all Asbestos Claims (as defined below). Lender is willing to provide the credit facility on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for valuable consideration hereby acknowledged, the parties agree as follows:

## SECTION 1. DEFINITIONS; RULES OF CONSTRUCTION

### 1.1. Definitions

. In addition to terms defined elsewhere in this Agreement, the following terms have the meanings set forth below:

4 Site: 4 Site LLC, a New York limited liability company, having its chief executive office located at 81 Spence Street, Bay Shore, New York 11706.

4 Site Debt Documents: collectively, that certain Revolving Credit Note dated February 3, 2003 executed by Borrower in favor of 4 Site, as modified pursuant to that certain Modified Revolving Credit Note dated May 1, 2007 executed by Borrower in favor of 4 Site, as amended pursuant to that certain Amendment to Modified Revolving Credit Note dated as of May 29, 2014 executed by Borrower in favor of 4 Site, as further amended pursuant to that certain Amendment to Modified Revolving Credit Note dated as of May 31, 2014 executed by Borrower in favor of 4 Site; and as further amended pursuant to that certain Amendment to Modified Revolving Credit Note dated as of June 26, 2015 executed by Borrower in favor of 4 Site; that certain Security Agreement dated February 3, 2003 by and between Borrower and 4 Site; and that certain Guaranty executed by Borrower in favor of 4 Site, as all of the foregoing now exist or may hereafter be amended, restated, renewed, extended, supplemented, substituted or otherwise modified.

Account: as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

Account Debtor: a Person obligated under an Account, Chattel Paper or General Intangible.

Affiliate: with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have correlative meanings.

Affiliated Distributors: **[Duro Dyne to advise of the applicable Century Mechanical Systems Group entity or entities]**1

Allocable Amount: as defined in **Section 5.8.3(b)**.

Applicable Margin: the margin set forth below, as determined by the Fixed Charge Coverage Ratio as of the most recently ended Fiscal Quarter:

| Level | Fixed Charge Coverage Ratio for most recently ended Fiscal Quarter | Applicable Margin for Revolving Loans |
|---|---|---|
| I | Greater than or equal to 1.25 : 1.00 | 1.75% |
| II | Greater than or equal to 1.00 : 1.00, but less than 1.25 : 1.00 | 2.00% |
| III | Less than 1.00:1.00 | 2.25% |

Until [December 31, 2018], margins shall be determined as if Level II were applicable. Thereafter, the margins shall be subject to increase or decrease by Lender on the first day of each of Borrower's Fiscal Quarters based upon the Fixed Charge Coverage Ratio as of the most recently ended Fiscal Quarter. If Lender is unable to calculate the Fixed Charge Coverage Ratio for the most recently ended Fiscal Quarter due to Borrower's failure to deliver any financial statement when required hereunder, then, at the option of Lender, margins shall be determined as if Level III were applicable until the first day of the Fiscal Quarter following its receipt.

Asbestos Claims: claims against one or more Chapter 11 Debtors for asbestos-related personal injury and wrongful death.

Asbestos Trust: Duro Dyne Asbestos PI Trust, a Delaware statutory trust, established pursuant to Section 524(g) of the Bankruptcy Code for the purposes of, among other things, settling any and all claims of present and future Asbestos Claimants against one or more Chapter 11 Debtors and their shareholders (collectively, the "Protected Parties") and issuing a permanent stay and injunction from any Person (i) commencing or continuing any action or proceeding against the Protected Parties with respect to such Asbestos Claims; (ii) enforcing, attaching, collecting or otherwise recovering any judgment, award, decree or order against any Protected Parties or against the property of any Protected Parties with respect to such Asbestos Claims, (iii) creating, protecting or enforcing any Lien of any kind against the Protected Parties or the property of the Protected Parties on the basis of the Asbestos Claims; (iv)

*1 Provide information about and relationship to Century Mechanical Systems Group.*

commencing any action or other proceeding with respect to an Asbestos Claim against a third party that pursuant to the Plan on or after the Effective Date of the Plan makes a loan to the Protected Parties or challenging or impairing any Lien granted in connection with such loan by reason of any Asbestos Claim; (v) except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation or contribution or recoupment of any kind against any obligation due any Protected Parties or the property of any Protected Parties with respect to such Asbestos Claim, and (vi) taking any act relating to such Asbestos Claim in any manner or place that does not comply with the provisions of the Chapter 11 Plan, any Chapter 11 Plan Documents, or the Trust documents.

Asbestos Trust Note: that certain Promissory Note, dated ____________, 2018, in amount of $13,500,000, made by Borrower to the Asbestos Trust in connection with the Chapter 11 Plan, and evidencing the obligations of Borrower under the Asbestos Trust Note Issuance Agreement, as amended from time to time.

Asbestos Trust Note Issuance Agreement: that certain loan and security agreement among Borrower, Spence LLC, ISWR Ohio LLC and the Asbestos Trust, dated ____________, 2018, setting forth the terms for, inter alia, issuance of the Asbestos Trust Note and delivery of security for payment and performance of the Asbestos Trust Note, as amended from time to time.

Availability: the Borrowing Base minus Revolver Usage.

Average Daily Availability: shall mean, for any period of determination, the average daily Availability during such period of determination.

Bank Product: any of the following products, services or facilities extended to Borrower by Lender or any of its Affiliates: (a) Cash Management Services; (b) products under Hedging Agreements; and (c) commercial credit card and merchant card services.

Bank Product Debt: debt, obligations and other liabilities of Borrower with respect to Bank Products.

Bank Product Reserve: the aggregate amount of reserves established by Lender from time to time in its discretion in respect of Bank Product Debt.

Bankruptcy Code: Title 11 of the United States Code.

Bankruptcy Court: as defined in the Recitals.

Borrowed Money: with respect to any Obligor, without duplication, its (a) debt that (i) arises from the lending of money by any Person to such Obligor; (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments; (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the ordinary course of business); or (iv) was issued or assumed as full or partial payment for Property; (b) capital leases; (c) reimbursement obligations with respect to letters of credit; and (d) guaranties of any debt of the foregoing types owing by another Person.

Borrowing Base: on any date of determination, an amount equal to the lesser of:

(a) the Revolver Commitment Amount; or

(b) the sum of:

(i) the sum of (x) up to 85% of the amount of Borrower's domestic Eligible Accounts, plus (y) up to 85% of Borrower's Eligible Foreign Insured Accounts, *provided, that*, in no event shall the aggregate amount of Revolver Loans made in respect of Eligible Foreign Insured Accounts exceed $200,000 at any time, plus

(ii) the lesser of (x) up to 65% of the Value of Borrower's Eligible Inventory and (y) up to 85% of the NOLV of Eligible Inventory based on Non-conversion NOLV, *provided, that*, in no event shall the aggregate amount of Revolver Loans made in respect of Eligible Inventory exceed 75% of the Borrowing Base; plus

(iii) during the period from the Closing Date through the date which is eighteen months (18) from the Closing Date, without duplication of Eligible Inventory included in the Borrowing Base in clause (ii) above, up to 85% of an amount equal to (x) the NOLV of Eligible Inventory consisting of raw materials based on a Conversion NOLV, minus (y) the NOLV of Eligible Inventory consisting of raw materials based on a Non-conversion NOLV, provided, that, in no event shall the aggregate amount of Revolver Loans made in respect of Eligible Inventory consisting of raw materials pursuant to this clause (iii) exceed $700,000 at any time, minus

(iv) Reserves.

Borrowing Base Report: a report of the Borrowing Base by Borrower, in form and substance satisfactory to Lender.

Business Day: any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, New York, and if such day relates to LIBOR, any such day on which dealings in dollar deposits are conducted in the London interbank market.

Cases: as defined in the Recitals.

Cash Collateral: cash, and any interest or other income earned thereon, that is delivered to Lender to Cash Collateralize any Obligations.

Cash Collateral Account: a demand deposit, money market or other account maintained with Lender and subject to Lender's Liens.

Cash Collateralize: the delivery of cash to Lender, as security for the payment of Obligations, in an amount equal to (a) with respect to LC Obligations, 105% of the aggregate LC Obligations, and (b) with respect to any other Obligations (including Obligations arising under Bank Products), Lender's good faith estimate of the amount due or to become due. "Cash Collateralization" has a correlative meaning.

Cash Management Services: services relating to operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox and stop payment services.

Change of Control: (a) Randy Hinden and the other Hinden Family Members cease to own and control, beneficially and of record, directly or indirectly, at least 50.1%[2] of the Equity Interests in Borrower; (b) a change in the majority of directors of Borrower during any 24 month period, unless

*2 Subject to review of Trust Note.*

approved by the majority of directors serving at the beginning of such period; or (c) the sale or transfer of all or substantially all assets of Borrower, except to another Borrower.

Chapter 11 Debtors: as defined in the Recitals.

Chapter 11 Plan: as defined in the Recitals and attached as Exhibit A to the Confirmation Order, and together with all exhibits, schedules, annexes, supplements and other attachments thereto, as amended, supplemented or otherwise modified from time to time in accordance with Section 6.1(o).

Chapter 11 Plan Documents: means the Chapter 11 Plan and the documents listed on Schedule A.

Collateral: all Property described in **Section 7.1**, and all other Property that now or hereafter secures (or is intended to secure) any Obligations.

Commitment Termination Date: the earliest to occur of (a) the Revolver Termination Date; (b) the date on which Borrower terminates the Revolver Commitment pursuant to **Section 2.1.3**; or (c) the date on which the Revolver Commitment is terminated pursuant to **Section 11.2**.

Commitments: the Revolver Commitment.

Compliance Certificate: a certificate delivered by a knowledgeable officer of Borrower certifying compliance with **Section 10.3**.

Confirmation Order: means ***[describe order confirming the Chapter 11 Plan]***.

Conversion: [***To be defined***].

Corporate Reorganization: the restructurings contemplated by the Chapter 11 Plan Documents.

Default: an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

Default Rate: for any Obligation (including, to the extent permitted by law, interest not paid when due), 2% plus the interest rate otherwise applicable thereto.

Deposit Account Control Agreement: a control agreement satisfactory to Lender executed by an institution maintaining a Deposit Account for an Obligor, to perfect Lender's Lien on such account.

Dilution Reserve: a reserve established from time to time by Lender, in its discretion, in an amount less than or equal to the amount of Borrower's bad debt write-downs, discounts, returns, promotions, credits, credit memos and other cash reductions with respect to Accounts to the extent such amount exceeds 5% of the gross face amount of such Accounts calculated on a trailing twelve month basis.

Disqualified Stock: any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is or becomes convertible into or exchangeable for debt or any other Equity Interests that would constitute Disqualified Stock, in each case, prior to the date that is 91 days after the Revolver Termination Date.

Dominion Account: a special account established by Borrower at Lender over which Lender has exclusive control for withdrawal purposes.

EBITDA: shall mean Borrower's earnings (a) before interest, taxes, depreciation, and amortization; (b) before deduction of losses or addition of gains associated with non-cash extraordinary items; (c) before deduction of losses or addition of gains associated with non-recurring and legacy items, including, without limitation, Asbestos Claims and costs, fees and expenses directly incurred in connection with the Cases, in an aggregate amount not to exceed $__________; and (d) before deduction of Related-Party Payments (which Related-Party Payments shall not increase year over year by more than ___% in the aggregate).

Effective Date: shall mean the date designated as such under the Chapter 11 Plan after (a) the Confirmation Order shall have become a Final Order and (b) all of the conditions precedent to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived in accordance with the Chapter 11 Plan Documents.

Eligible Account: an Account owing to Borrower that arises in the ordinary course of business from the sale of goods or rendition of services, and is deemed by Lender, in its discretion, to be an Eligible Account. Without limiting the foregoing, no Account shall be an Eligible Account if (a) it is unpaid for more than 60 days after the original due date, or more than 90 days after the original invoice date; (b) 50% or more of the Accounts owing by the Account Debtor (or its Affiliates) are not Eligible Accounts under the foregoing clause; (c) when aggregated with other Accounts owing by the Account Debtor (or its Affiliates), it exceeds 15% of the aggregate Eligible Accounts (or such higher percentage as Lender may establish for the Account Debtor from time to time); (d) it does not conform with a covenant or representation herein; (e) it is owing by a creditor or supplier, or is otherwise subject to a potential offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit or allowance (but ineligibility shall be limited to the amount thereof); (f) an insolvency or bankruptcy proceeding has been commenced by or against the Account Debtor; or the Account Debtor has failed, has suspended or ceased doing business, is liquidating, dissolving or winding up its affairs, is not solvent, or is subject to any sanction or on any specially designated nationals list maintained by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); or Borrower is not able to bring suit or enforce remedies against the Account Debtor through judicial process; (g) the Account Debtor is organized or has its principal offices or assets outside the United States , unless the Account is supported by a letter of credit (delivered to and directly drawable by Lender); (h) it is owing by a governmental authority, unless the Account Debtor is the United States or any department, agency or instrumentality thereof and the Account has been assigned to Lender in compliance with the federal Assignment of Claims Act; (i) it is not subject to a duly perfected, first priority Lien in favor of Lender, or is subject to any other Lien; (j) the goods giving rise to it have not been delivered to the Account Debtor, the services giving rise to it have not been accepted by the Account Debtor, or it otherwise does not represent a final sale; (k) it is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment; (l) its payment has been extended or the Account Debtor has made a partial payment; (m) it arises from a sale to an Affiliate, from a sale on a cash-on-delivery, bill-and-hold, sale-or-return, sale-on-approval, consignment, or other repurchase or return basis, or from a sale for personal, family or household purposes; (n) it represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond or similar assurance has been issued; or (o) it includes a billing for interest, fees or late charges, but ineligibility shall be limited to the extent thereof. In calculating delinquent portions of Accounts under clauses (a) and (b), credit balances more than 90 days old will be excluded. Notwithstanding anything to the contrary set forth in this definition, an Account shall cease to be an Eligible Account if the proceeds of such Account are remitted to Affiliated Distributors and Affiliated Distributors fails to deposit such proceeds in a Dominion Account within thirty (30) days of such remittance to Affiliated Distributors.

Eligible Foreign Insured Accounts: Accounts that meet the requirements of Eligible Accounts, except clause (g) of such definition, to the extent that (i) such Account is credit insured (the insurance carrier, amount and terms of such insurance shall be reasonably acceptable to Lender, shall name Lender as beneficiary or loss payee, as applicable and (ii) the Account Debtor owing on such Account is organized or has its principal offices in Australia, New Zealand or other countries acceptable to Lender in its sole discretion and confirmed by Lender in writing. Notwithstanding anything to the contrary set forth in this definition, an Account shall cease to be an Eligible Foreign Insured Account if the proceeds of such Account are remitted to Affiliated Distributors and Affiliated Distributors fails to deposit such proceeds in a Dominion Account within thirty (30) days of such remittance to Affiliated Distributors.

Eligible Inventory: Inventory owned by Borrower that Lender, in its discretion, deems to be Eligible Inventory. Without limiting the foregoing, no Inventory shall be Eligible Inventory unless it (a) is finished goods or raw materials and not work-in-process, packaging or shipping materials, labels, samples, display items, bags, replacement parts or manufacturing supplies; (b) is not held on consignment, nor subject to any deposit or down payment; (c) is in new and saleable condition and is not damaged, defective, shopworn or otherwise unfit for sale; (d) is not slow-moving, perishable, obsolete or unmerchantable, and does not constitute returned or repossessed goods; (e) meets all standards imposed by any governmental authority, has not been acquired from an entity subject to any sanction or on any specially designated nationals list maintained by OFAC, and does not constitute hazardous materials under any environmental law; (f) conforms with the covenants and representations herein; (g) is subject to Lender's duly perfected, first priority Lien, and no other Lien; (h) is within the continental United States, is not in transit except between locations of Borrower, and is not consigned to any Person; (i) is not subject to any warehouse receipt or negotiable Document; (j) is not subject to any License or other arrangement that restricts Borrower's or Lender's right to dispose of such Inventory, unless Lender has received an appropriate Lien Waiver; (k) is located (i) on a premises containing Eligible Inventory with an aggregate Value of at least $50,000, (ii) if such Inventory is located on a leased premises or in the possession of a warehouseman, processor, repairman, mechanic, shipper, freight forwarder or other Person, such lessor or such other Person has delivered a Lien Waiver or an appropriate Reserve has been established, or (iii) if such Inventory is located on a premises owned by Borrower and such premises is subject to a mortgage, the mortgagee of such premises has delivered a mortgagee waiver in form and substance satisfactory to Lender.

Enforcement Action: any action to enforce any Obligations or Loan Documents or to realize upon any Collateral.

Equity Interest: the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest.

Final Order: means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court of competent jurisdiction which judgment, order, ruling or other decree has not been reversed or stayed and as to which (a) the time to appeal or petition for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending or (b) any appeal or petition for review, rehearing or certiorari has been finally decided or waived and no further appeal or petition for review, review, rehearing or certiorari can be taken or granted.

Financial Covenant Trigger Period: the period (a) commencing on the day that (i) a Default or Event of Default occurs, or (ii) Availability is less than 15% of the Revolver Commitment Amount; and (b) continuing until, during each of the preceding sixty (60) consecutive days, (i) no Default or Event of

Default has existed and (ii) Availability has been more than the greater of 15% of the Revolver Commitment Amount.

Fiscal Quarter: each period of three months, commencing on the first day of a Fiscal Year.

Fiscal Year: the Fiscal Year of Borrower (as the context may require) for accounting and tax purposes, ending on December 31 of each year.

Fixed Charge Coverage Ratio: the ratio, determined for Borrower on a consolidated basis for the most recent 12 month period then ended, of (a) EBITDA minus (i) capital expenditures (except those financed with Borrowed Money other than Revolver Loans), minus (ii) cash taxes paid, to (b) Fixed Charges.

Fixed Charges: a determination for Borrower on a consolidated basis for the most recent 12 month period then ended, the sum of (a) interest expense (other than payment-in-kind), including cash interest on Borrower's pension withdrawal liability, plus (b) lease payments, including, without limitation, Related-Party Payments, plus (c) regularly scheduled principal payments made on Borrowed Money, (d) payments, other than interest payments, made on account of Borrower's pension withdrawal liability, plus (e) Restricted Payments made in cash during such period.

Foreign Subsidiary: any Subsidiary of any Person that is not organized or incorporated in the United States, any state or territory thereof or the District of Columbia.

Guarantor: each Person that guarantees payment or performance of Obligations.

Guarantor Payment: as defined in **Section 5.8.3(b)**.

Hedging Agreement: a "swap agreement" as defined in Bankruptcy Code Section 101(53B)(A).

Hinden Family Entities: collectively, Duro Dyne Canada, Inc., 4 Site LLC, Rize LLC, Rize Enterprises Canada Inc., Pro4ma LLC, Pro4ma II LLC, Foma LLC, ISWR Ohio LLC, Duro Dyne Spence LLC, The Irene Lee Hinden Trust, The Wendy Lynn Geller Trust, The Randall Scott Hinden Trust, and The Hinden Grandchildren Trust, the estate of Sheryl Blumenthal, and the trusts created under the will of Sheryl Blumenthal.

Hinden Family Members: collectively, Randall Hinden, Wendy Hinden, Irene Hinden, David Brett Krupnick, Lindsay Jill Trant, Tobey Hinden Parker Geller, Joshua Blumenthal, Jessie Geller Cawley, Abby Beth Wein, Hayley Rebekah Geller, and Max Hinden.

Increased Examination Trigger Period: the period (a) commencing on the day that (i) a Default or Event of Default occurs, or (ii) Availability, for each of the preceding three (3) consecutive days has been less than 20% of the Revolver Commitment Amount; and (b) continuing until, during each of the preceding sixty (60) consecutive days, (i) no Default or Event of Default has existed and (ii) Availability has been more than the greater of 20% of the Revolver Commitment Amount.

Increased Reporting Trigger Period: the period (a) commencing on the day that (i) a Default or Event of Default occurs, or (ii) Availability is less than 15% of the Revolver Commitment Amount; and (b) continuing until, during each of the preceding sixty (60) consecutive days, (i) no Default or Event of Default has existed and (ii) Availability has been more than the greater of 15% of the Revolver Commitment Amount.

Inventory: as defined in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in Borrower's business (but excluding Equipment).

LC Application: an application by Borrower to Lender for issuance of a Letter of Credit, in form and substance satisfactory to Lender.

LC Conditions: upon issuance of the Letter of Credit: (a) each condition in **Section 6** is satisfied; (b) after giving effect to any requested Letter of Credit, (i) total LC Obligations do not exceed the Letter of Credit Subline and (ii) Revolver Usage does not exceed the Borrowing Base; and (c) the purpose and form of the Letter of Credit are satisfactory to Lender in its discretion.

LC Documents: all documents, instruments and agreements (including LC Requests and LC Applications) delivered by Borrower or any other Person to Lender in connection with any Letter of Credit.

LC Obligations: the sum of (a) all amounts owing by Borrower for drawings under Letters of Credit; and (b) the Stated Amount of all outstanding Letters of Credit.

LC Request: a request for issuance of a Letter of Credit, to be provided by Borrower in form satisfactory to Lender.

Letter of Credit: any standby or documentary letter of credit, foreign guaranty, documentary bankers acceptance or similar instrument issued by Lender for the account or benefit of Borrower.

Letter of Credit Subline: $500,000.

LIBOR: for each month, the per annum rate of interest (rounded up to the nearest 1/8th of 1% and in no event less than zero) determined by Lender at or about 11:00 a.m. (London time) as of the first day of such month for a one-month term equal to the London Interbank Offered Rate for a 30-day interest period, or comparable or successor rate approved by Lender, as published on the applicable Reuters screen page (or other commercially available source designated by Lender from time to time); provided, that any comparable or successor rate shall be applied by Lender, if administratively feasible, in a manner consistent with market practice. If at any time LIBOR is less than zero, such rate shall be deemed to be zero.

LIBOR Screen Rate: the LIBOR quote on the applicable screen page Lender designates to determine LIBOR (or such other commercially available source providing such quotations as may be designated by the Lender from time to time).

License: any license or agreement under which an Obligor is authorized to use intellectual property in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of Property or any other conduct of its business.

Lien: a Person's interest in Property securing an obligation owed to, or a claim by, such Person, including any lien, security interest, pledge, hypothecation, assignment, trust, reservation, encroachment, easement, right-of-way, covenant, condition, restriction, lease, or other title exception or encumbrance.

Lien Waiver: an agreement, in form and substance satisfactory to Lender, by which (a) a lessor waives or subordinates any Lien it may have on the Collateral, and agrees to permit Lender to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for Lender, and agrees to deliver the Collateral to Lender upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges Lender's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to Lender upon request; and (d) for any Collateral subject to a licensor's intellectual property rights, the licensor grants to Lender the right, vis-à-vis such licensor, to enforce Lender's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the intellectual property, whether or not a default exists under any applicable license.

Loan: a Revolver Loan.

Loan Documents: this Agreement, Other Agreements and Security Documents.

Loan Year: each 12 month period commencing on the Closing Date (as defined in **Section 6.1**) and on each anniversary of the Closing Date.

Material Adverse Effect: the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances, (a) has or could be reasonably expected to have a material adverse effect on the business, operations, Properties, prospects or condition (financial or otherwise) of Borrower, on the value of any material Collateral, on the enforceability of any Loan Documents, or on the validity or priority of Lender's Liens on any Collateral; (b) impairs the ability of Borrower to perform their obligations under the Loan Documents, including repayment of any Obligations; or (c) otherwise impairs the ability of Lender to enforce or collect any Obligations or to realize upon any Collateral.

NOLV: the net orderly liquidation value of Inventory, expressed as a percentage, expected to be realized at an orderly, negotiated sale held within a reasonable period of time, net of all liquidation and/or foreclosure expenses, as determined from the most recent appraisal of Borrower's Inventory, performed by an appraiser and on terms satisfactory to Lender.

Non-conversion: [*To be defined*].

Notice of Borrowing: a request by Borrower for a Borrowing of Revolver Loans, in form satisfactory to Lender.

Obligations: all (a) principal of and premium, if any, on the Loans, (b) LC Obligations and other obligations of Borrower with respect to Letters of Credit (c) interest, expenses, fees, costs, indemnification obligations and other amounts payable by Borrower under the Loan Documents, (d) Bank Product Debt, and (e) other debts, obligations and liabilities of any kind owing by Borrower to Lender or any of its Affiliates, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any insolvency or bankruptcy proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

Obligor: Borrower, Guarantor, or any other Person that is liable for payment of any Obligations or that has granted a Lien in favor of Lender on its assets to secure any Obligations.

Other Agreement: each LC Document, Lien Waiver, Borrowing Base Report, Compliance Certificate, financial statement or report delivered hereunder; or other document, instrument or agreement (other than this Agreement or a Security Document) now or hereafter delivered by an Obligor or other Person to Lender in connection with any transactions relating hereto.

Overadvances: as defined in **Section 2.1.4.**

Patriot Act: the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

Payment Item: each check, draft or other item of payment payable to Borrower, including those constituting proceeds of any Collateral.

Permitted 4 Site Payments: (a) regularly scheduled payments of interest payable to 4 Site under the 4 Site Debt Documents (on a non-accelerated basis), so long as immediately prior to and after giving effect to any such payments, (i) no Default or Event of Default exists or is continuing and (ii) upon giving pro forma effect to such payment, (A) Borrower shall have maintained, for the 30 day period immediately preceding such payment, Average Daily Availability of not less than 25% of the Revolver Commitment Amount, and (B) Borrower shall have immediately after giving effect to such payment, Availability of not less than 25% of the Revolver Commitment Amount, and (b) regularly scheduled payments of principal payable to 4 Site under the 4 Site Debt Documents, so long as, immediately before and after giving effect to any such payment, (i) the conditions set forth in clauses (a)(i) and (a) (ii) of this definition are satisfied, and (ii) the Fixed Charge Coverage Ratio for the twelve month period preceding the month in which the proposed payment is to be made is not less than 1.0:1.0, which shall be calculated on a pro forma basis as if such payment was made during such twelve month period.

Permitted Asbestos Trust Earn Outs: solely to the extent that Borrower's trailing twelve month EBITDA exceeds $3,000,000, earn-out payments to the Asbestos Trust on or about September 30 of each year in an amount not greater than (x) 30% multiplied by (y) the amount by which Borrower's actual EBITDA for the trailing twelve month period then ended exceeds $3,000,000; *provided, that*, in no event shall the aggregate amount of all such Permitted Asbestos Earn Out Payments exceed $2,000,000.

Permitted Asbestos Trust Note Payments: regularly scheduled payments of principal and interest payable under the Asbestos Trusts Notes (on a non-accelerated basis), so long as immediately prior to and after giving effect to any such payments, (a) no Default or Event of Default exists or is caused thereby; and (b) Borrower shall have, immediately before and after giving effect to such payment, a trailing twelve month EBITDA of not less than $3,000,000, *provided, that*, in the event that Borrower is unable to make any Permitted Asbestos Trust Notes Payments as a result of the failure to satisfy the foregoing conditions, such payments shall continue to accrue and may be paid by Borrower at such time when the foregoing conditions would be satisfied before and after making any such payments.

Permitted Cure Securities: any Equity Interest of Borrower or a direct or indirect parent thereof other than Disqualified Stock including, without limitation, preferred stock that is issued on terms that, to Lender's satisfaction, subordinate the priority of payments thereunder to the payment in full of the Obligations hereunder.

Permitted Lien: as defined in **Section 10.2.2.**

Person: any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, governmental authority or other entity.

Property: any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

Real Estate: all right, title and interest (whether as owner, lessor or lessee) in any real Property or any buildings, structures, parking areas or other improvements thereon.

Related Parties: collectively, the Hinden Family Members, the Hinden Family Entities, and any other Entity owned or Controlled by any of the Hinden Family Members or any of the Hinden Family Entities (and any of them individually, a Related Party).

Related-Party Payment: payments made or to be made in the form of a dividend or similar distribution to a Related Party or on account of any debt or obligation owed to a Related Party arising expressly and only from (a) any base rental payment made on account of (i) that certain lease dated as of June 1, 2015, between Spence LLC, as landlord, and Duro Dyne, as tenant, pertaining to real property located at 81 Spence Street, Bay Shore, New York by or (ii) that certain lease dated as of August 1, 1991, by and between ISWR Ohio LLC, as landlord, and Midwest, as tenant, pertaining to real property located at 3825 Symmes Road, Fairfield, Ohio and (b) any other lease or rent payment made to a Related Party on account of or with respect to any property, plant, or equipment, but specifically excluding (i) payments under the 4 Site Debt Documents, and (ii) anything in the nature of a pass-through expense (i.e., which is not retained by the Related Party), including, without limitation, taxes.

Rent and Charges Reserve: the aggregate of (a) all past due rent and other amounts owing by an Obligor to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Collateral or could assert a Lien on any Collateral; (b) a reserve at least equal to three months' rent and other charges that could be payable to any such Person, unless it has executed a Lien Waiver; and (c) such other reserves with respect to rent and other amounts or the Borrowing Base as Lender may establish in its discretion owing by an Obligor to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Collateral or could assert a Lien on any Collateral.

Reserves: collectively, (a) the Bank Product Reserve and (b) the Dilution Reserve, (c) Rent and Charges Reserve; (d) all accrued and unpaid rebates owing to any customer of Borrower; (e) any negative variance of Borrower's perpetual inventory from Borrower's general ledger inventory; and (f) such other reserves against the Collateral or the Borrowing Base as Lender may establish in its discretion.

Restricted Payments: means payments on account of (a) distributions or dividends made in respect of the Equity Interest or other ownership interests of Borrower permitted under Section 10.2.4 and (b) acquisitions and investments permitted under Section 10.2.5(d).

Restricted Payment Conditions: to the extent this Agreement or a Loan Document requires that a Restricted Payment comply with the Restricted Payment Conditions, such payment shall be subject to the following conditions: prior to and after giving effect to such payment (a) no Default or Event of Default exists or is caused thereby; and (b) upon giving pro forma effect to such payment, (i) Borrower shall have maintained, for the 30 day period immediately preceding such payment, Average Daily Availability of not less than 30% (or, in the case of Restricted Payments under clause (b) of such definition, 20%) of the Revolver Commitment Amount, (ii) Borrower shall have, immediately after giving effect to such payment, Availability of not less than 30% (or, in the case of Restricted Payments under clause (b) of such definition, 20%) of the Revolver Commitment Amount; and (iii) the Fixed Charge Coverage Ratio for the twelve month period preceding the month in which the proposed payment is to be made, is not less than 1.10 : 1.0 (or, in the case of Restricted Payments under clause (b) of such definition, 1.0 : 1.0), which shall be calculated on a pro forma basis as if such payment was made during such twelve month period.

Revolver Commitment: Lender's obligation to make Revolver Loans and to issue Letters of Credit in an aggregate amount up to the Revolver Commitment Amount.

Revolver Commitment Amount: means $9,950,000.

Revolver Loan: a loan made pursuant to **Section 2.1**.

Revolver Termination Date: ___________ __, 2023.

Revolver Usage: the aggregate amount of outstanding Revolver Loans, plus the aggregate Stated Amount of outstanding Letters of Credit and other LC Obligations.

Royalties: all royalties, fees, expense reimbursement and other amounts payable by Borrower under a License.

Secured Party or Secured Parties: Lender and any of Lender's Affiliates that are providers of Bank Products.

Security Documents: the Guaranties, Deposit Account Control Agreements, and all other documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

Stated Amount: the outstanding amount of a Letter of Credit, including any automatic increase or tolerance (whether or not then in effect) provided by the Letter of Credit or related LC Documents.

Subordinated Debt: debt incurred by Borrower that is expressly subordinate and junior in right of payment to the indefeasible full payment of all Obligations, and is on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to Lender.

Subsidiary or Subsidiaries: any entity at least 50% of whose voting securities or Equity Interests is owned by Borrower (including indirect ownership through other entities in which Borrower directly or indirectly owns 50% of the voting securities or Equity Interests).

Tax Distributions: a distribution by Borrower to the holders of the Equity Interests of Borrower solely to the extent necessary to permit such holders to discharge their respective federal, state and local tax liabilities arising directly as holders of the Equity Interests of Borrower (and not any Affiliate of Borrower), determined based on the assumption that all such holders are subject to the highest marginal tax rate in effect at the time of such distribution.

UCC: the Uniform Commercial Code as in , among other things, effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

Unused Line Fee Rate: a per annum rate equal to 0.25%.

Value: with respect to Inventory, its value determined on the basis of the cost, calculated on a first-in, first-out basis, and excluding any portion of cost attributable to intercompany profit among Borrower and their Affiliates.

**1.2. Accounting Terms**

. Under the Loan Documents (except as otherwise specified therein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with generally accepted accounting principles in the U.S. ("GAAP") applied on a basis consistent with the most recent reviewed financial statements of Borrower delivered to Lender before the Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if Borrower's certified public accountants concur in such change, the change is disclosed to Lender, and all relevant provisions of the Loan Documents are amended in a manner satisfactory to Lender to take into account the effects of the change.

**1.3. Uniform Commercial Code**

. As used herein, the following terms are defined in accordance with the UCC in effect in the State of New York from time to time: "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right" and "Supporting Obligation."

**SECTION 2. CREDIT FACILITIES**

**2.1. Revolver Commitment.**

**2.1.1.** Revolver Loans

(a) . Lender agrees, on the terms set forth herein, to make Revolver Loans to Borrower in an aggregate amount up to the Revolver Commitment Amount, from time to time through the Commitment Termination Date. Revolver Loans may be repaid and reborrowed as provided herein. In no event shall Lender have any obligation to honor a request for a Revolver Loan if Revolver Usage at such time plus the requested Loan would exceed the Borrowing Base.

**2.1.2.** Use of Proceeds

. The proceeds of Revolver Loans shall be used by Borrower solely (a) to satisfy existing debt or credit facilities; (b) to pay fees and transaction expenses associated with the closing of this credit facility; (c) to pay Obligations in accordance with this Agreement; (d) to fund the Asbestos Trust in an amount not to exceed $7,500,000 and related fees and expenses; and (e) for other lawful corporate purposes of Borrower, including working capital.

**2.1.3.** Voluntary Reduction or Termination of Revolver Commitment.

The Revolver Commitment shall terminate on the Revolver Termination Date, unless sooner terminated in accordance with this Agreement. Upon at least 30 days prior written notice to Lender at any time, Borrower may terminate the Revolver Commitment and this credit facility. Any notice of termination given by Borrower shall be irrevocable. On the Commitment Termination Date, Borrower shall make full payment of all Obligations.

**2.1.4.** Overadvances

. If Revolver Usage exceeds the Borrowing Base ("Overadvance") at any time, such excess shall be payable by Borrower **on demand** by Lender, but all Revolver Usage (including the excess amount) shall nevertheless constitute Obligations secured by the Collateral and entitled to all benefits of the Loan Documents. No funding or sufferance of an Overadvance by Lender shall constitute a waiver of the Event of Default (as defined in **Section 11**) caused thereby.

**2.2. Reserved**

.

**2.3. Letter of Credit Facility**

.

2.3.1. Issuance of Letters of Credit

. Lender agrees to issue Letters of Credit from time to time until 30 days prior to the Revolver Termination Date (or until the Commitment Termination Date, if earlier), on the terms set forth herein, including the following:

(a) Borrower acknowledgess that Lender's willingness to issue any Letter of Credit is conditioned upon its receipt of a LC Application with respect to the requested Letter of Credit, as well as such other instruments and agreements as Lender may customarily require for issuance of a letter of credit of similar type and amount. Lender shall have no obligation to issue any Letter of Credit unless (i) it receives a LC Request and LC Application at least three Business Days prior to the requested date of issuance; and (ii) each LC Condition is satisfied.

(b) Letters of Credit may be requested by Borrower to support obligations incurred in the ordinary course of business, or as otherwise approved by Lender. Increase, renewal or extension of a Letter of Credit shall be treated as issuance of a new Letter of Credit, except that Lender may require a new LC Application in its discretion.

(c) Borrower assumes all risks of the acts, omissions or misuses of any Letter of Credit by the beneficiary. In connection with issuance of any Letter of Credit, Lender shall not be responsible for the existence, character, quality, quantity, condition, packing, value or delivery of any goods purported to be represented by any Documents; any differences or variation in the character, quality, quantity, condition, packing, value or delivery of any goods from that expressed in any documents; the form, validity, sufficiency, accuracy, genuineness or legal effect of any documents or of any endorsements thereon; the time, place, manner or order in which shipment of goods is made; partial or incomplete shipment of, or failure to ship, any goods referred to in a Letter of Credit or documents; any deviation from instructions, delay, default or fraud by any shipper or other Person in connection with any goods, shipment or delivery; any breach of contract between a shipper or vendor and Borrower; errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex, telecopy, e-mail, telephone or otherwise; errors in interpretation of technical terms; the misapplication by a beneficiary of any Letter of Credit or the proceeds thereof; or any consequences arising from causes beyond the control of Lender. Lender shall not be liable to Borrower or other Person for any action taken or omitted to be taken in connection with any Letter of Credit or LC Documents except as a result of its gross negligence or willful misconduct. Lender shall be fully subrogated to the rights and remedies of each beneficiary whose claims against Borrower is discharged with proceeds of any Letter of Credit.

(d) In connection with its administration of and enforcement of rights or remedies under any Letters of Credit or LC Documents, Lender shall be entitled to act, and shall be fully protected in acting, upon any certification, documentation or communication in whatever form believed by Lender, in good faith, to be genuine and correct and to have been signed, sent or made by a proper Person.

2.3.2. Reimbursement

. If Lender honors any request for payment under a Letter of Credit, Borrower shall pay to Lender, on the same day ("Reimbursement Date"), the amount paid under such Letter of Credit, together with interest at the interest rate for Revolver Loans from the Reimbursement Date until payment by Borrower. The obligation of Borrower to reimburse Lender for any payment made under a Letter of Credit shall be absolute, unconditional, irrevocable, and shall be paid without regard to any lack of validity or enforceability of any Letter of Credit or the existence of any claim, setoff, defense or other right that Borrower may have at any time against the beneficiary. Whether or not Borrower submits a Notice of Borrowing, Borrower shall be deemed to have requested a Borrowing of Revolver Loans in an amount necessary to pay all amounts due on any Reimbursement Date.

2.3.3. Cash Collateral

. If at any time (a) an Event of Default exists, (b) the Commitment Termination Date has occurred, or (c) the Revolver Termination Date is scheduled to occur within 20 Business Days, then Borrower shall, at Lender's request, Cash Collateralize all outstanding Letters of Credit. If Borrower fails to provide any Cash Collateral as required hereunder, Lender may advance, as Revolver Loans, the amount of Cash Collateral required.

## SECTION 3. INTEREST, FEES AND CHARGES

### 3.1. Interest.

3.1.1. Rates and Payment of Interest.

(a) The Obligations shall bear interest at LIBOR in effect from time to time, plus the Applicable Margin.

(b) During any Event of Default, Obligations shall bear interest at the Default Rate (whether before or after any judgment). Borrower acknowledgess that the cost and expense to Lender due to an Event of Default are difficult to ascertain and that the Default Rate is fair and reasonable compensation for this.

