Margaret F. Catalano
Christina R. Salem
570 Lexington Avenue – 8th Floor
New York, New York 10022
(212) 252-0004
meg.catalano@kennedyscmk.com
christina.salem@kennedyscmk.com

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 525-4147
george@ifrahlaw.com

*Attorneys for The North River Insurance Company*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>DURO DYNE NATIONAL CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>**Case No. 3:19-cv-15433-MAS** |

**THE NORTH RIVER INSURANCE COMPANY'S OBJECTION TO THE BANKRUPTCY COURT'S REPORT AND RECOMMENDATION FOR ENTRY OF: (A) FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO THE THIRD AMENDED PLAN OF REORGANIZATION; and (B) CONFIRMATION ORDER**

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

# TABLE OF CONTENTS

INTRODUCTION ........................................................ 1
NORTH RIVER'S RESPONSES ........................................................ 5
I. The Bankruptcy Court Improperly Admitted Evidence (Objections to Bankruptcy Court's Proposed Findings ¶ 5 and Throughout) ........................................................ 5
II. The Plan Was Not Proposed in Good Faith (Objections to Bankruptcy Court's Proposed Findings ¶¶ 5, 35–40, 98, 100–101) ........................................................ 8
A. The Plan Was Proposed to Gain Leverage over Insurers ........................................................ 9
B. The Plan Seeks to Evade Review by Redefining Substantial Consummation ....... 16
III. The Plan's Classification and Treatment of Its Reimbursement Claims is Unlawful, Precluding Confirmation (Objections to Bankruptcy Court's Proposed Findings ¶¶ 45–47, 52–54) ........................................................ 19
A. The Plan Cannot Be Confirmed to The Extent It Classifies North River's Claims for Recovery of Post-Petition Defense Costs and Pre- and Post-Petition Indemnity Costs as Class 7 Channeled Asbestos Claims ........................................................ 19
B. Even if North River's Claims Are Properly Classified in Class 7, The Plan Cannot be Confirmed Because it Does Not Provide North River's Claims with .. the Same Treatment Provided to Other Class 7 Claims ........................................................ 24
IV. The Plan Does Not Satisfy Section 524(g) (Objections to Bankruptcy Court's ... Proposed Findings ¶¶ 64–80, 85–88) ........................................................ 29
A. North River's Claims May Not Be Enjoined ........................................................ 29
B. The Plan Fails to Satisfy Section 524(g)(2)(B)(i)(II) ........................................................ 32
C. The Plan Fails to Satisfy Section 524(g)(2)(B)(i)(III) ........................................................ 33
D. The Plan Fails to Satisfy Section 524(g)(2)(B)(ii)(III) ........................................................ 37
E. The Plan Fails to Satisfy Section 524(g)(2)(B)(ii)(V) ........................................................ 40
F. The Plan Fails to Satisfy Section 524(g)(4)(B)(ii) ........................................................ 41
V. The Plan Cannot Be Confirmed Because It Does Not Satisfy "The Best Interests of Creditors" Requirement of Section 1129(a)(7) (Objections to Bankruptcy Court's Proposed Findings ¶¶ 106–109) ........................................................ 46
VI. The Plan Cannot Be Confirmed Because It Does Not Satisfy Section 1129(b) (Objections to Bankruptcy Court's Proposed Findings ¶¶ 124–129) ........................................................ 52
A. The Plan Fails to Satisfy the Absolute Priority Requirement of Section 1129(b)(2)(B)(i) ........................................................ 52
B. The Plan Fails to Provide North River With "Cramdown" Protection Under Section 1129(b) With Respect to Its Class 7 Claims ........................................................ 52
VII. The Proposed Settlements/Sales Cannot Be Approved (Objections to Bankruptcy Court's Proposed Findings ¶¶ 62, 89–95) ........................................................ 55
CONCLUSION ........................................................ 67

## TABLE OF AUTHORITIES

**Cases**

*Begier v. IRS*,
496 U.S. 53 (1990)....25

*Burns & Roe Enters., Inc.*,
No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009)....37

*Chesapeake Ins. Co. v. Curiale (In re Realex Group, N.V.)*,
210 A.D.2d 91 (N.Y. App. Div., 1st Dep't 1994)....54

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017)....56

*DaimlerChrysler Ins. Co. v. Universal Underwriters Ins. Co.*,
2010 N.Y. Misc. Lexis 1686 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 31, 2010)....58

*Folger Adam Security, Inc. v. Dematteis/Macgregor, JV*,
209 F.3d 252 (3d Cir. 2000)....59

*Furness v. Lilienfield*,
35 B.R. 1006 (D. Md. 1983)....15

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004)....8, 44

*In re Affiliated Foods, Inc.*,
249 B.R. 770 (Bankr. W.D. Mo. 2000)....47

*In re AOV Indus., Inc.*,
792 F.2d 1140 (D.C. Cir. 1986)....20

*In re Argus Group 1700, Inc.*,
206 B.R. 757 (E.D. Pa. 1997)....15

*In re Chateauguay Corp.*,
89 F.3d 942 (2d Cir. 1996)....24

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d. Cir. 2004).... *passim*

*In re Congoleum Corp.*,
362 B.R. 198 (Bankr. D.N.J. 2007).... *passim*

*In re Cont'l Airlines*,
91 F.3d 553 (3d Cir. 1996)....18

*In re Corp Res. Servs., Inc.*,
564 B.R. 196 (Bankr. S.D.N.Y. 2017)....54

*In re Dow Corning Corp.*,
237 B.R. 380 (Bankr. E.D. Mich. 1999)....51

*In re Elsinore Shore Assoc.*,
91 B.R. 238 (Bankr. D.N.J. 1988)....49

*In re Fraser's Boiler Serv., Inc.*,
No. 3:18-CV-05637-RBL, 2019 WL 1099713 (W.D. Wash. Mar. 8, 2019) ................ 62, 64, 66

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ..................................................................................9

*In re H & L Developers, Inc.*,
178 B.R. 77 (Bankr. E.D. Pa. 1994) ..............................................................................19

*In re HBA East, Inc.*,
87 B.R. 248 (Bankr. E.D.N.Y. 1988) ..............................................................................15

*In re Jersey City Med. Ctr.*,
817 F.3d 1055 (3d Cir. 1987)...........................................................................................21

*In re Jevic Holding Corp.*,
787 F.3d 173 (3d Cir. 2015), *rev'd on other grounds*,
*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017).............................................56

*In re Martin*,
51 B.R. 490 (Bankr. M.D. Fla. 1985)...............................................................................15

*In re Martin*,
91 F.3d 389 (3d Cir. 1996)...............................................................................................56

*In re New Valley Corp.*,
168 B.R. 73 (Bankr. D.N.J. 1994) ...............................................................................8, 44

*In re Nutraquest Inc.*,
434 F.3d 639 (3d Cir. 2006)..............................................................................................55

*In re One2One Commc'ns, LLC*,
805 F.3d 428 (3d Cir. 2015)..............................................................................................18

*In re Paolini*,
No. 85-00759F, 1991 WL 284107 (Bankr. E.D. Pa. 1991) ..............................................1

*In re Penn Central Trans. Co.*,
383 F. Supp. 1128 (E.D. Pa. 1974)....................................................................................59

*In re Plant Insulation Co.*,
734 F.3d 900 (9th Cir. 2013)...................................................................33, 35, 36, 51

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)................................................................................................8

*In re Quigley Co.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007)...............................................................20, 24, 42

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010)...............................................................47, 50, 51

*In Re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999)........................................................................................ 14, 15

*In re Sierra-Cal*,
210 B.R. 168, 172 (Bankr. E.D. Cal. 1997) ......................................................................47

*In re Silberkraus*,
253 B.R. 890 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003) ...............................9

*In re SportStuff, Inc.*,
430 B.R. 170 (B.A.P. 8th Cir. 2010) ..............................................................................31

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ..............................................................................47

*In re Trans World Airlines, Inc.*,
322 F.3d 283 (3d Cir. 2003)........................................................................................ 61, 66

*In re Tribune Co.*,
476 B.R. 843 (Bankr. D. Del. 2012) ..............................................................................20

*In re Tribune Media Co.*,
799 F.3d 272 (3d Cir. 2015)..........................................................................................18

*In re Union Meeting Partners*,
165 B.R. 553 (Bankr. E.D. Pa. 1994) ............................................................................51

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ...................................................................................... 11, 44, 51

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013), *and aff'd*, 729 F.3d 311 (3d Cir. 2013), *and aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013)). ...............................44

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013).................................................................................... *passim*

*In re W.R. Grace & Co.*,
900 F.3d 126 (3d Cir. 2018)..........................................................................................60

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)..........................................................................................20

*Keyspan Gas East Corp. v Munich Reins. Am., Inc.*,
96 N.E.3d 209 (N.Y. 2018) ..........................................................................................57

*MacArthur Co. v. Johns-Manville Corp.*,
837 F.2d 89 (2d Cir. 1988) (2d Cir. 1988) ........................................................30, 59, 60, 64

*Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*,
602 F.2d 538 (3d Cir. 1979)..........................................................................................35

*Maritime Elec. Co., Inc. v. United Jersey Bank*,
959 F.2d 1194 (3d Cir. 1991)..........................................................................................1

*Maryland Cas. Co. v. W.R. Grace & Co.*,
218 F.3d 204 (2d Cir. 2000)..........................................................................................58

*Matter of Zale Corp.*
62 F.3d 746 (5th Cir. 1995)..........................................................................................56

*Mercury Capital Corp. v. Milford Connecticut Assocs.*,
354 B.R. 1 (D. Conn. 2006) ....................51

*Northview Motors, Inc. v. Chrysler Motors Corp.*,
186 F.3d 346 (3d Cir. 1999) ....................55

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ....................55

*Ray v. Norseworthy*,
90 U.S. 128 (1874) ....................59

*Russello v. United States*,
464 U.S. 16 (1983) ....................46

*Scotts Co., LLC v. Ace Indem. Ins. Co.*,
18 Misc. 3d 1139(A) (N.Y. Sup. Ct. N.Y. Cnty. Feb. 26, 2008) ....................58

*United States v. Wong Kim Bo*,
472 F.2d 720 (5th Cir. 1972) ....................46

**Statutes**

11 U.S.C. § 363 ....................31, 59, 60, 61

11 U.S.C. § 506 ....................53

11 U.S.C. § 524 .................... *passim*

11 U.S.C. § 533 ....................53

11 U.S.C. § 553 ....................53

11 U.S.C. § 1101 ....................17, 19

11 U.S.C. § 1122 ....................19, 25

11 U.S.C. § 1123 .................... *passim*

11 U.S.C. § 1129 .................... *passim*

**Other Authorities**

140 Cong. Rec. 6, 8,021 (1994) ....................11

140 Cong. Rec. S4521–01 (Apr. 20, 1994) ....................32

4 *Collier on Bankruptcy*
¶ 524.07 (16th ed. 2013) ....................34

7 *Collier on Bankruptcy*
¶ 1129.03[7][b] (15th ed. Rev. 2004). ....................47

Sander L. Esserman & David J. Parsons,
*The Case for Broad Access to 11 U.S.C. § 524(g)*, NYU ANNUAL SURVEY OF AMERICAN LAW, Aug. 7, 2006 ....................11

UCC § 9-602 ....................35

UCC § 9-608 ....................34

UCC § 9-620 ....................35

**Rules**

Fed. R. Bankr. P. 9019 ....................55

Fed. R. Bankr. P. 9033 ....................4

The North River Insurance Company ("North River") respectfully submits the following objections to the Bankruptcy Court's Recommendation for Entry of: (A) Findings of Fact and Conclusions of Law with Respect to the Third Amended Plan of Reorganization; and (B) Confirmation of Order, Dkt. 784-1[2] ("Bankruptcy Court's Proposed Findings"). The Bankruptcy Court's Proposed Findings are not supported by the evidence or the law and, as such, this Court should decline to confirm Debtors' Third Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.*, under Chapter 11 of the Bankruptcy Code, as Modified, Dkt. 784-2 (the "Plan").

## **INTRODUCTION**

The Bankruptcy Court has submitted proposed findings and conclusions recommending that this Court confirm the Plan and approve certain settlements with several of Debtors' insurers. In doing so, the Bankruptcy Court has acted out of convenience and an apparent desire to confirm a plan regardless of its adherence to the Bankruptcy Code. The Bankruptcy Court's Proposed findings require this Court to violate the Federal Rules of Evidence by accepting unsupported opinion testimony, testimony that lacks foundation, and findings that have no evidentiary support whatsoever. North River submits that this Court, in conducting a *de novo* review of the evidence before the Court should find that the Plan Proponents woefully have failed to carry their burden of proof on multiple confirmation standards and have asked the Court to confirm a plan that violates multiple provisions of the Bankruptcy Code. North River does not dispute that confirmation would be convenient for the Plan Proponents, but it is impermissible.

[2] Docket cites throughout these objections refer to the Bankruptcy Court docket, No. 18-27963-MBK (Bankr. D.N.J.). Due to the voluminous nature of the Bankruptcy Court record, North River respectfully requests that this Court take judicial notice of this docket and filings therein. *See, e.g.*, *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); *In re Paolini*, No. 85-00759F, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa. 1991).

Only relatively minor changes that would protect North River's rights are necessary to render the Plan confirmable. But the Plan Proponents will not make those changes because, as they have repeatedly admitted, this Plan was designed and intended to "put leverage" on Debtors' insurers. They needed that leverage because, as they further admitted, "the Debtors have been forced to bear an increasing share of settlements and defense costs due to the insolvency of one of the Debtors' insurance carriers, the exhaustion of the Debtors' primary insurance coverage, and disputes with insurance carriers providing excess level coverage." Second Amended Disclosure Statement for Second Amended Prenegotiated Plan of Reorganization for Durodyne [sic] National Corp., *et al.*, ("Second Amended Disclosure Statement"), Dkt. 278, at 14. Nowhere in their explanation of the motivations for the filing of this case did the Debtors contend that they could not pay all asbestos claims in full or that a trust structure was necessary to treat present and future claims equitably. This case is the result of a scheme whereby the Debtors and tort claimants came together to put pressure on insurers. As part of the deal, the Debtors would get a complete release and propose the creation of a trust that settled, but did not defend claims, making it far easier for claimants to obtain recovery. At the same time, they proposed to strip any non-settling insurer of its state law rights without compensation.

In their effort to gain leverage over their insurers, the Debtors artificially split North River's claims into separate classes and seek to have the largest claims classified with asbestos tort claims and ineligible for payment. To understand the context of the proposed Plan and North River's objections, the Court must understand some of the Debtors' claims history and the nature of North Rivers' claims.

Although Debtors have been subject to asbestos liability, prior to the bankruptcy, Debtors and their insurers had successfully defended and resolved those asbestos claims, with approximately 90% of all claims being dismissed without payment of any sort. Debtors were unhappy, however, with certain state court coverage rulings that North River obtained that would have required Debtors to pay for a share of its defense and indemnity costs. Debtors have never disputed that it could afford to pay those costs; they simply did not want to pay them.

North River effectively has five different claims at issue in this case:

(1) A claim for pre-petition defense costs that have been classified as Class 6 and which the Debtors propose to pay in full over time. The Bankruptcy Court allowed this claim for voting purposes in the amount of $7,889,058.07. This claim is not contingent or unliquidated, but is disputed.

(2) A claim for pre-petition indemnity costs that North River paid in excess of its allocable share. This claim has been classified in Class 7 (with asbestos claims) and will be ineligible for payment. The Bankruptcy Court allowed this claim for voting purposes in the amount of $462,166.79. The claim is not unliquidated or contingent, but is disputed.

(3) A claim for post-petition indemnity costs to the extent North River is asked to pay more than its share of any liability. This claim has been classified in Class 7 (with asbestos claims) and will be ineligible for payment. North River, however, does not believe that there will be any claims in this category because it does not intend to pay more than its share of any claim. To the extent North River were asked to pay more than its share of indemnity, the proposed Plan and Trust Distribution Procedures ("TDPs"), Dkt 784-3, provide that North River will be entitled to a judgment reduction or setoff that would eliminate such claims.

(4) A claim for post-petition defense costs. This claim has been classified in Class 7 (with asbestos claims) and will be ineligible for payment. The Bankruptcy Court allowed this claim for voting purposes at $24.53 million. The proposed Plan does not provide for any treatment or value to be provided to North River with respect to this claim.

