UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY (TRENTON)

| | | |
|---|---|---|
| IN RE: | . | Case No. 18-27963 (MBK) |
| | . | |
| | . | |
| DURO DYNE NATIONAL CORP, *et al.* | . | United States Courthouse 402 East State Street Trenton, NJ 08608 |
| Debtors. | . | |
| | . | March 6, 2019 10:11 a.m. |
| . . . . . . . . . . . . . . . | | |

TRANSCRIPT OF CONFIRMATION HEARING
BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Lowenstein Sandler<br>By: JEFFREY D. PROL, ESQ.<br>One Lowenstein Drive<br>Roseland, NJ 07068 |
| Duro Dyne Insurance Counsel: | Anderson Kill Olick<br>By: CORT T. MALONE, ESQUIRE<br>1251 Avenue of The Americas<br>New York, NY 10020 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By: JEFFREY M. SPONDER, ESQ.<br>MITCHELL HAUSMAN, ESQ.<br>One Newark Center<br>Newark, NJ 07102 |
| Audio Operator: | Kathleen Feeley |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

APPEARANCES (cont'd):

| | |
|---|---|
| For Official Committee of Asbestos Claimants: | Caplin & Drysdale, Chartered<br>By: JAMES WEHNER, ESQ.<br>JEFFREY A. LIESEMER, ESQ.<br>JOHN FIALCOWITZ, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| | Gilbert LLP<br>By: KAMI ELIZABETH QUINN<br>1100 New York Avenue NW<br>Washington, DC 20005 |
| For Lawrence Fitzpatrick, Proposed Futures Representative: | Young, Conway, Stargett & Taylor<br>By: ED HARRON, ESQ.<br>SARA BETH A.R. KOHUT, ESQ.<br>Rodney Square,<br>1000 North King Street,<br>Wilmington, DE 19801 |
| For Hartford Accident and Indemnity Co.: | Shipman & Goodwin LLP<br>By: JOSHUA D. WEINBERG, ESQ.<br>400 Park Avenue, Fifth Floor<br>New York, NY 10022 |
| For Federal Insurance Co.: | Crowell & Moring<br>By: MARK PLEVIN, ESQ.<br>(Via Telephone)<br>TACIE H. YOON, ESQUIRE<br>590 Madison Avenue<br>20th Floor<br>New York, NY 10022 |
| For The North River Insurance Company: | Ifrah PLLC<br>By: GEORGE R. CALHOUN, ESQ.<br>1717 Pennsylvania Ave., NW<br>Washington, DC 20006 |
| | Kennedys CMK<br>By: MEG CATALANO, ESQ.<br>570 Lexington Avenue, 8th Floor<br>New York, NY 10022 |
| For 4 Site, LLC: | Rabinowitz, Lubetkin & Tully, LLC<br>By: JEFFREY A. COOPER, ESQ.<br>293 Eisenhower Parkway, Suite 100<br>Livingston, NJ 07039 |

APPEARANCES (cont'd):

| | |
|---|---|
| For International Association of Sheet Metal, Air, Rail and Transportation Workers: | Wasserman Jurista & Stolz, P.A.<br>By: SCOTT REVER, ESQUIRE<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920 |
| For MidStates Reinsurance: | Duane Morris<br>By: SOMMER L. ROSS, ESQUIRE<br>JEFFREY KAHANE, ESQUIRE<br>30 South 17th Street<br>Philadelphia, PA 19103 |
| For Munich Reinsurance America: | Dillworth Paxson<br>By: WILLIAM E. McGRATH, JR. ESQUIRE<br>2 Research Way<br>Princeton, NJ 08540 |

\- - - - -

**I N D E X**


| | PAGE |
|---|---|
| **WITNESSES:** | |
| MARK PODGAINY | |
| Cross Examination Mr. Calhoun | 36 |
| Cross Examination Mr. Sponder | 78 |
| Redirect Examination Mr. Prol | 81 |
| LAWRENCE FITZPATRICK | |
| Direct Examination by Mr. Harron | 87 |
| Cross Examination by Mr. Calhoun | 115 |
| **TENTATIVE RULING** | |
| The Court | 9 |
| **MOTIONS ON SEALING SETTLEMENTS** | |
| Mr. Prol | 15 |
| Ms. Quinn | 17, 23 |
| Mr. Calhoun | 17 |
| **PLAN MODIFICATIONS** | |
| Mr. Prol | 27 |
| TDP MODIFICATIONS | |
| Mr. Wehner | 30 |
| **TRUST AGREEMENT MODIFICATIONS** | |
| Mr. Wehner | 31 |

**PODGAINY CERTIFICATION**

Mr. Calhoun 33

RULING: The Court 34

**MOTION TO STRIKE PORTIONS OF PODGAINY'S AFFIDAVIT**

Mr. Calhoun 83

**DECISION BY THE COURT** 83

| EXHIBIT | | ID | EVID |
|---|---|---|---|
| P-1 | Redline version of plan | | 28 |
| P-2 | Redline TDP modifications | | 30 |
| P-3 | Redline Trust Agreement changes | | 31 |
| P-4 | Podgainy Certification | | 34 |
| P-5 | Merrill Lynch, Bank of America Statement | | 35 |
| P-6 | Transaction Account Detail | | 35 |
| P-7 | Mr. Fitzpatrick's declaration | | 92 |

THE COURT: All right. This is the Duro Dyne National Corp. matters. Let me have appearances of counsel, first in Court.

MR. PROL: Good morning, Your Honor. Jeffrey Prol, Lowenstein Sandler, on behalf of the debtors. I have in Court with me today several members of the Hinden family, as well as the officers of the corporation I'd like to introduce Your Honor to, they've been here before, but not for some time. Randy Hinden, who is the CEO --

THE COURT: Mr. Hinden.

MR. PROL: -- and one of the principals; Wendy Hinden, who is one of the principals; David Krupnick who's a senior vice-president and one of the principals of Duro Dyne National Corp.; and Pat Rosetto who is the president.

THE COURT: Welcome.

MR. PROL: Also in Court with me are from Getzler Henrich, Mark Podgainy and Chris O'Callaghan, financial advisors to the debtor.

THE COURT: All right. Thank you. Welcome.

MR. WEHNER: Good morning, Your Honor. James Wehner for the Asbestos Committee, with Jeff Liesemer from my firm, and John Fialcowitz from the John Fialcowitz Law Firm. And also with me is special insurance counsel Kami Quinn.

THE COURT: Welcome. Good morning.

MR. COOPER: Good morning, Judge. I'm sorry, Jeffrey

Cooper with Rabinowitz, Lubetkin & Tully. I'm representing 4 Site, and as of recently Randall Hinden, Irene Hinden and Wendy Hinden.

THE COURT: All right. Thank you.

MR. HARRON: Good morning, Your Honor. Ed Harron for the Future Claimants Rep. With me is my colleague Sara Beth Kohut and the --

THE COURT: And Mr. Fitzpatrick?

MR. HARRON: Futures Rep, Lawrence Fitzpatrick.

THE COURT: All right. Welcome.

MR. HARRON: Thank you.

MR. MALONE: Good morning, Your Honor, Cort Malone from Anderson Kill, insurance counsel to Duro Dyne.

THE COURT: All right. Thank you.

MR. REVER: Good morning, Your Honor. Scott Rever, Wasserman Jurista & Stolz, on behalf of the International Association of Sheet Metal, Air, Rail and Transportation Workers.

THE COURT: All right. Thank you. Now we get to this side.

MR. CALHOUN: Good morning, Your Honor, George Calhoun of Ifrah PLLC on behalf of The North River Insurance Company. Along with me today is my colleague from CMK Kennedy, Meg Catalano.

THE COURT: All right. Thank you.

MR. HAUSMAN: Good morning, Your Honor. Mitchell Hausman and Jeff Sponder for the Office of the United States Trustee.

THE COURT: All right. Anyone else? On the line, I should have Mr. Plevin. Are you on the line, Mr. Plevin?

MR. PLEVIN: Yes, I am. Good morning, Your Honor. Mark Plevin for Federal Insurance Company.

THE COURT: Good morning, again. All right.

MS. ROSS: Summer Ross of Duane Morris on behalf of MidStates Reinsurance, and with me is my colleague Jeff Kahane.

MR. KAHANE: Good morning, Your Honor.

THE COURT: Good morning.

MR. WEINBERG: Good morning, Your Honor, Joshua Weinberg on behalf of Hartford Accident and Indemnity Company.

THE COURT: Good morning.

MS. YOON: Good morning, Your Honor. Tacie Yoon of Crowell Moring representing Federal Insurance Company.

MR. SINCLAIR: Good morning, Your Honor. Gibbons Sinclair, representing the Asbestos Claimants Committee as a financial advisor.

THE COURT: Thank you.

MR. MCGRATH: Good morning, Your Honor. William McGrath, Dillworth Paxson, for Munich Reinsurance America.

THE COURT: Okay. Great. Thank you. We've covered everyone. All right. Prior to the start of this morning's

hearings, I asked counsel to meet with me in Chambers to go over process and procedures for today and to get some feedback on the Court's thoughts on how best to proceed. We have on the calendar today the confirmation hearing on the second -- the modified second amended plan of reorganization filed by the plan proponents which are the debtors, the Asbestos Committee and the Futures Rep.

We also have all brought on shortened time four separate motions seeking approval of settlements with certain insurance carriers, and four motions seeking to seal a specific term of the settlements, the bottom line settlement amount with respect to those settlements. And it was the Court's view that it would be best to proceed with the sealing motion arguments, and to defer consideration of the settlement motions themselves until after the confirmation hearing.

The Court views that since all of the settlements require, and include a provision requiring confirmation of the debtor's plan as a triggering event, that the plan and confirmation itself is of greater import. And by deferring consideration of the settlements until after confirmation, all parties are more aware of the status of the proceedings, but it also affords all parties a greater opportunity to raise objections, given the shortness of the time.

Indeed, two of these motions were filed early in the morning, I would think, or late in the evening. But there

would be no prejudice to any of the settling insurers, because the Court will accept and take notice that these insurers have objected to the confirmation. Their objections, those that have filed written objections are on file and the Court has reviewed them.

The Court will deem them as continuing objections throughout the confirmation hearing, subject only to withdrawal in the event the plan is confirmed and the settlements are approved. With that, the Court, for sake of clarity, wants to ensure that the settling insurers have objections that are of record for any ancillary proceeding and any appeal that may be -- that may arise. That they -- they are not waiving or releasing any rights with respect to their position relative to the debtor's -- of the plan proponent's confirmation.

It's just that it makes little sense to address the settlements without a confirmed plan, since one is dependent upon the other. The Court also indicated that it would provide all parties with a tentative ruling on the objections raised to confirmation. And I'll do that now, and then address the sealing motions.

So prior to the commencement of the confirmation hearing today, and the Court notes that that term is referenced in the plan documents as a defined term, and by plan I'm referring to the second amended plan of -- the modified second amended plan of reorganization. The Court wishes to make

certain pronouncements based on the written submissions, as well as the review of the applicable cited authorities, the memoranda that had been submitted by the parties, and the certifications that have been submitted on behalf of the plan proponents.

The Court is prepared to make a tentative ruling with respect to the confirmability of the second amended plan of reorganization as proposed jointly by the debtors, the Asbestos Claimants Committee, and the Legal Representative of the Future Claimants. In providing a tentative ruling on confirmation, I wanted to admonish the parties that I am doing so on a limited record. Meaning I am doing so without the benefit of either oral arguments, or on a review of the testimony that would be adduced at the confirmation, or a review of the documentary evidence that would be submitted during the course of the confirmation hearing.

As such, my tentative ruling is not intended to be law of the case, and has no binding effect. The Court reserves its rights to reconsider, to modify or supplement its rulings with respect to confirmability of the plan after hearing testimony, argument, and the review of additional exhibits. My ruling would be in summary form, without detailing any supporting reasoning or rationale.

I do want to point out just -- and I offer this for those that are concerned that the Court would be cemented to

any of its tentative findings, I have in the past deviated from my tentative rulings. I have a 2017 published opinion in In Re Dots, 562 Bankruptcy Reporter 286, in which my decision ultimately reflected a 180-degree reversal from my tentative ruling.

So there is a history of hopefully my giving the proper consideration and thought after hearing argument and reviewing evidence. In sum, I am issuing a tentative ruling for the benefit of the parties in the hope that it may possibly foster continued negotiations.

First, I have considered the following objections. I think it's important, even for planning today, detailing the objections that I'm aware of. We start with North River Insurance Company's objections, in addition to a joinder of those that have been filed by the U.S. Trustee.

Objections have been raised under Section 1129(a)(3) as to the debtor's good faith. The contention is that the plan has been designed to impair the insurance rights and to gain a tactical legal advantage in Court. Objections have been raised under 1122(a) as far as impermissible classification of North River's claim. 1122(a) and 1123(a)(4) as to unfair discrimination with respect to the treatment of their claims.

An objection has been raised as to violation of the fair and equitable mandates under the absolute priority Rule, and specifically 1129(b)(2), in that there is insufficient new

value to the extent there is a new value exception. Objections have been raised by North River as to failure to satisfy 524(g) provisions and that they violate current law in that there is a lack of adequate protection, and that the judgment reduction credit is inadequate as a form of adequate protection.

Objections have been raised under 524(g)(2)(b)(i)(3) and that requirement that the trust obtain a controlling interest on the effective date. Argument has been made that the plan improperly alters the insurer's rights, and specifically paragraph 4.07 of the TDP violates 1129(a)(3) with respect to the transfer of asbestos insurance rights to the trust.

And that the plan does not satisfy the best interest of creditors requirement under 1129(a)(7). MidStates has filed objections and the Court is cognizant that MidStates is one of the insurers that is subject to a settlement that has been proposed. But until that settlement is ruled on the objections remain of record and MidStates, in addition to its joinder of North River and the U.S. Trustee, cite to Section 1101(2) and 1129(a)(1) in that the plan impermissibly modified the definition of substantial consummation.

That the judgment reduction credit clause is inadequate because it applies only to judgments and not to settlements or dismissals. That the supplemental injunction provided under the plan exceeds by 24(g)'s scope, in that it's

beyond -- it goes beyond the protected parties who are derivatively liable.

And that the confirmation order needs to include certain neutrality language. SMART, the union also had an objection on record, in that they object to substantive consolidation and the lack of an escrow for their current claim of $7.6 million. Turning to the U.S. Trustee, they have objected primarily to the TDP. And in this regard they've objected to Sections 5.3(b) and 6.5 of the TDP which referenced confidentiality of claims. And their concern is the confidentiality of the submissions and the treatment of such settlement provisions.

There's an objection to Section 6.5 of the TDP that limits discovery requests in State Court actions, and limits the obligations of the trust to honor certain subpoenas. There's an objection under Sections 5.6(b)(3) which prohibits the trust from denying any claims, even if the claimant previously denied or misrepresented its exposure to Duro Dyne products.

There's an objection to Section 6.3, which allows a claimant to withdraw and then refile a claim, even if it would be barred by the Statute of Limitations. There's an objection under 5.6(a)(4) and (b)(3) in which the trust retains discretion to relax or waive any evidentiary requirement or even to consider other sources of the claimant's injuries.

There's an objection to the TDP providing for only discretionary audits under Section 5.7. There's an objection that for the omission of any ceiling or cap on attorney's fees by claimants' attorneys.

Generally, the U.S. Trustee submits that these deficiencies require a finding that the plan fails to satisfy 524(g)(2)(b)(5), because it is not able to pay the present and future claimants alike.

The U.S. Trustee also submits that the plan impermissibly provides for subsequent consolidation, and that the plan has not been filed in good faith to satisfy 1129(a)(11) in that it fails to disclose information regarding the ability to satisfy or even to identify the administrative holders and post-petition financing fees.

I think that covers and runs the gamut of the objections.

With respect to the Court's tentative ruling, the Court does not regard any of the aforementioned confirmation objections as sufficient to preclude confirmation of the proponent's second amended plan of reorganization. Currently, the Court is prepared to rule that the plan complies with all of the requisite 1129(a) and 1129(b) criteria.

Notwithstanding, the Court is troubled by certain of the TDP provisions, and will address these issues in more detail during the hearing. The Court -- assuming the Court

overrules the Code-based objections under 1122, 1123 and 1129, it would make little sense to address most of the U.S. Trustee's TDP based objections if the plan proponents do not ultimately carry their burden regarding confirmability of the plan relative to the classification and treatment objections.

At this point, I will hear the motions for sealing, with respect to the four proposed settlements. And, Mr. Prol, I'm assuming the request is to seal this information through the confirmation hearing and up until the point in which the Court considers the settlement for -- for approval of the underlying settlements?

MR. PROL: Your Honor, can I consult with defense counsel?

THE COURT: Yes.

(Pause)

MR. PROL: So, Your Honor, what we're requesting is that the amount of the settlements be sealed. And we believe that those numbers need to be sealed until we've either reached settlement with North River, or the North River issues have been fully adjudicated.

And so we -- what we've done in the plan, one of the modifications we made to the plan last night is we extended the deadline within which an insurer can reach a settlement and still take advantage of the 524(g) injunction through -- through the effective date of the plan.

And so we would ask that the sealing remain in place at least through that date.

THE COURT: So what you're suggesting, it doesn't matter if the Court confirms the plan over the objections of North River, if that were to happen, you would still want the information sealed in case they join in after the fact?

MR. PROL: Yes, Your Honor. There's still opportunity to negotiate a settlement with North River --

THE COURT: They want to leave this door open for you no matter how long.

MR. PROL: We -- we are eternal optimists, Your Honor.

THE COURT: If I deny confirmation, then it becomes moot, right? Because the settlements don't -- aren't triggered?

MR. PROL: Correct, Your Honor.

THE COURT: All right. Well let me hear the rest of the motions for the sealing, and I'm going to treat them all collectively, I don't know if --

MR. PROL: Sure.

THE COURT: -- there's much more to tell me.

MR. PROL: I --

THE COURT: But --

MR. PROL: -- I think the issues are -- are all the same, Your Honor. I think it's the --

THE COURT: For the record, let me just identify what we're talking about.

MR. PROL: Sure.

THE COURT: These are settlements with Hartford, Federal, Munich and MidStates, correct?

MR. PROL: Correct, Your Honor.

THE COURT: Okay.

MR. PROL: So I would ask Cami Quinn, insurance counsel, to address this further. Thank you.

MS. QUINN: Good morning, Your Honor.

THE COURT: Good morning.

MS. QUINN: As you've noted, there probably isn't a whole lot more to say about this. I mean, the -- I think the reasons why the plan proponents want to seal this information is fairly obvious. It is the most narrowly tailored confidentiality that we could possibly do here. All of the creditors in interest, other than the debtor's adversary and litigation have -- are aware of the number through counsel, or representatives in the case of the Future Claimants Representative.

This is only an effort to keep -- keep a number from a settlement negotiation that would be -- absolutely be confidential outside of bankruptcy, confidential here to -- to encourage further settlement negotiations with North River.

THE COURT: All right. Thank you. Let me hear from

those who wish to oppose the sealing.

MR. CALHOUN: Your Honor, George Calhoun for the North River Insurance Company. I may be lonely up here today, but nonetheless I think this one's easy. There is no authority whatsoever to support the sealing of a settlement amount. In fact, Third Circuit and the Supreme Court have come out and pretty much said the opposite.

That even if it -- if you want to keep it a secret for good reason, you can't. It's not commercially sensitive information, and in fact Ms. Quinn just told you that everyone knows this except North River. Which is pretty much the opposite of commercially sensitive information. I understand they don't want us to know. But we were able to brief at least the Hartford and we threw in Federal at the last minute. We haven't -- I haven't even seen the other two.

So I -- I can't say if there's something different, I don't know, we reserve our rights with respect to that.

THE COURT: Brief the sealing issue or brief the settlement issue?

MR. CALHOUN: We filed papers last afternoon, yesterday afternoon on both issues, Your Honor. I wonder if you've had a chance to see them yet?

THE COURT: I have not.

MR. CALHOUN: But I commend them to you, I won't repeat them. But suffice it to say, as far as the authority,

there have been numerous decisions in this Circuit, and the Supreme Court that recognize that the public has a right to access documents filed in Court.

