UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 18-27963 (MBK) |
| | . | |
| | . | |
| DURO DYNE NATIONAL CORP, et al. | . | Clarkson Fisher U.S. Courthouse<br>402 East State Street<br>Trenton, NJ 08608 |
| Debtors. | . | |
| | . | January 31, 2019<br>10:08 a.m. |
| . . . . . . . . . . . . . . | | |

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:

Lowenstein Sandler
By: JEFFREY D. PROL, ESQ.
TERRI FREEDMAN, ESQ.
One Lowenstein Drive
Roseland, NJ 07068

Anderson Kill, P.C.
By: CORT T. MALONE, ESQ.
1251 Avenue of the Americas
New York, NY 10020

Audio Operator: Kathleen Feeley

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For Lawrence Fitzpatrick, Futures Representative: | Young, Conway, Stargett & Taylor<br>By: SARA BETH A.R. KOHUT, ESQ.<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801 |
| For Official Committee of Asbestos Claimants: | Caplin & Drysdale, Chartered<br>By: JEFFREY A. LIESEMER, ESQ.<br>JAMES P. WEHNER, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| | The Law Office of John A. Fialcowitz<br>By: JOHN FIALCOWITZ, ESQ.<br>89 Headquarters Plaza<br>Morristown, NJ 07960 |
| For The North River Insurance Company: | Ifrah PLLC<br>By: GEORGE R. CALHOUN, ESQ.<br>1717 Pennsylvania Ave., NW<br>Washington, DC 20006 |
| | Kennedys CMK<br>By: CHRISTINA SALEM, ESQ.<br>570 Lexington Avenue, 8th Floor<br>New York, NY 10022 |
| For MidStates Insurance: | Duane Morris LLP<br>By: SOMMER L. ROSS, ESQ.<br>222 Delaware Avenue, Suite 1600<br>Wilmington, DE 19801 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By: JEFFREY M. SPONDER, ESQ.<br>One Newark Center<br>Newark, NJ 07102 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For 4 Site, LLC: | Rabinowitz, Lubetkin & Tully, LLC<br>By: JEFFREY A. COOPER, ESQ.<br>293 Eisenhower Parkway, Suite 100<br>Livingston, NJ 07039 |
| For MidStates Insurance: | Duane Morris LLP<br>By: JEFF D. KAHANE, ESQ.<br>865 South Figueroa Street, Suite 3100<br>Los Angeles, CA 90017 |

| | |
|---|---|
| For Hartford Accident and Indemnity Co.: | Shipman & Goodwin LLP<br>By: JOSHUA D. WEINBERG, ESQ.<br>400 Park Avenue, Fifth Floor<br>New York, NY 10022 |
| For Federal Insurance Co.: | Crowell & Moring LLP<br>By: TACIE H. YOON, ESQ.<br>590 Madison Avenue, 20th Floor<br>New York, NY 10022 |

\- - -

# I N D E X


| WITNESS | PAGE |
|---|---|
| MARC SCARCELLA | |
| Cross Examination by Mr. Wehner | 76 |
| Redirect Examination by Mr. Calhoun | 82 |

| EXHIBIT | | ID. | EVD. |
|---|---|---|---|
| Court-1 | Mr. Scarcella's Declaration and Report | 74 | 74 |

(Microphones 3 and 4 not working.)

THE COURT: That leaves us with Duro Dyne. Come on up. While counsel is settling in, on the phone through CourtCall I should have, Mr. Cooper? Are you?

MR. COOPER: Good morning.

THE COURT: Good morning. Mr. Kahane?

MR. KAHANE: Good morning, Your Honor.

THE COURT: Good morning. Mr. Weinberg?

MR. WEINBERG: Yes, good morning, Your Honor.

THE COURT: And is it, Ms. Yoon?

MS. YOON: Yes, Your Honor, I'm here.

THE COURT: All right. Anyone else on the line?

(No audible response)

THE COURT: All right. Let me have appearances in court.

MR. PROL: Good morning, Your Honor. Jeffrey Prol and Terri Freedman from Lowenstein Sandler. And we also have Cort Malone from the Anderson Kill firm, special insurance counsel, for the debtors.

THE COURT: All right. Thank you.

MR. LIESEMER: James Wehner and Jeffrey Liesemer from Caplin & Drysdale, and John Fialcowitz for the Official Committee of Asbestos Claimants.

THE COURT: Good morning.

MS. KOHUT: Good morning, Your Honor. Sarah Beth

Kohut from Young, Conaway, Stargatt & Taylor for Lawrence Fitzpatrick, the legal representative for Future Claimants.

THE COURT: All right. Good morning.

MR. CALHOUN: Good morning, Your Honor. George Calhoun on behalf of The North River Insurance Company. Also, with me today is Christina Salem from Kennedy CMK. Mr. Scarcella, our expert, is expected to be here. His train has been delayed due to the weather, but I think we can.

THE COURT: All right.

MS. ROSS: Good morning, Your Honor. Sommer Ross of Duane Morris on behalf of MidStates Insurance Corp.

THE COURT: All right. Thank you.

MR. SPONDER: Good morning, Your Honor. Jeff Sponder from the Office of the United States Trustee.

THE COURT: Good morning. And I did get your e-mail, Mr. Sponder.

MR. SPONDER: Thank you, Your Honor.

THE COURT: Hopefully, it becomes unnecessary. All right. Let's start with the preliminary, the two matters that are not the main show for today. With respect to the first, debtors' motion to extend the time to assume or reject the lease. There's been no opposition raised by any party-in-interest. The Court has no objection. So, Mr. Prol, is there anything you needed to add to that?

MR. PROL: No, Your Honor.

THE COURT: All right. So, that motion will be granted. The next motion was that of MidStates seeking compliance with Rule 2019.

MS. ROSS: Good morning.

THE COURT: Good morning.

MS. ROSS: For the record, Sommer Ross from Duane Morris on behalf of MidStates Reinsurance Corp. And, Your Honor, the motion speaks for itself. It's a short motion. There was an opposition and we filed a very short reply.

We believe that the motion to enforce Rule 2019 is beneficial to parties-in-interest and there's no prejudice to the debtor and/or any of the other plan proponents.

We recognize in our reply that as of the date hereof, no individual except this claimant has actively participated in the Chapter 11 case, and it's possible that none will. However, it's also possible that one or more asbestos claimants will participate at some point in connection with confirmation of the plan, and if they do, entry of an order granting the motion will only serve as a reminder of the existence of Rule 2019 and the need to comply with it.

And in light of the fact that the asbestos claimants have been excluded from the bar date, we see no harm or prejudice in granting the motion.

THE COURT: All right. Thank you.

MS. ROSS: Thank you.

THE COURT: Counsel?

MR. WEINBERG: Just briefly?

THE COURT: Yes.

MR. WEINBERG: Your Honor, Joshua Weinberg for the asbestos claimants. I think in the end what this case is asking for is an order enforcing a rule that hasn't been violated, and we just don't think that's necessary, Your Honor.

You could start with Rule 1001 and start entering orders until we get to the end of the rule book and I just don't think that makes any sense.

And I don't know, I'd be happy to talk more about why Rule 2019 doesn't apply anymore, but that seems to be a moot point.

THE COURT: I read the submissions and I appreciate the sentiment and I actually think the filing of the motion serves the purpose that you needed by putting everybody on notice of the need down the road.

So, in a sense you've accomplished it without having the order entered. I don't think the order adds anything to the docket that the motion itself didn't do by alerting the parties that should the situation change that there be a need to comply with Rule 2019.

But, I don't believe the Court has authority to enter an order prospectively barring people from violating a rule prospectively. I would never enter that order, that type of

order. It's just unnecessary.

But, I believe the point has been well taken and the parties are on notice. So, I'm going to deny it without prejudice to reissue it -- to refile it in the event it becomes an issue down the road.

MS. ROSS: Thank you, Your Honor.

THE COURT: Thank you. All right. Now, let's turn to North River's motion with respect to the claims estimation. And, my intention is to hear argument and raise a few questions, but not to interject as much as normal because it's a bit more educational for the Court, these issues that we don't see.

Although I have a burning question that at least my law clerk and I want to know. If the order from Judge Martin in the state court was a non-filed disposition, how did it get appealed?

MR. CALHOUN: Your Honor, under the New York procedures, you can appeal a non-final order if it affects a substantial portion of the case.

THE COURT: Kind of like an interlocutory?

MR. CALHOUN: It's actually an appeal. It's a right under the --

THE COURT: Really?

MR. CALHOUN: -- CPR. Fifty-five oh one or?

UNIDENTIFIED ATTORNEY: I think so.

MR. CALHOUN: I might have the CPR provision wrong, but.

THE COURT: That's why I hated practicing in New York.

MR. CALHOUN: They have --

THE COURT: All right.

MR. CALHOUN: They have a liberal appeal policy in New York, Your Honor.

THE COURT: Which explains why cases like KeySpan took decades and this case is five years and it's at summary judgment. All right. Having just noted that, I also just want to clarify, and maybe this is more substantive.

It doesn't seem that the issue relative to Class 6, the prepetition defense claim, whether it's one million or seven million makes a difference, that class is going to vote no. And I'll hear from debtors' counsel, but that class will have to be crammed down under a plan in either event, so it's not relevant.

MR. CALHOUN: That's correct, Your Honor. And to the extent that it's not relevant, we don't need to go forward on Class 6.

THE COURT: And as to the post-confirmation indemnity, I believe the paper -- in your papers you didn't pursue argument on those claims because essentially the defense cost claims, the post-confirmation defense cost claim, which I

think was in the 20 odd, $24 million range, serves the purpose.

MR. CALHOUN: That's one of the reasons, Your Honor.

THE COURT: Yes.

MR. CALHOUN: But, we are not seeking estimation of the indemnity claim.

THE COURT: And for whether it's contingent and subject to other 502 issues.

MR. CALHOUN: There's just too many issues there to.

THE COURT: All right. So, we are focused on the prepetition indemnity and the post-confirmation defense claims. Is that fair?

MR. CALHOUN: That's correct, Your Honor.

THE COURT: All right. Continue.

MR. CALHOUN: Thank you. Again, Your Honor, it's George Calhoun with Ifrah Law for the North River Insurance Company.

Just a little bit of background on why we're here and why this matters. As you recall, the debtors have placed our claim in its Class 7 along with the asbestos creditors. And then what they've done is gerrymandered the vote.

Keep in mind, debtors admitted filing this case because of their increasing share of liability with respect to their asbestos claims. And we've had two witnesses testify, one at deposition, and we had argument from counsel in court that one of the purposes of this plan is to create an

opportunity for the insurers, and now we're starting to see that come together.

We had the vote certification filed yesterday, Your Honor, where approximately fourteen hundred asbestos claimants voted $83.7 million in asbestos claims.