(c) Interest shall accrue from the date a Loan is advanced or Obligation is incurred or payable, until paid in full. Interest accrued on the Loans shall be due and payable in arrears, (i) on the first day of each month; (ii) on any date of prepayment, with respect to the principal amount of Loans being prepaid; and (iii) on the Commitment Termination Date. Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable **on demand**. Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable **on demand**.

3.1.2. Interest Rate Not Ascertainable

. If, due to any circumstance affecting the London interbank market, Lender determines that adequate and fair means do not exist for ascertaining LIBOR on any applicable date then Lender shall immediately notify Borrower of such determination. Until Lender notifies Borrower that such circumstance no longer exists, the obligation of Lender to make Loans based upon LIBOR shall be suspended and no further Loans may be requested, made or continued based upon LIBOR.

### 3.2. Fees.

3.2.1. Unused Line Fee. Borrower shall pay to Lender a fee equal to the Unused Line Fee Rate times the amount by which the Revolver Commitment Amount exceeds the average daily Revolver Usage during any month. Such fee shall be payable in arrears, on the first day of each month and on the Commitment Termination Date.

3.2.2.

3.2.3. Closing Fee. On the Closing Date, Borrower shall pay to Lender a closing fee of 0.25% of the Revolver Commitment Amount.

3.2.4. Administrative Fee. On the Closing Date and on each anniversary thereof, Borrower shall pay to Lender an administrative fee of $5,000.

3.2.5. LC Facility Fees

. Borrower shall pay to Lender (a) a fee equal to the Applicable Margin in effect for Revolver Loans times the average daily Stated Amount of Letters of Credit, which fee shall be payable monthly in arrears, on the first day of each month; (b) a fronting fee equal to 0.125% per annum on the Stated Amount of each Letter of Credit, which fee shall be payable monthly in arrears, on the first day of each month; and (c) all customary charges associated with the issuance, amending, negotiating, payment, processing, transfer and administration of Letters of Credit, which charges shall be paid as and when incurred. During an Event of Default, the fee payable under clause (a) shall be increased by 2% per annum.

### 3.3. Computation of Interest, Fees, Yield Protection

. All interest, as well as fees and other charges calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of 360 days. All fees payable under **Section 3.2** are compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money. A certificate as to amounts payable by Borrower under **Section 3.4**, or **3.7** submitted to Borrower shall be final, conclusive and binding for all purposes, absent manifest error, and Borrower shall pay such amounts to Lender within 10 days following receipt of the certificate.

### 3.4. Reimbursement Obligations

. Borrower shall pay all fees, costs, expenses or advances Lender may incur during an Event of Default promptly upon request. Borrower shall also reimburse Lender for all legal, accounting, appraisal, consulting, and other fees and expenses incurred by it in connection with (a) negotiation and preparation of any Loan Documents, including any modification thereof; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Lender's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) each examination or appraisal with respect to Borrower or any Collateral, whether by Lender's personnel or a third party. All amounts payable by Borrower under this Section shall be due **on demand.**

### 3.5. Illegality

. If Lender determines that any applicable law has made it unlawful, or that any governmental authority has asserted that it is unlawful, for Lender to make, maintain or fund Loans, or to determine or charge interest rates based upon LIBOR, or any governmental authority has imposed material restrictions on the authority of Lender to purchase or sell, or to take deposits of, dollars in the London interbank market, then, on notice thereof by Lender to Borrower, any obligation of Lender to make or continue

Loans based upon LIBOR shall be suspended until Lender notifies Borrower that the circumstances giving rise to such determination no longer exist.

3.6. **Inability to Determine Rates**

(a) Lender will promptly notify Borrower if, in connection with any Loan or request for a Loan, Lender determines for any reason that (i) dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable Loan; or (ii) LIBOR does not adequately and fairly reflect the cost to Lender of funding the Loan based upon LIBOR. Thereafter, Lender's obligation to make or maintain affected Loans based upon LIBOR shall be suspended until Lender withdraws the notice.

(b) Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Lender determines (which determination shall be conclusive absent manifest error), or Borrower notifies Lender that Borrower has determined, that:

(i) adequate and reasonable means do not exist for ascertaining LIBOR, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii) the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over Lender has made a public statement identifying a specific date after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "**Scheduled Unavailability Date**"), or

(iii) loans currently being executed, or that include language similar to that contained in this Section, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, reasonably promptly after such determination by Lender or receipt by Lender of such notice , as applicable, Lender and Borrower may amend this Agreement to replace LIBOR with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein) , (any such proposed rate, a ""**LIBOR Successor Rate**"), together with any proposed LIBOR Successor Rate conforming changes required by Lender and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after Lender shall have posted such proposed amendment to Borrower.

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), Lender will promptly so notify Borrower. Thereafter, the obligation of Lender to make or maintain LIBOR Loans shall be suspended. Upon receipt of such notice, Borrower may revoke any pending request for a LIBOR Loan, or, failing that, will be deemed to have converted such request into a request for a Loan at the LIBOR Successor Rate.

Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for the purposes of this Agreement.

3.7. **Increased Costs; Capital Adequacy**

3.7.1. Increased Costs Generally

. If any Change in Law shall:

(a) impose modify or deem applicable any reserve, liquidity, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender (except any reserve requirement reflected in calculating LIBOR);

(b) subject Lender to any taxes with respect to any Loan, Letter of Credit, Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c) impose on Lender or any interbank market any other condition, cost or expense affecting any Loan, Letter of Credit, Commitment or Loan Document;

and the result thereof shall be to increase the cost to Lender of making or maintaining any Loan or Commitment, or converting to or continuing any interest option for a Loan, or to increase the cost to Lender of issuing or maintaining any Letter of Credit (or of maintaining its obligation to issue a Letter of Credit), or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request by Lender, Borrower will pay to Lender such additional amount(s) as will compensate it for the additional costs incurred or reduction suffered.

3.7.2. Capital Requirements

. If Lender determines that a Change in Law affecting Lender or its holding company regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on Lender's or such holding company's capital as a consequence of this Agreement, Commitments, Loans or Letters of Credit to a level below that which Lender or such holding company could have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amounts as will compensate it or its holding company for the reduction suffered.

"Change in Law" means the occurrence, after the date of this Agreement, of (a) the adoption or taking effect of, or any change in, any law, rule, regulation or treaty, or (b) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any governmental authority, provided that "Change in Law" shall include all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) and shall in each case be deemed to be a "Change in Law" regardless of the date enacted, adopted or issued.

**3.8. Maximum Interest**

. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law ("maximum rate"). If Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, refunded to Borrower. In determining whether the interest contracted for, charged

or received by Lender exceeds the maximum rate, Lender may (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

## SECTION 4. LOAN ADMINISTRATION

### 4.1. Manner of Borrowing and Funding Revolver Loans

.

#### 4.1.1. Notice of Borrowing.

(a) Whenever Borrower desires funding of a Revolver Loan, Borrower shall give Lender a Notice of Borrowing. Such notice must be received by Lender by 11:00 a.m. on the requested funding date for the Loan. Notices received after such time shall be deemed received on the next Business Day. Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of the Borrowing, and (B) the requested funding date (which must be a Business Day).

(b) Unless payment is otherwise made by Borrower, the becoming due of any Obligation (whether principal, interest, fees, costs, expenses or other charges, including LC Obligations, Cash Collateral and Bank Product Debt) shall be deemed to be a request for a Revolver Loan on the due date in the amount due and the Loan proceeds shall be disbursed as direct payment of such Obligation. In addition, Lender may, at its option, charge such amount against any operating, investment or other account of Borrower maintained with Lender or any of its Affiliates.

(c) Presentation for payment of any Payment Item in any disbursement account of Borrower maintained with Lender when there are insufficient funds to cover it shall be deemed to be a request for a Revolver Loan on the presentation date, in the amount of the Payment Item. Proceeds of the Loan may be disbursed directly to the account.

#### 4.1.2. Notices.

Borrower, through Borrower, may request and transfer funds based on telephonic or e-mailed instructions to Lender. Borrower shall confirm each such request by prompt delivery to Lender of a Notice of Borrowing but if it differs materially from the action taken by Lender, the records of Lender shall govern. Lender shall not have any liability for any loss suffered by Borrower as a result of Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith to be a person authorized to give such instructions on Borrower's behalf.

### 4.2. Effect of Termination

. On the Commitment Termination Date, the Obligations shall be immediately due and payable, and each Secured Party may terminate its Bank Products. Until full payment of the Obligations, all undertakings of Borrower contained in the Loan Documents shall continue, and Lender shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents. Lender shall not be required to terminate its Liens unless it receives Cash Collateral or a written agreement, in each case satisfactory to it, protecting it from dishonor or return of any Payment Item previously applied to the Obligations. **Sections 3.4, 3.7, 5.5, 12.2**, this Section, and each indemnity or waiver given by an Obligor in any Loan Document, shall survive full payment of the Obligations.

4.3. **Reserved**

.

4.4. **One Obligation**

. The Loans and other Obligations constitute one general obligation of Borrower and are secured by Lender's Lien on all Collateral; provided, however, that Lender shall be deemed to be a creditor of, and the holder of a separate claim against, Borrower to the extent of any Obligations jointly or severally owed by Borrower.

## SECTION 5. PAYMENTS

5.1. **General Payment Provisions**

. All payments of Obligations shall be made without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any taxes or other amounts, and in immediately available funds, not later than 12:00 noon on the due date. Any payment after such time shall be deemed made on the next Business Day. Borrower agrees that Lender shall have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against Obligations, in such manner as Lender deems advisable.

5.2. **Repayment of Revolver Loans**

. Revolver Loans shall be due and payable in full on the Revolver Termination Date, unless payment is sooner required hereunder. Revolver Loans may be prepaid from time to time, without penalty or premium. If an Overadvance exists at any time, Borrower shall, on the sooner of Lender's demand or the first Business Day after Borrower has knowledge thereof, repay Revolver Loans in an amount sufficient to reduce Revolver Usage to the Borrowing Base.

5.3. **Reserved**

.

5.4. **Payment of Other Obligations**

. Obligations other than Loans, including LC Obligations and fess, cost and expenses, shall be paid by Borrower as provided in the Loan Documents or, if no payment date is specified, **on demand.**

5.5. **Marshaling; Payments Set Aside**

. Lender shall have no obligation to marshal any assets in favor of Borrower or against any Obligations. If any payment by or on behalf of Borrower is made to Lender or if Lender exercises a right of setoff, and any of such payment or setoff is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment or setoff had not occurred.

5.6. **Application of Payments; Dominion Account**

. The ledger balance in the main Dominion Account as of the end of a Business Day shall be applied to the Obligations at the beginning of the next Business Day. If a credit balance results from such application, it shall not accrue interest in favor of Borrower and shall be made available to Borrower as long as no Event of Default exists. For the purposes of calculating interest, Lender will be deemed to have applied funds deposited to the Dominion Account or otherwise received by Lender one Business Day following the Business Day of deposit to the Dominion Account or receipt by Lender.

### 5.7. Account Stated

. Lender shall maintain, in accordance with its customary practices, loan account(s) evidencing the debt of Borrower hereunder. Any failure of Lender to record anything in a loan account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrower to pay any amount owing hereunder. Entries made in a loan account shall constitute presumptive evidence of the information contained therein and shall be conclusive and binding on Borrower absent manifest error.

## SECTION 6. CONDITIONS PRECEDENT

### 6.1. Conditions Precedent to Initial Loans

. In addition to the conditions set forth in **Section 6.2**, Lender shall not be required to fund any requested Loan, issue any Letter of Credit or otherwise extend credit to Borrower hereunder, until the date ("Closing Date") that each of the following conditions has been satisfied:

(a) Each Loan Document shall have been duly executed and delivered to Lender by each of the signatories thereto, and Borrower shall be in compliance with all terms thereof.

(b) Lender shall have received acknowledgments of all filings or recordations necessary to perfect its Liens in the Collateral, as well as UCC and Lien searches and other evidence satisfactory to Lender that such Liens are the only Liens upon the Collateral, except Permitted Liens.

(c) Lender shall have received duly executed agreements establishing the Dominion Account and related lockbox in form and substance satisfactory to Lender.

(d) Lender shall have received certificates, in form and substance satisfactory to it, from a knowledgeable senior officer of Borrower certifying that, after giving effect to the initial Loans and transactions hereunder, (i) Borrower is solvent; (ii) no Event of Default exists; (iii) the representations and warranties set forth in **Section 9**; and (iv) Borrower has complied with all agreements and conditions to be satisfied by it under the Loan Documents.

(e) Lender shall have received copies of Borrower's organizational documents and all resolutions authorizing the execution and delivery of the Loan Documents and any other resolutions adopted with respect to this credit facility.

(f) Lender shall have received copies of the charter documents of Borrower, certified by the Secretary of State or other appropriate official of Borrower's jurisdiction of organization. Lender shall have received good standing certificates for Borrower, issued by the Secretary of State or other appropriate official of Borrower's jurisdiction of organization and each jurisdiction where Borrower's conduct of business or ownership of Property necessitates qualification, as well as any necessary third party or governmental consents and/or Lien Waivers.

(g) Lender shall have received copies of policies or certificates of insurance and insurance endorsements for the insurance policies carried by Borrower, all in compliance with the Loan Documents.

(h) Lender shall have completed its business, financial and legal due diligence of Borrower, including a field examination and appraisal of Inventory, with results satisfactory to Lender. No material adverse change in the financial condition of Borrower or in the quality, quantity or value of any Collateral shall have occurred since December 31, 2017 (it being understood that the commencement and continuance of the Cases, events attendant thereto, and consummation of the Chapter 11 Plan and the transactions contemplated thereby shall not be deemed to be or result in a material adverse change).

(i) Borrower shall have paid all fees and expenses to be paid to Lender on the Closing Date.

(j) Lender shall have received a Borrowing Base Report prepared as of [August __, 2018].

(k) Upon giving effect to the initial funding of Loans and issuance of Letters of Credit, and the payment by Borrower of all fees and expenses incurred in connection herewith and transaction costs associated with the Chapter 11 Plan (whether or not actually paid as of the Closing Date), as well as any payables stretched beyond their customary payment practices, Availability shall be at least $1,500,000;

(l) The Chapter 11 Plan shall be acceptable to Lender and shall have been approved by the Bankruptcy Court;

(m) Lender shall have received satisfactory evidence that Borrower and any other Obligors have satisfied all obligations in accordance with the Chapter 11 Plan that are payable or otherwise due as of the Effective Date, including payment of any transaction costs.

(n) Agent shall have received evidence that the Corporate Reorganization shall have been consummated in accordance with the Chapter 11 Plan Documents.

(o) The Confirmation Order, which, among other things confirms the Chapter 11 Plan and authorizes Borrower to take, and approves, such actions necessary to consummate the Chapter 11 Plan, including entering into this Agreement shall be in full force and effect, in form and substance acceptable to Lender, shall be a Final Order and shall not (i) be subject to a motion to stay, or (ii) have been vacated, reversed, stayed, amended or modified in any manner that is adverse (as determined in by the Lender) to the rights and interests of Lender and its affiliates, in their capacities as such, in any respect without written consent of the Lender. The Chapter 11 Plan shall not have been amended or modified in any manner that is materially adverse (as determined by the Lender in its discretion) to the rights and interests of each of Lender and its affiliates, in their capacities as such, relative to the version of the Chapter 11 Plan approved by the Confirmation Order, without written consent of the Lender;

(p) Lender shall have received a copy of the Confirmation Order as duly entered by the Bankruptcy Court and entered on the docket of the Clerk of the Bankruptcy Court in the Cases, and such order shall include such provisions with respect to the Loan Documents as are reasonably satisfactory to Agent and, providing, among other things, that Obligors shall be authorized to (i) enter into this Agreement and the other Loan Documents, (ii) grant the liens and security interests and incur or guaranty the indebtedness under this Agreement and the other Loan Documents, and (iii) issue, execute and deliver all documents, agreements and instruments necessary or appropriate to implement and

effectuate all obligations under this Agreement and the other Loan Documents and to take all other actions necessary to implement and effectuate borrowings under this Agreement and the other Loan Documents;

(q) Lender shall have received a report of the amounts of administrative expenses, priority tax claims, general unsecured claims, secured claims, and reclamation claims arising in the Cases which are to be paid in cash on the Closing Date or reasonably projected to be allowed and payable after the Closing Date, which amounts are, in all material respects, set forth in the projections delivered to Lender pursuant to Section 6.1(h) hereof;

(r) Lender shall have received all material documents related to the Asbestos Trust and the Asbestos Trust Note and evidence that all required amounts have been funded to the Asbestos Trust, other than the amounts to be advanced hereunder;

(s) Lender shall have received a customary payoff letter (or other evidence reasonably satisfactory to Lender) with respect to the then existing credit facilities other than with respect to the 4 Site Debt Documents (if any) (i) evidencing that, among other things, upon the making of the initial Revolver Loans on the Closing Date and the application of such funds in accordance with such payoff letter, all obligations under such facilities will have been paid and satisfied in full, and all commitments thereunder will terminate, and (ii) confirming that all Liens securing such existing indebtedness will be, contemporaneously with the initial funding under this Agreement, released and terminated; and

(t) Lender shall have received intercreditor and subordination agreements, in form and substance satisfactory to Lender, in respect to the Subordinated Debt (including the 4 Site Debt Documents) and indebtedness owing by Borrower to the Asbestos Trust pursuant to the Asbestos Trust Note, duly executed and delivered by the parties thereto.

**6.2. <u>Conditions Precedent to All Credit Extensions</u>**

. Lender shall not be required to fund any Loans, issue any Letters of Credit, or grant any other accommodation to or for the benefit of Borrower, unless the following conditions are satisfied:

(a) No Event of Default shall exist at the time of, or result from, such funding, issuance or grant;

(b) The representations and warranties of Borrower in the Loan Documents shall be true and correct in on the date of, and upon giving effect to, such funding, issuance or grant (except for representations and warranties that expressly relate to an earlier date);

(c) All conditions precedent in any other Loan Document shall be satisfied; and

(d) No event shall have occurred or circumstance exist that has or could reasonably be expected to have a Material Adverse Effect.

(e) With respect to a Letter of Credit issuance, all LC Conditions shall be satisfied.

Each request (or deemed request) by Borrower for funding of a Loan, issuance of a Letter of Credit or grant of an accommodation shall constitute a representation by Borrower that the foregoing conditions are satisfied on the date of such request and on the date of such funding, issuance or grant. As an additional

condition to any funding, issuance or grant, Lender shall have received such other information, documents, instruments and agreements as it deems appropriate.

## SECTION 7. COLLATERAL

### 7.1. Grant of Security Interest

. To secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all Property of Borrower, including all of the following Property, whether now owned or hereafter acquired, and wherever located:

(a) all Accounts;

(b) all Chattel Paper, including electronic chattel paper;

(c) all Commercial Tort Claims;

(d) all Deposit Accounts;

(e) all Documents;

(f) all General Intangibles, including intellectual property;

(g) all Goods, including Inventory, Equipment and fixtures;

(h) all Instruments;

(i) all Investment Property;

(j) all Letter-of-Credit Rights;

(k) all Supporting Obligations;

(l) all monies, whether or not in the possession or under the control of Lender, or a bailee or Affiliate of Lender, including any Cash Collateral;

(m) all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(n) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

### 7.2. Lien on Deposit Accounts; Cash Collateral

.

#### 7.2.1. Deposit Accounts

. To further secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all amounts credited to any Deposit Account of Borrower, including sums in any blocked, lockbox, sweep or collection account.

7.2.2. Cash Collateral

. Cash Collateral may be invested, at Lender's discretion (and with the consent of Borrower, as long as no Event of Default exists), but Lender shall have no duty to do so, regardless of any agreement or course of dealing with Borrower, and Lender shall have no responsibility for any investment or loss. As security for its Obligations, Borrower hereby grants to Lender a security interest in and Lien upon all Cash Collateral held from time to time and all proceeds thereof, whether held in a Cash Collateral Account or otherwise. Lender may apply Cash Collateral to the payment of Obligations as they become due, in such order as Lender may elect. Each Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of Lender, and no Borrower or other Person shall have no right to any Cash Collateral, until full payment of the Obligations.

**7.3. Reserved.**

**7.4. Other Collateral**

.

7.4.1. Commercial Tort Claims

. Borrower shall promptly notify Lender in writing if Borrower has a Commercial Tort Claim, and shall take such actions as Lender deems appropriate to subject such claim to a duly perfected, first priority Lien in favor of Lender.

7.4.2. Certain After-Acquired Collateral

. Borrower shall promptly notify Lender in writing if, after the Closing Date, Borrower obtains any interest in any Collateral and shall promptly take such actions as Lender deems appropriate to effect Lender's duly perfected, first priority Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien Waiver. If any Collateral is in the possession of a third party, at Lender's request, Borrower shall obtain an acknowledgment that such third party holds the Collateral for the benefit of Lender.

**7.5. Limitations**

. The Lien on Collateral granted hereunder is given as security only and shall not subject Lender to, or in any way modify, any obligation or liability of Borrower relating to any Collateral.

**7.6. Further Assurances; Extent of Liens**

. All Liens granted to Lender under the Loan Documents are for the benefit of Secured Parties. Promptly upon request, Borrower shall deliver such instruments and agreements, and shall take such actions, as Lender deems appropriate under applicable law to evidence or perfect its Lien on any Collateral, or otherwise to give effect to the intent of this Agreement. Borrower authorizes Lender to file any financing statement that describes the Collateral as "all assets" or "all personal property" of Borrower, or words to similar effect, and ratifies any action taken by Lender before the Closing Date to effect or perfect its Lien on any Collateral.

**SECTION 8. COLLATERAL ADMINISTRATION**

**8.1. Borrowing Base Reports**

. By the 15th day of each month, Borrower shall deliver to Lender a Borrowing Base Report as of the close of business of the previous month, and at such other times as Lender may request; provided, that, during an Increased Reporting Trigger Period, Borrower shall deliver to Lender a weekly gross Accounts report on or before the Tuesday of each week, reflecting all outstanding Accounts of Borrower as of the end of the preceding week. All information (including calculation of Availability or Average Daily Availability) in a Borrowing Base Report shall be certified by Borrower. During an Increased Reporting Trigger Period, Lender will have discretion to require Borrower to apply payments to invoices prior to cash being remitted from Affiliated Distributors. Outside of an Increased Reporting Trigger Period, Lender, in Lender's good faith credit judgment, reasonably exercised, may from time to time adjust such report to reflect Lender's reasonable estimate of declines in value of Collateral, due to collections received in the Dominion Account, held by Affiliated Distributors. Lender may from time to time adjust such report (a) to adjust advance rates to reflect changes in dilution, quality, mix and other factors affecting Collateral and (b) to the extent any information or calculation does not comply with this Agreement.

**8.2. Accounts**

.

**8.2.1.** Records and Schedules of Accounts

. Borrower shall provide to Lender, on or before the 15th day of each month, (a) a consolidated detailed aged trial balance of all Accounts as of the end of the preceding month, specifying each Account's Account Debtor name and address, amount, invoice date and due date, showing any discount, allowance, credit, authorized return or dispute, and including such proof of delivery, copies of invoices and invoice registers, copies of related documents, repayment histories, status reports and other information as Lender may reasonably request; provided, that, with respect to Eligible Accounts, the foregoing information shall be delivered on a weekly basis by the Tuesday of each week for the immediately preceding week; and (b) a monthly roll forward report of all Accounts from the previous month. If Accounts in an aggregate face amount of $50,000 or more cease to be Eligible Accounts, Borrower shall notify Lender of such occurrence promptly (and in any event within one (1) Business Day) after Borrower has knowledge thereof.

**8.2.2.** Account Verification

. Lender shall have the right at any time, in the name of Lender, any designee of Lender or Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrower by mail, telephone or otherwise.

**8.2.3.** Maintenance of Dominion Account

. Borrower shall maintain the Dominion Account pursuant to lockbox or other arrangements acceptable to Lender establishing Lender's control over and Lien in the lockbox and the Dominion Account, and requiring immediate deposit of all remittances received in the lockbox to the Dominion Account.

**8.2.4.** Proceeds of Collateral

. Borrower shall request in writing and otherwise take all necessary steps to ensure that all payments on Accounts or otherwise relating to Collateral are made directly to the Dominion Account (or a lockbox relating to the Dominion Account). If Borrower receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Lender and promptly (not later than the next Business Day) deposit same into the Dominion Account.

8.3. **Inventory**

.

8.3.1. Records and Reports of Inventory

. Borrower shall keep accurate and complete records of its Inventory, including costs and daily withdrawals and additions, and shall submit to Lender inventory and reconciliation reports, in form and substance satisfactory to Lender, on or before the 15th day of each month, and such inventory and reconciliation reports shall be prepared as of the preceding month. Borrower shall conduct a physical inventory at least once per calendar year (and on a more frequent basis if requested by Lender when an Event of Default exists) and periodic cycle counts consistent with historical practices, and shall provide to Lender a report based on each such inventory and count promptly upon completion thereof, together with such supporting information as Lender may request. Lender may participate in and observe each physical count.

8.3.2. Returns of Inventory

. No Borrower shall return any Inventory to a supplier, vendor or other Person, whether for cash, credit or otherwise, unless (a) such return is in the ordinary course of business; (b) no Event of Default or Overadvance exists or would result therefrom; (c) Lender is promptly notified of the aggregate Value of all Inventory returned in each month; and (d) any payment received by Borrower for a return is promptly remitted to Lender for application to the Obligations.

8.3.3. Acquisition, Sale and Maintenance

. Borrower shall not acquire or accept any Inventory on consignment or approval, and shall take all steps to assure that all Inventory is produced in accordance with applicable law, including the Fair Labor Standards Act of 1938 (the "FLSA"). Borrower shall not sell any Inventory on consignment or approval or any other basis under which the customer may return or require Borrower to repurchase such Inventory. Borrower shall use, store and maintain all Inventory with reasonable care and caution, in accordance with applicable standards of any insurance and in conformity with all applicable law, and shall make current rent payments (within applicable grace periods provided for in leases) at all locations where any Collateral is located.

8.4. **Equipment**

.

8.4.1. Records and Schedules of Equipment

. Borrower shall keep accurate and complete records of its Equipment, and shall submit to Lender a current schedule thereof, at the times and in form satisfactory to Lender. Promptly upon request, Borrower shall deliver to Lender evidence of their ownership or interests in any Equipment.

8.4.2. Dispositions of Equipment

. No Borrower shall sell, lease or otherwise dispose of any Equipment, without the prior written consent of Lender, other than replacement of Equipment that is worn, damaged or obsolete with Equipment of like function and value, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens.

8.4.3. Condition of Equipment

. The Equipment is and will remain in good operating condition and repair, and all necessary replacements and repairs have been and will be made so that the value and operating efficiency of the Equipment is preserved at all times, reasonable wear and tear excepted. Borrower shall not permit any Equipment to become affixed to real Property unless any landlord or mortgagee delivers a Lien Waiver.

**8.5. Deposit Accounts**

. **Schedule 8.5** shows all Deposit Accounts maintained by Borrower, including the Dominion Accounts have been identified to Lender in writing. Borrower shall take all actions necessary to establish Lender's control of each such Deposit Account (other than an account exclusively used for payroll, payroll taxes or employee benefits. Borrower shall be the sole account holder of each Deposit Account and shall not allow any other Person (other than Lender) to have control over a Deposit Account or any Property deposited therein. Borrower shall promptly notify Lender in writing of any opening or closing of a Deposit Account.

**8.6. General Provisions**

.

8.6.1. Location of Collateral

. All tangible items of Collateral shall at all times be kept by Borrower at the business locations disclosed in writing to Lender on **Schedule 8.6.1**, except that Borrower may (a) make sales or other dispositions of Collateral in the ordinary course of business for fair market value; and (b) move Collateral to another location upon 30 Business Days prior written notice to Lender.

8.6.2. Insurance of Collateral; Condemnation Proceeds.

(a) Borrower shall maintain insurance with respect to the Collateral, covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers satisfactory to Lender. All proceeds under each policy shall be payable to Lender. Upon Lender's request, Borrower shall deliver to Lender the originals or certified copies of its insurance policies, updated flood plain searches and other information relating to Borrower's insurance and insurance policies. Each policy shall include endorsements satisfactory to Lender. If Borrower fails to provide and pay for any insurance, Lender may, at its option, but shall not be required to, procure the insurance and charge Borrower therefor. Without limiting the foregoing, (i) any increase, extension, or renewal of the credit facility provided pursuant to this Agreement shall be subject to flood insurance due diligence and flood insurance compliance reasonably satisfactory to Lender, and (ii) in the event that any Real Estate is pledged or mortgaged as Collateral for the Obligations, and such Real Estate is located in a special flood hazard zone, Borrower shall maintain insurance with respect to the Real Estate covering

flood and other risks, in amounts (including as required by Flood Insurance Laws) and with endorsements and with insurers satisfactory to Lender.

(b) Any proceeds of insurance (other than proceeds from workers' compensation or D&O insurance) and any awards arising from condemnation of any Collateral shall be paid to Lender and shall be applied to payment of the Revolver Loans, and then to other Obligations. Subject to clause (c) below, any proceeds or awards that relate to Equipment or Real Estate shall be applied first to the Revolver Loans and then to other Obligations.

(c) If requested by Borrower in writing within 15 days after Lender's receipt of any insurance proceeds or condemnation awards relating to any loss or destruction of Equipment or Real Estate, Borrower may use such proceeds or awards to repair or replace such Equipment or Real Estate (and until so used, the proceeds shall be held by Lender as Cash Collateral) as long as (i) no Event of Default exists; (ii) such repair or replacement is promptly undertaken and concluded, in accordance with plans satisfactory to Lender; (iii) replacement buildings are constructed on the sites of the original casualties and are of comparable size, quality and utility to the destroyed buildings; (iv) the repaired or replaced Property is free of Liens, other than Permitted Liens that are not purchase money Liens; (v) Borrower complies with disbursement procedures for such repair or replacement as Lender may reasonably require; and (vi) the aggregate amount of such proceeds or awards from any single casualty or condemnation does not exceed $50,000.

**8.6.3.** <u>Protection of Collateral</u>

. All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all taxes or Royalties payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Lender to any Person to realize upon any Collateral, shall be borne and paid by Borrower.

**8.6.4.** <u>Defense of Title</u>

. Borrower shall defend its title to Collateral and Lender's Liens therein against all Persons, claims and demands, except Permitted Liens.

**8.7.** **<u>Power of Attorney</u>**

. Borrower hereby irrevocably constitutes and appoints Lender (and all Persons designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section. Lender, or Lender's designee, may, without notice and in either its or Borrower's name, but at the cost and expense of Borrower:

(a) Endorse Borrower's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Lender's possession or control; and

(b) During an Event of Default, (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts, by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Lender deems advisable; (iv) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating

to any Accounts, Inventory or other Collateral; and (vi) take all other actions as Lender deems appropriate to fulfill Borrower's obligations under the Loan Documents.

## SECTION 9. REPRESENTATIONS AND WARRANTIES

### 9.1. General Representations and Warranties

. To induce Lender to enter into this Agreement and to make available the Commitments, Loans and Letters of Credit, Borrower represents and warrants that:

#### 9.1.1. Organization and Qualification

. Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Borrower is duly qualified, authorized to do business and in good standing as a foreign corporation in each jurisdiction where failure to be so qualified could reasonably be expected to have a Material Adverse Effect, in each case subject to the entry of the Confirmation Order.

#### 9.1.2. Power and Authority

. Borrower is duly authorized to execute, deliver and perform its Loan Documents. Subject to the entry of the Confirmation Order, the execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action, and do not violate or cause a default under any of Borrower's organizational documents or under any applicable law, License, or contract or agreement to which any Obligor is a party.

#### 9.1.3. Enforceability

. Each Loan Document is a legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

#### 9.1.4. Capital Structure

. **Schedule 9.1.4** shows, for Borrower, its name, jurisdiction of organization, and holders of its equity or similar ownership interests. Except as disclosed in writing to Lender on **Schedule 9.1.4**, in the five years preceding the Closing Date, Borrower has not acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination.

#### 9.1.5. Title to Properties; Priority of Liens

. Borrower has good and marketable title to (or valid leasehold interests in) all of its Real Estate, and good title to all of its personal Property in each case free of Liens except for Permitted Liens. Borrower has paid and discharged all lawful claims that, if unpaid, could become a Lien on its Properties, other than Permitted Liens. All Liens of Lender in the Collateral are duly perfected, first priority Liens, subject only to Permitted Liens that are expressly allowed to have priority over Lender's Liens.

#### 9.1.6. Accounts

. Lender may rely, in determining which Accounts are Eligible Accounts, on all statements and representations made by Borrower with respect thereto. Borrower warrants, with respect to each Account at the time it is shown as an Eligible Account in a Borrowing Base Report, that:

(a) it is genuine and in all respects what it purports to be;

(b) it arises out of a completed, *bona fide* sale and delivery of goods or rendition of services in the ordinary course of business, and substantially in accordance with any purchase order, contract or other document relating thereto;

(c) it is for a sum certain, maturing as stated in the applicable invoice, a copy of which has been furnished or is available upon request to Lender;

(d) it is not subject to any offset, Lien (other than Lender's Lien), deduction, defense, dispute, counterclaim or other adverse condition except as arising in the ordinary course of business and disclosed to Lender; and it is absolutely owing by the Account Debtor;

(e) no purchase order, agreement, document or applicable law restricts assignment of the Account to Lender (regardless of whether, under the UCC, the restriction is ineffective), and the applicable Borrower is the sole payee or remittance party shown on the invoice;

(f) no extension, compromise, settlement, modification, credit, deduction or return has been authorized or is in process with respect to the Account, except discounts or allowances granted in the ordinary course of business for prompt payment that are reflected on the face of the invoice related thereto and in the reports submitted to Lender hereunder; and

(g) to the best of Borrower's knowledge, (i) there are no facts or circumstances that are reasonably likely to impair the enforceability or collectability of such Account; (ii) the Account Debtor had the capacity to contract when the Account arose, continues to meet the applicable Borrower's customary credit standards, is solvent, and has not failed, or suspended or ceased doing business; and (iii) there are no proceedings or actions threatened or pending against any Account Debtor that could reasonably be expected to have a material adverse effect on the Account Debtor's financial condition.

**9.1.7.** Financial Statements

. The consolidated and consolidating balance sheet, and related statements of income, cash flow and shareholders' equity, of Borrower that have been and are hereafter delivered to Lender, are prepared in accordance with GAAP, and fairly present the financial positions and results of operations of Borrower in all material respects at the dates and for the periods indicated. All projections delivered from time to time to Lender have been prepared in good faith, based on reasonable assumptions in light of the circumstances at such time. Since December 31, 2017, there has been no change in the condition, financial or otherwise, of Borrower that could reasonably be expected to have a Material Adverse Effect (it being understood that the commencement and continuance of the Cases, events attendant thereto, and consummation of the Chapter 11 Plan and the transactions contemplated thereby shall not be deemed to be or result in a Material Adverse Effect). No financial statement delivered to Lender at any time contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading. Borrower is solvent.

**9.1.8.** Surety Obligations

. No Borrower is obligated as surety or indemnitor under any bond or other contract that assures payment or performance of any obligation of any Person, except as permitted hereunder.

**9.1.9.** Taxes

. Borrower has filed all federal, state and local tax returns and other reports that it is required by law to file, and has paid, or made provision for the payment of, all taxes upon it, its income and its Properties that are due and payable.

**9.1.10.** Brokers

. There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents.

**9.1.11.** Intellectual Property

. Borrower owns or has the lawful right to use all intellectual and similar property necessary for the conduct of its business, without conflict with any rights of others. There is no pending or, to Borrower's knowledge, threatened claim with respect to Borrower or any of its Property (including any intellectual property). Except as disclosed on **Schedule 9.1.11**, no Borrower pays or owes any License, Royalty or other compensation to any Person with respect to use or License of any intellectual property. All intellectual property owned, used or licensed by, or otherwise subject to any interests of, Borrower has been disclosed on **Schedule 9.1.11**.

**9.1.12.** Governmental Approvals

. Borrower has, is in compliance with, and is in good standing with respect to, all governmental approvals necessary to conduct its business and to own, lease and operate its Properties.

**9.1.13.** Compliance with Laws

. Borrower has duly complied, and its Properties and business operations are in compliance, in all material respects with all applicable laws. There have been no citations, notices or orders of material noncompliance issued to Borrower under any applicable law. No Inventory has been produced in violation of the FLSA.

**9.1.14.** Compliance with Environmental Laws

. Except as disclosed on **Schedule 9.1.14**, no Borrower's past or present operations, Real Estate or other Properties are not subject to any federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material or environmental clean-up. No Borrower has received any notice regarding any violation of environmental laws. No Borrower has any contingent liability with respect to any violation of any environmental law, environmental pollution or hazardous material on any Real Estate now or previously owned, leased or operated by it.

**9.1.15.** Burdensome Contracts

. No Borrower is a party or subject to any contract, agreement or charter restriction that could reasonably be expected to have a Material Adverse Effect. No Borrower is a party or subject to any Restrictive Agreement, except as shown on **Schedule 9.1.15**. No such Restrictive Agreement prohibits the execution, delivery or performance of any Loan Document by Borrower.

**9.1.16.** Litigation

. Except as shown disclosed in writing to Lender on **Schedule 9.1.16**, there are no proceedings or investigations or any litigation pending or, to Borrower's knowledge, threatened against

Borrower, or any of their businesses, operations, Properties, prospects or conditions. Except as disclosed in writing to Lender, Borrower has no Commercial Tort Claim. No Borrower is in default with respect to any order, injunction or judgment of any governmental authority.

**9.1.17.** No Defaults

. No event or circumstance has occurred or exists that constitutes an Event of Default. No Borrower is in default, and no event or circumstance has occurred or exists that with the passage of time or giving of notice would constitute a default, under any contract or agreement to which Borrower is a party or in the payment of any Borrowed Money. There is no basis upon which any party (other than Borrower) could terminate a contract or agreement prior to its scheduled termination date.

**9.1.18.** ERISA

. Except as disclosed in writing to Lender on **Schedule 9.1.18**:

(a) Each ERISA Plan is in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code, and other federal and state laws. "ERISA" means the Employee Income Retirement Security Act of 1974, as amended from time to time. Capitalized terms used in this **Section 9.1.18** have the meanings given to them in ERISA (except as otherwise defined in this Agreement).

(b) There are no pending or, to the knowledge of Borrower, threatened claims, actions or lawsuits, or action by any governmental authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted in or could reasonably be expected to have a Material Adverse Effect.

(c) There has been no Reportable Event that might constitute grounds for termination of any Plan by the Pension Benefit Guaranty Corporation or for the appointment by any United States District Court of any trustee to administer any Plan.

**9.1.19.** Trade Relations

. There exists no actual or threatened termination, limitation or modification of any business relationship between Borrower and any customer or supplier, or any group of customers or suppliers, who individually or in the aggregate are material to the business of Borrower. There exists no condition or circumstance that could reasonably be expected to impair the ability of Borrower to conduct its business at any time hereafter in substantially the same manner as conducted on the Closing Date.