(5) A claim against the Trust arising out of contribution claims against settling insurers for defense costs. This claim has not been classified or will be classified as Class 7 claim.[3] As with the claim temporarily allowed by the Bankruptcy

[3] Because these claims were not against the Debtors, North River did not file a proof of claim with respect to such claims expressly, though its proofs of claim reserved rights with respect to any

> Court, this claim will be ineligible for payment or reduction of any kind despite the fact that it would be paid in full by non-debtor parties outside of bankruptcy.

The entire Plan is structured to relieve the Debtors and settling insurers of their obligations with respect to the substantial claims in the fourth and fifth category. While the Bankruptcy Code allows for broad injunctive relief, it carefully balances the rights of creditors against the desire to provide a debtor with a fresh start. Congress did not authorize bankruptcy courts to strip creditors of their rights under state law without providing a corresponding right or protection under the Code. But here, the Plan Proponents and the Bankruptcy Court seek to do just that – strip North River of valuable rights against both the Debtors and non-debtor third parties while giving it nothing in return. The Bankruptcy Code does not permit such a result.

Pursuant to Bankruptcy Rule 9033, this Court is obligated to conduct a *de novo* review of the evidence submitted with respect to confirmation of the Plan Proponents' proposed Plan. As discussed in detail with respect to each proposed finding or conclusion below, the Bankruptcy Court's proposed findings of fact and conclusions of law should be rejected by this Court. The proposed Plan is unconfirmable for multiple reasons, including but not limited to the facts that the proposed Plan, (i) impermissibly classifies and discriminates against North River's claims; (ii) was filed with improper purposes in bad faith; (iii) fails to satisfy the best interest of creditors test; and (iv) fails to satisfy the requisite findings necessary for the issuance of a Section 524(g) injunction. For similar reasons, the settlements recommended for approval by the Bankruptcy Court cannot be approved. In each instance, the proposed settlement orders provide for relief that is either beyond the power of this Court or improper for failing to provide adequate protection to North River's interests.

---

contribution claims. The claims will arise only if North River's claims against the settling insurers are channeled to a trust created by a confirmed plan.

## NORTH RIVER'S RESPONSES

### I. The Bankruptcy Court Improperly Admitted Evidence (Objections to Bankruptcy Court's Proposed Findings ¶ 5 and Throughout)

During the Confirmation Hearing, the Plan Proponents' proof consisted primarily of the declarations and testimony of the Debtors' financial advisor, Mark Podgainy; and the Future Claims Representative ("FCR"), Lawrence Fitzpatrick. March 6, 2019 Confirmation Hrn'g Tr. ("Mar. 6 Tr.") at 34:15–23 (attached hereto as **Exhibit A**). At the Confirmation Hearing, the Bankruptcy Court overruled North River's objection to admission of several portions of Mr. Podgainy's certification, Certification of Mark Podgainy in Support of Confirmation in Support of Confirmation of the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the United States Bankruptcy Code ("Podgainy Cert."), Dkt. 483, but stated that the Bankruptcy Court would "accord the appropriate weight as necessary that's appropriate to the various representation . . .." Mar. 6 Tr. at 35:20, 83:1–7. The Bankruptcy Court did, however, refuse to permit Mr. Podgainy to testify concerning certain subjects because they were not within his knowledge. *See* Mar. 6 Tr. at 88 (sustaining objection that statements in certification were not Mr. Podgainy's testimony, but came from someone else). The Federal Rules of Evidence (including Rules 602, 702, and 801–04) apply in bankruptcy confirmation hearings. Those rules preclude the admission of the Podgainy Certification and Mr. Fitzpatrick's declaration, Decl. of Lawrence Fitzpatrick in Support of Confirmation of Second Am. Pre-Negotiated Plan of Reorganization for Duro Dyne National Corp., *et al.* Under Chapter 11 of the Bankruptcy Code ("Fitzpatrick Decl."), Dkt. 484, because they extensively rely on hearsay, lack foundation, and contain improper legal conclusions.

Mr. Podgainy is a Managing Director at Getzler Henrich & Associates, LLC, and is a financial advisor for the Debtors in this matter. On February 26, 2019, Mr. Podgainy submitted

his certification in support of confirmation of the Second Amended Plan. The Podgainy Certification states that in drafting the certification, Mr. Podgainy relied on "[his] personal knowledge, information and belief, review of relevant documents, *inquiries made to others*, [his] knowledge of the Debtors' business affairs and financial condition and the *legal and financial advice provided by the professionals retained by the Debtors*." Podgainy Cert. ¶ 2 (emphasis added). Thus, Mr. Podgainy acknowledges in paragraph 2 of his certification that he does not have personal knowledge of all stated facts, and that he relied on hearsay and the legal conclusions of others. Based on the time entries that he has submitted to the Court, there is no factual evidence or basis to believe that Mr. Podgainy has actual knowledge of these topics.

Paragraphs 3–22, 36, 39–42 are taken verbatim, or nearly verbatim, from the Second Amended Disclosure Statement. Further, the Podgainy Certification recounts various actions taken in this matter of which Mr. Podgainy has no personal knowledge. *See, e.g.*, Podgainy Cert. ¶¶ 46–50. Finally, the Podgainy Certification relies on the legal conclusions of others regarding the Plan's compliance with the Bankruptcy Code. *Id.* ¶¶ 54–83.

Here, the Podgainy Certification includes excerpts taken verbatim from Debtors' Second Amended Disclosure Statement about which Mr. Podgainy, as neither manager nor an employee of Debtors, could not have personal knowledge and about which he only could have learned through others. In fact, Mr. Podgainy admitted as much on the stand during the Confirmation Hearing. *See* Mar. 6 Tr. at 39–82. *See id* at 40:17–23 ("Q: The first thing – did you write this certification yourself? A: No. Q: Okay. Who wrote it? A: Counsel. Q: Counsel for debtors? A: Yes."), 48:21–25 ("Q: So for the next several paragraphs of your declaration where you're describing the negotiations and the process of the bankruptcy filing, this is all – this is all material that was drafted by counsel for the debtors, isn't it? A: Yes."), 53:21–4 ("You testified

earlier you're not an attorney. In paragraph 31 you've got a statement that you believe – that debtors believe that based on underlying State law, that this claim should be expunged in its entirety. That's not your firsthand statement, is it? A: It's – it's based on the discussions I've had internally. A: So someone else has told you that they think this should be expunged? A: Correct."). Thus, these sections represent hearsay and information about which Mr. Podgainy has no personal knowledge. Further, the hearsay sections fail to fall under any of the exemptions of Federal Rule of Evidence 807 because they are Debtors' (and its counsel's) assessment of their own Plan and, as such, do not meet the stringent standards of trustworthiness set forth in the Rule.

The Podgainy Certification admittedly offers legal conclusions arrived at by others, including the Debtors' lawyers, that are not admissible under the Federal Rules of Evidence. A substantial portion of the Certification (*i.e.*, Section VII and VIII) contains opinion statements that the Plan complies with various provisions of the Bankruptcy Code with no discussion of how or why that is so. Such pure statements of legal opinion offer nothing of value to the Court. The Bankruptcy Court should have refused to admit the Mr. Podgainy's certification or limited it to the matters on which he has first-hand knowledge.

Similarly, and as discussed below, the Bankruptcy Court also accepted the Fitzpatrick Declaration subject to determining appropriate weight for the statements contained therein. Like Mr. Podgainy's certification, Mr. Fitzpatrick's declaration was full of unsupported, conclusory statements about which he had no personal knowledge. In many instances, he expressly stated that he or "his counsel" had done work and he did not have first-hand knowledge about which he was testifying. Critically, Mr. Fitzpatrick had no foundation for multiple statements that were relied upon by the Bankruptcy Court in its proposed findings. Mr. Fitzpatrick admittedly did not

do any investigation of the Debtors' claims or the available insurance or other assets. Similarly, Mr. Fitzpatrick testified at length that he did not know how Channeled Asbestos Claims were to be treated. Mar. 6 Tr. at 165–166. As such, his statements concerning the Debtors' claims and the need for Section 524(g) relief lack any foundation and the Court cannot rely on them.

For those reasons, and for the reasons stated below with respect to specific proposed findings, the Bankruptcy Court should not have admitted or relied on those declarations and North River renews its objection to their admission.

## II. The Plan Was Not Proposed in Good Faith (Objections to Bankruptcy Court's Proposed Findings ¶¶ 5, 35–40, 98, 100–101)

Pursuant to Section 1129(a)(3), a bankruptcy plan must be proposed in good faith and may not be proposed by any means forbidden by law. "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246–47 (3d. Cir. 2004) (quoting *In re PWS Holding Corp*., 228 F.3d 224, 241 (3d Cir. 2000)). Furthermore, a plan must be fundamentally fair, which requires that "the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (citation omitted); *see also In re New Valley Corp*., 168 B.R. 73, 80–81 (Bankr. D.N.J. 1994) ("A further refinement of the test for whether a plan is proposed in good faith is found in the notion that the plan must provide for fundamental fairness in dealing with creditors." (citation omitted)). As a practical matter, a court may find that a plan is proposed in bad faith if, for example, the plan is proposed as a tactic to delay or frustrate the efforts of stakeholders to enforce their rights.

As the Bankruptcy Court acknowledges, Bankruptcy Court's Proposed Findings ¶ 98, the Plan Proponents bear the burden of establishing good faith and fundamental fairness. *See In re Greate Bay Hotel & Casino, Inc*., 251 B.R. 213, 221 (Bankr. D.N.J. 2000) ("The proponent bears the burden of establishing the plan's compliance with each of [the] requirements [of Section 1129(a)]."); *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000) (debtor bears the burden of establishing "good faith" and fundamental fairness), *aff'd*, 336 F.3d 864 (9th Cir. 2003).

Although the Bankruptcy Court proposes to conclude that the Plan was filed in good faith, the Bankruptcy Court never addresses the fundamental fairness of the Plan as to North River. To the contrary, it acknowledges the standard and then never mentions it again. This omission was necessary because no objective observer could conclude that the Plan is fair to North River. The Plan Proponents and their proposed Plan violate numerous provisions of the Bankruptcy Code. While those violations individually provide grounds to deny confirmation – taken together they collectively show that the Plan is not proposed in good faith.

**A. The Plan Was Proposed to Gain Leverage over Insurers**

The Bankruptcy Court proposes that this Court find that "[t]he primary reason for the filing of the Debtors' Chapter 11 Cases was the need to address the Company's asbestos liability." Bankr. Ct.'s Proposed Findings ¶ 5. The Bankruptcy Court cites as support Mr. Podgainy's certification and testimony. *Id.* (citing Podgainy Cert. ¶ 3; Mar. 6 Tr. at 41, 86–87). In fact, the evidence shows that the true purpose for Debtors' Chapter 11 Cases was to gain leverage over its insurers, including North River. Mr. Fitzpatrick expressly admitted that the purpose of the Plan was litigation "leverage." Mar. 6 Tr. at 135. In argument on January 31, 2019, counsel for the ACC admitted that the design of the Plan is to "maximize" the recovery

from insurers. January 31, 2019 Motions Hrn'g Tr. ("Jan. 31 Tr.") at 57, 58 (attached hereto as **Exhibit B**).

The structure of the Plan bears out these admissions: the Plan proposes to strip North River of its state law rights and to extinguish North River's claims without payment. Plan §§ 4.13, 4.14; TDPs § 5.5. In contrast, similarly-situated unsecured creditors are paid in full, asbestos creditors are treated favorably, and equity holders retain their interests.[4] *See* Plan § 3.3.

North River objected to the Plan because it was admittedly filed to gain a tactical advantage and not out of motivation to reorganize a financially-troubled company. The Bankruptcy Court acknowledges that Debtors were solvent, operating companies. Because Debtors face asbestos liabilities, however, the Bankruptcy Court proposes that this Court find that "§ 524(g) is somewhat of an exception to the general rule" that Chapter 11 is "intended to reorganize financially troubled businesses." Bankr. Ct.'s Proposed Findings ¶ 35. While Congress certainly intended Section 524(g) to provide relief to companies facing asbestos liability, they did not otherwise relieve debtors facing asbestos liabilities from complying with other provisions of the Bankruptcy Code. Indeed, the Third Circuit addressed this very issue,

---

[4] The Debtors and the Hindens are contributing $26 million to the proposed Trust. This amount is approximately equivalent to the Debtors' share of projected indemnity liability. *See* Rpt. Of Marc C. Scarcella., M.A. ("Scarcella Rpt."), Dkt. 368-5, at 32, fig. 36. Historically, the Debtors have obtained dismissals of more than 90% of the asbestos claims filed against them. *See id.* at 9. Because pro rata allocation applies to the asbestos claims as a matter of governing New York insurance law, as discussed in greater detail below in Section III(A), the Debtors are responsible for a significant portion of any settlement or defense costs associated with those claims. As the Debtors' Chief Executive Officer, Randall S. Hinden, acknowledged, "the Company has been forced to bear an increasing share of settlements and defense costs due to the insolvency of one of the Company's insurance carriers, the exhaustion of the Company's primary insurance coverage, and disputes with insurance carriers providing excess level coverage . . .." Declaration of Randall S. Hinden in Support of Chapter 11 Petitions and First Day Pleadings filed by Jeffrey D. Prol on behalf of Duro Dyne National Corp., Dkt. 3, at 8. The purpose of the Plan, therefore, was to relieve the Debtors of their share of defense costs and to shift that costs on to Debtors' insurers.

stating "Section 524(g) is a special provision of the Bankruptcy Code created by Congress to provide 'supplemental injunctive relief for an *insolvent* debtor facing the unique problems and complexities associated with asbestos liability.'" *Combustion Eng'g*, 391 F.3d at 234 (emphasis added); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 91 (D. Del. 2012). As the Debtors were and continue to be a solvent, operating company, Section 524(g) relief is neither mandated nor appropriate.

Conceding that the Debtors were solvent, operating companies, the Bankruptcy Court manufactures a factual finding that lacks any support, proposing that this Court find:

> Ironically and tragically, these Debtors' very survival is threatened by the costs of their own defense attorneys retained under their insurance policies. A bankruptcy filed pursuant to § 524(g) removes that uncertainty and "facilitates the company's ongoing viability, which in turn provides the trust 'with an "evergreen" source of funding to pay future claims.'" *In re W.R. Grace & Co.*, 729 F.3d 311, 320 (3d Cir. 2013) (quoting *Combustion Eng'g,* 391 F.3d at 234). It defies logic to conclude that a bankruptcy under § 524(g) should only be available to financially troubled businesses because § 524(g) specifically contemplates a substantial ongoing business that can make continuous payments to the trust. This interpretation is adopted by many courts, discussed in scholarly articles, and finds support in the statute's legislative history. *See, e.g.*, 140 Cong. Rec. 6, 8,021 (1994) (statement of senator Brown); Sander L. Esserman & David J. Parsons, *The Case for Broad Access to 11 U.S.C. § 524(g)*, NYU ANNUAL SURVEY OF AMERICAN LAW, Aug. 7, 2006 at 201-202; *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004). In light of the structure of a § 524(g) injunction, it would be nonsensical to limit its use to companies on the brink of financial collapse when, in fact, the ideal candidate for a § 524(g) injunction is a healthy business that is, and will remain, a viable operation that can maximize the trust's assets to pay claims.

There is no factual support for the first part of this analysis and no legal justification for the second.[5]

The Bankruptcy Court cited no evidence to support this proposed finding. That omission has a sound basis: there is no evidence that the Debtors' cannot afford to pay their share of

---

[5] Even if this Court were to adopt this standard, it would result in denial of confirmation because the Plan admittedly does not provide an "evergreen" funding source.

defense or indemnity costs. To the contrary, Mr. Podgainy and Marc Scarcella, North River's expert witness, provided extensive evidence that the Debtors have sufficient assets to pay all of their creditors in full outside of the bankruptcy process. The Debtors' financial projections show that the Debtors will have annual earnings before interest, tax, depreciation and amortization ("EBITDA") in excess of $7 million (and approaching $9 million in some years) beginning in 2019. Podgainy Cert., Ex. D at 32. Those projections also show that the Debtors will have in excess of $5 million in net income each year beginning in 2021, with over $4 million in 2020. *Id.*, Ex. D at 33.[6] Mr. Podgainy's projections end in 2022, but he testified that he knew of no reason why the projections beyond 2022 would result in lower income to the Debtors. Mar. 6 Tr. at 64. He further testified that the projections were consistent with the Debtors' past performance. Mar. 6 Tr. at 58–59. Based on Mr. Podgainy's projections, over the term of the twenty-year Trust Note, the Debtors will have at least $100 million in net income.