These settlements are all documents that have been filed in Court, they're seeking judicial approval of them. If they wanted to settle and not get Court approval, which you can't do in bankruptcy, but if you wanted to do that, you know, there's a way you can do that. But when you file a document in Bankruptcy Court and seek the judicial stamp of approval, that's a public document and people have the right to see it. That includes us, even though they don't want us to see it.

And there have been cases that deal with, specifically with settlements in that context. And those courts have concluded that that's not commercially sensitive information that would be protected by Rule 9018. And the fact that you might want to keep that information secret because it might give claimants an idea of how much they could get, or for other purposes, is just too bad. That's -- it's not a trade secret, it's not commercially sensitive information, you can't seal it.

And, Your Honor, I want to point out that here this is not just a theoretical let's -- there's a guiding principle in favor of judicial access, but -- which, by the way, the Courts have said outweighs the judicial preference in favor of settlement. That the right of access is more important than

the desire to promote settlements.

But the case law aside, which overwhelmingly supports our position that these can't be sealed, keep in mind what's going on here today, Your Honor. We're about to have a confirmation hearing, where you're being asked to enter injunctions that strip North River of its rights. The two proposed orders that I was able to read both say that our interest will attach to the proceeds of these settlements.

Now there's other conditions that kind of render that vague and meaningless, and we'll talk about that, as we talked about the actual settlements in the confirmation hearing. But at least theoretically our interests are going to attach to these rights under 363(e) or (f). And the Court would have to make a ruling that that is fair and equitable to us. We can't argue about it, because we don't' even know what the amounts are.

Similarly, in 524(g)(4)(b), if Your Honor were to enter an injunction that would protect third parties, it would have to make the determination that their contribution was fair and equitable as to the parties whose claims are being enjoined. Which is us. We have rights, we filed a lawsuit in New York State Court against the other insurers, in addition to Duro Dyne.

There are claims among the insurers that they're going to ask you to cut off. You will have to make a

determination that those contributions, I mean, we have arguments that you don't have the power to do that anyway, but even if you do, you're going to be asked to make determinations that the contributions they're making are fair and equitable with respect to our claims.

We can't make arguments about that Your Honor, because we don't know what the heck they're contributing. It's completely unfair to ask us to go forward to argue these motions to settle, and with respect to the confirmation of the 524(g) injunction involving those insurers, but keeping us in the dark as to how our claims are to be treated, what proceeds our interests allegedly are going to attach to.

Frankly, Your Honor, we don't have sufficient notice of these hearings. I don't think you should even go forward with the hearings until we have them, because there's a complete deficiency of information that we need to make arguments in this case.

And without that information, we don't have the notice that's required for the Bankruptcy Code. So -- so not only is there a judicial presumption in favor of access, there's an actual prejudice to us. And for both reasons, you'd have to deny the motions to seal.

THE COURT: My understanding was that the plan proponents were prepared to proceed and are prepared to proceed on the confirmation whether or not there was settlements made

by any of these settling asbestos insurers -- well insurers. So that, how are you prejudiced? They were going to proceed -- I don't think it's a stretch to assume there's more money coming in to the trust from the insurers.

But they were prepared to proceed based on the 26 million or so that was being contributed under the proposed plan.

MR. CALHOUN: Your Honor, that's fair, and we don't think the plan's confirmable for a lot of reasons. But now they're saying we have settling asbestos insurers. Those are third parties that they're asking for the protection of the 524(g) injunction. There is a different Code, Bankruptcy provision code 524(g)(4)(b) that requires findings with respect to those third-party injunctions. That issue didn't exist when we filed our objections to the plan, by the way. So this is all, you know, as things have been filed and coming in, new issues have arisen.

So you could confirm the 524(b) plan and not include those third-parties. But if you're going to include the third-parties, you have to make findings with respect to whether or not the injunction is fair and equitable as to those parties. So although they can move forward, I don't think you can confirm a plan that does what they're saying they will do for these insurers without making those findings.

And to make those findings, we have to be able to

argue about whether or not their contributions are fair and equitable with respect to the treatment of our claims, not against the debtor, but against those third-parties.

THE COURT: So you're saying that in effect leaving the door open for North River, for instance, is irrelevant, because if I confirm the case, and even before it becomes -- goes effective, if North River wanted to join, I didn't confirm the case and make any findings as to your contribution, because they didn't exist yet. You hadn't settled. See what I'm saying? It would be of no import? Unenforceable?

MR. CALHOUN: Your Honor, at that point I don't know if there'd be anyone left to come in and -- and argue about that. But that's certainly a risk, you might have to reopen the confirmation hearing. I don't know. It's -- it's -- hasn't been presented that way. But we do know that they're asking for injunctions in favor of -- and, by the way, you have to make the same finding under 105 anyway, even if they were to try to go forward without 524(g), if you're going to -- assuming you have the power to issue an injunction barring claims between third parties, you have to determine that they're fair and equitable, and I just don't know how you can do that when you're telling one party you don't get to argue about what the contribution is.

THE COURT: All right. Thank you. Counsel, response there -- Mr. Calhoun's suggesting that it's a critical element

of confirming the plan.

MS. QUINN: First, I would say it's a little bit of a red herring, because if the plan is confirmed and Mr. Calhoun's claims will attach to the proceeds, but they will be -- they will be resolved through set offs or judgment reduction. So the amount of the settlement agreements actually are neither here nor there with respect to his claims attaching to the proceeds of the sales.

Moreover, as Your Honor mentioned, that, you know, the 524(g) injunction can be issued -- can be issued post-confirmation with respect to Mr. Calhoun if the totality of the asbestos, the plan proponent's, the FCR, the asbestos creditors all, it's in the general interest of the estate, it doesn't have to be in Mr. Calhoun's precise interest.

THE COURT: All right. Does the U.S. Trustee want to take a position on the confidentiality?

MR. HAUSMAN: Your Honor, we're not -- we haven't filed papers we're not taking a position, other than the Court has to make findings under 107 if it is going to seal the information.

THE COURT: All right.

MR. CALHOUN: Your Honor, since you haven't had a chance to read my brief, I'd be happy to -- would it be helpful if I handed a copy up?

THE COURT: Sure. Yes. Please.

(Pause)

THE COURT: I want to take an opportunity to read Mr. Calhoun's submission. I'm going to reserve. We'll start the confirmation hearing. We have ample time to address the sealing issues and the settlement issue, there's a lot that has to go on record in order to confirm a plan one way or the other, or not confirm it. Let me ask at this juncture, do the parties want to take any time, or just do they want to proceed to confirmation?

UNIDENTIFIED COUNSEL: If you wouldn't mind, Your Honor, I think a few minutes would be great.

THE COURT: Let's see, it is 10:44. I'm happy to come out at 11:00, and it gives me a chance to do some reading. Thank you.

(Court in recess 10:44 to 11:01 a.m.)

THE COURT: Well I guess I'm missing some people. Why not --

UNIDENTIFIED COUNSEL: Let me go and see if I can scare them up.

THE COURT: My law clerk knew it was going to be a long day, she measures it by how many sodas I bring out. This is going to be a two soda day.

(Pause)

THE COURT: Still have one empty chair.

(Pause)

THE COURT: All right.

MR. PROL: I apologize, Your Honor.

THE COURT: Excuse me?

MR. PROL: I apologize for being late.

THE COURT: Not a problem.

MR. PROL: Welcome to the weather here.

THE COURT: All right. We are prepared to proceed to confirmation?

MR. PROL: We are, Your Honor.

THE COURT: Okay. With respect to the pending motion to seal, I've learned one thing is never just read one side. So to the extent -- I am going to reserve and address the matter again before the close of evidence on the confirmation hearing. So as not to imperil or impair the rights of North River, Mr. Calhoun, you can raise the objections, assuming that the contribution of each settling insurer is $100. We'll go to an extreme.

MR. CALHOUN: Your Honor, with that said, we'll settle.

THE COURT: But for purposes of the objections go forward with the extreme. During the course of the confirmation hearing, I don't know how long we're going, but to the extent we go into tomorrow or the next day, if any of the plan proponents wish to address the brief, or the argument in Mr. Calhoun's brief, I'll accept a reply with respect to

sealing.

Like I said, I will address it again certainly before we get to hearing the underlying settlement, if we get that far, but also before the close of the record. Mr. Prol?

MR. PROL: So, Your Honor, we have a number of filings that were made last night, including two separate modified plans -- modifications to the TDP and to the trust agreement. Many of those modifications were made in response to objections. And I'd like to start by just walking Your Honor through some of those changes that were made.

I have a redline copy of the plan, if Your Honor would like me to hand that up?

THE COURT: I have the redline version as it --

MR. PROL: Okay. Great.

THE COURT: I know there were plan change -- there were changes to the TDP and the trust agreement --

MR. PROL: Yes. And we'll --

THE COURT: -- that were emailed. Those were being printed, so if we get to those, I'll take you up on your offer.

MR. PROL: Okay. Well we'll walk you through those as well.

THE COURT: Okay.

MR. PROL: So the modifications to the plan, and I'll focus on the substantive ones. On page four, Section 101.13, we modified the definition of insure -- asbestos insurance

settlement, that's what I referred to earlier, to provide that settlements can be made within 14 days after entry of the order by the District Court confirming the plan, or affirming on appeal an order of the Bankruptcy Court confirming a plan basically to expand the opportunity for settlement discussions with North River and --

THE COURT: Actually, I'm going -- I'm sorry to interrupt you. I have the modified version, I don't have the redline that I'm looking at. Do you have an extra redline version?

MR. PROL: It just so happens that I do.

THE COURT: All right. And do you want this as an exhibit?

MR. PROL: I -- yes, Your Honor.

THE COURT: It's -- I'll mark it P-1, Proponents 1.

MR. PROL: Great.

THE COURT: Thank you. I'm sorry, continue.

MR. PROL: So the next change is on page nine to Section 101.65. We've modified the definition of effective date to address the U.S. Trustee's concern that the effective date might never occur. And we put in a provision that provides that the effective date will occur not more than ten days after the date on which all conditions precedent have been met.

Next change is on page 11. Paragraph 101.79. We've

modified the definition of indirect trust claim to make it clear that claims of non-settling asbestos insurers are not indirect trust claims. As we assert in our brief, the non-settling asbestos insurer claims are -- fall within the category of asbestos personal injury claims.

The next modification's on page 28. Which is just a clerical change modifying paragraph numbers which were out of sequence. Next change is on page 46, which is Section 9.07(v), those are just clerical changes to insert the correct defined term non-settling asbestos insurer, rather than non-settled asbestos insurer.

The next change is on paragraph -- page 56, which is Section 13.03 sub (e), this is designed to address the U.S. Trustee's objection that the release of the committee members in addition to the exculpation was going too far. So you can see in the strikeout there, we've struck out the words released and, so the paragraph just says that the plaintiff's committee is discharged. And the Trustee also asked us in the next line to strike the words liabilities and obligations. We agreed to that change this morning, so that will be a further modification.

And the final change is on page 58 on the signature blocks. Since I've not been able to convince Mr. Fitzpatrick to change his name to Fitzgerald, I have conceded and used his correct name.

THE COURT: It should be the key to the whole case.

THE COURT: Mr. Plevin, did you wish to be heard?

MR. PLEVIN: Yes, Your Honor. Just briefly. Since you're going to defer on the settlement related issues, I was going to ask if I could be excused for now. My colleague, Ms. Yoon is in the courtroom. And if you get back to the settlement issues even later today or tomorrow, I will try to dial back in if she notifies me. Otherwise, if I could be excused, I'd appreciate it.

THE COURT: That's fine. Thank you for your participation so far.

MR. PLEVIN: Thank you, Your Honor.

THE COURT: Okay.

MR. PROL: Does Your Honor have any questions with regard to the modifications of the plan?

THE COURT: I do not.

MR. PROL: Okay. I'd ask Jim Wehner then to address the modifications to the TDP.

(Pause)

THE COURT: If we are referring to the redline version of the TDP, I'll mark that P-2?

MR. WEHNER: Yeah. And, I'm sorry, do you have a redline, Your Honor?

THE COURT: I do.

MR. WEHNER: Okay. Great. I've got an extra one if

you need it. I just wanted to -- obviously, we'll be getting into these in substance, but just highlight some of the changes that we have made in the TDP. In Section 2.1, there's some language changes regarding the asbestos trust goals.

That's on page three. There are some -- throughout, some conforming language changes to a defined term and indirect trust claims. You'll see those scattered throughout the -- the pages. On page 27, or thereabouts, in Section 5.5, there's a paragraph inserted making clear the treatment of non-settling asbestos insurer claims.

That's on page -- that's in Section 5.5, second to last paragraph is inserted.

THE COURT: Okay.

MR. WEHNER: Section 5.6(a)(4), which in my redline is page 30, has been removed. This is the one that was the subject of one of UFG's rejections. In Section 5.7 regarding the claims audit program, in my copy that's page 33. We have changed the language in the TDP from, directing the asbestos trust may develop a claims audit program, to shall develop.

I believe that is -- other than a few more instances of that replace all, I think that is it.

Your Honor, we did make some changes in the trust agreement and I --

THE COURT: For the record, I'm going to mark, again, my redline version as P-3.

MR. WEHNER: I think a large number of these are somewhat ministerial. Do you have it in front of you?

THE COURT: I have it, yes.

MR. WEHNER: Okay. On the first page there's some inserting of details that were missing in a previous version. Likewise, on page two in the whereas, some dates included. In Section 3.3 of the trust agreement, Source of Payments, there's a new paragraph 3.3©, which directs the trustee to establish and implement billing guidelines for professionals.

THE COURT: I'm sorry, what page was that?

MR. WEHNER: That's on page 16 of my redline. Section 3.3, source of payments.

THE COURT: Oh, I see.

MR. WEHNER: ©.

THE COURT: All right. The next one is Section 5.1, Trust Advisory Committee. And that specifies that the TAC will have five members. It had a blank in there before. At page 40, this is in Section 7.6 Notices, Notice. Addresses have been included for the TAC and the Delaware Trustee.

And I think the last change is the indication in the signature blocks of the name of the Delaware Trustee, which is Wilmington Trust. And those are the changes in the trust agreement. I -- just going back to the trust distribution procedures for one second, I believe, and I'm not sure that I have it on my redline, but I believe that we have now included

a form of release which would be used by the trust.

It's one of the papers that the trust uses which is referenced as an exhibit to the DP.

THE COURT: Thank you.

MR. WEHNER: Thank you.

MR. PROL: Your Honor, we'd like to proceed by proffering the testimony of Mark Podgainy, the debtor's financial advisor. We did file a certification of Mr. Podgainy in support of confirmation, it's filed at Docket Number 483. And so we'd like to mark that as an exhibit and move the affidavit and the exhibits attached to that into evidence.

THE COURT: All right. Document Number 483 let me hear from Mr. Calhoun, or is there -- are there any objections to accepting this proffer?

MR. CALHOUN: Your Honor, we do object to the proffer of Mr. Podgainy's declaration. It, upon its face, lacks foundation and contains hearsay evidence, and it's largely legal conclusions. I don't think it's an admissible document. Portions of it may well be, that the work that he actually did with respect to the calculations, we don't have an objection to. But vast swaths of it are more or less quotes of the disclosure statement, or legal argument, or statements that he was told by someone else, and that's simply not admissible.

THE COURT: So your request is to have direct testimony for Mr. Podgainy in lieu of this certification?

MR. CALHOUN: Your Honor, I would -- we can do -- either do that, or if they want to limit the testimony to the sections of the brief that are actually his work, which I believe are basically paragraphs 43, 45, 68, 69 and 74 and the exhibits, probably the statement about where he works too, but the substance, that would be okay.

Otherwise, I think we would need to proceed by direct.

THE COURT: Do you want --

MR. PROL: Your Honor, I think a lot of this information, I think Mr. Calhoun can elicit on cross-examination, if he's so inclined. I mean the information contained in Mr. Podgainy's affidavit relates to his involvement in the company, his participation in the formation of the plan, his understanding of plan provisions. And I submit to Your Honor, you can take it for what it's worth and, you know, at that -- he's available for cross-examination and -- and if there are issues Mr. Calhoun can certainly elicit those on cross-examination.

THE COURT: All right. I'm going to accept the certification as a proffer. I will accord the appropriate weight as necessary that's appropriate to the various representations within the certification, and I'll certainly entertain cross-examination with respect to any and all aspects of the document.

MR. PROL: Thank you, Your Honor.

THE COURT: I'll have this marked as P-4.

MR. PROL: Do you have a copy, Your Honor, or do you need one?

THE COURT: I have -- I have a copy. Wait -- actually, let me -- if you have another copy, mine's marked up.

(Pause)

THE COURT: Thank you. So we'll mark this as P-4. Certification of Mark Podgainy?

MR. PROL: Yes, Your Honor.

THE COURT: And are you tendering the witness?

MR. PROL: I would like to add one piece of additional information to the proffer of Mr. Podgainy. In the certification, Mr. Podgainy indicates that in advance of the commencement of the hearing today, that the Hinden family contribution, the Hinden family entity contribution totaling $3 million would be made. And if Mr. Podgainy were called under our testimony he would testify that the Hinden family members and Hinden family entities have made the contributions, which are set forth on an exhibit to his certification.

And I would ask to mark two additional documents. One is a -- it is a bank account statement for a segregated account at Duro Dyne National Corp. showing a balance of $3 million. And the second document is a -- it's actually a series of documents which are wire transfer receipts and copies

of checks from each of the Hinden family members and the Hinden family entities reflecting the contribution of their share of the $3 million.

THE COURT: Mr. Calhoun? All right. Then we'll accept those, mark them as P-5 and P-6. For the record, P-5 is the Bank of America, Merrill Lynch statement. And that will be P-5. P-6 is -- we'll call, and the same account transaction detail.

MR. PROL: Thank you, Your Honor.

THE COURT: All right.

MR. PROL: And with that I'll tender the witness, Your Honor.

THE COURT: All right. Mr. Podgainy? Would you please have a seat. Hopefully, you can get around the --

UNIDENTIFIED SPEAKER: I apologize for that, Your Honor.

THE COURT: I'm not going to make it through there, so we'll -- I'd ask you to please raise your right hand.

MARK PODGAINY, DEBTOR'S WITNESS SWORN

THE COURT: I'm going to ask that you please state your name, and give a work address for the record and spell your name.

THE WITNESS: Mark Podgainy, P-O-D-G-A-I-N-Y. Work address is 295 Madison Avenue, New York, New York, 10017.

CROSS EXAMINATION

BY MR. CALHOUN:

Q Good morning Mr. Podgainy. My name is George Calhoun, I represent the North River Insurance Company. Before I start, do you have a copy of your certification with you?

A I don't have it on me.

MR. CALHOUN: Your Honor, may I approach with a binder?

THE COURT: Yes.

MR. CALHOUN: I can move on to --

BY MR. CALHOUN:

Q Can you turn to what's been marked as Exhibit 5, please, it's Tab 5 of your binder?

MR. CALHOUN: Your Honor, we premarked exhibits that we exchanged with the debtor's counsel. And if it's okay with the Court we'll just use those exhibit numbers for --

THE COURT: Is P-4 -- is P-5 his certification?

MR. CALHOUN: Well you've already marked his certification as P-4 --

THE COURT: P-4.

MR. CALHOUN: P-4 so --

THE COURT: Right. So that's when he said P-5 I was --

MR. CALHOUN: It's marked as five in the binder is the reason there's some confusion, so --

THE COURT: All right.

MR. CALHOUN: So we can refer to it as P-4, it's just --

BY MR. CALHOUN:

Q Okay. Mr. Podgainy, do you recognize this exhibit as a copy of your certification?

A Yes.

Q What is your current position?

A I'm a managing director of Getzler Henrich & Associates and financial advisor to Duro Dyne.

Q All right. When were you retained as a financial advisor to Duro Dyne?

A It was approximately early 2014.

Q All right. And at that time, were you asked to assist Duro Dyne in connection with negotiations for a plan of reorganization?

A No.

Q When were you asked to do that -- or were you asked to do that at any time?

A Approximately spring of 2015.

Q And did you have any input to Duro Dyne's decision to file for bankruptcy?