When you set this hearing and you denied the motion to have part of it applied to the creditors, you said we'd revisit that, if it mattered. Well, now we're getting to the rub of that and you'll see that if you let those claims vote at the values that they're allowed at for voting purposes and you don't revisit that, we can stop because it's not going to matter.

THE COURT: In other words, your 24 million or so is not going to surpass the one-third you need for voting?

MR. CALHOUN: Not if you're going to let them vote at $83.7 million.

THE COURT: But, that issue's not on for today, correct?

MR. CALHOUN: It's not on today, but it's an important issue you said you would revisit.

THE COURT: Sure.

MR. CALHOUN: And I wanted to raise it in this context so that of that $83.7 million, there is approximately 350 meso claims that's been allowed to vote at $140,000 apiece. They voted those claims for approximately $49 million.

Now, we've talked about before historically 90 percent or 85 percent, depending on which period you're looking at, claims have been dismissed with no payment. Historically across all years mesothelioma has been paid by Duro Dyne approximately $104,000.

So, they're being allowed to vote more than on average they've ever been paid by Duro Dyne, and there is no discount whatsoever for the likelihood that those claims would not be an allowed in the tort system, even though it's overwhelmingly likely that they would not be allowed in the tort system.

With respect to the non-meso claims, those claims are actually dismissed at an even higher rate and have even lower values, and that they voted those claims in approximately $35 million, which is well over Duro Dyne's historical liability for all claims over its entire history, over 10,000 claims.

So, there's simply no question that the asbestos claims have been allowed to vote in dollar amounts that are greater than the average dollar amounts that they would have gotten in the tort system, and they've been allowed to vote without regard to the historical --

THE COURT: Just stop you just for one second. I apologize.

MR. CALHOUN: Yes.

(Court/Clerk discussion)

MR. CALHOUN: And they've been able to vote without regard to the likelihood that their claims would recover. So, that eighty, can't remember, the 83.7 million is vastly inflated. If you just took the 90 percent historical dismissal rate and applied that across the board you get the 8.37 (sic) million and it almost wouldn't matter whether our claims allowed 24 million or 10 million or 5 million, the class would fail. So, that issue really is, in large part, the controlling issue as to whether or not this class votes.

Now, you have some easy ways to deal with that without getting into all the stuff we're about to get into. The easiest way is to say we should -- North River as insurer shouldn't be in Class 7. That's going to be one of our main arguments at -- or main, it's going to be one of our arguments at confirmation because we think the classification is improper and the treatment is improper.

But, that's what gives rise to the need for this estimation and, frankly, it shouldn't have been formed on that basis at all. So, that's why this is important and that's, you know, the gerrymandering of this is sort of obvious at this point.

The numbers and whatnot are set forth in our paper and we can get into detail on that and if you have specific questions about the numbers, I can address those or Mr. Scarcella can, if and when he shows up.

But, I want to walk through some of the issues. First, on the 502(e)(1)(B) issue.

THE COURT: Let me just -- I'm sorry. Before you go through. Is it your intention to file a 3018 with respect to -- well, no, my error. We've already said that's a confirmation issue as to we'll challenge for estimation their ballots.

MR. CALHOUN: Well, Your Honor, what we ask. If you recall the, sort of the not tortured history but the history of this, noone really cares what they vote when the asbestos claims are in their own class, which is how we thought this was. The classification of our, what are now our post-petition defense and our prepetition indemnity claims, it was not at all clear that we were in Class 7 until the disclosure statement hearing, at which point there was no time to file an objection because they had the estimation of those claims for voting purposes as part of the disclosure statement.

THE COURT: So, you're reserving, essentially, it's going to be a confirmation issue.

MR. CALHOUN: Well --

THE COURT: The classification.

MR. CALHOUN: The classification is certainly --

THE COURT: Yes.

MR. CALHOUN: -- a confirmation issue. What we'd asked previously, Your Honor, was the ability to object to

those claims so that we could challenge them for voting purposes. And Your Honor reserved the right to revisit that at this hearing, which is why I raised that initially.

Because we do intend to, if permitted, object to the asbestos claims and object to them for voting purposes if permitted to do so, simply because if we're in the same class system, they should be voting something that there's a relationship to the actual liability, not to sort of a wish list that we're getting paid.

We're going to have claims that are valued more than they're valued in the tort system and they're going to be allowed without regard to whether or not they're valid. That doesn't work.

So, let me address some of the, if Your Honor can bear with me --

THE COURT: Yes.

MR. CALHOUN: -- some of the issues that were raised. I first want to start with 502(e)(1)(B). With respect -- that might have been a valid objection if we were seeking estimation of our post-petition indemnity claim. We and the debtors could be liable with respect to any individual tort claims that may have fallen within our policy period. We're not seeking that.

We're seeking estimation of our post-petition expense costs. This issue has been addressed and decided by at least two Courts. I don't know if you saw the reply that we filed

yesterday.

THE COURT: I did.

MR. CALHOUN: I'm sorry for filing it the day before. There was just not time to do it earlier. But, that issue has been addressed by the Courts. And we all agree on the standard of 502(e)(1)(B) and really the issue here is co-liability, and there isn't any.

The debtors' opposition or the plan proponent's opposition didn't identify with whom we might be co-liable or with whom the debtor might be co-liable with respect to post-petition defense costs because noone is. The debtors are obligated to repay North River and noone else.

There's no underlying claim by a tort claimant that could ever, under any circumstance, get access to defense dollars. We don't pay defense dollars to tort claimants. Duro Dyne doesn't pay defense dollars to tort claimants.

As the New York State Court ruled, we can file a motion to seek to have those defense costs reimbursed to North River. That's a direct claim. Just like Judge Gerber said in the Chemtura case and just like Judge Sontchi said in R&I, those are direct claims, there simply is no co-liability.

So, we can take 502(e)(1)(B) off the table. It just doesn't apply. So, that's the first hurdle. The Bankruptcy Code provision that might limit our estimation doesn't apply because this is a direct claim against the debtors. Whether

it's called reimbursement or contribution, simply doesn't matter because we're not talking about a claim where two creditors might be filing a proof of claim. There's no exposure to the debtor or double liability --

THE COURT: I understand.

MR. CALHOUN: Okay.

THE COURT: It's not a guarantor --

MR. CALHOUN: Yeah.

THE COURT: -- situation.

MR. CALHOUN: Right. And the debtor sort of focused sort of narrowly on just a single word and it doesn't pose an issue.

Now, the interesting thing about the debtors' opposition is they're seeking to rehash and reargue issues that have been litigated in the state court. And, quite frankly, Your Honor, that's not appropriate.

We have orders from the state courts that have been approved by the appellate courts. While the case hasn't been finally determined, that's the law of the case and the law of the case is, is that pro rate application applies and that the law of the case is that we're obligated to provide a defense and then be allowed to seek contribution after we've done so.

The very arguments that they're raising now about North River's obligation to provide a complete defense, were argued and decided multiple times in the state court. Frankly,

Your Honor, you just don't have the power to go back and say, yeah, that's wrong, I'm going to overrule the state court and come to a different conclusion.

The Rooker-Feldman doctrine bars you from acting as the New York Court of Appeals and saying that the appellate court was wrong. It doesn't mean the state court down the road can't do whatever the state court does, but we can't take existing rulings and change them here, especially where there's no basis to do so.

THE COURT: Well, let me address that.

MR. CALHOUN: Yeah.

THE COURT: And going against what I said I promised I wouldn't do is interject. But, I mean the heart of the issue, when Judge Martin -- I believe it's Judge -- Justice Martin. Supreme Court Justice, right? Trial court in New York.

When he issued his opinion it was 2014, it was four years before KeySpan; the appellate division was 2017, a year before KeySpan. The parties had essentially agreed that it was pro rata at that time, but my understanding is that there was no basis not to agree because the unavailability rule wasn't brought at issue as it was in KeySpan.

So, there was no opportunity or there was no vigorous litigation over that issue before Justice Martin, before the appellate division. And they're not, I mean, all Justice

Martin did was deny summary judgment to Dura Dyne, for the most part, and certainly the case continues. That Court could reevaluate its position in light of KeySpan.

MR. CALHOUN: Well, Your Honor --

THE COURT: Right?

MR. CALHOUN: Two things to add to that or to address that. One, the unavailability rule in KeySpan deals with how long the liability is spread. It doesn't deal with whether it's pro rata or not. All right. That's all within the --

THE COURT: Well, it shouldn't provide. KeySpan was assuming the proper allocation was a pro rata basis and therefore would the self-insured be responsible for that portion of it.

MR. CALHOUN: So, KeySpan did look -- the debtor in or the insured in KeySpan argued for all sums and the Court said, no, all sums doesn't apply pro rata and the unavailability rule doesn't apply, so that you don't end the pro rata allocation at the end of the coverage block, you know, when insurance became available.

Because that's the language that's in the papers, you know, directly contrary to the idea of pro rata allocation and the insurer's risk in the policy. So, you spread it over all periods from the date of exposure to the date of manifestation. That's what KeySpan said. So, KeySpan is about how do you allocate. It's not about, for the most part, whether pro rata

allocation applies.

The case that the debtors and the other plan proponents are seeking to rely on is Viking Pump.

THE COURT: Right.

MR. CALHOUN: Viking Pump came out in 2016, before the appellate ruling. They never argued -- when that came out, they could easily have come in and said we need to bring this to your attention. They didn't do that. They didn't raise it.

When they filed this case, they didn't raise that. They said you've got an increasing share of the liability, which only makes sense if it's pro rata.

Now, frankly, Your Honor, if they really thought all sums to apply, they don't need to have filed bankruptcy. The reason they filed bankruptcy is because their share of the risk is increasing. So, it's just entirely inconsistent. And it doesn't really matter why the state court held that it's pro rata. It's pro rata.

Now, the argument that Viking Pump applies, I mean I don't think we need to get into it because of the existing rulings, but even if we did, the debtors are really trying to stretch these policies and distort them in ways that just don't work.

Viking Pump relies on the presence of non-cumulation language. It's simply not in our policies. What they're trying to do is to take other language and to try

to twist it --

THE COURT: Well, did Viking Pump -- in the Viking Pump case there was non-cumulation language and --

MR. CALHOUN: Correct.

THE COURT: -- they went through it. But, it also suggested language that was akin to it, of that type. So, does it have to be only that type of language or any language that says -- suggests that the liability will go beyond the coverage period? I mean, we're talking about the language in this case that says will also be liable for death, you know, beyond.

MR. CALHOUN: Right. And New York courts have addressed that issue. Right. They're not in the debtors' brief, but New York courts have addressed that and they've all said no, that language alone isn't enough to get out of the default rule of pro rata allocation.

The only cases in New York that have said all sums, have the exact same -- similar, not necessarily the exact same language, but the exact same sort of non-cumulation provisions in their policies. The courts never said, oh, some portion of the bodily injury definition shifts the whole allocation method that's applicable under this policy.