**9.1.20.** Labor Relations

. Except as set forth on **Schedule 9.1.20**, no Borrower is party to or bound by any collective bargaining agreement, management agreement or consulting agreement. There are no material grievances, disputes or controversies with any union or other organization of Borrower's employees, or, to Borrower's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining.

**9.1.21.** Payable Practices

. No Borrower has made any material change in its historical accounts payable practices from those in effect on the Closing Date.

### 9.2. Complete Disclosure

. No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading. There is no fact or circumstance that Borrower has failed to disclose to Lender in writing that could reasonably be expected to have a Material Adverse Effect.

## SECTION 10. COVENANTS AND CONTINUING AGREEMENTS

### 10.1. Affirmative Covenants

. As long as any Commitment or Obligations are outstanding, Borrower shall:

#### 10.1.1. Inspections; Appraisals

.

(a) Permit Lender to visit and inspect Borrower's Properties, inspect, audit and make extracts from Borrower's and records, and discuss with its officers, employees, agents, advisors and independent accountants Borrower's business, financial condition, assets, prospects and results of operations. Borrower acknowledgess that all inspections, appraisals and reports are prepared by Lender for its purposes, and Borrower shall not be entitled to rely upon them.

(b) Reimburse Lender for all its reasonable charges, costs and expenses incurred in connection with (i) examinations of Borrower's books and records or any other financial or Collateral matters as it deems appropriate, up to (x) one (1) time per Loan Year if no Increased Examination Trigger Period occurs during such Loan Year, and (y) two (2) times per Loan Year if an Increased Examination Trigger Period occurs during such Loan Year, and (ii) appraisals of Inventory, up to one (1) time per Loan Year; provided, however, that if an examination or appraisal is initiated during an Event of Default, all charges, costs and expenses relating thereto shall be reimbursed by Borrower without regard to such limits. Borrower shall pay Lender's then standard charges for examination activities, including charges for its internal examination and appraisal groups, as well as the charges of any third party used for such purposes. No Borrowing Base calculation shall include Collateral acquired outside the ordinary course of business. There shall be no limit to the number of examinations or appraisals conducted by Lender while there exists a Default or Event of Default.

#### 10.1.2. Financial and Other Information

. Keep adequate records and books of account with respect to its business activities, and furnish to Lender:

(a) as soon as available, and in any event within 90 days after the close of each Fiscal Year, balance sheets as of the end of such Fiscal Year and the related statements of income, cash flow and shareholders' equity on a consolidated and consolidating basis for Borrower and its Subsidiaries, which consolidated statements shall be audited by a firm of independent certified public accountants of

recognized standing selected by Borrower and acceptable to Lender in its discretion, and shall include all consolidating schedules and set forth comparative corresponding figures for the preceding Fiscal Year;

(b) as soon as available, and in any event within 45 days after the end of each Fiscal Quarter, unaudited balance sheets as of the end of such Fiscal Quarter and the related statements of income and cash flow for such Fiscal Quarter and for the portion of the Fiscal Year then elapsed, on consolidated and consolidating basis for Borrower, setting forth in comparative form corresponding figures for the preceding Fiscal Year and certified by an authorized officer of Borrower as prepared in accordance with GAAP and fairly presenting the financial position and results of operations for such month and period, subject to normal year-end adjustments and the absence of footnotes;

(c) as soon as available, and in any event within 30 days after the end of each month,, unaudited balance sheets as of the end of such month and the related statements of income and cash flow for such month and for the portion of the Fiscal Year then elapsed, on consolidated and consolidating basis for Borrower, setting forth in comparative form corresponding figures for the preceding Fiscal Year and certified by an authorized officer of Borrower as prepared in accordance with GAAP and fairly presenting the financial position and results of operations for such month and period, subject to normal year-end adjustments and the absence of footnotes;

(d) concurrently with delivery of financial statements under clauses (a) and (b) above, or more frequently if requested by Lender while an Event of Default exists, a Compliance Certificate executed by the an authorized officer of Borrower;

(e) concurrently with delivery of financial statements under clause (a) above, copies of all management letters and other material reports submitted to Borrower by its accountants in connection with such financial statements;

(f) concurrently with delivery of Borrower's Borrowing Base Reports delivered pursuant to **Section 8.1** above, a listing of Borrower's trade payables, specifying the trade creditor and balance due, and a detailed trade payable aging, all in form reasonably satisfactory to Lender;

(g) not later than 60 days prior the end of each Fiscal Year, projections of Borrower's consolidated balance sheets, results of operations, cash flow and Availability for the next Fiscal Year, covering a time period acceptable to Lender month by month; and

(h) such other reports and information (financial or otherwise) as Lender may request from time to time in connection with any Collateral or Borrower's, or other Obligor's financial condition or business.

**10.1.3.** Notices

. Notify Lender in writing promptly of any of the following that affects Borrower: (a) the threat or commencement of any lawsuit, proceeding or investigation; (b) any pending or threatened labor dispute, strike or walkout; (c) any default under or termination of a material contract, License or other agreement; (d) the existence any Event of Default; (e) any judgment in any amount; (f) any violation or asserted violation of any applicable law (including ERISA, FLSA, or any federal, state or local environmental laws); (h) any environmental contamination or pollution by Borrower or on any Property owned, leased or occupied by Borrower; or receipt of any notice of violation of any environmental law; (i) the occurrence of any ERISA Event; (j) the discharge of or any withdrawal or resignation by Borrower's independent accountants; or (k) any opening of a new office or place of business, at least 30 days prior to such opening.

**10.1.4.** Landlord and Storage Agreements

. Upon request, provide Lender with copies of all existing agreements, and promptly after execution thereof provide Lender with copies of all future agreements, between Borrower and any landlord, warehouseman, processor, shipper, bailee or other Person that owns any premises at which any Collateral may be kept or that otherwise may possess or handle any Collateral.

**10.1.5.** Compliance with Laws

. Comply with all laws applicable to the conduct of Borrower's business, including ERISA, all environmental laws, FLSA, laws regarding anti-terrorism, and laws regarding collection and payment of taxes, and maintain all governmental approvals necessary to the ownership of its Properties or conduct of its business. If any environmental contamination or pollution occurs at or on any Properties of Borrower, it shall act promptly and diligently to investigate and report to Lender and all appropriate governmental authorities the extent of, and to make appropriate remedial action to eliminate, such contamination or pollution, whether or not directed to do so by any governmental authority.

**10.1.6.** Taxes

. Pay and discharge all taxes prior to the date on which they become delinquent or penalties attach.

**10.1.7.** Insurance

. In addition to the insurance required hereunder with respect to Collateral, maintain insurance with insurers satisfactory to Lender, (a) with respect to the Properties and business of Borrower of such type, in such amounts, and with such coverages and deductibles as are customary for companies similarly situated; and (b) business interruption insurance in an amount not less than the amount of insurance maintained by Borrower as of the Closing Date, with deductibles and subject to endorsements and assignments satisfactory to Lender.

**10.1.8.** Reserved.

**10.1.9.** Depository Bank. Maintain Lender as its sole depository bank, including for the maintenance of all operating, collection, disbursement and other deposit accounts and for all Cash Management Services.

**10.1.10.** Future Subsidiaries. Promptly notify Lender upon any Person becoming a Subsidiary and, if such Person is not a Foreign Subsidiary, cause it to guaranty the Obligations in a manner satisfactory to Lender, and to execute and deliver such documents, joinders, instruments and agreements and to take such other actions as Lender shall require to evidence and perfect a Lien in favor of Lender on all assets of such Person, including delivery of such legal opinions, in form and substance satisfactory to Lender, as it shall deem appropriate.

**10.2.** **Negative Covenants**

. As long as any Commitment or Obligations are outstanding, Borrower shall not, without Lender's prior written consent:

**10.2.1.** Debt

. Create, incur, guarantee or suffer to exist any debt, or contingent liabilities except:

(a) the Obligations;

(b) trade payables incurred in the ordinary course of business on normal trade credit;

(c) liabilities and leases in existence on the Closing Date and disclosed in writing to Lender on **Schedule 10.2.1**;

(d) Bank Product Debt incurred in the ordinary course of business; and

(e) debt arising from Borrower's pension withdrawal liability, not to exceed $2,000,000, which pension withdrawal liability, as it relates to Borrower's Bay Shore, New York facility, shall be payable in equal quarterly installments over not less than seventy-two (72) Fiscal Quarters.

**10.2.2.** Permitted Liens

. Create or suffer to exist any Lien upon any of its Property, except the following (collectively, "Permitted Liens"):

(a) Liens in favor of Lender;

(b) Liens for taxes not yet due;

(c) easements, rights-of-way, restrictions, covenants or other agreements of record, and other similar charges or encumbrances on Real Estate, that do not secure any monetary obligation and do not interfere with Borrower's ordinary course of business; and

(d) Liens existing on the Closing Date and disclosed to Lender in writing on **Schedule 10.2.2**;

**10.2.3. Reserved.**

**10.2.4.** Distributions

. Declare or make payment of any distributions, interest or dividend on the stock, Equity Interest or other ownership interests of Borrower or repurchase any stock or other ownership interests from any holder, except (i) payments in respect of Tax Distributions so long as, prior to and after giving effect to such Tax Distributions, no Default or Event of Default exists or is caused thereby, (ii) payments for other distributions to holders of Equity Interests in Borrower so long as the Restricted Payment Conditions are satisfied.

**10.2.5.** Acquisitions and Investments

. (i) Acquire a business, division or substantially all the assets of any Person, (ii) acquire 50% or more of the equity or other ownership interests of any Person or (iii) have existing or make any investment in or make any capital contribution or other transfer of assets to any Person except;

(a) investments existing on the Closing Date and disclosed in writing to Lender;

(b) investments in certificates of deposit;

(c) United States treasury bills or other obligations of the United States government; and

(d) to the extent not otherwise permitted under any of the foregoing provisions, acquisitions or investments made after the Closing Date so long as the Restricted Payment Conditions are satisfied.

**10.2.6.** Disposition of Business or Assets

. Make any sale, assignment, lease, transfer or other disposition of Borrower's business or assets except in the ordinary course of business for fair market value.

**10.2.7.** Loans

. Make any loans or other advances of money to any Person.

**10.2.8.** Restrictions on Payment of Debt

. Make any payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to:

(a) any Subordinated Debt (other than the Asbestos Trust Note and the 4 Site Debt Documents) without the prior written consent of Lender, or as set forth in the applicable subordination agreement relating to such Subordinated Debt;

(b) the 4 Site Debt Documents, other than Permitted 4 Site Payments;

(c) the Asbestos Trust Note, other than Permitted Asbestos Trust Note Payments and the Permitted Asbestos Trust Earn Outs; and

(d) any Borrowed Money (other than the Obligations, the Subordinated Debt, which Subordinated Debt shall be subject to the foregoing clause (a), or the Asbestos Trust Note, which Asbestos Trust Note shall be subject to the foregoing clause (c), or the 4 Site Debt Documents, which 4 Site Debt Documents shall be subject to foregoing clause (b) prior to its due date under the agreements evidencing such debt as in effect on the Closing Date and disclosed in writing to Lender (or as amended thereafter with the consent of Lender).

**10.2.9.** Fundamental Changes

. Change its name or conduct business under any fictitious name; change its tax, charter or other organizational identification number; change its form or state of organization; liquidate, wind up its affairs or dissolve itself; or merge, combine or consolidate with any Person.

**10.2.10.** Subsidiaries

. Except as provided in **Section 10.1.10**, form or acquire any subsidiary after the Closing Date.

**10.2.11.** Organic Documents

. Amend, modify or otherwise change any of its organizational documents or agreements.

**10.2.12.** Tax Consolidation

. File or consent to the filing of any consolidated income tax return with any Person.

**10.2.13.** Accounting Changes

. Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with **Section 1.2**; or change its Fiscal Year.

**10.2.14.** Restrictive Agreements

. Be or become a party to any agreement that conditions or restricts the right of Borrower to incur or repay the Obligations or to grant Liens on the assets of Borrower, except (a) in effect on the Closing Date and disclosed in writing to Lender on **Schedule 10.2.14**; or (b) constituting customary restrictions on assignment in leases and other contracts.

**10.2.15.** Hedging Agreements

. Enter into any Hedging Agreement, except to hedge risks arising in the ordinary course of business and not for speculative purposes.

**10.2.16.** Conduct of Business

. Engage in any business, other than its business as conducted on the Closing Date and any activities incidental thereto.

**10.2.17.** Affiliate Transactions

. Enter into or be party to any transaction with an Affiliate or a Subsidiary except (a) transactions expressly permitted by the Loan Documents; (b) payment of reasonable compensation, benefits and employment incentives to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities; (c) transactions in the ordinary course of business and on upon fair and reasonable terms and no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate; (d) transactions with Affiliates consummated prior to the Closing Date, as shown on **Schedule 10.2.17**.

**10.2.18.** Plans

. Become party to any ERISA Plan, other than any in existence on the Closing Date and disclosed in writing to Lender.

**10.2.19.** Change of Management or Control.

(a) Permit, or suffer to exist, Randall Hinden's failure to serve as Borrower's Chief Executive Officer or Patrick Rosetto's failure to serve as Borrower's President and such personnel change is not promptly, but in any event within thirty (30) days of such material change replaced with personnel satisfactory to Lender, or (b) permit or suffer a Change of Control.

**10.2.20.**Confirmation Order

. Borrower has delivered to Lender a complete and correct copy of the Chapter 11 Plan and the Confirmation Order (including all schedules, exhibits, amendments, supplements, modifications,

assignments and all other documents delivered pursuant thereto or in connection therewith). Borrower is not in default in the performance of or compliance with any provisions of the Chapter 11 Plan. The Chapter 11 Plan is in full force and effect as of the date hereof and has not been terminated, rescinded or withdrawn, and substantially concurrently with the effectiveness of this Agreement, the Effective Date has occurred. The Confirmation Order is a Final Order and is in full force and effect, and has not been stayed, or amended or modified in any material respect without the consent of Agents. All conditions to confirmation and effectiveness of the Chapter 11 Plan have been satisfied or validly waived pursuant to the Chapter 11 Plan (other than conditions consisting of the effectiveness of this Agreement). No court of competent jurisdiction has issued any injunction, restraining order or other order which prohibits consummation of any material transactions described in the Confirmation Order and no governmental or other action or proceeding has been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described in the Confirmation Order.

**10.2.21.**Amendments to Subordinated Debt and Asbestos Trust Note

. Amend, supplement or otherwise modify the Asbestos Trust Note, the 4 Site Debt Documents or any *other* document, instrument or agreement relating to any Subordinated Debt, if such modification (a) increases the principal balance of such debt, or increases any required payment of principal or interest; (b) accelerates the date on which any installment of principal or any interest is due, or adds any additional redemption, put or prepayment provisions; (c) shortens the final maturity date or otherwise accelerates amortization; (d) increases the interest rate; (e) increases or adds any fees or charges; (f) modifies any covenant in a manner or adds any representation, covenant or default that is more onerous or restrictive in any material respect for Borrower, or that is otherwise materially adverse to Borrower or Lender; or (g) results in the Obligations not being fully benefited by the subordination provisions thereof.

**10.2.22.**Affiliated Distributors

. Change any password or otherwise prohibit or interfere with Lender's access to the vendor portal maintained by Affiliated Distributors permitting Borrower and Lender with visibility to collections of Borrower's Accounts by Affiliated Distributors.

**10.3. Financial Covenants.**

As long as any Commitment or Obligations are outstanding, Borrower shall, on a consolidated basis:

**10.3.1.** Fixed Charge Coverage Ratio

. During a Financial Covenant Trigger Period, maintain a Fixed Charge Coverage Ratio of at least 1.0:1.0, determined as of the last day of each Fiscal Quarter for the trailing four quarter period then ended.

Compliance with the foregoing shall be evidenced by delivery of the Compliance Certificate required under **Section 10.1.2(c).**

**10.4. Equity Cure Right**

. Notwithstanding anything in **Section 11.1** to the contrary, in the event that Borrower fails to comply with the financial covenant set forth in clause **Section 10.3** above, Borrower shall have the right to issue Permitted Cure Securities for cash or otherwise receive cash contributions to the capital of Borrower, and, in each case, any such cash proceeds thereof shall be deemed to increase EBITDA with

respect to such applicable trailing four quarter period (the "Cure Right"); provided, that: (i) notice of Borrower's intention to exercise the Cure Right shall be delivered no later than the earlier of (x) the then applicable date on which financial statements are required to be delivered and (y) the date such financial statements are actually delivered; (ii) the proceeds of such Permitted Cure Securities are actually received by Borrower no later than the date that is ten (10) days (the "Standstill Period") after the earlier of (x) the date for which financial statements are then required to be delivered and (y) the date such financial statements are actually delivered; (iii) in each four consecutive Fiscal Quarter period, Borrower shall not exercise the Cure Right more than one (1) time; (iv) Borrower shall not exercise the Cure Right more than three (3) times after the Closing Date; (v) the aggregate amount of Permitted Cure Securities issued in connection with the exercise of a Cure Right shall not be greater than the amount required to cause Borrower to be in pro forma compliance with the financial covenants set forth in **Section 10.3** for the applicable period of determination; (vi) during a Standstill Period and until Borrower actually receives the proceeds of the Permitted Cure Securities, no Revolving Loans shall be made and no Letter of Credit shall be issued, amended, extended or renewed; and (vii) such proceeds shall be applied to prepay the Obligations; provided, further that, for the avoidance of doubt, (x) during such Standstill Period, Lender will not exercise remedies with respect to such breach of **Section 10.3**, and (y) the parties hereby acknowledge that the Cure Right permitted under this **Section 10.4** is being provided solely for purposes of permitting compliance with the financial covenants in **Section 10.3** and may not be relied on for purposes of calculating any financial ratios, basket levels, pricing or items or conditions governed by the calculation of EBITDA other than as expressly set forth in this **Section 10.4** and shall not result in any adjustment to any amounts other than the amount of EBITDA for such purposes referred to in this **Section 10.4**. If, after giving effect to the foregoing pro forma adjustment, Borrower is in compliance with the financial covenants set forth in **Section 10.3**, Borrower shall be deemed to be in compliance with such financial covenant as of the relevant date(s) of determination with the same effect as though there had been no failure to satisfy such financial covenant on such date(s), and the applicable breach or default of **Section 10.3** that had occurred or would have occurred shall be deemed cured for purposes of this Agreement.

## SECTION 11. EVENTS OF DEFAULT; REMEDIES ON DEFAULT

### 11.1. Events of Default

. Each of the following shall be an "Event of Default:"

(a) Borrower fails to pay its Obligations when due (whether at stated maturity, on demand, upon acceleration or otherwise);

(b) Any representation, warranty or other written statement of Borrower made in connection with any Loan Documents or transactions contemplated thereby is incorrect or misleading in any material respect when given;

(c) Borrower breaches or fails to perform any covenant contained in this Agreement or any Loan Documents;

(d) Any breach or default of Borrower occurs under (i) any Hedging Agreement; or (ii) any instrument or agreement to which it is a party or by which it or any of its Properties is bound;

(e) Any judgment or order for the payment of money is entered against Borrower;

(f) A loss, theft, damage or destruction occurs with respect to any Collateral;

(g) Borrower is enjoined, restrained or in any way prevented by any governmental authority from conducting any material part of its business; Borrower suffers the loss, revocation or termination of any material license, permit, lease or agreement necessary to its business; there is a cessation of any material part of Borrower's business for a material period of time; any material Collateral or Property of Borrower is taken or impaired through condemnation; Borrower agrees to or commences any liquidation, dissolution or winding up of its affairs; or Borrower is not solvent;

(h) An insolvency or bankruptcy proceeding is commenced by Borrower; Borrower makes an offer of settlement, extension or composition to its unsecured creditors generally; a trustee is appointed to take possession of any substantial Property of or to operate any of the business of Borrower; or an insolvency or bankruptcy proceeding is commenced against Borrower and: Borrower consents to institution of the proceeding, the petition commencing the proceeding is not dismissed within thirty (30) days of the petition date, or an order for relief is entered in the proceeding;

(i) A violation of ERISA occurs that has resulted or could reasonably be expected to result in liability of Borrower to a Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Plan; or Borrower fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan;

(j) Borrower or any of its senior officers is criminally indicted or convicted for (i) a felony committed in the conduct of Borrower's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that could lead to forfeiture of any material Property or any Collateral; or

(k) A Change of Control occurs; or any event occurs or condition exists that has a Material Adverse Effect.

**11.2. <u>Remedies upon Default</u>**

. If an Event of Default described in **Section 11.1(h)** occurs, then to the extent permitted by applicable law, all Obligations shall become automatically due and payable and all Commitments shall terminate, without any action by Lender or notice of any kind. In addition, or if any other Event of Default exists, Lender may in its discretion do any one or more of the following from time to time:

(a) declare any Obligations immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower to the fullest extent permitted by law;

(b) terminate, reduce or condition any Commitment, or adjust the Borrowing Base;

(c) require Borrower to Cash Collateralize all LC Obligations, Bank Product Debt and other Obligations that are contingent or not yet due and payable, and if Borrower fails to deposit such Cash Collateral, Lender may advance the required Cash Collateral as Revolver Loans; and

(d) exercise any other rights or remedies afforded under any agreement, by law, at equity or otherwise, including the rights and remedies of a secured party under the UCC. Such rights and remedies include the rights to (i) take possession of any Collateral; (ii) require Borrower to assemble Collateral, at Borrower's expense, and make it available to Lender at a place designated by Lender; (iii) enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by Borrower, Borrower agrees not to charge for such storage); and (iv) sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or

processing thereof, at public or private sale, with such notice as may be required by applicable law, in lots or in bulk, at such locations, all as Lender, in its discretion, deems advisable. Borrower agrees that 10 days' notice of any proposed sale or other disposition of Collateral by Lender shall be reasonable, and that any sale conducted on the internet or to a licensor of intellectual property shall be commercially reasonable. Lender may conduct sales on Borrower's premises, without charge, and any sales may be adjourned from time to time in accordance with applicable law. Lender shall have the right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and Lender may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the Obligations.

**11.3. License**

. Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all intellectual property of Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral. Borrower's rights and interests under intellectual property shall inure to Lender's benefit.

**11.4. Setoff**

. At any time during an Event of Default, Lender and its Affiliates are authorized, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations at any time owing by Lender or such Affiliate to or for the credit or the account of Borrower against its Obligations, whether or not Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness. The rights of Lender and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have.

**11.5. Remedies Cumulative; No Waiver**

.

**11.5.1.** Cumulative Rights. All agreements, warranties, guaranties, indemnities and other undertakings of Borrower under the Loan Documents are cumulative and not in derogation of each other. The rights and remedies of Lender under the Loan Documents are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise. All such rights and remedies shall continue in full force and effect until full payment of all Obligations.

**11.5.2.** Waivers. No waiver or course of dealing shall be established by (a) the failure or delay of Lender to require strict performance by Borrower under any Loan Document, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Loan or issuance of any Letter of Credit during a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by Lender of any payment or performance by Borrower under any Loan Documents in a manner other than that specified therein. Any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date.

**SECTION 12. MISCELLANEOUS**

**12.1. Amendments and Waivers**

.

**12.1.1.** Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Borrower, Lender, and their respective successors and assigns, except that Borrower shall not have the right to assign its rights or delegate its obligations under any Loan Documents.

**12.1.2.** Amendments and Other Modifications. No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of an Event of Default, shall be effective without the prior written agreement of Lender and Borrower; provided, however, that only the consent of the parties to a Bank Product agreement shall be required for any modification of such agreement. Any waiver or consent granted by Lender shall be effective only if in writing, and only for the matter specified.

**12.2. Indemnity**

. **BORROWER SHALL INDEMNIFY AND HOLD HARMLESS LENDER, EACH OTHER SECURED PARTY AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES, AGENTS AND ATTORNEYS (THE "INDEMNITEES") AGAINST ANY CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE, INCLUDING CLAIMS ASSERTED BY BORROWER OR ANY OTHER PERSON OR ARISING FROM THE NEGLIGENCE OF AN INDEMNITEE.** In no event shall any party to a Loan Document have any obligation thereunder to indemnify or hold harmless an Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee.

**12.3. Notices and Communications**

.

**12.3.1.** Notice Address. All notices and other communications by or to a party hereto shall be in writing and shall be given to Borrower at Borrower's address shown on the signature pages hereof, and to any other Person at its address shown on the signature pages hereof, or at such other address as a party may hereafter specify by notice in accordance with this **Section 12.3**. Each communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Notwithstanding the foregoing, no notice to Lender shall be effective until actually received by the individual to whose attention at Lender such notice is required to be sent; or (d) if given by overnight commercial service, upon receipt as evidenced by written confirmation of receipt from the overnight service. Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by Borrower shall be deemed received by Borrower.

**12.3.2.** Communications. Electronic communications (including e-mail, messaging and websites) may be used only in a manner acceptable to Lender and only for routine communications, such as delivery of financial statements, Borrowing Base Reports and other information required by **Section**

**10.1.2**, and administrative matters. Lender make no assurances as to the privacy and security of electronic communications. E-mail and voice mail shall not be effective notices under the Loan Documents.

**12.3.3.** Platform. Borrowing Base information, reports, financial statements, materials and other information shall be delivered by Borrower pursuant to procedures approved by Lender, including electronic delivery (if possible) upon request by Lender to an electronic system maintained by it ("Platform"). Borrower shall notify Lender of each posting of information on the Platform, and information shall be deemed received by Lender only upon its receipt of such notice. The Platform is provided "as is" and "as available." Lender does not warrant the adequacy or functioning of the Platform, and expressly disclaims liability for any issues involving the Platform. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY LENDER WITH RESPECT TO THE PLATFORM. No Indemnitee shall have any liability to Borrower or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform, including any unintended recipient, nor for delivery of any information via the Platform, internet, e-mail, or any other electronic platform or messaging system.

**12.3.4.** Non-Conforming Communications. Lender may rely upon any communications purportedly given by or on behalf of Borrower even if they were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation. Borrower shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses arising from any electronic or telephonic communication purportedly given by or on behalf of Borrower.

**12.4. Performance of Borrower's Obligations**

. Lender may, in its discretion at any time and from time to time, at Borrower's expense, pay any amount or do any act required of Borrower under any Loan Documents or otherwise lawfully requested by Lender to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of Lender's Liens in any Collateral, including any payment of a Royalty, judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien. All payments, costs, fees and expenses of Lender under this Section shall be reimbursed by Borrower, **on demand**, with interest from the date incurred until paid in full, at the Default Rate. Any payment made or action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

**12.5. Credit Inquiries**

. Lender may (but shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning Borrower.

**12.6. Severability**

. Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under applicable law. If any provision is found to be invalid under applicable law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

### 12.7. Cumulative Effect; Conflict of Terms

. The provisions of the Loan Documents are cumulative. The parties acknowledge that the Loan Documents may use several limitations or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided. Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

### 12.8. Counterparts

; Execution. Any Loan Document may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement shall become effective when Lender has received counterparts bearing the signatures of all parties hereto. Lender may (but shall have no obligation to) accept any signature, contract formation or record-keeping through electronic means, which shall have the same legal validity and enforceability as manual or paper-based methods, to the fullest extent permitted by applicable law.

### 12.9. Entire Agreement

. Time is of the essence with respect to all Loan Documents and Obligations. The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

### 12.10. No Control; No Fiduciary Responsibility

. Nothing in any Loan Document and no action of Lender pursuant to any Loan Document shall be deemed to constitute control of Borrower by Lender, and Lender has no fiduciary, agency or similar duty of any kind to Borrower. In connection with all aspects of each transaction contemplated by any Loan Document, Borrower acknowledges and agrees that (i) this credit facility and all related services by Lender or its Affiliates are arm's-length commercial transactions between Borrower and such Person; and (ii) Borrower is capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents.

### 12.11. Waiver of Confidentiality

. Borrower authorizes Lender to discuss Borrower's financial affairs and business operations with any accountants, auditors, business consultants, or other professional advisors employed by Borrower, and Borrower authorizes such parties to disclose to Lender such financial and business information or reports (including management letters) concerning Borrower as Lender may request.

### 12.12. Governing Law

. **UNLESS EXPRESSLY PROVIDED IN ANY LOAN DOCUMENT, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL CLAIMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES EXCEPT FEDERAL LAWS RELATING TO NATIONAL BANKS.**

### 12.13. Consent to Forum

12.13.1. Forum. **BORROWER HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE COURT SITTING IN NEW YORK OR THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT. BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.3.1.** A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by applicable law.

12.13.2. Other Jurisdictions. Nothing herein shall limit the right of Lender to bring proceedings against Borrower in any other court, nor limit the right of any party to serve process in any other manner permitted by applicable law. Nothing in this Agreement shall be deemed to preclude enforcement by Lender of any judgment or order obtained in any forum or jurisdiction.

12.14. Waivers by Borrower

. **To the fullest extent permitted by applicable law, Borrower waives (a) the right to trial by jury (which Lender hereby also waives) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies anything Lender may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing Lender to exercise any rights or remedies; (e) the benefit of all valuation, appraisement and exemption laws; (f) any claim against Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof.** Borrower acknowledgess that the foregoing waivers are a material inducement to Lender entering into this Agreement and that Lender is relying upon the foregoing in its dealings with Borrower. Borrower has reviewed the foregoing waivers and has knowingly and voluntarily waived its jury trial and other rights. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

12.15. Patriot Act Notice

. Lender hereby notifies Borrower that pursuant to the Patriot Act, Lender is required to obtain, verify and record information that identifies Borrower, including its legal name, address, tax ID number and other information that will allow Lender to identify it in accordance with the Patriot Act. Lender will also require information regarding any personal guarantor and may require information regarding Borrower's management and owners, such as legal name, address, social security number and date of birth. Borrower shall, promptly upon request, provide all documentation and other information as Lender

may request from time to time in order to comply with any obligations under "know your customer," anti-money laundering or other requirements of applicable law.

**12.16. NO ORAL AGREEMENT**

. **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.**

[Signature Pages Follow]

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered as of the date set forth above.

**LENDER:**

**BANK OF AMERICA, N.A.**

By: ______________________________
Name: ____________________________
Title: _____________________________
Address:
City Place 1
185 Asylum Street
Hartford, Connecticut 06103
Attn: Mr. Edgar Ezerins,
Senior Vice President
Telecopy: (860) 368-6044

[Signatures continued on following page]

**DURO DYNE NATIONAL CORP.**

By: ______________________________
Name: ____________________________
Title: _____________________________
Address:

______________________________
______________________________
Attn: _____________________
Telecopy: _________________

SCHEDULE A
to
Loan and Security Agreement

**LIST OF CHAPTER 11 PLAN DOCUMENTS**

SCHEDULE 8.5
to
Loan and Security Agreement

**DEPOSIT ACCOUNTS**

| Depository Bank | Type of Account | Account Number |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

SCHEDULE 8.6.1
to
Loan and Security Agreement

## BUSINESS LOCATIONS

1. Borrower currently has the following business locations:

Chief Executive Office:

Other Locations:

2. In the five years preceding the Closing Date, Borrower and Subsidiaries have had the following business locations in addition to those set forth above:

3. The following bailees, warehouseman, similar parties and consignees hold inventory of Borrower:

| Name and Address of Party | Nature of Relationship | Amount of Inventory | Owner of Inventory |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE 9.1.4
to
Loan and Security Agreement

**NAMES AND CAPITAL STRUCTURE**

1. The corporate names, jurisdictions of incorporation, and authorized and issued Equity Interests of Borrower and Subsidiary are as follows:

| Name | Jurisdiction | Number and Class of Authorized Shares | Number and Class of Issued Shares |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

2. The record holders of Equity Interests of Borrower and Subsidiary are as follows:

| Name | Class of Stock | Number of Shares | Record Owner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

3. All agreements binding on holders of Equity Interests of Borrower and Subsidiaries with respect to such interests are as follows:

4. In the five years preceding the Closing Date, no Borrower has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination, except:

SCHEDULE 9.1.11
to
Loan and Security Agreement

## PATENTS, TRADEMARKS, COPYRIGHTS AND LICENSES

1. Borrower's patents:

| Patent | Owner | Status in Patent Office | Federal Registration No. | Publication Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

2. Borrower's trademarks: None.

3. Borrower's and Subsidiaries' copyrights:

| Copyright | Owner | Status in Copyright Office | Federal Registration No. | Registration Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

4. Borrower's licenses (other than routine business licenses, authorizing them to transact business in local jurisdictions): [None]

| Licensor | Description of License | Term of License | Royalties Payable |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

SCHEDULE 9.1.14
to
Loan and Security Agreement

**ENVIRONMENTAL MATTERS**

SCHEDULE 9.1.15
to
Loan and Security Agreement

**RESTRICTIVE AGREEMENTS**

SCHEDULE 9.1.16
to
Loan and Security Agreement

**LITIGATION**

SCHEDULE 9.1.18
to
Loan and Security Agreement

**PENSION PLAN DISCLOSURES**

SCHEDULE 10.2.2
to
Loan and Security Agreement

**EXISTING LIENS**

SCHEDULE 10.2.14
to
Loan and Security Agreement

**RESTRICTIVE AGREEMENTS**

SCHEDULE 10.2.17
to
Loan and Security Agreement

**EXISTING AFFILIATE TRANSACTIONS**

# Plan Exhibit D

## Note Issuance Agreement

## NOTE ISSUANCE AND SECURITY AGREEMENT

THIS NOTE ISSUANCE AND SECURITY AGREEMENT (this "**Agreement**"), dated as of __________, 2018 (the "**Effective Date**"), is made and entered into by and among DURO DYNE NATIONAL CORP., a New York corporation ("**Issuer**"); DURO DYNE SPENCE LLC, a New York limited liability company ("**Spence LLC**"), and ISWR OHIO LLC, an Ohio limited liability company ("**ISWR**," and together with Spence LLC, the "**Grantors**" and each a "**Grantor**"); and the DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust ("**Asbestos Trust**," and together with the Issuer and Grantors, the "**Parties**" and each a "**Party**").

### RECITALS

A. The Issuer, Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. (collectively, "**Debtors**") were debtors and debtors-in-possession in chapter 11 cases filed in the U.S. Bankruptcy Court for the District of New Jersey and jointly administered under Case No. __________ ("**Chapter 11 Cases**").

B. The Plan Proponents in the Chapter 11 Cases proposed and filed the *Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code*, dated September 7, 2018 (as amended, modified, and supplemented, the "**Joint Plan**"), with the Bankruptcy Court, which provides, *inter alia*, for the creation and funding of the Asbestos Trust and the substantive consolidation and merger of the Debtors with and into the Issuer (the "**Merger**"), with the Issuer as the surviving entity, on the Effective Date of the Joint Plan.

C. The Joint Plan further provides, *inter alia*, that on the Effective Date all Channeled Asbestos Claims will be channeled to, and assumed by, the Asbestos Trust and that the Issuer and other Protected Parties will receive the benefit of the Asbestos Permanent Channeling Injunction in accordance with section 524(g) of the Bankruptcy Code.

D. As consideration for the Asbestos Permanent Channeling Injunction and the benefits conferred on the Debtors, the Issuer, and the other Protected Parties thereby and under the Joint Plan, (1) the Issuer has agreed to issue the Trust Note (as defined below); (2) the Grantors have agreed to secure payment and performance of the obligations hereunder and under the Trust Note by granting security interests and liens in and on certain properties pursuant to the terms set forth herein; and (3) certain shareholders of Issuer have agreed to pledge and grant a possessory security interest in 50.1% of the voting equity securities in the Issuer to the Asbestos Trust and the shareholder of Duro Dyne Canada has agreed to pledge and grant a possessory security interest in 50.1% of the voting equity securities in Duro Dyne Canada to the Asbestos Trust, in each case to secure payment and performance of the obligations hereunder and under the Trust Note, in accordance with the Pledge and Security Agreement.

E. Accordingly, each of the Parties desires to execute and deliver this Agreement to satisfy the purposes and requirements described in the preceding recitals.

**NOW, THEREFORE,** incorporating the foregoing recitals herein, and in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, each of the Parties hereby agrees as follows:

**Section 1. Definitions.** All capitalized terms used herein without definition, including those in the recitals hereof, shall have the meaning ascribed to them in the Joint Plan. As used in this Agreement, the following terms shall have the following meaning:

(1) "**4 Site**" means 4 Site LLC, a New York limited liability company, having its chief executive office located at 81 Spence Street, Bay Shore, New York 11706.

(2) "**4 Site Debt Documents**" means, collectively, that certain Revolving Credit Note dated February 3, 2003, executed by the Issuer in favor of 4 Site, as modified pursuant to that certain Modified Revolving Credit Note dated May 1, 2007, executed by the Issuer in favor of 4 Site, as amended pursuant to that certain Amendment to Modified Revolving Credit Note dated as of May 29, 2014, executed by the Issuer in favor of 4 Site, as further amended pursuant to that certain Amendment to Modified Revolving Credit Note dated as of May 31, 2014, executed by the Issuer in favor of 4 Site; and as further amended pursuant to that certain Amendment to Modified Revolving Credit Note dated as of June 26, 2015, executed by the Issuer in favor of 4 Site; that certain Security Agreement dated February 3, 2003, by and between the Issuer and 4 Site; and that certain Guaranty executed by the Issuer in favor of 4 Site, as all of the foregoing now exist or may hereafter be amended, restated, renewed, extended, supplemented, substituted, or otherwise modified.

(3) "**Accrual Period**" means successive semiannual periods (being April 1 through and including September 30, and October 1 through and including March 31); *provided* that the first Accrual Period shall otherwise commence on the Effective Date and end on [*insert*].

(4) "**Adjusted EBITDA**" means the consolidated earnings of the Issuer and Duro Dyne Canada (a) before interest, taxes, depreciation, and amortization; (b) before deduction of losses or addition of gains associated with non-cash extraordinary, non-recurring, and legacy items; and (c) before deduction of Related-Party Payments. The components of "Adjusted EBITDA," as defined herein, shall be calculated with respect to the Issuer and Duro Dyne Canada on a consolidated basis in accordance with generally accepted accounting principles as in effect in the United States of America from time to time, consistently applied in the period in which a calculation is performed.

(5) "**Applicable Law**" means, at any time with reference to any Entity or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Authority, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Authority applicable to such Entity or its property or in respect of its operations or to any referenced circumstances or events.

(6) "**Bay Shore Lease**" means that certain Agreement of Lease pertaining to the Bay Shore Property, dated as of June 1, 2015, by and between Spence LLC as owner and landlord

and Duro Dyne Corporation as tenant.

(7) **"Bay Shore Mortgage"** means that certain instrument, in substantially the form attached hereto as Exhibit 1, that will evidence and constitute a Lien on the Bay Shore Property to secure payment and performance under this Agreement and the Trust Note.

(8) **"Bay Shore Property"** means that certain real property owned by Spence LLC and located at 81 Spence Street, Bay Shore, New York, and all buildings, structures, improvements, and fixtures thereon, now and hereafter existing.