Although Plan Proponents chose not to analyze the asbestos liability, Mr. Scarcella prepared a report addressing the likely future claims against the Debtors. Projected asbestos liabilities are estimated to be a maximum of $34.7 million (undiscounted) over thirty years. *See* Scarcella Rpt. at 7. The median and minimum scenarios are far less: $24.7 and $12.6 million, respectively. *Id.* Defense costs are estimated to be a maximum of $51.3 million (undiscounted for present value). *Id.*

Historically, Debtors' insurers have paid for defense costs up front and also paid a share of indemnity expense for settled claims. Second Amended Disclosure Statement at 14–15; Scarcella Rpt., Ex. C-11 at 11–12. Under each scenario, however, the Debtors have sufficient

[6] Mr. Podgainy's financial projections are adjusted for payments to be made under the proposed Plan and, as such, are not "raw" financial projections.

income to pay their share of present and future claims in full. *Cf.* Podgainy Cert.; Scarcella Rpt. Moreover, based on the Debtors' anticipated future revenues, the Debtors are projected to have net income in excess of their projected asbestos exposure. *Cf.* Podgainy Cert, Ex. 4; Scarcella Rpt., Ex. C-2 (Scarcella Breakdown of Future Costs by Year). Further, Debtors adduced no testimony on this point to counter North River's evidence that Debtors were solvent and could pay all present and future claims in full. The Bankruptcy Court asks that this Court simply ignore the only evidence on this issue and assume the opposite.

Nor does the Bankruptcy Court's proposed conclusions concerning the purpose of Section 524(g) justify departure from the Third Circuit's observation that it is intended for "*insolvent* debtor facing the unique problems and complexities associated with asbestos liability.'" *Combustion Eng'g*, 391 F.3d at 234. To be sure, for Section 524(g) to be implemented, there must be a business that is capable of being reorganized and providing an evergreen funding source. But that does not mean it is appropriate for any company, no matter how healthy, simply because asbestos claims have been filed against it. There is a vast chasm between financially-healthy companies and companies "on the brink of financial collapse."

The Bankruptcy Courts thus proposes that this Court find that the Plan was filed in good faith because it will allow the Debtors to "emerge from bankruptcy able to operate as a going concern and continuously fund the trust." Bankr. Ct.'s Proposed Findings ¶ 38. This proposal is misleading because the Debtors will not be "continuously funding the trust." As Plan Proponents admit, there is no evergreen funding source. *See* Section IV(B), *infra*. The Debtors' trust contributions are limited to a fixed-term note and a limited earn out over two years. The Bankruptcy Court's statement cannot be supported as a matter of fact. It is also wrong because the Debtor went into bankruptcy as a going concern and could have operated indefinitely as such.

There was no dispute about that.

Moreover, the Bankruptcy Court's proposed findings concerning the Debtors' solvency do not address the good faith standard under the Bankruptcy Rules or the factual realities of this case. North River does not argue that the Debtors' status as profitable companies *alone* demonstrates a lack of good faith. While a profitable company may seek bankruptcy protection in certain cases, the fact that the companies are solvent is certainly relevant to the Debtors' good faith. Here, the Debtors sought bankruptcy protection to cap their liability at the expense of insurers even though they could afford to pay their share of defense and indemnity costs. They admitted that a purpose of the Plan was to "leverage" insurers. Further, in doing so, they preserved the value of their owner's equity interest, even though many creditors are not being paid in full and North River's Class 7 defense cost claims and non-debtor contribution claims are not being paid at all. To accomplish this feat, they carefully crafted classes to manipulate the vote in an effort to facially comply with classification and voting requirements. Taken in its entirety, this Court must conclude that the Plan was not submitted in good faith.

In *In Re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999), the Third Circuit ordered the dismissal of a bankruptcy case that had been filed to gain an unfair advantage over the debtor's litigation adversaries. There, the debtor similarly admitted that it filed the plan to gain an advantage over its litigation opponents. *Id.* at 158 (Debtor's vice president "testified that he believed filing for Chapter 11 would 'change the negotiating platform' with plaintiffs and 'increase the pressure on . . . plaintiffs to settle.'"). As the Third Circuit held, "filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws.'" *Id.* at 165 (quoting *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994) and citing *In re Argus Group 1700, Inc.*, 206 B.R. 757, 765–66 (E.D. Pa. 1997)); *see also Furness v.*

*Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation."); *In re HBA East, Inc*., 87 B.R. 248, 259–60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith."); *In re Martin*, 51 B.R. 490, 495 (Bankr. M.D. Fla. 1985). That is what happened in this case.

The Bankruptcy Court proposes that this Court distinguish *SGL Carbon Corp* based on a comparison to the *Johns-Manville* bankruptcy. Bankr. Ct.'s Proposed Findings ¶ 39. *Johns-Manville* was a massive asbestos case with few similarities to this one other than the mere fact of asbestos liability. *SGL Carbon* is relevant not because of the nature of the underlying liabilities, but because in it the Third Circuit addressed the good faith of a debtor who uses bankruptcy to secure a litigation advantage against its adversaries. Although ignored by the Bankruptcy Court, the Plan Proponents expressly admitted this case was filed as a litigation tactic. Mr. Fitzpatrick testified that the purpose of the Plan was litigation "leverage" over insurers like North River. Mar. 6 Tr. at 135. The Court cannot ignore this damning admission to reach the exact opposite conclusion.

In addition to their admissions that the Plan is intended to put pressure on insurers, Debtors' other conduct shows that the Plan lacks a valid reorganizational purpose. Debtors' website does not mention their bankruptcy. The last two quarterly issues of its internal newsletter "Good Times," do not mention the bankruptcy. After accounting for asbestos issues, the Debtors had earnings before interest, taxes, and dividends in excess of $5 million each of the last two years, which is considerably more than the total amount of indemnity paid to asbestos

claimants in any given year. *See* Scarcella Rpt. at Fig. 4. In short, like the debtor in *SGL Carbon*, Debtors operate a profitable business that has – with the assistance of its insurers – largely successfully defended themselves in the tort system. And like the debtor in *SGL Carbon*, Debtors filed for bankruptcy to gain a litigation advantage.

Additionally, the improper classification of North River's claims further demonstrates the fact that the Plan was not proposed in good faith. The only creditors who fare worse under the Plan are insurers – whose substantial Class 7 claims are ineligible for *any* payment whatsoever. The Plan Proponents went to great lengths to gerrymander a vote on this doomed structure. To prevent North River from causing Class 5 (or any other class) from rejecting the Plan, Debtors artificially split North River's claims and placed the bulk of those claims in Class 7 with Asbestos Claims. Then, so that Class 7 would not reject the Plan, the Plan Proponents proposed to temporarily allow North River's claims at $1.00, but agreed to allow all speculative asbestos claims to vote at values stated in the TDPs, regardless of the merit or historical dismissal rates of such claims. The result of these machinations is that the only parties in this case who are faring worse under the proposed bankruptcy Plan is North River, who – by design – had no say in the formulation of the Plan and was precluded from voting in proportion to the value and proper treatment of its claims. As in *SGL Carbon*, the Debtors' efforts to manipulate the votes and classes to gain a litigation advantage show that the Plan was not proposed in good faith.

**B. The Plan Seeks to Evade Review by Redefining Substantial Consummation**

As part of its good faith and Bankruptcy Code compliance arguments, North River challenges the Plan Proponents' effort to redefine "substantial consummation" and the reasons for their attempt to do so. The Bankruptcy Court contends that North River's argument that the Plan Proponents have sought to evade judicial review is without merit because North River can

file objections to the proposed findings and/or appeal. But the contested language is intended precisely to limit North River's ability to appeal absent a difficult-to-obtain stay pending appeal.

Consistent with their efforts to gain a litigation advantage over insurers, the Plan Proponents seek to unilaterally alter the definition of "substantial consummation" set forth in Section 1101(2), which provides that "substantial consummation" means—

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; *and*
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2) (emphasis added). The Plan avoids full compliance with these three conditions by deeming substantial confirmation to occur on the Effective Date of the Plan. *See* Plan § 13.05 ("On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code"). None of this Court, the Bankruptcy Court, nor the Plan Proponents have the power to alter the Bankruptcy Code. Because nothing in the Plan indicates that distributions will commence on the Effective Date, the Plan cannot be deemed substantially consummated at that time.

Section 3.03 of the Plan states if, how, and when distributions will be made for Claims in Classes 1–10, and none of those provisions contemplate distributions commencing as early as the Effective Date. *Id.* § 3.03. No distributions under the Plan will be made for Claims in Classes 3 and 4, which are unaltered, or for Claims in Class 9, which are expunged. *Id.* §§ 3.03(c), (d), and (i). Claims in Classes 1, 2, 5, and 8 will be paid only on "the later of" the Effective Date or the date when the Claim is allowed. *Id.* §§ 3.03(a), (b), (e), (h). Allowed Claims in Class 6 will be paid on the first through eighth anniversaries of the Effective Date. *Id.* § 3.03(f). Claims in Class 10 will be paid in the ordinary course, but will be subordinated to the Trust Note. *Id.* §

3.03(j). Finally, Asbestos Claims in Class 7 will only be paid after the procedures set out in the TDPs have been established (including, *inter alia*, preparation of claim forms and establishment of the Payment Percentage), *id.* § 3.30(g), which is extremely unlikely to occur before the Effective Date. Thus, the Plan improperly accelerates substantial confirmation by eliminating at least one of the definitional requirements under Section 1101(2) of the Bankruptcy Code. The reason for this acceleration is evident.

Under the doctrine of equitable mootness, an appellate court may refuse to grant meritorious relief if it "will undermine the finality and reliability of consummated plans of reorganization." *In re Tribune Media Co.*, 799 F.3d 272, 277 (3d Cir. 2015). Courts look to five factors to determine if an appeal has become equitably moot:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996). Of these five factors, "the foremost consideration has been whether the reorganization plan has been substantially consummated." *Id.* "[T]he importance of substantial consummation in rendering a claim equitably moot raises concerns that a debtor can 'stack the deck' in its favor to expedite implementation of its plan and foreclose review of questionable plan components." *In re One2One Commc'ns, LLC*, 805 F.3d 428, 448 n.1 (3d Cir. 2015) (citation omitted).

For this reason, substantial consummation must be based on the facts, not an arbitrary definition at odds with the Bankruptcy Code's own definition of the term. *In re H & L Developers, Inc.*, 178 B.R. 77, 80 (Bankr. E.D. Pa. 1994) ("Whether a plan has been substantially consummated is a question of fact to be determined upon the circumstances of each

case and the evidence provided by the parties."). By re-defining substantial consummation, the Plan guts this protection. Section 1129(a)(1) requires a plan to comply with all applicable provisions of the Bankruptcy Code. By re-defining substantial consummation, the Plan violates Section 1101(2) and eliminates a statutory protection for plan opponents. The redefinition of substantial consummation is thus part and parcel of the Plan's overall lack of good faith.

## III. The Plan's Classification and Treatment of Its Reimbursement Claims is Unlawful, Precluding Confirmation (Objections to Bankruptcy Court's Proposed Findings ¶¶ 45–47, 52–54)

### A. The Plan Cannot Be Confirmed to The Extent It Classifies North River's Claims for Recovery of Post-Petition Defense Costs and Pre- and Post-Petition Indemnity Costs as Class 7 Channeled Asbestos Claims

Under Section 1122(a) of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class *only if* such claim or interest is *substantially similar* to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added). The Bankruptcy Court proposes that "North River's claims are properly classified in Class 7 along with the personal injury tort claims." Bankr. Ct.'s Proposed Findings ¶ 47. The Bankruptcy Court so finds because "North River's claims arise *indirectly* from bodily or personal injury resulting from exposure to asbestos or asbestos-containing products," and because "[t]he root element common to all Class 7 claims is asbestos." *Id.* This proposed finding is erroneous because, unlike the asbestos claims, North River's claims do not depend on the existence of asbestos. They would exist upon responding to any potentially-covered claim, regardless of the nature of the underlying claim. As asserted by North River, and recognized in *In re Congoleum Corp.*, 362 B.R. 198 (Bankr. D.N.J. 2007), North River's claims are ordinary commercial claims and should be treated as such.

The Bankruptcy Court relies heavily on "the purpose of § 524(g), which 'evinces an intent to include all potential asbestos-related liability of a debtor, regardless of when such

liability arose.'" Bankr. Ct.'s Proposed Findings ¶ 47 (quoting *W.R. Grace*, 729 F.3d at 322). The issue with classification is not whether the claims may be channeled to the Trust. That is a separate issue. Even if North River's claims may be channeled to the proposed Trust, they cannot be classified with the underlying asbestos claims. Section 524(g) calls for the classification of "a separate class *or classes* . . .." *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa))) (emphasis added). The reason that the statute recognizes that there may be more than one class is because the Bankruptcy Code does not allow claims to be classed together when they will be treated differently.

The Third Circuit stated in *W.R. Grace* that "[t]o determine whether claims are 'substantially similar,' the focus is on 'the legal character of the claims as it relates to the assets of the debtor.'" *W.R. Grace*, 729 F.3d at 326 (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986)). *See also Congoleum*, 362 B.R. at 203 ("the foremost consideration in bankruptcy classification 'is the legal character of the claim as it relates to the assets of the debtor'" (quoting *AOV Indus*, 792 F.2d at 1150)). "[T]he phrase 'substantially similar' reflects 'the legal attributes of the claims, not who holds them.'" *W.R. Grace*, 729 F.3d at 326 (quoting *In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012)). "Claims are similar if they have substantially similar rights to the debtor's assets." *Id.* (quoting *In re Quigley Co*., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)). The Third Circuit has also stated that a plan's classification scheme will not be upheld if it is unreasonable or arbitrarily designates classes in a manner that "would not serve any legitimate purpose." *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993). *See also In re Jersey City Med. Ctr.*, 817 F.3d 1055, 1061 (3d Cir. 1987) ("the classification of the claims or interests must be reasonable").

Under these standards, North River's direct reimbursement claims against the Debtors – particularly their claims for reimbursement of defense costs – cannot properly be classified in Class 7 along with the claims of asbestos claimants. Certainly, its claims against non-debtor third parties should not be classified in Class 7. The Plan's classification of North River's claims for reimbursement of post-petition defense expenses in Class 7 is improper for several reasons. First, North River's reimbursement claims, which arise from their contractual relationship with Debtors, are not substantially similar to asbestos personal injury claims, which are tort claims. North River's claims against the Debtors have been addressed in the pending coverage litigation between Debtors and North River. Both the New York Supreme Court and the Appellate Division have held that Debtors must contribute to both defense costs and indemnity payments on a pro rata basis for injuries occurring during uninsured or self-insured periods and that North River is only liable to pay such expenses due to injury or loss occurring during its policy periods. Thus, North River's reimbursement claims, consistent with applicable New York law, seek merely to enforce obligations between sophisticated commercial entities within a contractual relationship governed by the parties' insurance policies. As such, these claims bear little resemblance to the tort claims of asbestos personal injury claimants. We know that they are different because the Plan Proponents propose to treat them differently – expressly stating that insurers' defense costs claims are ineligible for payment.[7] Accordingly, North River's claims should not be classified in Class 7 along with asbestos tort claims but should instead be classified

---

[7] As North River argued at the confirmation hearing, "Typically, if you're going to treat claimants differently you put them in different classes, that's what the bankruptcy code requires." March 7, 2019 Confirmation Hrn'g Tr. ("Mar. 7 Tr.") at 165 (attached hereto as **Exhibit C**). As discussed below, that difference in treatment provides further grounds to deny confirmation.

as general unsecured claims in Class 5. *See Congoleum*, 362 B.R. at 203 ("absent compelling justification, insurer claims should not be separately classified from other unsecured claims").

The impropriety of the classification is demonstrated by the absurdity of attempting to process North River's claims through the TDPs. North River's contractual and equitable claims for defense costs are not amenable to resolution through procedures addressing the exposure to asbestos or the proof of a disease. The TDPs simply have no mechanism for dealing with defense costs claims. Rather than attempt to do so, Plan Proponents ask the Court to instead rule by fiat that North River's claims are ineligible for compensation.

Second, North River's claims for reimbursement of post-petition defense costs do not meet the definitional requirements to be considered Indirect Trust Claims in Class 7. Class 7 is comprised of "all Channeled Asbestos Claims," which include, in pertinent part, "any (a) Asbestos Personal Injury Claim, [or] (b) Indirect Trust Claim." Plan § 1.01(7). Indirect Trust Claims include

> any Claim, now existing or hereafter arising, that is (a) held by a Non-Settling Asbestos Insurer . . . to the extent based on, arising out of, or attributable to an Asbestos Personal Injury Claim, *and* (b) on account of alleged liability *of a Debtor* for reimbursement, indemnification, subrogation, or contribution of any portion of any *damages* such Entity has paid or may pay . . . on account of . . . personal injury . . . caused or allegedly caused . . . by asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by a Debtor.