A Yes, I did input.

Q All right. Mr. Podgainy, are you a lawyer?

A No.

Q In your certification you opined on a number of legal

conclusions concerning compliance of various Bankruptcy Code provisions, correct?
A There's -- I do comment on legal matters in the declaration.
Q Okay. And are those conclusions that -- that you based on your own knowledge?
A Based on my own knowledge, and discussions with counsel.
Q All right. And so in paragraph two of your declaration you state that your declaration's based -- or your certification, excuse me, is based on "your personal knowledge, information and belief, review of relevant documents, inquiries made to others, my knowledge of the debtor's business affairs and financial condition, and the legal and financial advice provided by the processionals retained by the debtors."
Do you see that?
A Yes.
Q The first thing -- did you write this certification yourself?
A No.
Q Okay. Who wrote it?
A Counsel.
Q Counsel for the debtors?
A Yes.
Q When -- is there anything in this certification that tells us where a particular paragraph is based on legal and financial

advice provided by professionals retained by the debtors?
A Without flipping through the document, I don't recall exactly.
Q All right. And do those professionals retained by the debtors include its lawyers?
A Yes.
Q All right. In paragraph three, you make a statement concerning the primary reason that the debtors filed for Chapter 11. Do you see that?
A Yes.
Q All right. What is your firsthand knowledge of the reason the company filed for bankruptcy?
A I'm not sure I understand the question.
Q How do you know why the company filed for bankruptcy?
A I've been working with the company for five years and had intimate knowledge of the decision-making process.
Q Okay. Who made the ultimate decision to file for bankruptcy?
A The debtors made the ultimate decision.
Q All right. And was it because of asbestos liabilities?
A Yes.
Q Has the debtor ever incurred a judgment it could not pay, asbestos judgment?
A Not to my knowledge.
Q All right. Has the debtor ever paid defense costs for the

defense of asbestos liabilities in the last ten years?

A I believe so.

Q All right. And how much?

A I don't know.

Q And what was the -- do you know the total amount of that the debtor has paid on -- to settle or resolve asbestos claims in the past five years?

A I don't have an exact number, but it's millions of dollars.

Q And did any of those payments render Dura Dyne incapable of paying its debts as they became due?

A No.

Q And, in fact, Duro Dyne was profitable for each of the past five years?

A Without looking at the financial statements from the past five years, in recent years, yes. I can't say for certain all five years.

Q Do you recall how much the debtor paid to resolve claims in 2017?

A Not offhand.

Q Sixteen?

A Not offhand.

Q Do you recall a statement -- did you review the debtor's disclosure statement before it was submitted?

A Yes.

Q Do you assist in preparation of that document?
A Yes.
Q Do you recall a statement in the disclosure statement that -- actually, if you'd just look at paragraph four of your declaration where you state that "the company's been forced to bear an increasing share of settlements and claims for reimbursement of indemnity and defense costs." What's the basis for that statement?
A In 2014 I believe the company reached an agreement with the insurance carriers whereby it made contributions to its indemnity and defense costs, or it made contributions related to the asbestos-related litigation and the -- related to that agreement, there was significantly more money that was paid out starting at that point and -- and going further than had been paid previously.
Q To your knowledge, did any -- any of those agreements -- well, how many agreements do you recall there being in that regard?
A I don't recall.
Q All right. Do any of those agreements to your recollection require Duro Dyne to pay defense costs?
A I don't recall specifically.
Q Are you familiar with the coverage litigation between Duro Dyne and my client, North River, among others?
A Generally.

Q All right. And are you aware that one of the issues being litigated is -- is the extent to which Duro Dyne might be responsible for defense costs?
A Yes.
Q All right. And you're aware that Duro Dyne contends that it's not responsible for defense costs?
A Yes.
Q All right. Paragraph four of your declaration -- of your certification appears to come directly out of the disclosure statement. Did you write this paragraph in connection with the disclosure statement?
A No.
Q All right. This comes from counsel?
A Yes.
Q 2014, what sort of work were you doing for the debtor?
A I was providing litigation support.
Q What does that mean?
A The debtors were going to embark on a mediation of their -- their -- a potential agreement with the insurance carriers related to the insurance coverage litigation and requested financial advisory support in helping them understand what their -- what their financial position would be in relation to potential settlement options.
Q So it involved some degree of evaluating Duro Dyne's finances and as they existed at that time?

A Yes.
Q All right. And did you make -- at that time did you make projections of its future income?
A Yes.
Q Can you turn to paragraph eight of your declaration, please? Were you involved in the search for a Futures Representative?
A Yes.
Q All right. In what way?
A There were -- at some point there were a list candidates and I was asked for input.
Q Who was on the list of candidates?
A Mr. Fitzgerald (sic) and there were others, but I don't recall who they were specifically. Fitzpatrick -- did I -- same thing. It's like all related.

THE COURT: We can just change it for the purposes of this hearing.

MR. CALHOUN: Yeah.

THE WITNESS: Sorry.

MR. CALHOUN: I'd like to move that Mr. Fitzpatrick's name be changed, Your Honor.

THE COURT: All in favor --

BY MR. CALHOUN:

Q Did you have any knowledge of -- firsthand knowledge of any of the individuals on that list?

A No.
Q Where did the list come from?
A I don't recall.
Q Did it come from any of the asbestos plaintiff's lawyers that were negotiating with Duro Dyne?
A I don't recall.
Q Who gave you the list?
A Counsel.
Q Mr. Prol?
A Mr. Prol shared the information.
Q Do you have experience in asbestos litigation?
A No.
Q Do you have any experience in evaluating the qualifications of individuals to represent future claimants?
A No prior experience.
Q Did you know Mr. Fitzpatrick prior to this case?
A No.
Q All right. Did you make the decision to retain Mr. Fitzpatrick?
A No.
Q In paragraph ten of your declaration -- excuse me, I'm going to call it a declaration and we can -- when I do that, I'm meaning your certification so if I make that mistake again, please just bear with me -- you state that, "The Ad Hac Committee and Prepetition Future Claimants Representative

personally and or through various representatives conducted extensive due diligence concerning the background, nature and scope of the company's liability for asbestos claims." Did you write that sentence?

A No.

Q All right. And how do you know what they did?

A I was involved in the process.

Q All right. So you were involved in the Ac Hac Committee's and the Prepetition Futures Representative's due diligence concerning the company's asbestos claims?

A Concerning the whole plan that we're talking about today.

Q Did you gather knowledge or information concerning the underlying asbestos claims?

A I assisted in the due diligence process in gathering information.

Q About the asbestos claims?

A Through other parties.

Q Tell me what you did.

A So there were requests for information and they had to funneled let's say to special counsel who had a list of claimants and so on and so forth, so basically relaying requests here and there was the extent of my asbestos claims due diligence facilitation.

Q And do you know whether they did a really good job in that investigation?

A No.
Q All right. Do you know whether they conducted a careful review of the facts underlying the company's historical involvement in asbestos matters?
A No. I would say given the amount of time that elapsed in -- in the review process, my understanding or my -- my perception was that there was extensive review. That was my perception at the time.
Q But you don't know for a fact, do you?
A No.
Q All right. And do you know if they -- if those committees did anything to review the projected value of present and future claims against Duro Dyne?
A I don't recall.
Q All right. And you didn't do a projection of the future asbestos liability against Duro Dyne, did you?
A No.
Q And did you do a projection of the value of the insurance available to Duro Dyne?
A No.
Q So for the next several paragraphs of your declaration where you're describing the negotiations and the process of the bankruptcy filing, this is all -- this is all material that was drafted by counsel for the debtors, isn't it?
A Yes.

THE COURT: Do you -- Mr. Calhoun, do you have page references you want to provide the Court with --

MR. CALHOUN: Yeah. That was --

THE COURT: -- or what paragraphs?

MR. CALHOUN: -- Your Honor, paragraphs ten to 14 and part of 15, but I'm about to ask him a question on 15 so --

THE COURT: Sure.

BY MR. CALHOUN:

Q In paragraph 15 of your certification, you reference an Exhibit A, which is a 13-week cash flow projection. Did you prepare that cash flow projection?

A The company prepared the cash flow projection. I reviewed it and formatted it.

Q At some point, did you become aware that North River had filed discovery requests against the -- with respect to confirmation hearing on the debtor?

A Yes.

Q All right. In fact, you reviewed those discovery requests and discussed them with the debtor, didn't you?

A Yes.

Q All right. Did you produce copies to the debtor of all projections that you had done concerning the debtor's future income?

A I produced -- I produced information that was requested,

yes.
Q All right. And you don't know when -- whether that information was then turned over to -- to North River or not?
A I don't know precisely what was turned over.
Q Okay.
A I produced information and shared it with counsel.
Q At paragraph 16 of your certification, you state that the debtors estimate professional fees will be approximately $750,000 in addition to what's already been accrued. Is that an estimate that you did?
A Yes.
Q Okay. And what did you base that on?
A I based it on run-rates that were discussed with the professionals prior to bankruptcy and post-bankruptcy.
Q So in paragraphs 18, 19, 20 really through 28, is it fair to say that these are simply descriptions of what the plan provides -- actually, let me back up. In paragraph 23 there's a number of leases that are listed here. This is information you obtained from the debtor?
A Yes.
Q All right. Did you have any firsthand knowledge of that these are the leases that the debtors will assign -- assume?
A Yes.
Q All right. And that's based on work that you did working with the debtor?

A Yes.
Q One of the things that you did for the debtor was to conduct a feasibility analysis, correct?
A Feasibility analysis?
Q You went through and made sure the debtor would have enough money to pay the obligations that it said it was going to pay under the plan, right?
A Yes.
Q All right. You're aware, are you not, that North River filed a claim in Class 6 of the plan?
A Yes.
Q All right. And you're aware that that claim has been temporarily allowed for voting purposes by this Court?
A Yes.
Q All right. When you did your work to determine whether or not the debtor would have enough money to pay its claims, did you make that analysis based on North River's claim being allowed in full, or some other way?
A At the time we did not know what North River's allowed claim would be, so it's difficult to estimate.
Q When did you do that analysis?
A The analysis was -- the original analysis was performed prior to knowing the -- the value of North River's claim for voting purposes. There was a subsequent analysis that I believe was -- was prepared that's in the latest filings when

that knowledge was -- was known.

Q Well this -- this certification was filed on February 26, correct?

A Right. There were -- I'm sorry -- there were different versions of projections that were filed. The latest version contemplates the full value of the North River claim in feasibility, if you will.

Q So if North River's claims is allowed in full, the debtor has enough money to pay it, is that right?

A The -- during the projection period, yes.

Q What information did you review to --

THE COURT: Mr. Calhoun, let me just interrupt for a second. Just for the Court's benefit, the projection that you've indicated have been updated through to take into account North River's allowed claim for voting purposes, is that -- that's included as an exhibit to the document filed on February 26th?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead. Thank you.

(Pause)

MR. CALHOUN: All right.

BY MR. CALHOUN:

Q And are you familiar with how the plan proposes to treat North River's prepetition defense cost claim?

A Yes.

Q All right. And what is that treatment?
A If I could point -- flip through the --
Q Sure. If you look at --
A -- I just don't recall exactly offhand, but --
Q Why don't you look at paragraph 30 and 31 of your certification.
A Yes.
Q Do you know how the interest rate was chosen with respect to North River's prepetition defense cost claims?
A It's a standard interest rate that everybody understands.
Q Standard -- standard for what?
A It's typically used in -- in settlement purposes and so on, so from a similar context.
Q All right. Are you familiar with discount rates used by insurance companies?
A No.
Q All right. And would the judgment rate that's being used here fully compensate or incentivize an insurance company to forgo some other use of -- of its money?
A Don't know.
Q You testified earlier that you're not an attorney. In paragraph 31 you've got a statement that you believe -- that the debtors believe that based on underlying State law, that this claim should be expunged in its entirety. That's not your firsthand statement, is it?

A It's -- it's based on the discussions I've had internally.
Q So someone else has told you that they think this should be expunged?
A Correct.
Q And have the debtors reserved any funds to pay Class 6 claims if they're allowed in full?
A The debtors believe that given the financial projections that -- and the treatment of those claims in the plan, that those claims can be paid in full as specified under the plan.
Q Can you look at paragraph 33 of your certification, please? You have some statements there about North River and Federal's claims for prepetition and post-petition indemnity payments and post-petition defense costs. Did you write this paragraph?
A No.
Q All right. And you state that the debtors assert that these claims are properly classified as Class 7. Did -- are you speaking on behalf of the debtors in -- in this certification?
A Yes.
Q All right. And is it your opinion that North River's claims are properly classified in Class 7?
A Based on advice and discussion with counsel, that's my understanding.
Q All right. And do you view that -- whether the

classification of claims to be a legal issue?
A Yes.
Q In paragraph 36 of your certification, you list the assets that are to be assigned to the trust, correct?
A Yes.
Q Let me back up one second. All right, among those things is an assignment of insurance rights, correct?
A Yes.
Q All right. And in the disclosure statement, the debtors had contended that there might be $57 million in remaining limits. Are you familiar with that statement?
A I have to look at the disclosure statement, but I -- I know the disclosure statement does talk about value of -- potential value of policies.
Q All right. And do you have a view as to the remaining limits under the policy --
A No.
Q -- policies? Did you do any analysis of what those policies might be worth?
A No.
Q Paragraph 37, again, this is something that was written by counsel, correct?
A Yes.
Q All right. And these are things that someone else told you?

A Based on discussions with the professionals involved on the debtor's side, although it's not written by me, I do believe the statement that's included herein.
Q All right. Are you aware that the debtors have compromised its claims against potentially four of its insurers?
A Compromised meaning?
Q Settled.
A Yes.
Q All right. And are you aware of whether in those settlements the debtors will -- the trust will be obtaining more than the limits that otherwise would be available to pay asbestos creditors?
A No, I'm not aware.
Q Are you familiar with the terms of those settlements?
A No.
Q From the list of assets that are being contributed to the trust, the only contribution that's not coming from the debtors or its insurers is the Hinden family contribution, correct?
A Yes.
Q All right. So that would be the only asset or source of financing that's available in this Chapter 11 that would not be available in the tort system or in a Chapter 7, correct?
A I'm sorry, can you repeat the question?
Q The Hinden contribution is the only -- if this case were

dismissed tomorrow, that contribution would disappear, right?
A Yes.
Q All right. But it's the only thing that's not coming directly from the debtor or its insurers, right?
A The Hinden contribution is the only thing not coming from the debtor or its insurers.
Q All right. So of the other contributions, the debtor's contribution is about 23 million, correct? Just at face value.
A Yes.
Q All right. And on your view -- in your view, the debtors can afford to pay that, correct?
A Yes.
Q All right. And they're paying -- over how many years are they paying the -- let me back up. The cash contribution is coming in large -- largely from a loan from the Bank of America if I remember correctly, is that right?
A Yes.
Q All right. And then they're giving a promissory note to the trust for another 13.5 million, correct?
A Yes.
Q Over what terms is the Bank of America loan?
A Five years I believe.
Q Okay. And over what term is the trust note?
A 20 years.
Q Okay. And how many years do you project it will take for

the company to pay the earn-out?
A Two years.
Q So after 20 years there will be no further contribution from the debtors to pay asbestos claims, is that right?
A Under the terms of the -- of the plan, that's correct.
Q And over that 20 years, the sum total of their contribution would be at a face value of 23 million?
A Yes.
Q All right. And did you or your company prepare the long-term projections that are attached to your certification as Exhibit D or A through D?
A We assisted the company in preparing them, yes.
Q All right. What -- what do you mean by that? The company prepared them and you reviewed them?
A The company had the assumptions as to the long-term performance of the company and we assisted in projecting that out.
Q All right. Did any of its assumptions strike you as unreasonable?
A No.
Q All right. So you accepted them?
A Yes.
Q All right. Were its assumptions consistent with its past performance?
A Yes.

Q All right. And did those -- who relayed those assumptions to you?
A It was the senior management of the company.
Q All right. And did you check the company's math, or what was the scope of your involvement?
A We had a -- a general discussion about we had done this previously over the years, and so we had a methodology which was to go through various line items to get a basis of what the future might look like based on recent performance.
Q All right. And you're -- you're projecting that Duro Dyne will continue to be a profitable company, correct?
A Yes.
Q All right. Why don't we turn to some of those exhibits. All right, first if you could turn to Exhibit B, which is the Hinden contribution.
A Yes.
Q Can you explain to me what the table on the right concerning the non-shareholder Hinden entities is referring to?
A The table on the right is related to the -- the non-Hinden-related party contribution to the Hinden contribution.
Q There are two columns that are both captioned Contribution To Settlement that are slightly different. Can you explain why that is?
A Maybe you can just tell me what -- what the names -- the titles of the columns are so --

Q Yeah --
A -- I'm sure?
Q -- so they're both Contribution To Settlement. There's a contribution to a settlement -- "quick estimate of value." I assume quick estimate of value is -- is someone's guess as to what to these companies might be worth, is that correct?
A Yes.
Q Okay. And did you make those estimates or did someone else make those estimates?
A My team and I made those estimates.
Q Okay. And the first Settlement Contribution column, is that what's actually being contributed by these entities?
A Yes.
Q Okay.
A The -- the last column is a raw calculation and the first column is a rounding of that raw calculation.
Q Okay. To your knowledge, have any of these non-shareholder Hinden entities ever been sued on behalf of asbestos-containing products manufactured by Duro Dyne?
A Not to my knowledge.
Q Can you open Exhibit D with me, please? Can you tell me what Exhibit D is?
A Exhibit D is long-term financial projections.
Q So these are the projections you discussed earlier?
A Yes.

Q Okay. If you look at page 34, the second page of this exhibit, you have a -- the page is entitled Income Statement. Are you with me?
A I have a different page number but I'm with you on the income statement.
Q Yeah, I'm sorry, I'm looking at the -- the filing stamp at the top.
THE COURT: Where it says 34 --
MR. CALHOUN: It's the third --
THE COURT: -- 34 of 53 --
THE WITNESS: Okay. My --
THE COURT: -- at the top.
THE WITNESS: My -- my stamp says 32 of 53.
MR. CALHOUN: You're right.
BY MR. CALHOUN:
Q All right, so we can stay on that page. And so based on your projections for 2019, you expect -- is it accurate that you expect net income from the debtor's operations of $6.2 million in 2019?
A I'm sorry, can you repeat the question?
Q Based on -- based on your projections, is it accurate to say that you expect $6.2 million of net income from the operations of Duro Dyne in 2019?
A It's 6.2 million of income from operations.
Q All right. And then in 2020, again, it's slightly more,

6.5 million, is that right?
A Yes.
Q All right. And it continues to increase. In 2021, 6.8 million?
A Yes.
Q And in 2022, 7.4 million?
A Yes.
Q All right. So in your projections you're showing a large expense in 2019. That expense is largely related to the obligations that would be incurred in connection with this plan, correct?
A Yes.
Q All right. So that's the trust note -- the Bank of America note, payment of administrative fees and the like?
A Yes.
Q So at the bottom of this page, this is where you're showing, I take it, that the company's EBITDA on a trailing 12-month basis would exceed the earn-out amount, correct?
A Yes.
Q All right. So based on that, you expect the company in 2019 would pay an additional $1.3 million to the trust?
A Yes. Actually, let me clarify. The calculation would be based on '19 and be paid in 2020.
Q Okay. Thank you for that clarification. In general, the income for operations is the amount of net revenue that the

company has, is that right, and from that they have to pay other non-operating expenses?
A I'm sorry, can you -- can you say that again?
Q I'm just going back. So your income from operations line, that's -- that's basically the company's net revenue before non-operating expenses, right?
A Yeah, I would -- income, it's income after taking account expenses from operations --
Q Right.
A -- from ordinary operations, yes.
Q All right. So that doesn't include paying for asbestos claims or asbestos lawyers or Mr. Prol or anyone else, right?
A Yes.
Q But that's -- that's also a pre-tax number, correct?
A Yes.
Q All right. If you look at the last page of this exhibit, there is -- you note for each of these years a pretty large payment to -- that you've labeled as Tax Distribution Shareholders. Are you familiar with that line?
A Yes.
Q All right. And correct me if I'm wrong, that would be a distribution the company makes to account for profit that it has on its books that might not have been distributed to the shareholders, correct?
A I think a correct way to characterize it is the company is

a Chapter S -- Subchapter S Corporation and so the taxes related to the operations of the company are borne by the shareholders, and the typical practice of the company is to distribute -- make a distribution to the shareholders to pay those taxes, those federal and state taxes related to the income of the company.
Q All right. So taxes get imposed on profits, correct?
A Yes.
Q All right. So there's only taxes incurred, even in an S Corp, when the company is profitable, right?
A Yes.
Q All right. So each of these assumptions is -- each of these payments is making an assumption that this would be roughly equivalent to the tax liability of the shareholders, is that right?
A Yes.
Q All right. And is a company, to your knowledge, legally obligated to make those payments?
A I don't recall.
Q All right. Your projections end in 2022. Did you do projections that went farther than 2022?
A No.
Q All right. Do you have any reason to believe that the future projections beyond '22 would be significantly lower?
A No.