Where the policies have limited coverage to occurrences that occur within the policy period, as our policies do, the New York courts have said pro rata is the right rule. They've done that since Viking Pump.

So, the idea that you can try to cherry pick language, you know, the term all sums applies and appears in the policy --

THE COURT: Well, the California case interpreted it differently, correct?

MR. CALHOUN: The California case is the only one they've got.

THE COURT: Right.

MR. CALHOUN: And it's wrong. Meinweiser, the New York case they cite, contains the exact same sort of non-cumulation language that was present in Viking Pump. So, that case doesn't help them at all. The Fuller Moore case is just wrong, Your Honor.

All of these issues, by the way, are going to be heard on March 18 in the state court. That Court is aware of Your Honor's ruling lifting the stay and has set a hearing on that. So, these issues are all going to be heard in 40 days or 35 days, whatever. My math's probably off, but soon.

But, so, the New York Court of Appeals in Roman Catholic Diocese of Brooklyn, this is in 2013, before Viking Pump, addressed the very argument about language in a policy dealing with a bodily injury where after --

THE COURT: Which case was that?

MR. CALHOUN: The Roman Catholic Diocese of Brooklyn and I can give the exact cite.

THE COURT: Yes.

MR. CALHOUN: Let me see. It's 991 N.E. 2d 666, which is ominous, but that's the cite. And the New York Court of Appeals in that case said pro rata allocation applies, the exact same language the debtors are saying here means all sums. That language -- that policy didn't contain the non-cumulation type language that the Court of Appeals in Viking Pump said that all sums can apply. So, New York Court of Appeals already addressed this.

But, even after the Viking Pump decision, Courts have addressed similar arguments. So, in Liberty Mutual Fire Insurance v. J&S Supply Corp., it was decided by the Southern District of New York in 2017, that Court was addressing a motion for reconsideration filed in light of Viking Pump.

And that was dealing with the exact same type of language, but in the absence of the non-cumulation provision. In other words, the exact same situation we have here, and that Court rejected the request to apply all sums.

THE COURT: Do you have that cite handy?

MR. CALHOUN: I only have the Lexis site, Your Honor.

THE COURT: That's fine.

MR. CALHOUN: It's not published yet. It's --

THE COURT: Was that in your reply?

MR. CALHOUN: It wasn't, Your Honor, but a lot of this has been briefed in the underlying New York state case.

In fact, they attached one of their briefs so. It is for Your Honor but it's, let's see, 2017 U.S. District Lexis 162910.

THE COURT: All right. Thank you.

MR. CALHOUN: And then another case out of the Eastern District of New York, Underwriters of Lloyd's London v. National Railroad Passenger Corp., that's a 2017 U.S. District Lexis 131681, again, dealing with language that didn't include the non-cumulation provision. Again, limited that to pro rata allocation. So, this has come up in New York, not California courts, and the courts have rejected it.

What Dura Dyne is attempting to do, (indiscernible) to do is to take provisions in the bodily injury definition, not the occurrence definition, and expand and change what the New York Court of Appeals has set as its default rule. And, frankly, Your Honor, that's not appropriate. And it's a question in the end for the New York Court when it hears (indiscernible).

But, since we're here on estimation, the issue is, what does Your Honor do with this? And we know what the existing rulings are and we know that those are binding. So, the question is, okay, they've made an argument, they filed a motion to renew in the New York State Court, which would be the only avenue they would have to change the existing rules in the New York State Court.

Your Honor should note that they didn't file a motion

originally seeking anything, they didn't -- so, there's no motion to renew here. It's just procedurally improper. They didn't appeal or even attempt to appeal the appellate court's ruling that pro rata allocation applies. They didn't seek to file papers in the appellate court saying Viking Pump just came out and we think this is a change in law.

By the way, the New York courts have said Viking Pump is not a change in law, that it's simply application of the existing law. So, it's not even viewed by the New York courts as an intervening change.

So, but since we're here on estimation, you can in fact draw then and then, and say they have some small chance of winning that and discount our claim. You're not deciding these issues, you're trying to figure out what our claim should be.

So, Your Honor has discretion in estimations to figure out what an equitable result would be. Estimations for voting purposes is not trial on the merits, it's not summary judgment, it's not to determine these issues finally. What you're trying to do is find an equitable result, which is one of the reasons that I started with what the historical claims were.

Historically, defense dollars have run at multiples of indemnity dollars. The debtors are going to take issue with our calculations. They think that Mr. Scarcella didn't adequately take into account the impact of the bankruptcy on

future claims.

The reality is, Your Honor, that almost all of the defense dollars are spent on mesothelioma claims, the worst injured people. Unimpaired claims largely sit on inactive dockets. They don't take a whole lot of work. Other cancers and lung cancers for the most part don't move forward rapidly in the tort system, they don't receive lots of money in the tort system.

The vast, vast majority of money is spent on mesothelioma claims, the exact type of claims that they say are going to pass through, that they're going to allow to go into the tort system.

So, it's true that if they decide no claims will come through and we're all just going to have these funds sit in the trust that those defense dollars would go down. That's simply logic.

What we're told when we talk with the other side is that there's going to be defense dollars, you should settle. So, it's a conflicting message. When we talk to the Court it's defense dollars really should be last because we're going to keep all these bad -- invalid claims from moving into the defense system. Your Honor, that's -- it sort of doesn't matter. Those claims just don't take up a lot of defense dollars.

And Mr. Scarcella took that into account. When he

calculated defense dollars going forward, he used a trailing average of the defense spending. The last couple of years defense expenditures were in excess of four million and one year it was only one and a half million dollars a year. He used a trailing average of 3.75 million for the next three years, and then decreasing along with the incident curve after that.

So, the effect of that is, is that he's already taken out, you know, the peak dollar spends that would account for the most claims. And so, there's already been some consideration of not every claim is going to go through the bankruptcy because the reality is, the fed claims that aren't going to get to the bankruptcy aren't going to get paid much and if you have another cancer claim or a lung cancer claim that might have gotten $10,000 in the tort system, there's not a whole lot of incentive to try to opt out in any way.

But, keep in mind, Your Honor, that the reason we have to defend these claims, 90 percent of them getting dismissed, is because the plaintiffs over name. So, if you have a mesothelioma or a lung cancer, you might as well include Duro Dyne in your complaint, because it doesn't cost them anything. We still have to spend the defense dollars to get rid of them. It doesn't cost them anything to opt out either.

When you look at the plan language, Your Honor, Section 4.15?

UNIDENTIFIED ATTORNEY: Four.

MR. CALHOUN: Four. No, it's 4.15. They have language that says insurers aren't going to pay before the trust pays if you're a non-settled insurer. So, the only way for them to get to our insurance is by putting money into the tort -- by putting claims in the tort system. It's simply not credible, but that's their plan. They're going to incentivize insurers to settle by putting lots of bad claims, you know, badly injured personal injury claimants into the tort system in order to run up defense costs to incentivize insurers to settle.

Well, that's very obviously the plan under or the strategy under a plan that says, notwithstanding any payment by the trust, we don't have to pay that amount, we don't have to be allowed by the trust, or to schedule a value of the trust. That's what the plan says.

So, that being the case, the only way it's going to get to North River's money under the insurance policy is to sue them in the tort system.

The practical reality is that this plan is designed for claims to pass through to unsettled carriers in the tort system and to access their policies that way. In doing so, that creates an extremely high likelihood that defense dollars are going to be pretty close to what they were prepetition. They might be a little less because some of the frivolous

claims are going to be knocked out, but most of the claims that defense dollars are spent on are going to pass through.

That being the case, using a slightly lower defense dollars to pay its estimate, as Mr. Scarcella did, is the appropriate method to estimate what those defense dollars will be going forward. I don't know if you've reviewed Mr. Scarcella's report or if he's shown up yet.

THE COURT: He hasn't shown up. I have reviewed or at least, in summary fashion, gone through it.

MR. CALHOUN: It's very detailed.

THE COURT: Yes.

MR. CALHOUN: So, based on commonly accepted incident curves, he projects out the indemnity and the defense into the future. Fifth Star's are a little more stable than indemnity. Indemnity goes up and down depending on whether or not -- they don't pay many claims. So, one bad claim will spike it here on indemnity.

But, defense has been a little more stable. But, using the same incident curves, he projected those out into the future and those are incident curves that are used by experts retained by all sorts of parties in different positions in these litigations.

And that's how we calculated the total dollars that are out there, and their claim is simply calculated based on what we're paying under the existing orders in the state court

case and what our share is. It's really very simple.

Again, Your Honor has the ability to -- the goal of estimation was to produce equitable results. The goal of estimation is not to make final decisions on what the law is or should be, especially when you've already lifted the stay, and that's going to be determined by the state court. You don't need to step on the state court's toes here and try to make predictions on how he's going to rule.

Frankly, Your Honor, even if KeySpan doesn't apply, so that the pro rata block extends, our claim for reimbursement would be sufficient to keep Class M from accepting the claim, but for the allowance of its claim if it's such inflated numbers without regard to their historical dismissal rights.

THE COURT: Well, let me follow-up on that because that was the next area. It's clear, I think the language of the state court and the appellate division acknowledged that no Court has -- the New York Court of Appeals decision dictating that defense costs in pro -- let's assume pro rata, that defense costs will also be imposed upon the insured. Everybody's kicked it down the road to establish that there's been an occurrence during that unavailability period.

How do you determine the occurrence, number one, in that period given that -- is that possible to definitively say that the injury occurred during that period versus periods of your coverage?

MR. CALHOUN: Well, so, that's an interesting question, Your Honor. Christina, if I mess anything up, you let me know. Ms. Salem is our coverage counsel for North River, Your Honor.

It's the debtors' obligation -- the insured's obligation to prove that an injury occurs during our policy period. For these types of long tailed claims under pro rata location, if one assumes a continuous trigger applies, injury occurs in multiple periods.

And, so, what we have here, is we have injuries that have occurred indisputably both in uninsured periods and insured periods.

THE COURT: In other words, exposure may -- the initial exposure may be during a policy period or even predate a policy from another -- and during another policy, but because of the triggering, until the claim is actually filed or a death occurs, it's considered to have occurred in every period. Is that --

MR. CALHOUN: Correct.

THE COURT: -- fair?

MR. CALHOUN: Correct.

THE COURT: Okay.

MR. CALHOUN: So, when you know those dates, you know what percentage of the injury occurred in an uninsured or someone else's, on another insurer's period, and our client's

period.

So, that was the basis for the motion that was originally filed in the state court for the defense dollars with respect to claims that had already been decided because there, all those dates were known. That was sort of -- those are the claims there that were ripe for summary judgment on this issue in accordance with the judge's orders that we could file, and should file, such motions when those facts were known.

And that was one of the complaints we had that, oh, now we're seeking more for Class 6 than we did in the state court. Well, that's going to be at a bar date, Your Honor. We had to file other claims. That wasn't remarkable.