(9) **"Business Day"** means a day other than a Saturday, a Sunday, or any other day in which the commercial banks in New York, New York are required or authorized to close by law or executive order.

(10) **"Cash"** means the lawful currency of the United States of America or any of its cash equivalents.

(11) **"Catch-Up Payment"** shall have the meaning as set forth in Section 3(b)(3) below.

(12) **"Change of Control"** means (a) the sale of all or substantially all of the assets of the Issuer or (b) the sale or transfer of Control of the Issuer to any Entity, other than a sale or transfer of Control arising as a result of transfers to or among, or issuance of new ownership interests to, the Hinden Family Members or any senior manager of the Issuer who has served in such capacity for no less than two (2) consecutive years, or to or among any of their respective descendants, spouses, or estates, or to or among any trusts of which any of the foregoing is a beneficiary.

(13) **"Control"** or **"Controlled"** means (a) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an Entity, whether through the ability to exercise voting power, by contract or otherwise, including in any case the ability, directly or indirectly, to exercise 50.1% or more of the voting power (i) for the election of directors or other governing body of a corporation, (ii) of the general partners of a partnership, (iii) the members or managers of a limited liability company, or (iv) of any other management or ownership interest in an Entity; or (b) the possession, directly or indirectly, of a majority of the Equity Interests or other economic interest in any Entity.

(14) **"Computation Date"** means December 31st or June 30th of a given year.

(15) **"Credit Documents"** means, collectively, this Agreement, the Trust Note, the Bay Shore Mortgage, the Fairfield Mortgage, the Pledge and Security Agreement, and any other document or instrument executed in connection with any of the foregoing.

(16) **"Deferral Amount"** means the dollar amount by which $3,000,000 *exceeds* the LTM Adjusted EBITDA as of the Computation Date that immediately precedes the applicable Semiannual Payment Date.

(17) **"Earn Out Payment"** shall have the meaning of such term as set forth in the Plan.

(18) **"Entity"** means an individual, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association, a governmental unit or subdivision thereof, including the United States Trustee, or any other entity, whether acting in an individual, fiduciary, or other capacity.

(19) **"Equity Interest"** means shares of capital stock or equity, equity securities, or ownership interests in any Entity or any rights, including any (a) options, warrants, or other rights to purchase or acquire any such stock, equity, or interests (whether or not at the time exercisable), or (b) securities by their terms convertible or exchangeable for any such stock, equity, or interests (whether or not at the time so convertible or exchangeable), or options, warrants, or rights to purchase such convertible or exchangeable securities.

(20) **"Fairfield Lease"** means that certain lease pertaining to the Fairfield Property, dated as of August 1, 1991, by and between ISWR as owner and landlord and Duro Dyne Midwest Corp. as tenant, as modified by that certain Lease Modification Agreement, dated January 18, 2011, by and between the aforesaid parties.

(21) **"Fairfield Mortgage"** means that certain instrument, in substantially the form attached hereto as Exhibit 2, that will evidence and constitute a Lien on the Fairfield Property to secure payment and performance under this Agreement and the Trust Note.

(22) **"Fairfield Property"** means that certain real property owned by ISWR and located at 3825 Symmes Road, Fairfield, Ohio 45011, and all buildings, structures, improvements, and fixtures thereon, now and hereafter existing.

(23) **"Funded Debt"** means any debt, obligation, or Indebtedness for money borrowed or evidenced by bonds, notes, debentures, or similar instruments, including any debt or obligation under or arising from capitalized leases with non-Related Parties, but *not* including the Senior Lending Facility, trade debt payable to non-Related Parties arising in the ordinary course of business, and the Obligations.

(24) **"Governmental Authority"** means the United States of America, a state, commonwealth, district, territory, municipality; or a department, agency, instrumentality, court, or tribunal of the United States of America, a state, a commonwealth, a district, a territory, a municipality.

(25) **"Hinden Family Entities"** means, collectively, Duro Dyne Canada, 4 Site, Rize Enterprises LLC, Rize Enterprises Canada Inc., Pro4ma LLC, Pro4ma II LLC, Foma LLC, ISWR, Spence LLC, The Irene Lee Hinden Trust, The Wendy Lynn Geller Trust, The Randall Scott Hinden Trust, and The Hinden Grandchildren Trust, the estate of Sheryl Blumenthal, and the trusts created under the will of Sheryl Blumenthal.

(26) "**Hinden Family Members**" means, collectively, Randall Hinden, Wendy Hinden, Irene Hinden, David Brett Krupnick, Lindsay Jill Trant, Tobey Hinden Geller, Joshua Blumenthal, Jessie Geller Cawley, Abby Beth Wein, Hayley Rebekah Geller, and Max Hinden.

(27) "**Immaterial Agreement or Instrument**" means an agreement or instrument the relevant breach of or default under which would not have a Material Adverse Effect or would not subject the Noteholder to any liability (in tort or otherwise).

(28) "**Indebtedness**" means, as to any Entity, (a) the obligations created, issued, or incurred by such Entity in respect of deposits taken or for borrowed money and all obligations evidenced by bonds, notes, debentures, or similar instruments; (b) obligations of such Entity to pay the deferred purchase or acquisition price of property or services, other than trade accounts payable (other than for borrowed money) arising in the ordinary course of business so long as such trade accounts payable are not past due; (c) obligations of such Entity in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Entity; (d) obligations under leases that are required to be capitalized in accordance with generally accepted accounting principles as in effect in the United States of America from time to time; (e) all payments such Entity would have to make as of any date on an early termination of a swap, cap, collar, forward purchase, or similar agreements dealing with interest rates, currency exchange, or commodity prices; and (f) any obligations or agreement guaranteeing in whole or in part the payment or performance of any debt or indebtedness of another Entity, whether or not such guaranty is contingent, limited in amount, or a non-recourse obligation, including the pledging or hypothecating of any property to secure the debt or indebtedness of another Entity, any undertaking to purchase the debt or indebtedness of another Entity or to maintain the working capital, equity, or solvency of another Entity or otherwise assure or hold harmless the holder of the debt or indebtedness of such other Entity.

(29) "**Insolvency Proceeding**" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, liquidator, receiver, trustee, or other officer with similar powers, or any proceeding for the dissolution, liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

(30) "**Insolvency Laws**" means the United States Bankruptcy Code, 11 U.S.C. §§ 101—1532, as may be amended from time to time, together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation, or similar laws, proceedings, or equitable principles affecting the enforcement of creditors' rights, as amended from time to time.

(31) "**Intercreditor Agreement**" means an intercreditor agreement between the Asbestos Trust and Bank of America, N.A., relating to the respective rights of the Asbestos Trust and Bank of America, N.A. in connection with the Trust Note and the Senior Lending Facility.

(32) "**Interest Rate**" means an interest rate equal to 7.15% per annum, which shall be

calculated on the basis of a three hundred sixty (360) day year, based on twelve (12) thirty (30) day months.

(33) "**Internal Revenue Code**" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*

(34) "**Lien**" means, with respect to any asset, any mortgage, deed of trust, lien, pledge, charge, encumbrance, hypothecation, security interest, or assignment of any kind or nature in respect of such asset, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

(35) "**Loan and Security Agreement**" means that certain loan and security agreement dated as of the same date as this Agreement, between Issuer (as Borrower thereunder) and Bank of America, N.A. (as Lender thereunder), setting forth the terms and provisions governing the Senior Lending Facility, together with all of the exhibits and schedules thereto and all documents necessary to implement or secure the Senior Lending Facility.

(36) "**LTM Adjusted EBITDA**" means Adjusted EBITDA during a period of twelve (12) consecutive calendar months, the last day of which is a Computation Date.

(37) "**Material Adverse Effect**" means a material adverse effect on any of (a) property, business, operations, or financial condition of the Issuer; (b) the validity or enforceability of any of the Credit Documents; or (c) the rights and remedies of the Noteholder under any of the Credit Documents.

(38) "**Maturity Date**" means the earliest to occur of (a) the Scheduled Maturity Date or (b) the date on which the Trust Note becomes due and payable by acceleration under Section 3(g) or Section 14(b) hereof.

(39) "**Mortgaged Collateral**" means (a) the Bay Shore Property, as subject to and encumbered by the Bay Shore Mortgage, (b) the Fairfield Property, as subject to and encumbered by the Fairfield Mortgage, and (c) any replacement property or properties as subject to and encumbered by replacement mortgages with comparable terms, pursuant to the terms and conditions of the Bay Shore Mortgage and Fairfield Mortgage, as applicable.

(40) "**Noteholder**" means (a) the Asbestos Trust during the period in which it is a holder of the Trust Note; or (b) each Entity that becomes a holder of the Trust Note by way of assignment, transfer, or negotiation, or otherwise pursuant to this Agreement and Applicable Law.

(41) "**Obligations**" means all liabilities of the Issuer, the Grantors, and the Pledging Shareholders owing to, or in favor of, or for the benefit of, the Noteholder under the Credit Documents, in each case (a) whether now existing or hereafter arising or acquired, (b) whether owing to, or in favor of, or for the benefit of, Entities that are Noteholders by reason of any succession, transfer, or assignment at any time thereafter, and (c) whether or not an allowable

claim against the Issuer under the Bankruptcy Code or other Insolvency Law, or otherwise enforceable against the Issuer, any Grantor, or any Pledging Shareholder, and including, in any event, interest and other liabilities accruing or arising after the filing by or against the Issuer of a petition under the Bankruptcy Code or other Insolvency Law or that would have so accrued or arisen but for the filing of such a petition.

(42) **"Original Payment Date"** means the Semiannual Payment Date on which a Deferral Amount would have been originally payable had the applicable LTM Adjusted EBITDA been equal to or greater than $3,000,000 in accordance with Section 3(b)(2).

(43) **"Plan"** means the Joint Plan, including the Plan Documents (as such term is defined in the Joint Plan), as the same may be amended, modified, or supplemented from time to time in accordance with the terms and provisions thereof.

(44) **"Pledging Shareholders"** means the holders of Equity Interests in the Issuer or Duro Dyne Canada, as applicable, who are parties to the Pledge and Security Agreement.

(45) **"Principal Amount"** means Thirteen Million Five Hundred Thousand and 00/100 Dollars ($13,500,000.00).

(46) **"Related Parties"** means, collectively, the Hinden Family Members, the Hinden Family Entities, and any other Entity owned or Controlled by any of the Hinden Family Members or any of the Hinden Family Entities.

(47) **"Related-Party Payment"** means any transfer of assets or cash made or to be made in the form of a dividend, redemption, or other distribution or payment to a Related Party or on account of any debt or obligation owed to, or Equity Interest held by, a Related Party, including (a) any base rental payment made in accordance with, or on account of, the Bay Shore Lease or the Fairfield Lease and (b) any other lease or rent payment made to a Related Party on account of or with respect to any property, plant, or equipment, but specifically excluding (i) Tax Distributions so long as, prior to and after giving effect to such Tax Distributions, no Event of Default exists or is caused thereby; and (ii) other payments that are not retained at the discretion of a Related Party and as to which a Related Party serves or functions as a conduit for a transferee that is not a Related Party, including Tax payments that are designated as "additional rent" under the Bay Shore Lease or the Fairfield Lease.

(48) **"Scheduled Maturity Date"** means the Semiannual Payment Date immediately preceding the 20-year anniversary of the first Semiannual Payment Date that occurs following the interest only payments set forth in Section 3(b)(1).

(49) **"Semiannual Payment"** means, for each Semiannual Payment Date, a Cash payment in an amount equal to $639,542.67, subject, however, to adjustment in accordance with Section 4(b).

(50) **"Semiannual Payment Date"** means each successive March 31st and September 30th prior to the Maturity Date, commencing on [*insert first Semiannual Payment Date*] and

continuing through and including the Scheduled Maturity Date.

(51) **"Senior Lending Facility"** means a revolving credit facility in the amount of up to $9,950,000 to Issuer pursuant to the Loan and Security Agreement.

(52) **"Tax Distribution"** means a distribution or dividend by the Issuer to holders of Equity Interests in the Issuer solely to the extent necessary to permit such holders to discharge their respective federal, state, and local income tax liabilities arising directly with respect to their Equity Interests in the Issuer (and not in any Affiliate of the Issuer), determined (a) based on the assumption that such holders are subject to the highest federal, state, and local income tax rates in effect at the time of such distribution; and (b) after taking into account all tax deductions, credits, refunds, or other benefits reasonably available or attributable to the Issuer, including any such deductions, credits, refunds, or benefits arising from contributions to the Asbestos Trust or from net operating loss carrybacks or carryforwards resulting from such contributions.

(53) **"Taxes"** means all taxes, assessments, and other charges, if any, general, special, or otherwise, including assessments for schools, public betterments, and general or local improvements, which are levied, assessed, or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien on the Mortgaged Collateral.

(54) **"Trust Note"** means that certain promissory note in the Principal Amount that shall be issued by Issuer to the Asbestos Trust in connection with, and pursuant to, the Plan and this Agreement, the form of which is annexed hereto as Exhibit 3, and any other notes issued by the Issuer in replacement of such promissory note.

(55) **"Trust Note Liens"** means the Liens granted in accordance with, and evidenced by, the Bay Shore Mortgage and the Fairfield Mortgage.

**Section 2. Issuance of the Trust Note.** On or before the Effective Date, the Issuer shall execute and deliver the Trust Note to the Asbestos Trust.

**Section 3. Trust Note Payment Terms**

(a) Subject to the provisions of Section 4, the Issuer shall irrevocably and indefeasibly pay to the Noteholder in Cash pursuant to the Trust Note the Principal Amount, together with interest accruing at the Interest Rate, as follows:

(1) Except as provided in Section 3(b), the Issuer shall make the Semiannual Payment to the Noteholder on each Semiannual Payment Date. Each Semiannual Payment shall be applied first to interest accrued during the Accrual Period within which the applicable Semiannual Payment Date is the last day and then to the Principal Amount.

(2) If any payment hereunder becomes due and payable on a day that is not a Business Day, unless otherwise provided herein, the date for such payment shall be extended to the next Business Day.

(b) Notwithstanding anything to the contrary in subsection (a) above, the Issuer's obligation to make a Semiannual Payment to the Noteholder on the applicable Semiannual Payment Date is subject to the following:

(1) On each Semiannual Payment Date that occurs before the first anniversary of the Effective Date, the Issuer shall pay the Noteholder, in lieu of the full amount of a Semiannual Payment, all unpaid interest that has accrued at the Interest Rate from the Effective Date or the previous Semiannual Payment Date, as applicable, to the last day of the applicable Accrual Period.

(2) Except as provided in paragraph (1) above, the Issuer shall pay the full amount of the Semiannual Payment to the Noteholder if the LTM Adjusted EBITDA, as of the Computation Date that immediately precedes the applicable Semiannual Payment Date, is equal to or greater than three million dollars ($3,000,000). If the LTM Adjusted EBITDA, as of the Computation Date that immediately precedes the applicable Semiannual Payment Date, is less than $3,000,000, then the amount of the Semiannual Payment payable to the Noteholder shall be reduced by the Deferral Amount, but not below zero, and payment of the Deferral Amount shall be payable in accordance with paragraph (3) below.

(3) Each Deferral Amount, together with the interest that has accrued thereon at the Interest Rate from the Original Payment Date, shall be due and payable to the Noteholder on the earlier of (A) the fifth (5th) anniversary of the Original Payment Date; (B) the next Semiannual Payment Date as to which the LTM Adjusted EBITDA, as of the Computation Date that immediately precedes such Semiannual Payment Date, is greater than $3,000,000, to the extent that such applicable LTM Adjusted EBITDA exceeds $3,000,000 (such excess, a "**Catch-Up Payment**"); and (C) the Maturity Date.

(4) If a Catch-Up Payment is made with respect to any outstanding Deferral Amounts, such Catch-Up Payment shall be applied first to any and all interest that has accrued on the Deferral Amounts and then, after such accrued interest has been paid in Cash and in full, to the outstanding Deferral Amounts. If any accrued interest remains unpaid after application of a Catch-Up Payment in accordance with this paragraph (4), then such unpaid interest shall be added to the balance of outstanding Deferral Amounts and treated as a Deferral Amount, with interest accruing thereon at the Interest Rate in accordance with paragraph (3) above. In addition, if, after application of a Catch-Up Payment, there is a balance of Deferral Amounts that remains unpaid (including any accrued and unpaid interest that is added to such balance), then such balance shall continue to remain outstanding and be payable in accordance with paragraph (3) above.

(5) Notwithstanding anything to the contrary contained in this Section 3, the amount of each Semiannual Payment to the Noteholder on any Semiannual Payment Date shall not exceed an amount that would, if paid, result in a violation of a financial covenant in, or otherwise cause a default or acceleration under, the Loan and Security Agreement or any credit or loan agreement in replacement thereof. The amount of any shortfall in or reduction to the Semiannual Payment that results from the first sentence of this paragraph (5) shall be treated as a

Deferral Amount, with interest accruing thereon at the Interest Rate, in accordance with Section 3(b)(3).

(6) Notwithstanding anything to the contrary contained in this Section 3, section 4.11(e) of the Joint Plan shall control in the event a Catch-Up Payment and an Earn Out Payment are due and payable on the same Semiannual Payment Date.

(c) All payments, whether of principal, interest, or otherwise, due hereunder shall be paid by wire transfer of immediately available federal funds to the following account of the Noteholder, unless otherwise directed by the Noteholder in writing:

| | |
|---|---|
| **Bank Name:** | [ ] |
| **ABA#:** | [ ] |
| **DDA#:** | [ ] |

Any wire transfer received by the Noteholder after 4:59 p.m. New York City time shall be deemed received on the next succeeding Business Day.

(d) Unless payments are made in the required amount in immediately available funds at the place where the Trust Note is payable, remittances in payment of all or any part of the Obligations shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by the Noteholder in funds immediately available at the place where the Trust Note is payable (or any other place as the Noteholder, in the Noteholder's sole discretion, may have established by delivery of written notice thereof to the Issuer) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.

(e) Notwithstanding any provision in this Agreement, including subsection (b) above, and in any of the other Credit Documents, the remaining balance of the Principal Amount, all unpaid interest that has accrued at the Interest Rate, and all other portions of the Obligations that remain unpaid on the Scheduled Maturity Date shall be due and payable by the Issuer to the Noteholder on the Scheduled Maturity Date, unless accelerated in accordance with Section 3(g) or Section 14(b) or prepaid in full in accordance with Section 4, in which case the aforesaid sums described in this subsection (e) shall be payable on the Maturity Date or the prepayment date, as applicable.

(f) Subject to Section 15 hereof, following and during the continuance of an Event of Default, the Noteholder shall have the continuing, exclusive right to apply or reapply payments or proceeds of the Mortgaged Collateral against the Obligations, in such manner as the Noteholder deems advisable.

(g) Upon the occurrence of any sale, merger, or other transaction resulting in a Change of Control of Issuer, the outstanding Principal Amount, together with all accrued and unpaid interest thereon, shall be immediately due and payable, without presentment, demand, protest, or further notice.

(h) The Noteholder shall have no obligation to marshal any assets in favor of the Issuer or any Grantor against any Obligations. If any payment by or on behalf of the Issuer is made to the Noteholder or if the Noteholder exercises a right of setoff, and any of such payment or setoff is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Noteholder in its discretion) to be repaid to a trustee, receiver, liquidator, or any other Entity, then the Obligations originally intended to be satisfied, and all Liens, rights, and remedies relating thereto, shall be revived and continued in full force and effect as if such payment or setoff had not occurred.

**Section 4. Prepayment**

(a) Unless an Event of Default has occurred or is continuing, the Issuer may at any time and from time to time redeem the Trust Note, in whole or ratably in part, without premium or penalty, at a price equal to 100% of the unpaid Principal Amount and all accrued and unpaid interest thereon until the redemption date.

(b) If the Trust Note is redeemed in part by the Issuer, then the outstanding Principal Amount shall be amortized together with accrued interest on a level debt service basis at the Interest Rate from the redemption date through and including the Scheduled Maturity Date, and the amount of each Semiannual Payment that remains to be paid shall be adjusted accordingly to reflect such amortization on a level debt service basis.

**Section 5. Grant of Trust Note Liens.** To secure payment and performance of the Obligations, (a) Spence LLC shall grant to or in favor of the Noteholder a continuing first-priority Lien in and on the Bay Shore Property, in the form of and as evidenced by the Bay Shore Mortgage; and (b) ISWR shall grant to or in favor of the Noteholder a continuing first-priority Lien in and on the Fairfield Property, in the form of and as evidenced by the Fairfield Mortgage.

**Section 6. Certain Waivers by Issuer and Grantors.** Except for the notices specified in Section 13 hereof, the Issuer and each Grantor expressly waives presentment, demand, protest, notice of presentment, dishonor, protest, diligence of collection, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper, and guaranties at any time held by the Noteholder on which the Issuer or Grantor may in any way be liable, and hereby ratifies anything that the Noteholder may do in this regard. The Issuer and each Grantor hereby waives and releases all errors, defects, and imperfections in any proceedings instituted by the Noteholder under the terms of this Agreement, the Trust Note, or any other Credit Document. The Issuer and each Grantor agrees that any property that may be levied upon pursuant to a judgment obtained by virtue hereof, or upon any writ of execution issued thereon, may be sold upon any such judgment or writ in whole or in part in any order desired by the Noteholder.

**Section 7. Certain Waivers by Grantors.** Each Grantor hereby waives:

(a) any requirement, and any right to require, that any right or power be exercised or any action be taken against the Issuer, any other Grantor, or any collateral for the Obligations;

(b) until such time as the Obligations have been irrevocably and indefeasibly paid in Cash and in full in accordance with the terms hereof and of the other Credit Documents, all defenses to, and all setoffs, counterclaims, and claims of recoupment against, the Obligations that may at any time be available to the Issuer, a Grantor, or any Related Party;

(c) (1) notice of acceptance of and intention to rely on the Credit Documents, (2) notice of the making or renewal of any loans or obligations or other extensions of credit under the Trust Note and of the incurrence or renewal of any other Obligations; and (3) all other notices that may be required by Applicable Law or otherwise to preserve any rights or remedies of the Noteholder under the Credit Documents, including any notice of default, demand, dishonor, presentment, and protest;

(d) diligence;

(e) any defense based on or arising out of (1) any claim that any sale or other disposition of any collateral for the Obligations was not conducted in a commercially reasonable manner or that a public sale, should the Noteholder have elected to so proceed, was, in and of itself, not a commercially reasonable method of sale, (2) any claim that any election of remedies by the Noteholder occurred, including the exercise by the Noteholder of any rights against any collateral, including any right of subrogation, exoneration, reimbursement, or contribution, or right to obtain a deficiency judgment; and (3) any claim that the Credit Documents should be strictly construed against the Noteholder; and

(f) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ALL OTHER DEFENSES UNDER APPLICABLE LAW THAT WOULD, BUT FOR THIS SECTION, BE AVAILABLE TO ANY OF THE GRANTORS AS A DEFENSE AGAINST THE EXERCISE OR ENFORCEMENT OF ANY OF THE TRUST NOTE LIENS OR A REDUCTION OR LIMITATION OF THE OBLIGATIONS UNDER THE CREDIT DOCUMENTS.

**Section 8. Representations and Warranties of the Issuer.** The Issuer represents and warrants that each of the following statements is true as of the Effective Date, and that the Issuer acknowledges that, in accepting this Agreement, the Noteholder is relying on each of the following representations and warranties as being true and that such reliance is reasonable:

(a) The Issuer:

(1) is a corporation duly organized, validly existing, and in good standing under the laws of its state of organization;

(2) has all requisite corporate power and authority, and has all material governmental licenses, authorizations, consents, and approvals necessary to own its assets and carry on its business as now being conducted; and

(3) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure to so qualify, individually, or in the aggregate, could have a Material Adverse Effect.

(b) Other than the Chapter 11 Cases, there are no legal or arbitral proceedings, or any proceedings by or before any Governmental Authority, now pending or threatened against the Issuer or any of its respective subsidiaries with a reasonable possibility of an adverse determination that, individually or in the aggregate, if adversely determined, could have a Material Adverse Effect.

(c) The execution and delivery of this Agreement and the other Credit Documents to which it is a party, and the consummation of the transactions or compliance with the terms and provisions hereof and thereof, will not (1) conflict with or result in a breach of, or require any consent under, (A) the charter, articles, or bylaws of the Issuer, (B) any Applicable Law binding on the Issuer, or (C) any agreement or instrument (other than an Immaterial Agreement or Instrument) to which the Issuer is a party or by which the Issuer or any of its property is bound or to which any of them is subject; (2) constitute a default under any such agreement or instrument (other than an Immaterial Agreement or Instrument); or (3) result in the creation or imposition of any Lien under any such agreement or instrument (other than an Immaterial Agreement or Instrument) upon any of the properties or revenues of the Issuer.

(d) The Issuer has all necessary corporate power, authority, and legal right to execute, deliver, and perform its obligations under and to consummate the transactions contemplated by each of the Credit Documents to which it is a party.

(e) The execution, delivery, and performance by the Issuer, and the consummation of the transactions contemplated by each of the Credit Documents to which the Issuer is a party, have been duly authorized by all necessary corporate action on its part (including any required shareholder approvals).

(f) This Agreement has been duly and validly executed and delivered by the Issuer, and each of the Credit Documents to which it is a party when executed and delivered by the Issuer constitutes and will constitute its legal, valid, and binding obligation, enforceable against the Issuer in accordance with its terms, except as such enforceability may be limited by applicable Insolvency Laws or by the exercise of discretion by any court.

(g) No authorizations, approvals, or consents of, and no filings or registrations with, any Governmental Authority or any securities exchange are necessary for the execution, delivery, or performance by the Issuer of this Agreement and the other Credit Documents to which it is a party, the consummation of the transactions contemplated hereby or thereby or the legality, validity, or enforceability hereof or thereof, except for such authorizations, approvals, consents, filings, and registrations as have been effected prior to the date hereof and are in full force and effect, and for any filings in accordance with the periodic reporting requirements of the Securities Exchange Act of 1934.

(h) The Issuer has duly complied, and its properties and business operations are in compliance, in all material respects with all Applicable Laws. There have been no citations,

notices, or orders of material noncompliance issued to the Issuer under any Applicable Law, that have not been cured. The Issuer has not committed any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Mortgaged Collateral or any part thereof or any monies paid in performance of the Issuer's or Grantors' obligations under any of the Credit Documents.

(i) The Issuer is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940.

(j) Neither this Agreement nor any other document executed in connection therewith contains an untrue statement of material fact or omits any material fact necessary in order to make the statement made, in light of the circumstances under which it is made, accurate. There is no fact and circumstance that the Issuer has failed to disclose to the Noteholder in writing that could be expected to have a Material Adverse Effect.

**Section 9. Representations and Warranties of Grantors.** Each Grantor represents and warrants that each of the following statements is true as of the Effective Date, and that such Grantor acknowledges that, in accepting this Agreement, the Noteholder is relying on each of the following representations and warranties as being true and that such reliance is reasonable:

(a) Such Grantor:

(1) is a limited liability company duly organized, validly existing, and in good standing under the laws of its state of organization;

(2) has all requisite limited liability company power and authority, and has all material governmental licenses, authorizations, consents, and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted; and

(3) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure to so qualify, individually, or in the aggregate, could have a Material Adverse Effect.

(b) Spence LLC is the sole owner of and holds good and marketable title to, and the beneficial or equitable interest in, the Bay Shore Property.

(c) ISWR is the sole owner of and holds good and marketable title to, and the beneficial or equitable interest in, the Fairfield Property.

(d) Such Grantor has not received written notice of any legal or arbitral proceedings, or any proceedings by or before any Governmental Authority that is currently pending or threatened in writing against such Grantor or any of its respective subsidiaries with a reasonable possibility of an adverse determination that, individually or in the aggregate, if adversely determined, could have a Material Adverse Effect.

(e) The execution and delivery of this Agreement and the other Credit Documents to which such Grantor is a party, and the consummation of the transactions or compliance with the

terms and provisions hereof and thereof, will not (1) conflict with or result in a breach of, or require any consent under, (A) the operating agreement of such Grantor, (B) any Applicable Law binding on such Grantor, or (C) any agreement or instrument (other than an Immaterial Agreement or Instrument) to which such Grantor is a party or by which such Grantor or any of its property is bound or to which any of them is subject; (2) constitute a default under any such agreement or instrument (other than an Immaterial Agreement or Instrument); or (3) result in the creation or imposition of any Lien under any such agreement or instrument (other than an Immaterial Agreement or Instrument) upon any of the properties or revenues of the Grantor.

(f) Such Grantor has all necessary limited liability company power, authority, and legal right to execute, deliver, and perform its obligations under and to consummate the transactions contemplated by each of the Credit Documents to which it is a party.

(g) The execution, delivery, and performance by such Grantor, and the consummation of the transactions contemplated by each of the Credit Documents to which such Grantor is a party, have been duly authorized by all necessary limited liability company action on its part (including any required approvals).

(h) This Agreement has been duly and validly executed and delivered by such Grantor, and each of the Credit Documents to which it is a party when executed and delivered by such Grantor constitutes and will constitute its legal, valid, and binding obligation, enforceable against each Grantor in accordance with its terms, except as such enforceability may be limited by applicable Insolvency Laws or by the exercise of discretion by any court.

(i) No authorizations, approvals, or consents of, and no filings or registrations with, any Governmental Authority or any securities exchange are necessary for the execution, delivery, or performance by such Grantor of this Agreement and the other Credit Documents to which it is a party, the consummation of the transactions contemplated hereby or thereby or the legality, validity, or enforceability hereof or thereof, except for such authorizations, approvals, consents, filings, and registrations as have been effected prior to the date hereof and are in full force and effect, and for any filings in accordance with the periodic reporting requirements of the Securities Exchange Act of 1934.

(j) Such Grantor, the Mortgaged Collateral owned by such Grantor, and the use of the Mortgaged Collateral owned by such Grantor comply in all material respects with all Applicable Laws and legal requirements, including building and zoning ordinances and codes. There have been no citations, notices, or orders of material noncompliance issued to such Grantor under any Applicable Law, that have not been cured. Such Grantor has not received any written notice that, and such Grantor has no knowledge that, it is in default or violation of any order, writ, injunction, decree, or demand of any Governmental Authority, that has not been cured. There has not been committed by the Grantors or any other Entity in occupancy of or involved with the operation or use of the Mortgaged Collateral any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Mortgaged Collateral or any part thereof or any monies paid in performance of the Issuer's or the Grantors' obligations under any of the Credit Documents. To such Grantor's knowledge, on the

Effective Date, all improvements on the Mortgaged Collateral will be in material compliance with Applicable Law.

(k) No condemnation or other similar proceeding has been commenced or is pending, or, to such Grantor's knowledge, is threatened or contemplated with respect to all or any portion of the Mortgaged Collateral or for the relocation of roadways providing access to the Mortgaged Collateral.

(l) Such Grantor has not received any written notice of any pending or proposed special or other assessments for public improvements or otherwise affecting the Mortgaged Collateral, nor are there any contemplated improvements to the Mortgaged Collateral that may result in such special or other assessments.

(m) Each Grantor has obtained and has delivered to the Noteholder certificates of insurance reflecting the insurance coverages, amounts, and other requirements currently maintained by such Grantor. No claims have been made or are currently pending, outstanding, or otherwise remain unsatisfied under any such insurance policy, and neither of the Grantors nor, to Grantor's knowledge, any other Entity has done, by act or omission, anything that would impair the coverage of any such insurance policy.

(n) All material certifications, permits, licenses, and approvals, including certificates of completion and occupancy permits, required for the legal use, occupancy, and operation of each property constituting Mortgaged Collateral have been obtained and are in full force and effect. The use being made of each property constituting Mortgaged Collateral is in conformity with the certificate of occupancy issued for such property.

(o) None of the improvements on any of the Mortgaged Collateral is located in an area identified by the Federal Emergency Management Agency as having special flood hazards.

(p) No portion of the Mortgaged Collateral has been or will be purchased with proceeds of any illegal activity.

(q) Such Grantor is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940.

(r) Such Grantor is not a "foreign person" within the meaning of section 1445(f)(3) of the Internal Revenue Code.

(s) Neither this Agreement nor any other document executed in connection therewith contains an untrue statement of material fact or omits any material fact necessary in order to make the statement made, in light of the circumstances under which it is made, accurate. There is no fact or circumstance that Grantor has failed to disclose to the Noteholder in writing that could be reasonably expected to have a Material Adverse Effect.

**Section 10. Affirmative Covenants of the Issuer and Grantors.** Until all the Obligations are irrevocably and indefeasibly paid in full and in Cash to the Noteholder:

(a) The Issuer shall preserve and maintain its existence, legal structure, legal name, and rights (statutory and charter).

(b) The Issuer and each Grantor shall maintain all of the permits, licenses, approvals, privileges, and franchises that are material to the conduct of its business.

(c) The Issuer and each Grantor shall keep books and records in accordance with generally accepted accounting principles as in effect in the United States of America from time to time.

(d) The Issuer and each Grantor shall execute such documents or take such other steps as may be reasonably necessary to accomplish the purposes of the Credit Documents.

(e) The Issuer and each Grantor, as applicable, shall promptly, and in any event within five (5) Business Days of the occurrence thereof (if same remains uncured), notify the Noteholder in writing of any material defaults or material events of default of the Issuer or any of the Issuer's direct or indirect subsidiaries in respect of Indebtedness having an outstanding or unpaid principal amount in excess of $500,000.

(f) The Issuer and each Grantor, as applicable, shall promptly, and in any event within ten (10) Business Days of the occurrence thereof, notify the Noteholder in writing of any event having a Material Adverse Effect.

(g) The Issuer shall furnish the Noteholder with all financial reporting in the same form and at the same time as required by the lender under the Loan and Security Agreement or any secured or senior credit or loan agreement in replacement thereof, and any additional information reasonably required to monitor Adjusted EBITDA for purposes of payments under the Trust Note. All such financial reporting and additional information shall conform to generally accepted accounting principles, consistently applied in each period in which a calculation is performed, if such conformity is not required by the lender under the Loan and Security Agreement or any secured or senior credit or loan agreement in replacement thereof. If the Senior Lending Facility is terminated or not renewed or replaced, the Issuer shall furnish the Noteholder with such financial reporting at the same time and with the same level of detail and disclosure previously required under the Loan and Security Agreement. In addition, for purposes of determination of Tax Distributions, the Issuer shall furnish to the Noteholder, within ten (10) calendar days after the Issuer has transmitted IRS Schedule K-1s to the holders of Equity Interests in the Issuer, an accounting with an accountant's review of all tax deductions, credits, refunds, or other benefits reasonably available or attributable to the Issuer, including any such deductions, credits, refunds, or benefits arising from contributions to the Asbestos Trust or from net operating loss carrybacks or carryforwards resulting from such contributions.

(h) The Issuer and each Grantor, as applicable, shall promptly notify the Noteholder in writing of any Event of Default of which the Issuer and such Grantor has knowledge.

(i) The Issuer and each Grantor, as applicable, shall promptly notify the Noteholder in writing of any of the following that affects the Issuer or a Grantor, as applicable: (1) the threat or commencement of any lawsuit, proceeding, or investigation; (2) any pending or threatened labor dispute, strike, or walkout; (3) any default under or termination of a material contract, license, or other agreement; (4) any judgment in any amount; (5) the discharge of or any withdrawal or resignation by the Issuer's or a Grantor's independent accountants; or (6) any opening of a new office, place of business, or plant or manufacturing site at least thirty (30) calendar days prior to such opening.

(j) The Issuer shall, within seven (7) calendar days after request by the Noteholder, furnish the Noteholder with a statement, duly acknowledged and certified, setting forth (1) the original principal amount of the Trust Note; (2) the unpaid principal amount of the Trust Note; (3) the interest rate of the Trust Note; (4) any unpaid or outstanding Deferral Amounts; (5) the date installments of interest and principal, including any Catch-Up Payments, were last paid; (6) any offsets or defenses to the payment of the Obligations, if any, claimed by the Issuer; and (7) that the Trust Note, this Agreement, and the other Credit Documents to which the Issuer is a party have not been amended or modified or, if amended or modified, giving the particulars of such amendment or modification.

(k) The Issuer shall notify the Noteholder in writing of any amendment, modification, renewal, termination, substitution, or replacement of the Loan and Security Agreement, or any secured or senior credit or loan agreement in replacement thereof, and provide the particulars of any such amendment, modification, renewal, termination, substitution, or replacement, within five (5) Business Days after such amendment, modification, renewal, termination, substitution, or replacement becomes effective.

(l) Each Grantor shall notify the Noteholder in writing of any amendment, modification, renewal, termination, substitution, or replacement of the Bayshore Lease, the Fairfield Lease, or any lease in replacement of any of the foregoing, and provide the particulars of any such amendment, modification, renewal, termination, substitution, or replacement, within five (5) Business Days after such amendment, modification, renewal, termination, substitution, or replacement becomes effective.

(m) Each Grantor shall comply in all material respects with Applicable Laws and all recorded lawful covenants and agreements relating to or affecting the applicable Mortgaged Collateral.

**Section 11. Negative Covenants of the Issuer.** Until all of the Obligations are irrevocably and indefeasibly paid in full and in Cash to the Noteholder:

(a) The Issuer shall not make any Related-Party Payments if (1) any Event of Default has occurred and is continuing; (2) if any Deferral Amount is outstanding or due hereunder; or (3) there is an arrearage of any Indebtedness of Issuer or any Grantor. The Issuer's obligation to make Related-Party Payments is and shall be fully subordinated and junior in right of payment to the prior payment in full and in Cash of the Obligations which are then due and payable.

(b) The Issuer shall not incur any debt or obligations that are senior in right of payment to the Obligations, other than the Senior Lending Facility or as permitted by Section 11(c) solely with respect to the $200,000 allowance for purchase money security interests. By way of clarification, the amount owed under the Senior Lending Facility may be paid down and subsequently re-borrowed so long as the total amount owed thereunder does not exceed the original maximum principal amount of the Senior Lending Facility on the date of its origination.

(c) The Issuer shall not incur any Funded Debt unless the incurrence of such Funded Debt will not trigger a default, event of default, or acceleration of any Indebtedness *and* (1) such Funded Debt is fully subordinated and junior in right of payment to the prior payment in full and in Cash of the Obligations as due and payable; or (2) the aggregate amount of (A) the principal balance, accrued interest, and any other debt or obligation owed under the Senior Lending Facility, (B) such Funded Debt and any other Funded Debt (including principal balances, accrued interest, and any other debt or obligation owed in connection therewith) that is not fully subordinated and junior in right of payment to the prior payment in full and in Cash of the Obligations as due and payable, and (C) the balance outstanding of the Principal Amount, does not exceed four (4) times LTM Adjusted EBITDA as of the date that such Funded Debt is proposed to be incurred. Notwithstanding the foregoing, the Issuer may, in connection with its equipment leases with or purchases from non-Related Parties, incur Funded Debt secured by purchase money security interests, but the cumulative amount of such Funded Debt (including principal, accrued interest, and any other debt or obligation owed in connection therewith) shall not at any time exceed $200,000.