Plan § 1.01(79) (emphasis added). North River's reimbursement claims for recovery of Debtors' share of post-petition defense expenses do not encompass any payments that would be owed to asbestos personal injury claimants as "damages"; rather, the amounts sought to be reimbursed were paid by North River to defense counsel representing Debtors against the asbestos claimants. Because the Plan's definition of "Indirect Trust Claim" refers only to reimbursement of "damages," and does not include defense expenses, North River's claims for reimbursement of

defense costs do not fall within Class 7. Likewise, North River's claims against settling insurers are not "on account of alleged liability of a Debtor" and cannot be considered Indirect Trust Claims.

Third, apart from the definitional issue, North River's claims for reimbursement of amounts they paid to defense counsel cannot be considered claims that are similar in character to asbestos claimants' personal injury claims against Debtors. North River's claims seek recovery of amounts North River paid that were in excess of such North River's proper ratable shares and are thus rightfully owed by Debtors to North River. To the extent not secured by setoff rights, this is an ordinary commercial debt of the same character as the general unsecured claims in Class 5.

Judge Ferguson of the United States Bankruptcy Court for this District held in *Congoleum*, an asbestos bankruptcy case, that insurer claims like those at issue here should be classified along with general unsecured claims. There, an insurer-sponsored plan sought to classify insurer claims in a stand-alone class, separate from general unsecured claims. The insurer claims at issue were not fully defined but were alleged to include, *inter alia*, claims resulting from the insurers' "overpayment of indemnity and defense costs." *Congoleum*, 362 B.R. at 203. The court rejected the proposed stand-alone classification of the insurers' claims, stating: "The legal character of insurer claims vis-à-vis the debtor is that they would be unsecured claims. As such, absent compelling justification, insurer claims should not be separately classified from other unsecured claims." *Id.* The same is true here: North River's claims are substantially similar to, and therefore should be classified as, general unsecured claims in Class 5. They are not similar to the asbestos claimants' claims and therefore may not

be classified along with them. *See, e.g.*, *Quigley*, 377 B.R. at 116 ("Dissimilar claims may not be classified together." (quoting *In re Chateauguay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996)).

The Third Circuit's *W.R. Grace* decision does not permit North River's defense reimbursement claims to be classified in Class 7. There, the court held that because the indemnification and contribution claims asserted by Montana and the Crown were subject to the plan's Section 524(g) channeling injunction, those claims could be classified along with asbestos tort claims. The claims asserted by Montana and the Crown in that case did not include claims for reimbursement of defense costs owed by the debtor, like North River's claims here do. This fact is significant because, as noted elsewhere in this brief, the costs of defending against asbestos personal injury claims – whether incurred by North River or the Reorganized Debtor – are not being paid, directly or indirectly, by the Trust. Thus, the portion of North River's claims that seek reimbursement of post-petition defense costs cannot lawfully be enjoined under Section 524(g)(1)(B) – and, therefore, *W.R. Grace* provides no authority for classifying such claims along with asbestos personal injury claims.

Accordingly, because the Plan improperly classifies North River's reimbursement claims in Class 7, instead of in Class 5 (General Unsecured Claims), the Plan cannot be confirmed. Once properly classified in Class 5, North River is entitled to payment equal to the full Allowed Amounts of their claims or such other treatment that renders North River unimpaired. *See, e.g.*, Plan § 3.03(e)(ii). If Plan Proponents no longer want to treat Class 5 as unimpaired once North River's claims are reclassified there, they can amend their Plan and conduct a resolicitation allowing all Class 5 claimants to cast votes in favor of or against the Plan.[8]

**B. Even if North River's Claims Are Properly Classified in Class 7, The Plan**

[8] Because the Plan violates the classification provisions of the Code, contrary to the Bankruptcy Court's Proposed Findings ¶ 99, it also violates Section 1129(a)(3).

**Cannot be Confirmed Because it Does Not Provide North River's Claims with the Same Treatment Provided to Other Class 7 Claims**

The Third Circuit observed in both *W.R. Grace* and *Combustion Engineering* that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *W.R. Grace*, 729 F.3d at 327 (quoting *Combustion Eng'g*, 391 F.3d at 239 (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990))). The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly-situated claims. Several sections of the Bankruptcy Code are designed to ensure equal treatment of similarly situated claims. For example:

- Section 1122(a) requires that plans of reorganization classify only "substantially similar" claims together;
- Section 1123(a)(4) requires that a plan of reorganization "provide the *same treatment* for each claim or interest of a particular class;" and
- Section 524(g)(2)(B)(ii)(V) requires that present claims and future demands that are channeled to an asbestos trust be paid "in substantially the same manner."

As the Third Circuit explained in *W.R. Grace*, the "same treatment" requirement in Section 1123(a)(4) means "that all claimants in a class must have 'the same opportunity' for recovery." *Id.* "What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *Id.* Notably, the type of differences approved by the Third Circuit involved the timing or percentages payable over time. *Id.* at 327–328 ("differences in the timing of distributions and other procedural variations that have a legitimate basis do not generally violate § 1123(a)(4) unless they produce a substantive difference in a claimant's opportunity to recover."). Here, however, North River is ineligible for payment altogether.

The Bankruptcy Court proposes that this Court conclude that the Plan satisfies Section 1123(a)(4) because North River receives "value" for its claims in the form of Trust-Payment

Credits and Judgment-Reduction Credits, rather than the monetary distributions that other Class 7 claims receive. Bankr. Ct.'s Proposed Findings ¶¶ 53–54. *See also, e.g.*, Plan § 4.14(a) ("the liability, if any, of the Non-Settling Asbestos Insurer to the Channeled Asbestos Claimant shall be reduced dollar-for-dollar by the amount, if any, of the judgment establishing the Contribution Claims in accordance with Section 4.14(b)"). As such, the Bankruptcy Court proposes to conclude, "the Plan does not unfairly limit North River's opportunity for recovery, it merely distinguishes the type of recovery available to North River." Bankr. Ct.'s Proposed Findings ¶ 53. This assertion is mere pretense. North River's substantial claims would be paid nothing, unlike any other claimant holding valid, substantial claims against the Trust. The Bankruptcy Code requires that each creditor in a class be given the "same treatment." 11 U.S.C. § 1123(a)(4). Nothing in this provision says that "same treatment" is satisfied if one creditor treated differently than others, but is given some "value" in connection with a potential obligation to third parties. The Bankruptcy Code requires that creditors within a class be treated the same. Here, they indisputably are not. Certain creditors are processed through a trust distribution process and are entitled to cash payments. Others – chiefly North River – are not processed through a claims resolution process, and are totally ineligible for payment, but might be entitled, in extremely unlikely scenarios, to reduce an amount they might owe to some third party. Under no possible construction could these treatments be considered the "same" or even approaching the "same opportunity for payment." The Plan cannot refuse to pay North River's valid Class 7 claims while providing that other claims in the same class can be paid.[9]

[9] The Plan Proponents contend that some asbestos claimants also are not paid. But those claimants either elected to vote in favor of confirmation or did not object to confirmation. Their acceptance of an unfair treatment has no bearing on North River's claims. Moreover, there is no legal requirement that *invalid* tort claims be paid. Thus, in *W.R. Grace*, the Third Circuit upheld a plan that provided that *invalid* indirect asbestos claims would not be paid. "But," the court noted, "the

But that scenario is exactly what is proposed here. The Plan provides North River no opportunity to recover on its claims even though other claims classified in Class 7 have that opportunity. Plan Proponents previously admitted that "Asbestos Insurers will not receive any payment or distribution from the Asbestos Trust on account of such claims . . .." Second Amended Disclosure Statement at 17. On the eve of the Confirmation Hearing, the Plan Proponents modified the proposed TDPs to provide:

> Notwithstanding any provision in this TDP or any other Plan Document, because the Non-Settling Asbestos Insurers have received the benefit of certain credits and judgment reduction, as set forth in and subject to the terms and conditions of Sections 4.14 and 4.15 of the Plan, any claim of a Non-Settling Asbestos Insurer shall not be eligible for payment or compensation from the Asbestos Trust under this Section 5.5.

Cert. of J. Prol in Support of Confirmation, Dkt. 512, Ex. D § 5.5. The Plan also enjoins North River from seeking to recover on its reimbursement claims in court. Plan §§ 9.05–9.07. Because the Plan bars any recovery by North River on its reimbursement claims in Class 7, the actual effect of the Plan is to extinguish North River's valid claims.

In contrast, the Plan provides that Class 7 Asbestos Personal Injury Claims can obtain payments from the Trust and also obtain recoveries in court. Plan § 4.13; TDPs §§ 5.10, 7.6–7.7. Debtors' witness, Mr. Podgainy, admitted that among Class 7 claimants, the treatment of asbestos tort claimants differed from that of North River. March 6 Tr. at 74:2–5.

The Bankruptcy Court accepts the Plan Proponents' invitation to focus on the so-called "Trust-Payment Credits" and "Judgment-Reduction Credits" contained in the TDPs. Although the Bankruptcy Court suggests that these "credits" are an "undeniable benefit," Bankr. Ct.'s

---

only indirect claims that will not be paid based on that provision are those for which Grace has no underlying liability." *W.R. Grace*, 729 F.3d at 328. Here, North River's reimbursement claims have not been disallowed and thus the Plan must provide for them to be paid, like other claims classified in Class 7.

Proposed Findings ¶ 53, in actuality the proposed "credits" provide only an illusory benefit and no value. The "Trust-Payment Credit" applies where a claimant has been paid by the Trust and then seeks to recover from North River in the tort system. Plan §§ 4.14, 4.15. The Trust-Payment Credits provide nothing more than the fact that a claimant is entitled to only one recovery and if it already has been paid – in whole or in part – for its claim against a Debtor, North River cannot be compelled to pay more than one recovery (or indeed, its allocable share of any judgment). The Judgment-Reduction Credits provide that a claimant cannot seek to recover from North River on account of the shares of settling insurers. Plan § 4.14. But under its contract with the Debtors, and controlling New York law, North River is only responsible for paying its ratable share of any judgment in any case. The Judgment-Reduction Credit is a failsafe protection for settling insurers. It is of no benefit to North River. These so-called credits operate to implement the already-existing law.

Moreover, the credits apply only to North River's potential share of any judgment. As discussed above, North River's claims consist almost entirely of existing and future defense costs. Its claims against settling insurers also likely will be entirely defense costs expenditures. The so-called "credits" do not provide "value" to these claims in any way. Instead, the Bankruptcy Court proposes that this Court accept the Plan Proponents' invitation to have those claims simply disappear.

In short, the treatment of asbestos claimants' claims is unlike the treatment given North River's claims, which are treated as *per se* invalid. Regardless of whether the proposed treatment of insurer claims could be approved in a plan of reorganization, by classifying North River's claims in Class 7 with the asbestos tort claimants, the Plan Proponents were obligated to provide the same treatment to those claims as asbestos tort claims. 11 U.S.C. § 1123(a)(4). If

they desire to provide for differing treatment of insurer claims, as they have done, the Plan must *separately* classify those insurer claims. Because the Plan improperly discriminates among creditors in Class 7, it cannot be confirmed.

Based on the evidence, or lack thereof, discussed above, the Court cannot conclude that North River will have any significant benefit in the reduction of lawsuits after the Effective Date or that the Trust-Payment Credits and Judgment-Reduction Credits adequately compensate North River for its defense costs claims, which receive no credit or reduction under the proposed Plan.

## IV. The Plan Does Not Satisfy Section 524(g) (Objections to Bankruptcy Court's Proposed Findings ¶¶ 64–80, 85–88)

### A. North River's Claims May Not Be Enjoined

The Bankruptcy Court proposes that this Court find that the Plan complies with the requirements of Section 524(g). Bankr. Ct.'s Proposed Findings ¶ 64. Specifically, the Bankruptcy Court proposes without citation to any evidence that the Plan satisfies Section 524(g)(1)(B) because it "provides North River value for its claims in the form of Trust-Payment and Judgment-Reduction Credits" and because "North River's claims are properly channeled to the Trust." *Id.* North River's claims, however, may not be enjoined because those claims are not the type contemplated in Section 524(g)(1), as they are defense costs. Further, North River is provided with no recovery whatsoever under the Plan.

As stated above in Section III(A), *supra*, the Third Circuit's *W.R. Grace* decision does not permit North River's defense reimbursement claims to be classified in Class 7. Even if North River's claims were properly classified, its claims may not be enjoined because North River is provided with no recovery. Section 524(g) requires that claims or interests against property of the estate can only be enjoined if they have recourse against the Trust. This conclusion is clear from the plain language of the statute:

> An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, *is to be paid in whole or in part by a trust* . . ..

11 U.S.C. § 524(g)(1)(B) (emphasis added). The Second Circuit's *Johns-Manville* decision, which was effectively codified by Section 524(g), made this conclusion express:

> Even if we assume that MacArthur could show that it has a valid claim against the insurers, MacArthur is not left without a remedy: It may proceed in the Bankruptcy Court against the $770 million settlement fund. It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.

*In re Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988); *see also W.R. Grace*, 729 F.3d at 330–32 (injunction of indemnity and contribution claims proper where claims were to be paid from trust).

The Plan asserts that the insurers have interests in each other's policies in the form of contribution rights. *See* Plan § 1.01(12) (defining "Asbestos Insurance Policy Claim" to include claims for "contribution, reimbursement, indemnity or subrogation"). The Plan provides injunctive protections under Section 524(g) to any insurer that settles with the Trust, thereby extinguishing claims of non-settling insurers against a settling insurer. *See id.* § 9.05(a)(iv) (enjoining any entity from "asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due any Protected Party"). Thus, under the Plan, insurers may not pursue the Debtor, settling insurers, or the Trust, for any of their claims arising under state law.

As with its analysis of the "disparate treatment" argument, *see supra* at Section III(B), the Bankruptcy Court focuses on the alleged "value" given to North River on account of its claims as purportedly satisfying § 524(g)(1)(A). *See* Bankr. Ct.'s Proposed Findings ¶ 64 ("However, as

previously discussed, the Plan provides North River value for its claims in the form of Trust-Payment and Judgement-Reduction Credits."). As discussed above, the Bankruptcy Court's proposal asks this Court to accept an entirely new standard for evaluating equality of treatment under Section 1123(a)(4). But even if that standard were acceptable, it cannot be incorporated into Section 524(g). Section 524(g) authorizes this Court to issue an injunction "with respect to any claim or demand that, under a plan of reorganization, is *to be paid* in whole or in part by a trust . . .." 11 U.S.C. § 524(g)(1)(B)(emphasis added). The statutory language speaks expressly in terms of claims or demands that are to be "paid" by the trust. The Trust indisputably will not "pay" North River on account of its claims. The Court should not invent a vague "value" standard to change the commonly understood meaning of "pay" to mean a payment of money. North River's claims cannot be enjoined without payment (or at least eligibility for payment). Because the Plan purports to do just that, it cannot be confirmed.

Moreover, even if the Plan's judgment-reduction mechanism provided some "value" with respect to the North River's indemnity claims, it provides no such value with respect to the North River's right to reimbursement for defense obligations, which typically exceed indemnity obligations. As discussed above, the "credits" provided by the Plan are illusory.

Nor can the Court issue an injunction barring North River's claims against third parties if those claims do not have some right to payment from the Trust. Here, the Plan proposes to do exactly that by eliminating North Rivers' contribution rights against settling insurers without making any provisions for the payment of those claims. *Cf. In re SportStuff, Inc.*, 430 B.R. 170, 179 (B.A.P. 8th Cir. 2010) (holding that bankruptcy court erred in extinguishing contribution claims of non-settling insurers in connection with settlement under Rule 9019 but suggesting that such relief would be permissible under Section 363 *if the non-settling insurers have the right to*

*seek full contribution from the sale proceeds*). Because the Plan does not so provide, it cannot be confirmed.