Q In fact, based on your projections, they would probably continue to increase, wouldn't they?
A I don't know until I do them.
Q All right. Let's look at Exhibit E for a second, please, and this is labeled Duro Dyne Corporation Best Interest of Creditors Test, estimated values as of February 28th, 2019. Are you familiar with this document?
A Yes.
Q All right. Did you prepare it?
A I participated in preparing it, yes.
Q All right. Who else participated in preparing this document?
A My team.
Q This wasn't something that came from the debtors, this came from you?
A Yes.
Q Okay. Tell me what the Best Interest of Creditors Test is.
A It's a comparison of creditor recoveries based on Chapter -- what they would receive under a Chapter 11 plan versus what they would receive under a Chapter 7 liquidation.
Q And do you understand whether the Best Interest Test is conducted on a creditor-by-creditor basis or on a class basis?
A In this particular instance, we're looking at the recovery to the unsecured creditors.

Q All right. In fact, looking down at your columns here for Plan Recovery and Chapter 7 Recovery, you made no estimation as to the prepetition defense cost contribution claims, Class 6, correct?
A Correct.
Q All right. And the same is for Channeled Asbestos Claims. You made no estimate as to whether or not they would recover anything under either scenario?
A We didn't estimate claim amounts.
Q You estimated percentages, correct?
A So without -- maybe you can clarify and make sure I'm answering --
Q Sure.
A -- the right question.
Q So for administrative expense claims, you have stated in this exhibit that under a plan recovery, administrative expense claims would have 100 percent recovery, is that -- that's right?
A Yes.
Q And under the Chapter 7 recovery scenario, they still get 100 percent, right?
A Yes.
Q All right. Now on the other hand, equity interest you say are zero under both scenarios?
A Yes.

Q All right. However, for asbestos claims -- Class 7 and Class 6 claims, you've written simply "TBD." I assume that means "to be determined," correct?
A Yes.
Q All right. So does that mean you haven't determined whether -- what percentage of recovery these creditors would have under Class 7 -- or excuse me -- under a plan or under Chapter 7?
A Yes.
Q Okay. You're aware, are you not, that North River has filed claims in Class 7 of the -- under the plan?
A I'm sorry, can you say that one more time?
Q Are you aware that North River has filed claims that are classified in Class 7 under this plan?
A Yes.
Q Okay. And are you aware of how North River's claims are to be treated?
A Yes.
Q Okay. Under a Chapter 11 plan, what payment, if any, can North River ever get out of the trust?
A I'm sorry, can you repeat the question?
Q Yeah. What payment, if any, can North River ever get from the trust on account of its Class 7 claims?
A Out of the trust, oh, are you talking about Class 7 claims?

Q Class 7 claims.
A I don't recall.
Q All right. And if the trust provided that North River would not be eligible for payment in Class 7, that answer -- the answer to that would be zero, correct?
A Repeat the question?
Q If the trust's provisions -- the TDP provisions applicable to North River's claims say that North River's not eligible for payment, the answer to that question is really zero, isn't it, North River is not going to get paid by the trust?
A It sounds like it makes sense.
Q Well, we'll go back later --

THE COURT: I understand the point being made.

BY MR. CALHOUN:

Q We'll go back to your certification because you -- because you testified about it.
A I'm just -- I think I'm just confused by the question.
Q Okay. And in their Chapter 7, North River would theoretically be entitled to whatever's left of the estate value after it's been liquidated, correct?
A Yes.
Q All right. And that number, even if it's one cent, is greater than zero, isn't it?
A Yes.
Q That one's not tricky. All right, in your liquidation

analysis, did you account for the value of insurance?
A No.
Q All right. Did you conduct an analysis of how the company would fair if as opposed to Chapter 7, it dismissed its bankruptcy case?
A Can you repeat the question?
Q There's no exhibit that shows that you did this work. What I'm just asking is did you ever do an analysis of what would happen if instead of converting to Chapter 7, which is the classic Best Interest of Creditors Test, it dismissed its case and went back into the tort system?
A No, didn't do that analysis.
Q All right. Can you turn back to paragraph 49 of your declaration -- certification, please?
A Yes.
Q All right, and this is information that was given to you by debtor's counsel, is that right?
A Yes.
Q Okay. You don't have firsthand knowledge about the voting?
A I went onto the docket to see the -- the affidavit declaration from the balloting agent.
Q You read -- you read the balloting agent's certification?
A Yes.
Q Okay. And do you understand that the 24.9 million that's

listed here is -- represents North River's Class 7 claim?
A Yes.
Q All right. And do you further understand that if the Hartford settlement is approved, North River might be asked to pay for 100 percent of defense costs for claims going forward in the tort system?
A Not part of my analysis, so to speak.
Q Okay. All right, could you turn to paragraph 54, please?
A Yes.
Q This is a statement of belief by you that the plan complies with the applicable provisions of the Bankruptcy Code. Is this based on statements that were made to you by counsel for the debtor?
A Based on discussions with counsel.
Q All right, but it's not your own opinion based on your own legal expertise?
A Correct.
Q All right. In the next paragraph, paragraph 55, you state that you're "familiar with the classification of claims and interest and believe that they're based upon the legal nature and relative rights of the claims and interest and not proposed for any proper purposes." Is the answer the same for that? Is that something that was relayed to you by counsel for the debtors?
A Based on discussion with counsel.

Q All right. You haven't done any independent analysis of the legal nature of the various claims that have been filed against the debtor?

A No.

Q All right. In paragraph 57, you state that, "The treatment of each claim or interest in each particular class is the same as the treatment of each other claim or interest in such class, unless the holder of a particular claim or interest has agreed to a less favorable treatment of such particular claim or interest." Is that something that was told to you by debtor's counsel?

A On discussion and review of the -- the plan disclosure statement.

Q Okay. How does the plan propose to treat North River's claim?

A Have to flip back to the -- to the plan.

Q Okay, we can do that.

A And there -- there are claims in Class 6 and Class 7.

Q Right, we're talking about the Class 7 right now. How does -- do you recall how the plan treats North River's Class 7 claim?

A I have to go back to the paragraph.

Q Okay. Let's turn -- can you look at Tab 2, please, of the binder in front of you?

Actually, let me -- let me do it a different way

because that's been -- this has been changed and I didn't the change in time to put it in the tab, if you look at Tab 3, please of page 17 --

THE COURT: Counsel, what document are you looking at?

MR. CALHOUN: This is the second amended disclosure statement. It's been premarked as -- as Exhibit 3, but I think they've --

BY MR. CALHOUN:

Q Can you look at page 17, please, Mr. Podgainy?

A Yes.

Q Do you see where it says -- at the beginning of page 17 it says, "Claims of asbestos insurers will be included in and treated as Class 7 Channeled Asbestos Claims. Accordingly, any such claims of the asbestos insurers will be channeled by the asbestos permit channeling injunctions, the asbestos trust, but such claims will not be compensable and asbestos insurers will not receive any payment or distribution from the asbestos trust on account of such claims under the Trust Distribution Procedures."

Do you recall that statement and the disclosure statement?

A I'm not sure I am following where that is. I'm on page 17. This is at the top of the page.

Q 17 tab 3.

A Oh, okay, okay. I'm with you now. Yes. I've read it and refreshed my memory.

Q And to your knowledge that is an accurate representation of how the plan proposes to treat the claims -- Class 7 claims and the asbestos --

A Yes.

Q So they are not eligible for compensation, right?

A Based on the paragraph, yes.

Q What was the basis then for your statement that each holder proclaim a particular class as the same treatment as each other claim or interest in the class?

THE COURT: What paragraph are you reading from?

Q It's 50 -- back of 57 of his certification, Your Honor.

THE COURT: 57.

A Oh, so let me go back to the description of Class 7. The basis was that all claims were going to be channeled to the trust.

Q All right. So they are all channeled to the trust. But then if the trust treats them differently in your view that is okay?

A The basis for my view was to -- that they are all channeled to the trust.

Q But you understand, don't you, that the trust actually treats insurer claims very differently than it treats asbestos claims?

A I am sorry, what's the question?
Q You are aware, aren't you, that the trust treats asbestos claims different -- underlying asbestos tort claims, it treats them differently than insurer claims, doesn't it?
A It seems to be.
Q Are you aware of any other classification of asbestos claim in this TDP that have no payment from the trust whatsoever?
A Can you repeat the question, please.
Q Are you familiar -- you are familiar with the TDP in this case, right?
A Generally.
Q Okay. And you are -- are you familiar even in your general knowledge any other type of claim that is channeled to the trust that has no chance of getting a payment from the trust?
A I don't recall honestly.
Q All right. And, are you aware based on your study and work with the debtors and evaluating its liabilities that asbestos claimants sometimes get payments from other defendants?
A Yes.
Q Okay. They might get payments from insurers of other defendants, right?
A It's possible.

Q And, to your knowledge, do these TDP in any way tell a claimant that they -- that it's ineligible for payment if its claim has somehow been paid in part by another defendant in the tort system?

A Honestly, I don't recall.

Q You don't have any reason to believe that it does, do you?

A I just don't recall.

Q All right. If you look on page 19 of your certification, section eight, look at the first several paragraph through 67, there seem to be a number of statements that you think that you believe the plan complies with various provisions of the Bankruptcy Code? Are you with me?

A Yes.

Q And are these statements made based on your personal belief or are these things that were told to you by someone else?

A I would say it's a combination of my belief and discussions with the professionals in the case.

Q And you -- we looked earlier at the statement that's in the disclosure statement and your certification that the primary reason for the filing of this bankruptcy was the increasing asbestos indemnity and defense costs, correct?

A Yes.

Q All right. And in fact, the debtor's primary desire was to avoid having to pay those increased defense costs, correct?

A The primary desire was the concern that the company was not going to be able to pay its debts as they came due given the volume of claims that they were expecting.
Q Did the company, to your knowledge, ever retain any expert to conduct an analysis of future claims?
A I don't recall. Don't recall.
Q Can you look at page 68 -- excuse me -- paragraph 68 of your certification, please? All right, this is where you're referencing the liquidation analysis that we looked at earlier?
A Yes.
Q And here you state there would be several consequences of the liquidation and one of the things you say is that the Chapter 7 Trustee would likely not be able to negotiate insurance settlements anywhere near the terms that could be negotiated in a 524(g) plan. Do you have -- have you ever been a Chapter 7 Trustee?
A No.
Q All right. Do you have any -- do you have any experience negotiating insurance settlements with insurers?
A No.
Q Is this something that someone else told you to put in here, or is this from your own -- is this your own statement?
A This is based on discussions with counsel.
Q Is that true for paragraph 69, too? Is this largely a -- is this discussion of what would happen in Chapter 7 originally

something that came from counsel?
A We had -- we had discussions about this paragraph and the meaning of it and -- and why, so it's based on my discussions with counsel and my own opinion.
Q All right. And on page 21 you go on to say that, "Resolution of asbestos claims might be a never-ending process." Do you recall writing that?
A I recall having the discussion with counsel about that -- that line.
Q And is that because you think that Bankruptcy Courts are unable to -- to manage their dockets and efficiently handle claims?
A No.
THE COURT: Good answer.
THE WITNESS: Thank you.
BY MR. CALHOUN:
Q Are you aware of any Chapter 7 that had a claims resolution process that drug out for an inordinate amount of time?
A Not specifically.
Q All right. In a Chapter 7 case, would insurance -- assuming the Trustee could not manage settlements, insurance would still be available to defendant to pay claims, correct?
A I would assume so.
Q All right. You didn't factor that in into your

liquidation analysis though, did you?
A No.
Q In paragraph 70 you state that the plan -- because the plan provides for significantly greater recoveries for creditors than would be available in Chapter 7, the plan satisfies Section 1129(a)(7). Did you write that?
A No.
Q And, because you didn't factor in for example the insurance recoveries, you don't know whether that would actually be the case, do you?
A No.
Q Is there any statement in this declaration -- I keep calling it declaration, I don't know if there is a legal distinction between a certification and declaration, but this is a document you filed -- you signed under oath, correct?
A Yes.
Q All right. Anywhere in here where you begin a statement with I believe, is it fair to say that that is a statement that is based on information that was provided to you?
A Since that's -- generally that could be an answer or it could be something that I know factually. It could be a variety of reasons.
Q I'm trying to see if there is a way that we an distinguish between things that were told to you or opinions of counsel oo things that you came up on your own. Certainly there are a

number of them. If we look at paragraph -- I'm on page 23, 79 and 81. There are statements that I believe that section of -- certain sections of the code are satisfied. Anything like that where you're talking about satisfaction of legal requirements, that's coming from someone else, isn't it?

A It probably depends on the paragraph. But if you point out one I can tell you whether it's my belief or based on discussions with the professionals from the debtors.

Q Look at paragraph 72 for -- as an example of this. Is that -- that's really referring to administrative claims. Is that something that's based on your work or is that something that was told to you?

A That particular one is a combination of my common knowledge and discussions with counsel.

Q Can you look at paragraph 84, please?

A Yes.

Q All right. This is a reference to a cooperation agreement. And you state that this was done in satisfaction to an objection raised by the United States Trustee. Are you familiar with that objection?

A No.

Q Okay. And, did you have any role in negotiating the cooperation agreement?

A No.

Q How did the cooperation agreement come to be attached to

your certification?

A I don't recall.

Q Is it something that the debtor asked for you to put in?

A I don't recall.

Q All right. Did you review the cooperation agreement at any point in time?

A I flipped through it.

Q All right. Do you know what the cooperation agreement accomplishes?

A I don't recall.

MR. CALHOUN: Your Honor, can we take a five minute break possibly?

THE COURT: Sure. My intention would be, if you're approaching the end of your cross before allowing redirect, it's about 20 to one, I would take a break for lunch. Unless you tell me you need more.

MR. CALHOUN: No, I am approaching the end but I needed a personal break.

THE COURT: No, that's fine. More speaking toward to Mr. Prol, whoever's going -- if there's going to be redirect. Do you --

MR. HAUSMAN: Your Honor, the U.S. Trustee will probably have two to three minutes of questions on cross.

THE COURT: All right. Well, why we take the five minutes, help Mr. Calhoun, and I'll be back.

(Off the record, 12:37 p.m. to 12:49 p.m.)

THE COURT: Ask, but not a reflection of the way it's going. File it all. For everyone's benefit, even though it's 20 degrees outside, it was warm in here, it gets warm in here with all the people. Feel free to take off jackets if needed, if you wish, no pretense.

All right, Mr. Calhoun, continue.

BY MR. CALHOUN:

Q Mr. Podgainy, I only have a few more questions. Looking back at your Best Interest Test which is from the Exhibit E --

A Yes.

Q -- looking at --

THE COURT: The liquidation analysis, Exhibit E?

MR. CALHOUN: Correct, Your Honor.

BY MR. CALHOUN:

Q Looking at what's at the top it has -- says page 37 of 53, do you see that page?

A Yes.

Q All right. And then under your analysis you said you believe that there will be 8.4-million-and-change available for unsecured claims, is that right?

A Yes.

Q All right. And again, for prepetition defense costs, you didn't determine what would be available to pay them?

A No, not specifically.

Q All right. And for "asbestos liability" you have a -- a blank. Do you believe that asbestos creditors would receive nothing in a Chapter 7?
A No.
Q No, you don't believe they'll receive nothing or --
A No, I guess the -- the -- I'm sorry, I meant let me make sure I'm answering the -- the question right. So we're talking about on the bottom where it says "asbestos liability" and there's a blank, right?
Q Correct.
A Okay. So because the asbestos liability -- the specific volume of claims at the time that this was prepared was unknown it was blank, doesn't necessarily mean that there wouldn't be anything received.
Q Okay. And again, insurance wasn't factored into this analysis at all?
A No.
Q Okay. And so was one of your goals in preparing this to make Chapter 7 look unattractive?
A The goal was to prepare 7 and 11 and let the numbers fall where they may.
Q Okay. But you didn't actually determine whether or not there would be any distribution to any creditor in Class 7?
A Not specifically.
Q Okay.

MR. CALHOUN: Your Honor, I can pass the witness now. We would like to renew our -- not renew since we oppose the admission but move to strike those portions of his affidavit that are not based on his personal knowledge.

THE COURT: All right. With respect to that motion, I'm going to deny it. The Court will review the certification and as it always does, give whatever weight is appropriate.

CROSS-EXAMINATION

BY MR. SPONDER:

Q Good afternoon, Mr. Podgainy.

A Good afternoon.

Q My name is Jeff Sponder, I'm from the Office of the United States Trustee. I just have a few questions for you. With respect to P-4, paragraph 44 --

A P-4 -- I'm sorry --

Q P-4 --

A -- is which document?

Q -- which is your certification --

A Okay, thank you.

Q -- paragraph 44, you write about the Bank of America line of credit?

A Yes.

Q Do you know the status of that line of credit?

A Yes. It's -- yes, I do.

Q And what is the status of it?

A It's partially documented, there's -- some of the due diligence has been completed, the rest is in process. I believe that the committee has approved the loan and is waiting for the final due diligence and documentation to be prepared.
Q Do you know if the debtor will have sufficient funds for the plan to become effective if the Bank of America line of credit does not close?
A Yes. Just to be sure, do I know? Yes, I know whether or not.
THE COURT: And what is the answer?
THE WITNESS: And the -- the answer is no, the debtor would not have sufficient cash available to make its contribution to the plan -- initial contribution to the plan.
MR. SPONDER: Okay, thank you.
BY MR. SPONDER:
Q Turning to paragraph 53 --
A Yes.
Q -- do you have personal knowledge that customers and vendors identified the debtors generally as Duro Dyne as opposed to any individual corporate identity?
A That my -- my statement there is based on discussions with the company and the senior management.
Q And do you have personal knowledge that the debtor's trade creditors and customers view the -- view the debtors as a single entity when extending credit?

A No.
Q And do you have any personal knowledge that the debtors as a whole capitalized upon the scale and operations of the entirety of the debtor's business operations to negotiate agreements and maximize value?
A Yes.
Q How so?
A The -- the debtors, when they're conducting business, based on my working with them over five years, primarily and almost always would focus on discussions negotiations with their, you know, parties in interest -- the vendors, customers as -- as one entity.

For example, negotiating a supplier agreement, they would -- they would, you know, do that on behalf of the whole of the company as opposed to the individual entities. The same thing with, you know, let's say payment terms of the customers. It wasn't -- they don't operate on an individual-by-individual debtor entity.
Q All right. Do you have any specific examples?
A I don't -- I don't have a specific example for you.
Q All right.

MR. SPONDER: Those are my questions, Your Honor, thank you.

THE COURT: Thank you, Mr. Sponder. Anyone else wish to cross?

Mr. Prol, do you intend to redirect?

MR. PROL: Yes, Your Honor.

THE COURT: About how much time?

MR. PROL: Only a couple minutes.

THE COURT: Let's hear it.

(Pause)

REDIRECT EXAMINATION

BY MR. PROL:

Q Mr. Podgainy, in the course of your engagement by the debtors, you testified that you were involved in the planning process, the decision-making process regarding the filing for Chapter 11?

A Yes.

Q And at that point in time, was the company able to obtain bank financing?

A No.

Q Was the company able to obtain capital from equity investment?

A No.

Q Why not?