THE COURT: If liability is all sums it's not an issue because then they could pick any policy and you have -- they're not responsible for that unavailable period, is that correct? For defense costs.

MR. CALHOUN: I believe that's correct, Your Honor.

THE COURT: Now, why would you think that to date no Court in New York, I don't know elsewhere, has ruled on the obligation to pay defense costs? And you can defer --

MR. CALHOUN: There are several decisions where that has been addressed, Your Honor.

THE COURT: Okay.

MS. SALEM: And, in fact, the Court of Appeals has

addressed it, Your Honor --

THE COURT: Yes.

MS. SALEM: -- in Rapid-American v. Continental, I believe. I can get you the cite. But, the Court of Appeals did provide that a defense cost contribution is permissible where it can be shown that claims or occurrences happened during uninsured periods.

THE COURT: That's Continental Casualty, Rapid-American Corp.?

MS. SALEM: Rapid-American. Correct.

THE COURT: I didn't think it was definitive. They --

MS. SALEM: They deferred the issue.

THE COURT: They kicked the can down the road as well. Did they not?

MS. SALEM: Correct. They deferred the issue, but they clearly recognized that it is permissible once proof can be established.

MR. CALHOUN: In other words, Your Honor, it's a proof issue, not a validity of the claim issue.

MS. SALEM: And there are several trial court decisions that have imposed defense cost obligation contributions on the insured and we can certainly provide those citations to you.

THE COURT: All right. Thank you.

MR. CALHOUN: And, Your Honor, and just if you think about it in the context of this case, there is a pending motion where the debtors argue motion for summary judgment on this issue.

If the concept is right as Your Honor is asking about as they proposed that defense costs aren't allowable under New York law, that is a summary judgment issue and it would have been a summary judgment ruling.

THE COURT: That was going to be my question for them.

MR. CALHOUN: But, instead, the judge said, I can't rule on this now, I'm going to defer it until the facts are known and that you can show that the injury occurred.

So, you have to know the dates of exposure and the dates of manifestation before you can get -- you can submit the proof that would allow the Court to make the determination of where the dollars should be allocated. So, it's really a proof issue, not an issue of whether or not state law allows it.

THE COURT: Okay. Thank you.

MR. CALHOUN: Your Honor, unless you have any other questions, but I think that really addresses the meat of what's before you.

THE COURT: Do you want to further argue with respect to the issue of revisiting the asbestos claimants estimation?

MR. CALHOUN: Yes, Your Honor.

THE COURT: Do you want to put that off until after these arguments or?

MR. CALHOUN: Well, no, Your Honor, I mean I really think you should take it all part and parcel, because if you're not going to revisit that, I would invite Your Honor not to --

THE COURT: Then this is academic.

MR. CALHOUN: This is academic and the parties obviously have a lot invested in these issues and there's a lot invested and the state court making determinative rulings on this on March 18th or as soon thereafter as it can and it, frankly, wouldn't make sense to address them if you're not going to revisit that.

And, as I said, because the goal of estimation is really to give equity, we're faced with a situation where our claims are being totaled -- you're being asked to treat our claims at zero. Our worst case scenario, right? That is our absolute worst case scenario in the tort system. That the state court reverses all of its prior rulings and says, you know what? Never mind. We were all wrong before. We're going to disregard all these other New York cases and it's going to be all sums and you're going to get a zero. Absolute worst case scenario.

On the flip side, you got the other creditors in our class who are going to get paid. We're not even going to get paid in this class. You get the absolute best case scenario

for the most part. They're getting paid. They're getting their claims treated at more than they were allowed in the tort system, without regard to whether they would be paid in the tort system, when 90 percent or more of them would not get paid in the tort system.

The dichotomy could not be starker in how the debtors are treating our claims. It's not equitable to do that, Your Honor. If they're going to get best case treatment, we should get best case treatment. If we're going to get worst case treatment, they should get worst case treatment.

It doesn't make sense to say our claims, which are contractual claims that are supported by existing rules in the state court, should be treated at zero or one dollar, when their claims which usually, almost all cases, get paid zero, are to be treated at hundreds of thousands or, no, 140,000, 50,000. That doesn't -- that's just not fair, Your Honor.

THE COURT: But, that's, as you've acknowledged, that's -- really, that's the basis for the objection to confirmation.

MR. CALHOUN: Well, it's --

THE COURT: Because that's the distributions anticipated under the plan.

MR. CALHOUN: Right. So, we have a disparate treatment argument, we have a classification argument that are claims are dissimilar to those claims.

THE COURT: Right.

MR. CALHOUN: But, because they put us in this class with them, we think the class should vote no. We think our claims are worth more than theirs. So, the whole class should vote no. And, if they did that, they'd be back to the drawing board. They wouldn't have an unimpaired class except in the plan. They don't have to do it that way. They could split us out and they'd have to have another class and expand it. That's not hard.

They're forcing this on the Court, even though the claims are pretty obviously disparate, and the only reason for it is because this is a liability they're trying to avoid in this bankruptcy. They think they can use the asbestos claims to cram this down.

I don't know how, Your Honor, they're going to get over the confirmation objections of disparate treatment. Frankly, I don't know how they get over best interest test. They're not paying us a dollar on these claims. If they sold all their assets tomorrow and gave us pennies on the dollar we'd be better off. So, it doesn't -- and by the way, Your Honor, we didn't address the indemnity claims.

THE COURT: Right.

MR. CALHOUN: The prepetition indemnity claims. The Court has said that we can bring contribution claims for that. It's not even really a dispute. So, that's, even if you don't

deal with the future claims, that's over $100,000 of claims that would trigger all these other issues we're talking about as far as the confirmation objections to debtors' plan.

So, this is sort of the disparate treatment there and it's, frankly, just plain on its face. You could, sua sponte issue, summary judgment on that right now and say, debtors, put them in a different class because what we're really going to, Your Honor, and March 6th and 7th is a dead letter. There's no reason to go to confirmation on the plan the way it's currently structured, and that's what we're really trying to do.

If you treat our claims fairly, the same basis you treat asbestos claims, this class is going to vote no. They're going to amend their plan, probably to put us in a different class, and you're going to have a plan before you that either is going to be confirmable because they would have addressed our claims more fairly or at least the objections will be teed up plainly in a way where there's no obvious structural issues, and we'll be arguing about absolute priority rule and other cram down issues on a basis that Your Honor can determine whether confirmation is appropriate on a plan that at least has a chance. Right now, it doesn't.

And the reason we're fighting for this is because this plan is designed to hurt our clients, they've told you that repeatedly, and it's simply not fair. So, we want this class to vote no. It should vote no the way it's structured.

And if that happens, Your Honor, they're going to be back to the drawing board and when they come back to the Court with a revised plan, it will be one that's either confirmable or with issues that's teed up plainly for the Court without glaringly obvious confirmation objections.

THE COURT: All right. Thank you. Mr. Prol or?

MR. PROL: Your Honor, we divided up oral argument.

THE COURT: I was wondering who was going to take the laboring oar.

MR. PROL: I'm going to ask Mr. Malone to start off and address some of the insurance issues.

THE COURT: Sure.

MR. MALONE: Good morning, Your Honor.

THE COURT: Good morning.

MR. MALONE: Cort Malone from Anderson Kill on behalf of the debtors, Duro Dyne companies.

THE COURT: Welcome.

MR. MALONE: Duro Dyne's position, Your Honor, in the insurance coverage case is that the Court there has pending motions in front of it, and it doesn't need to overturn or reverse anything from those prior rulings.

Obviously, North River and some of the other insurance companies read the decision of Justice Martin one way. We read it a completely different way that we feel is consistent with decades upon decades of New York insurance law.

And, in fact, the very cases cited by Justice Martin in his decision.

Your Honor asked a great question to Mr. Calhoun, getting at the heart of what's the open issue in the New York insurance case, and that has to do with what has to be shown as far as these occurrences for there to be some ability for the insurance company to cutoff their defense cost obligation.

Their position, reading Justice Martin's order, is that so long as there's any part of it that hits an uninsured period, they get to pro rata out the defense costs. That's not the law of New York. That's not what Justice Martin's decision says.

The actual cases he cites, going back to the Continental Casualty Company v. Rapid-American case, and then the other cases he cites including Fulton Boiler, U.S. Generalie (phonetic) they all hold that you can only cutoff that defense obligation if there's -- the insurance company proves a claim falls solely or entirely within an uninsured period. And that's what makes sense through, again, decades and decades of New York law on defense and indemnity costs.

Before going into anymore detail on that, Your Honor, I think we should take a step back and look at a few of these big picture insurance issues, because I think there's a few things that have been conflated here. One of them is the issue with respect to potential reimbursement of defense costs. The

other has to do with allocation of indemnity costs only, which is what the KeySpan decision involved. KeySpan, there's no allocation of defense costs, there's no pro rata defense costs. That's purely an indemnity costs case.

The policies at issue, generally speaking, cover both of these types of costs. The cost of defending claims, or defense costs, and the cost for judgments or settlements, which are indemnity costs. And these two types of costs are treated dramatically differently, under New York law, and they have been for, again, decades and decades.

New York courts refer to policies with an obligation to pay defense costs as duty to defend policies. And there is reams and reams of case law talking about the fact that in New York, the duty to defend is much broader than the duty to indemnify. The duty to defend is also considered litigation insurance, that's another quote you see, in addition to liability insurance.

And what that means is, the key with defense coverage is in any lawsuit where there's even a potential that the insurance applies, the insurance company has to defend. And that doesn't matter if there are ten claims in the case and only one of them is potentially covered, they're in for the whole case. They have to provide a complete defense of the entire action.

THE COURT: But, that's not an issue here. There's

been no question of North River defending. Isn't it more -- I don't think anybody's taken issue, even the Court, that there's been defense. It's that they should be responsible -- who's responsible for the cost of the defense.

MR. MALONE: That's exactly right, Your Honor. And, so, the point is, when you get to whether or not there can be any responsibility on the policyholder, on the insured for those defense costs, every New York case that has decided this issue, with the rare exceptions of whether it was an agreement by the policyholder to contribute to defense or where there have been proven claims that fell entirely within an uninsured period, are the only situations in which defense costs get allocated back to a policyholder.

In short, Your Honor, there's no such thing as allocation of defense costs under New York law, and especially not for recoupment of costs, as North River's claiming here. North River's argument that the New York State Court ruled that North River's entitled to contribution is based on misreading of that decision, and especially the cases cited therein.

Specifically, the New York Court cited Fulton Boiler, which is the case that explicitly holds, "An insurance company can only be relieved of its defense obligation if it shows that a claim involved occurrences solely during self-insured periods." That's a quote from Fulton Boiler.

The U.S. Generalie case, also cited by Justice

Martin, it similarly involved two different occurrences of lead poisoning. The Court ruled that one of the two cases fell entirely outside of a policy period, and that's why the policyholder bore responsibility for the defense of that case.