(d) The Issuer shall not (1) transfer any assets to a Related Party (other than payments authorized under any of the Plan Documents or payments in the ordinary course of Issuer's business to Duro Dyne Canada in exchange for reasonably equivalent value) or to any Entity, the majority of whose Equity Interests are owned directly or indirectly by the Issuer or one or more of the Related Parties; (2) acquire a business, division, or substantially all the assets of any Entity; or (3) acquire fifty percent (50%) or more of the Equity Interests in any Entity, unless, before any asset transfer or acquisition is effectuated, such Related Party or Entity (i) expressly assumes joint and several liability for all of the Obligations, (ii) agrees in writing that its books, records, and financial statements, including the calculation of Adjusted EBITDA, shall be kept and done on a consolidated basis with the Issuer and Duro Dyne Canada, and (iii) executes and delivers to the Noteholder an assumption agreement that is satisfactory in form and substance to the Noteholder.

(e) Except as otherwise permitted under the Joint Plan, the Issuer shall not amend, supplement, or otherwise modify the 4 Site Debt Documents or any other document, instrument, or agreement relating to any debt or obligation to a Related Party, if such amendment, supplement, or modification (1) increases the principal balance of such debt, or increases any required payment of principal or interest; (2) accelerates the date on which any installment of principal or any interest is due, or adds any additional redemption, put, or prepayment provisions; (3) shortens the final maturity date or otherwise accelerates amortization; (4) increases the interest rate; (5) increases or adds any fees or charges; or (6) modifies any covenant in a manner, or adds any representation, covenant, or default, that is more onerous or restrictive

in any material respect for the Issuer, or that is otherwise materially adverse to the Issuer or the Noteholder.

(f) Except as provided in section 8.06(c) of the Joint Plan and in Section 11(g) hereof, Related-Party Payments shall not increase year over year by more than three percent (3.0%) in the aggregate.

(g) Related-Party Payments made in accordance with, or on account of, (1) the Bay Shore Lease, (2) the Fairfield Lease, and (3) any lease that is a renewal or replacement of the Bay Shore Lease or the Fairfield Lease, shall not increase year over year by more than three percent (3.0%) in the aggregate, except under the following circumstance: (i) if any improvements are made to the Bay Shore Property or the Fairfield Property that result in an increase in the fair market value of such property, or (ii) if real property is acquired in replacement of the Bay Shore Property or the Fairfield Property (**"Replacement Property"**) and the fair market value of such Replacement Property is greater than the fair market value of the replaced Bay Shore Property or Fairfield Property, as applicable, then the amount of such Related-Party Payments may be increased only in proportion to the incremental increase in fair market value (A) of the improved Bay Shore Property or Fairfield Property or (B) resulting from the acquisition of the Replacement Property.

**Section 12. Covenants and Further Assurances of the Grantors.** Until all of the Obligations are irrevocably and indefeasibly paid in Cash and in full to the Noteholder:

(a) Without Asbestos Trust's prior consent, which shall not be unreasonably withheld, conditioned, or delayed, each Grantor will not sell or otherwise dispose of, or grant any warrant or option with respect to, any of the Mortgaged Collateral, or create or suffer to exist any Lien on any of the Mortgaged Collateral that is *pari passu* with or senior in payment priority to the Obligations or any of the Trust Note Liens, other than (1) the easements, restrictions, and other matters currently of record with respect to the Mortgaged Collateral and Taxes for the current tax year that are not yet due and payable, (2) any municipal lien, utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Mortgaged Collateral if bonded off or released of record, or (3) any mechanics' or materialmen's liens that attach automatically under Applicable Law upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Collateral and for which Grantor is not delinquent in the payment for any such work or materials.

(b) Each Grantor will not change its name, type of organization, or jurisdiction of organization without, in each case, (1) giving at least fourteen (14) calendar days' prior written notice thereof to the Noteholder, and (2) taking all action necessary or reasonably requested by the Noteholder in order to maintain the validity, effectiveness, first-priority status, or perfection of the Trust Note Liens.

(c) Each Grantor shall maintain its legal existence.

(d) Each Grantor shall, from time to time, at its expense, promptly execute and deliver all further instruments, documents, and notices, and take all further action that may be necessary or desirable, or that the Noteholder may reasonably request, in order to create, perfect,

and protect any Lien granted or purported to be granted by the Bay Shore Mortgage or the Fairfield Mortgage, as applicable, or to enable the Noteholder to exercise and enforce its rights and remedies hereunder or thereunder. Without limiting the generality of the foregoing, each Grantor will, upon the Noteholder's request, appear in and defend any action or proceeding that may affect such Grantor's title to, or the Trust Note Liens on, any of the Mortgaged Collateral.

(e) Each Grantor shall not commit, and each Grantor shall never permit any other Entity in occupancy of or involved with the operation or use of the Mortgaged Collateral owned by such Grantor to commit any act or omission affording any Governmental Authority the right of forfeiture against such Mortgaged Collateral or any part thereof or any monies paid in performance of the Issuer's or such Grantor's obligations under any of the Credit Documents, and each Grantor covenants and agrees not to commit, permit, or suffer to exist any act or omission affording such right of forfeiture.

(f) Each Grantor shall keep the Mortgaged Collateral owned by such Grantor insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is consistent with such Grantor's past practice.

(g) Each Grantor shall promptly give the Noteholder notice of the actual or threatened commencement of any proceeding for the condemnation of any Mortgaged Collateral owned by such Grantor and shall deliver to the Noteholder copies of any and all papers served in connection with such proceedings.

(h) Each Grantor shall pay all Taxes imposed against the Mortgaged Collateral owned by such Grantor or any part thereof prior to same becoming delinquent. Each Grantor will deliver to the Noteholder receipts for payment or other evidence satisfactory to the Noteholder that all Taxes have been so paid within ten (10) calendar days of such payment.

(i) Each Grantor shall promptly pay for, or cause to be paid, all utility services provided to the Mortgaged Collateral owned by such Grantor.

(j) Each Grantor shall permit agents, representatives, and employees of the Noteholder to inspect the Mortgaged Collateral or any part thereof owned by such Grantor at reasonable hours upon reasonable advance notice; *provided, however,* that, unless an Event of Default has occurred and is continuing, (1) such inspections shall occur no more frequently than semiannually and (2) the Noteholder shall bear the out-of-pocket expenses incurred by its agents, representatives, or employees to carry out such inspections.

(k) Each Grantor will warrant and defend (1) the title to the Mortgaged Collateral owned by such Grantor and every part thereof, subject only to Liens permitted hereunder, if any, and (2) the validity and priority of the Trust Note Liens, subject only to Liens permitted hereunder, if any, in each case against the claims of all Entities whatsoever. Each Grantor shall reimburse the Noteholder for any losses, costs, damages, or expenses (including reasonable attorneys' fees and expenses) incurred by the Noteholder if an interest in the Mortgaged Collateral owned by such Grantor, other than as permitted hereunder, is claimed by another Entity.

(l) In the event (1) that any mortgage encumbering the Mortgaged Collateral is foreclosed in whole or in part or that any such mortgage is put into the hands of an attorney for collection, suit, action, or foreclosure, (2) of the foreclosure of any mortgage encumbering the Mortgaged Collateral prior to or subsequent to the Bay Shore Mortgage or the Fairfield Mortgage, as applicable, in which proceeding the Noteholder is made a party, or (3) of the commencement of an Insolvency Proceeding in respect of a Grantor or any of its constituent Entities, such Grantor, its successors, or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and expenses, incurred by the Noteholder or such Grantor in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

(m) Each Grantor shall obtain the Noteholder's prior written consent to any material alterations to any improvements on the Mortgaged Collateral owned by such Grantor. For purposes of this subsection (m), "material alterations" means alterations that may have a material adverse effect on the value of the applicable Mortgaged Collateral.

(n) Each Grantor shall not (1) engage in any dissolution, liquidation, or consolidation, or merger with or into any other Entity; (2) engage in any business activity not related to the ownership and operation of the Mortgaged Collateral; (3) subject to the provisions of the applicable mortgage with respect to transfer, lease, or sale of the applicable Mortgaged Collateral, transfer, lease, or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of such Grantor; or (4) modify, amend, waive, or terminate its organizational documents or its qualification and good standing in any jurisdiction, in each case, without obtaining the prior written consent of the Noteholder.

**Section 13. Events of Default**. Each of the following shall constitute an event of default ("**Event of Default**") under this Agreement and the Trust Note:

(a) *Payment*. Failure of the Issuer to pay in Cash any amounts, including principal and interest, when due and payable under the Trust Note, this Agreement, or any of the other Credit Documents, and the Issuer has not remedied and fully cured such failure to pay within five (5) Business Days after the date on which such payment is due.

(b) *Representations and Warranties*. Any representation or warranty made by the Issuer or any Grantor in this Agreement or any other Credit Document, is false or misleading in any material respect as of the date made.

(c) *Covenants Herein*. Failure of the Issuer or any Grantor to perform or comply with any covenant set forth in this Agreement, and the Issuer or breaching Grantor has not remedied and cured such failure within fourteen (14) calendar days of receipt of written notice of such failure; *provided, however*, that, if (1) such failure to perform or comply pertains to a covenant set forth in Section 10(d) or Section 10(m) hereof, and (2) such failure is curable but shall reasonably require longer than fourteen (14) calendar days to cure, an Event of Default shall occur if the Issuer or the breaching Grantor fails to (A) commence the cure of such failure within fourteen (14) calendar days after receipt of notice thereof or (B) continuously and diligently

prosecute the curing of the same to completion, but in no event shall the period to cure such failure exceed an additional ninety (90) calendar days.

(d) *Bay Shore Mortgage Covenants.* Failure of Spence LLC to perform or comply with (1) the covenants set forth in section 4.10(d)(i) of the Bay Shore Mortgage within the number of days specified in such section; or (2) any other covenant set forth in the Bay Shore Mortgage and Spence LLC has not remedied or cured such failure within fourteen (14) calendar days of receipt of written notice of such failure; *provided, however*, that, if (A) such failure to perform or comply pertains to a covenant set forth in section 4.06, 4.07(d), 4.08(e), 4.08(f), 4.10(c), or 4.10(d)(ii)-(vii) of the Bay Shore Mortgage, and (B) such failure is curable but shall reasonably require longer than fourteen (14) calendar days to cure, an Event of Default shall occur if Spence LLC fails to (i) commence the cure of such failure within fourteen (14) calendar days after receipt of notice thereof or (ii) continuously and diligently prosecute the curing of the same to completion, but in no event shall the period to cure such failure exceed an additional ninety (90) calendar days.

(e) *Fairfield Mortgage Covenants.* Failure of ISWR to perform or comply with (1) the covenants set forth in section 4.10(d)(i) of the Fairfield Mortgage within the number of days specified in such section; or (2) any other covenant set forth in the Fairfield Mortgage and ISWR has not remedied or cured such failure within fourteen (14) calendar days of receipt of written notice of such failure; *provided, however*, that, if (A) such failure to perform or comply pertains to a covenant set forth in section 4.06, 4.07(d), 4.08(e), 4.08(f), 4.10(c), or 4.10(d)(ii)-(vii) of the Fairfield Mortgage, and (B) such failure is curable but shall reasonably require longer than fourteen (14) calendar days to cure, an Event of Default shall occur if ISWR fails to (i) commence the cure of such failure within fourteen (14) calendar days after receipt of notice thereof or (ii) continuously and diligently prosecute the curing of the same to completion, but in no event shall the period to cure such failure exceed an additional ninety (90) calendar days.

(f) *Agreements Invalid.* (1) The invalidity or unenforceability of this Agreement or any of the other Credit Documents; (2) the commencement of an action or proceeding by the Issuer, by a Grantor, by any Related Party, or by a successor, heir, or assign of the Issuer, a Grantor, or any Related Party to establish the invalidity or unenforceability of this Agreement or any of the other Credit Documents; or (3) a repudiation by the Issuer, a Grantor, of any portion of its respective liability or obligations under any of the Credit Documents.

(g) *Bankruptcy or Insolvency of the Issuer*

(1) The Issuer becomes insolvent, or fails to pay, or is generally unable to pay, or admits in writing its inability to pay, its debts as they become due or payable;

(2) the Issuer applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, liquidator, or other custodian, for a substantial portion of its property, or makes a general assignment for the benefit of creditors;

(3) an Insolvency Proceeding is commenced by, against, or in respect of the Issuer; *provided, however*, that if the Issuer has not voluntarily commenced or initiated the Insolvency Proceeding, the pendency of such Insolvency Proceeding shall not constitute an

Event of Default hereunder unless (A) the Issuer consents to the commencement of the Insolvency Proceeding, (B) the petition or other document commencing such Insolvency Proceeding is not dismissed within thirty (30) calendar days after such petition or document is filed with a court, or (C) an order for relief is entered in such Insolvency Proceeding; or

(4) a trustee, receiver, liquidator, or other custodian is appointed for the Issuer, or for a substantial part of the Issuer's property.

(h) *Bankruptcy or Insolvency of a Grantor*

(1) a Grantor applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, liquidator, or other custodian, for a substantial portion of its property, or makes a general assignment for the benefit of creditors; or

(2) an Insolvency Proceeding is commenced by, against, or in respect of a Grantor; *provided, however*, that if such Grantor has not voluntarily commenced or initiated the Insolvency Proceeding, the pendency of such Insolvency Proceeding shall not constitute an Event of Default unless (A) such Grantor consents to the commencement of the Insolvency Proceeding, (B) the petition or other document commencing such Insolvency Proceeding is not dismissed within thirty (30) calendar days after such petition or document is filed with a court, or (C) an order for relief is entered in such Insolvency Proceeding.

(i) *Cross Default*. The occurrence of (1) a default (beyond any applicable notice and cure period) under, an event of default under, or a material breach of (A) any of the other Credit Documents, or (B) the Loan and Security Agreement or any secured or senior credit or loan agreement in replacement thereof; or (2) a default (the existence of which surpasses any applicable notice and cure period), an event of default, or acceleration with respect to any Indebtedness of the Issuer, having an outstanding or unpaid principal amount of $500,000, excluding, however, to the extent due to the Issuer's failure to make a Related-Party Payment in order to comply with Section 11(a) hereof.

**Section 14. Remedies**

(a) An Event of Default shall constitute a default or event of default under all of the other Credit Documents.

(b) Upon the occurrence of any Event of Default, all unpaid principal and accrued interest under the Trust Note shall become immediately due and payable, without presentment, demand, protest, or further notice.

(c) Upon the occurrence of an Event of Default, the Noteholder shall be authorized and entitled to pursue all rights and remedies available to it under the Credit Documents or under Applicable Law against the Issuer, each Grantor, or any other party to one or more Credit Documents, including the right to foreclose or enforce any Trust Note Lien against any of the Mortgaged Collateral.

(d) Upon the occurrence or continuance of an Event of Default, the Issuer shall (1) pay to the Noteholder all costs of collection when incurred, including reasonable attorneys' fees

and expenses and costs of sale of any collateral encumbered by the Trust Note Liens, which costs of collection may be added to the Obligations and shall be paid promptly **upon demand**, with interest from the date incurred until paid in full, at the Interest Rate; and (2) perform and comply with each of the terms, covenants, and provisions contained in this Agreement, the Trust Note, or any of the other Credit Documents that the Issuer is obligated to observe or perform.

(e) Without limiting the generality of the foregoing, the Noteholder shall have the right to enter, take possession of, and sell in a commercially reasonable manner the Mortgaged Collateral, or any part thereof, at a public sale or private sale for cash, upon credit, or for future delivery, at such price or prices as the Noteholder may deem best; and, except as otherwise provided under Applicable Law, the Noteholder may, by credit bid or other means, be the purchaser of any of the Mortgaged Collateral so sold and thereafter may hold the same absolutely free and clear from any right or claim of whatever kind. The Noteholder is authorized, at any such sale, if it deems commercially reasonable to do so, to restrict the number of prospective bidders or purchasers, or further restrict such prospective bidders or purchasers, to Entities that will agree that they are qualified purchasers within the meaning of Applicable Law, and may otherwise require that such sale be conducted subject to restrictions as to such other matters as the Noteholder may deem necessary in order that such sale may be effected in such manner as to comply with Applicable Law.

(f) The Issuer shall remain liable to the extent of any deficiency between (1) the amount of all proceeds realized upon the sale or other disposition of the Mortgaged Collateral in accordance with this Agreement and (2) the amount of the Obligations. Upon the sale of any of the Mortgaged Collateral hereunder by the Noteholder (whether pursuant to a judicial proceeding or otherwise), the receipt of the purchase money or other proceeds of sale by the Noteholder or other officer making the sale shall be a sufficient to discharge the purchaser or purchasers of the Mortgaged Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money or proceeds of sale paid over to the Noteholder or such officer, or be answerable in any way for the application or misapplication thereof.

**Section 15. Application of Payments.** The Noteholder shall apply any payments or proceeds received in accordance with this Agreement as follows:

(a) *first*, to such amounts, if any, as shall be required to reimburse the Noteholder for any fees, expenses, or other amounts owed to the Noteholder under the terms of the Credit Documents, including the Bay Shore Mortgage and the Fairfield Mortgage;

(b) *second*, after giving effect to subsection (a) of this Section, an amount equal to the aggregate amount of accrued and unpaid interest then due and payable under the Trust Note;

(c) *third*, after giving effect to subsections (a) and (b) of this Section, an amount equal to the unpaid portion of the Principal Amount due and payable under the Trust Note;

(d) *fourth*, after giving effect to subsections (a) through (c) of this Section, without duplication, to the payment of all other Obligations that are then due and payable to the Noteholder; and

(e) *fifth*, after giving effect to subsections (a) through (d) of this Section, the balance, if any, shall be paid (1) to the Grantor as to whose Mortgaged Collateral was sold or disposed of in accordance with this Agreement or other Credit Document, or (2) if all of the Mortgaged Collateral is so sold or disposed of, to the Grantors, with each Grantor to receive its pro rata amount of such balance based on the respective sale price of its respective Mortgaged Collateral.

**Section 16. Assignment or Transfer of the Trust Note.** The Trust Note shall be a negotiable instrument in accordance with Article 3 of the Uniform Commercial Code; *provided, however*, that the Asbestos Trust shall be subject to the requirements and procedures set forth in subsection (a) below.

(a) If the Asbestos Trust intends to offer the Trust Note for sale (which shall be deemed to include any assignment or transfer for consideration), the Asbestos Trust shall provide the Issuer with notice of the Asbestos Trust's intent to sell (each, a "**Intent to Sell Notice**") prior to offering the Trust Note for sale to any prospective purchaser or prior to negotiating any proposal received from any prospective purchaser. Any such Intent to Sell Notice shall set forth the principal terms and conditions by which the Asbestos Trust would offer the Trust Note for sale to third parties. The Issuer may, but shall not be required to, make an offer to purchase the Trust Note in response to the Intent to Sell Notice, and the Asbestos Trust may, but shall not be required to, accept such an offer from the Issuer. The Asbestos Trust shall not be permitted to solicit offers or engage in negotiations with third parties to purchase the Trust Note for a minimum of thirty (30) calendar days following the Issuer's receipt of the Intent to Sell Notice. If the Asbestos Trust thereafter receives from a third party an offer to purchase the Trust Note that is acceptable to the Asbestos Trust, or a third party accepts a proposed offer from the Asbestos Trust, the Asbestos Trust shall provide the Issuer with notice of such acceptable third-party offer and the principal terms and conditions thereof (each, a "**Third-Party Offer Notice**"). The Issuer may, upon notice to the Asbestos Trust ("**Match Notice**") provided within five (5) calendar days after the Issuer's receipt of the Third-Party Offer Notice, elect to match the offer to purchase described in the Third-Party Offer Notice. If the Issuer does not provide the Match Notice within the time period described above, the Asbestos Trust shall be free to sell the Trust Note to such third party on the terms disclosed in the Third-Party Offer Notice; *provided, however*, that if the Asbestos Trust does not close on or consummate such sale within thirty-five (35) calendar days of the Issuer's receipt of the Third-Party Offer Notice and if such failure to close or consummate is not due to any action or inaction by the Issuer, the Asbestos Trust shall not sell the Trust Note pursuant to such offer, unless the Asbestos Trust resubmits the Third-Party Offer Notice to the Issuer and the procedure described above is again complied with. If the Issuer provides the Match Notice to the Asbestos Trust, but then the sale of the Trust Note is not closed or consummated within thirty (30) calendar days after the Asbestos Trust's receipt of such Match Notice and such failure to close or consummate is not due to any action or inaction by the Asbestos Trust, then such Match Notice shall be deemed null and void, and the Asbestos Trust will be free to pursue and effectuate such sale of the Trust Note in its sole discretion and without further notice to, or restriction by, the Issuer.

(b) Notwithstanding anything in this Agreement to the contrary, (1) Section 16(a) shall not apply to any Noteholder that is not the Asbestos Trust; and (2) upon the occurrence and continuance of an Event of Default, Section 16(a) shall not apply to the Asbestos Trust, in which

event the Asbestos Trust shall be free to pursue and effectuate the sale of the Trust Note in its sole discretion and without any notice to, or restriction by, the Issuer.

(c) Upon the sale, assignment, or transfer of the Trust Note by the Noteholder to a transferee in accordance with the terms hereof, the existing Noteholder may sell, assign, or transfer all of the Trust Note Liens and all of the collateral mortgaged, conveyed, granted, pledged, or assigned pursuant to the Credit Documents, or any part thereof, to the transferee, who shall thereupon assume all obligations of the Noteholder hereunder and thereunder and become the "Noteholder" hereunder and be vested with all the rights herein and therein or under Applicable Law given to the Noteholder with respect thereto, and the transferring Noteholder shall thereafter forever be relieved and fully discharged from any liability or responsibility under the Credit Documents, other than liabilities or responsibilities arising or accruing prior to such transfer; but the transferring Noteholder shall retain all rights hereby given to it with respect to any liabilities, the Trust Note Liens, and the collateral not so transferred.

**Section 17. No Assignments or Delegation by Issuer or Grantors.** Notwithstanding anything to the contrary herein, the Issuer and each of the Grantors shall not assign any of their respective rights or delegate any of their respective duties or obligations under the Credit Documents to any Entity, and no assignment or delegation of any such right, duty, or obligation shall release or discharge the Issuer or any Grantor therefrom, without the prior written consent of the Noteholder. In addition, except as otherwise expressly provided in the Credit Documents, no assignment or transfer of property, rights, claims, privileges, duties, or obligations by or among the Issuer or any Grantor shall release or discharge the Issuer or Grantor from any of its duties or obligations under the Credit Documents.

**Section 18. Rules of Construction**

(a) Captions and headings in this Agreement are for convenience of reference only and in no way define, limit, describe, or otherwise affect the scope or intent of the provisions hereof.

(b) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, or neuter forms.

(c) The terms "**Issuer**," "**Grantor**," and "**Noteholder**" shall include their respective successors or assigns.

(d) The word "**will**" is to be construed as having the same meaning and effect as the word "**shall**," and vice-versa.

(e) All terms defined in this Agreement in the singular form shall have comparable meanings when used in the plural form, and vice-versa.

(f) All references herein to "**Section**" shall be deemed references to sections of this Agreement unless the context shall otherwise require.

(g) The words "**herein,**" "**hereof,**" and "**hereunder,**" and words of similar import when used in this Agreement shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof.

(h) The word "**or**" shall not be exclusive and shall thus be construed to mean "and/or."

(i) Unless otherwise indicated, the term "**including**" means "including without limitation" and "including but not limited to," except when used in the computation of time periods.

(j) Any definition or reference to any agreement, instrument, or other document, including the Loan and Security Agreement, the Bay Shore Lease, and the Fairfield Lease, shall be construed as referring to such agreement, instrument, or other document as from time to time amended, modified, supplemented, restated, substituted, or replaced (subject to any restrictions on such amendments, modifications, supplements, restatements, substitutions, or replacements set forth herein).

(k) For purposes of computing time periods, whenever this Agreement provides for an event to occur "**within**" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. In addition, the word "**from**" means "from and including"; "**after**" means "after and excluding"; and "**to**" and "**until**" mean "to and including."

(l) All sums of money referred to herein or in the Trust Note are denominated in United States of America dollars.

(m) Unless otherwise provided herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**Section 19. Notices and Deliveries.** All notices, requests, and other communications to any Party shall be in writing and shall be given to such Party at its address set forth below or at such other address as such Party may hereafter specify in writing for the purpose of receiving notices hereunder. Each such notice, request, or other communication shall be effective and deemed received by the Party to whom such communication is directed (a) if given by a nationally recognized overnight courier service sent for next Business Day delivery, on the first (1st) Business Day after such communication is deposited with such courier service; (b) if given by certified mail, return receipt requested, on the third (3rd) Business Day after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid; or (c) if given by any other means, when delivered, as documented by a signed proof of delivery at the address specified below.

**If to Issuer:**

81 Spence Street

Bay Shore, New York 11706
Attn: Patrick Rossetto

**If to Spence LLC:**

81 Spence Street
Bay Shore, New York 11706
Attn: Patrick Rossetto

**If to ISWR:**

81 Spence Street
Bay Shore, New York 11706
Attn: Patrick Rossetto

**If to Noteholder:**

**Section 20. Amendment and Waiver.** Except for the waivers expressly set forth herein, any amendment or waiver of, or consent with respect to, any provision of this Agreement or the Trust Note shall be effective only if the same shall be in writing and approved and executed by each of the Parties. Any such amendment, waiver, or consent shall be effective only in the specific instance and for the specified purpose for which it is given.

**Section 21. Parties Bound.** This Agreement shall inure to the benefit of the Noteholder and each of its respective nominees, successors, and assigns, and shall be binding on the Issuer and the Grantors and each of their respective nominees, successors, and assigns.

**Section 22. No Third-Party Beneficiaries.** Notwithstanding anything to the contrary herein, no provision of this Agreement or any other Credit Document is intended to benefit any party other than the Noteholder, the Issuer, and the Grantors, nor shall any such provision be enforceable by any other Entity.

**Section 23. Counterparts.** This Agreement may be executed in any number of counterparts and by different Parties on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (*e.g.*, "pdf" or "tif" file format) shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 24. Subordination.** Any claims or rights that might arise between or among the Issuer and each of the Grantors with respect to the Trust Note, the Obligations, or any of the Credit Documents, or any amounts paid or performance rendered thereunder, including claims for subrogation, reimbursement, contribution, indemnity, or interest, shall be fully subordinated to the rights of the Noteholder, and shall not be paid or become payable until all of the Obligations shall have been irrevocably and indefeasibly paid in Cash and in full.

**Section 25. Other Remedies.** Except as otherwise provided herein, any and all remedies, rights, and powers herein expressly conferred on the Noteholder shall be deemed cumulative with and not exclusive of any other remedy, right, or power conferred hereby or by law on such Noteholder, and the exercise of any one remedy, right, or power shall not preclude the exercise of any other.

**Section 26. Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but to the extent any provision of this Agreement is held to be invalid, void, voidable, prohibited, illegal, or unenforceable in any respect under any Applicable Law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction. The Parties further agree to use commercially reasonable efforts to replace such invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision of this Agreement with an effective, valid, and enforceable provision that will achieve, to the fullest extent possible, the economic, business, and other purposes of the invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision.

**Section 27. Governing Law.** Each of the Parties hereby agrees that this Agreement and the Trust Note shall be interpreted, construed, governed, and enforced according to the substantive laws of the State of New York without giving effect to its principles of choice of law or conflicts of law that would defer to the substantive law of another jurisdiction, provided that at all times the provisions for the creation, perfection, and the enforcement of the Trust Note Liens on the Mortgaged Collateral shall be governed by and construed in accordance with the laws of the state where the Mortgaged Collateral is located.

**Section 28. CONSENT TO JURISDICTION**

(a) ***EXCLUSIVE JURISDICTION.*** EXCEPT AS PROVIDED IN SECTION 28(b), EACH OF THE PARTIES AGREES THAT ALL DISPUTES BASED ON, ARISING OUT OF, OR ATTRIBUTABLE TO THIS AGREEMENT OR THE TRUST NOTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, MUST BE RESOLVED EXCLUSIVELY BY STATE OR FEDERAL COURTS LOCATED IN TRENTON, NEW JERSEY; HOWEVER, EACH OF THE PARTIES ACKNOWLEDGES THAT ANY APPEALS FROM THOSE COURTS MAY BE HEARD BY A COURT LOCATED OUTSIDE OF TRENTON, NEW JERSEY.

(b) ***OTHER JURISDICTIONS.*** EACH OF THE PARTIES AGREES THAT THE NOTEHOLDER SHALL HAVE THE RIGHT TO PROCEED IN A COURT IN ANY LOCATION TO ENABLE THE NOTEHOLDER TO (1) OBTAIN PERSONAL JURISDICTION OVER ANY PARTY HERETO OR ANY PROPERTY OF SUCH A PARTY, INCLUDING ANY OF THE MORTGAGED COLLATERAL OR (2) ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE NOTEHOLDER. EACH OF THE PARTIES WAIVES ANY OBJECTION TO THE LOCATION OF THE COURT IN WHICH THE NOTEHOLDER HAS COMMENCED A PROCEEDING DESCRIBED IN THIS SUBSECTION.

**Section 29.** **<u>WAIVER OF TRIAL BY JURY</u>. EACH OF THE PARTIES HEREBY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED ON, ARISING OUT OF, OR ATTRIBUTABLE TO THIS AGREEMENT, THE TRUST NOTE, OR ANY OF THE OTHER CREDIT DOCUMENTS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY EACH PARTY, AND EACH PARTY ACKNOWLEDGES THAT NEITHER OF THE OTHER PARTIES, OR ANY ENTITY ACTING ON SUCH PARTY'S BEHALF, HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. EACH PARTY FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED IN CONNECTION WITH THE EXECUTION AND DELIVERY OF THIS AGREEMENT, THE TRUST NOTE, AND THE OTHER CREDIT DOCUMENTS, AND THIS WAIVER WAS PREPARED OR REVIEWED BY LEGAL COUNSEL SELECTED BY EACH PARTY OF ITS OWN FREE WILL AND THAT EACH PARTY HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH SUCH COUNSEL. EACH PARTY FURTHER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER AND THAT ITS EXECUTION OF THIS AGREEMENT SHALL CONSTITUTE CONCLUSIVE EVIDENCE OF THE FOREGOING. NO PARTY SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.**

**Section 30.** **Waiver of Confidentiality**. The Issuer authorizes the Noteholder to discuss the Issuer's financial affairs and business operations with any accountants, auditors, business consultants, or other professional advisors employed or engaged by the Issuer, and the Issuer authorizes such parties to disclose to the Noteholder such financial and business information or reports (including management letters) concerning the Issuer as the Noteholder may request.

**Section 31.** **Noteholder's Right to Cure**. If the Issuer or any Grantor shall fail to make a timely payment with respect to, or on account of, any undisputed Indebtedness with an outstanding or unpaid principal amount in excess of $200,000, and the continued failure to make such payment may or will cause a default, an event of default, a material breach, or an acceleration with respect to such Indebtedness, the Noteholder, although not obliged to do so, may, at the Noteholder's option, make such payment on the Issuer's or such Grantor's behalf. All payments, costs, fees, and expenses of the Noteholder under this Section shall be reimbursed by the Issuer or Grantor, as applicable, **on demand**, with interest from the date incurred until paid in full, at the Interest Rate. Any payment made or action taken by the Noteholder under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Credit Documents.

**Section 32.** **Survival of Representations and Warranties**. The Issuer and the Grantors each agree that all representations and warranties made by the Issuer and each such Grantor in this Agreement and in the other Credit Documents to which it is a party shall survive

for so long as any amount of the Obligations remains owing to the Noteholder under the Trust Note and the other Credit Documents. All representations, warranties, covenants, and agreements made in this Agreement and in the other Credit Documents shall be deemed to have been relied upon by the Noteholder notwithstanding any investigation heretofore or hereafter made by the Noteholder on the Noteholder's behalf.

**Section 33. Intercreditor Agreement**. This Agreement, the Trust Note, and the other Credit Documents are subject to the Intercreditor Agreement, and to the extent there is conflict between a Credit Document and the Intercreditor Agreement, the latter shall govern and control.

[*Signatures Appear on Following Pages*]

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Agreement as of the date first written above.

**ISSUER:**

WITNESS:

DURO DYNE NATIONAL CORP.,
a New York corporation

By:____________________
Name:____________________
Title:____________________

By: ____________________
Name: ____________________
Title: ____________________

**GRANTOR:**

WITNESS:

DURO DYNE SPENCE LLC,
a New York limited liability company

By:____________________
Name:____________________
Title:____________________

By: ____________________
Name: ____________________
Title: ____________________

**GRANTOR:**

WITNESS:

ISWR OHIO LLC,
an Ohio limited liability company

By:____________________
Name:____________________
Title:____________________

By: ____________________
Name: ____________________
Title: ____________________

**NOTEHOLDER:**

WITNESS:

DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust

By:____________________
Name:____________________
Title:____________________

By: ____________________
Name: ____________________
Title: ____________________

**EXHIBIT 1**

**MORTGAGE AGREEMENT**[1]

**by**

**DURO DYNE SPENCE LLC**

**as mortgagor**

**(Mortgagor)**

**in favor of**

**DURO DYNE ASBESTOS PERSONAL INJURY TRUST**

**as mortgagee**

**(Mortgagee)**

**County: Suffolk**

**Block: [BLOCK]**

**Lot: [LOT]**

**Premises: 81 Spence Street, Bay Shore, New York**

**Dated: [DATE]**

---

**Record and Return to:**

Lowenstein Sandler LLP

One Lowenstein Drive

Roseland, New Jersey 07068

Attn: Jeffrey D. Prol, Esq.

[1] NTD: Revise to satisfy State-specific recording requirements.

## MORTGAGE AGREEMENT

This Mortgage Agreement (this "**Mortgage**"), made as of the [DATE] day of [MONTH], 2018, by DURO DYNE SPENCE LLC, a New York limited liability company, having an address at 81 Spence Street, Bay Shore 11706, New York ("**Mortgagor**") to DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust, established pursuant to the Plan of Reorganization (defined below), having an address at [ADDRESS] (together with its successors and assigns, "**Mortgagee**").

## RECITALS

A. Mortgagor is the fee owner of that certain real property located at 81 Spence Street, Bay Shore, New York, described on Schedule A attached hereto and made a part hereof;

B. This Mortgage is given to Mortgagee to secure a certain promise to pay in the original principal amount of Thirteen Million Five Hundred Thousand 00/100 DOLLARS ($13,500,000.00) (the "**Principal Obligation**"), which Principal Obligation is evidenced by that certain Asbestos Trust Promissory Note, dated as of [DATE], issued by Duro Dyne National Corp., an affiliate of Mortgagor, to Mortgagee, as the noteholder (as amended, amended and restated, supplemented, renewed or otherwise modified from time to time, the "**Trust Note**") and pursuant to that certain Plan of Reorganization (as defined below); and

C. Mortgagor desires to secure the payment of the outstanding principal amount set forth in, and evidenced by, the Trust Note, together with all interest accrued and unpaid thereon and all other sums due to Mortgagee in respect of the Principal Obligation under the Trust Note, that certain Note Issuance and Security Agreement dated as of even date herewith by and between Duro Dyne National Corp., an affiliate of Mortgagor, Mortgagor, ISWR Ohio LLC, an affiliate of Mortgagor, and the Duro Dyne Asbestos Personal Injury Trust (the "**Note Issuance Agreement**"), and this Mortgage, and to secure the performance and observance of all the provisions hereof, of the Trust Note, and of all other documents, agreements, and certificates that are either or both executed and delivered in connection with the Note Issuance Agreement (all such obligations being hereinafter collectively referred to as the "**Secured Indebtedness**").

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, Mortgagor hereby represents, warrants, covenants, and agrees for the benefit of Mortgagee as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Mortgage, the following terms shall have the following meaning. Capitalized terms used in this Mortgage without definition shall have the meaning ascribed to such terms in the Note Issuance Agreement.

"**Applicable Law**" means, at any time with reference to any Entity or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Authority, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Authority applicable to such Entity or its property or in respect of its operations or to any referenced circumstances or events.

"**Casualty**" has the meaning set forth in Section 4.04(e).

"**Environmental Law**" has the meaning set forth in Section 4.10(a).

"**Environmental Liens**" has the meaning set forth in Section 4.10(d).

"**Event of Default**" has the meaning set forth in the Note Issuance Agreement.

"**Fixtures and Equipment**" has the meaning set forth in Section 2.01(b).

"**Hazardous Substance**" has the meaning set forth in Section 4.10(a).

"**Improvements**" has the meaning set forth in Section 2.01(b).

"**Knowledge of Mortgagor**" means the knowledge of (i) any current member, manager, or officer of Mortgagor, and (ii) any current officer or director of Issuer, in each instance after reasonable inquiry.

"**Land**" has the meaning set forth in Section 2.01(a).

"**Leases**" has the meaning set forth in Section 2.01(d).

"**Mortgage**" has the meaning set forth in the introductory paragraph.

"**Mortgagee**" has the meaning set forth in the introductory paragraph.

"**Mortgagor**" has the meaning set forth in the introductory paragraph.

"**Mortgage Release**" has the meaning set forth in Section 6.01.

"**Net Proceeds**" means gross proceeds of the sale, transfer, or conveyance transaction less customary and usual closing costs.

"**Note Issuance Agreement**" has the meaning set forth in the Recitals.

"**Permitted Encumbrances**" means (i) the easements, covenants, restrictions, right-of-ways and other matters currently of record with respect to the Property, and Taxes that are not yet due and payable or that may thereafter be paid without penalty or that are being contested in good faith by appropriate proceedings, (ii) any municipal lien (other than with respect to Taxes), utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Land and Improvements if bonded off or released of record, (iii) any mechanics' or materialmen's liens that attach automatically under Applicable Law upon the commencement of any work upon, or delivery of any materials to, the Property and for which Mortgagor is not delinquent in the

payment for any such work or materials; (iv) zoning, building and other similar restrictions; and (v) encumbrances that do not, individually or in the aggregate, materially impair the continued use, value, or operation of the Property and that do not, in the aggregate, exceed $5,000 in amount.

"**Plan of Reorganization**" means the *Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code*, dated as of September 7, 2108, which was confirmed by order entered by the United States Bankruptcy Court for the District Court of New Jersey on __________, 2018.

"**Proceeds**" has the meaning set forth in Section 2.01(h)

"**Property**" has the meaning set forth in Section 2.01.

"**Release**" has the meaning set forth in Section 4.10(a)(iii).

"**Remediation**" has the meaning set forth in Section 4.10(a)(iv).

"**Rents**" has the meaning set forth in Section 2.01(e).

"**Restoration**" shall mean the repair and restoration of any Property after a Casualty as nearly as possible to the condition such Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Mortgagee.

"**Secured Indebtedness**" has the meaning set forth in the Recitals.

"**Tenant-Owned Improvments**" means improvements or fixtures located on the Property that are set forth on, or otherwised described on, attached Exhibit A.[2] **[NTD: Status?]**

"**Trust Note**" has the meaning set forth in the Recitals.