**B. The Plan Fails to Satisfy Section 524(g)(2)(B)(i)(II)**

Section 524(g)(2)(B)(i)(II) provides that the asbestos personal injury trust must be "funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." The Bankruptcy Court proposes that the Trust Note "constitutes an 'obligation . . . to make future payments,' and satisfies § 524(g)(2(B)(i)(II)." Bankr. Ct.'s Proposed Findings ¶ 66 (quoting 11 U.S.C. § 524(g)(2)(B)(i)(II)). Although the Trust Note might be considered a "security" in the broadest sense, as admitted by the Plan Proponents, it does not satisfy the future funding requirement because it is a limited term note. It certainly does not constitute a dividend as envisioned by Congress.[10] Plan Proponents assert that future payments on the Trust Note and the Earn Out Payments "do not have to be 'dividends' because, under the Bankruptcy Code, the word 'including' is 'not limiting.'" Plan Proponents' Notice of Filing of Proposed Findings of Fact and Conclusions of Law and Proposed Forms of Orders in Support of Confirmation of the Modified Second Amended Prenegotiated Plan of Reorganization ("Plan Proponents' Proposed

---

[10] Review of the Congressional Record shows that Congress likely did mean "equity shares." *See* 140 Cong. Rec. S4521–01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. The underlying company funds the trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.")). Here, Debtors' future profitability has no impact on the Trust.

Findings”), Dkt. 615, ¶ 134. Even if the Court were to ignore the statute’s requirement that the Trust be funded by dividends, the Plan Proponents’ statutory construction argument is irrelevant

Regardless of whether Congress intended for securities to mean share ownership in Section 524(g), it clearly contemplated an evergreen funding source. *See Combustion Eng’g*, 391 F.3d at 248, *In re Plant Insulation Co.*, 734 F.3d 900, 914 (9th Cir. 2013) (“Courts have recognized that § 524(g) embodies the requirement that the reorganized debtor becomes a ‘going concern, such that it is able to make future payments into the trust to provide an ‘evergreen’ funding source for future asbestos claimants.’”). The Bankruptcy Court ignores the evergreen requirement and simply concludes that the Trust Note obligates the Debtors to make future payments. Bankr. Ct.’s Proposed Findings ¶ 66. The Bankruptcy Court’s proposed finding should be rejected because the Plan does not satisfy Section 524(g)’s evergreen funding requirement.

At the confirmation hearing, Mr. Fitzpatrick conceded that the Plan does not contain an evergreen funding source for the Trust:

> Q: Do you understand – do you have an opinion as to whether or not the contributions to this Trust constitute an evergreen source of funding?
>
> A: I don’t believe that they do, no.

Mar. 6 Tr. at 162. The only provision that gives the Trust an interest in the performance of the company is the proposed earn-out payment. Plan § 4.08. But that obligation will be satisfied in two years. *Id*. at 57–58. Because the Trust is not funded by an evergreen funding source, the Plan violates Section 524(g)(2)(B)(i)(II) and cannot be confirmed as structured.

**C. The Plan Fails to Satisfy Section 524(g)(2)(B)(i)(III)**

The Plan violates Section 524(g)(2)(B)(i)(III) because no realistic possibility exists of the Trust owning a majority of the voting shares. A plan providing for a Section 524(g) trust and

channeling injunction must provide for the trust to "own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares" of "each such debtor," "the parent corporation of each such debtor," or "a subsidiary of each such debtor that is also a debtor." 11 U.S.C. § 524(g)(2)(B)(i)(III). "This provision is to ensure that, if there are not sufficient funds in the trust otherwise, the trust may obtain control of the debtor company." 4 *Collier on Bankruptcy* ¶ 524.07 (16th ed. 2013).

Accepting the Plan Proponents' arguments, the Bankruptcy Court proposes that the Trust Note and stock pledge satisfy the voting control requirement of Section 524(g). Bankr. Ct.'s Proposed Findings ¶¶ 67–72. The Plan's compliance with the control requirement is completely dependent on the occurrence of a "specified contingency." To satisfy the "specified contingency," the Plan requires that the Debtors provide the Trust with the "Trust Note." *See* Plan § 1.01(123). The Plan Proponents contend that the Trust could own 50.1% of the Reorganized Debtors' voting shares in the event of a payment default on the Trust Note. *See* Mar. 6 Tr. at 155:23–156:11. This argument fails for two reasons.

First, this contention ignores the reality of a pledge. A security interest such as a pledge does not grant the Trust the right to own *any* of the Debtors' equity. It grants the Trust only a right to *foreclose* on the pledged collateral. This conclusion is black-letter law under the Uniform Commercial Code ("UCC"): a foreclosing creditor is entitled only to satisfaction of its debt and is liable to the debtor for any surplus. *See* UCC § 9-608(a) ("If a security interest . . . secures payment or performance of an obligation, the following rules apply: . . . (4) A secured party shall account to and pay a debtor for any surplus, and the obligor is liable for any deficiency . . .."). The UCC also makes clear that an oversecured creditor can keep all of the collateral only if the debtor consents after the default occurs. A debtor's consent given prior to a

default is invalid. *See* UCC § 9-620(c)(2) ("a debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default"). These provisions of the UCC are nonwaivable. *See* UCC § 9-602; *Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538, 542 (3d Cir. 1979) (secured creditor "was obligated to account for and pay over the surplus proceeds to [the debtor] . . . as a debtor's right to surplus . . . cannot be waived even by an express agreement"). As such, the fact that a security interest is granted does not provide the Trust with a right to own any equity of the Debtors. Just as with any other security interest, the pledge grants the Trust a right only to foreclose on the shares by way of a private or public sale.

The note/default structure is also insufficient because it is illusory. In the unlikely event of a default, the Debtors' shares will likely be worthless. Multiple courts have found note-default provisions similar to the one at issue here insufficient to satisfy Section 524(g)(2)(B)(i)(III). *See Congoleum*, 362 B.R. at 179 (plan providing that trust would not be granted immediate majority ownership but would instead receive promissory note from debtors that, upon the debtors' continuing default, could be converted to 51% of the debtors' shares did not satisfy Section 524(g)(2)(B)(i)(III) because there was no plausible scenario in which a trust would be able to convert shares when they were still valuable, so trust would obtain control of the debtors only when control was not meaningful); *see also Plant*, 734 F.3d at 916. The *Congoleum* court explained that if the reorganized debtor were to "default on such insignificant payments, it is essentially insolvent, making the value of the shares negligible . . .. That cannot be the kind of contingency Congress envisioned when it drafted Section 524(g)(2)(B)(i)(III)." *Congoleum*, 362 B.R. at 179. The Ninth Circuit in *Plant* further explained:

> The history of § 524(g) also suggests that this subsection is not to be lightly discarded. In the model Johns-Manville bankruptcy, the trust came out of the

> bankruptcy with 80% of Johns-Manville's common stock. *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986). Indeed, taking less than 100% of the common stock was viewed as a "significant concession" by the Asbestos Health Committee at the time. *In re Johns-Manville Corp.*, 66 B.R. 517, 529–30 (Bankr. S.D.N.Y. 1986). It strains credulity to believe that, against this backdrop, Congress would have drafted such a toothless provision.

734 F.3d at 916.

Just as in *Congoleum* and *Plant*, in the unlikely event that a payment default on the Trust Note does occur – meaning that the Reorganized Debtors cannot pay it – the shares the Trust would be entitled to receive will be worthless.[11] The Trust Note is a debt obligation of the Reorganized Debtors senior to their equity. If the Reorganized Debtors cannot pay the Trust Note – and thus do not have the financial wherewithal to pay their debt obligations – they will be insolvent.[12] The Reorganized Debtors' equity would therefore be inconsequential. The possibility of the Trust ever acquiring a majority of the voting shares of the Reorganized Debtors is illusory; the Plan therefore does not satisfy Section 524(g)(2)(B)(i)(III) and cannot be confirmed. The default provisions of the Trust Note result in only an illusory possibility that the

[11] The Trust would only be entitled to receive the shares if they successfully credit bid for the shares and the value of the default was equal or greater than the value of a majority of the shares. Similarly, even if the trust exercised a non-payment default, it would not be entitled to the stock, but only to foreclose on that stock.

[12] The Bankruptcy Court found it noteworthy that "North River previously argued that the Debtor-companies were too healthy for chapter 11 bankruptcy . . . but now in the context of § 524(g)(2)(B)(i)(III) asks the Court to predetermine that the companies are so unstable that their stock becomes worthless in the event of a default." Bankr. Ct.'s Proposed Findings ¶ 68. In effect, this is a charge of hypocrisy, but does not address North River's actual argument, which is fully supported by the law and facts. North River is not contending that a default is likely. To the contrary, as the evidence showed, the Debtors are projected to have far more income than necessary to pay the Trust Note and all of its other expenses. That reflects the sweetheart deal that the Debtors cut. But if a default were to occur on the Trust Note, the Debtors' stock likely would be worthless because its debt is senior to its equity and it would only default on the note obligation if it were insolvent. In that situation, it would make no sense to exchange senior debt for junior equity. That is the logic found persuasive by Chief Judge Ferguson in *Congoleum* and the Ninth Circuit in *Plant*.

Trust can own a majority of the Debtors' voting shares. This circumstance does not satisfy the statutory standard.

The Bankruptcy Court erroneously decides to ignore the rulings in *Congoleum* and *Plant* because of irrelevant factual distinctions. In those cases, the courts concluded that the pledge of voting stock to secure a promissory note from the debtor does is inadequate and "inconsequential" because, if a payment default were to occur, the reorganized debtor most likely would be insolvent and therefore the voting stock would be worthless. Both *Congoleum* and *Plant* focus on the illusory nature of the trust note/default structure. The Bankruptcy Court instead cites approvingly to *Burns & Roe*, which confirmed a plan with a trust note/default structure. *Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009). But in that case, the court did not consider or analyze any objections to the structure because it had concluded that the objecting insurer in that case did not have standing to object. *Id.* at *32. In short, there is no evidence showing that the Trust will ever be in a meaningful position to own a majority of the voting stock of the Debtors.

**D. The Plan Fails to Satisfy Section 524(g)(2)(B)(ii)(III)**

Before a court may issue a channeling injunction, Section 524(g) requires that the Court find that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands . . .." 11 U.S.C. § 524(g)(2)(B)(ii)(III). The Bankruptcy Court's proposed findings assert that Mr. Fitzpatrick's declaration is sufficient to support a finding that "pursuit of demands outside the procedures is likely to threaten the Plan's purpose to equitably deal with claims and demands." Bankr. Ct.'s Proposed Findings ¶ 77. That conclusion is erroneous, and this Court cannot make that determination in the absence of admissible evidence.

In proposing this finding, the Bankruptcy Court relied on bare legal conclusions in the FCR's declaration. In doing so, the Bankruptcy Court noted that Mr. Fitzpatrick "has more than 30 years of experience in dealing with asbestos claims" and stated that it "affords Mr. Fitzpatrick's informed opinion considerable weight." *Id.*[13] The Court is not asked to decide whose opinion it would value more; it is tasked with making a specific factual finding based on the evidence before it. On the issue of the need for Section 524(g), there was none. Mr. Fitzpatrick, having conducted no evaluation of the claims or the available assets, asserted that there might be a race to the courthouse. Fitzpatrick Decl. ¶ 29. A race to the courthouse where a debtor can afford to pay all claims is no reason to invoke Section 524(g).

In many asbestos bankruptcy cases, the liability faced by the Debtor is overwhelming, obvious, and unchallenged. This case is different. Mr. Fitzpatrick admitted that it was a relatively small case. Mar. 6 Tr. at 143. Both Mr. Podgainy and Mr. Fitzpatrick conceded that the Debtor was profitable pre-petition and would remain so. Podgainy Cert., Ex. D at 33; Mar. 6 Tr at 161:8–13. In these circumstances, it is incumbent upon the Plan Proponents – to say nothing of the responsibility of individuals appointed to represent the interest of future claimants – to fully evaluate whether the provisions of Section 524(g) are necessary to ensure equitable treatment of future demands. But rather than conduct such analysis, the Plan Proponents asked that the Court simply assume that Section 524(g) is necessary. The Bankruptcy Court proposes that this Court accept that invitation, notwithstanding that it violates the law. While Section 524(g) is an appropriate remedy for debtors burdened by asbestos liability, its application is not automatic upon invocation of the specter of asbestos liability. To the contrary, Congress

---

[13] If experience with the tort system were sufficient to support a bare legal conclusion, North River could submit contradicting affidavits from experienced practitioners with far more collective experience than Mr. Fitzpatrick. Experience uninformed by data is meaningless.

required exacting fact findings to justify a Section 524(g) injunction precisely because it is capable of abuse and a departure from the Bankruptcy Court's traditional power.

The Plan Proponents conducted no analysis of the future claims against the Debtors. Nor did they consider the insurance available to the Debtors or the Debtors' projected net income in considering how asbestos creditors would be treated outside of the Plan. Mr. Podgainy admitted that he did not conduct an analysis of the projected value of future asbestos claims against the Debtors. Mar. 6 Tr. at 48:11–15, 76. Similarly, he did not conduct an analysis of the insurance available. *Id.* at 48:20. Mr. Fitzpatrick also admitted that no estimate of future asbestos claims had been done. Mar. 6 Tr. at 121. He further testified that although he had "eyeballed" the potential future claims, he admitted that he did not have an opinion, "one way or the other," concerning the future value of asbestos claims against Debtors. Mar. 6 Tr. at 143. Mr. Fitzpatrick also testified that, from his perspective, Debtors have a minimal claims history and that the Debtors' case is a "relatively small asbestos case." Mar. 6 Tr. at 142. Finally, Mr. Fitzpatrick testified that he had not considered whether Debtors' insurers would be obligated to defend it in the tort system if it were liquidated. Mar. 6 Tr. at 146. When asked specifically about the need for Section 524(g) to treat present and future claims similarly, rather than repeat the bare legal conclusion form his declaration, Mr. Fitzpatrick testified:

> Q: Do you have any reason to believe that outside of bankruptcy, claims in the future would not be treated similarly to present claims.
>
> A: In the tort system?
>
> Q: Yes.
>
> A: Well, you're asking me to predict what's going to happen in the asbestos tort system, which is pretty hard to do. I don't have any reason as we sit here today to think that they would be handled differently, but I can't predict the future. I don't have a crystal ball, so I can't swear to that.

Mar. 6. Tr. at 166–67. In short, Mr. Fitzpatrick admitted that he had no basis to make the statement upon which the Bankruptcy Court proposes to rely.[14]

The analysis of Mr. Scarcella, in contrast, provided the only admissible evidence concerning the need for Section 524(g) relief. Mr. Scarcella provided the only analysis of future claims. Based on his analysis, the Debtors (and its insurers) are in positions to pay *all* of the asbestos claims against the Debtors in full. Scarcella Rpt., Ex. C-2 (Scarcella Breakdown of Future Costs by Year). *See also* Podgainy Cert., Ex. B. The Bankruptcy Court did not even address this unrebutted testimony in its proposed findings. Quite simply, the Plan Proponents have failed to establish the predicate facts to support a finding that Section 524(g) relief is appropriate. There is no need for this bankruptcy to ensure equity in the treatment of future claims. To the contrary, all that the Plan accomplishes is to relieve the Debtors of defense costs and mandate that the few future claimants that might hold valid claims forego their opportunity to be paid in full in the tort system.[15]

### E. The Plan Fails to Satisfy Section 524(g)(2)(B)(ii)(V)

Section 524(g)(2)(B)(ii)(V) requires that present claims and future demands that are channeled to an asbestos trust be paid "in substantially the same manner." The Bankruptcy Court proposes that the Plan complies with Section 524(g)(2)(B)(ii)(B) for substantially the same reason it holds the Plan complies with Section 1123(a)(4) and in reliance on Mr. Fitzpatrick's

---

[14] Because Mr. Fitzpatrick's declaration in this respect, Fitzpatrick Declaration ¶ 29, lacks any foundation, it is not entitled to any weight and should have been excluded altogether.

[15] This conclusion is so because, as described by the FCR's counsel, the Trust will be a claimant's trust that will not defend claims and will impose a payment percentage. As a result, more claims will be allowed at a lower value than that which the holder of a valid might receive in the tort system.

declaration. Bankr. Ct.'s Proposed Findings ¶¶ 79– 80. Because the Plan discriminates against North River's claims, North River objects to this finding.

Section 524(g) requires that present claims and future demands will be paid "in substantially the same manner." Here, although the Plan Proponents have channeled North River's claims to the Trust, they have not proposed to treat those claims in a way that is "substantially" the same as other channeled claims. It is no solace that the Plan Proponents look upon insurers with disfavor.[16] The Plan Proponents voluntarily chose to classify North River's claims as Class 7 Claims. Having done so, they must treat them in the same manner with other claims and demands. They have not.