A The -- the uncertainty over the -- the asbestos liability was a deterrent for any party that was potentially interested in providing capital to the company. It changes the valuation of the business for an equity investor and provides extreme uncertainty for a lender in terms of whether the company will

ultimately have the ability to pay back a loan.

Q And if these cases were dismissed as Mr. Calhoun suggested, would the company have those same problems?

A Yes.

Q And can you refer to the liquidation analysis attached to your certification as Exhibit E?

A Yes.

Q Now focusing on the Chapter 7 Liquidation column, you estimate that in a liquidation the assets of the company could be liquidated for slightly in excess of $18 million?

A Yes.

Q And in the next category you have listed uses of those funds, and those uses are to pay administrative claims in -- in the first instance?

A Yes.

Q And then to pay secured claims?

A Yes.

Q Professional fees?

A Yes.

Q Chapter 11 Trustee fees? That would be good.

A Yes.

Q United States Trustee fees of late, right?

A Yes.

Q Priority tax claims?

A Yes.

Q And you then have a number for Chapter 7 Trustee, correct?
A Yes.
Q And so the total uses on the schedule are 10,121,000-and-change?
A Yes.
Q And then you come down to a balance available of $8.4 million-and-change?
A Yes.
Q And from that $8.4 million, you've not yet accounted for the costs of liquidating claims that are filed against the Chapter 7 estate, correct?
A Correct.
Q And as Mr. Calhoun pointed out, you did not project -- strike that.

In your certification, you express concern about the costs of liquidating claims in -- in a Chapter 7, correct?

MR. CALHOUN: Objection.

THE WITNESS: Yes.

MR. CALHOUN: He testified that that information came from someone else. It's not his testimony.

THE COURT: Sustained.

MR. PROL: His testimony was that that was in connection with discussions that he had with the company and its counsel.

THE COURT: We didn't go by -- sentence-by-sentence

as to what was attributed to him versus professionals.

BY MR. PROL:

Q In the Chapter 7, do you believe that any of that $8.4 million would be available for distribution to general unsecured creditors?

A It's possible.

MR. PROL: I have no further questions.

THE COURT: Any recross?

MR. HAUSMAN: No, Your Honor, for the U.S. Trustee.

THE COURT: I thank you for your time. You may step down. Thank you, counsel.

All right, it's a little after 1:00. I don't know where you'll go for lunch. Good luck with that.

UNIDENTIFIED SPEAKER: There was some discussion about going (inaudible) around the corner, Your Honor.

THE COURT: Discount. They'll all be legal soon apparently. 2:00 -- how about by 2:15, ready -- ready to go by 2:15, and we'll continue from there.

(Lunch recess, 1:03 p.m. until 2:17 p.m.)

THE COURT: All right. Let's start up. Mr. Prol.

MR. PROL: Your Honor, next we're going to call Lawrence Fitzpatrick.

THE COURT: All right. Mr. Fitzpatrick.

MR. PROL: Oh, yes. Your Honor, before we do that, attached to Mr. Podgainy's certification was a tabulation of

balloting. The balloting agent is here in court, and I just wanted to offer if anybody had any issues about the report, he's available for cross-examination. So I'd like to enter that into evidence as well.

THE COURT: Well, let me ask Mr. Calhoun or the UST, could we stipulate to the balloter or just --

MR. CALHOUN: We have objection to that.

THE COURT: -- we'll stipulate to the tabulation.

MR. PROL: Thank you.

THE COURT: Now, is -- I was going to ask is Mr. Fitzpatrick going to testify in lieu of a certification or are we proffering the certification?

MR. HARRON: I was probably going to do a little of both. I like to gild the lily, Your Honor.

So we -- yes, we think for ease of administering the record, the declaration would be useful. We'd like to mark it and admit it into evidence. I'm sure Mr. Calhoun may have a view on that. And then I'd like to put Mr. Fitzpatrick on the stand to briefly go through a couple of the highlights in the declaration and then make him available for cross-examination.

THE COURT: Mr. Calhoun, your thoughts.

MR. CALHOUN: I don't have an objection, Your Honor, to that proposed process. There are some portions of this declaration that purport to be based on work done by Young

Conaway and certainly I may have objections to the admission of certain portions of that.

So I think what probably would make some sense is accept the proffer and have the examination and then if there -- there are issues, we'll raise that.

THE COURT: That's fine. Along the lines we've done before, identify those paragraphs that you're troubled with.

All right. Do I -- do you have an extra copy for the Court?

MR. HARRON: I do, Your Honor. I think it's going to be found at Docket 484.

THE COURT: If we're making this -- if you premarked exhibits, I don't want to deviate. I know we did a little bit before. Do you have a premarking for this?

MR. HARRON: You give me too much credit, Your Honor. I do not. Where were we? 7 -- P-7?

THE COURT: Well, let's see here. Hold it.

MR. HARRON: May I approach with a sticker?

THE COURT: Sure. I don't need a sticker. Why start now? Since I have a P-6 already, we'll refer to the -- we're one up over your schedules -- P-7.

MR. HARRON: All right. With that, Your Honor, I'd like to call Mr. Fitzpatrick --

THE COURT: All right.

MR. HARRON: -- to the stand. I'm going to do my

best not to call him Mr. Fitzgerald. So when the cases were before Judge Fitzgerald, it got very confusing.

THE WITNESS: That was -- that was confusing.

THE COURT: Mr. Fitzpatrick.

THE WITNESS: Thank you.

THE COURT: Right. I'll ask you to please raise your right hand.

LAWRENCE FITZPATRICK, Sworn.

THE COURT: Thank you.

MR. HARRON: And, Your Honor, I note for the record that Mr. Fitzpatrick's CV is attached as an exhibit to the declaration.

THE COURT: Correct.

MR. HARRON: And we covered much of this ground the last time Mr. Fitzpatrick was in that seat.

DIRECT EXAMINATION

BY MR. HARRON:

Q But, briefly, if you would, Mr. Fitzpatrick, if you could -- I'd like to review your legal background. Now, you did graduate from law school, right?

A Yes, in 1975. And from '75 to '80 I worked for a company that did not make any asbestos products, so it's really irrelevant.

In 1980, I went to work for a company called Owens-Illinois which was a fairly prominent asbestos defendant, and I

worked for them for five years doing asbestos personal injury litigation, property damage cases and insurance work, the whole gamut of asbestos-related litigation.

In 1983-'84, I became involved in some negotiations called the Wellington Negotiations which was an attempt to settle all the then pending asbestos litigation involving 35 of the prominent defendants and 16 of their insurers. Those discussions led to an organization being formed called the Asbestos Claims Facility which consisted of 35 former manufacturers of asbestos products and 16 of their insurers.

I was the Vice President of Law for the Asbestos Claims Facility and for most of its existence I was also its Chief Executive Officer because it had a hard time keeping a Chief Executive Officer. And it eventually fell apart due to disputes among the members of how to share the asbestos liabilities.

So in October of 1988, I helped co-found an organization called the Center for Claims Resolution which was a consortium of 21 former asbestos manufacturers and their insurers. I was the President of the Center for Claims Resolution or CCR for a number of years until 1997.

In 1997 my wife passed away at age 44 leaving me with four children. And I tried to run the business and raise my family for a couple years, and that just wasn't working. So effective January 1, 1999, I left the Center for Claims

Resolution, took a few months off to get my kids some counseling and some tutoring and things that they needed.

And then became the Trustee of the Fiberboard Settlement Trust which was an asbestos trust of about $1.3 billion. I managed that for a number of years.

During that period of time, I was approached to become the Future Claims Representative in a bankruptcy called Pittsburgh Corning Corporation which actually involved Pittsburgh Corning and its two parents, PPG and Corning, a very large bankruptcy.

And from then on, I just became a Future Claims Representative in a number of other cases upon request of the parties. That's where I am today.

Q And when you were working on behalf of defendants for Owens-Illinois, the Asbestos Claims Facility and the CCR, in your experience, did those defendants keep their tort settlements confidential?

A Oh, yes, absolutely. You certainly wanted to keep your settlements confidential.

If they became public knowledge, today's ceiling would be tomorrow's floor and everybody would be trying to get in excess of that the next time you went around with them. So you certainly tried to keep your settlements as confidential as possible.

Q And in terms of exposure evidence, did the defendants in

your experience normally require a claimant to provide their full exposure history?

A Well, certainly not for the Center for Claims Resolution and the Asbestos Claims Facility. If you identified one member of the Asbestos Claims Facility or one member of the Center for Claims Resolution, that triggered an obligation of all the members to pay their several shares.

Q Now, turning to trusts, for how many 524(g) trusts do you serve as a Future Claims Representative currently?

A With trusts, I currently serve as the FCR for six operational trusts -- well, six trusts, Pittsburgh Corning, NARCO or North American Refractories Company, A.P. Green, AC&S, a company called Metex and finally a company called Durabla.

I am also the FCR for three or three and a half, depending on how many cases -- cases. Right now one being Kaiser Gypsum, another being Rapid American and a third being SEPCO. And those are in Virginia, Ohio and New York.

Q And focusing on the cases where you are a Future Rep for an existing trust, in each of those cases, did a Court approve the trust distribution procedures?

A Oh, yes.

Q And are you familiar with the Plan, the TDP and the Trust Agreement in this case?

A I certainly hope so.

Q And in terms of negotiating those documents, did you

continue to negotiate essentially to today?
A I haven't done anything today. Yesterday we -- I think I stopped.
Q Is it fair to say since the last time you were here in court, you've continued to work with the plan proponents to refine the documents?
A Yes, that's fair.
Q And in terms of your negotiations, in addition to Young Conaway, did you have the assistance of Special Insurance Counsel?
A Yes, Ms. Quinn of the Gilbert Firm in Washington, D.C.
Q And what about a financial consultant, did you have the assistance of a financial adviser?
A Yes. In this particular case to save money because there are limited assets, we shared a financial adviser with the trust advisory -- or the Asbestos Claimants Committee, rather. And in this case, we used a company called Charter Oaks as our financial consultants.
Q And in the process of negotiating and reviewing these documents, have you formed an opinion on whether the trust will be operated through mechanisms that provide reasonable assurance that the trust will value and be in a position to pay present claims and future demands that involve similar claims in substantially the same manner?
A Yes, I have.

Q And what is your opinion?
A In my opinion, it will.
Q And can you identify some of the mechanisms that are in the trust documents that provide this assurance in your view?
A Well, they have certainly the payment percentage which is something that needs to be derived and we're waiting on doing that until the trust is ready to -- has a trustee up and running and is ready to become operational, because at least until yesterday we were hopeful to get more insurance.
And you can't establish a payment percentage until you know your assets, so we held off doing the payment percentage in this case. But that certainly helps make -- make the trust documents fairer to the claimants.
Q Do the trust documents include a matrix of disease values?
A They do.
Q And do they provide for supplemental payments?
A Yes.
Q And do they have specific medical and exposure criteria?
A They do.
Q And have you had the opportunity to evaluate the contributions being made by or on behalf of third parties in exchange for protection under the -- a channeling injunction?
A Yes, I have.
Q And have you formed an opinion on whether those contributions by or on behalf of the Hinden families and the

Hinden entities are fair in respect of the interests of future claimants?

A Yes, I have, after consultation with our -- with our financial advisers and with my attorneys, concluded that they are, in fact, fair and equitable -- equitable. Excuse me.

Q Turning back to the TDP, has the TDP in this case been tailored to the specific facts of this case in your view?

A Yes, it has.

MR. HARRON: Your Honor, I'd like to go through just a few provisions in the trust documents. So I -- I've prepared some blow-ups for the ease of the witness. Can I approach?

THE COURT: Yes.

BY MR. HARRON:

Q And we endeavored to conform the slides there to the most current version of the TDP that was I think filed yesterday. So if anyone needs an additional copy, if the Court needs a copy.

THE COURT: I'm fine. I'm working off what we've marked as P-2.

MR. HARRON: P-2. All right. Thank you, Your Honor.

BY MR. HARRON:

Q And, Mr. Fitzpatrick, I'd like to direct your attention to Section 2.5 of the TDP there, claims payment ratio. Can you briefly describe for the Court the purpose of the claims ratio and what's unique about the claims payment ratio in this case?

A Yes. Generally, the claims payment ratio is a mechanism to make sure that not too many of the trust dollars go to one category of disease.

There was a worry -- oh, go back ten years or so ago -- that too much money would go to the non-malignant cases that were -- and not enough would be left for the truly, truly sick, the malignants. So the claims paid -- claims paid ratio would say that 35 percent of the money had to go to the malignancies and 65 percent only could be spent on non-malignants. And now --

Q And what's different about this case?

A This case is different because as you know, Your Honor -- well, you were the one that urged us to come up with -- see if we could find ways that could change things for the better, and we endeavored to do that.

And we think we have in this case through a number of changes, one of which is to the number of diseases that are compensated, and the other is in the percentages that go to the various diseases. There are only five disease categories that are compensated under this Trust Distribution Procedures.

Those five would be mesothelioma which is the most serious of asbestos diseases, almost invariably fatal and caused only by asbestos. So mesothelioma is one of the diseases that is compensated. Lung cancer, there are two forms of lung cancer with asbestosis and without; those are the

second and third disease categories that are compensated.

Fourthly, other cancers caused by asbestos; namely, laryngeal, esophageal, stomach and one more which escapes me right now, but there are four other -- other disease of cancer that will be compensated, not as much as mesothelioma or lung cancer because of the causation between those four cancers and asbestos is not that well established.

And unlike mesothelioma and almost like lung cancer, these particular cancers have a survival rate, so you're not necessarily going to die from them.

And then the final disease category to be compensated is severe asbestosis and that, while it's not a malignancy, is a horrible condition that's every bit as terrible as -- it basically means your lungs no longer work. You have no real elasticity left. And so that's included even though it's technically not a malignancy.

Fortunately, we don't see much of that anymore because of the OSHA that went in in 1972 when the general awareness that asbestos was harmful, that gradually permeated our society.

Q Thank you, Mr. Fitzpatrick. Turning again briefly to the claims payment ratio, is a 90 percent for Category A, does that mean 90 percent of the dollars goes to mesothelioma claims here?

A That's what I mean. 90 percent of the money in this trust

is going to go to mesothelioma victims, leaving ten percent for the other four categories. And, of course, there will be no money spent on non-malignants other than severe asbestosis.

Q And 90 percent to mesothelioma claimants, that's a higher percentage going to mesothelioma claimants than in your other trusts where you serve as FCR?

A Yes, by -- by far, not even close.

THE COURT: From -- let me just confirm. Mesothelioma gets 90 percent and --

THE WITNESS: Yes, sir.

THE COURT: -- and those other four categories get combined ten percent?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Thank you.

THE WITNESS: And the non-malignants get nothing under this -- this TDP.

BY MR. HARRON:

Q Is it fair to say that this provision assures that the sickest people get most of the money?

A Yes, that's fair to say.

MR. HARRON: All right. Next slide.

BY MR. HARRON:

Q And I'd like to --

THE COURT: I'm sorry. I have a quick question or two before -- on this topic.

So this trust has identified certain members of class seven who would be injured asbestos victims who would be channeled into class seven as receiving a different amount. And are there other asbestos victims who in the tort system would have claims who are receiving nothing under the trust?

THE WITNESS: It's possible that there are some, yes.

THE COURT: Is this common in all 524(g) trusts that you've had experience with?

THE WITNESS: No. It's generally not true. Usually a lot of the money goes to non-malignant cases, some of them of questionable merit.

THE COURT: In these trusts that you've had familiarity in the past, there are matrixes established which provide for different compensation levels for different members of the class?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

BY MR. HARRON:

Q All right. Mr. Fitzpatrick, just following up on the Judge's questions, other trusts compensate claimants who suffer from other asbestos diseases in addition to the ones that you've identified, right, as a disease category, other asbestos disease?

A Yes.

Q And other trusts compensate asbestos pleural disease but

this trust does not, right?

A That's correct, asbestos pleural disease being minimal or no impairments. And that's true, other trusts do compensate them.

Q Is it fair to say that in this case claimants with asbestos pleural disease and other asbestos disease in addition to the diseases you listed will be -- will be channeled pursuant to the channeling injunction, but will be paid nothing from the trust?

A That's correct.

MR. HARRON: All right. Let's flip the slide.

BY MR. HARRON:

Q Just quickly, Mr. Fitzpatrick, could you explain to the Court the purpose of the supplemental payment provision at Section 4.3 of the TDP?

A Sure. The payment percentage is frequently adjusted during the course of a trust lifetime depending on how many diseases you get and what quality and what disease category so that you sometimes have to adjust the payment percentage. And that means that those who have already been compensated are entitled to the difference if you will in what they got originally and what they're entitled to now after the payment percentage change.

And normally if the trust owes anything over $100, they have to compensate all these asbestos recipients from the

trust. We're raising that here to $250 because it's an enormously expensive proposition to find all those people and to send them checks and we think by raising this from $100 to $250 per claimant, we'll be saving substantial moneys that can go to asbestos victims as opposed to being wasted if you will doing these supplemental small payments.

THE COURT: Just another follow-up question. In situations where there are payment changes, percentage payments are decreased -- there are situations such as that, correct?

THE WITNESS: Yes.

THE COURT: And if earlier compensated victims received more than they would under the current percentage, are those victims ever -- are future payments ever discounted or are those victims ever required to pay back any sums?

THE WITNESS: No, Your Honor. We've never tried to claw back or pay back. Once you pay these people, their money is gone basically, and you're not going to be able to get it back from them.

THE COURT: All right. I'm sorry. Continue. Oh, yes.

MR. HARRON: Do you have any further questions on this provision?

THE COURT: Continue, please.

MR. HARRON: Okay. The next slide.

BY MR. HARRON:

Q Mr. Fitzpatrick, I'd like to focus your attention on TDP Section 5.3(a).

A Sure.

Q There's a lot going on on this slide so -- the blow-up didn't help so much on that one. First, would you explain to His Honor the concept of expedited review?

A Sure. Expedited review is what I call the normal -- normal review, and basically a claimant submits the claim. The schedule values for expedited review are smaller than they are for something called individual review which I'll get to in a minute.

But as a quid pro quo for that, you receive slightly less money. The claimant gets slightly less money. He has to submit slightly less in terms of evidence. Some claimants in some trusts, you can go for what's called individual review where they submit more documentation and more evidence and have a chance of receiving more money than the scheduled value. Was I clear on that?

THE COURT: Yes.

THE WITNESS: Okay.

BY MR. HARRON:

Q And this trust only offers expedited review, is that correct?

A That's correct. This trust will not offer individual review, again, because it's an enormously expensive thing for

the trust to do, and we feel that this will save money and make money available for more deserving claimants.

Q And, Mr. Fitzpatrick, I think you already talked about the disease categories. Here there are five disease categories as you've testified. In other trusts, how many disease categories are there?

A Normally, eight.

Q Okay. And I attempted to highlight in yellow on the top of the schedule at 5.3(a), this trust offers an inflation adjustment, is that correct, Mr. Fitzpatrick?

A Yes, that's right. One of the things that the U.S. Trustee cited in their objections to the plan is an article that -- it shows that there's been a decline in the total net worth of asbestos claims over the last several years, which certainly seems to be true.

One of the reasons for that is there was no provision for inflation in the awards that were awarded to claimants in the earlier days of the trust. So here we're building in an inflation factor to help ameliorate that problem of claim diminution value over time.

So it's one percent. Inflation had been fairly benign over the last decade or so. Certainly that one percent is subject to adjustment to a higher number if it's appropriate in the future.

Q And is a mandatory inflation adjustment --

THE COURT: Let me just -- I'm sorry to interrupt. I don't have that language in -- and I'm looking at -- some blank stares by the U.S. Trustee. I'm looking at what I have marked as P-2 which I thought is the redlined version and 5.3(a)(3), and I don't have that first -- that sentence in my copy.

MR. HARRON: May I approach, Your Honor?

THE COURT: I guess I'm just assuming -- it looks like it's at the top of the paragraph.

MR. HARRON: Yes.

THE COURT: So it's above the categories.

MR. HARRON: It's right above the chart.

THE COURT: It's not the beginning of the paragraph. It's the last sentence in the paragraph.

MR. HARRON: Right. Yes.