Finally, Your Honor, the seminal case on this issue that Ms. Salem referenced, the Continental Casualty v. Rapid-American case, it is factually on point with Duro Dyne's case.

The Rapid-American decision makes clear it was already a known fact that the asbestos claims at issue in that case included occurrences that were during uninsured and insured periods, just like Duro Dyne's claims. In fact, the Rapid-American Court called these periods of, quote, overlapping occurrences.

Rapid-American held that the policyholder was entitled to a full and complete defense. And I quote, "The allegation that the policyholder was self-insured for a period of time, pre-dating the insurance coverage, cannot operate to deny the policyholder the complete defense to which it is entitled."

The only reference to pro rata contribution in that case, Your Honor, specifically says that the insurance company who is hit with the full defense cost up front, could then seek contribution from, quote, other insurance companies, never from the policyholders.

THE COURT: Well, it says in that case, the question whether the insured itself must contribute to defense costs, an issue on which courts have divided, is appropriately deferred. So, it's not taking it off the table.

MR. MALONE: Well, Your Honor, my contention is --

THE COURT: It cites the Sixth Circuit and D.C. Circuit and basically says it's still open, as of that case in '93.

MR. MALONE: When you look to the facts of Rapid-American and what it's talking about, it admits in the facts of that case that it knew, the Court knew that the claims hit uninsured and insured periods.

And what the Court is saying when it says that you have to look to whether or not there are claims during the uninsured periods, that only makes sense if they're talking about solely during the uninsured periods, as the Fulton Boiler Court confirmed after the fact.

The bottom line is the trial court's order in the New York case, which was sort of summarily affirmed by the appellate division and unfortunately didn't clarify that issue, it's now right back in front of the trial court on the pending briefing and if and when it gets there it will decide this issue.

But, this is a critical distinction that from the Duro Dyne and the debtors' perspective, North River is going to

be entitled to zero reimbursable defense costs under New York law.

THE COURT: But, let me ask you something. And I apologize for interrupting.

MR. MALONE: Not at all, Your Honor.

THE COURT: It's as much as I promise I won't do it, I can't help myself. Well, Justice Martin cast aside the estoppel and the waiver arguments with respect to the defense costs and the appellate division affirmed that.

What would have been the reason to even have to proffer those if there was no liability based on Fulton Boiler? Why have to go to the extent of trying to convince the Court that there was a waiver or there was estoppel argument? You wouldn't need it. And, but, it wasn't -- didn't seem to be raised at all. So, that would -- one would assume that, well, there is a basis to assert responsibility for those costs.

MR. MALONE: Your Honor, to the extent that there was a waiver or estoppel argument made, that had to do with the insurance companies paying not only 100-percent of the defense, but 100-percent of Duro Dyne's indemnity costs as well.

And, so, there was on the one hand at the time based on existing New York law, the concession that pre- Viking Pump, pre- KeySpan, that pro rata applied to the indemnity costs. The argument was, pro rata would have applied to the indemnity costs under the primary policies as well, but those insurance

companies, many of the same who had excess policies decided for whatever reason, they wanted to pay 100-percent of the indemnity.

Now, the behind the scenes look at that is, the faster they pay the indemnity, the faster they exhaust their policy limits because the defense doesn't exhaust the limits of the policy. So, at the primary layer, it was beneficial to the insurance companies to pay 100-percent of indemnity costs. So, they did that, they burned through those policy limits.

Now, they get up to the umbrella policies which don't have, or don't all have the defense costs outside of limits, so they changed their tune. And the argument for waiver on estoppel was really geared toward the indemnity cost basis because we said, well, they paid 100-percent for 20 years, they should keep paying one hundred percent now.

THE COURT: But, was it argued before Justice Martin? Notwithstanding our waiver and estoppel positions, there was no liability anyway because of Fulton and U.S. Generalie?

MR. MALONE: With respect to --

THE COURT: With respect to defense costs during the unavailable period.

MR. MALONE: I will say, Your Honor, it certainly wasn't argued orally in front of him. I'm not even sure it made it into the papers in that way. It was a very small part.

THE COURT: Wouldn't it have been logical to argue

that way? We're trying to avoid liability based on waiver and estoppel of defense costs. You would think you would argue first there is none. But, should the Court find that there is, they've waived it and estopped it. It seems to me like you missed the first part.

MR. MALONE: Well, that's not only with respect to, even for the defense costs, Your Honor, there was an argument that Duro Dyne was responsible for some percentage related to an insolvent insurance company.

Again, this -- I think the waiver and estoppel, to be honest, at the time it was argued had much more to do with putting every argument on the table for the Court to consider. Again, I think it was briefed in a very minimal fashion.

But, I think the entire focus of it had much more to do with the indemnity basis and the argument at the time, again, under longstanding New York law, the insurance companies can't cite to you a single case that will say, oh, here is a case where defense costs were allocated to a policyholder, that doesn't have some sort of a unique factual spin to it, such as an agreement by the policyholder or an acknowledgment that there were claims that fell within uncovered periods.

THE COURT: So, is that the case for the cases just cited by counsel, Liberty Mutual and the Southern District or the Eastern District case, N.R., I wrote down N.R.P.C., the railroad case.

MR. MALONE: See, I think there was some conflation there, Your Honor, on the pro rata versus all sums allocation issue with the cases that were being cited. But, again, we've briefed this issue three times over in the trial court and I've still never seen a case holding that they've cited there allocating defense costs to a policyholder on a pro rata basis and on a reimbursement basis.

Which, again, for Justice Martin to cite to the Rapid-American, the Fulton Boiler, the Generalie cases, and then purportedly in a throw away sentence at the end of his decision, somehow overturned 50 years of New York jurisprudence. It just doesn't follow that he would then somehow completely divert what those cases and longstanding New York law have held.

THE COURT: All right.

MR. MALONE: And just very quickly, Your Honor, on the last point on the indemnity claim issue. North River claims that Viking Pump relied solely on the non-cumulation provision. As Your Honor pointed out, that's simply not true. That case also clearly pointed to the continuing coverage clause.

And, in addition, they said in their briefing that there is no New York case relying on this continuing coverage language. The Meinweiser case in fact says, "As further support for all sums allocation, decedent policy also contains

a continuing coverage provision, extending the policy's protections for continuing injuries beyond the policy period, which would be irrelevant under a pro rata allocation, which further supports all sums allocation."

So, since Viking Pump, there are New York courts that also have held the continuing coverage clause is relevant as well.

THE COURT: All right. Thank you.

MR. MALONE: Thank you, Your Honor.

MR. LIESEMER: Your Honor, Jeffrey Liesemer, Caplin & Drysdale on behalf of the Official Committee of Asbestos Claimants.

I'm going to speak to the issues of 502(e)(1)(B) and then maybe pull back the camera a bit and talk a little bit about the bigger picture issues that have been mentioned here, in particularly with respect to the voting.

With respect to 502(e)(1)(B), the central issue that the parties appear to be crossing swords on is co-liability. On the future defense costs, North River admits that it has a contingent claim. It's not really taking a position on whether it's a contribution or a reimbursement claim. So, either way it falls within the statute. So, the issue comes down to co-liability.

Well, as we said in our papers, and I don't think this is disputed by the courts, co-liability is a broad

concept. The contribution claimant and the debtor don't have to be co-defendants in the same proceeding, they don't have to be co-liable under the same legal theory or under the same statute. It's very broad.

And basically in order to establish co-liability, we need to identify three parties. And I think that's what North River's objection is here, we haven't identified the three parties.

So, party number one is obviously the debtor. We have Duro Dyne. Party number two is the claimant seeking the contribution or reimbursement and that is North River. And, so, we need to identify the primary creditor, for lack of a better word, or direct claimant, to whom both Duro Dyne and North River are liable to.

And to answer that question, Your Honor just has to ask, who's generating the defense costs? Well, it's the defense attorneys, and others, experts and other professionals who are enlisted in the defense. But, for simplicity, let's just focus on the defense lawyers.

And, remember, North River's whole premise, and it's a premise we disagree with, but their whole premise is, Duro Dyne lives in KeySpan world, not Viking Pump world. And in KeySpan world the longer in time we move out from 1991, which was the end of the policies, the more of the indemnity cost, the greater share of the indemnity cost, the debtors are going

to have to shoulder.

And, so, therefore, these defense attorneys in rendering legal services to defend Duro Dyne, are not only benefitting Duro Dyne through their services, they are benefitting Duro Dyne directly.

And, so, when one asks -- so, North River and Duro Dyne are co-liable on the fees, the future fees that would be generated by the future defense lawyers of America. It doesn't have to say so in the retention letter, right, because for legal theories under which Duro Dyne and North River would be liable for the fees, they don't have to coincide.

The retention letter can say that North River covers the fees. But, what if North River, since we're talking about the future, one day doesn't pay anymore for outstanding fees? It could be for any reason, insolvency, liquidation, or they just refuse to pay.

Defense lawyers can look to Duro Dyne under a theory of quantum meruit or unjust enrichment. And, so, therefore, we do have all three parties identified in order to establish co-liability.

Now, the Chemtura is different. I know a little bit about that case because I represented most of the diacetyl tort claimants in that case. In Chemtura you had a bar date that was set and a bunch of proof of claims were filed by the distributors and the resellers of a product that Chemtura made

called diacetyl, which is a butter flavoring. And when diacetyl is added as an ingredient in food processing plants, it vaporizes as part of the heating process and it's breathed in by the workers and bad things happened to their lungs as a result.

So, Chemtura found itself in the tort system defending against diacetyl claims, and so did the distributors and resellers of Chemtura's diacetyl product. And, so, when they filed their proofs of claims, they were saying, look, we're in the tort system, we're spending money on lawyers to defend ourselves, and we have to pay these settlements or judgments in the indemnity portion, and this is all because of Chemtura diacetyl product. So, we have claims for indemnity or contribution against Chemtura because they made this product.

Well, the defense costs in that case that Judge Gerber picked up on were the defense costs benefitting the distributors and the resellers who were in the tort systems themselves. And, so, we're talking about Citrus & Allied and Ungerer and Flavor Concepts and the other entities that are mentioned in Judge Gerber's opinion.

Those were their defense costs. It wasn't Chemtura's defense costs. And, so, therefore, Judge Gerber correctly decided that with respect to their defense costs benefitting them, yes, there wasn't any co-liability.

Citrus & Allied's lawyers didn't have a claim against

Chemtura because they weren't benefitting Chemtura. They were benefitting Citrus & Allied.

THE COURT: So, ultimately, what you're -- you're contending that if Duro Dyne has liability and must be responsible for indemnity and defense costs during the periods where there was no insurance, where they were self-insured, North River still has an obligation to defend. That hasn't been contested.

MR. LIESEMER: Right.

THE COURT: So, those -- and the attorneys' defense costs, do they have a right to go directly to North River for their fees? They're retained by North River?