## ARTICLE II
## GRANTS OF SECURITY

**Section 2.01 Property Mortgaged.** In order to secure the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, whether at the stated maturity, by acceleration, or otherwise, Mortgagor does hereby MORTGAGE, PLEDGE, BARGAIN, ASSIGN, TRANSFER, WARRANT, CONVEY, AND GRANT, to Mortgagee the following property, rights, interests, and estates now owned, or hereafter acquired by Mortgagor (collectively, the "**Property**"):

(a) all that certain tract or parcel of land lying and being in Suffolk County, New York, and being more particularly described in Schedule A attached hereto and incorporated herein by this reference (the "**Land**");

[2] **NTD:** Subject to Charter Oak review with respect to effect on value of collateral package for Note.

(b) all buildings, structures, and other improvements of every kind and nature whatsoever now or hereafter situated on the Land, exclusive of any Tenant-Owned Improvements (collectively, the "**Improvements**"), and any appliances, storm doors and windows, lighting, plumbing, pipes, pumps, tanks, conduits, sprinkler and other fire prevention or suppression, refrigeration, incineration, escalator, elevator, loading, security, water, steam, gas, electrical, telephone, cable, internet, switchboards, storm and sanitary sewer, drainage, HVAC, boilers, waste removal, or other utility equipment or systems, exclusive of any Tenant-Owned Improvements (collectively, the "**Fixtures and Equipment**") now or hereafter affixed to or located at the Land or the Improvements and all replacements, substitutions, and additions to the foregoing;

(c) all easements, rights-of-way or use, strips and gores of land, streets, ways, alleys, passages, sewer rights, utility reservations and capacity rights, waters, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, minerals, royalties, privileges, liberties, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating, or pertaining to the Land or the Improvements, or any part thereof and the reversions, remainders, rents, issues, and profits thereof; and all land lying in the bed of any street, road, or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim, and demand whatsoever, both at law and in equity, of Mortgagor of, in, and to the Land and the Improvements, and every part and parcel thereof, with the appurtenances thereto;

(d) all leasehold estates, leases, subleases, sub-subleases, licenses, concessions, occupancy agreements, or other agreements (written or oral, now or at any time in effect and every modification, amendment, or other agreement relating thereto, including every guarantee of the performance and observance of the covenants, conditions, and agreements to be performed and observed by the other party thereto) which grant a possessory interest in, or the right to use or occupy, all or any part of the Land or Improvements, together with all related security and other deposits (in each case, as amended, amended and restated, supplemented, renewed, extended, substituted, or otherwise modified from time to time, collectively, "**Leases**"); for the avoidance of doubt, the term "Leases" shall include the Bay Shore Lease, as amended, amended and restated, modified, supplemented, or extended from time to time;

(e) all rents (whether denoted as advance rent, minimum rent, percentage rent, additional rent, or otherwise), receipts, issues, income, revenues, profits, deposits (whether denoted as security deposits or otherwise), lease termination fees or payments, rejection damages, buy-out fees, and any other fees made or to be made in lieu of rent, any award made hereafter to Mortgagor in any court proceeding involving any tenant, lessee, licensee, or concessionaire under any of the Leases, and all other payments, rights and benefits of whatever nature from time to time due under any of the Leases, including, without limitation, (i) rights to payment earned or arising under the Leases for space in the Improvements for the operation of ongoing businesses, and (ii) all other income, consideration, issues, accounts, profits, or benefits of any nature arising from the ownership, possession, use, or operation of the Property (collectively, the "**Rents**");

(f) all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications, and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management, or operation of the Land and any part thereof and any Improvements and all right, title, and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of any default or Event of Default hereunder, to receive and collect any sums payable to Mortgagor thereunder;

(g) all trade names, trademarks, logos, copyrights, goodwill, and books and records relating to or used in connection with the operation of the Property by Mortgagor or any part thereof; all general intangibles related to the operation of the Property by Mortgagor now existing or hereafter arising;

(h) all insurance or other settlement proceeds relating to or arising out of the foregoing, or any portion of the foregoing, and all causes of action, claims, compensation, awards, damages, proceeds, payments, relief, or recoveries, including interest thereon, as a result of any casualty or condemnation of all or any part of the Property or for any damage or injury to the Property (collectively, the "**Proceeds**"); and

(i) any and all other rights of Mortgagor in and to the items set forth in subsections (a) through (i) above.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee and its successors and assigns, forever; PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagee shall be well and truly paid the Secured Indebtedness at the time and in the manner provided in the Trust Note, Note Issuance Agreement, and this Mortgage, if Mortgagor shall perform the other obligations as set forth in this Mortgage and the other Credit Documents, and if Mortgagor shall abide by and comply with each and every covenant and condition set forth herein and therein, these presents and the estate hereby granted shall cease, terminate, and be void.

**Section 2.02 Absolute Assignment of Rents.** Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title, and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Mortgage, Mortgagee grants to Mortgagor a revocable license to (i) collect, receive, use, and enjoy the Rents, and (ii) enforce the terms of, and perform the obligations of the landlord under, the Leases.

## ARTICLE III
## SECURED INDEBTEDNESS

**Section 3.01 Secured Indebtedness.** This Mortgage and the grants, assignments, and transfers made in Article II are given for the purpose of securing the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, whether at the stated maturity, by acceleration, or otherwise.

**Section 3.02 Incorporation by Reference.** All the covenants, conditions, and agreements of Mortgagor contained in the Note Issuance Agreement, are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein. To the extent that any such covenants, conditions, and agreements of Mortgagor contained in the Note Issuance Agreement conflict with those in this Mortgage, then the covenants, conditions, and agreements of Mortgagor contained in this Mortgage shall control.

## ARTICLE IV
## MORTGAGOR'S REPRESENTATIONS, WARRANTIES, AND COVENANTS

**Section 4.01 No Transfers.** Mortgagor shall not sell, transfer, or otherwise convey the Land and Improvements except as set forth in Section 4.02 below. Nor shall Mortgagor create, incur, assume, or suffer to exist any Lien, other than Permitted Encumbrances, on any portion of the Property or permit any such action to be taken.

**Section 4.02 Permitted Transfer.** Notwithstanding anything to the contrary contained herein, Mortgagor shall be permitted to sell, transfer, and convey the Land and Improvements, *provided* that (a) the Net Proceeds of such transaction are applied to the payment of the Secured Indebtedness, (b) Mortgagor or an affiliate thereof provides substitute collateral to Mortgagee in reasonably equivalent value to the Property, and a mortgage agreement, in the form of this Mortgage (with property and State-specific modifications), is provided to Mortgagee with respect to any such substitute real property collateral, or (c) a combination of clauses (a) and (b) (*i.e.*, if only a portion of the Net Proceeds are applied against the Obligations, then the value of the substitute collateral that would otherwise be required by clause (b) shall be reduced by the amount of such application against the Secured Indebtedness). In the event of a sale, transfer, or conveyance of the Land and Improvements, it shall be at Mortgagor's option to proceed using either of clauses (a), (b), or (c).

**Section 4.03 Warranty of Title.**

(a) Mortgagor represents and warrants that it possesses fee simple title to the Land and owns the Improvements, Fixutres and Equipment, and the balance of the Property free and clear of all Liens other than Permitted Encumbrances. Mortgagor shall forever warrant, defend and preserve such title and priority of the Mortgage against claims of all Entities whatsoever.

(b) Mortgagor further represents and warrants that all of the Improvements and Fixtures and Equipment situated on the Land lie wholly within the boundaries and building restriction lines of the Land, and no improvements on adjoining properties encroach upon the Land, and no easements or other encumbrances upon the Land encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those that are insured against by any applicable title insurance policy.

**Section 4.04 Insurance.**

(a) Mortgagor represents and warrants that it has obtained or caused to be obtained and delivered to Mortgagee all insurance policies that provide insurance

coverage of any kind on the Property, including any blanket insurance which may cover the Property and other property not subject to this Mortgage, and all such insurance policies (i) reflect insurance coverage on the Property that is consistent with the coverages maintained by Mortgagor on the Property for the ten-year period preceding the date of this Mortgage, (ii) contain the standard New York mortgagee non-contribution clause endorsement or an equivalent endorsement satisfactory to Mortgagee naming Mortgagee as the person to which all payments made by the insurer thereunder shall be paid or name Mortgagee as an additional insured, and (iii) are otherwise in form and substance satisfactory in all respects to Mortgagee.

(b) Mortgagor further represents and warrants that no claims have been made or are currently pending, outstanding, or otherwise remain unsatisfied under any insurance policy obtained and delivered under subsection (a), and neither Mortgagor nor any other Entity has done, by act or omission, anything that would impair the coverage of any such insurance policy.

(c) Mortgagor shall pay or cause to be paid the premiums for all insurance policies described in subsection (a) as the same become due and payable, and Mortgagor shall at all times comply with and shall cause the Property and the use, occupancy, operation, maintenance, alteration, repair, and restoration thereof to comply with the terms, conditions, stipulations, and requirements of such insurance policies.

(d) If at any time Mortgagee is not in receipt of written evidence that all insurance required hereunder is in force and effect, Mortgagee shall have the right without notice to Mortgagor to take such action as Mortgagee deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Mortgagee, in its sole discretion, deems appropriate, and all expenses incurred by Mortgagee in connection with such action or in obtaining such insurance and keeping it in effect shall be secured by this Mortgage and paid by Mortgagor to Mortgagee **upon demand**.

(e) If the Property shall be damaged or destroyed, in whole or in part, by fire or other property hazard or casualty (any such event, a "**Casualty**"), Mortgagor shall give prompt notice thereof to Mortgagee. Proceeds of insurance paid to Mortgagee by any insurer in connection with any Casualty shall be applied as follows:

(i) If the Proceeds shall be less than $100,000.00 and the costs of completing the Restoration shall be less than $100,000.00, the Proceeds will be disbursed by Mortgagee to Mortgagor upon receipt, provided that all of the conditions set forth in Section 4.04(e)(ii)(A) below, excluding Section 4.04(e)(ii)(A)(7), are satisfied and Mortgagor delivers to Mortgagee a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(ii) If the Proceeds are equal to or greater than $100,000.00 or the costs of completing the Restoration is equal to or greater than $100,000.00,

Mortagee shall make the Proceeds available for the Restoration in accordance with the provisions of this Section 4.04(ii).

(A) The Proceeds shall be made available to Mortgagor as necessary to restore or replace the damaged or lost property in accordance with customary construction financing procedures and protections as reasonably determined by Mortgagee, provided that each of the following conditions are met:

(1) no Event of Default shall have occurred and be continuing;

(2) the Mortgagor has sufficient available economic resources to complete the Restoration;

(3) Mortgagor shall commence the Restoration as soon as reasonably practicable, but in no event later than ninety (90) days after such Casualty, and shall diligently pursue the same to completion reasonably satisfactory to Mortgagee;

(4) Mortgagee shall be reasonably satisfied that any operating deficits, including all scheduled payments of principal and interest under the Trust Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty will be covered out of (1) the Proceeds or (2) by other funds of Mortgagor or Duro Dyne National Corp.;

(5) Mortgagee shall be reasonably satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date and (2) such time as may be required under all Applicable Law in order to repair and restore the Property to the condition it was in immediately prior to such Casualty;

(6) the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Law;

(7) the Restoration shall be done and completed by Mortgagor (or Mortgagor's agent) in an expeditious and diligent fashion and in compliance with all Applicable Law; and

(8) such Casualty does not result in the loss of access to the Property or the Improvements. **[NTD: As discussed, Casualty has not resulted in destruction of all means of ingress and egress to property, e.g., earthquake]**

(B) Proceeds shall be held by Mortgagee in an interest-bearing account and, until disbursed in accordance with the provisions of this

Section 4.04(e), shall constitute additional security for the Secured Indebteness. The final disbursement of the Proceeds shall be disbursed by Mortgagee to, or as directed by, Mortgagor only upon completion of the Restoration, upon receipt of evidence satisfactory to Mortgagor, including without limitation an officer's certificate of the Mortgagor, that (1) all costs incurred in connection with the Restoration, including without limitation all materials installed and work and labor performed have been paid for in full, (2) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property (other than the liens imposed by this Mortgage and Permitted Encumbrances) that have not either been fully bonded to the satisfaction of Mortgagee and discharged of record, and (3) all required certificates of occupancy and approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities.

(C) All Proceeds not required to be made available for the Restoration pursuant to the terms hereof may be retained and applied by Mortgagee toward the payment of the Secured Indebtedness, whether or not then due and payable in such order, priority, and proportions as Mortgagee, in its sole discretion.

The provisions contained herein with respect to insurance shall apply notwithstanding any contrary provisions of subdivision 4 of Section 254 of the Real Property Law of New York.

(f) Mortgagor shall cooperate with Mortgagee in obtaining for Mortgagee the benefits of any insurance proceeds lawfully or equitably payable in connection with the Property or any part thereof, and Mortgagee shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by any Entity of the expense of an appraisal on behalf of Mortgagee in case of any casualty affecting the Property or any part thereof) out of such insurance proceeds.

**Section 4.05 Payment of Taxes.**

(a) Mortgagor represents and warrants that it is not in default of payment of any Taxes due and payable on the Property.

(b) Mortgagor shall pay or cause to be paid all Taxes on the Property prior to same becoming delinquent, and Mortgagor shall provide Mortgagee with written evidence satisfactory to Mortgagee that all Taxes have been timely paid within ten (10) calendar days of such payment.

(c) If the Mortgagor (i) determines that it will be unable to pay any Taxes on the Property, or (ii) receives notice that it is in default on the payment of any Taxes on

the Property, it must notify Mortgagee within three (3) Business Day of such determination or notice.

(d) If at any time Mortgagee receives a notice from Mortgagor under subsection (c) or is not in receipt of written evidence that all Taxes have been timely paid by Mortgagor, Mortgagee shall have the right without notice to Mortgagor to take such action as Mortgagee in its sole discretion deems necessary to protect its interest in the Property, including, without limitation, paying Taxes on the Property and any penalties or other costs necessary to cure any default in the payment of Taxes on the Property, and all expenses incurred by Mortgagee in connection with such action shall be secured by this Mortgage and paid by Mortgagor to Mortgagee **upon demand**.

**Section 4.06 Condemnation.** In the event of a taking of any of the Property by any public or quasi-public authority through eminent domain or otherwise, Mortgagee may participate in any proceedings related to such taking, and Mortgagor shall from time to time deliver to Mortgagee all instruments requested by Mortgagee to permit such participation. Mortgagor shall, at its expense, diligently prosecute any such proceedings, and shall consult with Mortgagee, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), Mortgagor shall not be relieved of any obligations under this Mortgage, and all parties to the Trust Note and the Note Issuance Agreement shall continue to perform their respective Obligations thereunder. The Secured Indebtedness shall not be reduced until any condemnation award shall have been actually received and applied by Mortgagee, after the deduction of expenses of collection, to the reduction or discharge of the Obligations. Mortgagee shall not be limited to the interest paid on the condemnation award by the condemning authority but shall be entitled to receive out of the condemnation award interest at the rate or rates provided in the Note Issuance Agreement or in the Trust Note. If the applicable Property is sold, through foreclosure or otherwise, prior to the receipt by Mortgagee of the condemnation award, Mortgagee shall have the right, whether or not a deficiency judgment on the Trust Note shall have been sought, recovered or denied, to receive the condemnation award, or a portion thereof, sufficient to pay the Secured Indebtedness. Further, Mortgagor shall cooperate with Mortgagee in obtaining for Mortgagee the benefits of any condemnation or similar award lawfully or equitably payable in connection with the Property or any part thereof, and Mortgagee shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by any Entity of the expense of an appraisal on behalf of Mortgagee in case of any condemnation affecting the Property or any part thereof) out of such award.

**Section 4.07 Assignment of Leases and Proceeds Therefrom.**

(a) As of the date of this Mortgage, Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of its right, title, and interest in and to all Leases, whether now in existence or which may hereafter come into existence during the term of this Mortgage, (but without an assumption by Mortgagee of liabilities of Mortgagor under any such Leases by virtue of this assignment), and Mortgagor hereby absolutely and unconditionally assigns to Mortgagee the proceeds now or hereafter

arising from the Leases to be applied by Mortgagee in payment of the Secured Indebtedness. Mortgagee may retain and apply such proceeds toward payment of the Secured Indebtedness in such order, priority, and proportions as Mortgagee, in its sole discretion, shall deem proper. Nevertheless, subject to the terms of this Mortgage and provided no Event of Default has occurred, Mortgagee grants to Mortgagor a revocable license to (i) collect, receive, use, and enjoy the Rents, and (ii) enforce the terms of, and perform the obligations of the landlord under, the Leases. The license granted to Mortgagor in this subsection (a) shall terminate immediately upon the occurrence of an Event of Default and Mortgagor agrees (i) to hold any Rents collected or received on or after the date of such Event of Default in trust for Mortgagee; and (ii) to remit any Rents collected or received by Mortgagor on or after date of such Event of Default within one (1) Business Day.

(b) Mortgagor shall not, without the prior written consent of Mortgagee, make, or suffer to be made, any Leases which are not in conformity with prevailing market rents and terms for similar space in the area where the leased Property is located (**"Prevailing Terms"**). Except as provided in subsection (c) below, Mortgagor will not modify or cancel or accept surrender of any Leases or assign the whole or any part of the rents thereon. Mortgagee shall have all of the rights against tenants of the Property as set forth in Section 291-f of the Real Property Law of New York.

(c) Anything contained in subsection (b) to the contrary notwithstanding, and provided that no Event of Default exists, Mortgagor shall have the right to terminate or modify any existing Lease provided that the replacement Lease shall provide for the payment of rents that are on Prevailing Terms, shall be with a tenant having a credit rating at least as good as that of the existing tenant (or such tenant provides other credit enhancement tools) and shall contain such other terms and conditions as are comparable for property of like character in the area in which the leased Property is situated. Mortgagor shall on request furnish to Mortgagee a report of its leasing activities with respect to the Property.

(d) Mortgagor shall (i) fulfill or perform, in all material respects, each and every provision of the Leases on the part of Mortgagor to be fulfilled or performed, (ii) promptly send copies of all notices of default which Mortgagor shall send or receive under the Leases to Mortgagee, and (iii) enforce, short of termination of the Leases, the performance or observance of the provisions thereof by the tenants thereunder. Nothing contained in this paragraph shall be construed as imposing on Mortgagee any of the obligations of the lessor under the Leases.

(e) Mortgagor represents and warrants that there are no prior assignments of any Leases or any proceeds thereof.

**Section 4.08 Use and Maintenance of the Property.**

(a) Mortgagor represents and warrants that the Land has rights of access to public ways and is served by water, storm sewer, sanitary sewer or septic services, and storm drain facilities adequate to service the Improvements and Fixtures and Equipment

for their intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting such property (which are connected so as to serve such property without passing over other property) or in recorded easements serving such property. All roads necessary for the use of the Land and Improvements for their current purposes have been completed and dedicated to public use and accepted by all Governmental Authorities.

(b) Mortgagor further represents and warrants that the Property is in good condition, order, and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Mortgagor has not received notice from any insurance company or bonding company of any defects or inadequacies in such Property, or any part thereof, that would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(c) Mortgagor further represents and warrants that there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(d) Mortgagor further represents and warrants that none of the Improvements is located in an area identified by the Federal Emergency Management Agency as having special flood hazards.

(e) Mortgagor shall cause the Property to be maintained in good working order and repair, normal wear and tear excepted, and the Improvements and the Fixtures and Equipment shall not be removed, demolished, or materially altered (except for normal replacement of the Fixtures and Equipment) without the prior written consent of Mortgagee. Mortgagor shall promptly comply, in all material respects, with all Applicable Laws affecting the Property, or any portion thereof or the use thereof. Mortgagor shall or shall cause the tenant to promptly repair, replace, or rebuild any part of the Property that may be damaged or destroyed by Casualty (including any fire or other property hazard or casualty for which insurance was not obtained or obtainable) or that may be affected by any taking by any public or quasi-public authority through eminent domain or otherwise, and shall complete and pay for, within a reasonable time, any structure at any time in the process of construction or repair on the Premises. So long as this Mortgage is in effect, if such Casualty shall be covered by insurance, Mortgagor shall remain obligated to repair, replace or rebuild such portion of the Property notwithstanding that the Proceeds from insurance policies may be insufficient to effect such repair, replacement, or rebuilding or that Mortgagee shall exercise its rights under Section 4.04 hereof to retain and apply all or any portion of such proceeds to the Secured Indebtedness.

(f) Except for Permitted Encumbrances, Mortgagor shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever that may be or

become a Lien or charge against the Property or any part thereof and shall promptly pay for all utility services provided to the Property.

**Section 4.09 Property in Compliance with Applicable Law.**

(a) Mortgagor represents and warrants that (i) the Property and the use of the Property comply in all material respects with all Applicable Laws and legal requirements, including building and zoning ordinances and codes, (ii) Mortgagor is not in default or violation of any order, writ, injunction, decree, or demand of any Governmental Authority, (iii) there has not been committed by Mortgagor or any other Entity in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof, and (iv) all Improvements and Fixtures and Equipment are in material compliance with Applicable Law.

(b) Mortgagor further represents and warrants that all certifications, permits, licenses, and approvals, including certificates of completion and occupancy permits, required for the legal use, occupancy, and operation of the Property have been obtained and are in full force and effect, and the use being made of the Property is in conformity with the certificate of occupancy issued for such property.

(c) Mortgagor further represents and warrants that no portion of the Property was purchased with proceeds of any illegal activity.

(d) Mortgagor shall not, without obtaining the prior consent of Mortgagee, initiate, join in, or consent to any private restrictive covenant, zoning ordinance, or other public or private restrictions, limiting or adversely affecting the uses that may be made of the Property or any part thereof.

(e) Mortgagor shall not commit, and shall never permit any other Entity in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof.

**Section 4.10 Environmental Provisions.**

(a) For the purposes of this Section 4.10 the following terms shall have the following meanings:

(i) the term "**Environmental Law**" shall mean any present and future Applicable Law (A) relating to protection of human health or the environment; (B) relating to Hazardous Substances (as defined below); (C) relating to liability for or costs of Remediation (as defined below) or prevention of Releases (as defined below) of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment; (D) conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; (E) requiring notification or disclosure of Releases of Hazardous Substances or other

environmental condition of the Property to any Governmental Authority or other Entity, whether or not in connection with transfer of title to or interest in the Property; (F) imposing conditions or requirements in connection with permits or other authorization for lawful activity related to the environmental condition of Property; (G) relating to nuisance, trespass, or other causes of action related to the environmental condition of the Property; or (H) relating to wrongful death, personal injury, or property or other damage in connection with any environmental condition of the Property, including, without limitation, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations, and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.

(ii) the term "**Hazardous Substances**" shall mean any and all substances (whether solid, liquid, or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables, explosives, mold, mycotoxins, microbial matter and airborne pathogens (naturally occurring or otherwise), but excluding substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purpose of cleaning or other maintenance or operations, and otherwise in compliance with all Environmental Laws.

(iii) The term "**Release**" shall mean, with regard to Hazardous Substances, any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing, or other movement of Hazardous Substances.

(iv) The term "**Remediation**" shall mean any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain, or otherwise remediate any Hazardous Substance, any actions to prevent, cure or mitigate any Release of any Hazardous Substance, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

(b) Mortgagor represents and warrants that to the Knowledge of Mortgagor:

(i) There are no Hazardous Substances or underground storage tanks in, on, or under any of the Property, except those that are (A) in compliance with Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required under Environmental Law), (B) de-minimis amounts necessary to operate such property that will not result in an environmental condition in, on, or under such property and that are otherwise permitted under and used in compliance with Environmental Law, or (C) fully disclosed to Mortgagee in Schedule B hereto;

(ii) there are no past, present, or threatened Releases of Hazardous Substances in, on, under, or from any of the Property that has not been fully remediated in accordance with Environmental Law;

(iii) there is no threat of any Release of Hazardous Substances migrating to any of the Property;

(iv) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with any of the Property that has not been fully remediated in accordance with Environmental Law;

(v) Mortgagor does not know of, and has not received, any written or oral notice or other communication from any Entity (including a Governmental Authority) relating to Hazardous Substances or Remediation thereof, possible liability of any Entity pursuant to any Environmental Law, other environmental conditions in connection with any of the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and

(vi) Mortgagor has truthfully and fully disclosed to Mortgagee in Schedule B hereto any and all information relating to environmental conditions in, on, under, or from the Property that is known to Mortgagor, and has provided to Mortgagee all information that is contained in Mortgagor's files and records, including any reports relating to Hazardous Substances in, on, under, or from the Property and to the environmental condition of the Property. **[NTD: Intent is receipt of any existing Phase I or similar reports and any other items currently known to Mortgagor w/r/t the property]**

(c) Mortgagor shall comply, and shall cause all tenants or other occupants of the Property to comply, in all material respects with all Environmental Law and permits issued pursuant thereto.

(d) Mortgagor covenants and agrees that:

(i) there shall be no Releases of Hazardous Substances in, on, under, or from the Property or any part thereof requiring notification or disclosure under

any Environmental Law with respect to which Mortgagor has not (A) commenced compliance with Mortgagor's obligations under clauses (iv) and (v), as applicable, within fifteen (15) calendar days after Mortgagee's written request or (B) satisfied Mortgagor's obligations under clauses (iv) and (v), as applicable, within 365 days (or such longer period to which Mortgagee may consent in Mortgagee's reasonable discretion) after Mortgagee's written request;

(ii) there shall be no Hazardous Substances in, on, or under the Property or any part thereof, except those that are (A) in compliance with all Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required by Environmental Law), (B) de-minimis amounts necessary to operate the Property or any part thereof for the purposes for which it was used as of the date this Mortgage is executed that will not result in an environmental condition in, on, or under the Property or any part thereof and that are otherwise permitted under and used in compliance with Environmental Law, or (C) to the extent permits are required under Environmental Laws, fully disclosed to Mortgagee in writing;

(iii) Mortgagee shall keep the Property free and clear of all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Mortgagor or any other Entity ("**Environmental Liens**");

(iv) if Mortgagee has reason to believe that an environmental hazard exists on the Property or any part thereof, Mortgagor shall, at its sole cost and expense and pursuant to any reasonable written request of Mortgagee, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property or any part thereof (including sampling, testing and analysis of soil, water, air, building materials, and other materials and substances, whether solid, liquid, or gas), and share with Mortgagee the reports and other results thereof, and Mortgagee shall be entitled to rely on such reports and other results thereof;

(v) if Mortgagee has reason to believe that an environmental hazard exists on the Property or any part thereof, Mortgagor shall, at its sole cost and expense, comply with all reasonable written requests of Mortgagee to (A) reasonably effectuate Remediation of any condition (including a Release of a Hazardous Substance) in, on, under, or from such Property or any part thereof; (B) comply with any Environmental Law; (C) comply with any directive from any Governmental Authority; and (D) take any other reasonable action necessary or appropriate for protection of human health or the environment;

(vi) Mortgagor shall not do or allow any Entity or other user of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any person or Entity (whether on or off the Property), impairs or may impair the value of the Property or any part thereof, is contrary to any requirement of any insurer, constitutes a public or

private nuisance, constitutes waste, or violates any covenant, condition, agreement, or easement applicable to the Property or any part thereof; and

(vii) Mortgagor shall immediately notify Mortgagee in writing of (A) any presence or Releases or threatened Releases of Hazardous Substances in, on, under, from, or migrating towards the Property or any part thereof in violation of Environmental Laws; (B) any non-compliance with any Environmental Laws related in any way to the Property or any part thereof; (C) any Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property or any part thereof; and (E) any written or oral notice or other communication of which Mortgagor becomes aware from any source whatsoever (including a Governmental Authority) relating in any way to the Release or potential Release of Hazardous Substances or Remediation thereof, likely to result in liability of any Entity pursuant to any Environmental Law, other environmental conditions in connection with the Property or any part thereof, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.

(e) If Mortgagor fails to timely take, or to diligently and expeditiously proceed to complete in a timely fashion, any such action described in subsections (d)(iv) or (d)(v), Mortgagee shall have the right, in its sole and absolute discretion, to make advances or payments toward the performance or satisfaction of the same, but shall in no event be under any obligation to do so. All sums so advanced or paid by Mortgagee (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, and fines or other penalty payments) and all sums advanced or paid in connection with any judicial or administrative investigation or proceeding relating thereto, will immediately, upon demand, become due and payable from Mortgagor and shall bear interest at the Interest Rate from the date any such sums are so advanced or paid by Mortgagee until the date any such sums are repaid by Mortgagor to Mortgagee.

(f) If this Mortgage is foreclosed, or if the Property is sold pursuant to provisions of this Mortgage, of if Mortgagor tenders a deed or assignment in lieu of foreclosure or sale, Mortgagor shall deliver the Property to the purchaser at foreclosure or sale or to Mortgagee, its nominee, or a wholly owned subsidiary, as the case may be, in the same environmental condition as existed on the date of this Mortgage.

(g) Mortgagor will defend, indemnify, and hold harmless Mortgagee from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs, or expenses of whatever kind or nature, known or unknown, foreseen or unforeseen, contingent or otherwise (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and litigation expenses) arising out of, or in any way related to, (i) any breach by Mortgagor of any of the provisions of this Section 4.10, (ii) the Release or threatened Release of any Hazardous Substance which is at, in, on, under, about, from or affecting the Property, including, without limitation, any damage or injury resulting from any such Hazardous Substance to or affecting the Property or the soil, water, air, vegetation,

buildings, personal property, persons or animals located on the Property or on any other property or otherwise, (iii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any such Hazardous Substance, (iv) any lawsuit, proceeding or investigations brought or threatened, settlement reached, or order or directive of or by any Governmental Authority relating to such Hazardous Substance, or (v) any violation of any Environmental Law or any policy or requirement of Mortgagee under this Section 4.10.

(h) The obligations and liabilities of Mortgagor under this Section 4.10 shall survive and continue in full force and effect and shall not be terminated, discharged, or released, in whole or in part, irrespective of whether the Secured Indebtedness has been paid in full and irrespective of any foreclosure of this Mortgage, sale of the Property pursuant to the provisions of this Mortgage or acceptance by Mortgagee of a deed or assignment in lieu of foreclosure or sale and irrespective of any other fact or circumstance of any nature whatsoever.

**Section 4.11 Truth of Statements Made Herein.** The Mortgagor represents and warrants that this Mortgage neither contains any untrue statements of material fact nor omits any material fact necessary in order to make the statement made, in light of the circumstances under which it is made, accurate.

**Section 4.12 Survival of Representations and Warranties.** All representations and warranties contained in this Mortgage shall survive the execution and delivery of this Mortgage.

## ARTICLE V
## REMEDIES

**Section 5.01 Remedies Following Event of Default.** If an Event of Default exists, in addition to any other rights, remedies, and powers that Mortgagee may have under the Trust Note or the Note Issuance Agreement, or as provided by law, Mortgagee may immediately take such action, without notice or demand, as it deems advisable to protect and enforce the Lien and security interest hereof and its rights hereunder, including, without limitation, the following actions, concurrently or otherwise, at such time and in such manner as Mortgagee may determine in its sole discretion, without impairing or otherwise affecting the other rights, remedies, and powers of Mortgagee:

(a) **Entry and Possession.** The license granted to Mortgagor under Section 2.02 hereof shall automatically be revoked, and Mortgagee may enter into or upon the Property, either personally or by its agents, nominees, or attorneys, and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages, or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records, and accounts relating thereto, and Mortgagor agrees to surrender possession of the Property and of such books, records, and accounts to Mortgagee upon demand, and thereupon Mortgagee may (i) use, operate, manage, control, insure, maintain, repair, restore, improve, alter, and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) exercise all rights and powers of Mortgagor with respect to the Property, whether in the name of Mortgagor or

otherwise, including, without limitation, the right to make, cancel, enforce, or modify Leases, obtain and evict tenants, and demand, sue for, collect, and receive all Rents of the Property and every part thereof; (iii) apply the receipts and income (including Rents) from the Property to the payment of the Secured Indebtedness, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations; and (iv) require Mortgagor to transfer and assign to Mortgagee, in form satisfactory to Mortgagee, Mortgagor's interest as lessor in any Lease now or hereafter affecting the whole or any part of the Property.

(b) **Payment of Sums.** Pay any sums in any form or manner deemed expedient by Mortgagee to protect the Lien and security interest of this Mortgage or to cure any Event of Default other than payment of principal of or interest on the Secured Indebtedness; make any payment hereby authorized to be made according to any bill, statement, or estimate furnished or procured from the appropriate public officer or the party claiming payment without inquiry into the accuracy or validity thereof, and the receipt of any such public officer or party in the hands of Mortgagee shall be conclusive evidence of the validity and amount of items so paid, in which event the amounts so paid, shall be added to and become a part of the Secured Indebtedness and be immediately due and payable to Mortgagee; and Mortgagee shall be subrogated to any encumbrance, Lien, claim, or demand, and to all the rights and securities for the payment thereof, paid or discharged with the principal sum secured hereby or by Mortgagee under the provisions hereof, and any such subrogation rights shall be additional and cumulative security to this instrument.

(c) **Acceleration.** Declare the entire Secured Indebtedness immediately due, payable, and collectible, regardless of maturity, and, in that event, the entire Secured Indebtedness shall become immediately due, payable, and collectible; and thereupon Mortgagee may institute proceedings to foreclose this Mortgage by judicial action, or to enforce its provisions or any of the indebtedness or obligations secured by this Mortgage.

(d) **Foreclosure Sale.** Institute a foreclosure action in accordance with Applicable Law in effect on the date foreclosure is commenced, or take any other action as may be allowed, at law or in equity, for the enforcement of the Secured Indebtedness and realization on the Property (or such part or parts thereof as Mortgagee may from time to time elect to foreclose upon). If Mortgagee is the purchaser at the foreclosure sale of the Property, in lieu of paying cash Mortgagee may make settlement for all or a portion of the purchase price by crediting the sale proceeds against the Secured Indebtedness.

(e) **Other Rights.** Exercise any and all rights, remedies, and powers accruing to a secured party under this Mortgage, any other Applicable Law, or available in equity.

**Section 5.02 No Obligation to Marshal Assets.** In exercising its rights and remedies hereunder, Mortgagee shall have no obligation whatsoever to marshal assets, or to realize upon all of the Property. Mortgagee shall have the right to realize upon all or any part of the Property from time to time as Mortgagee deems appropriate. Mortgagor hereby waives any right to have

any of the Property marshaled in connection with any sale or other exercise of Mortgagee's rights, remedies, and powers hereunder.

**Section 5.03 Remedies Cumulative.** The rights, powers, and remedies of Mortgagee granted and arising under this Mortgage are separate, distinct, and cumulative of all other rights, powers, and remedies that Mortgagee may have at law or in equity, none of which are to the exclusion of the others and all of which are cumulative to the rights, powers, and remedies provided at law for the collection of indebtedness, enforcement of rights under mortgages, and preservation of security. No act of Mortgagee shall be construed as an election to proceed under any one provision herein or under the Trust Note or Note Issuance Agreement to the exclusion of any other provision, or an election of remedies to the bar of any other remedy allowed at law or in equity, anything herein or otherwise to the contrary notwithstanding.

**Section 5.04 No Waiver.** No failure or delay of Mortgagee of any kind in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. No waiver by Mortgagee of any Event of Default or breach of this Mortgage shall operate as a waiver of any other Event of Default or breach of this Mortgage or of the same Event of Default or breach of this Mortgage on a future occasion, and no action by Mortgagee hereunder shall in any way affect or impair Mortgagee's rights and remedies or the obligations of Mortgagor under this Mortgage.

## ARTICLE VI
## RELEASE OF MORTGAGE

**Section 6.01 Release on Satisfaction of Secured Indebtedness.** If at any time during the period of this Mortgage the Secured Indebtedness has been paid and performed in full, no indebtedness remains outstanding under the Trust Note, then Mortgagee will, upon written request of Mortgagor and at Mortgagor's sole cost and expense, execute and deliver to Mortgagor a release, reconveyance, satisfaction, or cancellation (a "**Mortgage Release**") of this Mortgage and such other documentation as may be reasonably necessary to effectuate the release and termination of Mortgagee's Liens and security interests on the Property.

**Section 6.02 Release on Sale or Transfer of Property.** If the Property or any portion thereof is sold or otherwise transferred in accordance with the provisions of Section 4.02 above, then Mortgagee will, upon written request of Mortgagor and at Mortgagor's sole cost and expense, execute and deliver to Mortgagor a Mortgage Release of this Mortgage with respect to such portion of the Property as is so sold or transferred and such other documentation as may be reasonably necessary to effectuate the release and termination of Mortgagee's liens and security interests on such portion of the Property.

## ARTICLE VII
## NOTICES

**Section 7.01 Notices.** Unless specifically stated otherwise in this Mortgage, all notices, requests, and other communications to Mortgagor or Mortgagee shall be in writing and shall be

given to such party at its address set forth below or at such other address as such party may hereafter specify in writing for the purpose of receiving notices hereunder. Each such notice, request, or other communication shall be effective and deemed received by Mortgagor or Mortgagee, as applicable, (a) if given by a nationally recognized overnight courier service sent for next Business Day delivery, on the first (1st) Business Day after such communication is deposited with such courier service; or (b) if given by certified mail, return receipt requested, on the third (3rd) Business Day after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid.

To Mortgagor: 81 Spence Street
Bay Shore, New York 11706
Attn: Patrick Rossetto

To Mortgagee: [ADDRESS]

**Section 7.02** All notices and demands delivered by 'an attorney for Mortgagor or Mortgagee on such party's behalf shall be deemed to have been delivered by such party. Notices shall be valid only if served in the manner provided in this Article VII.

## ARTICLE VIII
## INSURANCE; CASUALTY AND CONDEMNATION

**Section 8.01 Insurance.** Mortgagor shall provide or cause to be provided the following: (a) fire and extended coverage insurance including vandalism and malicious mischief, broadened to the so-called "All Risk of Physical Loss" coverage basis of not less than one hundred (100%) percent of the full replacement value of the insured property (both real and personal, including fixtures and equipment) at the time of issuance of such policy or policies and at each renewal date thereof, exclusive of land, excavations, foundations, and other items normally excluded from such policies; (b) public liability insurance in an amount not less than One Million and 00/100 Dollars ($1,000,000.00) and umbrella liability insurance of not less than Five Million Dollars ($5,000,000.00) and workers' compensation insurance (if applicable); and (c) in the event any part of the Property is now or is hereafter determined by the Secretary of Housing and Urban Development ("**HUD**") or the Director of the Federal Emergency Management Agency ("**FEMA**") to be in a "Special Flood Hazard Area," Mortgagor covenants to provide flood insurance providing coverage at least equivalent to that provided under the National Flood Insurance Program ("**NFIP**"), in the Special Flood Hazard Area, the aggregate amount of flood insurance must equal, at a minimum, (i) the amount of flood insurance available under NFIP, (ii) the insurable value of all buildings, or (iii) such other amount as may reasonably be required by Mortgagee; or, if only part of the Property is in a Special Flood Hazard Area, the insurable buildings exposed to flood hazards must be covered by flood insurance in an aggregate amount equal at a minimum (x) the amount of flood insurance available under NFIP, (y) the insurable value of the exposed building, or (z) such other amount as may reasonably be required by Mortgagee. All insurance policies shall be in the form and substance, for amounts and in companies reasonably acceptable to Mortgagee, with annual premiums prepaid by Mortgagor,

shall contain non-contributory standard mortgagee and Mortgagee's loss payable clauses (as Mortgagee may require) effective as of the closing date, providing for any loss payable thereunder to be paid to Mortgagee, shall provide that the policy may not be canceled without thirty (30) calendar days' prior written notice to Mortgagee and shall be deposited with Mortgagee at any time while any part of the Secured Indebtedness remains outstanding.