### F. The Plan Fails to Satisfy Section 524(g)(4)(B)(ii)

Section 524(g)(4)(B)(ii) requires that any injunction under that section be "fair and equitable." The Bankruptcy Code does not provide a standard for this analysis. The Third Circuit discussed the requirements of Section 524(g)(4)(B)(ii) in *W.R. Grace* and observed that "one way to evaluate the equities is to consider the amount being contributed to the trust in comparison to the liability exposure of the protected parties." *See W.R. Grace*, 729 F.3d at 330–32. North River submits that this analysis makes no sense as to North River because the Plan

[16] Mr. Fitzpatrick's answers with respect to insurer claims demonstrate that the Plan Proponents gave no regard to North River's rights:

> Q: . . . And do you believe that to be accurate, that there's no circumstances under which the Trust will pay claims of non-settling insurers?
> A: Well, again, never say never, but I – normally I would not think the Trust would pay such claims.
> Q: Why not?
> A: Why should the Trust pay a non-settling insurer?
> Q: Well, they're claimants, are they not?
> A: They're insurers.

Mar 6. Tr. at 150.

proposes to cut off its claims after channeling them to the Trust. In essence, there is no amount of value being contributed to the Trust on account of North River's claims.

But even if the Court were to analyze the value of the proposed injunction versus the benefits to the protected parties, the proposed injunctions would not be fair and equitable. Here, the Hindens and the Debtors are contributing a total of $26 million to the Trust over a twenty-year period.[17] Plan § 4.08. Over that same period, the Debtors are projected to have annual income from operations well in excess of $5 million – meaning that over the course of the note payment period, Debtors will earn in excess of $100 million, four times the amount they are contributing to the Trust. *Compare* Scarcella Rpt., Ex. C-2 *with* Podgainy Cert., Ex. B. This disparity far exceeds that found by the Third Circuit to violate the requirements of equity. *W.R. Grace*, 729 F.3d at 331 (citing *In re Quigley Co., Inc.*, 437 B.R. 102, 140 (Bankr. S.D.N.Y. 2010)).

As made clear by Mr. Scarcella's report, the Debtors are potentially responsible for a significant percentage of defense and indemnity costs moving forward. Scarcella Rpt. at 32, fig. 36. Equally clear, however, is that the Debtors are projected to have the ability to pay 100% of their share of such costs. *Compare* Scarcella Rpt., Ex. C-2, *with* Podgainy Cert., Ex. B. What the proposed Plan accomplishes is to eliminate the Debtors' share of future defense costs and to provide favorable treatment to asbestos claimants.[18] To accomplish this scenario, Debtors seek to shift liability on to North River and then to eliminate its rights to recover from other responsible parties. A side impact of this tactic is that the Trust will impose a payment

[17] To be clear, that number probably exceeds the Debtors' indemnity liability, but does not take into account its projected defense costs exposure.
[18] Counsel for the FCR claimed in argument that they would not agree to a Trust that defended claims. Mar. 7 Tr. at 99 ("[T]he trust isn't in the business of defending claims. Rather it's a claimant trust funded by claimant indemnity dollars.")

percentage on present and future claimants that otherwise are likely to be paid in full in the tort system. *See* Mar. 6 Tr. at 97, 121. North River will not even receive that discounted payment on its defense cost claims.

The Hindens are contributing only $3 million to the Trust and are retaining their equity interests. Second Amended Disclosure Statement at 77; Podgainy Cert., Ex. B. As shown by Mr. Podgainy's certification, the Debtors' projected future income is significantly greater than the $3 million being contributed by the various Hinden parties. Podgainy Cert., Ex. D. As such, the value of the proposed Plan to the Hindens is enormous in comparison to their contribution. Indeed, although the dollar contribution of the settling insurers to the Trust was maintained by the Court under seal, Mr. Fitzpatrick admitted that those settlements discounted the insurers' limits by more than $3 million amount being contributed to the Trust by the Hindens. Mar. 6 Tr. at 163. In order to receive that $3 million, the Plan has foregone any opportunity to reap the benefit of future income from the Debtors. At the same time, Plan Proponents have extracted settlements from certain insurers that discounts the available insurance by more than the amount secured from the Hindens.[19] There is no rational reason that securing the Hinden contribution has any importance in this context. There is no discernable benefit to future demand holders, and certainly not North River, which will be ineligible to receive even of a penny of that contribution.

The Bankruptcy Court seeks to avoid this analysis altogether by proposing that this Court find "North River is not a future asbestos claimant whose interest must be taken into account

[19] The Bankruptcy Court sealed the amounts of the settlements, preventing North River from evaluating the overall fairness of those agreements. Based on Mr. Scarcella's analysis, North River believes that the indemnity exposure of the settling insurers is modest. In proposing to cut off the settling insurers' defense cost contribution obligations, which have greatly exceeded the Debtors' indemnity exposure, the proposed settlements are unfair.

under § 524(g)'s 'fair and equitable' standard" because it is a "known party with contingent, unliquidated and disputed claims."[20] Bankr. Ct.'s Proposed Findings ¶ 86. That analysis is directly contradicted by existing case law. In *W.R. Grace*, the District of Delaware considered whether future defense and contribution claims were "future demands" within the meaning of § 524(g). That court, which was subsequently affirmed by the Third Circuit on this issue, explained:

> Section 524(g) defines the term "demand" in the context of Chapter 11 reorganization plans related to asbestos liability as a "demand for payment" that is either "present or future" and that "arises out of the same or similar conduct or events that give rise to the claims addressed by the injunction." 11 U.S.C. § 524(g)(5)(B). Thus, the straightforward reading of the statute would appear to be that a demand is a claim that is either already present or may arise at some point in the future. Montana and the Crown's requests for indemnity and/or contribution fit neatly within the parameters of this definition—they are claims against Grace seeking reimbursement for personal injury lawsuits related to Grace Asbestos that Appellants defended *or will defend in the future*. Thus, the Court finds that Appellants' indemnity and/or contribution requests also satisfy the definitional requirements of "demands" under the Bankruptcy Code.

*In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012) (concluding that contribution claims were both claims and demands, *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013), *and aff'd*, 729 F.3d 311 (3d Cir. 2013), *and aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013)).

Even if the Court accepted the Bankruptcy Court's erroneous proposed finding, it does not relieve the Court of the burden of finding that the proposed Trust and the compromises incorporated therein are fair and equitable. It is undisputed here that the Debtors' asbestos

---

[20] Regardless of whether the Plan was required to be "fair and equitable" as to North River under Section 524(g)(4)(B)(ii), the Bankruptcy Code requires that a plan must provide for fundamental fairness in dealing with creditors." *ACandS*, 311 B.R. at 43 (citation omitted); *see also New Valley Corp.*, 168 B.R. at 80–81. The Bankruptcy Court did not make any such conclusion with respect to North River, nor would such a conclusion be appropriate.

creditors are moving from a tort system where a few (approximately 10%) valid creditors were paid in full to one in which claims are not defended but are paid only a percentage of their value. It is difficult to discern how this scenario is fair and equitable.

The Bankruptcy Court attempted to escape this financial reality by proposing that there was insufficient foundation for North River's projection regarding Debtor's future income. Bankr. Ct.'s Proposed Findings ¶ 87. The Bankruptcy Court states no rationale for its finding and its proposed conclusion is incorrect. North River did nothing more than accept the Debtors' *own* financial projections and continue to run them into the future.[21] Mr. Podgainy testified that there was no reason to believe that his future projections beyond 2022 would be lower. Mar. 6 Tr. at 64:23–25. Accepting his work, North River's estimate of $100 million in future net income (not discounted for present value) was conservative.

Presumably because that analysis threatens confirmation of the Plan, the Bankruptcy Court proposes that this Court instead accept an "illustrative cash-flow projection" that was submitted after the close of evidence, was not admitted into evidence, was not submitted to cross-examination, and is not in the court record. Bankr. Ct.'s Proposed Findings ¶ 87. Neither the Plan Proponents nor the Court can rely on a document submitted after the close of evidence and as to which North River was not permitted an opportunity to review or cross-examine the proponent. If the Court concludes that North River's math is unreliable, the fact remains that the Plan Proponents did not carry their burden of proof and cannot establish that the Plan is fair and equitable.

[21] Mr. Podgainy's estimates show $6.2 million in income from operates in 2019, $6.5 million in 2020, $6.8 million in 2021, and $7.4 million in 2022. Mar. 6 Tr. at 61–62.

The Bankruptcy Court proposes that this Court reject North River's assertion that the Plan was tactically designed to put leverage on insurers. Bankr. Ct.'s Proposed Findings ¶ 88. The evidence at the hearing, however, is explicit and undisputed: the FCR admitted that the Plan was designed to "put leverage" on insurers. Mar. 6 Tr. at 135. It does so by shifting defense costs onto non-settling insurers and then stripping those insurers of all right to recovery from the Debtor or other third parties. Because over 90% of claims against Debtors have been resolved without any payment, those defense costs are normally a multiple of indemnity expense. *See generally* Scarcella Rpt. As it stands, North River is the only creditor whose Class 7 claim has no opportunity for payment. The proposed injunction is not fair and equitable as required by Section 524(g).

## V. The Plan Cannot Be Confirmed Because It Does Not Satisfy "The Best Interests of Creditors" Requirement of Section 1129(a)(7) (Objections to Bankruptcy Court's Proposed Findings ¶¶ 106–109)

The Bankruptcy Court proposes that this Court overrule North River's objection that the Plan violates the "best interests of creditors" requirement of Section 1129(a)(7) because, in part, North River will receive full payment of its allowed Class 6 claims and that it will receive "value" for its Class 7 claims in the form of Trust-Payment Credits and the Judgment-Reduction Credits.[22] Bankr. Ct.'s Proposed Findings ¶¶ 106–107. These proposed findings rely on erroneous law and fact. Moreover, they would work a serious injustice and abuse of the Bankruptcy Code.

---

[22] Unlike Sections 1123(a)(4) and 524(g), Section 1129(a)(7) does speak in terms of value. This use of different terminology in different circumstances demonstrates that Congress knew how to specify value when it intended to mean value rather than payment. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

Section 1129(a)(7) is designed to protect individual dissenting members of an impaired class, establishing the minimum that they must receive or retain under the plan. *See, e.g.*, *In re Quigley Co., Inc.*, 437 B.R. 102, 144 (Bankr. S.D.N.Y. 2010). The best interests test reflects one of the foundational precepts of Chapter 11: the debtor's various constituencies are free to negotiate and formulate a plan of reorganization via the structures of Chapter 11, but the final product of this process may not deprive any objecting creditor of the amount it would receive upon liquidation of the debtor without the objecting creditor's consent. 7 *Collier on Bankruptcy* ¶ 1129.03[7][b], at 1129-45–1129-46 (15th ed. Rev. 2004).

The Bankruptcy Court largely disregarded the best interest requirements because North River's claims, which have been allowed for voting purposes, were "disputed and unliquidated." Bankr. Ct.'s Proposed Findings ¶ 108. But whether North River's claims are disputed or unliquidated has no bearing on the Plan Proponents' obligation to satisfy the best interests test with respect to North River. The best interests test applies even to contingent and disputed claims not allowed to vote on the plan and gives creditors who did not vote to accept the plan a "pocket veto" to prevent confirmation. *In re Sierra-Cal*, 210 B.R. 168, 172, 176 (Bankr. E.D. Cal. 1997); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 181 n.66 (Bankr. D.N.J. 2010) (hypothetical liquidation "requires an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, *id.*, the potential disallowance of claims (under § 502(d)), *id.*, the probability of success and value of causes of action held by the estate . . . .") (quoting *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000)).

Contrary to the Bankruptcy Court's proposed findings, the Plan Proponents have not satisfied the best interest of creditors test. The evidence is undisputed that the Plan Proponents

conducted no analysis of what North River might receive in a hypothetical liquidation: the Plan Proponents' only witness on this issue conceded that: (i) he did not consider the impact of insurance on creditor recoveries, (ii) North River would be eligible for a pro rata payment in a hypothetical Chapter 7 proceeding, and (iii) that such payment likely would be greater than the zero payment that is proposed under the Plan. Podgainy Cert. at 36; Mar. 6 Tr. at 67:1–12 ("Q: So does that mean you haven't determined whether – what percentage of recovery these creditors would have under . . . Chapter 7? A: Yes."), 67:19–68:11 ("Q: Okay. And are you aware of how North River's claims are to be treated? . . . If the trust's provisions – the TDP provisions applicable to North River's claims say that North River's not eligible for payment, the answer to that question is really zero, isn't it, North River is not going to get paid by the trust? A: It sounds like it makes sense."), 78, 82:1–24, 89:3–6 ("Q: In the Chapter 7, do you believe that any of that $8.4 million would be available for distribution to general secured creditors? A: It's possible."); Mar. 7 Tr. at 150:11–151:7. *See also* Mar. 7 Tr. at 138:10–139:19. Debtors' counsel attempted to rehabilitate this testimony in argument, but has presented the Court with no analysis or facts to support the hypothetical arguments made to attack their witnesses' testimony. Mar. 7 Tr. at 146:5–16. As such, the Plan Proponents wholly fail to carry their burden on satisfaction of Section 1129(a)(7). Further, North River would fare better in a Chapter 7 liquidation because, without any Section 524(g) injunction, it would be free to pursue contribution claims against Settling Insurers to the full extent allowed by law.

The Bankruptcy Court focuses on "value" and suggests that the Plan need not provide cash. But, as discussed above, the Plan here does not provide for "value" to North River's Class

7 Claims – and certainly not its claims against third parties that the Plan proposes to cut off.[23] Bankr. Ct.'s Proposed Findings ¶ 107. The Plan proposes a system of judgment-reduction and setoff credits that would, as a practical matter, never come into play and would not apply at all to North River's defense costs claims, which are the only claims that would arise in the future. Plan Proponents admit that they do not address these claims. Mar. 7 Tr. at 130 ("So what about the scenario in which as North River has pointed out there are numerous dismissals without payment and is left with all these orphaned defense costs. Well, that's true. We don't directly address that.").

The Bankruptcy Court proposes that this Court find that North River's argument that it would fare better in a Chapter 7 liquidation "amounts to little more than unsupported speculation or whimsy" because North River ignores "potential substantial costs" involved in a Chapter 7 liquidation. Bankr. Ct.'s Proposed Findings ¶ 108. North River, however, does not have the burden of proof on the best interest of creditors test. The same statement could easily apply to the Plan Proponents, and they bear the burden of proof to show that they *do* satisfy the test. They have not done so. Rather, they ask that this Court assume that they do because there are "potential substantial costs" involved in a Chapter 7 liquidation. But the *only* evidence before this Court is the testimony of Mr. Podgainy that North River could receive a distribution on its defense costs claims in a Chapter 7 liquidation. The Court cannot ignore that evidence in favor

[23] The Bankruptcy Court also attempts to add consideration of North River's Class 6 claims. But the best interest test of Section 1129(a)(7) expressly applies to individual claims within each class and therefore must be considered on a claim-by-claim basis. *See* 11 U.S.C. § 1129(a)(7) (The best interest test requires that each holder of a claim "will receive or retain under the plan *on account of such claim or interest* property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . ..") (emphasis added). *See also In re Elsinore Shore Assoc.*, 91 B.R. 238, 269 (Bankr. D.N.J. 1988) (the focus under 1129(a)(7) is upon the claim, as distinguished from the class in which the claim is placed).

of its own, convenient suppositions. The Plan Proponents unequivocally failed to submit evidence to carry their burden of proof on the satisfaction of the best interest of creditors test.

The Plan also fails to satisfy the best interest of creditors test because the Plan strips North River's rights against non-debtor third parties with no compensation. The Bankruptcy Court proposes to hold that the best interest analysis is limited to the dividend that a creditor would receive from the Chapter 7 trustee only, and not from third-party non-debtors. Bankr. Ct.'s Proposed Findings ¶ 109. This Court should reject that flawed reasoning,

If this Court is to enjoin North River's claims against third parties, it naturally must consider North River's rights against third parties in analyzing compliance with Section 1129(a)(7). If this case were converted to Chapter 7, claimants would be permitted to sue Debtors (because there is no corporate discharge in a chapter 7); Debtors would tender the claims to insurers; if insurers chose to (as they presumably would), they would defend and resolve claims, subject to reservations of rights; and if any settling asbestos insurer or any other insurer failed to pay their fair share, insurers who had paid more than their fair share would have the right, to the fullest extent permitted by law, to sue for, and recover, contribution in 100-cent dollars from solvent, non-debtor entities. The Plan takes away that right, enjoining the assertion of all contribution claims, granting an imperfect judgment reduction remedy that may partially compensate insurers only under certain limited circumstances, and leaving insurers without any remedy at all in other circumstances.