THE COURT: All right. Well, I'm not alone then.

MR. HARRON: We took a little poetic license with -- it would have made for a terribly small font if we had put all that on there.

THE COURT: Okay. Thank you.

MR. HARRON: Okay.

BY MR. HARRON:

Q But the annual, the mandatory inflation adjustment, is this different than the other trust with which you're involved, Mr. Fitzpatrick?

A Yes. Only one of the trusts that I'm involved with has an

inflation factor and that's something that I just -- was instituted recently at my insistence. Normally the trusts do not have inflation -- asbestos trusts do not have inflation built in. I think in the future we'll see more and more of them with inflation built in.

Q Thank you. May I direct your attention to Section 5.6(b)(3)(A), presumptive occupations.

A Sure.

(Pause)

BY MR. HARRON:

Q And, again, I think this was one of the provisions in which the Office of the United States Trustee expressed some interest. Can you explain to His Honor the purpose of presumptive occupations and how the list of occupations in this case compares to other trusts?

A Sure. Certain occupations the defendants are well aware that those who worked in those occupations worked with their asbestos containing products and used them extensively.

For example, let's just take the Norfolk Virginia shipyard. Everybody knows that the Acme Company's Kaylo product was at the Norfolk shipyard. So if you're a chipper or a laborer or a ship welder at a shipyard -- at the Norfolk Naval Shipyard it really doesn't make a lot of sense to make a claim and prove over and over -- claimants prove over and over again that they were exposed to Acme's Kaylo product.

So certain -- certain occupations are presumed to have product exposure and the claimants aren't forced to unnecessarily produce evidence of exposure when they fall within the purview of one of those presumed occupations.

Q Given that this is a relatively small defendant how many presumed occupations are recognized under this TDP?

A Under this particular TDP only eight occupations are presumed occupations.

By way of contrast in some of my larger trusts -- NARCO for example, it's -- I think it's over a thousand presumed occupations now so it's -- we've whittled down the number of presumed occupations.

Q Thank you. I'd like to direct your attention, Mr. Fitzpatrick, to Section 5.6(b)(3)(B).

A Okay.

Q Standard of exposure. How many -- how many products are recognized under this TB -- under this TDP as being a source of Duro Dyne exposure?

A As near as we have been able to figure out only one Duro Dyne product was ever a source of asbestos liability and so there is only one Duro Dyne product that is in -- compensable product, if you will, and that is a flexible duct connector. So if they produce evidence of exposure through a flexible duct connector claimants will be compensated under this TDP.

No other Duro Dyne products, yet at least, have been

implicated in asbestos liabilities. That, again, could be subject to change in the future, but right now that's the best we can do. And I think it's a benefit for the claimants and for the trust because it conserves resources.
Q And how does this compare to your other trusts?
A Again, some of them have hundreds of products, certainly scores of products, that have been known to cause asbestos related diseases.
Q Thank you, Mr. Fitzpatrick.
A You're welcome.
Q Now I'd like to direct your attention to TDP Section 5.7, audit.
A Yes.
Q Again, this is the focus of some interest from the Office of the United States Trustee. Can you briefly explain to the Court that -- the changes we've made to the audit program provision here?
A Well, I think certainly the major change is it used to read "may" audit and now it reads, "shall develop a claims audit procedure. So rather than being -- being something that was discretionary it is now mandatory on the trustees to develop a claims audit program.
Q I think there was also some confusion in some of the objections. Does this audit provision apply to both medical evidence and exposure evidence?

A Yes.

Q Now, Mr. Fitzpatrick, I'd like to direct your attention to TDP Section 5.11.

A Okay.

UNIDENTIFIED SPEAKER: 5.11 or 5.1?

MR. HARRON: 5.11.

BY MR. HARRON:

Q Claims against non-settling asbestos insurers.

A Yes.

Q Can you explain the purpose of this provision to -- to His Honor?

A Sure. This means that a claimant who has been compensated, or not compensated for that matter by the trust, can pursue a non-settling asbestos insurer with the consent of the Trust Advisory Committee and the FCR in the case. So it is possible for a claimant to bring suit against a non-settling insurer which, frankly, there's only one of them left in this case now, but that's possible to do under this TDP. Yes.

Q Why did you agree to a provision that would allow claimants to pursue insurers directly?

A Well, there's a couple of reasons.

One is it gives the claimants a little bit of leverage against a non-settling insurer and hence gives the non-settling insurer some reason to want to settle with the -- with the trust.

Another reason is that if a claimant gets paid by a trust generally only the trust can pursue the non-settling insurer. That's not true in all states, but generally it's true.

And when the trust comes after the non-settling insurer there is an argument that the non-settling insurer can make saying, look, I never insured you, Mr. Trust, I insured the Acme Company, but it insured you. There's no privity of contract. We don't owe you anything and that's an argument that has been made in some states successfully unfortunately, so that's another reason.

THE COURT: Let me ask a couple of questions.

THE WITNESS: Sure.

THE COURT: I understand the first explanation being one of leverage.

THE WITNESS: Yes.

THE COURT: But clearly that disappears because there's an end date from which a non-settling insurer can become a settling insurer. It's been extended under the amended plan, but there's an end date.

Explain for me the rationale, the reasoning, that the advisory committee and the futures rep, what reasoning would they follow to decide to allow claims or not allow claims? What dictates that decision to allow claims to pursue non-settling trustees -- I mean, non-settling insurers rather.

THE WITNESS: Yes, it could be a host of factors.

How close do we think is their hope that we can come to an agreement with this non-settling insurer?

Does it make sense to allow people to pursue them and will it bring them to the table?

Does it make economic sense?

How many people are doing this is something we have to watch because they could bleed theoretically at least -- bleed funds away that could be available for -- for other claimants.

So I think there's a whole host of factors, but I hope that answers your question.

THE COURT: This is a common provision in most of the trusts, most of the DEP's?

THE WITNESS: Yes, this is fairly common.

THE COURT: And could you provide a rough estimate or percentage of the times when such permission is -- or consent is given? How often does this happen? It is the norm, for instance --

THE WITNESS: I don't think it's --

THE COURT: -- or the exception?

THE WITNESS: I think it's the exception.

THE COURT: The exception?

THE WITNESS: Yes.

(Pause)

BY MR. HARRON:

Q Mr. Fitzpatrick, is it fair to say that one of the factors that you'd consider in being asked to consent on passing a claim through to insurance is the quality of the claim? Said other -- said differently, is it fair to say that the best claims, the ones of the highest value and with the most persuasive evidence, are the ones you're most likely to allow to pass through to insurance?

MR. CALHOUN: Objection.

THE COURT: Leading?

MR. CALHOUN: It's leading and it's compound.

THE COURT: It's sustained.

BY MR. HARRON:

Q What types of claims are you most likely to pass through to insurance?

A Obviously, the stronger --

MR. CALHOUN: The objection has already let him --

A -- the stronger the claim the more likely it is that we'll allow it to pass through to insurance.

THE COURT: Why is that?

THE WITNESS: Because there's a greater chance of recovery that they would have.

THE COURT: For the claimant?

THE WITNESS: For that claimant, yes.

BY MR. HARRON:

Q Does the consent provision allow you to protect the future claimants?
A I'm sorry, there was a bit of a --
Q Does the consent provision allow you to condition recoveries in a way that could protect the interest of future claimants?
A Sure. You can -- you can put any condition on your consent that you -- that you wish.

For example, you can say that one-half of any recovery has to go into a reserve that the trust will hold for other claimants or -- there's no end to the kind of conditions you can attach to the consent.

THE COURT: Who specifically is making that decision?

THE WITNESS: That's made by the trust, the trustees, but they also must have the consent of the Trust Advisory Committee and the FCR, so it's a tri-party body.

BY MR. HARRON:

Q Mr. Fitzpatrick, I may have misheard you when the Judge asked you a question, but did you say that this provision is common in other TDP's, the insurance pass through?
A I thought I did and I -- now I don't know that pass through's are common. To be honest with you I just don't know the answer to that question, Judge, how common they are.

THE COURT: You've had them in prior trusts?

THE WITNESS: I certainly think so. It's definitely

-- it's really not a big issue.

THE COURT: But the reason it's included in this agreement is to -- is it fair to say is to aid future victims or a certain group of future victims?

THE WITNESS: Yes, I think that's fair to say.

THE COURT: You can't object to a leading question of the Judge. Sorry.

UNIDENTIFIED COUNSEL: I wasn't going to this time.

BY MR. HARRON:

Q Just a few more questions on this provision. In your experience is it -- is it likely that the higher value claims would be the ones that would tend to avail themselves of this pass through?

A Yes, I think that's correct.

Q And the lower value ones wouldn't have an economic incentive to do so?

A Yes, I think that's right.

Q Now, I'd like to move on to Section 6.4 of the TDP.

A Sure.

Q Can you briefly explain Section 6.4 to the Court?

A That's just simply making a decision to require a filing fee for this particular trust to discourage meritless claims -- from making claims against the trust and causing the trust to spend money needlessly when that money could be used for victims.

It's at a relatively modest $50 right now, which is really not high enough I don't think, to discourage a truly meritorious claim, but it would cut out the things like -- that do happen like all the inmates of Joliet Prison file claims with a trust in Illinois because they've got a couple of jailhouse lawyers with nothing else to do but time on their hands and so that's the intent.

Not many trusts have filing fees. A few do, so it's a bit unusual, not terribly unusual.

Q Thank you, Mr. Fitzpatrick. Excuse me. I'd like to address a few provisions in the trust agreement. I'm almost finished, Your Honor.

THE COURT: All right.

MR. HARRON: Do you have a copy of the trust agreement?

THE COURT: Yes, I do.

(Pause)

MR. HARRON: And this -- this was a relatively new addition to the trust agreement, Your Honor. I'm not -- I'm not certain it's going to show up in your version. I hope it does.

BY MR. HARRON:

Q Mr. Fitzpatrick, can you explain to His Honor the purpose of the billing guidelines referenced in Section 3.3©?

A Sure. Let me -- these are simply designed to help the

trust control its administrative expenses and conserve valuable resources for claimants and not see them go out the door in the way of expenses.

In these trusts a dollar is a dollar. There's no indemnity defense or indemnity administration kind of a breakdown. So if you waste a dollar on a needless administrative expense it's a dollar that is not available for claimants, so this is just intended to control the administrative expenses of the trust.

Q Do any of your other trusts have mandatory billing guidelines?

A We're working on it.

Q And, finally, Mr. Fitzpatrick, would you direct your attention to Section 4.5 of the trust agreement?

A Of the trust agreement? Yes.

Q What is the annual retainer paid to the trustee here?

A The trustee in this case is paid an annual retainer of only $25,000, which means that he's the lowest trustee I've seen yet anywhere in the asbestos world. It's an extremely modest amount. He can bill against that as I understand it. Yes.

THE COURT: So it's not a flat fee?

THE WITNESS: No, it's -- well, it is a flat fee if he -- yes, but he can also bill against it and he can -- he can incur more than $25,000 of expenses, but he --

THE COURT: Oh, I see, it's a retainer?

THE WITNESS: Yes, it's a retainer.

BY MR. HARRON:

Q And what's the hourly rate for the trustee here?

A $500 per hour and then 250 an hour for travel.

(Pause)

MR. HARRON: May I have one moment, Your Honor?

THE COURT: Yes.

(Pause)

MR. HARRON: Your Honor, that concludes our direct examination. I'm prepared to tender the witness.

THE COURT: All right.

MR. HARRON: Thank you, Mr. Fitzpatrick.

THE WITNESS: You're welcome. Thank you.

(Pause)

CROSS EXAMINATION

BY MR. CALHOUN:

Q Good afternoon, Mr. Fitzpatrick. George Calhoun for the North River Insurance Company.

A Good afternoon, Mr. Calhoun.

Q Good to see you again.

(Pause)

BY MR. CALHOUN:

Q Mr. Fitzpatrick, I'm going to ask you a few questions about the testimony you just gave and then some questions about

your declaration and the TDP that we've just gone over this afternoon.

At the beginning of your testimony you commented on when you worked at Asbestos Defendants that you liked to keep settlements confidential. Do you recall that testimony?

A Yes, the names were actually the Asbestos Claims Facility and the Center for Claims Resolution.

Q Right.

A Yes, the defendants -- all asbestos defendants I've ever seen want to keep their settlements confidential.

Q And typically you see the same law firms bringing claims against defendants over and over and over, right?

A There is a great deal of that, yes.

Q Right. And so they know what their settlements are with prior claimants that they may have brought against the company, right?

A They know of their own settlements, yes.

Q And that might be hundreds of thousands of settlements for some defendants?

A Yes.

Q And they may actually talk with other plaintiff lawyers from time to time too?

A Quite possibly, yes.

Q All right. One of the things you mentioned also -- and we talked about this -- also is that there is a payment percentage

in the TDP that needs to be derived. Do you recall that testimony?
A Yes.
Q All right. And that hasn't been done yet, right?
A That's correct.
Q All right. And one of the things you'll need to do to derive that payment percentage is to prepare some sort of estimate of future asbestos claims, right?
A Yes.
Q All right. And that work hasn't been done yet, has it?
A No.
(Pause)
BY MR. CALHOUN:
Q You also testified that you believe the contributions of the Hinden's with respect -- were fair and equitable with respect to future claimants. Do you recall that?
A Yes.
Q Okay. And in making that decision you said you relied on consultation with the your financial advisors and your attorneys, is that right?
A That's correct.
Q Did you conduct your own analysis of whether or not the Hinden contribution was fair and equitable?
A I conducted my analysis along with my financial advisor and my attorneys.

Q And did you rely on that information in making -- reaching that determination?
A Yes.
Q Okay. And what did the financial advisors tell you about the Hinden contribution?
A I don't recall exactly what they said, but basically that it seemed to be an adequate contribution for -- from them and that more -- more concerned to me that he thought they had the resources to pay that amount.
Q So the financial -- your financial advisor that you shared with the ACC was concerned with the Hinden entities ability to make that contribution?
A It's one of the things we asked him to look at, yes.
Q And what did your lawyer tell you about the Hinden contribution that enabled you to make -- determine that it was fair and equitable?
MR. HARRON: I object, Your Honor. He's asking for attorney/client privileged information.
THE COURT: Mr. Calhoun?
MR. CALHOUN: He's put it at issue, Your Honor.
MR. HARRON: Your Honor, his testimony was that he consulted with his advisors in reaching conclusions. I don't believe that testimony puts at issue every bit of legal advice. Every board trustee always speaks with their lawyers. It can't be the case that puts at issue every bit of legal advice they

receive if he's not relying on any specific legal advice that we gave him. He's not citing any specific legal conclusion.

THE COURT: Objection sustained.

BY MR. CALHOUN:

Q Are you aware of any asbestos claims that have been made against any of the Hinden's on account of products for which Duro Dyne has responsibility?

A Against the Hinden's as individuals?

Q Against any of the entities who are making the Hinden contribution.

A No, I'm not aware of any.

Q You also testified about the claims payment ratio. Do you recall that testimony that 90 percent goes to mesothelioma?

A Yes.

Q Are you aware of what percentage of indemnity dollars went to mesothelioma victims prior to the bankruptcy?

A No, I'm not.

Q Would it surprise you that the vast majority of compensation already went to mesothelioma -- mesothelioma victims?

A I would find that a little surprising, yes.

Q All right. And you're aware, are you not, that in the tort system claimants who have unimpaired asbestos diseases for the most part are not compensated, correct?

A I don't think that's correct at all.

Q Sir, you're not -- are you aware of inactive dockets that exist in some states?
A Yes, I'm the inventor of the inactive docket.
Q And what happens with an inactive docket?
A In an inactive docket a claimant who is marginally impaired goes on an inactive docket so that he's not barred by the statute of limitations and he remains on that docket unless and until he contracts an asbestos-related disease.
Q All right. So if you're on the inactive docket and you don't get sick you're not going to get paid, right?
A That's correct.
Q In fact, most cases that go to trial are mesothelioma cases, right?
A I've never seen a study that said that. I would tend to doubt it. Defendants, as a general rule, don't like to have to try mesothelioma cases.
Q Do you know one way or the other?
A No, I've never seen that study. I do know what we -- what we did at the Asbestos Claims Facility and the Center for Claims Resolution.
Q Of that 90 percent claim ratio how much goes to insurer claims?
A Of the 90 percent that's earmarked?
Q Of the claims ratio where do insurer claims come in?
A The trust does not make insurer claims -- pay insurer

claims.

Q So they get nothing?

A Not from the trust in terms of monetary value.

Q Now, you mentioned that there might be different compensation for different members of Class 7. Do you remember that testimony?

A I don't ever recall using Class 7 in my testimony.

Q Those are the claims that are channeled to the trust.

A Repeat the question, please.

Q Do you remember testifying earlier this afternoon about how there would be different compensation for different claimants who were channeled to the trust?

A Yes.

Q All right. So a person with mesothelioma might be eligible for up to 140,000 and a person with pleural disease isn't -- or asbestosis isn't going to get paid, is -- is that right?

A That's right.

Q Okay. And those people would be paid differently in the tort system in all likelihood wouldn't they?

A Sure.

Q And that's -- because that's based on the severity of their disease, right?

A Yes.

Q But they all have an opportunity to get paid in some form

or fashion, right?
A In the tort system?
Q In the trust or in the tort system?
A No, in the trust only the disease category, as I have testified to, get paid.
Q Well, anybody can go bring a suit in the tort system, right?
A Yes.
Q It doesn't matter -- you don't have to get permission to bring the suit in the tort system, right?
A No, anybody can sue in the tort system.
Q Right. So anyone can go in the tort system and they can get a judgment, is that right?
A It's possible.
Q Right.
A Yes.
Q And if they want to collect on that judgment then they have to come back to you and say, hey, we want to collect on this judgment, is that right?
A Let's back up. You were talking about the tort system a minute ago.
Q Right.
A Are we talking the tort system or the trust?
Q Both. Section 4.13 of the plan.
A Yes.

Q Let's turn to that. Do you have the plan in front of you?
A No.
Q We'll get that for you.
(Pause)
MR. CALHOUN: May I approach, Your Honor?
THE COURT: Yes.
THE WITNESS: Thank you.
MR. CALHOUN: And just for the record, this version of the plan is perhaps one or two trailing the changes that were made this morning and last night, but I don't believe there are any subsequent changes to Section 4.13.
BY MR. CALHOUN:
Q This is the provision, is it not, that allows a claimant to bring a claim of the tort system, and it provides among other things, "Channeled asbestos claimant shall have the right to commence an action against the reorganized debtor and pursue their claims in the tort system to obtain the benefit of asbestos insurance coverage," and it goes on from there.
Are you familiar with that section?
A I am, but give me a minute to read it and make sure it's current. All right. What is your question?
Q That's the provision of the plan that allows claimants to pursue their claims in the tort system, right?
A Yes.
Q Okay. And that's not condition with your consent, is it?

A It does not appear to be, no.
Q In fact, can you turn back to the TDP, please, Mr. Fitzpatrick, and turn your attention to Section 5.10.
A Do you have the TDP?
Q Do you not have them up there still?
A Is it part of the handouts?
Q If you turn to Tab 2, that's the TDP without the last change which we'll talk about that in a minute.
A In what section was it?
Q 5.10, it's on Page 34. So under this provision, isn't it right that for an asbestos claimant to bring an action against a reorganized debtor, all that this requires they do is tell the Trust about it?
A That's what this appears to say.
Q All right. And then if -- once they've done that, if they then want to exercise their rights under Section 4.14 of the plan, which is to bring an action against insurer to actually collect on an amount, then that would implicate Section 5.11 of the TDP and they would have to get your consent. Is that right?
A Right. Well, maybe could you repeat that question again?
Q Right. So any tort claimant can bring a claim as long as they give you notice. I think that's what we've established 5.10 and 4.13 say.
A That's what it appears to say.