MR. LIESEMER: Yes, I would imagine the way this is setup is they're retained by North River and they cover the fees.

THE COURT: And they have a right to go directly against Duro Dyne?

MR. LIESEMER: And they would have the right to go against Duro Dyne because they're benefitting Duro Dyne through their legal services.

THE COURT: So, they have a lawful right. They could bring suit to recover outstanding fees against both the insured and the insurer?

MR. LIESEMER: That's right.

THE COURT: During that period.

MR. LIESEMER: That's right.

THE COURT: So, that's where you're getting the three parties?

MR. LIESEMER: Exactly. Exactly. And the same thing with R&I One (phonetic). That was a case in which you had an officer of a company that eventually filed Chapter 11. Before Chapter 11 the company was accused of suspect accounting practices. Did an internal investigation. The officer was fired. There was -- the SEC went out to the company. They were able to settle up with the company. The company filed bankruptcy. The SEC and the government did file proofs of claims.

So, you know, the government was done with respect to the debtor corporation. But, the SEC filed an action against the former officer to impose civil penalties on him for the suspect accounting practices.

And, so, this was his only defense. This was his own defense costs. And, of course, he's claiming indemnity for these defense costs because under the by-laws and under Delaware law, he was entitled to them and it appears that there wasn't any D&O insurer. The Court basically authorized a $20 million reserve to cover the defense costs of officers and directors.

And, so, that's what he was benefitting from. But, again, this was his own defense. This wasn't the defense of

the debtor. And, so, he was making a direct claim based on indemnity against the debtor for legal services that were benefitting him. They weren't benefitting the debtor. And, so, again, that is a different case from our situation.

THE COURT: Is there authority going back to -- question I have. There's authority or it's simply accepted practice that the insured would be liable to the attorneys retained by the defense -- by the insurance company in the event that the insured has indemnity liability?

MR. LIESEMER: Your Honor, I'm not aware of anything off the top of my head. I don't know to what extent, you know, there is an issue as to whether, you know, I don't know to what extent this comes up. To the extent that, you know, the policyholder is liable for defense costs.

But, I would -- what I'm positing here is that even if it didn't say so in the retention letter, there would be some sort of restitution or equitable remedy that the future defense lawyers would have against Duro Dyne based on quantum meruit, implied contract, unjust enrichment, whatever, because they did regular service to Duro Dyne, they were protecting Duro Dyne, they were trying to minimize Duro Dyne's liability in the tort system, and on that basis I think that the attorneys would have a colorable claim based on those legal theories and that's how I see the co-liability being established and how -- and that's what makes 502(e)(1)(B)

applicable here.

THE COURT: All right. Thank you.

MR. LIESEMER: Now, let's pull the camera back a bit because there was a lot of talk about where we stand with the vote. This is a -- this plan represents a deal that was a pre-negotiated plan. It took three years to put together and a lot of that time was just dealing with the economics of it and the economic terms.

And I think to the credit of the professionals who were working here, there was a lot of creative problem solving by the legal professionals and also the financial professionals in order to get us here.

So, everything that's built into this plan has been well thought out. We have tried to maximize as much value that we can gather from Duro Dyne and put that into asbestos trust.

One of the big variables here, of course, is the insurance coverage, because that's the subject of litigation. If we are able to settle the insurance coverage, then the proceeds of that would be sent to the trust and that would be more of a corpus to benefit the asbestos claimants.

If not, there is a passthrough that's allowed in which the asbestos trust acts as a gatekeeper. And the asbestos trust would basically decide whether a particular asbestos claim can go into the tort system and try to access that unsettled coverage. That was really the only way we could

figure out how to deal with the insurance situation. Okay.

We are trying to as, you know, good debtors-in-possession are trying to do, they are trying to maximize the insurance asset and, of course, we have to deal with adversaries who are not that -- that's not where their interest lies necessarily, but, we are trying our best.

What we did with respect to treatment of insurers is we basically split them. We're not leaving them with nothing, they have disputed claims, but we said, okay, to the extent that you end up with allowed claims for prepetition defense costs, you're in Class 6 and you will get paid in full over time in the amount of your allowed claim, with interest of course. And that's how we're treating Class 6. We're not leaving the insurers with nothing.

With respect to Class 7, you know, these are harder issues. We're talking about, you know, future defense costs, indemnity payments. This is still very much in dispute. And, so, we basically went to, as our precedent, went to the _Plan Insulation_ case which was out in California, and looked how they treated those claims.

And, you know, what we're trying to achieve here is maximize the value of this insurance asset and, so, yes, of course, we are trying to incentivize the insurers to settle. And, so, yes, they will not get anything for their contribution claims under -- in Class 7.

But, they're not the only ones who are going to end up with non-compensable claims because as we pointed out, and as I pointed out to this Court before, there is going to be other asbestos claimants with non-malignant diseases such as those suffering from pleural effusions or pleural plaque, that those are diseases that just aren't eligible.

And this is an important point to me because we will get to this at confirmation. There is a trust distribution procedures that basically sets forth the medical criteria and the exposure criteria that a given claimant has to satisfy in order to get a settlement offer from the trust. And the values that were voted here are the settlement offers.

So, this isn't a situation in which, you know, this is just sort of a free for all and all asbestos claimants can come and even though they would be dismissed in the tort system they would get money here. That's not true.

In fact, because this -- this will not be a large trust as far as asbestos settlement trusts go. And, so, what we will present to this Court at the confirmation hearing is that we have drawn this trust distribution procedures as tightly as we can to make sure that the claims who are offered a settlement offer, a liquidated amount, are -- really have strong medical and exposure evidence backing them and were working in the types of industries, like sheet metal worker, that were more likely to be exposed to Duro Dyne's product than

not.

So, this isn't a windfall for claimants. They're going to have to go through the paces in order to satisfy. And even when they have, you know, even if they have, you know, a settlement amount of $150,000, for example, for their mesothelioma claim, we still have to figure this out, there will be a payment percentage. So, they will get cents on the dollar for that liquidated amount. So, even --

THE COURT: So, it's not 100-percent of the amount? In other words, under the TDP?

MR. LIESEMER: No, it won't be 100-percent of the amount. No, there will be a payment percentage. Very likely. Very likely. We have pushed that issue to another day as to what the payment percentage will be, but a lot of these trusts set payment percentage that basically pay pennies on the dollar for whatever claim is awarded by the trust to them.

THE COURT: But, isn't there going to be, for instance, you're giving $140,000 for voting purposes, yet you have no intention of paying?

MR. LIESEMER: That's correct. That's correct. They will get a distribution, just like every creditor in bankruptcy gets a pro rata distribution of whatever their liquidated claim amount is. That's basically the principle here.

So, let's get back to the voting. We, when we put the voting procedures together, we decided to award asbestos

claimants the liquidated amount they would get from the trust, assuming they, you know, met the medical and exposure criteria. And these are basically keyed off of asbestos diseases.

And this Court has, you know, discretion for awarding these voting amounts and, basically, these voting amounts are practical expedience because there is no quick and easy way to look at these claims and say, yes, this will be a claim that will be dismissed and, yes, this particular claim will get a home run jury verdict.

That's another important thing to bring up. These asbestos claimants are not -- are, by being channeled to the trust and being subjected to the trust distribution procedures, they're being subjected to settling amounts, not verdict amounts or home run verdicts.

And when you think about it, what North River is asking for is a home run verdict in the coverage action. Right. And we have these asbestos claimants voting settlement amounts because there's no other way to really look behind it and get through this bankruptcy case in any sort of seasonable or expeditious way.

And we keep hearing about this statistic, you know, this 90-percent dismissal rate. I cannot tell you whether that is accurate or not. I just don't have an opinion on it. But, even so, we shouldn't be subjecting claimants, you know, by extrapolation to some sort of random statistic. I mean, these

claimants will be affected, they will be channeled, and, so, they should have the opportunity to vote.

And, when we presented these voting amounts to Your Honor, there was no objection. The explanation was, was, well, we didn't know we were in Class 7 at the time. Well, maybe, maybe not. I mean, North River is represented by very sophisticated bankruptcy counsel who's been doing this for a long time. I think they knew which way their claims were going.

THE COURT: Backhanded compliment there.

(Laughter)

MR. LIESEMER: They knew which way their claims were going. Counsel could have called me and I would have explained how all of this works. So, I'm taking all of this with a grain of salt.

But, even then, okay, so, they never objected, the Court approved them. I don't see any reason for the Court to revisit, okay, because I mean at the end of the day, no matter how we rescramble the values and the numbers, all right, the central question will be whether North River achieves a blocking position in Class 7, basically is able to veto the plan and -- or whether it's not.

I mean, we could, you know, take the statistic and let's say, okay, well, we'll just, you know, give everybody $1 voting amount in Class 7. Well, on that basis, we would still

have the vote, Class 7 would still accept. Or you could do it another way and North River would have its blocking position.

And there is no reason to undertake that exercise and to go through any sort of this, you know, these collateral distractions just to figure out whether North River ought to have a blocking position on the plan or not.

North River clearly has problems with our plan and they have articulated a number of those objections to Your Honor already. And we submit that it is time, rather than figuring out whether North River deserves a blocking position, it's time to move on to confirmation, and this Court can consider all objections, including those made by North River, and we will decide then whether their treatment under the plan is proper and whether the absolute priority rule is complied with and so on and so forth. Let's decide then. Let's move on from this. There is no reason to revisit anything. The vote has been made and there were reasons why we constructed the vote as we did.

I'm seeing if there's any other points I need to address. I think I've covered most of that. One thing I don't want to let slip.

We received two submissions from MidStates in response to North River's motion, in which MidStates wants what's known as insurance neutrality language in any order. We don't think that that's really necessary, and I think this

Court can make clear either in a bench ruling or in the order itself that you're estimating voting amounts, you're not deciding on the merits, so there is no reason for other courts and other proceedings to, you know, to follow that or consider that.

This is basically a decision that the Court acting in its discretion is making, strictly for deciding how to weigh the parties' particular voting. So, it's unnecessary and we don't think that needs to be in there.

Unless Your Honor has anything else for me, I will stand down.

THE COURT: Thank you. Before -- is the U.S. Trustee taking any position?

MR. SPONDER: Thank you, Your Honor. Pursuant to this motion, the 3018 motion, the United States Trustee is not taking a position.

THE COURT: All right. And I assume noone on the phone is taking a position?

UNIDENTIFIED ATTORNEY: No, Judge. Thanks.

THE COURT: Counsel?

UNIDENTIFIED ATTORNEY: Could you assist, please?

MS. ROSS: Yeah.

THE COURT: Did you?

MS. ROSS: If I may?

THE COURT: Yes.

MS. ROSS: For the record, Sommer Ross with Duane Morris on behalf of MidStates Insurance. As counsel pointed out, we did file a response to North River's motion, and in that response we did request insurance neutrality language. The purpose being so that MidStates' rights under its policy are not prejudiced.