**Section 8.02 Notice to Mortgagee.** Mortgagor shall give Mortgagee prompt written notice (which shall in no event be greater than seven (7) calendar days after such occurrence) of the occurrence of any Casualty affecting, or the institution of any proceedings for eminent domain or condemnation of, the Property or any portion thereof. Mortgagee may participate in any suits or proceedings relating to any such occurrence of Casualty or institution of proceedings for eminent domain or condemnation, or any proceeds, causes of action, claims, compensation, awards, or recoveries related thereto, and Mortgagee is hereby authorized, in its own name or in Mortgagor's name, to adjust any loss covered by insurance or any condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and Mortgagor shall from time to time upon request deliver to Mortgagee any instruments required to permit such participation; *provided, however*, that, so long as no Event of Default shall be continuing, Mortgagee shall not have the right to participate in the adjustment of any loss.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01 Amendments, Extensions, and Modifications.** No amendment, supplement, waiver, or other modification of this Mortgage shall be effective unless it is in writing and executed by Mortgagor and Mortgagee.

**Section 9.02 Entire Agreement.** The Credit Documents and the Plan of Reorganization contain or incorporate by reference the entire agreement of the parties with respect to matter contemplated herein and supersede all prior negotiations. The Credit Documents and the Plan of Reorganization grant further rights to Mortgagee and contain further agreements and affirmative and negative covenants by Mortgagor that apply to this Mortgage and to the Property and such further rights and agreements are incorporated herein by this reference.

**Section 9.03 Successors and Assigns.** This Mortgage may be assigned or transferred, in whole or in part, by Mortgagee subject, in all events, to the terms and conditions of Section 16 of the Note Issuance Agreement. Mortgagor may not assign or transfer this Mortgage or any of its rights hereunder without the prior written consent of Mortgagee or as otherwise permitted by this Mortgage. This Mortgage shall inure to the benefit of and be binding upon the parties hereto and their permitted assigns. The terms "Mortgagor" and "Mortgagee" shall include the legal representatives, heirs, executors, administrators, successors, and assigns of the parties hereto, and all those holding under either of them. The term "Mortgagee" shall include any payee of the Secured Indebtedness and any transferee or assignee thereof, whether by operation of law or otherwise.

**Section 9.04 No Merger.** In the event that Mortgagee's interest under this Mortgage and title to the Property or any estate therein shall become vested in the same person or entity, this Mortgage shall not merge in such title but shall continue as a valid lien on the Property for

the amount secured hereby, unless expressly provided otherwise in writing executed by the person in whom such interests, title, and estate are vested.

**Section 9.05 Headings.** The headings of the various articles, sections, and subsections in this Mortgage are for reference only and shall not define, expand, or limit any of the terms or provisions hereof.

**Section 9.06 Severability.** Whenever possible, each provision of this mortgage shall be interpreted in such manner as to be effective and valid under Applicable Law, but to the extent any provision of this Agreement is held to be invalid, void, voidable, prohibited, illegal, or unenforceable in any respect under any Applicable Law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Mortgage in any jurisdiction. Mortgagor shall use commercially reasonable efforts to replace such invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision of this Mortgage with an effective, valid, and enforceable provision that will achieve, to the fullest extent possible, the economic, business, and other purposes of the invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision; *provided, however*, that no provision of this Mortgage shall be replaced without the consent of Mortgagee.

**Section 9.07 Governing Law.** This Mortgage and any claim, controversy, dispute, or cause of action (whether in contract, equity, tort, or otherwise) based upon, arising out of, or relating to this Mortgage and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

**Section 9.08 Waiver of Jury Trial.**

(a) MORTGAGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS MORTGAGE, THE SECURED INDEBTEDNESS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, EQUITY, TORT, OR ANY OTHER THEORY. **MORTGAGOR AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY BENCH TRIAL WITHOUT A JURY AND THAT ANY PARTY THERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH PARTY TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY.**

(b) **MORTGAGOR RESPRESENTS AND WARRANTS TO HAVING DISCUSSED, OR HAVING HAD AN OPPORTUNITY TO DISCUSS, THIS AGREEMENT AND SPECIFICALLY THE PROVISIONS OF THIS SECTION 9.08 WITH COUNSEL OF ITS OWN CHOOSING.**

**Section 9.09 Service of Process and Jurisdiction.**

(a) Unless otherwise required by non-waivable provisions of Applicable Law, Mortgagor consents to service of process by overnight mail or overnight delivery by a nationally recognized overnight courier, at the addtess to which notic is to be given under Section 7.01 hereof, it being agreed that service in such manner shall constitute valid service upon Mortgagor in connection with any action or proceeding arising out of, connected with, related to, or incidental to this Mortgage; provided, however, that nothing in this Section 9.08 shall affect the right of any Entity to serve legal process in any other manner permitted by Applicable Law of the jurisdiction in which such action or proceeding is brought.

(b) Except as provided in subsection (c) below, Mortgagor irrevocably agrees that all disputes arising out of, connected with, related to, or incidental to this Mortgage, whether arising in contract, tort, or otherwise, must be resolved exclusively by state or federal courts located in Trenton, New Jersey, and Mortgagor irrevocably waives any objection to the location of the court considering the dispute or any claim that Mortgagor is not personally subject to the jurisdiction of such court; however, any appeals from those courts may be heard by a court outside of Trenton, New Jersey.

(c) Mortgagee shall have the right to proceed in a court in any location to enable Mortgagee (1) to obtain personal jurisdiction over any Entity or any property of any Entity, including any of the Property, (2) to institute a foreclosure action in accordance with Section 5.01(d), (3) to enforce any part of the Lien and security interest granted under this Mortgage, including, without limitation, the collection or recovery of Rents, or (4) to enforce a judgment or other court order in favor of Mortgagee. Mortgagor waives any objection to the location of the court in which Mortgagee has commenced a proceeding described in this subsection.

**Section 9.10 Sole Discretion of Mortgagee.** Except as may otherwise be expressly provided to the contrary, wherever, pursuant to this Mortgage or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the Secured Indebtedness, Mortgagee exercises any right given to it to consent or not consent, or to approve or disapprove, or any arrangement or term is to be satisfactory to Mortgagee, the decision of Mortgagee to consent or not consent, or to approve or disapprove, or to decide that arrangements or terms are satisfactory or not satisfactory, shall be in the sole and absolute discretion of Mortgagee and shall be final and conclusive.

**Section 9.11 Reasonableness.** If at any time Mortgagor believes that Mortgagee has not acted reasonably in granting or withholding any approval or consent under the Note, this Mortgage, or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the loan secured hereby, as to which approval or consent either (i) Mortgagee has expressly agreed to act reasonably, or (ii) absent such agreement, Applicable Law would nonetheless require Mortgagee to act reasonably, then Mortgagor's sole remedy shall be to seek injunctive relief or specific performance, and no action for monetary damages or punitive damages shall in any event or under any circumstance be maintained by Mortgagor against Mortgagee.

**Section 9.12 Waiver of Statutory Rights.** Mortgagor shall not and will not apply for or avail itself of any appraisement, valuation, stay, extension or exemption laws, or any so-called "Moratorium Laws," now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Mortgage, but hereby waives the benefit of such laws to the full extent that Mortgagor may do so under Applicable Law. Mortgagor for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the Property marshaled upon any foreclosure of the lien of this Mortgage and agrees that any court having jurisdiction to foreclose such lien may order the Property sold as an entirety. Mortgagor hereby waives for itself and all who may claim through or under it, and to the full extent Mortgagor may do so under applicable law, any and all rights of redemption from sale under any order of decree of foreclosure of this Mortgage or granted under any statute now existing or hereafter enacted.

**Section 9.13 Filing of the Mortgage.** Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage, and any security instrument creating a Lien or evidencing the Lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any Applicable Law in order to publish notice of and fully to protect, preserve, and perfect the Lien hereof upon, and the interest of Mortgagee in, the Property. To the extent not exempted therefrom under section 1146(a) of the Bankruptcy Code or the order confirming the Plan of Reorganization, Mortgagor will pay all filing, registration, and recording fees, and all expenses incident to the preparation, execution, and acknowledgement of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Property, and any instrument of further assurance, and all other costs arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, and security instrument with respect to the Property or any instrument of further assurance; *provided, however,* that any Taxes imposed on the making and recording of this Mortgage shall be subject to the treatment set forth in Section 10.02(f) hereof.

**Section 9.14 Further Assurances.** Mortgagor shall from time to time and at the sole cost and expense of Mortgagor promptly execute and deliver all further instruments, documents, and notices and take all further action that may be necessary or desirable, or that Mortgagee may reasonably request, in order to create, grant, perfect, or protect any interest or rights granted or purported to be granted to Mortgagee by this Mortgage or to enable Mortgagee to exercise its rights and remedies hereunder. Without limiting the generality of the foregoing, Mortgagor shall, upon Mortgagee's request, appear in and defend any action or proceeding that may affect Mortgagor's title to the Property or otherwise affect the interests and rights of Mortgagee under this Mortgage. Further, Mortgagor shall furnish to Mortgagee, from time to time upon Mortgagee's request, statements and schedules further identifying, updating, and describing the Property and such other information, reports, and evidence concerning the Property as Mortgagee may reasonably request.

## ARTICLE X
## STATE-SPECIFIC PROVISIONS

**Section 10.01 State-Specific Provisions Control.** In the event of any conflict between the terms and provisions set forth in this Article X and the other terms and provisions of this Mortgage, the terms and provisions of this Article X shall control and be binding.

**Section 10.02 State-Specific Provisions.** With respect to the Property, which is located in the State of New York, notwithstanding anything contained herein to the contrary:

(a) **Remedies Not Exclusive.** The rights and remedies of Mortgagee specified in this Mortgage shall be in addition to Mortgagee's rights and remedies under New York law, specifically including Section 254 of the Real Property Law. In the event of any conflict between the provision of this Mortgage and the provisions of Section 254 of the Real Property Law, the provisions of this Mortgage shall control.

(b) **Trust Fund.** Pursuant to Section 13 of the Lien Law of New York, Mortgagor shall receive the advances secured hereby, if any, and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply such advances, if any, first to the payment of the cost of any improvement before using any part thereof for any other purpose. Mortgagor shall comply strictly with Section 13 of the Lien Law of New York.

(c) **Commercial Property.** Mortgagor represents and warrants that this Mortgage does not encumber real property principally improved or to be improved by one (1) or more structures containing in the aggregate not more than six (6) residential dwelling units, each having their own separate cooking facilities.

(d) **[New York Real Property Law Section 291-f.** In connection with any non-residential Leases having an unexpired term of five (5) years or longer from the date of this Mortgage, Mortgagee shall have, against the tenant under each Lease, all the rights set forth in Section 291-f of the Real Property Law of the State of New York, as amended from time to time. Mortgagor shall promptly deliver the written notices described in said Section 291-f to all present tenants under the Leases.][3]

(e) **Security Deposits.** In furtherance of and not in limitation of any other provisions of this Mortgage, any assignment of security deposits is subject to Section 7-103, Section 7-105, and Section 7-106 of the New York General Obligations Law.

(f) **Mortgage Taxes.** (i) As provided in the order confirming the Plan of Reorganization, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to a confirmed plan under section 1129 of the Bankruptcy Code shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real-estate transfer tax, mortgage-recording tax, or other similar tax or governmental assessment. To the fullest extent contemplated by section 644.1(b)(3) of the Codes, Rules and Regulations of the State of New York and Bankruptcy Code section 1146(a), the appropriate state or local governmental officials or

[3] NTD: We would like this deleted for several reasons. First, the lease term has less that 5-years remaining. Second, this provision is not necessary where the tenant is an affiliate, as is the case here. [UNDER REVIEW]

agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation of this instrument or other related documents without the payment of any such tax or governmental assessment.

(ii) Mortgagor shall execute an affidavit, consistent with clause (i) above, to be recorded concurrently with this Mortgage, which shall describe the basis for the exemption from mortgage recording and similar taxes.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Mortgagor has caused this Mortgage to be executed on the date set forth in the acknowledgment below and to be effective as of the date first set forth above.

WITNESS:

DURO DYNE SPENCE LLC, a New York limited liability company

____________________

Name:

By____________________

Name:

Title:

STATE OF ______ )

) SS.

COUNTY OF ______ )

On the ______ day of ______ in the year 2018 before me, the undersigned, personally appeared ____________________ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/ executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

____________________

Notary Public

My commission expires:

**SCHEDULE A**

**LEGAL DESCRIPTION**

# EXHIBIT A

## Tenant-Owned Improvments

01:23366393.1

01:23502941.3

**EXHIBIT 2**

**TO BE PROVIDED**

# EXHIBIT 3

# PROMISSORY NOTE

**$13,500,000.00**

**Bay Shore, New York**
**________________, 2018**

FOR VALUE RECEIVED, the undersigned, DURO DYNE NATIONAL CORP., a New York corporation with an address of 81 Spence Street, Bay Shore, New York 11706 ("**Maker**"), hereby promises to pay to the order of the DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust (such original payee or any successor from time to time, the "**Noteholder**"), the principal amount of THIRTEEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($13,500,00), in full by the Scheduled Maturity Date, together with interest thereon and all other amounts payable hereunder, in the manner provided below. Capitalized terms used herein and not otherwise defined have the meaning ascribed to them in that certain Note Issuance and Security Agreement, dated as of the Effective Date and entered into by and among Maker, the Noteholder, Duro Dyne Spence LLC, and ISWR Ohio LLC (the "**Note Issuance Agreement**"), and the rules of construction set forth in section 18 of the Note Issuance Agreement shall apply to this Promissory Note (this "**Note**").

1. Interest shall accrue during the term hereof at a rate equal to 7.15% per annum on the unpaid principal balance hereof from time to time outstanding from the date hereof, and shall be payable at the times provided in the Note Issuance Agreement.

2. Subject to the provisions of the Note Issuance Agreement, payments of the principal and interest shall be made at the office or agency of the Noteholder, or such other place as the Noteholder may from time to time specify in writing, in the lawful currency of the United States of America and in immediately available funds, without setoff, recoupment, counterclaim, or other defense of any nature, and free and clear of, and without any deduction or withholding for, any taxes or other payments.

3. This Note is referred to in, and is entitled to the benefits of, the Note Issuance Agreement and other Credit Documents, including the representations, warranties, covenants, conditions, security interests, and Liens contained or granted therein. The Note Issuance Agreement, among other things, contains provisions for acceleration of the Scheduled Maturity Date upon the happening of certain stated events and also for prepayment of all or part of the Obligations due and owing under this Note prior to the Scheduled Maturity Date upon the terms and conditions specified in the Note Issuance Agreement. Maker waives presentment, demand, notice, protest, and all other demands and notices in connection with the delivery, acceptance, performance, default, or enforcement of this Note and the Note Issuance Agreement.

4. Maker's payment and performance of all obligations under this Note are secured by, or are intended to be secured by, the Liens granted under the Note Issuance Agreement and the other Credit Documents.

5. This Note shall bind Maker and its successors and assigns, and the benefits hereof shall inure to the benefit of the Noteholder and its successors and assigns. All references herein to "Maker" and the "Noteholder" shall be deemed to apply to Maker and the Noteholder,

respectively, and their respective successors and assigns as permitted under the Note Issuance Agreement.

6. This Note is intended to be a negotiable instrument in accordance with Article 3 of the Uniform Commercial Code, as enacted in the State of New York, and may be negotiated to a transferee subject to the provisions of section 16 of the Note Issuance Agreement.

7. This Note is subject to the express condition that at no time shall Maker be obligated or required to pay interest on the principal balance due hereunder at a rate that could subject the Noteholder to civil or criminal liability as a result of being in excess of the maximum interest rate that Maker is permitted by Applicable Law to contract or agree to pay. If, by the terms of this Note, Maker is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of such maximum rate, the Interest Rate shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to the Noteholder for the use, forbearance, or detention of the Obligations shall, to the extent permitted by Applicable Law, be amortized, prorate, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Obligations does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Obligations for so long as the Obligations are outstanding.

8. **WAIVER OF JURY TRIAL. MAKER HEREBY WAIVES, FOR ITSELF, AND ITS SUCCESSORS AND ASSIGNS, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR ATTRIBUTABLE TO THIS NOTE OR ANY OF THE OTHER CREDIT DOCUMENTS.**

9. Upon receipt of an affidavit or sworn declaration of the Noteholder as to the loss, theft, destruction, or mutilation of this Note, Maker will issue in lieu thereof a replacement promissory note in the same principal amount thereof and setting forth the same terms and provisions of this Trust Note.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Maker has caused this Note to be executed and delivered by its duly authorized agent as of the date first written above, with the intention that it constitutes a sealed instrument.

**MAKER:**

| WITNESS: | DURO DYNE NATIONAL CORP.,<br>a New York corporation |
|---|---|
| By:________________ | By: ________________ |
| Name:________________ | Name: ________________ |
| Title:________________ | Title: ________________ |

# Plan Exhibit E

## Pledge and Security Agreement

# PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (this "**Agreement**") is made as of the Effective Date by and among the DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust ("**Asbestos Trust**"); DURO DYNE NATIONAL CORP., a New York corporation ("**Reorganized Debtor**"); and IRENE HINDEN, RANDALL HINDEN, and WENDY HINDEN (collectively, the "**Individual Pledgors**").

## RECITALS

A. Duro Dyne National Corp., Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. (collectively, "**Debtors**") were debtors and debtors-in-possession in chapter 11 cases filed in the U.S. Bankruptcy Court for the District of New Jersey, and their cases were jointly administered under Case No. ____________ (collectively, "**Chapter 11 Cases**").

B. The Plan Proponents in the Chapter 11 Cases proposed and filed the *Prenegotiated Plan of Reorganization for Duro Dyne National Corp. et al. Under Chapter 11 of the Bankruptcy Code*, dated September 7, 2018 (as amended, modified, and supplemented, the "**Plan**"), with the Bankruptcy Court, which provides, *inter alia*, for the creation and funding of the Asbestos Trust and the substantive consolidation and merger of the Debtors with and into the Reorganized Debtor (the "**Mergers**"), with the Reorganized Debtor as the sole surviving entity, on the Effective Date of the Plan.

C. The Plan further provides, *inter alia*, that on the Effective Date all Channeled Asbestos Claims will be channeled to, and assumed by, the Asbestos Trust and that the Debtors and other Protected Parties will receive the benefit of the Asbestos Permanent Channeling Injunction in accordance with section 524(g) of the Bankruptcy Code.

D. As consideration for the Asbestos Permanent Channeling Injunction and the benefits conferred on the Debtors and the other Protected Parties thereby and under the Plan, Duro Dyne National Corp. has agreed to issue the Trust Note to the Asbestos Trust.

E. The Plan provides, *inter alia*, that payment and performance under the Trust Note shall be secured by a pledge of and the granting of a possessory security interest in 50.1% of the Voting Stock of the Reorganized Debtor (the "**Reorganized Duro Dyne Stock**") and 50.1% of the Voting Stock of Duro Dyne Canada (the "**Duro Dyne Canada Stock**") (such 50.1% of the Reorganized Duro Dyne Stock and 50.1% of the Duro Dyne Canada Stock, collectively, the "**Pledged Shares**").

F. Together, the Individual Pledgors hold 100% of the Reorganized Duro Dyne Stock, and as a result of the Mergers, the Reorganized Debtor holds 100% of the Duro Dyne Canada Stock.

G. The Individual Pledgors and the Reorganized Debtor have determined that it is in their respective best interests to pledge the Pledged Shares to the Asbestos Trust on the terms and

conditions set forth in this Agreement as security for payment and performance of the Reorganized Debtor's obligations to the Asbestos Trust under the Trust Note.

H. Accordingly, each of the Parties (as defined below) desires to execute and deliver this Agreement to satisfy the purposes and requirements of the foregoing recitals.

**NOW, THEREFORE,** incorporating the foregoing recitals herein, which are hereby made a substantive part of this Agreement, and in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, each of the Parties hereby agrees as follows:

**Section 1. Defined Terms.** All capitalized terms used herein without definition, including those in the preamble and recitals hereof, shall have the meaning ascribed to them in the Plan. Unless otherwise defined herein, or unless the context otherwise requires, all terms used herein that are defined in the UCC shall have the meaning ascribed to them in the UCC. As used in this Agreement, the following terms shall have the following meaning:

(1) "**Credit Documents**" means, collectively, this Agreement, the Trust Note, the Note Issuance Agreement, the Bay Shore Mortgage, the Fairfield Mortgage, and any other document or instrument executed or delivered in connection with any of the foregoing.

(2) "**Governmental Unit**" means the United States of America, a state, commonwealth, district, territory, municipality, or foreign state; or a department, agency, instrumentality, court, or tribunal of the United States of America, a state, a commonwealth, a district, a territory, a municipality, or a foreign state; or other foreign or domestic government, or subdivision thereof.

(3) "**Hinden Family Members**" means, collectively, Randall Hinden, Wendy Hinden, Irene Hinden, David Brett Krupnick, Lindsay Jill Trant, Tobey Hinden Geller, Joshua Blumenthal, Jessie Geller Cawley, Abby Beth Wein, Hayley Rebekah Geller, and Max Hinden.

(4) "**Issuer**" means, as applicable, (a) Duro Dyne Canada as issuer of the Duro Dyne Canada Stock or (b) the Reorganized Debtor as issuer of the Reorganized Duro Dyne Stock.

(5) "**Laws**" means, at any time and with reference to any Entity or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Unit, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Unit applicable to such Entity or its property, or in respect of its operations or to any referenced circumstances or events.

(6) "**Lien**" means, with respect to any property or asset (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, hypothecation, assignment as collateral, or encumbrance of any kind or nature in respect of such property or asset (including any conditional sale or title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or

comparable Law of any jurisdiction) to secure payment of a debt or performance of an obligation.

(7) **"Material Adverse Effect"** means a material adverse effect on any of (a) the property, business, operations, financial condition, or prospects of the applicable Issuer; (b) the validity or enforceability of any of the Credit Documents; or (c) the rights and remedies of the Secured Party under any of the Credit Documents.

(8) **"Noteholder"** means (a) the Asbestos Trust during the period in which it is a holder of the Trust Note; or (b) each Entity that becomes a holder of the Trust Note by way of assignment, transfer, negotiation, or otherwise pursuant to the Credit Documents and applicable Laws.

(9) **"Obligations"** means all liabilities of the Reorganized Debtor owing to, or in favor of, or for the benefit of, the Noteholder under the Credit Documents, in each case (a) whether now existing or hereafter arising or acquired, (b) whether owing to, or in favor of, or for the benefit of, any Noteholder by reason of any succession, transfer, or assignment at any time thereafter, and (c) whether or not an allowable claim against the Reorganized Debtor under the Bankruptcy Code or otherwise enforceable against the Reorganized Debtor, and including, in any event, interest and other liabilities accruing or arising after the filing by or against the Reorganized Debtor of a petition under the Bankruptcy Code or that would have so accrued or arisen but for the filing of such a petition.

(10) **"Parties"** means, collectively, the Individual Pledgors, the Reorganized Debtor, the Secured Party, and any Subsequent Pledgor.

(11) **"Permitted Transferee"** means (a) any Hinden Family Member; (b) any senior manager of the Reorganized Debtor who has served in such capacity for no less than two (2) consecutive years; (c) any of their respective descendants, spouses, or estates; or (d) any trusts of which any of the foregoing is a beneficiary, including The Irene Lee Hinden Trust, The Wendy Lynn Geller Trust, The Randall Scott Hinden Trust, and The Hinden Grandchildren Trust, and the trusts created under the will of Sheryl Blumenthal.

(12) **"Pledgors"** means, collectively, the Individual Pledgors, the Reorganized Debtor, and any Subsequent Pledgors.

(13) **"Proceeds"** means all proceeds (including proceeds of proceeds) of the Pledged Shares, including (a) all rights, benefits, distributions, premiums, profits, dividends, interest, cash, instruments, documents of title, accounts, contract rights, inventory, equipment, general intangibles, deposit accounts, chattel paper, and other property from time to time thereafter received, receivable, or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution of any of the Pledged Shares, or proceeds thereof (including any cash, Equity Interests, or other securities or instruments issued after any recapitalization, readjustment, reclassification, merger, or consolidation with respect to the Reorganized Debtor and any security entitlements as defined in the UCC with respect thereto); and (b) "proceeds" as such term is defined in the UCC.

(14) **"Secured Party"** means (a) the Asbestos Trust; or (b) any Entity to whom the rights, powers, and under this Agreement are transferred or assigned in accordance with Section 24 hereof.

(15) **"Subsequent Pledgor"** means any Permitted Transferee that executes and delivers a Joinder (as defined below) in accordance with Section 31 hereof.

(16) **"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided, however*, that in the event, by reason of mandatory provisions of Law, any or all of the perfection or priority of, or remedies with respect to, any of the Pledged Shares is governed by the Uniform Commercial Code as enacted or in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code or comparable Law as enacted and in effect in such other jurisdiction solely for purposes of the provision hereof relating to such perfection, priority, or remedies.

(17) **"Voting Stock"** means the voting stock or voting securities of the Reorganized Debtor or Duro Dyne Canada, the common stock of any successor corporation thereto, any voting preferred stock of the Reorganized Debtor, Duro Dyne Canada, or any successor corporation thereto, or any similar Equity Interest in any successor Entity thereto.

(18) **"Voting Stock Rights"** means any (a) options, warrants, or other rights to purchase or acquire Voting Stock (whether or not at the time exercisable); (b) securities convertible into or exchangeable for Voting Stock (whether or not at the time so convertible or exchangeable); or (c) options, warrants, or rights to purchase such convertible or exchangeable securities.

**Section 2. Rules of Interpretation**

(a) Captions and headings in this Agreement are for convenience of reference only and in no way define, limit, describe, or otherwise affect the scope or intent of the provisions hereof.

(b) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, or neuter forms.

(c) The word **"will"** is to be construed as having the same meaning and effect as the word **"shall,"** and vice-versa.

(d) All terms defined in this Agreement in the singular form shall have comparable meanings when used in the plural form, and vice-versa.

(e) All references herein to **"Section"** shall be deemed references to sections of this Agreement unless the context shall otherwise require.

(f) The words "**herein,**" "**hereof,**" and "**hereunder,**" and words of similar import when used in this Agreement shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof.

(g) The word "**or**" shall not be exclusive and shall thus be construed to mean "and/or."

(h) Unless otherwise indicated, the term "**including**" means "including without limitation" or "including but not limited to," except when used in the computation of time periods.

(i) Unless otherwise indicated, any definition or reference to any agreement, instrument, or other document shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein).

(j) For purposes of computing time periods, whenever this Agreement provides for an event to occur "**within**" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computed in the computation of days elapsed. In addition, the word "**from**" means "from and including"; "**after**" means "after and excluding"; and "**to**" and "**until**" mean "to and including."

(k) Unless otherwise provided herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**Section 3. Pledge and Grant of Security Interest.** As security for the due and punctual payment and performance of the Obligations, effective as of the Effective Date, the Pledgors hereby pledge, assign, and deliver to the Secured Party, and grant to the Secured Party a continuing and first-priority Lien on and security interest in, all of their rights, title, and interest in and to the following (collectively, the "**Pledged Collateral**"):

(a) the Pledged Shares and, subject to Section 9, all dividends, distributions, cash, instruments, warrants, options, securities, and other property and rights, including voting rights, received as a result of owning such Pledged Shares and Proceeds from time to time received, receivable, or otherwise made on or distributed in respect of, or in exchange for any, or all of the Pledged Shares; and

(b) to the extent not otherwise included in the foregoing, all Proceeds thereof.

**Section 4. Delivery of Pledged Collateral; UCC Financing Statements.** On the Effective Date, the Pledgors shall deliver all certificates or instruments representing or evidencing any Pledged Collateral to the Secured Party pursuant hereto, to be held by the Secured Party in accordance with this Agreement. The Pledged Collateral shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed undated instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Secured

Party. In addition, the Pledgors hereby authorize the Secured Party to file at any time or from time to time one or more UCC financing statements and amendments thereto relating to all or any part of the Pledged Collateral. In connection with any permitted Transfer or Dilution Event described in Section 31, the Reorganized Debtor, on behalf of a Permitted Transferee, shall deliver to the Secured Party the new stock certificates, together with duly executed undated instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Secured Party, in accordance with this Section 4.

**Section 5. Representations and Warranties of the Individual Pledgors.** Each of the Individual Pledgors represents and warrants to the Secured Party that each of the following statements is true and correct, and each of the Individual Pledgors acknowledges that the Secured Party is relying on each of the following statements as being true and correct and that the Secured Party's reliance thereon is reasonable:

(a) The Individual Pledgors are the record and beneficial owners of their respective shares of Reorganized Duro Dyne Stock.

(b) The shares of Reorganized Duro Dyne Stock that have been duly and validly authorized and issued to the respective Individual Pledgors and are fully paid and non-assessable.

(c) **Schedule 1** attached hereto completely and accurately identifies, as of the Effective Date, (1) the number of issued and outstanding shares of Reorganized Duro Dyne Stock held by each of the Individual Pledgors and, separately, the number of issued and outstanding shares of Reorganized Duro Dyne Stock that constitute the Pledged Shares; and (2) the percentage of the aggregate issued and outstanding shares of Reorganized Duro Dyne Stock that constitute the Pledged Shares.

(d) All shares of Reorganized Duro Dyne Stock that are held by the Individual Pledgors are free of all Liens except for the security interest and the Lien in favor of the Secured Party created hereby, and there are no outstanding warrants, options, or other rights to purchase, or shareholder, voting trust, or similar agreements or Voting Stock Rights outstanding with respect to any of such shares.

(e) No effective financing statement or other instrument similar in effect under any applicable Law validly covering all or any part of the Reorganized Duro Dyne Stock held by the Individual Pledgors is on file in any filing or recording office.

(f) The delivery of the Individual Pledgors' respective Pledged Shares to the Secured Party in accordance with this Agreement is effective to create a valid and effective first-priority Lien on and security interest in the Pledged Shares in favor of the Secured Party, free of any adverse claim, and such security interest is entitled to all of the rights, priorities, and benefits afforded by the UCC.

(g) Except for Confirmation and Consummation of the Plan, together with the Bankruptcy Court's approval of the Plan Documents, no authorization, approval, or other action by, and no notice to or filing with, any Governmental Unit or regulatory body, or consent of any

other Entity is required for (1) the pledge and grant of a Lien or security interest by each Individual Pledgor in accordance with this Agreement, (2) the perfection of the Lien or security interest granted hereunder in favor of the Secured Party, (3) the execution, delivery, or performance of this Agreement by each of the Individual Pledgors, or (4) the exercise by the Secured Party of its rights and remedies hereunder (except as may be required in connection with any disposition of the Pledged Collateral by Laws affecting the offering and sale of securities generally).

(h) In accordance with that certain Revised and Restated Voting Shareholder Agreement dated as of July 27, 2009 (as it may be amended, modified, or supplemented, the "**Voting Shareholder Agreement**"), the board of directors of the Reorganized Debtor has consented in writing to the Individual Pledgors' entry into this Agreement and delivery of their respective Pledged Shares to the Secured Party so as to create a valid and effective first-priority Lien on and security interest in the Pledged Shares in favor of the Secured Party,

(i) The Voting Shareholder Agreement and that certain Revised and Restated Non-Voting Shareholder Agreement dated as of July 27, 2009 (as it may be amended, modified, or supplemented, and together with the Voting Shareholder Agreement, the "**Shareholder Agreements**") do not and will not interfere with or impair the rights, Liens, and security interests granted to the Secured Party hereunder and under applicable Law.

(j) Each Individual Pledgor has caused the Reorganized Debtor to record on its books and records that the Pledged Shares are subject to the Lien and security interest created hereby.

(k) The exact name of each Individual Pledgor is set forth above in the preamble of this Agreement.

(l) Each of the outstanding shares of Reorganized Duro Dyne Stock is a "security" governed by Article 8 of the UCC and is evidenced by a certificate as of the Effective Date.

**Section 6. Representations and Warranties of the Reorganized Debtor.** The Reorganized Debtor represents and warrants to the Secured Party that each of the following statements is true and correct, and acknowledges that the Secured Party is relying on each of the following statements as being true and correct and that the Secured Party's reliance thereon is reasonable:

(a) The Reorganized Debtor:

(1) is a corporation validly existing and in good standing under the Laws of the State of New York;

(2) has all requisite corporate power and authority, and has all material governmental licenses, authorizations, consents, and approvals necessary, to own its assets and carry on its business as now being or as proposed to be conducted;

(3) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure to so qualify, individually, or in the aggregate, could have a Material Adverse Effect; and

(4) the Reorganized Debtor's execution and delivery of this Agreement has been duly authorized by all necessary corporate action on the part of the Reorganized Debtor.

(b) The Reorganized Debtor is the record and beneficial owner of all of the outstanding shares of Duro Dyne Canada Stock.

(c) The shares of Duro Dyne Canada Stock have been duly and validly authorized and issued to, or are duly and validly held by, the Reorganized Debtor and (to the extent applicable) are fully paid and non-assessable.

(d) **Schedule 2** attached hereto completely and accurately identifies, as of the Effective Date, (1) the number of issued and outstanding shares of Duro Dyne Canada Stock held by the Reorganized Debtor and, separately, the number of issued and outstanding shares of Duro Dyne Canada Stock that constitute the Pledged Shares; and (2) the percentage of the aggregate issued and outstanding shares of Duro Dyne Canada Stock that constitute the Pledged Shares.

(e) All shares of Duro Dyne Canada Stock are free of all Liens except for the security interest and Lien in favor of the Secured Party created hereby, and there are no outstanding warrants, options, or other rights to purchase, or shareholder, voting trust, or similar agreements or Voting Stock Rights outstanding with respect to any of such shares.

(f) No effective financing statement or other instrument similar in effect under any applicable Law validly covering all or any part of the Duro Dyne Canada Stock is on file in any filing or recording office.

(g) The delivery of Reorganized Debtor's Pledged Shares to the Secured Party in accordance with this Agreement is effective to create a valid and effective first-priority Lien on and security interest in the Pledged Shares in favor of the Secured Party, free of any adverse claim, and such security interest is entitled to all of the rights, priorities, and benefits afforded by the UCC.

(h) Except for Confirmation and Consummation of the Plan, together with the Bankruptcy Court's approval of the Plan Documents, no authorization, approval, or other action by, and no notice to or filing with, any Governmental Unit or regulatory body, or consent of any other Entity is required for (1) the pledge and grant of a Lien or security interest by the Reorganized Debtor in accordance with this Agreement, (2) the perfection of the Lien or security interest granted hereunder in favor of the Secured Party, (3) the execution, delivery, or performance of this Agreement by the Reorganized Debtor, or (4) the exercise by the Secured Party of its rights and remedies hereunder (except as the Pledgors or the Secured Party may have taken or directed and except as may be required in connection with any disposition of the Pledged Collateral by Laws affecting the offering and sale of securities generally).

(i) In accordance with the Voting Shareholder Agreement, the board of directors of the Reorganized Debtor has duly consented in writing to the Pledgors' entry into this Agreement and delivery of their respective Pledged Shares to the Secured Party so as to create a valid and enforceable first-priority Lien on and security interest in the Pledged Shares in favor of the Secured Party.

(j) The Shareholder Agreements do not and will not interfere with or impair the rights, Liens, and security interests granted to the Secured Party hereunder and under applicable Law.

(k) By a resolution adopted according to the Canada Business Corporations Act and the bylaws of Duro Dyne Canada, the board of directors of Duro Dyne Canada has duly approved and consented in writing to the Reorganized Debtor's entry into this Agreement and delivery of its respective Pledged Shares to the Secured Party so as to create a valid and enforceable first-priority Lien on and security interest in the Pledged Shares in favor of the Secured Party.

(l) The Reorganized Debtor has recorded on its books and records that the Pledged Shares are subject to the pledge and security interest created hereby.

(m) The Reorganized Debtor has caused Duro Dyne Canada to record on its books and records that the Pledged Shares are subject to the pledge and security interest created hereby.

(n) Each of the outstanding shares of Reorganized Duro Dyne Stock and Duro Dyne Canada Stock is a "security" governed by Article 8 of the UCC and is evidenced by a certificate as of the Effective Date.

(o) The certificate of incorporation of the Reorganized Debtor has been amended in accordance with section 1123(a)(6) of the Bankruptcy Code so as to prohibit the issuance of nonvoting Equity Interests in the Reorganized Debtor until the Obligations are irrevocably and indefeasibly paid in Cash and in full.

(p) The charter, articles of incorporation, or other applicable corporate governance documents of Duro Dyne Canada have been amended so as to prohibit the issuance of nonvoting Equity Interests in Duro Dyne Canada until the Obligations are irrevocably and indefeasibly paid in Cash and in full.

**Section 7. Covenants and Further Assurances of the Individual Pledgors and Subsequent Pledgors.** Until the Obligations are irrevocably and indefeasibly paid in Cash and in full, and except as otherwise set forth in Section 31 hereof:

(a) Each Individual Pledgor and Subsequent Pledgor will not sell or otherwise dispose of, or grant any warrant, option, or other Voting Stock Right with respect to, any of the Pledged Collateral, the Reorganized Duro Dyne Stock, or Duro Dyne Canada Stock, or create or suffer to exist any Lien or security interest (other than the Liens and security interests in favor of

the Secured Party) on or in any Pledged Collateral, the Reorganized Duro Dyne Stock, or Duro Dyne Canada Stock.

(b) Each Pledgor shall not change its name without, in each case, giving at least fifteen (15) calendar days' prior written notice thereof to the Secured Party and taking all action necessary or reasonably requested by the Secured Party in order to maintain the effectiveness and priority of the Lien or security interest granted hereby.

(c) If, while this Agreement is in effect, an Individual Pledgor or Subsequent Pledgor shall become entitled to receive or shall receive additional Voting Stock, such Pledgor shall, in each case, accept the same as the Secured Party's agent, hold the same in trust for the Secured Party, and deliver the same forthwith to the Secured Party in the exact form received, with the endorsement of the Pledgor where necessary or with duly executed undated instruments of transfer or assignment, in blank, all in form and substance reasonably satisfactory to the Secured Party, to be held by the Secured Party, subject to the terms hereof, as part of the Pledged Shares; *provided, however*, that each Individual Pledgor and Subsequent Pledgor shall only be required by this subsection (c) to pledge and deliver such additional Voting Stock as shall be necessary to cause the aggregate Pledged Shares to equal 50.1% of the aggregate shares of Voting Stock of the Reorganized Debtor and 50.1% of the aggregate shares of Voting Stock of Duro Dyne Canada.