This type of interference with the right to pursue non-debtor third parties for full payment led Chief Judge Bernstein in *Quigley* to refuse to confirm a Section 524(g) plan because it failed the best interests test. *Quigley*, 437 B.R. at 118. In *Quigley*, the plan sought to establish a Section 524(g) channeling injunction that would have enjoined asbestos claimants from pursuing

claims against Pfizer, debtor's solvent non-debtor parent company. The court explained that, because "[i]n a Chapter 7 liquidation proceeding, creditors retain their rights to pursue nondebtors for full payment," "giving at least liquidation value to each creditor [in a Chapter 11 case] requires protection of the Chapter 7 right to pursue non-debtor actions." *Id.* at 145. The court dismissed as a "lopsided view of creditor equality" any plan "which sanctions confiscation of these non-debtor rights," noting that only plans that respect "creditors' Chapter 7 right to seek full satisfaction from non-debtors" will satisfy the "best interests test." *Id.* (emphasis added). *See also Combustion Eng'g*, 391 F.3d at 234, 243 n.59.[24] The *Quigley* court thus held that the plan could not be confirmed because the dissenting claimants would not receive the full value of their third-party claims against non-debtor Pfizer. *Quigley*, 437 B.R. at 143–46.[25] Precisely the same is true here: North River, which voted against the Plan, in addition to receiving nothing on

[24] Other courts similarly have held that plans do not satisfy the "best interests" test when they provide recoveries from non-debtors that are less than what would be available under a Chapter 7 plan. *See Mercury Capital Corp. v. Milford Connecticut Assocs.*, 354 B.R. 1, 9 (D. Conn. 2006) (remanding confirmation order where plan released certain non-debtor guarantors and, therefore, appeared to extinguish pre-petition guarantees benefitting the creditor and holding that the objecting creditor "may be significantly less secured under the debtor's plan than under a Chapter 7 liquidation"); *In re Union Meeting Partners*, 165 B.R. 553, 576 (Bankr. E.D. Pa. 1994) (denying confirmation for failure to satisfy "best interests" test where plan proposed to cut off rights against debtor's non-bankrupt partners).

[25] The Bankruptcy Court proposes to distinguish *Quigley* because the complaining creditors there were asbestos claimants. Bankr. Ct.'s Proposed Findings ¶ 109. The Bankruptcy Court further suggests that those creditors' contingent, unliquidated claims were somehow more certain than North River's unliquidated claims. Those proposals demonstrate the unfortunate tendency of some courts to conclude that a different law applies to asbestos claimants. It does not. Judge Bernstein's analysis applies equally to any creditor. Moreover, the cases cited by the Bankruptcy Court do not involve an effort to discharge non-debtor claims, as does the case here, or are not good law. *See e.g.*, *Plant*, 469 B.R. at 887 (reversed on appeal because bankruptcy court failed to adequately address insurance settlement at issue); *In re Dow Corning Corp.*, 237 B.R. 380, 411–12 (Bankr. E.D. Mich. 1999) (discussing appropriate interest rate, not discharge of third-party claims); *W.R. Grace*, 475 B.R. at 149 (discussing availability of insurance available in both Chapter 7 and Chapter 11). Left with no logical basis to distinguish *Quigley*, the Bankruptcy Court simply notes that it is from the Southern District of New York and not binding.

its claims against the Debtors, would be enjoined under the Plan from receiving the full value of its third-party claims against non-debtors. In a non-Section 524(g) bankruptcy case, the court cannot enjoin or discharge a claim against a third party. *See Combustion Eng'g*, 391 F.3d 190, 233 (3d Cir. 2004). As a result, whether a creditor could obtain a recovery against a third party normally makes no difference in Chapter 7 versus Chapter 11. In this case, however, the Bankruptcy Court proposes the unusual step of stripping North River of third-party claims with no compensation. In that circumstance, at least, it is appropriate to consider North River's rights vis-à-vis third parties. As a result, the Plan violates Section 1129(a)(7).

## VI. The Plan Cannot Be Confirmed Because It Does Not Satisfy Section 1129(b) (Objections to Bankruptcy Court's Proposed Findings ¶¶ 124–129)

### A. The Plan Fails to Satisfy the Absolute Priority Requirement of Section 1129(b)(2)(B)(i)

North River contends that the Plan would violate the absolute priority rule if its Class 7 Claims were properly classified separately from the underlying asbestos creditors. If this Court concludes, as would be proper, that North River's claims cannot be classified with the asbestos claimants because North River's claims are being treated differently or otherwise, then the Plan also would fail the absolute priority rule and the Bankruptcy Court proposes that this Court find that the Plan satisfies the absolute priority rule of Section 1129(b)(2) because North River's Class 7 Claims are not being paid in full (or at all) yet Debtors' equity owners are retaining their interests.

### B. The Plan Fails to Provide North River With "Cramdown" Protection Under Section 1129(b) With Respect to Its Class 7 Claims

The Bankruptcy Court proposes that this Court conclude that North River is not entitled to "cramdown" protection under Section 1129(b) with respect to its Class 7 claims. Bankr. Ct.'s Proposed Findings ¶ 128. If the classification and voting scheme approved by the Bankruptcy

Court were permissible, the Bankruptcy Court would be correct. North River, however, contends that its Class 7 Defense Cost and Claims against non-debtor parties should have been classified in a class other than Class 7 (even if channeled to the Trust). Moreover, Class 7 would have rejected the Plan if the Court had applied any sort of discount on the votes of asbestos creditors to account for the reality that 90% of the claims had been dismissed without payment.[26] In either case, North River's claims would have been enough to cause an impaired class to reject the Plan and, therefore, the Plan would be required to provide North River with the "indubitable equivalent" of its state law setoff rights. Setoff rights are treated as secured claims under the Bankruptcy Code. *See* 11 U.S.C. §§ 553, 506. Section 1129(b) provides that a plan is fair and equitable with respect to such claims if it provides the class with the "indubitable equivalent" of its claims. The Plan expressly seeks to eliminate these setoff rights.[27] *See* Plan § 9.05(a)(iv). Because the Plan does not preserve those rights, it cannot be confirmed.

The Bankruptcy Court proposes that this Court conclude that North River has no setoff rights under New York law, so its claims are not "secured" under Sections 506 and 533. Bankr. Ct.'s Proposed Findings ¶ 129. Such a conclusion would be contrary to New York law and the existing rulings of the New York State Court. New York law does allow insurer setoff claims. *See, e.g.*, N.Y. Ins. Law § 7427 (providing in relevant part that "[i]n all cases of mutual debts or mutual credits between the insurer and another person in connection with any action or

---

[26] In addition, pursuant to the terms of the proposed settlements (discussed below), North River's claims against those settling insurers would be channeled to the Trust or otherwise enjoined. *Id.* As such, North River could be responsible for a greater percentage of defense costs and its claims in Class 7 accordingly would need to be increased. If the settlements were approved, North River's claims would increase by an amount sufficient to have caused Class 7 to reject the Plan.

[27] The Plan's efforts to strip insurers' setoff rights further demonstrates the improper classification and disparate treatment of Insurers' Class 7 Claims. No other creditors in Class 7 have such setoff rights – present or future. Rather than preserve them, the Plan Proponents expressly seek to abrogate those rights.

proceeding under this article, such credits and debts shall be set off and the balance only shall be allowed or paid…"); *Chesapeake Ins. Co. v. Curiale (In re Realex Group, N.V.)*, 210 A.D.2d 91, 95 (N.Y. App. Div., 1st Dep't 1994) (in reinsurer action against liquidator seeking offset against debt owed, court applies principle that "law will compel restitution from a person who obtains money or property from another fraudulent, *unjustly, or without authority* . . .. This principle applies to offsets involving insolvents.").

The Bankruptcy Court's proposal rests on the premise that North River's claims are contingent. But North River's claims are more properly considered unliquidated, not contingent.[28] While the *amount* of North River's claims against Debtors for defense contribution is uncertain, the *existence* of these claims is not. The New York State Court has previously held that pro rata allocation applies to the Debtors' asbestos claims and that Debtors are obligated to contribute to defense costs for claims/occurrences during uninsured periods. The only remaining dispute that exists is as to the percentages of that liability for which each insurer and the Debtors will be responsible. Second Amended Disclosure Statement at 15–16. Thus, while the *amount* of North River's claims against have not be finally adjudicated, the *existence* of those claims—and the preexisting setoff rights they engender—has been established. Moreover, but for the Debtors' separation of North River's claims into pre- and post-petition classes (Classes 6 and 7, respectively), North River's claims could not be considered contingent in any case. As such, North River's claims for defense contribution amount to a "preexisting right of setoff under nonbankruptcy or state law." *In re Corp Res. Servs., Inc.*, 564 B.R. 196, 203 (Bankr. S.D.N.Y. 2017).

[28] North River's Class 6 Claims are neither contingent, nor unliquidated, but are disputed.

North River does not contend that it could set off anticipated defense costs against a present indemnity obligation. The Bankruptcy Code, however, uniquely accelerates claims to be treated as of the petition date – rendering the New York law on the timing of offsets irrelevant. Regardless of whether North River could *exercise* its setoff rights as of the petition date, it undeniably has those rights. The Plan improperly seeks to eliminate those rights and thus violates the anti-cramdown provisions of Section 1129(b).

## VII. The Proposed Settlements/Sales Cannot Be Approved (Objections to Bankruptcy Court's Proposed Findings ¶¶ 62, 89–95)

The Plan Proponents seek court approval of various insurer settlements. Mot. to Approve Compromise under R. 9019 with Hartford Accident and Indemnity Co., Dkt. 468; Mot. to Approve Compromise under R. 9019 with Federal Insurance Co., Dkt. 500; Mot. to Approve Compromise under R. 9019 & Mot. to Sell Free & Clear of Liens under 363(f), Dkt. 518; Mot. to Approve Compromise under R. 9019 & Motion to Sell Free & Clear of Liens Under 363(f), Dkt. 522. The Bankruptcy Court proposes that this Court find that "the settlement and releases described in section 9.11 of the Plan are approved pursuant to Federal Rule of Bankruptcy Procedure 9019(a) and § 105(a) of the Bankruptcy Code." Bankr. Ct.'s Proposed Findings ¶ 62.

A bankruptcy court has the authority to "approve a compromise or settlement" of a claim "after notice and a hearing" on the compromise. Fed. R. Bankr. P. 9019(a). Similarly, pursuant to Section 363(b), a debtor may use estate property outside the ordinary course of business, upon notice and a hearing, to settle claims with the approval of the bankruptcy court. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 350 (3d Cir. 1999). The bankruptcy court must then decide whether the settlement is "fair and equitable," *In re Nutraquest Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)), and "assess and balance the value of the

claim that is being compromised against the value to the estate of . . . accept[ing] . . . the compromise" by considering: "(1) the probability of success in ligation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). A settlement's fidelity to the requirements of the Bankruptcy Code will generally be the most important factor in determining whether a settlement is fair and equitable. *In re Jevic Holding Corp*., 787 F.3d 173, 184 (3d Cir. 2015), *rev'd on other grounds*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017). As the Supreme Court has stated, bankruptcy courts cannot approve settlements that violate the tenets of the Bankruptcy Code. *See Czyzewski*, 137 S. Ct. at 983–84.

In a bankruptcy proceeding, the fairness and equity of an agreement necessarily has a broader meaning. The Fifth Circuit has articulated the scope of the intended analysis as follows:

> While it is true that the bankruptcy court has jurisdiction to determine whether a settlement between the debtor and other parties is fair and equitable, "looking only to the fairness of the settlement as between the debtor and the settling claimant [and ignoring third-party rights] contravenes a basic notion of fairness." *In re AWECO, Inc.*, 725 F.2d at 298; *see also F.D.I.C. v. Jones (In re Jones)*, 966 F.2d 169, 173 (5th Cir. 1992) (discussing § 105(a) and court's duty to avoid unfairness and injustice); *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan)*, 957 F.2d 1020, 1026, 1031 (2d Cir. 1992) (holding that "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval," and requiring determination that "no one has been set apart for unfair treatment").

*Matter of Zale Corp.* 62 F.3d 746, 754 (5th Cir. 1995). That scenario is precisely what is happening here – non-settling insurers have "been set apart for unfair treatment."

At the Confirmation Hearing, the Debtors adduced no evidence that the proposed sales of their insurance policies (pursuant to the proposed buybacks) were fair and equitable. Instead, they concealed the amounts of the settlement, though the FCR admitted that they had provided

discounts to the settling insurers that exceeded the Hinden Contribution. Further, the FCR testified that Plan Proponents did not even consider whether the settlements were fair and equitable. Mar. 6 Tr. at 140:4–16.

The proposed settlements are unfair to North River. The proposed settlements seek to eliminate the reimbursement, contribution, subrogation and/or indemnification rights of non-settling insurers, *i.e.*, North River, against the settling insurers. *See generally* Four (4) Proposed Orders Approving Settlements with Asbestos Insurers ("Proposed Settlement Orders"), Dkt. 784-5; Plan §§ 9.05–9.07. The cost of defending claims against Debtors has significantly exceeded the actual payments to asbestos claims – over 90% of which have been dismissed without payment. *See* Scarcella Rpt. at 9. The New York state court has previously held that pro rata allocation applies to the Debtors' asbestos claims and that Debtors are obligated to contribute to defense costs for claims/occurrences during uninsured periods. This holding is the reason that Debtors stated in its Second Amended Disclosure Statement that they "have been forced to bear an increasing share of settlements and defense costs . . .." Second Amended Disclosure Statement at 14. There currently is a dispute as to the percentages of that liability for which each insurer and the Debtors will be responsible. *Id.* at 15–16. Based on the application of the New York Court of Appeal's decision in *Keyspan Gas East Corp. v Munich Reins. Am., Inc.*, 96 N.E.3d 209 (N.Y. 2018), Mr. Scarcella calculated that the settling insurers would be responsible for approximately $7.53 million in future defense costs. Scarcella Rpt. at 32, fig. 36 (median scenario). The proposed settlements would have the effect of granting the settling insurers discharges for millions of dollars in defense costs that they otherwise would be obligated to contribute. In the tort system, North River's right to collect from the settling insurers would be determined under applicable state law and the solvency of each respective settling insurer. No

one has disputed that North River likely would be paid in full for any such rights. Here, however, they would lose those rights with no recourse. In the Bankruptcy Context, where third party releases are generally prohibited, such a result is the definition of unfair.

The proposed sales also violate Section 363 because the Debtors have not provided adequate protection for North River's interests. Under New York law, the settling insurers have no ability to extinguish reimbursement obligations or duties (outside of a global settlement). *See, e.g.*, *Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 210 (2d Cir. 2000) (rejecting as "untenable" under New York law the "notion that any settlement by which an insurer obtains a release from its insured, regardless of its terms, insulates that insurer from all contribution claims."); *DaimlerChrysler Ins. Co. v. Universal Underwriters Ins. Co.*, 2010 N.Y. Misc. Lexis 1686 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 31, 2010) ("The contract of settlement an insurer enters into with the insured cannot affect the rights of another insurer who is not a party to it. Instead, whatever obligations or rights to contribution may exist between two or more insurers of the same event flow from equitable principles."); *Scotts Co., LLC v. Ace Indem. Ins. Co.*, 18 Misc. 3d 1139(A) (N.Y. Sup. Ct. N.Y. Cnty. Feb. 26, 2008) (permitting contribution suit against settled co-insurer). The Plan Proponents and settling insurers' proposed settlement offers the non-settling insurers no protection for these state law rights. That result would be a complete nullification of the parties' state law rights and turns the Bankruptcy Code on its head by allowing the settling insurers to buy releases from liability to third parties by making a payment to the Debtor or to the Trust.

As the Second Circuit observed in *MacArthur Company v. Johns-Manville Corporation*, cited with approval by the Third Circuit in *Combustion Engineering*, the bankruptcy court has the authority to approve settlements "and to channel claims arising under the policies to the

proceeds of the settlement." *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92–93 (2d Cir. 1988) (2d Cir. 1988) (citing *In Van Huffel v. Harkelrode*, 284 U.S. 225 (1931)). The Second Circuit found this power under Section 363(f) of the Bankruptcy Code, which permits, under certain circumstances, sales of property in the debtor's estate "free and clear of any interest in such property of an entity other than the estate." To do so, however, the interest being stripped must follow and apply with equal force and priority to the proceeds of the settlement:

> It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition. *See Ray v. Norseworthy*, *supra*, 90 U.S. at 134–35; S. Rep. No. 989, 95th Cong., 2d Sess. 56 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5842 (committee report on 11 U.S.C. § 363(f)) ("Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale.").