Q All right. So then before they can then collect on whatever judgment they get in that case they would have to come to you and get your consent to do that under 5.11 of the TDP in Section 4.14 of the plan?
A Let me just -- I have to check Paragraph 4.14.
Q Take your time.
(Pause)
A You're on the plan? I have to go back to the plan.
Q The plan is 4.14 and the TDP is 5.11.
A Right.
(Pause)
Q All right. Can you show me in the plan exactly where this verbiage which you're referring to?
A Sure.
THE COURT: If it helps, he's referring to Page 31 of the plan, Section 4.14.
MR. CALHOUN: Your Honor, if I may, I'll just approach with the page?
THE COURT: Sure. All right, that's fine.
THE WITNESS: All right, this is 4.14. And your question about 4.4 -- 4.14 was what?
BY MR. CALHOUN:
Q That's what -- that's the provision that allows a claimant to actually access the insurance proceeds, right?
A With the permission of the --

Q Right. So once -- they can bring their action, and then if they get a judgment then they could come to you and say, hey, I want to get paid, is that okay, is that right?
A That appears to be correct. Correct.
Q And would that also be true if they were to seek to settle with a non-settling insurer? So they exercise their right under -- assume they exercise their right under Section 4.13, and the insurer says, hey, that's a great claim, but let's resolve this, would they be allowed to settle their claim?
A This does not appear to address that situation.
Q And would the Trust allow the non-settling insurer and the asbestos claimant to settle claims if they thought it was in their best interest to do so?
A Yeah, I presume so, yes.
Q All right. And then even if it was a very large settlement would the Trust say, oh, we don't want to approve that because that's going to take too much of the insurance proceeds?
A No. Maybe you misunderstood my answer. I said I thought the Trust would allow them to settle with (inaudible) not settle each --
Q Okay. And that's irrespective of the amount of any settlement?
A Well, I think there's -- everything is relevant. I mean I assume there's some choke point somewhere.

Q All right. And if you look at Section B -- excuse me, 4.14A, this is the judgment reduction provision in Section 4.14. Are you familiar with this provision?
A Yes, I believe so.
Q Did you have any assistance -- any role in the drafting or inclusion of this provision?
A I did not personally.
Q And I guess before I get into this, you testified earlier that you thought that this sort of opt-out was common, and then I think you retracted that a little bit. What other cases, if any, are you aware of that had this sort of right to pursue non-settling insurers?
A I'm not able to name them by name.
Q Can you think of one?
A I'd have to go back and look at all the documents. I'm just not prepared to do that today.
Q Sitting here today you're not aware of any other case that has the same sort of provision allowing the pursuit of non-settling insurers?
A I'm not aware -- unaware, I just haven't looked at this. This never come up before.
Q So it's fair to say that it's not common if it's never come up before, isn't that right?
A No, that's not fair to say either.
Q Are any of the Trust that you've worked for, do they have

a similar provision?
A Again, I'd have to go look, I'm not sure.
Q Wouldn't that be something you would know as a trustee of a Trust whether or not claimants could pursue claims outside of the Trust?
A Well, the Trust that I'm -- the Trust I'm a trustee of?
Q Right.
A There's two trusts.
Q And do either of them have similar provisions?
A No. One is -- both already had fully settled insurance situations, so it wouldn't make any sense in that since it's kind of a -- there were no non-settling insurers in either one of those.
Q All right. So looking at this -- taking you back to Section 4.14 and the judgment reduction provision, if a claimant were to bring a claim against an insurer, in this case I guess it would be my client, this provides them with a right to reduce the amount that they would have to pay by any judgment establishing a contribution claim.
Do you -- how do you understand this provision to work?
A When you use pronouns, allow them, by they you mean your client?
Q I'll just make it simple. How do you understand this provision will work?

A Well, generally if there is a judgment against a non-settling insurer and that judgment would be reduced by the amount of any contribution claims that the non-settling insurer may have against the contributing insurers or settling insurers.

Q And would this provision include claims that the non-settling insurer has against Duro Dyne?

A No, that's not my understanding. Contribution claims that you have against other insurers.

Q All right. So just the other insurers, not -- if they had a contribution or other right against Duro Dyne, this provision doesn't provide for a setoff of that?

A I'm not absolutely sure about that, but I believe that's the case.

Q All right. And is it your understanding that the non-settling insurer can only take advantage of this provision if they obtain a judgment specifying the amount of contribution?

A Generally that's true, although the non-settling insurer also gets a benefit from this provision in settlements because a claimant's attorney who is aware of, you know, what's involved is likely to take less in the way of settlement for a non-settling insurer in the tort system because of this provision, so they do enjoy an indirect benefit.

Q Why do you say that?

A Just imagine if you were a plaintiff's attorney and you had to jump through all these hurdles against your clients, you would be likely to -- in order to get a judgment, you would be more likely to settle your case for a cheaper amount. Q Well, is it equally likely that they would say I'm not going to settle unless you agree to pay me X?

A Perhaps.

Q Who does this provision envision the non-settling insurer bringing in an action in order to get a judgment establishing a contribution claim?

A Well, it has to be an action against the non-settling insurers.

Q Is it your understanding under this plan that if the settlements that have been filed and for which the debtor seek approval are approved, and the plan is confirmed that we would have -- that a non-settling insurer would have the ability or the right to sue the settling insurer?

A No, that's true, they would not have the right to sue the settling insurer.

Q And, in fact, we would be enjoined from bringing a contribution claim against the settling insurer, wouldn't we?

A Yes.

Q Right. So isn't it fair to say that this provision requires an impossibility that we obtain a judgment against someone against whom we are enjoined?

A Well, that's not -- and I have to confess to you that the insurance portion of this is not my forte. I am not an expert in asbestos insurance, that's why we hire asbestos insurance counsel. So I'm really not the best person to answer your question one way or the other.
Q All right. So you understood these provisions were designed in part at least -- or you understood the purpose of these provisions was to put leverage on the insurers, right?
A It's my understanding that that was one of the purposes, yes.
Q And when I asked you the question at your deposition a few months ago, that's exactly what you said. The purpose of this was to put leverage on the insurer, isn't that right?
A Yes.
Q All right. And one of the ways it does that is that anyone can bring a claim, and when that happens insurers would presumably defend that claim, is that right?
A Again, to the best of my knowledge, yes.
Q All right. And if they -- even though they defend that claim these provisions would prevent the insurer from settling that claim, wouldn't they?
A Well, like it still says in the claim, if they wished.
Q But they would have to -- you would have to agree to that, wouldn't you?
A Yes.

Q So any settlement wouldn't be between the insurer and the claimant, it would be between the insurer, the claimant, the Trustee, the TAC and the FCR?
A The Trustee, the TAC and the FCR would have to agree to it, yes.
Q All right. And is it your understanding -- are you familiar with the cooperation agreement that has been submitted to the Court today?
A I haven't had a chance to look at it as well as I will look at it, but, yes, I'm generally familiar with it.
Q All right. And that provides that the debtor will submit defense related information to the Trust, correct?
A Yes.
Q So that the Trust could extend their claims out there. It could cooperate in the defense of claims, is that it's purpose?
A It's to help the Trust defend itself against -- state your question again.
Q What's the purpose of the cooperation agreement?
A Generally it's so that the knowledge as the producer, in this case, Duro Dyne, has is transferred to the Trust so that the Trust can you use it in handling claims.
Q Taking you back to the judgment reduction provision, you understand, do you not, that North River would have contribution claims against other insurers for defense cost, correct?

A It's possible.
Q Right. And those claims are disputed, but assuming that those claims were valid, those contribution rights would accrue with respect to each claim that North River defended, correct?
A I would presume that that's the case, yes.
Q All right. And is it your interpretation of this provision that we would -- that North River would be entitled to reduce any amount that it would pay by such defense cost contribution rights?
A No, that's not my understanding of it.
Q What is your understanding?
A Of what?
Q How does this provision taken into account North River's claims for defense costs against other settled insurers?
A I don't believe that it does.
Q All right. So what happens to those claims?
A I don't know. I would have to study these documents and ask someone.
Q All right. Well, you've -- in your declaration you state that you believe that those -- that the various insurance settlements are fair and equitable, correct?
A The insurance of them, yes.
Q All right. And among other things that those settlements do is they purport to bar claims against those settled insurers, right?

A Right.

Q All right. And you acknowledge that there are claims, as few as they may have, that North River has against those insurers, right?

A I suppose so, yes.

Q Right. And what I think I'm hearing you say is that --

MR. HARRON: I object, Your Honor. He's misstating the testimony that's in the declaration. Mr. Fitzpatrick has not testified that the insurance settlements are fair and equitable as to North River.

THE COURT: Do you want to read the document?

MR. CALHOUN: I'll get there, Your Honor, by why don't we turn -- I'm following their direct so I'm a little bit out of order.

BY MR. CALHOUN:

Q Why don't you turn to Paragraph 40 to 41 of your declaration. Excuse me, 41.

A May I have my declaration, please?

Q Oh, you don't have it?

A For the second time, no.

Q First time I've asked you about your declaration.

THE COURT: All right. This is P-7.

BY MR. CALHOUN:

Q Look at Tab 6 of the binder, please. I believe this was marked previously P-7

THE COURT: P-7.
A And that is Tab 6. What paragraph did you want?
Q 41.
A Yes.
Q All right. And did you write this sentence in Paragraph 41?
A Let me read it. Yes.
Q All right. In that you state that you believe the receipts of the settling asbestos insurance junction -- settling asbestos insurers is fair and equitable with respect to persons that might assert demands.
Based on -- is it your position that the settlement is not fair and equitable to insurers -- non-settling insurers specifically?
A No, all I'm saying is that settling insurers are settled with a fair receipt of benefits in return.
Q All right. You say here it's fair with respect to persons that might assert demands.
A Right.
Q Right. And you believe that the contribution they make is fair with respect to someone who might make demands, is that right?
A And by "they" who -- would you define "they" please?
Q The insurers, the settling insurers?
A Settling -- yes, that's correct.

Q And did you consider the amount of limits that were available under those policies?
A I did, yes.
Q And did you consider the rights of other insurers as to those insurers, what the value of those rights was?
A I can't say that that was high on my list of priorities, no
Q So that's a no?
A That is a no. The insurers are not my clients in this case.
Q I'm trying to find out if you are -- you're not telling the Court, are you, that these settlements are fair and equitable as to North River?
A Which settlements?
Q Any of the insurance settlements.
A I'm not saying they are or they aren't.
Q All right. In this case the claims of North River, the Class 7 claims of North River has been classified in Class 7, and I understand there was a change last night to make clear that those claims are not indirect asbestos claims. Are you familiar with that change?
A No, I'm not.
Q Okay. Do you consider the asbestos Class 7 claims of North River to be channeled asbestos claims?
A I don't know.

Q And do you understand -- would you include the claims of North River that arise in the future with respect to defense cost that occur in the future to be demands?
A I would not consider them to be demands, no.
Q In your view demands only means actual individual tort claimants?
A That's correct in my view.
Q So it doesn't matter in your view the nature of claims that are channeled to the Trust in the future. Your view is you only represent the rights of individual asbestos claimants?
A That's correct. I don't represent insurers.
Q Can you look at Paragraph 13 of your declaration, please?
In this paragraph you state that YCST and I conducted due diligence in connection with a number of things. And I take it YCST is your counsel, Young Conaway, correct?
A That's correct.
Q All right. And looking at this list one of the things you said you reviewed was the likelihood, the potential value of the future asbestos claims demands against the debtors and the protective parties. Do you see that?
A Yes.
Q All right. And I think you've already testified you didn't retain any expert to conduct an estimation of those claims, did you?
A Not yet, no.

Q All right. And did you personally do anything to consider the likelihood and value of future asbestos claims?
A Sure.
Q What did you do?
A Looked at the past history of Duro Dyne, where they've been sued, who had sued them, things of that nature.
Q All right. And based on that, you would agree with me, would you not, that this is a relatively small asbestos case?
A As asbestos cases go, yes, I would agree.
Q All right. It's a relatively minimal claims history?
A Well, it depends on from whose perspective you're talking.
Q That's always true.
A From my perspective, yes, because I'm used to many cases, but I'm certain Mr. Heimann would have a different opinion there.
Q All right. And did your counsel do anything to estimate the likelihood and value of future claims upon which you relied in offering your testimony?
A Again, using his prior experience in many many asbestos cases and looking at the history and the debtor, he did the same thing I did.
Q Was it fair to say that you attempted to eyeball the potential future likelihood?
A Yes, with the understanding that at the appropriate time we would hire a claims expert.

Q Sitting here today you don't have an opinion on the actual likely value of future asbestos claims?
A For Duro Dyne?
Q For Duro Dyne?
A I would want input from an expert which we will do when we start formulating the payment percentage.
Q So does that mean sitting here today you do not have an opinion on the future value of asbestos claims against Duro Dyne?
A Not one way or the other today.
Q In Paragraph 14 of your declaration among other things you state that your due diligence concluded a review of matters relating to the debtor's insurance assets and their availability to pay asbestos claims and demands.
Are you familiar with your statement there?
A Yes.
Q And what did you do to evaluate the debtor's insurance assets?
A For that we obtained special insurance counsel. I don't remember how much we used her for this particular task but we also drew upon our own experience in analyzing Duro Dyne's situation.
Q Unpack that for me a little bit? What do you mean "we analyzed" based on your own experience?
A Well, both my counsel and myself have numerous cases where

we've looked at the insurance picture of a given defendant and the likelihood of recoveries and things of that nature, so it's just using our prior experience.

Q And in this case what did you view the potential limits available to asbestos claimants to be?

A That I don't recall, I'd have to go back and look at some things.

Q In the debtor's disclosure statement they've stated they believe that there was potentially up to $57 million insurance. Is that close to how you valued it?

A I don't recall.

Q All right. You also stated in Paragraph 14 that you reviewed the debtor's business. Who did that review?

A That was done by the financial experts or financial consultants.

Q Okay. And who are the related parties that you refer to in Paragraph 14?

A I think it was the Heimann's was my belief.

Q All right. To your knowledge was Duro Dyne profitable in 2016?

A I believe it was.

Q In 2017?

A Yes.

Q In 2018?

A Again, I believe it was.

Q And 2015?
A I don’t recall.
Q And all those years it was paying for coverage litigation for insurers, right?
A I don’t know.
Q All right. Were you aware of whether Duro Dyne ever made any payments for defense costs prior to the bankruptcy?
A I’m not aware one way or the other.
Q All right. Do you have any reason to believe that if the company were not to have filed bankruptcy, that insurers would have stopped defending the debtor?
A I have no information on that one way or the other.
Q All right. You understand that the insurers were providing a defense in the Duro Dyne asbestos cases prior to bankruptcy?
A I do not understand that, no.
Q Do you have any knowledge of that one way or another?
A No.
Q All right. Do you have any knowledge about the sort of claims that the insurers made against Duro Dyne prior to the bankruptcy?
A Williams against Duro Dyne by the insurers?
Q Right.
A No, I don't have any information on that.
Q Okay. Did you have any understanding as to whether or not

they were asserting that Duro Dyne was liable for a portion of the defense and indemnity costs?

A I'm aware that that was said to be the case in some instance, yes. I don't know the particulars on it.

Q If -- if Duro Dyne had filed a Chapter 7 and decided to liquidate, would the -- in your experience, would the insurers still be obligated to defend and resolve asbestos claims?

A If Duro Dyne liquidated, --

Q Yes.

A -- would its insurers still be obligated to defend it in the tort system after it was liquidated?

Q Correct.

A I don't know the answer to that.

Q Don't know the answer. Have you ever considered that issue?

A No.

(Pause)

BY MR. CALHOUN:

Q Can you turn your attention back to the TDP for a moment.

A And which one is that in the binder?

Q I think this is P-2, I think.

THE COURT: It's marked P-2, --

MR. CALHOUN: Oh, in there it's Tab 2.

THE COURT: -- but not in the binder.

MR. CALHOUN: Tab 2 in the binder.

A I'll look here again, Charlie.
Q I direct your attention to Section 5.10 again.
A 5-1-0?
Q At the bottom of page 34 --
A Can you give me a minute here?
Q Sure.
(Pause)
A Okay.
Q This is again Section 5.10 of the TDP dealing with claims against insurers under 4.13 and 4.14 of the plan. Can you explain to me what the last sentence of Section 5.10 means?
(Pause)
A You're gonna have to give me a minute to read this, if you would, please.
Q Sure.
(Pause)
A It says what it says. I don't have any particular light I can shine on it more than you can by reading it.
Q Okay. Who drafted this provision, do you know?
A I'm not sure.
Q So if a non-settling asbestos insurer pays a judgment, the Trust will treat them as the holder of that claim, right?
A That's what it says, yes.
Q All right. And then this provision says that the tort claimant will then hold the Trust harmless against any and all

indirect asbestos claims that may be asserted against the Trust in connection with the litigation, including attorneys' fees and costs.

Do you understand that to mean that the tort claimant will indemnify the Trust if a settling asbestos insurer subsequently brings a claim against the Trust based on its payment of a tort claimant?

A I just -- as I told you before, I'm not sure. I don't know for sure.

Q And is there any situation in which a settling asbestos insurer would become a holder of an indirect asbestos claim?

A Again, I -- I don't -- I can't -- possibly, but as I -- I suppose it's possible, I just don't know.

Q Is there another reason that that language would appear in Section 5.10 of the TDP, which purports to be dealing with claims covered by policies issued by non-settling asbestos insurers?

A I don't know.

Q So you can't tell me today how exactly a non-settling insurer's rights would be treated under this provision?

A That's correct, cannot.

Q But you understand it, do you not, that under this TDP that non-settling insurers are not eligible to receive payment?

A Would you restate the question?

Q Do you have an understanding as to whether or not non-

settling insurers are entitled to any payment under this Trust Distribution Procedure?
A Again, I'm not -- it's something I haven't focused on. I can't imagine a situation where a non-settling insurer would be entitled to payment from the Trust, but I suppose anything's possible.
Q All right. You understand that North River filed substantial claims that have been classified in Class 7, right?
A I understand that, yes.
Q All right. And it's your understanding that those claims would be not -- not entitled to any payment by the Trust, right?
A I'm not positive.
Q Are you aware of the change that was made to the Trust yesterday in Section 5.5, I believe? Language was added that says, "Notwithstanding any provision in this TDP or any other plan document, because the non-settling asbestos insurers have received the benefit of certain credits and judgment reduction as set forth and subject to the terms and conditions of Sections 4.14 and 4.15 of the plan, any claim without qualifier of a non-settling asbestos insurer shall not be eligible for payment or compensation from the asbestos trust under the Section 5.5."
Are you familiar with that language?
A Yes, generally familiar with it.

Q All right. And do you believe that to be accurate, that there's no circumstances under which the Trust will pay claims of non-settling insurers?
A Well, again, never say never, but I -- normally I would not think the Trust would pay such claims.
Q Why not?
A Why should the Trust pay a non-settling insurer?
Q Well, they're claimants, are they not?
A They're insurers.
Q The debtors have classified their claims in Class 7. Did you agree with that classification?
A I didn't agree or disagree.
Q All right. So you acquiesced to the classification of the insurers' claims in the same class with asbestos claimants and demand holders, is that right?
A I did, yes.
Q Okay. And so having acquiesced, you now take the position that they should not be eligible for payment?
A I'm taking the -- yes. The two don't necessarily go hand -- I mean I'm not --
Q And you think they're not eligible -- that they don't deserve to be paid simply because they're insurers?
A Normally a trust does not pay insurers. Insurers pay the trust.
Q All right. It's true in most cases, isn't it not, that

insurers don't have claims that they can assert against their insured?

A Sometimes. It's true in many cases.

Q And in most cases, to the extent that an insurer does have claims, they're not channeled to the trust, are they?

A No, they're not.

Q All right. And if they are channeled to the trust, it's normally in situations where they would be paid in full, right?

A That I don't know.

Q Now, do you have any understanding as to what would happen to -- outside of this bankruptcy, if North River had a contribution claim against Hartford, for example, is there any limitation other than Hartford's solvency on North River's ability to obtain payment from -- from Hartford?

MR. HARRON: Object, Your Honor. It's beyond the scope. It calls for speculation.

THE COURT: Sustained. Mr. Calhoun, before you move on, may I ask a question?

MR. CALHOUN: Sure.

THE COURT: I'm still, Mr. Fitzpatrick, a little confused. And I'm referring to Section 5.10, okay, and the last sentence that Mr. Calhoun had you read.