And the reply that was filed by the debtors or the response filed by the debtors in opposition to the motion, just reiterated the point that insurance neutrality language is necessary.

And the reason that we filed a reply to the plan proponents' opposition was to make a statement that all policies contain language requiring all sums allocation.

As we discussed here today at length, that is, you know, an issue for the state court in the coverage action and it is our goal that any order entered by Your Honor in connection with the motion before you, you know, MidStates should not be prejudiced by any subsequent Court's interpretation.

Noone knows how a subsequent Court may interpret whatever order it entered, but the insurance neutrality language is necessary and it would preclude any subsequent interpretation that could be ripe to prejudice to MidStates' rights under its policies. And, again, MidStates' policies are not before your Court or the subject of this motion. Thank

you.

THE COURT: All right. Thank you.

MR. CALHOUN: Your Honor, George Calhoun for North River. Those are some very interesting presentations. With respect to Mr. Malone's presentation, it was a little bit remarkable to hear all the things that the state court did and didn't do, even though some of those things that it allegedly didn't do were in its orders.

So, there is no dispute that North River has provided defense and is obligated to provide defense. We've never disputed that.

The idea that the state court would take that up and we would be eligible for reimbursement only for claims that didn't fall within our policy period at all, is sort of interesting because if it doesn't fall within our policy period at all, we don't provide any defense. It's not relevant to us. It doesn't trigger our policy if the injury doesn't occur during our policy period.

So, that's simply not an issue. It could not possibly have been an issue before the state court. If the policy -- if the injury doesn't trigger our policy, we don't even provide a defense and we're not obligated to do so.

The question before the Court was how do you allocate injuries that cross uninsured and insured periods. That was the very issue in front of the Court. The Court in that -- and

the state court considered the Fulton Boiler case that he talked about, it considered the Rapid-American case that Mr. Malone talked about.

And what the Court determined was that they hadn't -- the insurers had not waived their right to seek defense costs or indemnity costs and that they could file their motions in those when they determine to what extent claims go within insured and uninsured periods.

That's exactly what it did. You can read the order yourself. Us arguing about what it says is sort of pointless. It's right there on paper. The cases that the Court relied on are right there on paper. It's many of the same cases that we've heard about today.

It's simply not the case that New York law doesn't allow pro rata allocation of defense costs and for that there are a number of cases where that's been the case. You know, there's Travelers v. Northrop Grumman Corp. case where the -- there's some disputes about what claims fell within what period and the Court entered an order requiring the debtor to pay, or the insurer -- I've got my bankruptcy lawyer prejudices, so I say debtor instead of insured. I probably will say insured instead of debtor.

THE COURT: Understood.

MR. CALHOUN: Required the insured in that case to pay 25 percent until those figures could be worked out about

exactly where which claims fell. So, it's just not true that New York law doesn't allow pro rata allocation of defense costs.

It is true that their case is going off in different ways. That's unfortunate and that's often the cases that you're presented with.

But, it can't be the case that we're talking about only claims that fall outside of coverage. That just doesn't make sense. It wouldn't make sense to present that to the Court in the state court action, because that's easy.

So, the idea that that's what was at issue or the fact that we have an obligation to provide a complete defense, means that we don't later get to make a claim. That's completely contradicted and what the judge ruled and all the Court's rulings in the state court action.

So, you know, you can factor in whatever you want with respect to the likelihood of their motion to renew being granted as you're exercising equitable powers, discretionary powers.

But, you can't say, oh, that wasn't before the Court, because that's what the Court did consider and that's what it ruled in its ruling in our favor on that issue in the sense that it allowed us to make contribution claims for expense and indemnity. And although it hasn't ruled on how those will turn out with respect to specific claims, the fact that we're

allowed to make them, in other words, is set.

So, it can't be the position that we're not entitled to make and which means as a matter of law, it can't be that our claims are zero, based on the law. It could be the Court finds that based on facts those issues. But, the Court basically found factual issues and that's why it sent it back for determination. The issues about what the New York law were, were up for the Court to decide.

THE COURT: So, if I thought that the state court was going to revisit the issue in light of KeySpan and other cases, and it wanted to discount your claim from 24 million, 25 percent, to 18 million or 15 million. You're also saying it doesn't make a difference if I allow the claimants' claim?

MR. CALHOUN: That's where I started at, Your Honor, because what you can probably tell from MidStates filing, insurers care a lot about these issues, they're hotly litigated in the state courts. And, frankly, noone really wants to get into these issues, outside of the state court. But, that's, unfortunately, the way it is.

But, that's absolutely correct, Your Honor. If you were to decide I'm not going to revisit that, there would be no reason to grant any of this, because it's not going to make a difference to vote.

And, Your Honor, you can do that. We disagree with it, but you can do that. But, you know, we asked to object to

these, for the asbestos claimants to file proofs of claim so we could object to them. And if we are allowed to object to the claims, their votes would all be zero, or you'd have to estimate them for real, instead of just the cherry pick estimation that we ended up with.

I agree with my colleague that there was a purpose to how they selected the voting procedures for the claimants. The purpose was to get an accepting class. You know, it's not, I mean, that's a little cynical, but it's true. There's not -- there's no secret there.

And I agree with them that there are practical difficulties with respect to any individual claim. How do you sift the good from the bad?

Where I depart with them is that statistical methods aren't appropriate. We hired an expert. He has done the work that they talked about deferring. And he's been an expert for FCRs, he's been an expert on all sides of this, and, you know, we picked the scenario that we used for proofs of claim.

But, under his median scenario, the total indemnity that this debtor will face in the future is about $24 million. They've already got 23 from the debtor. At their net present value, valid claims are going to get paid in full, already.

So, you know, the issue of voting is important and the issue of whether they revisit them is important. You could certainly say I'm not going to revisit them and maybe that

becomes an issue down the road, but that's -- ultimately, I don't think it will because we think you're going to deny the confirmation of this plan. But, you've really got to make it easy and deny it on the vote so that we can come back with a plan that's got a better shot.

On the 502(e)(1)(B) issue, it was kind of an interesting argument that we heard there, too. It's the objector's burden to show that there's co-liability. And what you heard was, well, maybe the debtor would be obligated to pay these defense costs, we're not sure, if it presents any evidence that in fact there is a liability of the debtor. And that's just not the case. The debtor wasn't jumping up and down and saying, yes, we are liable for that because the insurers pay it.

Now, we think we have rights to seek reimbursement of that, but that's the situation where it is. I mean, it's not distinguishable and argued from Chemtura or from R&I which talked about not just the fact that maybe these claims were people who were defending themselves. They talked about co-liability on the underlying claims from the claimants and that was where they focused to distinguish defense costs from indemnity costs.

If Your Honor does want to get into the merits of what New York cases have said about defense costs or the precise language of all sums and all that, we're happy to

submit the additional cases that we refer to and that are out there on that.

We don't think it's necessary under light of the state court's rulings that we have the right to file those motions, but those rulings are inconsistent with a regime of law where such filings are barred as a matter of law.

We understand they disagree with that, but that's not where it is. You know, we've been allowed to file those motions by courts that have control of that issue.

So, yes, you could discount on the likelihood that the state court revisits that. But, at the end of the day, it's only going to matter if -- they've got the burden of changing th court's rulings.

THE COURT: Right.

MR. CALHOUN: And even if you were to discount it, I don't think you could give it realistically a very large discount based on changing the rulings when this issue about that policy language has been around for years and courts have ruled on it almost exclusively in our favor.

I disagree with Mr. Malone's characterizations of some of that language that courts have ruled on. The only courts that have said Viking Pump applies have specific non-cumulation language and the courts have not done that based on simply language in the definition of bodily injury or things of that sort.

THE COURT: I won't need the cases submitted that you cited. I took notes. I do intend to look at them, but I don't need you to supply them.

MR. CALHOUN: All right. There are others. That's the only reason that I make that offer.

THE COURT: I mean, you're -- let me just, for the benefit of all. We know this decision can't linger.

MR. CALHOUN: Yeah.

THE COURT: But, nor is it going to be a ruling from the bench today. I will probably take a few days, into next week, and do something and have a chance to at least give it some thought since my colleagues in the state courts have had it for years.

(Laughter)

THE COURT: So, it's only fair.

MR. CALHOUN: We're not going to get into the New York State Court practices. It might get me in trouble.

THE COURT: Let me ask you this, regarding your expert. You have a submission with his determinations. I can accept that as a proffer and I can offer the debtor and the asbestos claimants, do you want an opportunity to examine under oath?

MR. WEHNER: If they're going to proffer the witness then we would take cross examination of him.

MR. CALHOUN: He's here. We're happy to do that.

THE COURT: I think it would be expeditious to take the proffer, to accept it as a proffer. Do you anticipate -- I'm trying to gauge time for the court.

MR. WEHNER: I only have a few questions if --

THE COURT: Then why don't we do that to have a full record?

MR. CALHOUN: Okay.

THE COURT: If acceptable.

MR. CALHOUN: So, we would proffer his report.

THE COURT: I'll take the report into evidence. Do you have -- it was attached to?

MR. CALHOUN: It was attached to his declaration which was attached to our motion.

THE COURT: To his declaration. So, his declaration and the attached report. And then if you're prepared, put him on the stand for a limited cross examination. One thing I need is to have, well, I'll pull it up here. Why don't you come on up? Well, before you do that. Mr. Calhoun, is there anything else you wanted to add?

MR. CALHOUN: No, I think we covered it. You know, the appellate court has already considered the Rapid-American and the Fulton Boiler cases that were cited and found that those didn't preclude our motions. So, I think we're ready to proceed with Mr. Scarcella.

THE COURT: All right.

MR. CALHOUN: I have referenced the Travelers v. Northrop Grumman site to Your Honor. I didn't give you that pin site.

THE COURT: Yes, let me have that site, please.

MR. CALHOUN: It's 2013 WestLaw.

THE COURT: Bear with me. The case name?

MR. CALHOUN: It's Travelers Indemnity Company v. Northrop Grumman Corp.

THE COURT: Northrop. Okay.

MR. CALHOUN: And it's 2013 WestLaw 3388235.

THE COURT: Two, three, five. All right. Thank you. And --

MR. MALONE: Your Honor, if I might just very briefly respond to let you know that we did mention that there were certain cases where defense was allocated by agreement of the parties. That's one of those cases.

THE COURT: All right. I understood the arguments.

MR. MALONE: Thank you, Your Honor.

THE COURT: And let me -- I just want to make sure.

MR. CALHOUN: And, Your Honor, if it further helps you, we can give you all the trial court briefs where all of this was briefed multiple times, and the appellate briefs.

THE COURT: No, thank you.

(Laughter)

MR. CALHOUN: That, Your Honor, is why we think you

should rely on the existing rulings.