(d) Each Individual Pledgor and Subsequent Pledgor shall not take any action, or permit any Issuer to take any action, to cause any new shares of any Issuer to be issued to any Entity, other than a Pledgor in accordance with Section 31, while this Agreement is in effect.

(e) Each Individual Pledgor and Subsequent Pledgor shall not take any action, or permit any Issuer to take any action, to cause any Voting Stock not to be a "security" within the meaning of, or not to be governed by, Article 8 of the Uniform Commercial Code as in effect under the applicable Laws of any jurisdiction, or to become uncertificated.

(f) Each Individual Pledgor and Subsequent Pledgor shall, from time to time, at its expense, promptly execute and deliver all further instruments, documents, and notices and take all further action that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create, grant, perfect, or protect any Lien or security interest granted or purported to be granted by this Agreement or to enable the Secured Party to exercise its rights and remedies hereunder. Without limiting the generality of the foregoing, each Individual Pledgor and Subsequent Pledgor will, upon the Secured Party's request, appear in and defend any action or proceeding that may affect the Individual Pledgor's or Subsequent Pledgor's title to or the Secured Party's Lien on or security interest in the Pledged Collateral.

(g) Each Individual Pledgor and Subsequent Pledgor shall furnish to the Secured Party, from time to time upon the Secured Party's request, statements and schedules further identifying, updating, and describing the Pledged Collateral and such other information, reports, and evidence concerning the Pledged Collateral as the Secured Party may reasonably request.

**Section 8. Covenants and Further Assurances of the Reorganized Debtor.** Until the Obligations are irrevocably and indefeasibly paid in Cash and in full, and except as otherwise set forth in Section 31 hereof:

(a) The Reorganized Debtor will not sell or otherwise dispose of, or grant or issue any warrant, option, or other Voting Stock Rights with respect to, any of the Pledged Collateral, the Reorganized Duro Dyne Stock, and the Duro Dyne Canada Stock, or create or suffer to exist any Lien or security interest (other than the Liens and security interests in favor of the Secured Party) on any Pledged Collateral, the Reorganized Duro Dyne Stock, and the Duro Dyne Canada Stock.

(b) The Reorganized Debtor shall ensure that each certificate representing one or more shares of Reorganized Duro Dyne Stock or Duro Dyne Canada Stock bears the following legend:

> THE SHARES EVIDENCED HEREBY ARE SUBJECT TO CERTAIN DRAG-ALONG RIGHTS OF THE DURO DYNE ASBESTOS PERSONAL INJURY TRUST GRANTED IN SECTION 13 OF THE PLEDGE AND SECURITY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES, THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY SUCH DRAG-ALONG RIGHTS IN SAID PLEDGE AND SECURITY AGREEMENT.

At any time after all Pledged Shares are released from the security interest of the Secured Party pursuant to the terms of this Agreement, the Reorganized Debtor may cause the reissuance of a new certificate without the legend to any holder of a stock certificate that surrenders a legend-bearing certificate to an Issuer for removal of the legend.

(c) The Reorganized Debtor shall maintain its existence as a corporation and, at all times, maintain at least one complete set of its books and records concerning the Pledged Collateral.

(d) The Reorganized Debtor shall cause Duro Dyne Canada to maintain its existence as a corporation and, at all times, maintain at least one complete set of Duro Dyne Canada's books and records concerning the Pledged Collateral.

(e) The Reorganized Debtor shall not, and shall not permit Duro Dyne Canada to, amend its organizational documents or change its name without, in each case, giving at least fifteen (15) calendar days' prior written notice thereof to the Secured Party and taking all action necessary or reasonably requested by the Secured Party in order to maintain the effectiveness and priority of the Lien or security interest granted hereby.

(f) The Reorganized Debtor shall not, and shall not permit Duro Dyne Canada to, change its jurisdiction of organization without, in each case, giving at least fifteen (15) calendar days' written notice thereof to the Secured Party and taking all action necessary or reasonably

requested by the Secured Party in order to maintain the effectiveness and priority of the Lien or security interest granted hereby.

(g) If, while this Agreement is in effect, the Reorganized Debtor shall become entitled to receive or shall receive additional Voting Stock of Duro Dyne Canada, the Reorganized Debtor shall, in each case, accept the same as the Secured Party's agent, hold the same in trust for the Secured Party, and deliver the same forthwith to the Secured Party in the exact form received, with the endorsement of the Reorganized Debtor where necessary or with duly executed undated instruments of transfer or assignment, in blank, all in form and substance reasonably satisfactory to the Secured Party, to be held by the Secured Party, subject to the terms hereof, as part of the Pledged Shares; *provided, however*, that the Reorganized Debtor shall only be required by this subsection (g) to pledge and deliver such additional Voting Stock as shall be necessary to cause the aggregate Pledged Shares to equal 50.1% of the aggregate shares of Voting Stock of Duro Dyne Canada.

(h) The Reorganized Debtor shall not take any action, or permit Duro Dyne Canada to take any action, to cause any new shares of Voting Stock to be issued to any Entity, other than a Pledgor in accordance with Section 31 hereof, while this Agreement is in effect.

(i) The Reorganized Debtor shall not take any action, or permit Duro Dyne Canada to take any action, to cause any Voting Stock not to be a "security" within the meaning of, or not to be governed by, Article 8 of the Uniform Commercial Code as in effect under the applicable Laws of any jurisdiction, or to become uncertificated.

(j) The Reorganized Debtor shall, from time to time, at its expense, promptly execute and deliver all further instruments, documents, and notices and take all further action that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create, grant, perfect, or protect any Lien or security interest granted or purported to be granted by this Agreement or to enable the Secured Party to exercise its rights and remedies hereunder. Without limiting the generality of the foregoing, the Reorganized Debtor will, at its own expense, upon the Secured Party's request, appear in and defend any action or proceeding that may affect the Pledgor's title to or the Secured Party's Lien on or security interest in the Pledged Collateral.

(k) The Reorganized Debtor shall furnish to the Secured Party, from time to time upon the Secured Party's request, statements and schedules further identifying, updating, and describing the Pledged Collateral and such other information, reports, and evidence concerning the Pledged Collateral as the Secured Party may reasonably request.

(l) The Reorganized Debtor shall not amend, modify, revise, or supplement its certificate of incorporation in order to permit the issuance of nonvoting Equity Interests in the Reorganized Debtor; nor shall any nonvoting Equity Interests in the Reorganized Debtor be issued to any Entity unless and until the Obligations have been irrevocably and indefeasibly paid in Cash and in full.

(m) The Reorganized Debtor shall not amend, modify, revise, or supplement, or cause or permit the amendment, modification, revision, or supplementation of, the charter, articles of

incorporation, or other applicable corporate governance documents of Duro Dyne Canada in order to permit the issuance of nonvoting Equity Interests in Duro Dyne Canada. In addition, no nonvoting Equity Interests in Duro Dyne Canada shall be issued to any Entity unless and until the Obligations have been irrevocably and indefeasibly paid in Cash and in full.

**Section 9. Voting Rights, Dividends.**

(a) So long as no Event of Default has occurred and is continuing in respect of which the Secured Party has elected to exercise the rights and remedies set forth in Section 9(b) hereof:

(1) Each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral, or any part thereof, for any purpose not inconsistent with the terms of this Agreement.

(2) Subject to Sections 7(c), 8(g), and 31 of this Agreement, each Pledgor shall be entitled to receive all distributions, dividends (in the form of cash, securities, or otherwise), cash, instruments, chattel paper, and other rights, property, or Proceeds or products from time to time received, receivable, or otherwise distributed in respect of the Pledged Collateral.

(b) At any time that an Event of Default has occurred and is then continuing in respect of which the Secured Party has elected to exercise the rights and remedies set forth in this Section 9(b):

(1) all rights of each Pledgor to exercise voting and other consensual rights in respect of the Pledged Collateral shall immediately cease upon the Secured Party's election to exercise its rights hereunder, and upon such election all such voting and other consensual rights shall become vested in the Secured Party, and the Secured Party shall thereupon have the sole right to exercise such voting and other consensual rights, including the right to vote in favor of, and to exchange any of the Pledged Collateral upon, the consolidation, recapitalization, merger, or other reorganization with respect to an Issuer. In order to effect the foregoing, each Pledgor hereby grants to the Secured Party an irrevocable proxy to vote the Pledged Collateral and, at any time that an Event of Default exists, each Pledgor agrees to execute such other proxies as the Secured Party may reasonably request; and the appointment of the Secured Party as proxy is coupled with an interest and shall be valid and irrevocable until the Obligations have been irrevocably and indefeasibly paid in Cash and in full; and

(2) all rights of each Pledgor to receive and retain any distributions, dividends (in the form of cash, securities, or otherwise), instruments, chattel paper, or other Proceeds or property paid or payable with respect to, or on account of, any of the Pledged Collateral shall immediately cease, and any such distributions, dividends (in the form of cash, securities, or otherwise), instruments, chattel paper, or other Proceeds or property paid or payable with respect to, or on account of, any of the Pledged Collateral shall be paid to the Secured Party (for application to the Obligations, with respect to any cash or cash equivalents, or to be held by the Secured Party as additional security for the Obligations, with respect to any other type of property); and any distributions, dividends (in the form of cash, securities, or otherwise),

instruments, chattel paper, or other Proceeds or property paid or payable with respect to any of the Pledged Collateral and received by a Pledgor contrary to the provisions of this Agreement shall be received in trust for the benefit of the Secured Party, shall be segregated from other assets (including, in the case of cash or cash equivalents, from other funds) of such Pledgor and shall be forthwith paid to the Secured Party (for application to the Obligations, with respect to any cash or cash equivalents, or to be held by the Secured Party as additional security for the Obligations, with respect to any other type of property).

**Section 10. Limitation on Duty of Secured Party with Respect to the Pledged Collateral.** Beyond safe custody thereof, each Pledgor agrees that the Secured Party shall have no duties concerning the custody and preservation of any Pledged Collateral in its possession (or in the possession of any agent of the Secured Party) or with respect to any income thereon or the preservation of rights against prior parties or any other rights pertaining thereto. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property. The Secured Party shall not be liable or responsible for any loss or damage to any of the Pledged Collateral, or for any diminution in the value thereof, by reason of the act or omission of any agent selected by the Secured Party in good faith. It is expressly agreed that the Secured Party shall have no responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders, or other matters relative to any Pledged Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Pledged Collateral, but the Secured Party may do so.

**Section 11. Events of Default and Remedies**

(a) Each of the following events shall be an "**Event of Default**" for purposes of this Agreement:

(1) any failure to pay in full and in Cash, including a default in the full payment of, the Obligations to the Secured Party as and when due in accordance with the Note Issuance Agreement and the Trust Note;

(2) the occurrence of any default under, event of default (including an "Event of Default" as defined in the Note Issuance Agreement) under, or a material breach of any of the Credit Documents;

(3) any default or breach in the performance of any covenant, condition, or agreement contained in this Agreement and such default or breach is not cured within ten (10) calendar days after the earlier of (A) the applicable Pledgor or a senior officer of such Pledgor becoming aware thereof and (B) the receipt of written notice thereof by the applicable Pledgor from the Secured Party; or

(4) any representation or warranty set forth in this Agreement has been found to be false.

(b) Upon the occurrence and during the continuance of an Event of Default, the Secured Party and its attorneys may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the UCC and applicable Law, and the Secured Party may also, without demand, advertisement, or notice of any kind (other than the notice specified in subsection (c) below relating to a public or private sale), sell the Pledged Collateral or any part thereof in one or more portions at one or more public or private sales or dispositions, at any exchange, broker's board, or at any of the Secured Party's offices (or those of the Secured Party's attorneys) or elsewhere, for cash, on credit, or for future delivery, at such price or prices and upon such other terms as the Secured Party deems advisable.

(c) Each Pledgor agrees that, to the extent notice of sale shall be required by Law, at least ten (10) calendar days' notice to such Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification of such matters; except that no notification need be given to such Pledgor if it has authenticated after default or Event of Default a statement renouncing or modifying any right to notification of sale or other intended disposition.

(d) At any sale of the Pledged Collateral or any part thereof, if permitted by Law, the Secured Party may bid (which bid may be, in whole or in part in the form of cancellation of indebtedness) for the purchase of the Pledged Collateral or any portion thereof free of any right or equity of redemption. The Secured Party shall not be obligated to make or complete any sale of the Pledged Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(e) Each Pledgor recognizes that the Secured Party may be unable to effect a public sale of all or part of the Pledged Collateral and may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such Pledged Collateral for their own account, for investment, and not with a view to the distribution or resale thereof. Each Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the seller than if sold at public sales and agrees that such private sales shall be deemed to have been made in a commercially reasonable manner, and that the Secured Party shall be under no obligation to delay a private sale of any of the Pledged Collateral for the period of time necessary to permit the Issuer of such Pledged Collateral to register such securities for public sale under the Securities Act of 1933, or under any other applicable requirement of Law, even if such Issuer would agree to do so. To the extent permitted by Law, each Pledgor hereby specifically waives (and, as applicable, releases) any right or equity of redemption, and any right of stay or appraisal, which each Pledgor has or may have under any Law now existing or hereafter arising.

(f) Each Pledgor acknowledges that the Secured Party shall not be liable for any failure or delay in realizing upon or in collecting the Obligations, or any guaranty thereof or

collateral security therefor; and each Pledgor further acknowledges that the Secured Party shall not have any duty to take any action with respect thereto.

**Section 12. Security Interest Absolute.** To the maximum extent permitted by applicable Law, all rights of the Secured Party, all pledges, Liens, and security interests made or granted hereunder, and all obligations of each Pledgor hereunder shall, upon the effectiveness of this Agreement, in accordance with the terms hereof, be absolute and unconditional irrespective of:

(a) any change in the time, manner, or place of payment of all or part of the Obligations, or any other amendment or waiver of or any consent to any departure from the Plan or any of the Credit Documents;

(b) any exchange, release, or non-perfection of any other collateral, or any release or amendment or waiver of, or consent to departure from, any guaranty for all or part of the Obligations;

(c) the insolvency of any Pledgor or any Issuer; or

(d) any other circumstances that might otherwise constitute a defense available to, or a discharge of, any Pledgor, other than the payment in full and in Cash of the Obligations.

**Section 13. Drag-Along Rights**

(a) If at any time after an Event of Default, the Secured Party enters into an agreement with a third party ("**Drag-Along Purchaser**") whereby the Secured Party will sell, and the Drag-Along Purchaser will purchase, in one transaction, or in a series of related transactions, all of the Reorganized Duro Dyne Stock, all of the Duro Dyne Canada Stock, or all or substantially all of the assets of either or both the Reorganized Debtor or Duro Dyne Canada, the Secured Party shall have the right to require that the applicable Pledgors or any other holder (each such Pledgor or holder, a "**Drag-Along Transferor**") of one or more shares of Reorganized Duro Dyne Stock or Duro Dyne Canada Stock (in either case, the "**Drag-Along Shares**") participate in such sale ("**Drag-Along Sale**"). Notwithstanding anything to the contrary in this Agreement, if the Drag-Along Sale is structured as (i) a merger, consolidation, or similar business combination or (ii) a sale of all or substantially all assets, or would result in a change of control of an Issuer, each Drag-Along Transferor shall vote, as eligible, in favor of the transaction and take all actions to waive any dissenters, appraisal, or other similar rights.

(b) To exercise its rights under this Section 13, the Secured Party shall deliver a written notice (the "**Drag-Along Sale Notice**") to the Reorganized Debtor and any other affected Drag-Along Transferor no more than ten (10) calendar days after the execution and delivery by all of the parties thereto of the agreement pertaining to such Drag-Along Sale and, in any event, no later than twenty-one (21) calendar days prior to the closing date of such Drag-Along Sale. The Drag-Along Sale Notice shall refer to the Secured Party's rights and obligations hereunder and shall describe in reasonable detail:

(1) the name of the Drag-Along Purchaser;

(2) the proposed date, time, and location of the closing of the Drag-Along Sale;

(3) the per-share purchase price; and

(4) any other material terms or conditions of such Drag-Along Sale.

(c) Subject to Section 13(d) hereof, each Drag-Along Transferor shall be required to participate in the Drag-Along Sale on the terms and conditions set forth in the Drag-Along Sale Notice and to tender all of its Drag-Along Shares as set forth below. Not more than fourteen (14) calendar days after the date of the Drag-Along Sale Notice, each of the Drag-Along Transferors shall deliver to the Secured Party, or the Secured Party's representative designated in the Drag-Along Sale Notice, certificates representing such Drag-Along Transferor's Drag-Along Shares, duly endorsed, together with all other documents required to be executed in connection with the Drag-Along Sale. If a Drag-Along Transferor should fail to deliver such certificates to the Secured Party or the Secured Party's designated representative, as the case may be, the Reorganized Debtor shall cause the books and records of the applicable Issuer to show that such shares are bound by the provisions of this Section 13 and that such shares shall be sold to the Drag-Along Purchaser immediately upon surrender by the holder thereof.

(d) Each Drag-Along Transferor hereby grants to the Secured Party an irrevocable proxy and power of attorney (with full power of substitution), for and in the name, place, and stead of such Drag-Along Transferor, (1) to vote all of the Drag-Along Shares held by such Drag-Along Transferor in favor of any Drag-Along Sale to be effected in accordance with this Section 13 at any meeting of stockholders or to act by written consent with respect to such Drag-Along Shares to approve such Drag-Along Sale (whether or not such approval of the Drag-Along Sale is required by applicable Law), and (2) to take any and all other actions contemplated by this Section 13 that may be necessary or advisable to consummate any Drag-Along Sale to be effected in accordance with this Section 13 or to transfer to the Drag-Along Purchaser the Drag-Along Shares that such Drag-Along Transferor is required to transfer to the Drag-Along Purchaser in connection with such Drag-Along Sale pursuant to this Section 13 (it being hereby acknowledged by each Drag-Along Transferor that such actions may be taken by the Secured Party notwithstanding, and shall not limit in any manner the effect of, any approval, consent, or waiver already given by such Drag-Along Transferor hereunder). Each Drag-Along Transferor hereby agrees that the irrevocable proxy and power of attorney set forth in this Section 13(d) is given to secure the performance of the obligations of such Drag-Along Transferor under this Section 13 and that such proxy and power of attorney shall be irrevocable, shall be deemed to be coupled with an interest, shall extend for the term of this Agreement or, if earlier, until the last date permitted by applicable Law, and shall be binding upon the heirs, successors, and assigns of the applicable Drag-Along Transferor. Except as expressly contemplated by this Agreement, no Drag-Along Transferor shall grant any proxy or power of attorney or become party to any voting trust or other agreement that is inconsistent with or conflicts with the provisions of this Section 13(d).

(e) The Secured Party shall have a period of ninety (90) calendar days after the date of receipt of the Drag-Along Sale Notice by the last Drag-Along Transferor to receive such notice, to consummate the Drag-Along Sale on the terms and conditions set forth in such notice. If the Drag-Along Sale shall not have been consummated during such period, the Secured Party shall return to each of the Drag-Along Transferors all certificates or other evidence of title and ownership representing the shares that such Drag-Along Transferors delivered for sale in accordance with this Section, together with any documents in the possession of the Secured Party executed by the Drag-Along Transferors in connection with such proposed Drag-Along Sale.

(f) At the closing or otherwise upon consummation of the Drag-Along Sale, the Secured Party shall collect or receive all consideration or proceeds from such Drag-Along Sale, including consideration or proceeds given in exchange for the Drag-Along Shares, and shall apply such consideration or proceeds in accordance with Section 14 hereof.

**Section 14. Application of Payments or Proceeds**

(a) The Secured Party shall apply any payments or Proceeds received upon the sale or other disposition of the Pledged Collateral or Drag-Along Shares as follows:

(1) *first*, to such amounts, if any, as shall be required to reimburse the Secured Party for any costs of sale or transfer taxes not previously paid by any Pledgor or Drag-Along Transferor and not otherwise rendered nugatory under section 1146(a) of the Bankruptcy Code; and any fees, expenses, or other amounts owed to the Secured Party pursuant to the terms of this Agreement or any of the other Credit Documents to the extent not previously reimbursed by any Pledgor or Drag-Along Transferor;

(2) *second*, after payment in full of the amounts specified in paragraph (1) above, to the full amount, or unpaid portion, as applicable, of the Obligations;

(3) *third*, after payment in full of the amounts specified in paragraphs (1) and (2) above, (A) in the case of a Drag-Along Sale consummated in accordance with Section 13 hereof, *pro rata* to each of the Pledgors and each of the Drag-Along Transferors who surrendered their certificates or other evidence of ownership of the Drag-Along Shares sold in connection with such Drag-Along Sale; or (B) in the case of a sale or other disposition of the Pledged Collateral that is not a Drag-Along Sale, *pro rata* to each of the Pledgors.

(b) The Reorganized Debtor shall remain liable to the extent of any deficiency between (1) the amount of all Proceeds realized upon the sale or other disposition of the Pledged Collateral or Drag-Along Shares in accordance with this Agreement and (2) the amount of the Obligations. Upon the sale of any of the Pledged Collateral or Drag-Along Shares hereunder by the Secured Party (whether by virtue of the power of sale herein granted, pursuant to a judicial proceeding, or otherwise), the receipt of the purchase money or other Proceeds of sale by the Secured Party or other officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Pledged Collateral or Drag-Along Shares so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money or

other Proceeds of sale paid over to the Secured Party or such officer, or be answerable in any way for the application or misapplication thereof.

**Section 15. Secured Party May Perform.** If a Pledgor fails to perform any agreement contained herein, then upon the occurrence and during the continuance of an Event of Default, the Secured Party may itself perform, or cause performance of, such agreement at the expense of such Pledgor.

**Section 16. Termination.** This Agreement and the Lien and security interest granted hereunder shall terminate and be released, automatically and without the necessity of action on the part of any Entity, when the Obligations have been irrevocably and indefeasibly paid in Cash and in full, and all rights to the Pledged Collateral shall thereupon revert to each of the Pledgors. In connection with the foregoing, the Secured Party shall execute and deliver to each Pledgor or its designee any documents or instruments that a Pledgor shall reasonably request from time to time to evidence such termination and release, and shall assign, transfer, and deliver to any such Pledgor without recourse and without representation or warranty, such of the Pledged Collateral as may then be in the possession of the Secured Party.

**Section 17. Waiver of Demand.** The Pledgors hereby waive demand, payment, notice of dishonor or protest, and all other notices of any kind in connection with the Obligations except for those notices required by this Agreement or any of the other Credit Documents.

**Section 18. Specific Performance.** Each of the Parties acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Agreement, the Secured Party would be irreparably and immediately harmed and could not be made whole by monetary damages. It is accordingly agreed that (a) the Secured Party shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Agreement or to obtain injunctive relief to prevent breaches of any specific provision of this Agreement exclusively in the courts; (b) the Pledgors shall waive, in any action for specific performance or injunctive relief, the defense of adequacy of a remedy at law; and (c) the Pledgors shall waive any requirement for securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief. For the avoidance of doubt, the Parties agree that the Secured Party shall be entitled to enforce specifically the terms and provisions of this Agreement to prevent breaches of, or to enforce compliance with, (1) those provisions requiring each Pledgor to deliver the Pledged Collateral; (2) those provisions requiring each Drag-Along Transferor to sell, transfer, or otherwise dispose of its Drag-Along Shares if the conditions to such Drag-Along Transferor's obligations to sell, transfer, or otherwise dispose of such Drag-Along Shares, as set forth in Section 13 hereof, have been satisfied or waived; or (3) the covenants or agreements herein of each of the Pledgors. The Secured Party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which the Secured Party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by the Secured Party.

**Section 19. No Election of Remedies.** The rights and remedies of the Secured Party hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise

have. No exercise of by the Secured Party of any right or remedy shall be deemed to be an exclusive election of rights or remedies.

**Section 20. Attorneys' Fees and Costs.** The Pledgors each agree to pay all costs and expenses, including reasonable attorneys' fees, incurred by the Secured Party in enforcing this Agreement following an Event of Default, including costs, expenses, and attorneys' fees accruing or incurred before, during, or after the insolvency, bankruptcy, or reorganization of the Reorganized Debtor or Duro Dyne Canada.

**Section 21. Subordination.** Any claims or rights that might arise between or among the Pledgors with respect to this Agreement, the Trust Note, the Obligations, the Pledged Collateral, or any of the Credit Documents, or any amounts paid or performance rendered thereunder, including claims for subrogation, reimbursement, contribution, indemnity, or interest, shall be fully subordinated to the rights of the Secured Party, and shall not be paid or become payable until all of the Obligations shall have been irrevocably and indefeasibly paid in Cash and in full.

**Section 22. No Precedence or Primacy of Conflicting Agreements.** Notwithstanding any provision contained in any agreement to which the Reorganized Debtor or any of the Individual Pledgors is a party, including any provision therein that purports to be preemptory,

(a) to the extent any provision set forth in any such agreement (1) conflicts with, impairs, or limits any of the rights granted to Secured Party under this Agreement or the provisions hereof, or (2) provides for, permits, impresses, requires any Lien on any of the Pledged Collateral, the terms and provisions of this Agreement shall have precedence and primacy so as to override and negate such conflicting provision, impairment, limitation, or Lien;

(b) the Reorganized Debtor shall not, and shall cause Dura Dyne Canada not to, purchase, buy back, acquire, or redeem any of the Pledged Shares without the prior written consent of the Secured Party;

(c) nothing in any agreement shall require or compel the Secured Party to sell, transfer, or otherwise dispose of any Drag-Along Shares in connection with any sale, transfer, or other disposition of any of the Pledged Shares, if the Secured Party elects or opts not to invoke the provisions of Section 13 hereof;

(d) if, at any time after the Effective Date, a Pledgor acquires any shares of the Reorganized Duro Dyne Stock or the Duro Dyne Canada Stock, by purchase, inheritance, or otherwise, such Pledgor shall provide written notice thereof to the Secured Party, within five (5) Business Days after the occurrence thereof, and such written notice shall identify (1) the date of the acquisition; (2) the Entity that issued or transferred such shares acquired by such Pledgor; (3) the number of such shares so acquired; (4) the manner in which such shares were so acquired (*e.g.*, purchase, inheritance); (5) the seller of such shares or the Entity that, immediately prior to the acquisition, owned or held such shares; and (6) the purchase price, if any, of such shares; and

(e) if, at any time, an Event of Default has occurred in respect of which the Secured Party has elected to exercise the rights and remedies set forth in Section 9(b) hereof, then any provision in any agreement to which any Pledgor is a party and which is inconsistent with the terms of this Agreement shall be automatically rescinded and cancelled, and thereby rendered null and void, without the necessity of any further notice or action by, or on the part of, any Party or other Entity.

**Section 23. No Assignments or Delegation.** Notwithstanding anything to the contrary herein, no Pledgor shall assign any of its rights or delegate any of its duties or obligations under this Agreement, whether held individually or collectively, to any Entity, and no assignment or delegation of any such right, duty, or obligation shall release or discharge any Pledgor therefrom. In addition, no assignment or transfer of property, rights, claims, privileges, duties, or obligations by or among any of the Parties shall release or discharge the Reorganized Debtor or any Pledgor from any duty or obligation under the Credit Documents.

**Section 24. Assignment by Secured Party.** Notwithstanding anything to the contrary in this Agreement or in any of the other Credit Documents, upon the assignment, sale, or other transfer of the Trust Note or any of the rights and interests thereunder by the Secured Party to another Entity ("**Trust Note Transferee**"), the Secured Party shall have the right, but not the obligation, to assign, at its own discretion, any of its rights and interests under this Agreement (including the right of assignment set forth in this Section 24) and any of its rights and interests in the Pledged Collateral to the Trust Note Transferee.

**Section 25. Entire Agreement.** This Agreement constitutes the entire agreement among the Parties with respect to the Lien or security interest granted under or evidenced by this Agreement.

**Section 26. Amendments and Waiver.** Except for the waivers expressly set forth herein, any amendment or waiver of, or consent with respect to, any provision of this Agreement shall be effective only if the same shall be in writing and approved and executed by each of the Parties. Any such amendment, waiver, or consent shall be effective only in the specific instance and for the specified purpose for which it is given.

**Section 27. Notices and Deliveries.** All notices, requests, and other communications to any Party shall be in writing and shall be given to such Party at its address set forth below or at such other address as such Party may hereafter specify in writing for the purpose of receiving notices hereunder. Each such notice, request, or other communication shall be effective and deemed received by the Party to whom such communication is directed (a) if given by a nationally recognized overnight courier service sent for next Business Day delivery, on the first (1st) Business Day after such communication is deposited with such courier service; (b) if given by certified mail, return receipt requested, on the third (3rd) Business Day after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid; or (c) if given by any other means, when delivered, as documented by a signed proof of delivery at the address specified below.

**If to the Secured Party:**

**If to the Reorganized Debtor:**

**If to Irene Hinden:**

**If to Randall Hinden:**

**If to Wendy Hinden:**

**Section 28. Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but to the extent any provision of this Agreement is held to be invalid, void, voidable, prohibited, illegal, or unenforceable in any respect under any applicable Law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction. The Parties further agree to use commercially reasonable efforts to replace such invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision of this Agreement with an effective, valid, and enforceable provision that will achieve, to the fullest extent possible, the economic, business, and other purposes of the invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision.

**Section 29. Further Assurances.** Each of the Pledgors shall, at their own cost or expense, prepare, execute, and deliver any and all agreements, instruments, or other documents and take any other action that the Secured Party may, from time to time, reasonably request in order to effectuate the provisions and intent of this Agreement.

**Section 30. Survival of Representations and Warranties.** All representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement.

**Section 31. Permitted Transfers and Adjustments for Dilution.** Notwithstanding the foregoing and any and all other terms to the contrary contained herein:

(a) Each Pledgor shall be permitted to sell, gift, assign, transfer, or otherwise dispose of (each, a "**Transfer**") any or all of such Pledgor's Pledged Shares to any Permitted Transferee, if and only if the Permitted Transferee of any such Transfer who is not already a signatory to this Agreement has executed and delivered a joinder to this Agreement (a "**Joinder**") which provides that such Permitted Transferee agrees to be bound by the terms hereof and shall be deemed to be a Subsequent Pledgor hereunder. If a Pledgor wishes to make such a permitted Transfer hereunder, such Pledgor shall inform the Secured Party and the Reorganized Debtor of such proposed Transfer at least ten (10) calendar days prior to the anticipated date of such Transfer (the "**Transfer Date**"). On such Transfer Date, the following actions shall occur, and all such actions shall be deemed to have occurred contemporaneously: (1) the Secured Party shall return the certificates for the Pledged Shares subject to the Transfer to the Reorganized Debtor; (2) the Reorganized Debtor shall cancel such certificates and issue new stock certificates representing the Pledged Shares so Transferred, registered in the name of the Permitted Transferee, such new

stock certificates to bear the legend set forth in Section 8(b) hereof; (3) the Permitted Transferee shall sign the Joinder and deliver such executed Joinder to the Secured Party and the Reorganized Debtor; and (4) the Reorganized Debtor, on behalf of the Permitted Transferee, shall deliver to the Secured Party, in accordance with Section 4 hereof, the new stock certificates representing the Transferred Pledged Shares, together with duly executed undated instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Secured Party, and such shares shall be deemed Pledged Shares hereunder.

(b) The Reorganized Debtor or Duro Dyne Canada shall be permitted to issue, grant, sell, or distribute new shares of Voting Stock to a Permitted Transferee in accordance with the terms of this subsection (b) (each such issuance, grant, sale, or distribution, a "**Dilution Event**"). Upon the occurrence of a Dilution Event, the Secured Party shall receive and have, as security for the due and punctual payment and performance of the Obligations, such additional Voting Stock as shall be necessary to cause the aggregate Pledged Shares to equal 50.1% of the total number of outstanding shares of Reorganized Duro Dyne Stock and 50.1% of the total number of outstanding shares of Duro Dyne Canada Stock, after taking into account and giving effect to the Dilution Event. Any stock certificates representing such new shares of Voting Stock shall bear the legend set forth in Section 8(b) hereof. The Reorganized Debtor, on behalf of itself or Duro Dyne Canada, as applicable, shall deliver to the Secured Party, in accordance with Section 4 hereof, stock certificates representing such new shares of Voting Stock, together with duly executed undated instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Secured Party, and such new shares shall be deemed Pledged Shares hereunder. The Reorganized Debtor shall not issue, grant, sell, or distribute, and shall cause Duro Dyne Canada not to issue, grant, sell, or distribute, any new shares of Voting Stock to a Permitted Transferee that is not already a signatory to this Agreement unless and until such Permitted Transferee shall have executed and delivered a Joinder providing that such Permitted Transferee agrees to be bound by the terms of this Agreement and shall be deemed to be a Subsequent Pledgor hereunder.

**Section 32. Service of Process and Jurisdiction**

(a) The Reorganized Debtor and each of the other Pledgors consent to service of process by overnight mail or overnight delivery by a nationally recognized overnight courier, at the address to which notices are to be given under Section 27 hereof, it being agreed that service in such manner shall constitute valid service upon the Reorganized Debtor and each of the other Pledgors or their respective successors, heirs, legatees, or assigns in connection with any action or proceeding arising out of, connected with, related to, or incidental to this Agreement; *provided, however*, that nothing in this Section 32 shall affect the right of any Party, or its respective nominees, heirs, successors, legatees, and assigns, to serve legal process in any other manner permitted by the applicable Laws of the jurisdiction in which such action or proceeding is brought.

(b) Except as provided in subsection (c) below, the Reorganized Debtor and each of the other Pledgors irrevocably agree that all disputes arising out of, connected with, related to, or incidental to this Agreement, whether arising in contract, tort, or otherwise, must be resolved exclusively by state or federal courts located in Trenton, New Jersey, and the Reorganized

Debtor and each of the other Pledgors irrevocably waive any objection to the location of the court considering the dispute or any claim that the Reorganized Debtor or any other Pledgor is not personally subject to the jurisdiction of such court; however, each of the Parties acknowledges that any appeals from those courts may be heard by a court outside of Trenton, New Jersey.

(c) The Secured Party shall have the right to proceed in a court in any location to enable the Secured Party to (1) obtain personal jurisdiction over any other party or any property of any other party, including any collateral, or (2) to enforce a judgment or other court order in favor of the Secured Party. The Reorganized Debtor and each of the other Pledgors waive any objection to the location of the court in which the Secured Party has commenced a proceeding described in this subsection.

**Section 33. Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without reference to principles of conflicts of law thereunder, and applicable federal law.

**Section 34. WAIVER OF TRIAL BY JURY.**

(a) **THE REORGANIZED DEBTOR AND EACH OF THE OTHER PLEDGORS IRREVOCABLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO OR INCIDENTAL TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT. THE REORGANIZED DEBTOR AND EACH OF THE OTHER PLEDGORS AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY BENCH TRIAL WITHOUT A JURY AND THAT ANY PARTY THERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE REORGANIZED DEBTOR AND EACH OF THE OTHER PLEDGORS TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY.**

(b) **THE REORGANIZED DEBTOR AND EACH OF THE OTHER PLEDGORS REPRESENT AND WARRANT TO HAVING DISCUSSED, OR HAVING HAD AN OPPORTUNITY TO DISCUSS, THIS AGREEMENT AND SPECIFICALLY THE PROVISIONS OF THIS SECTION 34 WITH COUNSEL OF THEIR OWN CHOOSING.**

**Section 35. No Waiver.** No failure or delay of the Secured Party of any kind in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. No waiver by the Secured Party of any default, Event of Default, or breach of this Agreement shall operate as a waiver of any other default, Event of Default, or breach of this Agreement or of the same default, Event of Default, breach of this Agreement on a future occasion, and no action by the Secured Party hereunder shall in any way affect or impair

the Secured Party's rights and remedies or the obligations of the Reorganized Debtor and the other Pledgors under this Agreement. No notice or demand on the Reorganized Debtor or any of the other Pledgors in any case shall entitle the Reorganized Debtor or any other Pledgor to any other or further notice in similar or other circumstances.

**Section 36. Parties Bound.** This Agreement shall inure to the benefit of the Secured Party and each of its respective nominees, successors, and assigns, and shall be binding on the Reorganized Debtor and the other Pledgors, and each of their respective nominees, heirs, successors, legatees, devisees, and assigns, including any transferees or beneficiaries of any kind with regard to any or all of the Pledged Collateral.

**Section 37. No Third-Party Beneficiaries.** Notwithstanding anything to the contrary contained herein, no provision of this Agreement is intended to benefit any party other than the Parties hereto, nor shall any such provision be enforceable by any other party.

**Section 38. Counterparts.** This Agreement may be executed in any number of counterparts and by different Parties on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (*e.g.*, "pdf" or "tif" file format) shall be effective as delivery of a manually executed counterpart of this Agreement.

[*Signatures of the Parties Follow*]

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Agreement as of the date first written above.

**REORGANIZED DEBTOR:**

ATTEST:

By:____________________
Name:____________________
Title:____________________

DURO DYNE NATIONAL CORP.,
a New York corporation

By: ____________________
Name: ____________________
Title: ____________________

**INDIVIDUAL PLEDGORS:**

WITNESS:

____________________
Name:____________________

____________________
Name: Irene Hinden

WITNESS:

____________________
Name:____________________

____________________
Name: Randall Hinden

WITNESS:

____________________
Name:____________________

____________________
Name: Wendy Hinden

**SECURED PARTY:**

WITNESS:

DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust

______________________________
Name:__________________________

By: ____________________________
Name: __________________________
Title: ___________________________

**SCHEDULE 1**

| Individual Pledgor | Shares of Reorganized Duro Dyne Stock Held | Shares of Reorganized Duro Dyne Stock Pledged ("Pledged Shares") | Percentage of Shares of Reorganized Duro Dyne Stock Held That Are Pledged Shares |
|---|---|---|---|
| Irene Hinden | 1,000 | 501 | 50.1% |
| Randall Hinden | 1,000 | 501 | 50.1% |
| Wendy Hinden | 1,000 | 501 | 50.1% |
| **TOTAL** | **3,000** | **1,503** | **50.1%** |

## SCHEDULE 2

| Pledgor | Number of Shares of Duro Dyne Canada Stock Held | Percentage of Issued and Outstanding Duro Dyne Canada Stock Held | Number of Shares of Duro Dyne Canada Stock Pledged ("Pledged Shares") | Percentage of Issued and Outstanding Shares of Duro Dyne Canada Stock That Are Pledged Shares |
|---|---|---|---|---|
| Duro Dyne National Corp. | 266.66 | 100% | 133.59666 | 50.1% |

# Plan Exhibit F

## Trust Distribution Procedures

(The Trust Distribution Procedures are attached as Exhibit 3 to the Transmittal Form)