*Johns-Manville Corp.*, 837 F.2d at 93.[29]

Recognizing the common law requirements highlighted by the Second Circuit, Congress codified the protection of third-party interests in Section 363(e). It provides, in relevant part:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

The Third Circuit has also recognized this controlling principle applicable to claim stripping Section 363 sales. *See Folger Adam Security, Inc. v. Dematteis/Macgregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f) and, therefore,

---

[29] *See also Ray v. Norseworthy*, 90 U.S. 128, 134–35 (1874) (court may sell property encumbered by third-party claims as long as third parties retain their respective priorities in the proceeds of the sale); *In re Penn Central Trans. Co.*, 383 F. Supp. 1128, 1130 (E.D. Pa. 1974) (power of a reorganization court to transfer interests in debtor's property to the proceeds of a sale is well established)).

attaches to the proceeds of the sale.") (internal citations omitted). Section 524(g) operates in the same manner as Section 363. *In re W.R. Grace & Co.*, 900 F.3d 126, 130 (3d Cir. 2018) ("claims against certain third parties who are alleged to be directly or indirectly liable for the debtor's conduct . . . are directed to the trust . . . which assumes the asbestos liabilities").

The Plan Proponents originally paid lip service to this requirement in the Proposed Settlement Orders, which facially provided that North River's interests would attach to the proceeds of the sales. After North River objected that these provisions were illusory because the claims were channeled to the Trust where they would be ineligible for payment, the Plan Proponents dropped the charade. Instead, they now ask the Court to strip North River's claims against the settling insurers and provide them no compensation. Section 363(f) does not permit the Court to do so.

Under the Bankruptcy Code, property of the estate may not be used or sold without providing adequate protection to entities with an interest in the property. *See* 11 U.S.C. § 363(e). The adequate protection requirement is generally satisfied if an entity's interest in estate property attaches to the proceeds from the sale or use of the property. *See Johns-Manville Corp.*, 837 F.2d at 94 ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition."). Here, the Plan violates Section 363 by failing to protect the interests of North River in settlements that are proposed in conjunction with the Plan.

The Bankruptcy Court attempts to evade this requirement by proposing that North River is not a lien creditor and is instead an unsecured creditor ineligible for adequate protection under Section 363. Bankr. Ct.'s Proposed Findings ¶ 89. Further, the Bankruptcy Court proposes that

North River does not hold any interest that is entitled to protection under the Bankruptcy Code.[30] *Id.*

The Third Circuit has interpreted the term "interest" broadly to include *claims* against the debtor or settling party arising out of the property to be sold. *See, e.g.*, *Trans World Airlines*, 322 F.3d at 283. Contrary to the Bankruptcy Court's findings, North River has an "interest" in the policies issued by the Settling Asbestos Insurers as contemplated by Section 363. Whether North River's claim arises through equity or contract is of no relevance to the Section 363 "interest" issue.

The Plan Proponents seem to acknowledge that claims are entitled to adequate protection. They have submitted four similar, but slightly different proposed settlement orders that have gone through various revisions throughout the confirmation process. The orders recommended by the Bankruptcy Court, however, each pays lip service to the adequate protection requirement by providing in substantively similar terms that "[a]ny and all Interests that the Court determines are entitled to protection under § 363(e) of the Bankruptcy Code shall attach to the proceeds of the sale with the same validity, force, and effect as such Interests had in the Policies prior to entry of this Order, subject to the terms and conditions of any Plan confirmed for the Debtors . . . ." *See* Proposed Settlement Orders at 11, 25, 39, 53. That provision is wholly illusory because the proposed Plan provides that North River's claims against Settling Insurers will be ineligible for payment. *See* Section III(A), *supra.*

---

[30] For example, the Bankruptcy Court asserts that "North River's contribution claims against the Settling Asbestos Insurers, whether they are for indemnity or defense costs, arise as a matter of equity. They do not involve property of the estate and will not erode limits on those policies." *Id.* The second statement is true as to some settling insurers and false as to others. But in each case, North River's claims against the Settling Insurers arise because of the insurance policies issues by those parties. The Third Circuit has held that such claims do constitute interests. *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003).

In argument, counsel for the Official Committee of Asbestos Claimants ("ACC") claimed that North River had no protectible interest. Mar. 6 Tr. at 122:20–123:14.[31] Demonstrating the convenient flexibility of their positions, just weeks before the Bankruptcy Court issued its proposed findings, the ACC's counsel argued to the Ninth Circuit that non-settling insurers *do* hold protectible interests in a settled insurer's policy. In *In re Fraser's Boiler Serv., Inc.*, No. 3:18-CV-05637-RBL, 2019 WL 1099713, at *9 (W.D. Wash. Mar. 8, 2019), the district court reversed the bankruptcy court's approval of settlement between a former boilermaker saddled with asbestos claims and some insurers that would enjoin claims from non-settling insurers. The district court concluded that the non-settling insurers did not have an interest in the settling insurers' policies and that the court lacked jurisdiction to enjoin third-party contribution claims. *Id.* On appeal, Fraser's Boiler Service, represented by the same counsel that represents the ACC here, argued that a non-settling insurer's contribution claims *are* interests in Debtor's property that must be considered for purposes of Section 363. Appellant's Opening Br. at 11, 17, 22–23, *Fraser's Boiler Serv., Inc. v. Certain Underwriters at Lloyd's London, et al.*, No. 19-35320 (9th Cir. filed June 10, 2019) (attached hereto as **Exhibit D**). In any case, the Bankruptcy Court

[31] The Court: So in this case there's a sale of a policy as part of the settlement for X dollars. Is it the plan proponent's position that North River has an interest in that policy?
Mr. Liesemer: No, North River has a claim as arising from those policies, like the equitable contribution claims against –
The Court: A claim against –
Mr. Liesemer: Against the settling insurers.
The Court: – its own insurers.
Mr. Liesemer: But that claim arises from equity, it doesn't arise from the policy.
The Court: But it's not an interest in – that's what I'm trying to –
Mr. Liesemer: No.
The Court: – to glean, it's not –
Mr. Liesemer: No.
The Court: – an interest in the policy, in the subject – in the asset of a bankruptcy estate that's being sold for – as part of the compromise.

either must provide adequate protection or it lacks the power to enjoin such third-party contribution claims.

In their currently-proposed insurance settlement orders, the Plan Proponents ask that the Court find that the interests of claimants and parties in interest "are adequately protected because the Agreement provides that the Settlement Amount will be paid to the Asbestos Trust established pursuant to the Filed Plan to pay Channeled Asbestos Claims against the Debtors." Proposed Settlement Orders at 7, 21, 35. *See also id* at 49. But any such "protection" is entirely illusory. As discussed above, the TDPs provide that North River's claims for defense costs (whether against Debtors or settling insurers) will be ineligible for payment. To the extent that the Plan pays lip service to the adequate protection requirement, the Bankruptcy Court's proposed findings make clear that there is no adequate protection being provided to North River's interest. The Plan Proponents ask this Court to strip North River's claims against the Settling Insurers and provide them no compensation.

In *Fraser's Boiler Service, Inc.*, discussed briefly above, the United States District Court for the Western District of Washington held that a debtor's promised judgment reduction provisions failed to adequately protect the interests of non-settling insurers:

> Even if it were reasonable, the Settlement does not adequately protect the interests of the Non-Settling Insurers. The CSA sets out specific percentages of defense costs and establishes that each insurer must pay indemnity costs on a "pro rata by time basis" in the event of an asbestos claim. However, the Settlement's judgment reduction clause only offsets costs if an asbestos claimant procures a judgment against one of FBS's insurers. Consequently, if the Non-Settling Insurers were to successfully defend against a claim, there would be no way for them to offset such costs under the judgment reduction clause. Furthermore, in the event that a plaintiff's claim were settled, the Non-Settling Insurers would have no way of fairly reducing their share. All asbestos claims against FBS so far have resulted in settlements. Dkt. #32, at 14. Given these facts, the judgment reduction clause provides almost no protection.

> To account for the problems created when a claim is settled, the Bankruptcy Court surmised that "awareness of the judgment reduction provision will inform what judgment could be obtained against the non-settling insurer at trial and, therefore, what settlement amount would be acceptable to the claimant." Dkt. #1, at 20. A claimant could then "seek the remainder of what he or she could have been awarded or settled for, but did not because of the contribution claim, from the liquidating trust," which would evaluate the claimant's application. *Id.* at 21. This highly speculative description places far too much faith in a rickety system that protects the Non-Settling Insurers with theoretical rather than actual rights. It also ignores the situation where an insurer successfully defends FBS and overlooks the fact that, once the trust runs out, the Non-Settling Insurers will have no leverage to offset the amount of settlements. Consequently, the Settlement fails to adequately protect the Non-Settling Insurers and the sale free and clear of the Inter-Insurer Claims was impermissible under § 363(f).

*Fraser's Boiler Serv., Inc.*, 2019 WL 1099713 at *9. Just like the bankruptcy plan considered in *Fraser's Boiler Service*, this Plan fails to protect North River's interests.

As stated above, the Second Circuit observed in *MacArthur Company v. Johns-Manville Corporation* that the bankruptcy court has the authority to approve settlements "and to channel claims arising under the policies to the proceeds of the settlement." 837 F.2d at 92–93. The Bankruptcy Court proposes that *MacArthur Company v. Johns-Manville Corporation* is distinguishable because the plaintiff there was a co-insured under the policies.[32] Bankr. Ct.'s Proposed Findings ¶ 90. But that distinction makes little difference; the exact nature of the underlying claim is immaterial. The principal holding is that where a Bankruptcy Court strips and enjoins a claim, it must allow that claim to attach to the proceeds. It is the Plan Proponents' failure to follow through on the latter requirement where the present Plan fails.

The Bankruptcy Court contends that North River's arguments based on Section 363 are "irrelevant and unavailing" because "the statutory basis for enjoining North River's contribution

[32] Ironically, the Bankruptcy Court contends both that North River's claims do not relate to the settled insurance policies when considering whether North River has a protectible interest, but then contends that it can enjoin North River's claims against the settling parties because they arise out of the insurance policies issued to the Debtors. *Cf.* Bankr. Ct.'s Proposed Findings ¶¶ 89–91.

claims against the Settling Asbestos Insurers is § 524(g), not § 363(f)." Bankr. Ct.'s Proposed Findings ¶ 91. Accordingly, the Bankruptcy Court proposes that North River's reliance on *Combustion Engineering* and *Johns-Manville* cases to support its discharge arguments are misplaced because those cases involved Section 105, rather than Section 524(g), injunctions. *Id.* The Bankruptcy Court further proposes that because any injunction in this case would be issued under Section 524(g), rather than Section 363 or Section 105, North River's alternative argument that the Bankruptcy Court lacks jurisdiction because North River does not have an interest warranting adequate protection. Bankr. Ct.'s Proposed Findings ¶ 93. These arguments are wrong on two counts.

First, the proposed settlement orders do not reference or rely on Section 524(g).[33] In direct contrast to the Bankruptcy Court's proposed findings, each proposed settlement order specifically bars North River's claims under Sections 363 and 105. The Plan Proponents' reliance on Section 524(g) is an after-the-fact effort to justify their improper third-party releases. The proposed settlement orders recommended to this Court each provide for relief under Sections 363 and 105. For example, one order provides:

> Effective upon [Settling Insurer's] payment in full of the Settlement Amount, pursuant to Sections 105(a) and 363 of the Bankruptcy Code, all Persons who have held or asserted, who hold or assert, or who may in the future hold or assert any Claim or Interest of any kind or nature against or in any of the Debtors, their bankruptcy estates, the Policies, or [Settling Insurer] based upon, arising under or out of, or in any way attributable to the Policies or any Interim Funding Agreement whenever or wherever arising or asserted (including all thereof in the nature of or sounding tort, contract, warranty or any other theory of law, equity, or admiralty), shall be permanently stayed, restrained, and enjoined from asserting any such Claims or Interests against [Settling Insurer] and from continuing, commencing or otherwise proceeding or taking any action against [Settling Insurer] to enforce such Interests or Claims or for the purpose of directly or indirectly collecting, recovery, or receiving payments from [Settling Insurer] to recover with respect to such Claim or Interest.

[33] In any case, the Plan Proponents have not satisfied the conditions for a Section 524(g) injunction.

*See* Proposed Settlement Orders at 11. Nowhere in the proposed settlement orders is Section 524(g) referenced. Rather, the proposed settlement orders are expressly premised on Sections 363 and 105.

Second, if North River's claims are not "interests" subject to adequate protection, Section 363 does not allow their sale free and clear in any respect. The Bankruptcy Court evades this issue by proposing that this Court conclude that North River's claims not be treated as interests in the policies, but simply as claims against the Settling Insurers.[34] If that is the case, the various proposed settlement orders cannot be approved because each contains an express injunction under Sections 105 and 363 barring North River's claims. The Bankruptcy Code does not authorize the issuance of such injunctions or equitable relief. *See Fraser's Boiler Serv.*, 2019 WL 1099713 at *9 (reversing approval of settlement between former boilermaker facing asbestos claims and some insurers that would enjoin claims from non-settling insurers).

Moreover, if North River's claims against the settling insurers for defense costs are being channeled to the Trust, as would be required to make any injunction of those claims permissible, the Trust must actually *pay* such claims. 11 U.S.C. § 524(g)(1)(B) ("injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, *is to be paid in whole or in part* by a trust described in paragraph (2)(B)(i)"). Here, however, the Plan Proponents propose not to pay North River's

[34] This does not, however, distinguish such claims from the definition of "interest" adopted by the Third Circuit in *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003), which interpreted the term "interest" broadly to include *claims* against the debtor or settling party arising out of the property to be sold.

contribution claims against non-debtor settling insurers in whole or in part, but to have those claims simply disappear. Nothing in the Bankruptcy Code permits such treatment.

The Bankruptcy Court contends that the Section 524(g) injunction is necessary because without the Section 524(g) injunction, there would be no settlement with the Settling Asbestos Insurers and the Trust would not be funded, causing the asbestos personal injury victims further injury. Bankr. Ct.'s Proposed Findings ¶ 94. There is no basis for this finding because the Plan Proponents offered no evidentiary support for it beyond the unsupported testimony of Mr. Fitzpatrick who admitted that he did not examine the claims against the Debtors or the assets available to pay those claims. Mar. 6 Tr. at 121, 143. To the contrary, the undisputed evidence was that Debtors' insurers were defending and paying their share of settled claims. There was zero evidence that any claimant would not be paid in full in the future from the Debtors' assets and the remaining insurance available (which the Debtors' estimated at $57 million).

The Bankruptcy Court proposes that the Plan Proponents have complied with all applicable provisions of the Bankruptcy Code, including Section 1125, and, as such, the Plan satisfies Section 1129(a)(2). Bankr. Ct.'s Proposed Findings ¶ 95. For the reasons stated above, the Plan fails Section 1129(a)(2), which requires that the plan proponent be in compliance with the Bankruptcy Code, because the Plan violates Section 363 by not providing adequate protection for North River's interests in settlements that are proposed in conjunction with the Plan.

## **CONCLUSION**

The Plan before this Court is the result of a bankruptcy filed with an improper purpose to gain a litigation advantage over the Debtors' insurers. To gain the claimants' support, the Debtors signed on to a process that would create a trust that settled, but did not defend, claims

that have been dismissed at a 90% rate historically. At the same time, they strip North River of valuable claims against both the debtors and non-debtor third parties. Unlike every other type of creditor in this case, only North River's claims are totally ineligible for compensation. That circumstance is the definition of unfairness and bad faith. The Court should refuse to adopt the Bankruptcy Court's Proposed Findings and Conclusions and should instead enter an order denying confirmation of the Plan.

Dated: July 30, 2019

Respectfully submitted,

KENNEDYS CMK LLP

*/s/ Christina R. Salem*
Margaret F. Catalano
Christina R. Salem
570 Lexington Avenue, 8th Floor
New York, N.Y. 10022
(212) 252-0004
Emails: meg.catalano@ kennedyscmk.com
christina.salem@kennedyscmk.com

-and-

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
Ifrah PLLC
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
202.525.4147
Email: george@ifrahlaw.com

*Attorneys for The North River Insurance Company*