THE WITNESS: Yes.

THE COURT: Where it says that the -- essentially the tort claimant -- sorry, the sentence before that where it says

that the asbestos trust shall treat the claim of the tort claimant that has been satisfied by a non-settling asbestos insurer as being assigned to that non-settling insurer. If that -- if the assignment of that claim does not give rise to a payment as part -- under the trust, what is the purpose for assigning it the claim? If I'm understanding it correctly.

THE WITNESS: Give me a moment, Your Honor.

(Pause)

THE COURT: And let me rephrase it or add to that. So if an injured asbestos claimant would be entitled to a payment of $5,000 under the trust, and yet the non-settling insurer satisfied a judgment, does this provision bar the non-settling insurer from seeking payment of that 5,000 in lieu of some offset?

(Pause)

THE WITNESS: All right, this can't be that complicated. All right. We have a tort claimant who receives a judgment.

THE COURT: Right.

THE WITNESS: All right.

THE COURT: And that judgment is satisfied through not the insurance but by the non-settling insurer.

THE WITNESS: Right. So he's --

THE COURT: And this provision says that the non-settling insurer is assigned the claim, correct, against the

trust?

THE WITNESS: Yes.

THE COURT: I'm trying to understand what benefit is that? Why is that being done if they can't make a payment on that claim or receive payment on that claim? What does that assignment do for the non-settling insurer?

THE WITNESS: The purpose of paying any further amounts due on the claims of the assignees -- that doesn't answer our question.

THE COURT: And to take you off the hot seat, if you don't under -- don't know the answer and someone else can get the answer, somebody will tell me during the course of the confirmation hearing. I just want to get to the truth.

THE WITNESS: Okay.

THE COURT: And to have an accurate understanding.

THE WITNESS: I think there are people better equipped to answer that than I am.

THE COURT: All right. Thank you.

THE WITNESS: You're welcome.

MR. CALHOUN: We'd like an answer, too. It doesn't make sense to us.

(Pause)

BY MR. CALHOUN:

Q Mr. Fitzpatrick, if you'd look at paragraph 21 of your declaration, please.

A In the declaration is which tab now?
Q Six.
A And the paragraph is?
Q 21.
A 21?
Q Yes, sir.
A Yes.
Q So you said in this paragraph that you believe that the permanent channeling injunction is necessary to secure the contributions by the debtors and other protected parties to the asbestos trust. By the other protected parties, were you referring just to the Hindens here?
A No.
Q Also including settling insurers?
A Yes.
Q And do you believe that the Trust is -- the injunction is necessary to secure the contributions by the debtors?
A I do believe that, yes.
Q All right. So that -- is your understanding that the debtors are obligated to pay claims against them outside of the bankruptcy? The debtors are already legally obligated to pay claimants who obtain a judgment against them, correct?
(Pause)
A Can you rephrase the question?
Q So you understand that the debtors are making

contributions to the plan, correct, to the Trust?

A The debtors, of course.

Q Right. And you understand that that's a contribution that they can afford to make, right?

A Yes.

Q All right. That's what you had your financial advisors evaluate, one of the things was, can they make these payments, right?

A Right.

Q Right. Outside of bankruptcy, they would still be obligated to commit their resources to paying valid claims against them, wouldn't they?

A I would presume so, yes.

Q All right. And the same is true for insurers, right?

A Well, it's apples and oranges, but I don't -- I don't understand where your question is going.

Q Outside of bankruptcy, the insurers would still be obligated subject to the rights under their contracts to defend and pay claims against the debtor, right?

A Yes.

Q Will you look at section -- paragraph 25 of your declaration, please? And I guess 26 also.

Under this structure, under the structure of this plan, is the Trust ever entitled to own 51 percent of the debtor's stock?

A Yes.
Q All right. Under what circumstances could the Trust own the debtor's stock?
A By default on the note.
Q All right. What would happen if the debtor defaulted on the note?
A The Trust would become entitled to 51 percent of the -- over 50 percent of the common -- of the stock of the debtor.
Q The Trust note is secured by a pledge of that stock, correct?
A Correct.
Q All right. So if the debtor missed a million dollar payment hypothetically, it would be able to sell that stock in order to satisfy that million dollar shortfall, right?
A That I'd have to look at the bond documents, which I haven't done, to know if that's possible. I highly doubt it, but --
Q Have you -- did you review the pledge agreement?
A Not the entire amount of the bond documents. I don't recall the pledge agreement right now. Yes, I took a look at it.
Q All right. And do you have any expertise in the Uniform Commercial Code?
A None in particular, no.
Q So is it your assumption that upon a default, the Trust

would simply own the stock?
A Well, I assume there has to be some sort of an affirmative step taken, but I'm not sure what that is.
Q All right. So isn't it right, in fact, that they would have to foreclose on that stock in exercising their rights as a secured creditor?
A I'm not positive one way or the other.
Q Okay.
A I know some stock would have to be taken.
Q All right. And -- so when you -- when you testified that under certain conditions they would be entitled to own a majority of the voting shares of the organized debtor, you hadn't actually examined the steps that would needed to be take -- taken for the debtor -- or, excuse me, for the Trust to own a majority share of the debtor's stock?
A Not at that time, no.
Q And sitting here today you haven't?
A That's correct.
Q All right.
A On that we had Young Conaway looking at it for me and their bond counsel.
Q And did they tell you that under certain contingencies, the majority of the voting shares of the organized debtors would be owned by the Trust?
A No, I knew that. That was -- it was obvious.

Q And how -- how did you know that? Because that's not what you just said.
A What I just said.
Q Under what contingencies? How would it happen?
A A default.
Q All right. In a default, what happens next?
A Well, that I don't know. I would have to check with them to see what you do next when they default.
Q All right. So when you testified to this, this is really your lawyers told you that this would happen?
A No, I --
THE COURT: Wait, wait, hold. Don't answer.
MR. HARRON: He's mischaracterizing the answer and mischaracterizing the document.
THE COURT: Sustained.
BY MR. CALHOUN:
Q Sitting here today, you can't tell me what steps would need to be taken in order for the Trust to own 51 percent of the stock, can you?
A No, but it's fairly easy to find out, if I need to find out.
Q Okay. You -- can you identify specified contingencies that would enable the debtor to own 51 percent of the stock?
A I didn't understand your --
Q Can you identify specified contingencies that would enable

the Trust to own the majority of the debtor's stock?

A A default on the bond.

Q Okay. The note is senior to the debtor's equity, is it not?

A I believe so.

Q And if the debtor defaults on the note, what would that tell you about the value of the equity?

A I'm not sure. I would have to consult with my lawyers.

Q All right. You're an attorney, aren't you?

A I don't specialize in bonds.

Q All right. But you are very familiar with the bankruptcy process, right?

A I have some familiarity with bankruptcy.

Q All right. You've been acting as a future claimant's representative in bankruptcies for a number of years, right?

A Yes.

Q All right. And you're generally familiar with a priority scheme, correct?

THE COURT: Do you have an objection?

MR. HARRON: A couple.

THE COURT: Okay.

MR. HARRON: This has been asked and answered. Two, he's badgering the witness. And he's asking him -- it's a -- it's a confusing and compound question to suggest what might happen -- it calls for speculation, what might happen to the

equity if there's a default on the note.

There could be a default on the note just because they decide not to put the check in the mail. It's entirely speculative what the value of the equities would be if there's -- if there's a failure to satisfy one of the conditions on the note.

THE COURT: In fairness to the witness, a default on a note doesn't necessarily correlate to anything on equity. We all know that. There has to be other -- other aspects.

MR. CALHOUN: That's what I'm trying to get --

THE COURT: So if you want to -- if you want to go into that --

MR. CALHOUN: I'm trying to get into these aspects, Your Honor, because one of the requirements obviously is that they show that under certain specified contingencies they're entitled to this, and that's what I'm trying to explore is, what those contingencies are and whether they be meaningful.

BY MR. CALHOUN:

Q So if there's a -- so in general you understand, do you not, that debt is a higher priority than equity, right?

A Yes.

Q Okay. And if the debtors are unable to pay the note, not that they forgot to mail the check, that would suggest, would it not, that the debtors may be insolvent?

A That would be one possibility, yes.

Q All right. And if the debtors were insolvent, their equity would be worthless, right?
A Possibly, yes.
Q And if the -- alternatively, if the debtors were solvent, do you have an opinion as to what their equity value is, sitting here today?
A No, I don't.
Q All right. All right. You'd agree with me today that Duro Dyne is a profitable operating company, right?
A At the present time, yes.
Q All right. And it has been for the past several years, right?
A At least for the past few years, yes.
Q All right. Other than the earn-out, this plan structure does not give the Trust an ongoing interest in the performance of the debtor, correct?
A The bond gives it an interest.
Q Well, that's a fixed payment, right?
A Yes.
Q All right. And are there any dividends that the debtor would ever have to contribute to the Trust?
A No.
Q All right. And if ten year from now -- ten years from now Duro Dyne had a profit of $20 million, none of that would go to asbestos claimants, right, other than what the bond payment

was?
A That's correct.
Q So the Trust's only interest is that the debtors remain sufficiently viable to continue to pay the Trust note and the earn-out, correct?
A That's correct.
Q Do you understand -- do you have an opinion as to whether or not the contributions to this Trust constitute an evergreen source of funding?
A I don't believe that they do, no.
Q All right. And do you have an understanding of what evergreen funding is?
A Sure.
Q All right. Can you explain that to the Court what that is?
A It's funding basically forever until the -- in the tort context, until the claims right out.
(Pause)
Q So by this plan, other than contributions from the debtor and the insurers, the only other source of funding is a $3 million contribution from the Hindens, correct?
A Yes.
Q All right. And you're giving up more than that in insurance limits, aren't you?
A I don't quite understand what you mean.

Q In your compromises and settlements with the other insurers, I don't know what the amounts are, but are you or are you not settling those claims for collectively more than $3 million under your view of the limits?
A I think those -- at this point, those insurance settlements are confidential. I can't comment on the amounts.
Q I don't want to know the individual amounts, I'm just saying collectively you're giving up more than $3 million in limits, aren't you?
A I'm not going to answer any questions about the amounts of the settlements with the insurers right now.
THE COURT: Mr. Fitzpatrick, I'm going to ask you to answer that question.
A Restate the question, please?
Q Under the settlements with the four insurers collectively, you're giving up more than $3 million in limits based on your view of the limits, aren't you?
A Yes.
Q Can you turn to page 32 of your -- or, excuse me, paragraph 32 of your declaration, please?
A Yes.
Q All right. So this -- this paragraph deals with your view of whether the Trust will be in the position to pay value and be in a financial position to pay channeled asbestos claims that involve similar claims in substantially the same manner.

You understand that North River's claims are channeled asbestos claims?
A No, I do not understand that.
Q Okay. How -- how are North River's claims -- they're Class 7 claims, right?
A You were classified as Class 7 for voting purposes, that's all I know.
Q Okay. And all Class 7 claims are channeled to the Trust?
A That I don't know.
Q So when you made this evaluation that you recorded in paragraph 32, you didn't consider the claims of North River in any way?
A I did not, no.
Q And one of the things you've said in -- in paragraph 33 is that the TDP are designed essentially that provide a fair treatment of claims. Do these TDP require asbestos claimants to provide evidence of their exposure to other products from other manufacturers?
A No, if they can -- they have to provide evidence, generally speaking, of exposure to a Duro Dyne product. Any Duro Dyne product can be compensated.
Q Is it common for defendants in the tort systems to want to know that information?
A Want to know what information?
Q What other exposures, asbestos exposures a claimant might

have?
A Yes.
Q And that information might provide evidence that would go to several defenses to a claim, right?
A Might.
Q All right. In the Trust -- you discussed earlier in your testimony that you're only aware of one debtor product that caused asbestos injuries; do you recall that testimony?
A I said I was only aware of one --
Q Right.
A -- product that is alleged to have caused injury.
Q And you have the ability to modify that, right? You can add a different product if you chose in the future?
A If the evidence -- yes. Yes, we could add additional products.
Q All right. And that would be done by you with the Trust Advisory Committee?
A Well, it would be done by the trustee with the consent of the -- of me and with the Trust Advisory Committee.
Q And the Trust Advisory Committee is comprised of asbestos plaintiffs' lawyers?
A Generally speaking, yes.
Q All right. Is there anyone currently nominated to serve on the Trust Advisory Committee who's not an asbestos plaintiff lawyer?

A Not that I'm aware of.
Q All right.
THE COURT: Mr. Calhoun, give me an estimate if you have --
MR. CALHOUN: Not very much longer, Your Honor.
THE COURT: All right.
MR. CALHOUN: I'm pretty close to wrapping up.
THE COURT: Because I'm going to want to take a break before we continue. But I'll let you finish up.
BY MR. CALHOUN:
Q Mr. Fitzpatrick, can you look at paragraph 37, please, of your declaration?
A Yes.
Q You stated that you believe that the asbestos trust agreement and Trust Distribution Procedures will ensure that future demand holders will be treated in substantially the same manner as other similar channeled asbestos claims.
In making this statement, did you consider the claims of North River in any way?
A No, I did not.
Q And did you compare the treatment of claims -- present claims in the tort system with future claims in the tort system?
A That I don't understand at all.
Q Okay. Do you have any reason to believe that outside of

bankruptcy, claims in the future would not be treated similarly to present claims?
A In the tort system?
Q Yes.
A Well, you're asking me to predict what's going to happen in the asbestos tort system, which is pretty hard to do. I don't have any reason as we sit here today to think that they would be handled differently, but I can't predict the future. I don't have a crystal ball, so I can't swear to that.
Q Mr. Fitzpatrick, are you aware of the credits or judgment reductions that would be provided to non-settling insurers under the terms of the Trust Distribution Procedures in this case?
A Generally aware, yes.
Q All right. And what sort of claims do those provisions protect? Do they -- let me unpack that a little bit for you. Do those provisions allow North River to deduct from any liability it might have its defense contribution claims against other insurers?
A I don't think so, no.
Q All right. And if North River doesn't have a -- defense claims that don't result in judgment or result in dismissals of those claims, does North River have any recourse against the Trust for the debtor's share of any defense costs that it incurred in connection with those dismissed claims?

A Could you repeat that question, please?
Q Yes. Does -- does North River have any recourse against the Trust for the debtor's share of defense claims -- or defense costs, excuse me, in connection with claims that are dismissed without payment?
A Not to my -- I wouldn't think so.
Q Thank you, Mr. Fitzpatrick.
A You're welcome.

THE COURT: All right. Thank you. Mr. Hausman, are you going to have cross?

MR. HAUSMAN: Your Honor, I know you had mentioned taking a break. I would like to take a break to give you an answer on that.

THE COURT: Sure.

MR. HAUSMAN: I can tell you my cross will be -- will not be extensive, if any.

THE COURT: All right. I'm just trying to get a gauge on whether I'm asking my court recorder to stay and for how long.

On redirect, what do you anticipate?

MR. HARRON: Very little, Your Honor, subject to Mr. Hausman.

THE COURT: All right. Kathy, what are your -- you want to stay?

THE CLERK: Yeah, I'll stay.

THE COURT: Really?

(Laughter)

UNIDENTIFIED COUNSEL: He looked really disappointed, by the way.

THE COURT: All right. I'll come back out at 4:30 and we'll -- we'll plow through. Do you need more? You need more time?

MR. HAUSMAN: 10 -- a solid 10 -- let's just say 15 minutes so I won't --

(Off the record at 4:24 p.m. to 4:45 p.m.)

MR. HAUSMAN: I apologize, Your Honor, but I will say the extra minute or two I took resulted in no cross-examination for the witness.

THE COURT: Well worth that time.

(Laughter)

THE COURT: If only everyone would learn that lesson.

MR. HAUSMAN: That's not to say I don't have argument to make, but --

THE COURT: All right. Well, thank you, Mr. Hausman. Then redirect. There's no one else for cross; redirect.

MR. HARRON: I'll be brief, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. HARRON:

Q Hello again, Mr. Fitzpatrick. Just briefly, I wanted to focus you back on the question of other exposures. I believe

it's your testimony that the Duro Dyne TDP only requires evidence of exposure to Duro Dyne products?
A Correct.
Q In your experience, in settling claims for other defendants for settlements, do those defendants want evidence of exposure to their product or a full exposure history?
A For individual defendants, they want evidence of exposure to their product. If you have an organization like I had, like the Center for Claims Resolution, then evidence of exposure to one was the same thing as exposure to all. But the run-of-the-mill tort defendant wants evidence of exposure to its product before it settles a case.
Q And I just wanted to apologize to you on the record for 5. -- is it 5.10? I'm not going to ask you any questions about it, but people on our side of the table are also scratching our heads. We'll be reporting back to the Court on 5.10.
A Thank heavens.
(Laughter)
MR. HARRON: I have nothing further, Your Honor.
THE COURT: Wow. All right then. Mr. Fitzpatrick, I thank you. You may step down.
THE WITNESS: Thank you.
THE COURT: Let's talk about where we go from here. Obviously another day. We return tomorrow.
What do you anticipate for tomorrow, as far as

witnesses?

MR. PROL: Judge, the only other witness we would have would be Mr. Rossetto, the president of the company, to testify with regard to issues concerning the escrow requested by Smart, if that claim is not settled. And I'm looking to Mr. Rever to see where we are.

MR. REVER: I'm still here.

MR. PROL: Are we settling?

MR. REVER: Oh, where are we? I'm told it's close, very close.

MR. PROL: Well, we're closer than we were this morning.

THE COURT: So you're getting this. We might -- any other testimony for any of the plan proponents, apart from that discreet issue?

UNIDENTIFIED COUNSEL: That would be the only other testimony.

THE COURT: All right. Mr. Calhoun, will you -- or the U.S. Trustee, will you be introducing any witnesses?

MR. CALHOUN: Your Honor, we will be calling Mr. Scarcella, and we may or may not be calling Mr. Hinden. We haven't made the final call on that yet.

THE COURT: All right. And --

MR. HAUSMAN: We will not be calling any witnesses, but we would like the opportunity for not more than a half hour

to give oral argument, not counting back and forth --

THE COURT: Oh, I -- I anticipate oral argument.

MR. HAUSMAN: Oh, okay. I just --

THE COURT: Summations are, you know, certainly bringing it all together for me.

MR. HAUSMAN: I just didn't want any misunder -- no witnesses, Your Honor.

THE COURT: Okay. I'm just looking to see what we're going to need for a factual record. So it would seem to be tomorrow we should be able to complete the factual record, and then we'll hopefully see what we have as far as time for any arguments or other issues. At that point in time, the Court will consider addressing the ceiling and the other issues. So we'll -- we'll see where we're at. All right? Then I will stand adjourned. And 10:00 work for everybody?

UNIDENTIFIED COUNSEL: Yes, Your Honor.

THE COURT: All right. Yes?

UNIDENTIFIED COUNSEL: Your Honor, I didn't know if it made sense to discuss an earlier start time, if that would ensure us that we could conclude tomorrow and then we have Friday?

THE COURT: Well, I live 12 minutes away, so it's easy for me. Mr. Hausman's coming from Mahwah. So what are your thoughts? I mean I can --

MR. HAUSMAN: I mean I can do 9:30, if people

think --

THE COURT: Why don't we schedule it for 9:30, take that half hour. We got delayed because of the motion practice and other issues this morning. I do have a call that I had scheduled for 9:30 to try to move things along. So shoot for 9:30 and maybe I'll be five or ten minutes on the call. Okay?

ALL COUNSEL: Thank you, Your Honor.

THE COURT: Thank you.

(Court adjourned)

* * * * *

# C E R T I F I C A T I O N

We, JOSETTE JONES, DIANE GALLAGHER, LOIS VITARELLI, JOAN PACE, RITAJEAN WIONCEK and ROXANNE GALANTI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Josette Jones
JOSETTE JONES

/s/ Diane Gallagher
DIANE GALLAGHER

/s/ Lois Vitarelli
LOIS VITARELLI

/s/ Joan Page
JOAN PACE

/s/ Ritajean Wioncek
RITAJEAN WIONCEK

/s/ Roxanne Glanti
ROXANNE GALANTI

J&J COURT TRANSCRIBERS, INC. Date: March 12, 2019