THE COURT: This is the declaration of Mr. is it Scarcella or sella (pronouncing)?

MR. SCARCELLA: Scarcella is the way it's commonly said.

THE COURT: Okay.

MR. SCARCELLA: But in Italy it's actually pronounced Scarcella.

THE COURT: All right.

MR. SCARCELLA: You're right, either one.

THE COURT: Okay. Why don't you come up here then? Thank you. And I'm going to ask you to raise your right hand.

M A R C S C A R C E L L A, WITNESS, SWORN

THE COURT: And if you would please repeat your name and give a business address for the record?

MR. SCARCELLA: My name is Marc Scarcella and my business address is 3330 Washington Boulevard in Arlington, Virginia.

THE COURT: All right. Counsel, you may proceed.

MR. CALHOUN: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WEHNER:

Q Good morning, Mr. Scarcella.

A Good morning.

Q Hello, again.

A Hello.
Q We just saw each other yesterday.
A We're becoming close friends.
Q Yeah. Mr. Scarcella, do you understand that your report has been proffered as sort of your direct testimony here today? Do you understand that?
A Yes.
Q This is the first time you have been the author of an expert report estimating the number and value of asbestos personal injury claims that claimants would bring in the future, isn't that right?
A Correct.
Q Now, in your report, you come to the conclusion that North River's share of defense costs in the future would be somewhere in the range of 2.3 million to 2.6 million, is that correct?
A Without my report in front of me, I can't say for certain, but that sounds about right.
Q I'm happy to provide a copy of the report if you --
THE COURT: The Court has it in front of the Court, so why not make it available if you have it?
MR. WEHNER: I will give the witness a copy.
THE COURT: Thank you.
MR. WEHNER: May I approach the witness, Your Honor?
THE COURT: Yes, please.
Q Mr. Scarcella, I have given you a copy of what I believe

to be your report, and I've marked it just for convenience sake, Scarcella Exhibit 1. Do you recognize that as your report?

A Yes.

Q Let's go back then to my question. In your report you calculated North River's share of defense costs in the future to be somewhere in the range of 2.3 to 2.6 million dollars. And I direct, for your convenience, you to Page 7.

A Correct. I see that.

Q Okay. Is that correct, what I said?

A Yes.

Q So, you think that North River's -- here you say RiverStone, but. What's the relationship between RiverStone and North River?

A My understanding is that RiverStone bears the responsibility for the North River policies.

Q So, when you say RiverStone, you mean also North River, correct?

A Yes. I think that relationship was described and defined in the prior page.

Q So, North River's future defense costs payments are between 2.3 million and 2.6 million, is that correct?

A Yes. Based on the allocation assumptions used in the report.

Q North River has asked the Court in a motion to allow its

claim for voting purposes to be 24.53 million. And that is not a number that appears in your report, is that correct?
A I don't believe that it does. And I don't know how that was calculated, so it would be difficult for me to tell you exactly what components of my report were leveraged in coming up with that number.
Q In your report, Mr. Scarcella, you calculated a discount rate that would be appropriate for amounts that would be paid by the insurance company like North River, is that correct?
A Yes. In the appendix I do offer various options of potential discount rates, if and when future estimated costs would need to be discounted to present day value.
Q You concluded there, did you not, that the discount rate that would be appropriate for a property casualty insurer like North River, would be 8.2 percent, is that correct?
A That's correct.
Q It is also true, is it not, that the numbers that precede that part late in your report are all nominal, not undiscounted numbers, is that correct?
A That's correct. They're nominal.
Q In preparing your report, Mr. Scarcella, you did not talk to any defense counsel who represent Duro Dyne in asbestos personal injury cases, is that correct?
A That's correct. There were no direct correspondence.
Q You didn't talk to anybody from Duro Dyne?

A No, I did not.
Q You didn't talk to any asbestos claimants?
A No, I did not.
Q In your report, Mr. Scarcella, you did not examine the possible effect of a bankruptcy that might -- what effect that might have on future claims, is that correct?
A Yes and no. We discussed this at length yesterday. I considered the impact the bankruptcy could have on this portion of non-settling insurance tort claims and it was my determination that there was no concrete qualitative theory in the plan that would suggest that claims that were being brought against Duro Dyne in the tort system in the contemporary period leading up to the prepetition or the petition date, would somehow be restricted in any way from pursuing the claims against the non-settling insurers post-confirmation.

And even if there was some sort of concrete qualitative argument that could support that theory, it would be very difficult to quantify what that type of impact would be, what that discount would be.

As I read the plan, claimants who felt that they had a compensable claim against Duro Dyne in the tort system prepetition, if they felt they still had a compensable claim against Duro Dyne post-confirmation and felt that they deserved monies beyond what the trust was compensating them for, that they would then pursue a claim against the non-settling

insurers in the tort system, just as they would prior to the petition date.

Q So, you referenced our deposition yesterday. When I asked you about this yesterday at the deposition, and I'm reading from Page 39. Line 24 in the deposition I asked, "Can you point me to anyplace in your report where you examined the possible effect of the existence of a bankruptcy trust on future claims behavior?"

And you said, "That is not in the report because it was determined there was no concrete way of quantifying any potential impact, if any. And, therefore, the forecast of the tort system having existed prepetition would be the estimate that I would put forward." Is that what you said?

A That sounds very consistent with what I just mentioned. And I believe the discussion was a little bit more lengthy than that, but that was certainly something that I would have said.

Q When you were estimating defense costs here, you did not know whether or not Duro Dyne has ever tried an asbestos personal injury case to verdict before a jury, ever, is that correct?

A That's correct. I don't recall seeing any indication in the claims data I received. Though I did note, in the report as well as yesterday, that there were some high individual claim dollar amounts for indemnity, which may have been verdicts, but they also could have been just through way of

settlement.

Q But, you don't know whether there was any? If there was ever any trial to verdict for Duro Dyne?

A That's correct. I did not see anything in the data that would indicate that.

Q When you say you don't see anything. You're not aware of any such verdict?

A Correct.

Q And you don't know whether or not there was ever such a verdict?

A Not as I sit here.

MR. WEHNER: That's all I have. Thank you.

THE COURT: All right. Thank you. Any other counsel wish to examine?

(No audible response)

THE COURT: All right. Mr. Calhoun?

REDIRECT EXAMINATION

BY MR. CALHOUN:

Q Now, almost good afternoon, Mr. Scarcella. Nice to see you again. I have just a couple very, very brief follow-up. You were asked whether this was the first time you were an author of a report concerning the estimation of future asbestos claims. Could you tell the Court a little bit about your experience in estimating future asbestos claims?

A Certainly. I started as the statistician for the Manville

Personal Injury Asbestos Settlement Trust back in 2001, where I regularly analyzed their claim data and compared internal estimates to those offered by outside consultants as to what the future liabilities might hold.

Then I spent seven years for a D.C. based consulting firm called ARPC, where the firm was regularly retained as estimation experts on behalf of future claim representatives, at times, though more limited, debtors and, at times but more limited, creditor committees, in some of the largest asbestos bankruptcies under 524(g) of that decade.

I worked on teams extensively. My specialty and focus was the forecasting of future cash flows and the discounted value of those cash flows under both the tort system as well as under trust environments.

Then I spent seven years as a principal at Bates White Economic Consulting where, again, had the opportunities to work on the estimation of future liabilities associated with asbestos injuries in both the context of bankruptcy as well as in the context of SEC reporting disclosures for reserves.

It is true that in those instances I was a key member of the estimation team, though the official author on the reports would have been other experts at the firms for which I worked.

Q And the methods you used to prepare this report, are they commonly accepted by experts who prepare estimations of future

asbestos claims?
A Very consistent, particularly with the experts that I've worked with in the past, both on behalf of futures reps, creditor committees, and debtors.
Q And when you prepared this report, you were asked about the range of potential defense costs that North River might be responsible for. In fact, you prepared three different scenarios, right?
A Correct.
Q All right. And do you have an understanding of what scenario North River based its claim on under your three scenarios?
A I do not.
Q In your maximum scenario, what was the overall defense cost that we would have -- let me back up. In the maximum scenario, you projected a total defense cost of 51.3 million, correct?
A Yes. Approximately 51.3 or 51.4. In fact, and just to clarify, there are three scenarios presented on that summary page, which is the minimum, the maximum, and the median. But, actually on Page 24, Figure 26, there's actually 12 independent forecasts that were run based on the four different calibration periods noted there and three different incidents curves.
So, the three you referenced, the minimum, maximum, and median, are just three or two scenarios from that discrete

set of 12, plus the median of all of those scenarios.

Q And you were asked whether you talked to defense counsel or asbestos claimants in connection with preparing your report. Did you feel it was necessary to do that in order to evaluate the data that you had?

A The data was very informative. I mean, first and foremost, whenever doing these forecasts you rely on the historical data points that you have. It's only in the case that you see something that looks like an anomaly and you have the opportunity to discuss with somebody let's say at the defendant or counsel level, where that could be somewhat beneficial to your analysis. But, first and foremost, and almost predominantly, it all relies on the historical data.

Q Thank you, Mr. Scarcella.

THE COURT: All right. Thank you. Anyone else?

(No audible response).

THE COURT: You may step down. Thank you for your time.

MR. SCARCELLA: Thank you.

THE COURT: Welcome again to Trenton. I wasn't going to have him come down for nothing.

MR. CALHOUN: No.

THE COURT: All right. Any other closing comments or issues?

MR. CALHOUN: Your Honor, I just wanted to point out,

although I don't think there's a suggestion, the math on how we took Mr. Scarcella's number and arrived at a claim, is in our motion and in our proof of claim.

THE COURT: Thank you. All right, folks, I'm going to give this some more thought. I'll either place something on the record or advise of a conference call. I understand time is short and there's a lot of work to be done. I appreciate your efforts on this. Well argued, well briefed. Thank you.

ALL ATTORNEYS: Thank you.

MS. ROSS: Your Honor --

THE COURT: Kathy, let's go off record.

MS. ROSS: One more matter before we go off record.

THE COURT: One more matter on record.

MS. ROSS: It's just a very quick housekeeping matter. So, when we were before Your Honor last, it was in connection with certain insurers' motion for relief from the automatic stay.

THE COURT: Yes.

MS. ROSS: In the ruling you had said the stay would be lifted effective March 1 and you would carve out the inter-insurer claims from --

THE COURT: Correct. I recall.

MS. ROSS: Right. The carve out was not included in the form of order that was entered. We have an amended order granting stay relief and has been shown to counsel and to the

plan proponents and all the insurance counsel.

THE COURT: Just give it to my law clerk and I'll get it entered.

MS. ROSS: Thank you, Your Honor.

THE COURT: Now, off record.

* * * * *

**C E R T I F I C A T I O N**

I, JANET D. PERSONS, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Janet D. Persons

JANET D. PERSONS

J&J COURT TRANSCRIBERS, INC. DATE: February 15, 2019