UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY (TRENTON)

| | | |
|---|---|---|
| IN RE: | . | Case No. 18-27963 (MBK) |
| | . | |
| | . | |
| DURO DYNE NATIONAL CORP, *et al.* | . | United States Courthouse<br>402 East State Street<br>Trenton, NJ 08608 |
| Debtors. | . | |
| | . | March 7, 2019 |
| . . . . . . . . . . . . . . | | 9:46 a.m. |

TRANSCRIPT OF CONFIRMATION HEARING
BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Lowenstein Sandler<br>By: JEFFREY D. PROL, ESQ.<br>TERRI FREEDMAN, ESQ.<br>One Lowenstein Drive<br>Roseland, NJ 07068 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By: JEFFREY M. SPONDER, ESQ.<br>ROBERT SCHNEIDER, ESQ.<br>MITCHELL HAUSMAN, ESQ.<br>One Newark Center<br>Newark, NJ 07102 |
| Audio Operator: | Kathleen Feeley |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

APPEARANCES (cont'd):

| | |
|---|---|
| For Official Committee of Asbestos Claimants: | Caplin & Drysdale, Chartered<br>By: JAMES WEHNER, ESQ.<br>KEVIN MACLAY, ESQ.<br>JOHN FIALCOWITZ, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| For Lawrence Fitzpatrick, Proposed Futures Representative: | Young, Conway, Stargett & Taylor<br>By: ED HARRON, ESQ.<br>SARA BETH A.R. KOHUT, ESQ.<br>MICHAEL NEIBURG, ESQ.<br>Rodney Square,<br>1000 North King Street,<br>Wilmington, DE 19801 |
| For Hartford Accident and Indemnity Co.: | Shipman & Goodwin LLP<br>By: JOSHUA D. WEINBERG, ESQ.<br>400 Park Avenue, Fifth Floor<br>New York, NY 10022 |
| For Federal Insurance Co.: | Crowell & Moring<br>By: MARK PLEVIN, ESQ.<br>MARK S. LICHTENSTEIN, ESQ.<br>590 Madison Avenue<br>20th Floor<br>New York, NY 10022 |
| For The North River Insurance Company: | Ifrah PLLC<br>By: GEORGE R. CALHOUN, ESQ.<br>1717 Pennsylvania Ave., NW<br>Washington, DC 20006 |
| | Kennedys CMK<br>By: CHRISTINA SALEM, ESQ.<br>570 Lexington Avenue, 8th Floor<br>New York, NY 10022 |
| For 4 Site, LLC: | Rabinowitz, Lubetkin & Tully, LLC<br>By: JEFFREY A. COOPER, ESQ.<br>293 Eisenhower Parkway, Suite 100<br>Livingston, NJ 07039 |

\- - - - -

# I N D E X


| WITNESSES: | PAGE |
| --- | --- |
| MARK SCARCELLA | |
| Direct Examination by Mr. Calhoun | 15 |
| Cross-Examination by Mr. Wehner | 22 |

| EXHIBITS: | ID | Evid |
| --- | --- | --- |
| Creditor Exhibit C-1 | 19 | 28 |
| Creditor Exhibit C-2 | -- | 28 |

THE COURT: All righty. I appreciate everybody's indulgence on that, and we are ready to proceed in Dura Dyne.

Mr. Prol?

MR. PROL: Good morning, Your Honor.

THE COURT: Good morning.

MR. PROL: Last night after we left the courthouse, we did reach upon terms of settlement with the Smart Union. We'll just put it on the record. The debtors have agreed to pay $76,332 on account of the Smart claim within ten days of entry of a final order approving that settlement.

And the debtors have also agreed to assume the collective bargaining agreement between Duro Dyne Midwest and Smart. That CBA covers only the Ohio plant.

THE COURT: Right.

MR. PROL: And consistent with 365, we're assuming that contract. We're not modifying it at all. It will only continue to apply to the Ohio plant. It will not apply to the debtors' consolidated operation post-confirmation.

THE COURT: This resolves the objection to the claim? There'll be a consent order to be submitted. That matter's on for the 18th I believe.

MR. PROL: Yes. Yes, it resolves the objection to the claim and resolves their objection to confirmation.

THE COURT: All right. That's always good to hear.

MR. PROL: Okay.

THE COURT: And we'll wait for the consent order to come in.

MR. PROL: Okay, great. Thank you.

And with that, Your Honor, the debtors, the plan proponents have no further witnesses that they intend to call.

THE COURT: All right. Thank you. So I assume then that the plan proponents rest their case --

MR. PROL: Yes, Your Honor.

THE COURT: -- with respect to confirmation?

I guess we turn to this side of --

MR. PROL: Your Honor, I guess we would just ask that the exhibits that were marked in our case would all be moved into evidence. And I don't think that the plan supplement was marked, and we would ask that that be marked and moved into evidence as well.

THE COURT: I have P-1 through P-7 marked. Let me ask objectors, are there any objections to -- I'm assuming they're not talking about the slides that were there. Those were just demonstrative. What you're talking about what's been marked.

MR. CALHOUN: Your Honor, we raised some objections to Mr. Podgainy's declaration, but I understand you've overruled those. I just want to make sure that that objection is to be on the record.

THE COURT: It's preserved for the record.

MR. HAUSMAN: And my understanding, Your Honor, all those documents are documents that were filed in the bankruptcy case?

THE COURT: Yes.

MR. HAUSMAN: No objection.

THE COURT: All right. I would take if you have a copy of the plan supplement. At some point if you want to -- I'm going to put it aside as P-8 if we go further.

So we're going to turn to the objections, and I understand Objectant North River is going to put on witnesses. In advance of the objector's case, in fairness I wanted to render a ruling on the sealing motion.

In the bankruptcy context, the right of public access -- and this is with respect to the I guess the four sealing motions, separate motions with respect to the four proposed settlements -- that will test my memory -- Hartford, Federal, MidStates, and --

UNIDENTIFIED SPEAKER: Munich.

THE COURT: -- Munich. Close. The right of public access is prescribed by the Bankruptcy Code under 11 U.S.C. Section 107(a) which is a codification of the common law general right to inspect judicial records and documents. Section 107 provides in pertinent part that is: "Except as provided in subsections (b) and (c) of this section and subject to Section 112, a paper filed in a case under this title in the

dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times and without charge." That's 11 U.S.C. Section 107(a).

Congress has also codified a few limited exceptions to this general rule in Section 107(b) and (c). The Third Circuit has not addressed Section 107(b) or the corresponding rule, Federal Rule of Bankruptcy Procedure 9018, but it has examined the common law right of public access in the context of confidential agreements.

Judge Gross recently in the last couple of years in the In Re Owens Corning Armstrong World Industries case, 229 -- I'm sorry, 560 B.R. 229, noted that the presumption -- that notwithstanding the presumption, the court retains the authority to seal documents in certain situations when justice so requires.

And Judge Gross cited to the Garlock case which you all are aware of as well as the Third Circuit case of LEAP Systems, Inc. v. MoneyTrax, a 2011 Third Circuit decision which reaffirmed that all the right to access of judicial records is beyond disputed. It's not absolute, citing to the Nixon v. Warner Communications case, 435 U.S. 589, and further held that: "Every court has supervisory power over its own records and files and access has been denied where court files might have been used as a vehicle for improper purposes. Thus, while we recognize a strong presumption in favor of public

accessibility, we also permit the sealing of documents when justice so requires."

Now the criteria to be considered in determining whether confidentiality provisions in settlements justify keeping the substance of such settlements from public access must be flexible and vary according to the nature of the settlement and the specific intent and the impact of the settlement on the bankruptcy case.

Several years back Judge Colleen Brown in the In Re Hemple case, 295 B.R., developed a series of criteria to use in examining this issue. She indicated:

"The starting point for this inquiry must be the general mandate of Section 107 and that absent compelling circumstances, those documents filed in bankruptcy cases should be available to the public. Then, the specifics of the presented and the relevant factors must be considered.

"And then types of relevant factors include: (1) the necessity of the settlement to the viability of the bankruptcy case; (2) relevant confidentiality provisions truly essential to the settlement; (3) whether the creditors have been notified of the request for approval of the settlement without disclosure of the amounts or terms of settlement and, if so, whether any objections weren't opposed; (4) if

there has been an objection to the request to file the agreement under seal; (5) whether the objection demonstrates harm to the public's need to know; (6) whether the creditors will clearly benefit from the settlement, notwithstanding a lack of access to the specific terms of the settlement; (7) whether the parties will be able to keep the terms of the settlement confidential in the absence of a bankruptcy filing; (8) and whose interests are being protected by allowing the filing of the settlement agreement under seal; and (9) whether there's any negative impact either on the estate or in the treatment of other interested parties in this case; and (10) what the likelihood of other parties actually obtaining the details of the agreement if not filed under seal and whether the document needs to be kept under seal permanently or some shorter time period could suffice."

Now, this Court has no doubt that the majority of the cases address settlement agreements find that they do not constitute the type of commercial information that is the -- that falls within the purview of the exceptions noted in the statute.

In reading the statute, though, the Court does not view Section 107 as limiting the Court's ability consistent

with the common law as set forth in the Circuit to restrict access for a limited time period. What's being asked of this Court is to limit disclosure of the settle amount, that's the single term in each of the settlement agreements, through and including the date a plan if confirmed becomes effective so that the public is not being denied access to the information on a permanent basis. It's being limited for a short-term basis.

And even Section 107 speaks to a showing that the public has access on reasonable times. There is no bar or it doesn't address rather short-term limitations. When I apply the factors that I've read in this case, it is clear that the settlement amounts in each of these proposed compromises is sought to be sealed for the purpose of enhancing the trust's ability to negotiate a higher settlement figure from North River -- I mean the remaining non-settling insurer.

If that were to happen, that would certainly benefit the bankruptcy estate and the trust in particular. More dollars that go into the trust, enhance the return for future claimants which was certainly an interest of Congress in establishing Section 524(g). It's a public interest to ensure that more dollars go into trust for ultimate payment to those beneficiaries of the trust. That's a valuable public good.

I weigh that against the interests that are impaired by limiting access for the short time period in question.

Unsecured creditors in this case are not impaired because they are receiving under the Class 5 full payment. Class 6 are not -- creditors are not impaired because they are receiving full payment. Class 7 claimants, those that are being channeled, certainly the asbestos victims have supported sealing. They are one of the plan proponents and parties to the compromise. So the issue falls, of course this is obvious, to North River.

North River's interest when compared to the concerns of the public in enhancing the possible return and enhancing the availability of funds for payment to future victims fall short in this Court's view. Its interest as a creditor is not impaired. Like it or not at this juncture as a Class 7 creditor, it is not receiving dollars. It's receiving other non-economic offsets which it's contesting. But the amount of dollars to North River will not change as a result of these settlements.

Arguably, the only interest it has is to ensure that other insurers who are settling insurers are paying as much as possible into the plan, into the trust so as to be entitled to the protections of the channel injunction because North River's claims are or North River's ability to pursue contribution claims from these insurers are impaired by the channeling injunction.

So if these insurers are buying their policies and buying peace and buying freedom from contribution claims from

North River, it should have the ability to -- it should have the requirement to pay in a fair and equitable amount in order to protect those interests. And this Court ultimately has to make a determination that the settlement amounts being paid are a fair percentage of their exposure, their indemnity -- ultimate indemnity exposure.

But the Court does not see a situation where North River is going to argue that these other settling insurers should be paying more into the plan, a greater percentage of their indemnity exposure. Certainly, that doesn't help North River if it does decide to become a settling insurer in this case and it's not going to help North River in any future case to argue that the insurer should be paying a higher percentage. It's just unlikely to happen.

So given those interests that are there, the fact that this is for a short time period, that it's a limited amount of information that's being sealed, that there's been no objection from any party apart from North River whose objection is bottomed on its role as a we'll call it negotiation adversary with respect to the trust, that it doesn't impair their economic interests as a creditor under the plan that all creditors have been placed on a notice of the settlement and withholding of the specific settlement terms -- and, again, there's been no objection -- that outside of bankruptcy this type of information certainly would not be available.

Applying these standards and making these findings, the Court is going to grant the motions to seal through and including the effective date of the plan if we get that far. Needless to say if we don't confirm the plan, there are no settlements and there's no purpose served by sealing. I am going to consider the motions to approve the compromises essentially on the papers, although the parties are going to be free as part of any argument to raise any objections today and in any supplemental submissions. But the Court will review the settlement terms themselves as far as the settlement figures in camera and make a ruling as part of the same decision incorporated in this decision whether or not to confirm the plans.

So having given those rulings, North River is free to argue as part of its objection to confirmation that an appropriate percentage of the outstanding indemnity liability should be going into the trust by any settlement insurer. Any position you want to take on that, you're welcome to make. The Court will factor any percentage that you argue is appropriate in deciding whether or not these settlements meet those criteria. Thank you.

Mr. Calhoun?

MR. CALHOUN: Thank you, Your Honor. We'll -- I'll address certainly that issue when we get to argument. Your Honor, we would like to call Mr. Mark Scarcella. You may

recall he testified here about six weeks ago. We've had some discussions with the plan proponents and we want to shortcut the process a little bit.

If it's acceptable to Your Honor, we would stipulate that his testimony from the estimation hearing would be admissible at confirmation. We have one additional documents we'd like to admit and then he would be available for cross from the plan proponents if that works. Otherwise, we can -- we're happy to put him on and ask him questions.

THE COURT: I don't have any problem with that except I don't have a transcript of his prior testimony. I don't know -- was a transcript made of it?

MR. CALHOUN: No, I don't think I -- I didn't order one.

THE COURT: So my question becomes how do I know when I'm --

MR. CALHOUN: Okay.

THE COURT: -- reviewing it what he said. I don't want to necessarily have him testify. You could always go back and order it after the fact or if anybody can come up with a creative solution. I just don't have anything from which to look at and to take in.

MR. CALHOUN: We can certainly do that or I can put him on because it won't take long in either case.

THE COURT: If I recall the estimation hearing, it

didn't take very long.

MR. CALHOUN: It took about ten minutes, Your Honor.

THE COURT: After yesterday, ten minutes would be a blessing, so --

(Laughter)

THE COURT: Well, if you're comfortable, if you need time in advance or to prepare or --

MR. CALHOUN: No, we're ready.

UNIDENTIFIED SPEAKER: Let's just go ahead. Put him on.

MR. CALHOUN: That's fine.

THE COURT: All right.

Welcome back. Could I ask you to please raise your right hand?

MARK SCARCELLA, SWORN

THE COURT: I'm going to ask you to spell your name for the record and give a business address.

THE WITNESS: Certainly. It's Marc, M-A-R-C, Scarcella, S-C-A-R-C-E-L-L-A. Business address is 3330 Washington Boulevard in Arlington, Virginia.

DIRECT EXAMINATION

BY MR. CALHOUN:

Q Good morning, Mr. Scarcella. Good to see you again. I'm George Calhoun representing the North River Insurance Company. Can you tell the Court, please, about your professional

background?

A Certainly. I began in the area of mass tort claims analysis when I was the statistician and data analyst for the Johns-Manville Asbestos Personal Injury Trust in the early 2000s. I then moved on to a consulting firm called Analysis Research Planning Corporation which is a Washington D.C.-based consulting firm that has since been acquired by Anker Consulting.

My time with ARPC, as it's known, as spent largely in the area of mass tort, damages estimation, particular for asbestos bankruptcy reorganizations and confirm bankruptcy trusts. My particular role in those matters dealt primarily with the long-term financial obligations and forecasts of either damages in the tort system or under a trust compensation settlement program. Those models would be used to do things like set payment percentages for trusts to liquidate their assets, similar to what was discussed yesterday in testimony.

In 2009, I left ARPC and I went to another D.C.-based consulting firm, Bates White, where I continued to do damages estimation in terms of environmental and product liability mass tort, including 524(g) in other bankruptcy reorganizations, including Motors liquidation, Specialty Products Holding Corporation or Bondex as its known, as well as Garlock Sealing Technologies.

Q All right. And have you published in the area of asbestos

estimation?

A Personally as an expert, I have published in this particular case. My work at ARPC I was part of a team of analysts with again my primarily role being lead financial modeler for the future projections to test the financial viability of whether it be a trust or a company resolving cases in the tort system. That work also led to reserving exercises for let's say SEC purposes and disclosures.

Q Can you turn -- I believe you have a binder in front of you. Can you turn to Tab 9, please?

A I'm there.

Q All right. Do you recognize that as a copy of the report that you prepared in this matter?

A Yes.

Q Can you tell the Court what you were asked to do?

A I was asked to look at the historical experience of Duro Dyne in the tort system as far as indemnification claims and the defense of those claims and estimate future losses associated with tort system obligations for both indemnity and defense.

Q Is that the same sort of work that you did at ARPC on behalf of futures claimants reps?

A In part. Typically during an estimation proceeding for a bankruptcy, what you have available is the historical tort experience of a particular debtor and that's what you would use

as a foundation for an initial estimation in bankruptcy proceedings. Subsequent post-confirmation, you may consider other factors as far as what the trust-specific future financial outlook might look like because when you move from a tort environment to a trust environment, you may be dealing with different circumstances that lead to differences in claiming rates and payment rates.

Q Were you asked in this matter to attempt to inflate or minimize any of the future liability?

A No.

MR. CALHOUN: Your Honor, this has been premarked as Exhibit 9. If we can mark it as North River 1 or however you would like to make it, but I'd like to move the admission of his report.

THE COURT: Why don't we mark it as -- is there an objection?

MR. WEHNER: I would like a very short voir dire.

MR. CALHOUN: But it's already been admitted before, Your Honor, but -- because you admitted it --

THE COURT: As far as the estimation hearing. You can address some of the issues on cross.

MR. WEHNER: Okay. We --

THE COURT: I'll defer ruling on the admissibility until after cross. But we'll mark it as -- I'm trying to avoid you having new numbers.

MR. CALHOUN: I don't mind a new number, Your Honor.

THE COURT: Then why don't we just mark it as C-1, Creditor 1.

(Creditor Exhibit C-1 Marked for Identification)

MR. CALHOUN: Your Honor, would you like a copy?

THE COURT: Yes, please. Thank you.

MR. CALHOUN: Your Honor, may I approach the witness?

THE COURT: Yes.

(Pause)

BY MR. CALHOUN:

Q Mr. Scarcella, I'm going hand you another document that I've just marked as C-2. Can you review that and tell the Court what this document is? Do you recognize it?

A Yes. Thank you. So this document corresponds to the numbers that I originally produced in my January 11th report. What this does is take the aggregate summaries of three discrete scenarios that were presented in the report, one being the minimum scenario, one being the maximum, and one being the discrete scenario that very closely mimics the median of all 12 discrete scenarios that I produced in the January 11th report.

And it takes those aggregate summaries that were in the report and presents them in an annual nominal terms for the forecast that I produced.

Q So these numbers tie into the figures that are already in your report?

A Yes.
Q Just broken down annually?
A Yes, The first set of columns are for the indemnity and defense expenditures that I forecasted. The second set of columns corresponds then the aggregate solvent insurance share that were calculated in my report under the assumptions that were taken in the report, and the third set of columns will represent the remaining share to Duro Dyne once you deduct the solvent insurance share from the expenditures.
Q Can you turn to Page 40 of your report, please? This is a section of your report dealing with present value discounting and discount rates?
A Yes.
Q Can you explain to the Court how you arrived at the discount rate that you deemed appropriate if these figures were to be discounted?
A Well, the -- the figures that would be appropriate as far as discount rates depends on the assumption of risk or transfer of risk between the parties. So I looked at two different types of risk-bearing companies, one being an insurance carrier as a party to the case as well as a building products manufacturing company which was a proxy for a company like Duro Dyne.
And we looked at their risk profiles relative to market and industry and sector assumptions and statistics.

Under the general economic principle, foundation principle of time value of money, that a dollar today is worth more in hand than a dollar sometime in the future. And that fundamental principle is based on economic concepts of not only risk but also the idea of opportunity cost, the idea of -- of giving up a dollar today versus a dollar sometime in the future, you are foregoing the opportunity to use that dollar for something else, whether it be an investment, whether it be to pay down existing debt.

And with that in mind, when you look at a risk-bearing company, whether it be an insurance carrier or products manufacturing company or any type of company, you would look at what their what's called their weighted average cost of capital which takes into account their cost of carrying debt and equity as far as an operational company is concerned because when you think about the opportunity cost and the risk that underlie the time value of money concept. In order for a company to let's say make a payment up-front today, they have to justify that by measuring it against what else they could do with that money and this idea that maybe let's say paying down other debt is one of those opportunities. You look at something like the weighted average cost of capital.

To put it in personal finance terms, it's imagine you had a mortgage at 5 percent but credit card balances at 15 percent interest. If you were given a dollar today, it would

be wise to pay -- advance pay down your credit card debt because it has a higher carrying cost of capital than your mortgage which has a lower carrying cost of capital.

So when you look at the carrying cost of capital for a company, that percentage, that weighted average cost of capital is a good proxy for a discount rate because in order to get that company to incentivize them, to advance money for some purchase or funding, they will want to be satisfied knowing that they couldn't take that money and use it for an opportunity to pay down a higher carrying cost of capital or even something else that can yield a larger return, let's say research and development or just simple investments.

So there's a lot that goes into the concept of discount rates. But at its core, it's time value of money, it's opportunity cost, and it's a transfer of risk between parties.

Q Thank you, Mr. Scarcella. In your report, just one clarifying question, you were asked to assume that the Keyspan case applied to the allocation that you did, correct?

A Correct.

Q Okay. And if you used a different pro rata allocation, the amounts that you attributed to no insurance of Duro Dyne would have been less, correct?

A Correct.

MR. CALHOUN: Your Honor, I would like to move -- I think I've moved already C-1. I'd like to move the admission

of C-2. I understand you may want to reserve that for cross, but I just want to make sure those motions are --

THE COURT: All right. Are you done with direct?

MR. CALHOUN: I'm done with my direct, Your Honor.

THE COURT: Okay.

(Pause)

CROSS-EXAMINATION

BY MR. WEHNER:

Q Good morning, Mr. Scarcella.

A Good morning.

Q We've met before, but for the record, I'm Jim Wehner from Caplin & Drysdale for the Asbestos Committee. Mr. Scarcella, this is the first time that you have ever authored a report that estimates the number in value of asbestos PI claims that would be brought in the future, is that correct?

A As an expert, yes.

Q Well, at this point, you haven't been offered as an expert, but just as a matter of record, that is correct what I just said?

A Correct.

Q You --

THE COURT: He's been offered as an expert. He hasn't been accepted as an expert.

(Laughter)

MR. WEHNER: I didn't hear it, but --

THE COURT: I'm just clarifying.

MR. WEHNER: -- if you say he did, you know, that's fine.

MR. CALHOUN: Thanks for pointing it out. I'll make sure that it's clear on the record.

BY MR. WEHNER:

Q You, when doing the work for this report, did not talk to Duro Dyne's underlying asbestos defense counsel, is that correct?

A Correct.

Q You didn't talk to anybody at Duro Dyne, correct?

A Correct.

Q You do not talk to any asbestos claimants or their counsel, is that correct?

A Correct.

Q Do you know sitting here today whether Duro Dyne ever tried a case to a verdict?

A I do not.

MR. WEHNER: Your Honor, we would object to Mr. Scarcella's testimony being admitted as an expert -- as expert testimony on the basis of his qualifications and insufficiency of the materials that he looked at.

THE COURT: All right.

MR. WEHNER: If I can continue with cross or if you want to rule on it.

THE COURT: I'm ready to rule. Objection will be overruled.

BY MR. WEHNER:

Q Mr. Scarcella, your report generates a range of estimates of both defense and indemnity, is that correct?

A Correct.

Q Those different results that you come to are because you use different disease incidence curves and different what we call calibration periods, is that right?

A Correct.

Q And the disease incident curves are the projections of how much mesothelioma there will be in the future, right?

A In this particular incidence looking particularly at occupational exposure or occupationally-driven exposures and the resulting incidence of disease.

Q Right. You used a couple of different curves of what it might look like in the future, is that right?

A Right. There was three of them.

Q Right. And you used different calibration periods which are sort of the baseline on which you based your model, is that right?

A Right. It's looking back at the historical experience of Duro Dyne in the tort system and while it's not always clear which particular period in time the future may mimic, you look at various periods of time to try and bookend what a reasonable

range would be.
Q And as between those estimates, the various estimates that your report offers, you do not -- you find them all reasonable, is that correct?
A I find them all to be within a reasonable range. I would be surprised if an estimate of indemnity based on the same data under the same assumptions would produce numbers higher or lower than what I came up with.
Q Right. But the bottom end is as reasonable as the top end in your view?
A I think the approach to the top end and the bottom end were both done reasonably well. I think the key is whether or not there is more comfort in looking at different calibration periods. It's certainly reasonable to look at a shorter calibration period. Maybe one would feel more comfortable that the more immediate time period in the years leading up to bankruptcy is a better indicator of what the future may mimic as opposed to maybe a longer view that goes back five years or so which is one of the calibration periods I used.
One thing that I -- I would note and I do in my report is that if you took off the shorter calibration period of only about two years and the longer calibration period of about five years and you looked at those two calibration periods of three and four years, the results from those two calibration periods were very consistent with one another.

So while I would agree that the range itself in all the discrete scenarios in the range are reasonable, there may be something in the historical data itself that suggests that maybe the midrange would be more likely, though all are reasonable. I wouldn't be shocked if the future mimicked the more recent time period. Likewise, I wouldn't be shocked if it mimicked the longer time period.

Q When I asked you -- when I deposed you last month in Washington, I asked you in that deposition the question, do you have an opinion as to which calibration period is the best one to use here, you answered -- this is at 60, 10 through 14, "No, I didn't offer that opinion." Is that right?

A That's correct.

Q Okay. And the same is true, isn't it, of which incidence curve to use. You do not have an opinion as to which one is the best one to use, is that right?

A That's correct. But as I noted in the report, all three from a burn rate or decay rate perspective are all very similar from the 2017 point on. So there wasn't a lot of variation there, which again gave me a sense of comfort knowing that I could have three independent curves all telling me similar results.

Q Right. But different enough that taken with the calibration periods, you generate indemnity forecasts ranging from $12 million to $35 million, is that right?

A That's correct. But within each of those incidence curves, there isn't as much variation which is to say the -- the variation really stems from the calibration periods, particularly the five-year calibration versus the two-year calibration as opposed to the -- the differences and influence of the three incidence curves.

MR. WEHNER: Thanks. That's all I have, Your Honor.

THE COURT: All right. Thank you.

MR. WEHNER: Thank you, Mr. Scarcella.

THE WITNESS: Thank you.

THE COURT: Any redirect?

MR. CALHOUN: Just in case there's any confusion, we would like to offer Mr. Scarcella as an expert and request again that C-1 and C-2 be admitted.

THE COURT: C-1 and C-2 are admitted into evidence.

(Creditor's Exhibits C-1 and C-2 admitted)

THE COURT: Mr. Scarcella is accepted as an expert. Thank you.

MR. CALHOUN: Thank you, Your Honor.

THE COURT: I have no further questions. Thank you.

MR. CALHOUN: Your Honor, we're not going to call any further witnesses, so I don't know if the trustee has any witnesses or if we're going to be ready for argument.

THE COURT: Well, I think from yesterday you indicated no witnesses, just argument, Mr. Hausman. Is that

correct?

MR. HAUSMAN: That is correct, Your Honor.

THE COURT: All right. Any rebuttal witnesses on the plan proponent side? No?

Then we are prepared for argument. Do you all need any time or are you ready to move forward?

MR. HAUSMAN: Judge a five-minute break, Your Honor. We can just discuss how we'd organize the --

THE COURT: That's fine. All right.

(Recess at 10:27 a.m./Reconvened at 10:39 a.m.)

MR. COOPER: Jeffrey Cooper of Rabinowitz, Lubetkin & Tully. Since among the clients I represent is Mr. Hinden and he's not going to be called today as a witness, I wanted to ask whether I might be excused from the hearing going forward?

THE COURT: Go safely.

MR. COOPER: Thank you.

THE COURT: Mr. Hausman?

MR. HAUSMAN: Your Honor, Mitchell Hausman for the Office of the United States Trustee. Your Honor, the plaintiff's unconfirmable. Of course, it fails to satisfy the confirmation requirements of Code Section 1129(a)(3), and that has not been proposed in good faith. This is due to the lack of adequate safeguards and required disclosures in the trust distribution procedures which could lead to abuses in the payment of the claims.

In addition, the plan is unconfirmable because it cannot comply with Code Section 524(g). Under 524(g), the Court must make a finding that present and future claims will be paid in substantially the same manner. Future claims have a vital interest in insuring the plan contain strong protections against fraud and abuse. If left unchecked, payment of false claims could well exhaust the trust before some valid future claims can be paid, therefore, creating disparate treatment between present and future claims.

As the TDP states and as Mr. Fitzpatrick testified yesterday, once money is paid out, it's gone. If the payment percentage gets lowered, it's the futures that suffer. At past hearings Your Honor has stated that the Court is aware and concerned about the efficacy of the trust process as it developed over the last three decades and perhaps there are structural changes to ensure and address the fairness and adequacy concerns that have been raised in our objection to the futures representative.

We are here again today to address the fraud and transparency issues of the asbestos trust system. The trouble in this case is that the TD proposed has ignored all the inadequate safeguards and lack of disclosure and oversight that caused all the problems in past plans. The TDP in this case is consistent with pre-Garlock type plans.

The Garlock opinion showed that the fraud in the tort

system by plaintiffs withholding larger evidence in a tort case. The discovery showed that in 15 cases, the average plaintiff disclosed about two exposures to bankrupt companies' products but after settling with Garlock, made claims against 19 asbestos trusts.

Another way of saying this, in the 15 cases plaintiffs disclosed 32 exposures but failed to disclose an additional 284 exposures. This is a failure rate of 90 percent. This is from the Tulane Law Review article cited in our papers, Page 1123.

The Garlock opinion supported this by finding that plaintiffs withheld exposure evidence which could have mitigated Garlock's own liability and also found that plaintiffs were permitted to file claims against the trust even after representing to a court in a different proceeding that they had never been exposed to those defendants' products.

In addition, a subsequent study of the Garlock claims unsealed as the litigation concluded showed that many claims submitted by the same claimants and law firms to different trusts contained inconsistent information regarding the claimant's work history and exposure. And this is from insights and inconsistencies also cited in our objection.

To be specific, 21 percent of the claim study contained major factual inaccuracies. This is evidence of fraud in the trust system. The main issue appears to be the

lack of sharing of information between various trusts and, therefore, there is no way to detect inconsistencies regarding exposure and work history in claims that are filed.

To confirm this plan with the TDP as drafted almost insures that this case will be overrun with asbestos claims which would not be paid in the tort system. This is prejudicial to future claimants.

This is a debtor that prior to filing had 8,100 asbestos cases dismissed and settled 650 claims. There are currently 956 cases pending. This amounts to the debtor settling a few dozen claims annually on a national basis. This is a debtor with a specialized product that gave rise to an asbestos liability and has survived until now without needing bankruptcy protection.

The TDP itself says the goal is to treat all claimants equally and with the intention to pay all claims over time as equivalent to share as possible of the value of their claims based on historical values for similarly -- for substantially similar claims in the tort system. The phrase "in the tort system" is repeated several times in the TDP.

The changes we are asking Your Honor to make further this goal. Certainly, the type of exposure that plaintiff has been subject to would be relevant in the tort system. Garlock has proven this is an issue. The TDP as drafted helps keep secret whether a plaintiff has exposure in other cases. This

information can potentially change the results in the tort system.

If the TDP is not changed, the Court will be turning a blind eye to all the various studies, law review articles, and the Garlock decision which showed alarming evidence of fraud and mismanagement. This is compounded by the lack of transparency and oversight of the trust operations.

Specifically as detailed in our objection presented in Exhibit A, you can see that many of the provisions in this TDP are similar to pre-Garlock TDPs and ignore many of the innovations from the Garlock TDP. As a result of the findings that show the misrepresentations in Garlock, the trust procedures adopted in that case were very different from previous asbestos TDPs.

What we ask of Your Honor today we feel is simple. We know nothing is that simple, but adjust the TDPs to make it harder to commit the type of fraud that has been identified and add transparency and accountability to the asbestos trust process. If the Court does this, it will not inhibit pre-negotiated or pre-packaged asbestos plants in the future, a concern Your Honor had in our motion with the futures rep. It will just be harder to file duplicative and false claims which will fulfill the statutory requirements of 524(g), that present and future claims be paid in substantially the same manner.

We have suggested certain changes to the TDP

provisions and had a discussion with debtor's counsel about how to change the TDP. Unfortunately, we have not been able to make any headway. We think there can be several solutions. Most of our recommended changes are based on the Garlock model. We would gladly work with the plan proponents in revising certain provisions if consistent with Your Honor's ruling. Even your pre-ruling did not bring the plan proponents to the negotiating table. Apparently, they are waiting for a stronger indication of Your Honor's concerns.

Again, these changes need to be made because they are similar to pre-Garlock TDPs. Where the TDP has deviated has done so by making the TDP even less transparent and even more susceptible to abuse.

The following is a roadmap to the most troubling provisions in the TDP which need to be deleted and changed. TDP 6.5 keeps claim submissions confidential by treating them as settlement discussion and obligates the trust to resist discovery and disclosure. This provision is substantially identical to pre-Garlock cases and puts up many roadblocks to people seeking discovery into claims that have been received and paid including disclosure to other trusts. We have asked for language taken from the Garlock TDP. If there is confidential information that needs to be protected, there's nothing in the language that we proposed that prevents that.

TDP 5.6(a)(4), this is a provision that the plan

proponents did agree to take out, Your Honor. However, they made it clear that they may look to other trusts to accept disease level in lieu of medical evidence required under this TDP. And, you know, one thing I note in the provisions, they were saying 5.6(a)(4) just helps implement 5.6(a)(3) and they fully intend to use and implement 5.6(a)(3). They will look to other trusts to see the disease level and maybe accept or waive the medical requirements.

But, you know, what we're asking for here look -- for the same individual, look what they filed in another trust and see if it's consistent here.

THE COURT: So let me just clarify. The changes they made to 5.6(a)(4) are insufficient in what respect? Because they eliminated 5.6(a)(4) correct?

MR. HAUSMAN: Correct. I mean so they satisfied our concerns of 5.6(a)(4), but I'm just saying they did make it clear that that provision was really just to implement 5.6(a)(3), and they still fully intend to use -- look to other trust disease categories and possibly waive medical evidence.

THE COURT: So you're asking the Court to focus on (a)(3) which remains?

MR. HAUSMAN: We did not specifically object to that. I'm just using it to point out that by taking out 5.6(a)(4) -- in essence, yes, I'm asking the Court to look at 5.6(a)(3). And I'm making the point that they seem to have the ability to

look at other trusts when --

THE COURT: When they want to.

MR. HAUSMAN: Correct.

THE COURT: Okay.

MR. HAUSMAN: 5.6(b)(3), this provision exempts claimants from disclosing exposure to other products and provides no penalty for a claimant denying exposure to the debtor's products in a tort action. It again tries to keep information confidential and specifically states the information is not for defendants in the tort system. These are the type of actions that Garlock exposed and should not be allowed to continue. This provision needs substantial revisions.

TDP 6.3, this allows a claimant to withdraw a trust claim and refile without affecting the statute of limitations. This should not be allowed to happen. Again, this is an opportunity for claimants to gain the system in terms of timing of the disclosing the facts of their exposures. This provision should be deleted.

5.7, the order provision, has severe limitations. It states it may do a lot of things. It doesn't really state what it is going to do. They did change it from discretionary to mandatory, but we don't know how often it's going to happen. And we would suggest a stronger order provision by an independent party and, again, suggest language from Garlock.

Provisions we feel should be added, for certain claims the Garlock TDP included the claimant executor lease authorizing the trust to receive copies of any submissions that the claimant had to make to other trusts. This would help bring transparency and deter fraudulent claims, and there's no reason not to have one here.

And we think there should also be a provision for attorney fees cap. There's not contained one in the TDP, and there should be a limit on fees for uncontested matters.

THE COURT: Do other -- any other trust have those to your knowledge or in the Garlock trust?

MR. HAUSMAN: There is another trust that has it. I could provide the Court with that information, in the API case.

THE COURT: All right. Thank you.

MR. HAUSMAN: Your Honor, in reading the memorandum of law in support of confirmation submitted by the plan proponents which I also refer to as the reply, at first blush, it does seem to cast some doubt on the arguments made by the UST. However, after checking the authorities cited for arguments made in the memorandum of law, it shows that many of the arguments in the reply are not supported and the statements are misleading.

I could go through the response point by point, but given our fundamental disagreement, I don't think it's useful. When I say the fundamental disagreement, on Garlock and its

implications, and I will get into that in a second, I'll just give Your Honor an example of why I say it's misleading. The plan proponents quote a GAO report which observes that trusts were "committed to ensuring that no fraudulent claims are paid by the trust which aligns with their goal of preserving assets for future claimants."

What they don't say is that this observation is according to officials that were interviewed at all 11 trusts they selected to speak with. The GAO report is not based -- it's based on self-reporting. It does not purport to be an independent comprehensive analysis. The report goes on to state that the U.S. trustee only cites one case that involves any misstatement to an asbestos trust, and that case is from 2007 referring to the Canadian case, the tobacco case.

The response only addresses Garlock in a footnote and tries to summarily dismiss it by saying it's not about fraud in the asbestos system. It just criticizes the tort system and does not mention the word fraud. Your Honor, this is the crucial point and highlights the heart of the parties' disagreements.

The plan proponents are technically correct. Garlock involved fraud in the tort system. But the key point is that TDPs like the one before Your Honor today that allowed or at least aided in what Garlock or if the Garlock were described as a startling pattern of misrepresentation.

I think Your Honor can deny confirmation on this point alone. The TDP is an instrument for facilitating fraud in the tort system and, therefore, the plan is not proposed in good faith. The TDP says it's supposed to replicate recoveries in the tort system but inhibits those recoveries in at least two ways. Your Honor, the points I am making are primarily from the Tulane Law Review article by Lester Brickman which is cited in our objection. This article really highlights the interplay between trust payments, the claimants, and suits against solvent defendants in the tort system.

Getting back to why the TDP can inflate recoveries in the tort system, first, state courts generally require that the liable defendant be given credit for compensation for amounts the plaintiff has already received. Therefore, if a provision makes the amount of the trust recoveries hard to obtain or allows plaintiffs to first recover from a tort case and then bring trust claims, it inflates recoveries.

Second, there are several jurisdictions that require plaintiffs to prove not only exposure to a defendant's product but also show that the product was a substantial factor in causing the plaintiff's disease, therefore, making it difficult for defendants to obtain exposure information from trusts can also inflate recoveries. And I think we see from the Garlock decision that the Court lowered the amount of future -- of estimated liabilities from one -- from an approximate 1 billion

to 1.3 billion to 125 million.

And these points are in addition to the subsequent studies of the unsealed Garlock claims which showed major inconsistencies in trust claims in bankruptcy that I had discussed earlier. And this does affect and could be precluded by this trust having provisions to examine for the same individual other trust claims filed.

The subsequent studies in Garlock showed that there are major inconsistencies a person working at the same time in different parts of the country. There have been 30 years of history with this asbestos litigation and then Garlock comes along. The plan proponents choose to ignore its implication. The U.S. trustee does not. It should not be business as usual. That is the heart of the dispute. Quite frankly, the remainder of the response details cases that were pre-Garlock, and our response is the same. Garlock cannot be ignored.

Your Honor, we ask that you not confirm this plan until the TDP provisions discussed in our objection are changed. And just for Mr. Fitzpatrick's testimony yesterday, Your Honor, he testified about not making supplemental payments to claimants if the payment percentage increased unless it's over $250 and instituting a $50 filing fee which apparently was a new claim.

And while I'm not saying these aren't good ideas, I can't help but think the TDP is focused on the wrong issues.

It's not getting to the heart of the issues, and there are just some of these changes that may save them a little money. But in terms of knocking out some mesothelioma claims, there's no protections built in about fraudulent claims.

THE COURT: Are you finished with your presentation? I have just a question or two.

MR. HAUSMAN: I do. We had some other miscellaneous objections that Mr. Sponder will respond to that mainly have been resolved with the substantive consolidation and things like that. But before he details that, if Your Honor has questions?

THE COURT: I have a question that I was certainly going to pose to both sides regarding the TDP because it seems to me that a significant portion of the U.S. trustee's concerns are focused on transparency, transparency as far as a review of procedures and information. And part of it, I would think, is attributable to the oversight issue.

Now the oversight of the trust is of course by the trustee, but it's also by the futures rep and it's by the TAC. It would seem that many of the issues that the U.S. trustee is raising can be addressed if the oversight includes mechanisms to come to this court for review of procedures, as simple as guidelines for reviewing claims or releasing information, honoring subpoenas to other more substantive issues.

The bankruptcy courts in general retain oversight,

but I'm going to be candid. I look at the confirmed case that I've had previously, State Insulation, the oversight of the bankruptcy court has been limited to receiving once a year an annual report that is about three pages. It gives me numbers. It's provided to the U.S. trustee. I'd be shocked if they look at it, and I'd be shocked if but for this case, I'd be looking at it. The numbers are meaningless to me because they're just summary form. They don't show any -- they don't show the decision making process going into the numbers.

There is lacking some oversight mechanisms. No issues have ever been brought to me as a result in that case when there's a question or a debate in the TAC or as to oversight. So my question becomes would some of these issues be addressed by expanding the TAC, right now it's five members which are primarily asbestos counsel members, to include representatives of the Department of Justice, one representative of the Department of Justice, either the U.S. trustee or someone else, and maybe one member of the insurers. It is a good portion of their money settling insurers.

I'm not glued to any of this, but I throw it out because I'm -- I see that if there were oversight of the trusts and decision making and an avenue to bring concerns to the Court, then we don't have to rely on think tank studies, research studies, law review articles. I don't -- I'm not real confident that the future of a company and employees and the

survivability of a family-owned business that employees hundreds of people across the country should rise or fall on a law review article. I'm being candid.

But on the ground oversight, it may not be something that is palatable to the U.S. trustee or the Department of Justice, but certainly, a seven-member TAC in which two members are truly independent at least offers the eyes and ears on the ground that could bring issues before the Court. So I throw that out and would ask either at some point in time both sides give me their thoughts on it either in oral argument or written submissions.

MR. HAUSMAN: Your Honor, I've heard what you said. I think, you know, before I have a new job, I may have to discuss it with my -- you know, with my client. And we hear what you're saying and, you know, we do realize part of your preliminary ruling was you intend to confirm this plan.

We are arguing it not be confirmed with these provisions, but we think something, you know, possibly what Your Honor's suggesting but we can work things out here to bring -- the key point Your Honor hit the nail on the head is transparency and oversight. If we could make some real headway with that in either what Your Honor's suggests or another form, it would go a long way to my client agreeing to procedures, but --

THE COURT: In fairness to all today so that you

understand what I'm contemplating and, of course, I'll hear argument or discussion on it. After oral argument, I'm going to be asking for proposing findings of fact and conclusions. Needless to say, I'm only going to ask the objectors to give me proposed findings and conclusions of law as to their objections. I'll ask the debtor, the plan proponents to give me essentially it would be necessary anyway for the referral up to the district court. But I certainly would use these as a basis to make my decision.

But -- and I'll ask you at some point how much time you need for all that. But I would foresee that it gives some ability to advise the Court in response to questions I'm raising and also to continue discussions between objectors and plan proponents.

MR. HAUSMAN: Your Honor, in fairness to myself and even to the plan proponents, I think some of the things you've raised, I don't think either one of us -- I won't speak for them. I don't think I could give you a firm answer.

THE COURT: I didn't expect it. It's not how it works.

MR. HAUSMAN: I'm not saying I can't, but --

THE COURT: No.

MR. HAUSMAN: -- I can't do it today. I do need some time and to have -- I wasn't implying we -- of course, we will answer the Court. But --

THE COURT: Right.

MR. HAUSMAN: -- it needs -- you know, it's not something I could go into the conference room, make a call and -- I need a little bit more --

THE COURT: No, I understand. Let me hear -- then let me hear the balance of the trustee concerns.

MR. SPONDER: Thank you, Your Honor. Jeff Sponder from the Office of the U.S. Trustee. Your Honor, I'll be brief. There were eight other objections set forth, the first being substantive consolidation. Your Honor, the debtors have not provided any evidence in support of substantive consolidation. In fact, yesterday Mr. Podgainy's testimony, he had no personal knowledge as to all of the -- whatever information was provided to try to support the substantive consolidation. So as a result, we don't feel that the debtors have met their burden under Owens Corning.

Next, Your Honor, as to feasibility, the testimony yesterday also from Mr. Podgainy was that without the Bank of America line of credit, the plan could not go effective. We think that's a large issue and would have preferred that that Bank of America line of credit been taken care of prior to confirmation as opposed to leaving it to the effective date and then everyone, you know, going -- trying to go forward. And it might be that the plan can't go effective because of that.

Those really were the two issues, Your Honor, that

remained outstanding. The other six, the effective date, we had argued that that needed to be changed. The debtors have changed it. The statutory fee issue was that we wanted to make clear that if Your Honor does not substantively consolidate these cases that the reorganized debtors, each of them would still be responsible for a fee. They have agreed to to that.

As to the administrative claims, priority claims, and general unsecured claims, Your Honor, as I'm looking, there are still claims that need be paid. There are claims that are going to be objected to, so there are still issues there. But it seems like those based on the Podgainy certification, there are sufficient funds to handle those or that they've been paid.

THE COURT: You're satisfied with respect for the post-petition financing from BOA. I know you're not satisfied that it hasn't been issued already or approved. But as far as the fees, the disclosure fees relative to that?

MR. SPONDER: Yes, Your Honor. That was one of our other objections. They have provided that information. The fees are I think 140 or 170,000 and seem in line with normal with these types of loans.

Committee member release, Your Honor, we discussed that yesterday. We had requested that the word "release" be removed as well as the words "liabilities and obligations." And that's in Section 13.03(e) of the plan. And the debtors have agreed to that or the plan proponents, I should say.

And lastly, Your Honor, the cooperation agreement, we simply objected that it hadn't been attached, and it has been attached. And we have no further objection with that.

THE COURT: I want to go back to one issue. And it may be that Mr. Hausman had addressed it. With respect to the change proffered by the plan proponents with respect to discretionary audits and that the plan no provides for the implementation of a audit program -- and you can stay there if you're more comfortable.

In light of that change, and I have the sense the U.S. trustee's saying it doesn't go far enough because there are no specifics, have you proposed to the plan proponents -- needless to say, the Court is not always privy to the discussions that go back and forth. And I don't want to retread where you've gone. Have you proposed anything in response to that provision or was it all prior to their agreement to change?

MR. HAUSMAN: I believe we had -- and, Your Honor, just let me clarify. When I say proposed, we were trying to get a conversation going. What we did propose to them, I didn't have final authority to ink a deal on so I don't want to make more out of it than it is. But I believe we did suggest the Garlock-type ordered provision to them.

THE COURT: All right. And --

MR. HAUSMAN: I'd have to go back. Yes, I believe

that's accurate.

THE COURT: All right. Is that in the schedule that you've attached to your objection, in other words, if I want to see what was the Garlock-type ordered provisions?

MR. HAUSMAN: I believe it's in Exhibit A.

THE COURT: It's included in the language issues?

MR. HAUSMAN: Yes.

THE COURT: All right. I have no further inquiries at this point with respect to the U.S. trustee objections. I assume we're going down the line or do you --

MR. CALHOUN: Do you want to address that or should I go --

THE COURT: Do you want to -- what's the plan proponent's preference to go by objector or just in some?

MR. WEHNER: It's your pleasure, Judge.

THE COURT: Well then, why don't we hear all the objections at one time and then allow the responses.

MR. CALHOUN: Good morning, again, Your Honor.

THE COURT: Good morning.

MR. CALHOUN: George Calhoun on behalf of the North River Insurance Company. Unfortunately, this will not be quite as brief as the direct examination of Mr. Scarcella.

I want to address the Court's seeming driving concern first, that confirmation of this plan is necessary to save this family-owned business and its employees. That's just not the

case, Your Honor. This is a profitable company. You heard from Mr. Podgainy and took testimony that they're projecting operating income in excess of six or seven million dollars each of the next few years. This was a profitable company coming into bankruptcy. This company never had an inability to pay its asbestos claims.

And what you have, Your Honor, is a cynical attempt really to shed those liabilities and boost the profitability to the shareholders who are keeping their stock in this company. This is quite simply not about saving Duro Dyne. It is about increasing the value of Duro Dyne to the Hindens.

And the other thing to look at on the flip side of that is, well, what's in it for the asbestos creditors. Why would they agree to do that? There was a lot of discussion just a moment ago about the TDP and how they're going to allow more claims. And you have to ask yourself here's a company with an income stream of six, seven million dollars a year over the twenty years that the trust note's projected. They're going to get $13.5 million from Duro Dyne. Over that same period, they're going to get a 100 or 120 billion dollars of income that could be provided to asbestos claimants. That's not even getting to the millions, tens of millions of dollars of insurance.

So the asbestos creditors are giving up a lot of potential recovery here, and you have to ask yourself why are

they doing that. The answer is pretty self-evident. They're going to have trust distribution procedures that allow them more easily to have claims paid because 90 percent of these claims don't get paid. More than 90 percent of them don't get pair in the tort system. As Mr. Hausman noted, it's a handful, Ten, twenty, thirty claims a year actually get paid.

The economic incentive for the plaintiffs' lawyers to go along with this deal is obvious. There's no reason for them to have agreed to give up the potential income, potential payments from a profitable debtor with income projected, you know, in excess of $100 million over this limited period in exchange for $20 million or $23 million. It just doesn't make a whole lot of sense. And that's important, Your Honor, as we'll get into for other reasons because it means there's a failure for them to satisfy the 524(g) requirements.

But I wanted to focus on that first simply because it is important that this is not about saving their jobs. If you dismiss this case tomorrow, this company would still be profitable. And there aren't many debtors before you, I would wager, that are in that position that come to you with a profitable operating business. I recognize, Your Honor -- we all recognize that asbestos causes serious diseases and that there are a lot of people who are very sick from it. With that said, the word asbestos is not some sort of talismanic magic word that means a company is insolvent and requires bankruptcy

protection.

Bankruptcy is still a serious matter. It still requires that the debtors comply with the Code. It's intended to address situations where a debtor can't meet its obligations. The fact that 524(g) is available to deal with asbestos claims doesn't mean it's appropriate for every creditor or for every company with asbestos problems. That's not what Congress said.

So I wanted to start with that as the baseline because I think there's a lot of incentive and pressure on Your Honor to approve a plan. And I want to emphasize that that's not necessary here. And --

THE COURT: Is that still true -- and I don't want to interrupt.

MR. CALHOUN: Yeah.

THE COURT: I did not do that to Mr. Hausman, so I'm going to restrain myself.

MR. CALHOUN: I'm happy to answer your questions, Your Honor, so --

THE COURT: But from your Exhibit C-2 which shows, and I know plan proponents don't necessarily agree with the figures, but anywhere -- Duro Dyne's share going forward for this company is estimated at anywhere from $47 million between indemnity and defense to $69 million.

MR. CALHOUN: Yep.

THE COURT: Six million dollars a year, does that really address that exposure?

MR. CALHOUN: More than, Your Honor. So if you compare the income from operations to the maximum -- the most their share ever gets is 4.88 million, and it goes down from there. That's under Mr. Scarcella's maximum scenario, which is so you're taking the worst incident curves, the worst calibration period and the insurers win all of their arguments, right. So this is the worst it can get, they still have operating income that exceeds that amount.

And the operating income is the right figure to look at here because the other expenses that Mr. Podgainy took out from the operating expense are the expenses of the trust note and the other things that were going to be paying that. So the short answer to that is yes, they do have more than enough income to meet their obligations as projected by Mr. Scarcella. And even if they didn't, they would have a short-term cash flow issue, not an inability to meet these obligations over the long terms. But just from the numbers, the uncontested numbers that are before Your Honor, they do have enough.

Your Honor, as you know, there are -- in order to confirm a plan, a debtor has to meet several requirements of Section 1129. We contend that this plan fails a number of those provisions, including both 1129(a)(1) and (2), 1129(a)(3), 1129(a)(7), and 1129(a)(10), which we'll get into.

There was some questions raised as to feasibility. I think those have been addressed.

I'm going to first start, Your Honor, with the classification of -- well, actually, 1129(a)(1) and (a)(2) require that the plan and the plan proponent to be in compliance with the Code. Those were sort of umbrella objection provisions. They play into a number of our other objections that I will be discussing.

In our view, this plan's not confirmable because the debtors are not in compliance with a number of other Code provisions, including 363, 105, and 524(g). In addition, we believe that this plan can't be confirmed because of the improper classification and treatment of North River's claims under 1122(a), 1123(a)(4), and 524(g).

Your Honor, as you know, the Third Circuit has observed and some courts observe that the quality of distribution is a central policy of the Bankruptcy Code. And what's required with respect to under 1123(a)(4) is that a debtor provide the same treatment for each claim or interest in a particular class. We've had some discussion about what same treatment means with respect to North River's claims in Class 7. But according to the Third Circuit in W.R. Grace, it means they must have the same opportunity for recovery.

It's uncontested in this case, Your Honor, that North River has no opportunity to get paid on its Class 7 claims.

There is no other creditor who is completely ineligible for payment. And not only is North River ineligible for payment under the trust, this plan unlike any other Class 7 creditors strips North River's ability to get payment from third parties for some of its claims, in particular its defense cost claims with respect to which it would have claims in the tort system against other insurers who might have an obligation in that regard.

That other tort defendants (a) could bring claims in the tort system if they're unhappy with the treatment from the trust and seek recovery from non-settling insurers, they can recover from other defendants in the tort system who might be responsible for their injuries. The complete elimination of any remedy is unique to non-settling insurers, which in this case my client North River. There is simply no way that they can say that we have the same opportunity for payment.

All that they say -- so it's sort of axiomatically not true that we don't -- that we have the same opportunity for payment. So they fail 1122(a)(3) -- excuse me, (a)(4). They tried to say, oh, well, there are other tort claimants who won't get paid. Those are claimants who are not getting paid not because their claims -- largely because those claims don't get paid in the tort system. They have the opportunity for payment if they can prove that they're sick and are entitled to compensation.

That's not what they're doing with their claim. They're not saying you're not going to get paid because your claim wouldn't get paid in the tort system. They're saying the opposite. They're saying we're not going to pay you because we don't want to pay you. That's different. It's not the same treatment. It's not the same opportunity for payment.

So the treatment is really -- I'll get into in a minute what they say is -- well, I'll just do it now. What they say is, oh, well you're going to get credit and you're going to get a judgment production. Your Honor, that's a way of saying your claim will be less, arguably, but that's not a payment on our claim. And I want to focus particularly on the defense claims because you heard yesterday from Mr. Fitzpatrick that in no circumstances would we get a payment for defense cost contribution claim or would we get a credit or offset for defense cost contribution claim. He emphatically stated that we would not get such a credit.

So what they're saying is with respect to our defense cost contribution claims, which remember are the vast bulk of our claims, in fact, that's likely to be the entirety of our Class 7 claim, that we get nothing. We get no offset. We get no judgment credit. So we simply are getting nothing. There's no way -- there's simply no way that can comply with Section 1123(a)(4).

We don't think we should have been classified in that

class anyway. We have contract claims. We have equitable claims that are based in large part on a shared obligation to defend claims. These claims are not for liabilities to tort claimants as has been suggested. You know, we're channeled to a trust where we'd be paid by a TDP that lays out different disease criteria and exposure evidence, none of which is applicable to defense cost claims. It has nothing to do with those claims. Those claims are not asbestos claims. They are contract claims. How do we deal with this liability on a shared basis.

It's just quite simply not an asbestos claim. It's only -- you know, if these were environmental liabilities or if these were some other sort of tort, these same issues would arise. It has nothing to do with the nature of the underlying claim. It's simply that there's an obligation under these contracts to pay defense costs. So these claims are different. They're not treated the same in the tort system. They're subject to different defenses, different contract rights, different issues. We should have never been a Class 7 in the first place.

So we also think that this fails the 1122(a) classification requirement that a claim -- a plan only classify substantially similar claims together. Our claims are very different from the asbestos claims and it's shown by the fact when you read the TDP, you can't really figure out how they're

treating out claims. They don't really even know other than that they're not going to pay us because the provisions of the TDP and the plan are internally inconsistent on that issue.

If you asked four of us, you might get a different answer from each of us about how it's supposed to work because they don't really make sense. And that's in part because this plan was designed to prejudice insurers. It was designed to force us to settle by weaponizing defense costs. It's -- the reason we were classified in that way and the reason there is this discriminatory treatment of us is because this plan was designed, as Mr. Fitzpatrick said, to put leverage on insurers.

Well, how does it put leverage on insurers? It allows everyone who wants to to bring a lawsuit against the reorganized debtor and an insurer theoretically has to defend that claim and incur lots of costs. Those costs typically have vastly exceeded indemnity costs because most of the claims against Duro Dyne are bogus. So but what they then do is they limit the insurer's ability to even resolve those claims. They say you have to have our permission to actually settle the claim. You have to have our permission to pay the claim. So we can pay forever without even having any ability to resolve a claim that we're defending in the tort system which simply doesn't make a whole lot of sense.

This is really an effort to weaponize defense costs to, as I say, leverage us and trying to make us pay now, to pay

early, and pay into a trust system that allows them to more easily get paid on claims that it wouldn't get paid in the tort system, as Mr. Hausman noted.

The judgment --

THE COURT: I'm going to interrupt you one second.

MR. CALHOUN: Yeah.

THE COURT: I'm going to ask this question, and you can --

MR. CALHOUN: Yeah.

THE COURT: -- politely decline to answer. You don't often get that opportunity. But it's just staring me in the face. So with the opportunity to become a settling insurer and limit your exposure on defense costs that you've estimated 24-plus million dollars going forward, why not?

MR. CALHOUN: Your Honor, there are lots of reasons for that. I won't get into our litigation strategy, but the short answer to this is we're happy to resolve this if we're talking about what our expected indemnity obligations are. But we're not going to accede to a shakedown and pay millions of dollars to someone for defense costs that they would never have an opportunity to recover.

You know, the argument is hey, you should settle because you'll save money on this other thing. Even though we're not entitled to it, just pay it to us and we'll go away. If we do that here, Your Honor, you're going to see a thousand

of these cases, not necessarily you but your colleagues. Defense -- tort claimants don't get defense costs. It's not what it's there for. Policy limits may be available. Frankly, Your Honor, the exposure in this case really isn't that big. If you look at Mr. Scarcella's estimates, which are uncontested --

THE COURT: But the defense costs are.

MR. CALHOUN: The defense costs are fairly substantial, Your Honor, but the reality is that the indemnity exposure's not that big. And if we're talking about resolving that, putting money in a trust to pay the indemnity, you know, we've had discussions. We've tried; they haven't worked. So --

THE COURT: Fair enough. Just --

MR. CALHOUN: -- we're not going to accede to a shakedown is the short answer to that, Your Honor.

THE COURT: Fair enough.

MR. CALHOUN: And I guess the other response to that, Your Honor, is it doesn't really matter. They still have an obligation to comply with the Code, and it's their burden to do so. And they haven't met that. And it doesn't mean we're going to stop talking to them and that we wouldn't try to resolve this case because, yeah, we have incentives and we recognize that.

Like I said, the unfair classification and the

treatment was designed to put leverage on us. You've already ruled on the estimation motion, but I just wanted to point out, Your Honor, that with the settlement of Hartford, North River would be asked to pay 100 percent of the defense costs, not the approximate 50 percent that we set forth in our estimation motion. If they had settled the week before the estimation motion, there's a very high likelihood that if Your Honor had ruled in the same way that they would not have had a class accepting this plan.

And even then you're looking at an 84 or 85 million dollar vote from the asbestos creditors that allowed values that were more than paid in the tort system, had no discounts for the likelihood that 90 percent of those claims would be dismissed without payment. The simple reality, the actual facts would be that if you look at the value of those claims, they would be under $10 million. And you would not have a class accepting this plan.

I'm going to come back to the treatment of our claims in a minute as it relates to Section 363 which impacts both the settlements and confirmation of this plan under 1129(a)(3). So I'm going to move off from that issue, but I do want to come back to it.

This plan also violates 524(g) in a number of respects. Your Honor, under 524(g)(2)(B)(i)(II), a trust must be funded by securities and by the obligation of the debtor to

make future payments including dividends. The Third Circuit in Combustion Engineering said this is an evergreen funding requirement. You heard yesterday from Mr. Podgainy that there is not evergreen funding of this trust. There are no dividends being contributed to this trust. What we have is a fixed buy-out by the debtor of this liability. For that reason alone, they don't satisfy 524(g) and you can't confirm this plan.

They also have a requirement in 524(g)(2)(B)(i)(III) that under certain contingencies, the trust be in a position to own a majority share of the stock. Again, this is to ensure theoretically that if the money runs short, that they have a way to fund claims going into the future. They do have a provision, as we discussed yesterday, where there's a majority of the share securing the trust note, which is a $13.5 million obligation. It's black letter law, however, that a secured creditor if there's a default on the note, could foreclose on that stock and then sell it up to the amount of the default.

It is not the case that if you hold a pledge in a stock, you just get to keep it and it becomes yours upon an event of default. That's not what the pledge agreement says. That's not what the law says. So it's great that they secured the loan. What they have not done is create a contingency whereby they would be entitled to own 51 percent of the -- or a majority, 50.01 of the voting shares of the stock.

What they've done is they've secured a $13.5 million

note. And they may be allowed to credit bid that note, whatever's remaining of it for that stock. But what they haven't done is create a contingency where they can own that stock if they'd done something else. And all you have to do is read the pledge agreement and be familiar with UCC to know that.

So they've also failed the requirement that there be contingencies to allow them to own the stock. And that's --

THE COURT: What's the very purpose of the stock, of the 51 percent?

MR. CALHOUN: The 51 percent is -- you know, in the Manville case, which this was modeled on, they contributed their stock so that it gives the trust an incentive, it incentivizes them or gives them an evergreen -- again, it's an evergreen funding source.

THE COURT: To secure the obligation to the trust, correct?

MR. CALHOUN: No, it doesn't say that, Your Honor. It's more ambiguous than that. It's modeled off a situation where the stock was contributed to the trust. And there are trusts that say we're going to commit up to, you know, X million dollars per year. If you use it all, great. If you don't use it all, we keep it. But if there's an evergreen funding source, you keep going in perpetuity. It doesn't stop.

But the trust, if you contribute the stock, you sort

of have that evergreen funding source because as long as the company's viable, you can continue to get the dividends off of the stock. So (II) and (III) go together, but the idea is if you're insolvent because of your asbestos liability, we'll give you a way to fix that asbestos overhang but it's not a way to cleanse the equity and give the company back to the owners. It's a way that the claimants share in that equity and moving forward, you know, the company can keep some of its stock, right, so that it's incentivized -- the owners and operators are incentivized to continue to work. But it creates a shared incentive for the asbestos creditors and the equity holders to have a profitable company moving forward.

So that appears to be the incentives that Congress was trying to do when it created these sections. What we have here is a different situation where they're really sort of having a fixed buyout of that. There's no long-term incentive of the company to make any contributions to this trust. And that's why this is an inappropriate form of relief for a solvent company, right. They don't -- they didn't need to do this. They wouldn't -- they don't want to contribute their equity, right, because they don't need to. They're solvent.

The other -- another provision of 524(g) that this plan violates, Your Honor, is 524(g)(2)(B)(ii)(III). This section requires that the court make a finding that pursuit of demands outside of the procedures specified in the trust is

likely to threaten the plan's purpose to deal equitably with claims and demands. Your Honor, there's no factual predicate for such a finding in this case. You haven't been presented with one iota of evidence that would support that. All they've done is waive the word "asbestos."

But if you look at the evidence before Your Honor, you have evidence of projections of significant income. You have projections of asbestos liability that might accrue in the future that's below that. Quite frankly, Your Honor, this company has the ability to pay its asbestos liabilities indefinitely. There is no evidence that if you don't approve this plan that future claimants are going to do worse than present claimants.

And you can look at this pretty simply. The plan establishes the trust with 23 and a half million from the debtors and a contribution from the Hindens. There's also some settlements from the insurers that are contributing less than their limits. We know that the contributions from the insurers is less their limits by a greater amount than the Hindens are contributing. So what we have is a trust that's going to be capitalized with some amount that's less than unquestionably this debtor contribute in the future going forward over time and unquestionably less than what the insurers might contribute over time.

So under this trust, all the creditors may be

required to take a haircut. That's certainly true, and you would have to look at whether you can treat them the same in that context. The trust could establish procedures to try to make sure that they're all treated the same, but it's not necessary because outside of the trust, they're all going to get paid in full.

And if you look over the period that Mr. Scarcella estimated claims which is 30 years, not the 20 years of the trust note, the income that the debtors could contribute is massive, over 150 million conservatively. You know, something can change. The Green New Deal could pass and people could stop using air conditioning and the company could have a problem. But just based on what we know today and what the debtor's financial expert projected, the future income going forward is massive in comparison to what they're contributing to this trust. That evidence is undisputed.

And, Your Honor, if you focus on why did the debtors say that they filed this case? It was to deal with their asbestos liabilities, yes, but specifically because they had an insurer insolvency and they were concerned that they were going to have to bear an increasing share of the liability. They'd never paid defense costs prior to this. That's the issue that's being litigated in the state court. They paid a little bit in indemnity, but they weren't forced into this. This was a choice that they made.

And the choice that they made was an agreement that they made with some of the asbestos creditors. Your Honor, this goes to the good faith of the plan. This was not a plan that was brought to save this company from asbestos claims. This was a plan that was brought to increase the value of the shareholders, to force insurers to settle, and to allow claimants to have their claims resolved by TDP that they viewed as more favorable than the tort system which frankly had not been terribly favorable to them.

Your Honor, on the best interest of creditors test, the debtors fail woefully. That test under 1129(a)(7), it looks specifically at each creditor. It's a fail-safe. If you get stuck in a class with a bunch of creditors who don't vote like you, you always have the best interest of creditors test. Unfortunately, that's what would happen to North River here. And it's a simply test. Would you get more in a liquidation than you would in this plan? For North River, that's easy. We're getting told we get nothing.

Certainly, with respect to our defense contribution claims, that was emphatically stated. We never get paid and we don't get offsets. We don't get credits even if those were appropriate to consider, which we don't think they are. Mr. Podgainy testified that he had not done a calculation of what we would get in a Chapter 7, so there's no evidence before the Court on that point. When he was asked about whether we would

get funds in a Chapter 7, he said yes, it's possible.

So, frankly, Your Honor, it's undisputed that they fail the best interest of the creditors test. You can't confirm this plan.

Now, the plan proponents disagree as to whether the best interest of creditor test requires the Court to consider a creditor's rights outside of bankruptcy against non-debtors. We say that it does. We cite Your Honor to Quigley which is a case out of the Southern District of New York, and we cite Your Honor to Combustion Engineering.

You know, the court noted in Quigley that it would not consider a lopsided view of creditor equality in that it wouldn't -- that any plan which sanctions confiscation of non-debtor rights, that it would not sanction such a confiscation -- it will only confirm plans that respect creditor's Chapter 7 right to seek full satisfaction from non-debtors and that if you don't do that, you fail the best interest test. That's what's happening here to North River.

With respect to our indemnity claims against or contribution state law rights against Hartford Federal, the other insurers, this plan takes claims that we would have against those insurers -- that are not claims against the debtor. They're claims against third parties. They're not really before the Court. And I'd ask Your Honor to enjoin those claims and tell North River that we would get zero on

those claims.

In the tort system, assuming we prove those claims, we would get 100 percent. We'd get -- those claims would be paid in full. And instead, we get asked to accept zero. There's no way we can satisfy the best interest of creditors test by stripping our third-party rights and telling us that we'll get a zero. And not only are they telling us we get a zero, we get no offset or credit for those two claims whatsoever. So, again, there's no way they satisfy the best interest of creditors test.

That same issue where they attempt to strip our third-party rights violate Section 363 of the Code, Your Honor. Section 363 requires that any claims or interest attach to the proceeds of a sale. They give lip service to this in their orders. They sort of recognize that the Code requires it. So in their proposed order approving the settlements, at least the two that I've read today, they say that our claims or interest will attach to the proceeds of the sale, but then they say subject to the terms of the plan. So they give with one hand; they take away from the other -- with the other because the plan says those claims are not entitled to any payment.

So our interest against the other insurers attach to the proceeds but then we can't ever enforce them. It's an illusory grant. It was an effort to facially comply with the requirement of Section 363. Now they may argue, well, you

don't really have claims or interest as are recognized in Section 363. That's really to apply to liens. We'll accept that, too, Your Honor. If we don't have a claim or interest in these proceeds, you don't have jurisdiction over our claims against North -- against the other insurers. You can't enjoin them.

So either way you cut it, they have to respect our claims against third party non-debtors. So if we have -- if our interest attached to the proceeds, they have to attach to those proceeds with the same priority and viability as they would have in the tort system, which means to the extent we pay defense dollar, we should be able to recover that defense dollar from the proceeds a hundred percent.

THE COURT: Is that argument still viable in light of the Millennium decisions in Delaware and other courts, Second Circuit as well, regarding release of third-party releases about courts having jurisdiction to approve as part of Chapter 11 plans third-party releases?

MR. CALHOUN: Your Honor, if it is -- I think that you're specifically talking about claims that are in the context of the PSLRA, which has specific bar order provisions in the statute. So it's a little bit apples and oranges. But keep in mind that these settlements as they're drafted are under 363 and 105. It's not even a 524(g). They're contingent on 524(g), but the injunctions you're issuing or being asked to

issue are under 105 and 363.

But, yes, I do think that the Court lacks power to bar claims among third parties unless they are a claim or an interest that are before the Court.

THE COURT: All right.

MR. CALHOUN: But assuming -- and you may have seen in our brief, frankly, Your Honor, I think the argument is better that they are -- that our claims are a claim or an interest with respect to those policies and that what they have to do is protect them. But there was an argument in the plan proponent's papers that suggested that, hey, that only applies to liens. I think that's the wrong argument.

I think the right argument is it is a claim or interest, and they have to protect it. They can't simply eliminate it, which is what they're proposing to do. And that principle, Your Honor, has been recognized by the Second Circuit and by the Third Circuit that when a debtor's assets are disposed of free and clear, the third party is adequately protected as if his interest is assertable against the proceeds. That was the case in Johns Manville. That was the case in W.R. Grace.

I do want to address the issue of judgment reduction further. That's how they say, oh, we're going to deal with your claims, we're going to give you these super valuable judgment reduction rights and these credits. Your Honor, all

they're saying is with respect to the credits is that they're -- we'll start from the simple principle and I think we can all agree with is that tort claimants are entitled to one recovery. They're not entitled to multiple recoveries. That's a bedrock principle of law.

All they're saying is is if they get paid something, you get to take that into account. That's true anyway. If a claim -- asbestos claim goes to judgment, there's three defendants, and the judgment comes out to a million dollars and two defendants pay 600,000, we wouldn't pay a million dollars. We would pay 400,000. That's how it works. Credit is simply an operation of law. It's not something they're giving us if it already exists.

The judgment reduction that they are proposing to give us is illusory. What they're saying is that we will get a judgment reduction theoretically for any indemnity amount that we have a contribution right against other insurers and that will reduce the amount that we'd have to pay to the folks who bring claims against a third party. With respect to our defense claims, it's difficult to track in the TDP, but Mr. Fitzpatrick clarified that we get nothing for our defense claims.

But with respect to the defense, even if we did get that, remember, Your Honor, the majority of the claims that would be asserted by North River are for defense costs. Those

claims would accrue with respect to claims that are brought that are dismissed the vast, vast majority of the time, right. So over 90 percent of claims are dismissed.

Plan proponents may contend, oh, we're only going to bring really merit -- really claims that are full of merit once we have this trust in place, but that's not true. They don't have any control over what claims are brought. Anyone can bring a claim and all they have to do is say tell the trust about it. The only thing they say they get to control is when those claimants get to get paid. They're not in control of when claims are brought. So we wouldn't incur defense costs in the future. And then, theoretically, we never get to assert those claims or get any credit for the defense cost that we claim.

So -- and even then, to the extent we got a -- had a valid contribution claim against the other insurers, they say that we have to get a judgment against those insurers establishing those contribution rights. But we can't sue those insurers because you're going to have enjoined that. So it's not clear how we would have to do that or whether we'd have to litigate with each and every claimant our claims against the other insurers based on that claim and all the other claims we've defended. Your Honor, it would just -- frankly, it would create a nightmare scenario, and it's a totally illusory protection.

The debtors will say that, hey, we got it, Judge, and the Ninth Circuit to agree to in plan. Frankly, Your Honor, that decision is --

THE COURT: Three judges, bankruptcy court, district court, and Ninth Circuit.

MR. CALHOUN: And they're all wrong.

(Laughter)

MR. CALHOUN: I'll just say it, quite frankly, they're all wrong, Your Honor, and they are because they didn't really focus on these issues. They took it as a principle of faith that these procedures would work, and they just don't. And the witness who was put on yesterday by the plan proponents to explain the TDP and had some big charts and was explaining to you what these meant, when I asked him how the plan -- how those TDP provisions worked with respect to these issues, he couldn't do it because they don't work.

And so they may have hood-winked the Ninth Circuit, Your Honor. I'd like them not to allow them to do that to you.

It's also clear that the contribution or the judgment reduction rights that they say they give us require a judgment. So there's no -- what they're doing is taking the ability to settle claims off the table which greatly diminishes as a result of that. They may argue that, oh, well, the claimants will know that, so they won't bring these claims.

Maybe it works out that way. My experience with

claimants' lawyers is they'll say, I don't care what that says. I'll settle with you. I'll resolve this claim if I get paid X and they're not really going to care about the other stuff. But no one knows. All we know for sure is that they're eliminating the ability to settle claims.

As Mr. Fitzpatrick testified, to settle a claim, we would need not just the claimant in the room. We would need the trustee, the ACC who are a bunch of other plaintiffs' lawyers, and the futures representative. This idea that we really have a right to get a judgment credit reduction is a complete sham.

Your Honor, I'll mention absolute priority just to preserve it. As we've indicated before, we believe that we should have had sufficient vote to control Class 7. If we had, there's no question this claim would have violated -- this plan would have violated the absolute priority rule. There are creditors who are not getting paid in full, and the debtors are maintaining -- or excuse me, the equity holders are maintaining a hundred percent of their equity.

And even though 524(g) envisions evergreen funding source and dividends and the like, none of that's happening. They're keeping a hundred percent of their equity and creditors are not getting paid in full. But for the deal that the debtors cut with the asbestos plaintiffs' lawyers, there's no way this plan would be confirmable.

And that goes to the good faith of this plan, Your Honor. Again, the plan must be proposed in good faith and not by means for -- we've gone through a number of the plan provisions that they violate. But if you look at this in summary and consider whether this plan is fundamentally fair, it's certainly not with respect to North River. This plan was designed to put leverage on North River by stripping it of rights. It was designed to force North River to settle.

That is expressly a litigation advantage that is being sought by the plan proponents. It's exactly the type of thing that the Third Circuit has criticized in other cases. You know, look, everyone like settlements. They're great. But what you can't use is weaponize the Bankruptcy Code to try to force someone to settle. That's what they've said they've done.

On the other side of this, what we have is we have a debtor being released of asbestos liabilities and freeing up tens of millions of dollars of income that might be available to those creditors. It's really difficult to see how Mr. Fitzpatrick deemed that this trust funded by this contribution is better for future claimants than having they're obligated to pay these claims in tens years from now or fifteen years from now when it's got excess income, you know, five, six, seven, eight, nine million dollars a year.

This plan is not fundamentally fair. It allows claims at amounts higher than the tort system but more easily paid than in the tort system. That's the quid pro quo that the asbestos lawyers get in exchange for the congoleum -- or excuse me, for -- that's a Freudian slip --

(Laughter)

MR. CALHOUN: -- Duro Dyne agreeing to this deal to put leverage on its insurers and allow the easier claims.

So this is not a troubled debtor that came in to resolve its liabilities. This was a scheme for a quick payment for some asbestos lawyers to get claims paid that otherwise couldn't get paid. Duro Dyne gets a boost to its equity value, it remains profitable. The only people who really lose out here are futures in the out years and insurers.

So, Your Honor, in sum, I don't think that you can find that this plan is fundamentally fair, especially not to North River. I don't think that you can find that our interests are adequately protected in the proposed 363 sales. I don't think you can find that the trust provisions treat us the same as other creditors. I don't think you can find that the trust provisions adequately protect our rights and interests either presently or in the future.

What you have is basically an invocation of the word "asbestos." This is a terrible product that causes terrible diseases. 524(g) deals with asbestos. Please ignore the fact

that we're solvent. Please ignore the fact that we've been a profitable company and will continue to be. Their motivations are clear. They're admitted. This is a case where they are seeking to put leverage on insurers to free up the equity of the debtors. They have plan provisions TDP put in place that will allow claims that wouldn't be allowed in the tort system, they would like to use TDP, that the U.S. trustee objects to. And we join in those objections.

If you were to confirm this plan, you would be committing multiple serious irreversible errors. I recognize your predisposition, but I invite you to reconsider. They simply did not carry their burden of proof on a number of these issues, and it is their burden of proof. Even if you disagree with some of our legal arguments, they simply haven't met their burden to carry -- to support confirmation.

THE COURT: All right. Thank you, Mr. Calhoun.

All right. Mr. Prol or other counsel, it's 12:00. What is your preference, to respond now or take a break?

MR. PROL: Your Honor, we prefer to take a break so that we can allocate the responsiveness to the attorneys.

THE COURT: All right.

MR. PROL: We could use a break to figure that out.

THE COURT: I'm sure everybody could use a break.

(Laughter)

THE COURT: Why don't we return then at -- were you

able to find lunch in an hour and fifteen minutes? Did that work? Then come back by 1:15. All right?

MR. PROL: Thank you, Your Honor.

THE COURT: Thank you.

(Recess at 11:58 a.m./Reconvened at 1:18 p.m.)

THE COURT: All right. Plan proponents?

MR. WEHNER: Good afternoon, Your Honor. As Mr. Prol indicated before we broke for lunch, we're going to sort of divide up our responsive argument among a few attorneys here.

THE COURT: All right.

MR. WEHNER: I am going to address some of the TDP issues that Mr. Hausman raised, as is Mr. Harron, and then Jeff Liesemer and Jeff Prol will address the other issues after that, if that's all right with you.

THE COURT: That's fine with me.

MR. WEHNER: Okay. I'd like to just begin with a little context. We sort of jumped right in to fraud and Garlock and all these things, and I want to just step back for a second and note that asbestos trusts are not some new thing. They have been around for 25 years and you've seen them before, the New Jersey Bankruptcy Courts have seen them before. There are -- according to the GAO's report in 2011, there were more than 60 asbestos trusts.

And as we noted in our brief, the 3rd Circuit in Federal-Mogul has found them to be successful in their mission.

They have proven themselves over and over. The Duro Dyne TDP is based on proven models that have been approved by courts time and again, and that have paid millions of claims over those 25 years.

Virtually every provision in the TDP has pedigree. But as Mr. Fitzpatrick noted yesterday, we are not merely replicating past models, and we have had to make some difficult choices because of the kind of asbestos trust that this is. Mainly this is a small asbestos trust. It is very small. It's going to have on the order in assets, you know, 30- to $50 million perhaps.

And to give the Court some sense of perspective on its size relative to other asbestos trusts, the W.R. Grace Trust had $3 billion. It's a hundred times bigger. The Garlock Trust had half a billion dollars in it, ten times bigger. Of course those defendants had, you know, far more asbestos claims than Duro Dyne and paid far more in the tort system. I mean their overall footprint is bigger than Duro Dyne.

So it's not surprising that this is a smaller trust. But it is a small trust. And while even that amount of money, 30- to $50 million, might sound like a lot, this trust has to pay claims for decades. And if you do the math, that doesn't leave very much money year-to-year. It's a very small amount. Every dollar that this trust has will count.

To accomplish the purpose of this trust, well, with this relatively small, it's -- maybe once a shoestring, but it's darn close to maybe two shoestrings or something like that, we have some fairly unique features, and those are the ones that Mr. Fitzpatrick highlighted yesterday. The limited numbers of diseases that are compensated, a single type of review just the straight up, no individual review, just one kind of review, a filing fee to try to limit the number of claims that are being filed and focus those claims. We think that we've struck the right balance here using what is tried and true in TDPs adapted to the realities of a small trust.

It's important too to understand that claimants do not want companies to go into bankruptcy. Like all the creditors I'm sure you see, they are not excited when somebody -- when a company like Duro Dyne says it's going to file for bankruptcy. I wish they were, I mean I work in this particular field and so it would be nice if my clients were excited when they had to hire me, but they are not.

And so the idea that there's some kind of evil plan to put companies into bankruptcy and, I don't know, get easy payments, is just not the way it is. The trust, the asbestos trust is a compromise with the reality that the asbestos problem is often unmanageable for individuals companies.

And for the creditors that we represent, the present asbestos claimants, you know, they are acutely aware that this

is a compromise. That's why it's important to note that when we put this plan out for vote, we put it out with this TDP, and the creditors agreed to it. But the mechanisms by which claims are paid are very important to the claimants. How their claims are treated by the trust matters very much to them when they vote on the plan. And so we are constrained in the kind of changes we can make to the TDP without going back to them for, you know, their vote again.

Now we heard a lot about fraud and as part of my general comments before I get into specifics of the TDP I want to just talk a little bit about fraud. This fraud argument is a perennial strategy of the asbestos defense bar. It comes up over and over again characterizing asbestos claimants and their counsel as fraudsters. It is an essentially *ad hominem* attack and it is not new with Garlock. It is something that happens year-after-year-after-year. It started almost as soon as asbestos claims became a thing and it is a perennial favorite.

In the GI case that Judge Gambardella had, it's now almost 20 years ago, the Debtor there sued a whole bunch of asbestos plaintiffs' firms for RICO violations, and then put the company into bankruptcy almost immediately after that. And they alleged fraud and all the bad things that the asbestos claimants and their counsel did. And nothing ever came of that lawsuit, it was, my view, a litigation tactic and it was ultimately dismissed and resolved as part of the GI bankruptcy.

But I'm bringing it up just to point out that this is sort of a normal part of litigation. When I say normal part, it's a normal claim that the asbestos defendants are making.

We heard a lot about Garlock and, you know, Garlock is another instance where Garlock filed for bankruptcy, Garlock made a lot of claims about fraud, and then ultimately the bankruptcy was resolved. Mr. Hausman pointed out, Oh, there is a -- the -- Garlock said their liability was 125 million and the asbestos claimants said it was 1.3 billion. Well, Garlock resolved for $500 million, right in between the two.

And attempts to find the fraud that Garlock found since then have fizzled. In Pittsburg Corning an insurance company objecting to the confirmation of the Pittsburg Corning plan combed through the Garlock record and attempting to find fraudulent votes, they had a theory that they had -- claims had misrepresented their exposure and that they would be able to show fraudulent with the Garlock record.

And after an exhaustive search they found 10 ballots of 357,000 that were filed that they alleged were fraudulent. The Court obviously didn't buy the argument that the vote was tainted by fraud in any way. But the point again I'm trying to make is, this fraud mantra, it's something that the corporate asbestos defense bar puts out, it's something that they pay experts to write articles about, it's something that they lobby

for legislation about, it is a tactic.

I have a cite for that Pittsburg Corning case if you're interested.

THE COURT: Yes, please.

MR. WEHNER: 2015 WL 4773425.

The asbestos claimants, the present asbestos claimants want this trust to pay legitimate claims. They do not want fraud to happen, they want to police against fraud, and they intend through the TDP that is being offered here to police against fraud. But I think we need to step back a little from the fraud rhetoric and understand it for what it is.

I'm going to turn now to some of the provision that Mr. Hausman touched on in his objection and his presentation. I'll start with the confidentiality provision at Section 6.5. The UST in their papers concedes there's valid privacy interests here. There is sensitive medical and financial information associated with trust claims. Trust claimants, you may understand this or it maybe hadn't occurred to you, but they are typically either sick or elderly or both. They are often either the person who is dying of asbestos disease or their widow, or in some cases their executor.

They are vulnerable, it is a vulnerable population, and it is appropriate for the trust to protect their privacy interests. It is appropriate because these people are sick,

elderly and have oftentimes -- and have in some cases been paid a small amount from this trust and so they're vulnerable to scams, they're vulnerable to, you know, rip off artists who, if all this information was just something you could get off the website, could target these individuals with ill intent. And so that is the reason, and is a reason that the UST concedes it's a valid privacy interest.

The confidentiality provision at 6.5 is utterly standard. It is in the GI Trust approved by Judge Gambardella, it is in the state trust that you agree with, it's in Burns and Roe, it is in W.R. Grace. There is a confidentiality provision in Garlock, in the Garlock Trust. The confidentiality provision does not conceal anything from anyone. It merely says that in order to get the information you have to subpoena the trust. It says right here it will provide the information in response to a valid subpoena.

THE COURT: It restricts the courts though. Correct?

MR. WEHNER: To the Bankruptcy Court, Delaware State Court, United States District Court for the District of Delaware, yeah.

THE COURT: What's the purpose of the restrictions in courts?

MR. WEHNER: The -- it is anticipated that this will be a Delaware trust. Right. And so when you subpoena an entity you have to go to the state where the entity is --

THE COURT: Right.

MR. WEHNER: -- and get a subpoena. So it's just the right court, it's just part of subpoena practice.

THE COURT: Why the step of a subpoena as opposed to simple, well, ordinary discovery subject to attorney's eyes only or other type of protection?

MR. WEHNER: Well, an asbestos trust is not a part -- I mean this comes up in asbestos lawsuits. Right?

THE COURT: Right.

MR. WEHNER: And so the trust is no different than any other third party in such a lawsuit. It is a third party. If I sued Mr. Liesemer and I wanted something from you, I'd have to send you a subpoena.

THE COURT: A subpoena.

MR. WEHNER: I can't just send you a discovery request. It's just the way it's done. Just utterly standard.

The UST is their paper, and perhaps because of length, but they cut off the quotation of 6.5, and the very end of 6.5 in the Duro Dyne TDP says, Nothing in this TDP, the plan or the trust agreement, expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil litigation regarding his or her submission of factual information to the asbestos trust for the purpose of obtaining compensation for asbestos related injuries from the asbestos trust.

I mean this -- the trust will respond to subpoenas, they do respond to subpoenas. Insurance companies send subpoenas to the trust for -- often for thousands of records on theories that, you know, sometimes, you know, if they can only show fraud then they don't have to pay their claim or something. Asbestos trusts deal with these requests all the time, and they provide that information subject to subpoenas.

It's also just not so that this information is somehow unavailable out in the tort system where people are suing asbestos defendants. Asbestos trusts have been around for a long, long time. The asbestos defense bar knows perfectly well what asbestos trusts are out there. And they ask in normal discovery, they ask asbestos claimants, Give me your asbestos trust claims.

And, in fact, it's so common that it is actually baked into the asbestos rules in many asbestos speciality courts around the country. We cited some in our paper, there's a New York -- I mean New York even prescribes when you make your trust claims. This is not a mystery, it is a not a mystery to the asbestos defense bar, it is entirely available. So the confidentiality provision is totally standard and it does not hide anything.

The Chamber of Commerce, the tort reform lobby in Washington, has lobbied for years for Congress to create a kind of -- for the ease and convenience of the asbestos defense bar

to create of a -- some kind of a data clearing house. Right. They want it all in one place for their convenience. The TAL report that we cite in our paper notes at Page 21 that the Chamber of Commerce was asking for this back in 2010. The legislation on this is routinely introduced, the fact that it was introduced in 2015, it was reintroduced in 2017. Despite all this lobbying effort for a clearing house, Congress has not enacted such legislation. And it is our view that this Court does not need to step into the breach and create some kind of data clearing house where Congress decided that it wasn't necessary.

THE COURT: Just a quick question, then what's the function of having that clause regarding subpoenas? I understand how discovery works, I understand the trust is going to comply with applicable law period. Why have the clause in there in the first place? I can understand the confidentiality provision protecting this full open disclosure of personal identifiable information, why have it in there, what purpose is it serving?

MR. WEHNER: That --

THE COURT: To say you're going to comply with subpoenas. It's like saying, I'm going to obey the red light.

MR. WEHNER: Right. Well, just like with -- I mean you are entitled as a third party to litigation to -- where a subpoena exceeds what is appropriate to get. You're entitled

to go to court and say, This subpoena is not right, it needs to be quashed or limited, or you need to for example pay, you know, when you subpoena a third party. If an insurance company comes to a trust and says, I want 100,000 asbestos records for my coverage lawsuit, it is necessary to go to court sometimes and say, Hey, we're not going to get this to you for -- you know, it might be subject to a protective order, you may need to pay, I mean there are various ways in which having the subpoena function permits appropriate limits to be enforced under court supervision. And so that's the function of the subpoena.

THE COURT: Okay.

MR. WEHNER: I'm going to turn now to Section 5.6(b)(4) which is a fairly easy one to address because we took it out. In reflection it was just surplusage.

THE COURT: (a)(4) or (b)(4)?

MR. WEHNER: Sorry, 5.6(b)(4) --

THE COURT: (b)(4).

MR. WEHNER: -- that's the one that --

UNIDENTIFIED SPEAKER: (a)(4).

THE COURT: (a)(4). Thank you.

MR. WEHNER: I'm sorry, (a)(4). Thank you. Yes, I'm sorry, (a)(4).

THE COURT: Okay.

MR. WEHNER: Exemption from filing medical evidence.

It was, as we indicated in our brief, intended to implement the previous section where the trust, as a cost-saving measure, because it is a very small trust, could, if another trust determined that somebody had mesothelioma they could rely on that if an appropriate arrangement could be made. You know, mesothelioma diagnoses are not very contentious typically, there's usually not much doubt as to whether somebody has mesothelioma. If another trust made that determination, it is possible that through some kind of arrangement we could achieve cost savings by accepting that finding. And so that's the purpose for (a)(3).

We turn to 5.6(b)(3) which is Debtor exposure. Mr. Hausman touched only very briefly on this. No one is going to be paid by this trust without demonstrating that they were exposed to a Duro Dyne product. It's the first thing that is said in 5.6(b)(3). The claimant must demonstrate meaningful and credible exposure to asbestos, asbestos containing products, or conduct for which the asbestos trust has legal responsibility as described in this 5.6(b)(3) Debtor exposure. It really could not be clearer. There is no circumstance in which exposure is going to be waived.

In the UST's papers they raise a scenario in which somehow there's a waiver of a defense that there was if there was not exposure shown elsewhere that somehow that the trust would be waiving it if they litigated the case. First of all,

the way an asbestos trust works is you come, you demonstrate that you are sick with a compensable disease and you have exposure, and then you get paid a set amount.

This is no -- for every claim there is no litigation, it is a qualifying settlement trust. If you qualify, you get paid the amount. The trust doesn't litigate these claims, except in a very, very rare instance. If they go to ADR and then they go to a tort case, and in the history of asbestos trusts, that's -- it's probably happened a handful of times. Millions of claims paid. But theoretically it's there.

Even in that case, Section 7.6 of the TDP preserves all the defenses that the trust might have in litigation, if they ever conceivably go to litigation with a claimant, which probably won't happen, but if it did, the trust has all its defenses. So this idea of some kind of waiver just -- it doesn't work, it's cut off by the TDP.

I'm going to turn now to withdrawal and deferral. Withdrawal and deferral serve important purposes for the trust. And in particular withdrawal and deferral give practical claims processing benefits to the trust. Claimants who want to file a claim with the Duro Dyne trust face statute of limitations issues just like people in the tort system. They stare down SOL deadlines and sometimes lawyers facing those deadlines will file protective claims. And sometimes they will file an incomplete claim.

Without the ability to withdraw that claim those claims that are filed remain on the trust books as filed claims. And they can complicate planning and payment percentage calculations. It is the experience of most trusts that withdrawn claims, when they're filed and withdrawn and thereby preserving their statute of limitations, or just as if you had filed a lawsuit. They've -- most never come again. But in the event that one of those people who filed by the SOL deadline and then withdrew, some time later determined that they have evidence of Duro Dyne exposure, they can then come back and get paid by the trust. And there is absolutely nothing wrong with that. That is the whole purpose of this trust, to pay people who had Duro Dyne exposure and have this -- and have the requisite illness.

The met the deadline and they have the exposure and they get paid, or they never come back. But it's better to have them never come back, better to have them off the books, have them gone, have them withdrawn then to have them on the books and have to -- the trustee have to go, Here's our -- we have this many filed claims. It can depress the payment percentage.

THE COURT: Isn't there another way of attacking that by requiring that they complete the claims process, file what would deemed a proper claim within 90 days or 120 days or whatever it is, and not open up the door for claims to be

withdraw and refiled past the SOL? It seems that for convenience without having to take into account filed claims that are not going anywhere, because that's what your concern is administratively, you're opening the door to whatever mischief that the US Trustee has identified. Why --

MR. WEHNER: Well, but, first of all, I mean --

THE COURT: -- why not attack it from a different perspective?

MR. WEHNER: Well, the US Trustee has made an allegation about this, Judge. Let's --

THE COURT: Correct.

MR. WEHNER: -- just be clear, and presented nothing to substantiate that at all. In the tort system discovery continues to apply. Right? I mean you can discover anything you can discover in a tort case. Can you discover that you filed a claim and withdrew it? Sure. I mean there's no -- there's nothing hidden. It is a mechanism by which the trust facing its own liabilities manages those liabilities.

And paying claims later benefits the trust because paying claims later permits the trust to earn a return on retained funds. So it's better for the trust to pay later than now. And so one of the answers to your question is, look, the trust does better by paying later.

THE COURT: But they wouldn't be paying sooner because it's an incomplete claim, it's not a supported claim.

So it's not a matter of when you're paying it, you --

MR. WEHNER: Well, no, but you just -- and I'm sorry, Your Honor, I don't mean to quibble with you, but you --

THE COURT: No.

MR. WEHNER: -- just said, Well, what if we just made them do it right now. I mean there is an absolute benefit by paying a claim, if it was ready now or ready later, it'd be better to pay it later.

THE COURT: So in essence the trust is saying, We're okay with you claimant not really putting in everything you need for a claim because then we don't have to pay it until you do.

MR. WEHNER: Right. Turning to Section 5.7. That has been amended as Mr. Fitzpatrick noted that 5.7 now requires a claims audit program, it is mandatory, it is a shall, it is not a may to eliminate any doubt that the trust would institute a claims audit program. And there really isn't any doubt that the trust would do so, but with that change we made that clear in case there was any doubt that the claims -- that the trust would institute an audit program.

THE COURT: Are there other audit programs in other trusts they've dealt with?

MR. WEHNER: Absolutely. Most trusts have audit programs. And, in fact, the GAO report which we cited in our brief discusses all the audit programs that trusts have. They

audit claims, medical exposure to make sure that they're being paid right. And the GAO report details, at least as of 2011, and it's only got more -- there's only been more audit activity since then. So there -- audit is a regular feature of asbestos trusts, and will be a feature of this one.

I'm going to address this idea that because in the Garlock Trust there is a provision which requires a claimant to come forward and provide information about exposures to other products and other claims that it has made somehow means that this trust should do that. It's one of the arguments that the UST made in its brief, and it's also -- I think Mr. Hausman alluded to it briefly.

The provision that the UST cited in Garlock is what is known as an extraordinary claims provision. Some trusts have this extraordinary claims provision which gives a claimant an opportunity to get an enhanced recovery if they show that this -- that the trust that they are making the claim to is responsible for a product that they had certain exclusive exposure to. Most asbestos claimants are exposed to multiple asbestos products because there are people in, you know, manufacturing environments, construction environments, and they're exposed to multiple products, and so they recover from multiple sources. They sue multiple people and they recover from multiple trusts.

There is the occasional, very rare circumstance where

somebody is exposed exclusively to one asbestos product, and in such a case some trusts have an extraordinary claim provision which says, If you can show us you only ever got exposed to one product, this product for which we're responsible, we'll give you a bump up in price. Garlock has such a provision. But it -- but I will say to you it is very rare that anybody makes an extraordinary claim. It is indeed extraordinary for somebody to be exposed just to one asbestos product.

The provision that they cited about giving information about other exposures is the requirements for an extraordinary claim in the Garlock Trust. Well, if you're going to tell a trust that I get an enhanced recovery because yours is the only product I was ever exposed to, then it makes sense for you to have to give the trust information about other trusts that you were exposed to.

The Duro Dyne TDP does not have an extraordinary claims provision. It is too small. It is one of the things that was on the cutting room floor to try and make this trust, which is small, work. There is no -- it is just the plain vanilla claim. You were exposed to Dura Dyne, you're sick, you get the settlement payment.

THE COURT: Will a trust benefit from information regarding exposure to other products?

MR. WEHNER: No. It is of no consequence to them. They're not -- you know, if for some reason they ever litigate

the claim and they want to litigate it in the tort system, like I said, all defenses are available to them and all discovery would be available to them if they ever litigated the claim. But they don't, it never has. So the idea that this trust, which is on a shoestring, should give information about products that it has no responsibility for, is -- it's utterly useless, it has nothing to do with the qualification for this settlement payment.

Finally, I just want to touch briefly on attorneys fees, the relationship between attorneys and their clients is something that is extensively regulated by states. And we cited in our brief some examples of the kind of regulation that various states deem the lawyers in their states and the clients in their states and the relationships they can have. And we, in our view -- and this is not something this Court needs to get involved with. There are no attorneys fees provisions in Garlock, there are none in GI, and there are none in Grace or State or Burns and Roe or Pittsburg Corning. You know, there's a lot of asbestos trusts out there, but there is no need for this Court to get involved in the regulation of attorneys fees.

Finally, I just -- we heard a little bit about one idea I know was mentioned maybe yesterday that I wanted to address before wrapping up, and that is with respect to present and future claims. There was a discussion about claw back. So I'd like to -- an idea that -- and it's just very briefly

referenced in the UST's papers, but I just wanted to address it because I think you might have mentioned it yesterday.

THE COURT: It was in response to one of my inquiries.

MR. WEHNER: Right, one of your inquiries. It is -- this TDP has all the appropriate mechanisms for ensuring that present and future claimants are paid as nearly as possibly on the same basis. Payment percentage, periodic estimates, maximum annual payments, they're the features that time and again courts have found, you know, make that assurance. And, you know, obviously that's something that a futures rep is very concerned about, I'm sure Mr. Harron will say something about.

But I just wanted to touch on this idea of a claw back. There is, if the payment percentage goes up, there's supplemental payments if they meet a certain threshold as Mr. Fitzpatrick was talking about. There is no claw back if payments are made and the payment percentage goes down because there is no way to do that. I mean it is just an impossibility.

If a person makes a claim, a widow makes a claim to the Dura Dyne trust for something, and, you know, she gets a small payment, it's going to go to her needs, and it's not going to sit around in an escrow account for 20 years. It just can't. So there's just no practical way to do any kind of claw back without -- I mean unless you wait till the end of time and

pay everyone, and that just doesn't work either, that's not fair.

So just to recap, I mean this is a small trust and we have taken the standard TDP, the usual TDP and we have made adjustments to focus on the reality that this is going to be a trust that is pretty strapped for cash. It is not going to be able to afford a lot of bells and whistles. And doing that, going through that exercise, we think that we have achieved a TDP that serves the purposes for which it is intended, which is to compensate the asbestos claimants. Thank you.

THE COURT: Thank you.

Mr. Harron, I assume somebody's going to be addressing -- I didn't ask Mr. Wehner this, if this trust is so strapped for cash based on funding, doesn't that support the argument, Mr. Calhoun's argument that you should just -- you all were better off just letting it proceed outside of bankruptcy, going after available insurance proceeds and the revenues generated by the company for the next 20, 30 years which would have produced the dollars that his expert spoke of.

MR. HARRON: And, Your Honor, I do plan to address that towards the end of my argument.

THE COURT: Sure.

MR. HARRON: But that issue touches on several topics. I think if the trust were, one, established in the nature of what the UST appears to be advocating for, claimants

very well may be better off in the tort system. If trust dollars were spent to fight claimants, defend claims, provide information to other defendants in the tort system, that would reduce, particularly with small trusts, reduce dramatically what is available to pay to sick people. That's probably not the kind of the trust that future claimants or current claimants would sign up for.

But here what we've done is we've tried to replicate basically the indemnity dollars that claimants might be entitled to recover in the tort system, the company gets a break from defense costs as the insurers. And then the trust isn't in the business of defending claims. Rather it's a claimant trust funded by claimant indemnity dollars. And we try to manage it very efficiently so that everyone get's paid something.

And the structure is particularly significant for future claimants because it's those future claimants that bear the risk of Duro Dyne becoming insolvent because it no longer can bear its portion of defense and indemnity costs, or maybe its business prospects aren't as rosy as its financial projections might suggest. And once Duro Dyne is no longer available to defend and answer claims, it becomes much more difficult to have the insurance companies pay up.

In Chapter 7 you don't have insurance companies lining up with their checkbooks. What they do is they add on

to the tort defenses coverage defenses, and it largely becomes impractical for an individual claimant to put on an exposure and damages case, and then also put on an insurance coverage case.

So the scenario that Mr. Calhoun posited could be one where Duro Dyne goes out of business, future claimants receive nothing and insurers pay very little. Thank you very much Office of the United States Trustee. That could be how the case would work out but for the efforts to implement a 524(g) trust.

Your Honor, I did want to talk on general policy principles. But first I think I need to make a disclosure. You may have realized this if you're reading the state insulation reports, I'm the successor trustee to the State Insulation Trust. Our reports are pretty thin as is our funding. We're sitting on about a million and a half dollars, haven't paid many claims. I'm a flat-fee retainer in that case.

THE COURT: Right.

MR. HARRON: But we've --

THE COURT: No, I had a conversation with someone who suggested their curious as to how to dispose of the funds, that there aren't many claims.

MR. HARRON: It's difficult, Your Honor, but in that case it is illustrative of the difficulties of administering a

small trust. We're really trying to get money to people who were sickened by a state insulation's conduct, and do it in a way that we don't overwhelm the trust with administrative costs. And the smaller the trust gets, the more difficult that balance becomes.

But, Your Honor, I would be happy to buy you a cup of coffee and tell you everything you'd like to know about the State Trust operations.

THE COURT: Another time.

(Laughter)

MR. HARRON: So, Your Honor, we think the --

UNIDENTIFIED SPEAKER: I think that was an attempt to bribe Your Honor.

(Laughter)

MR. HARRON: If it makes Mr. Calhoun feel better --

THE COURT: Yeah, he should be --

MR. HARRON: -- I'll allow you to buy the coffee.

THE COURT: -- he should be speaking in soda.

(Laughter)

MR. HARRON: So, Your Honor, we think that the US Trustee's case and -- but I'll take it personally from Mr. Hausman or Mr. Sponder because we've seen these same arguments in three other jurisdictions so far. It's a policy position coming down from DC, the motive behind which are not entirely clear to us, but as Mr. Wehner has said, these same positions

have been advocated by the defense bar for years, and they're proponents of legislation that sought greater transparency from the trust, the legislation failed.

The US Chamber of Commerce has been pushing this. Many of the arguments that are in the Trustee's papers come right out of PowerPoints from the Chamber of Commerce. We're not -- it's not clear to us why the Trustee's office has chosen to take up the causes of defendants and ignore the issues of claimants. But from where we sit that's exactly what they're doing.

THE COURT: Okay.

MR. HARRON: So we think the entire position of the United States Trustee is based on a false premise. Asbestos litigation has been made clear in numerous opinions, including I think the Georgine opinions, the AmCam opinions, the 3rd Circuit is mentioned in Combustion and probably Federal-Mogul. It was a mess. It was clogging up the court system, people weren't getting paid, a lot of attorneys were making a lot of money fighting over defendant claims, fighting over class actions.

There really wasn't an efficient way to compensate claimants, and it was terrible for the United States business environment when many companies had to deal with the overhang of asbestos liability on its operations, on its ability to obtain financing, on its market cap. Issues not dissimilar to

the issues that Mr. Podgainy described yesterday.

So the answer came first in the form of Manville and then was codified in 524(g). Your Honor, we think 524(g) is working. Sick people are receiving compensation from claimant trusts funded with claimant dollars. And companies are free to conduct business and not deal endlessly with the specter and cost of asbestos litigation.

In the tort system I think it's common that the defense-to-indemnity ratio is three-to-one, three defense dollars to every dollar paid to asbestos victims. It looks like from the Scarcella information that the ratio here is more like two-to-one. Your Honor, I believe when it comes to asbestos trusts between 85 and 90 cents on every dollar is paid to claimants. And that reflects a policy decision largely made by future claimants, the people who vote for these plans, the courts that approve them, and we believe it was implicit in the policy that Congress intended to implement a 524(g), that more money should be spent paying claimants and less money should be spent fighting claims.

Your Honor, and we agree that the trusts are not perfect. They're evolving. It's our view that one of the benefits that Mr. Fitzpatrick brings to this case is his experience. We've learned from the mistakes of the past, we've done some things in the administration of this trust and the trust documents that are designed to ensure that even more

money goes to the claimants and it's spread evenly over time.

The US Trustee pointed to fraud. I'll note for the record that they've provided no evidence of fraud with respect to this case or with respect to any trust they rely on. Defense oriented publications and the Garlock decision, again the Garlock decision did not address claiming against asbestos trusts, it addressed conduct in the tort system. And it was not based on a random sample of claims, it was based on 15 claims cherry picked by the company out of probably 100,000.

To us, the most important part of trust operations is the payment percentage. And in some cases it's set too high, the trust is formed -- is forced to reduce it and the future claimants suffer. There are many reasons why this may be, and what we've done in each case is we try to account for what those reasons are, we try to better focus our forecasting processes and come up with a more accurate payment percentage that protects the corpus over time.

But, Your Honor, when -- it's not surprising that when you move from a tort system where a defendant is motivated to hide evidence and to not pay sick people, and you go to an administrative trust system that makes evidence public such things as product lists and site lists and you see advertisements, more people are going to file claims.

Some people may see that as a bad thing. We think it's a good thing. We think if more people were sickened by

Duro Dyne products than we anticipated, we should pay them. The challenge for us is to allocate it over time fairly so that when a future claimant, who may not have known they were sickened by Duro Dyne products, they didn't have the benefit of a site list or a product list, when they come along and they're beyond the historic forecast based on the tort system full of claims, it's our challenge to make sure that we anticipate that future claimant. The claimant that falls out of the tort system forecast but should be covered in a trust system forecast because we're going to see more people because the trust is transparent when it comes to the information that claimants need to know to understand whether or not they can file a claim.

But we'd be naive, Your Honor, to say that there's never fraud. Whenever you have a settlement program of the magnitude of all the 524(g) trusts, there's probably going to be bad behavior. You see in the BP settlement, the 9-1-1 Fund that goes way back to the Black Lung resolution. But here the challenges of fraud are really kind of different. If you look back I believe in the -- and I think Duro Dyne stopped distributing asbestos containing products, or using asbestos in its insulation of its products and I think back in the '70s, most of the claimants we see are aged. And a lot of products, and I'm not familiar with the ducks here, but they're not clearly marked, Hey, this thing has asbestos, and that's the

reason there are lawsuits. And sometimes the claimants don't know who manufacture it.

A lot of times the claimants that file claims to the trust are people who suffer from secondhand exposure, the wives who did the laundry. And so how much do you ask of an 80 year old person who was exposed 30 years ago when she did her husband's laundry, how much exposure evidence do you require of them in order to get paid a modest recovery from the Duro Dyne Trust? It's a difficult balancing act.

The trust errs on the side of sick people with mesothelioma, a disease whose only known cause is asbestos. It's probably the case that sometimes some trusts pays a mesothelioma claimant who mistakenly ID'd the products. Maybe it evens out at the end of the day. It gets -- the way we administrate an administrative fund you have expeditious and kind of even so on the criteria to be applied over time, you intend for sick people to get paid and you do the best you can balancing the needs of the claimants, the need to spread the money out over time, and the difficulty of coming up with this exposure evidence.

But we do take fraud seriously, Your Honor. And we did take heed to the Court's comments when we were before you last fall. We beefed up our audit program allowing the TDP to make clear, as Mr. Wehner said, the trusts do audit, but we made very explicit here that this trust will have an audit and

the audit will audit both exposure and medical. And that's how we're going to look for fraud. We have targeted audits and -- pardon me, we have random audits that go to exposure and medical, and then if there's a reason to believe that a firm may be conducting -- or acting inappropriately, we also have the trustee, we'll also have the opportunity to conduct targeted audits. And then the trust documents provide for penalties if people are engaged in improper conduct.

Your Honor, the -- a couple of things about Garlock. Again, Garlock didn't address the trust system, it addressed the trust system's implication for defendants, not for claimants. But in any event, the Garlock TDP has the same type of confidentiality provision that we propose in the TDP here, that Mr. Wehner covered for an expedited review claim. Duro Dyne only pays expedited review claims, that's all we can afford to do. They only require a claimant to identify the Garlock product, exactly the same as we require a claimant to identify a Duro Dyne product.

And, Your Honor, I think the trustee mistakenly pulled the Garlock TDP off the docket in that case. If you go to our pleading, I think it's one of the footnotes we identified a Garlock Trust website and that has the current TDP if Your Honor wanted to confirm the things I'm representing to you.

THE COURT: Okay.

MR. HARRON: And let's talk a moment more about the confidentiality provision and the need for a full exposure history. We have no doubt that defendants would like the trust to collect the full exposure history of every claimant and to make that available to all the defendants in the tort system. That's what they call transparency. Your Honor, it's equally true that claimants would very much appreciate full transparency from every defendant in the tort system, but they don't get it.

Defendants go to great lengths to keep their settlements confidential. For years, generally, not specific to Duro Dyne, I'm not at all referencing Duro Dyne, but the history of asbestos litigations, defendants have hid the use of asbestos. They've hid the dangers of asbestos. They've made it very difficult for claimants to recover and to know whom to recover against.

How come the United States Trustee is not asking for more transparency from defendants? Rather they want a trust with limited funds, usually funded with indemnity dollars, not budget to defend the claims. They want them to spend their money gathering information that can be used against the very beneficiaries of those trusts. It's a ridiculous proposition.

The civil justice system addresses transparency through discovery. Defendants have a right to obtain discovery from claimants and from trusts. Plaintiffs have a right to

obtain discovery from defendants. The fact that the money that Duro Dyne used to pay the claimants is now being administered by a trust doesn't meant the claimants who recover from that trust or the trust itself should have lesser rights or owe some kind of duty to non-beneficiary third-party defendants. There's nothing in the Bankruptcy Code that suggests that.

That Duro Dyne gets a discharge, gets to go about its business but the claimants who are taking a discount on their recoveries in the tort system, the trust that's paying them with their own money somehow is subject to Congressional oversight and oversight by a United States Trustee. Where's the fairness there?

As Mr. Wehner said, defendants have been asking Congress for years for trust transparency, Congress has said no. Sometimes we've been surprised when they've said no because the defendants have a very effective and well-funded lobby, but they said no. We'd asked the Court not interpose itself where Congress has declined to act.

Now, Your Honor, I want to address your initial question, why does this make sense, why not stay in the tort system? It's kind of interesting. Mr. Calhoun during his presentation said a couple of things. He said that North River won't agree to settle if it has to pay any defense costs. So it's only going to pay indemnity dollars to a trust. But any thoughts to what money is necessary for the trust to administer

to claims, let alone put the claims under the type of scrutiny that they suggest is necessary.

They said the claimants are getting too little -- or, pardon me, they said claimants are getting too much and the company's paying too little. Which is an interesting position for an insurer of the company to say the company's paying too little. But you don't see it on their promotion materials.

But anyway, I'd like to direct you -- the Court's attention to Mr. Scarcella's work. It's Exhibit C2. I think this illustrates very well why 524(g) makes sense, why this case and this trust makes sense. Let's go with the median forecast to be fair. I believe it's the first page. So, Your Honor, the Hinden family and the company together, I think they're contributing $26 million to the trust. Now if you believe Mr. Scarcella's work to be accurate, and these are nominal dollars so this is for illustrative purposes.

THE COURT: Right.

MR. HARRON: But you can see under Mr. Scarcella's median forecast the company's share is $58.15 million. So rather than pay $58.15 million over time, the company and the Hindens are opting to pay $26 million now. It doesn't strike me as a bad business decision. And if you look how the dollars break down, 19.3 million in indemnity dollars. So perhaps they're over-paying the claimants a bit from what they would have to pay if they remained in the tort system. I don't think

Duro Dyne's been hit with judgments, but if someone rang the bell with a meso claim, these numbers would go up.

But what Duro Dyne is doing, and it's not surprising that they're doing it based on insurance coverage litigation results and based on the things that North River says here in court today, is they're trying to avoid $38.8 million in future defense costs. So that's what 524(g) does, it gets the claimants something, it provides some certainty that money will be available over time. It allows the company to resolve its liabilities fairly, perhaps over-pay on the indemnity, we think probably not, and to avoid $38 million in defense costs. And we offer the same types of resolutions to the settling insurers.

North River is telling you that rather -- one, they'd rather try to blow up the plan, or it rather stay in the defense -- in the tort system a defendant claims can incur its share of defense costs than to fund a bit over indemnity limits so that the trust could administer these claims over time. That's what they'd prefer to do. Other insurers who we think act more rationally about to settle, but it's pretty obvious why you settle. You resolve these cases, you eliminate litigation costs in the tort system, in exchange claimants get a settlement trust with fixed criteria and expeditious payment, which embodies the concept of fairness for kind of both parts.

And then the claimants have kind of -- have an

implicit understanding among themselves. As you know, Your Honor, it take 75 percent vote. We talked about it yesterday, there's some claimants who voted on this plan are never going to get paid from it. But collectively as a group, a voting group, and the future claimants rep, we all recognize that it's better to compromise, have a fixe pot available to pay over time.

Some claimants are going to receive less than they would get in the tort system, some payments -- some claimants are going to receive nothing, although they'd be paid in the tort system. But in exchange for a streamlined process they're willing to forego rolling the dice in the tort system for certainty. And it's a bigger roll of the dice for future claimants who might lose the race to the courthouse.

And, Your Honor, I just want to emphasize an important point I think. This trust is structured so 90 percent of the dollars is going to go to mesothelioma claimants. It used to be at the beginning of the asbestos trusts, everyone complained that a bunch of money was going to the unimpaired claimants. That issue is behind us. It's a small trust and what we've -- what all the parties have decided is the most important thing to do is to try to get dollars to the people who are going to die from mesothelioma and have evidence of Duro Dyne exposure.

Your Honor, that's really all I have unless you have

questions.

THE COURT: Not at the moment. Thank you.

MR. HARRON: Thank you.

MR. LIESEMER: Good afternoon, Your Honor. Jeffrey Liesemer on behalf of the Committee. And I'll be speaking to the North River objections and the 1129 and 524(g) elements this afternoon.

And we heard some strong words this morning from North River, because North River wants to paint this as a shake down, it's cynical, these are strong words for strongly-held positions. So I think the best way to approach our response to North River's arguments is to talk about the practical realities that have shaped this plan, and to go back to a few first principles because we all know that liability insurance is an asset of the estate, and the estate is worth more with it than without it.

And so it is incumbent upon the Debtors as debtors-in-possession to maximize the value of that insurance coverage. In 524(g) among other purposes helps the Debtors accomplish that because with a channel injunction that can flow in favor of protected parties such as settling insurers, we can offer and these settling insurers can buy a complete piece, particularly from equitable contribution claims from the non-settling insurers. And that way we are more likely to get settlements on more favorable terms than we would, or we might

not even get settlements at all if we didn't have -- if we couldn't offer that injunctive protection.

And it has worked in this case. All the insurers that we have been dealing with, some of the them have been here in contested hearings, have settled up with us. All but one, North River. And so the question is, well, what does one do with unsettled coverage when we have a hold out insurer. Well, there's basically three alternatives. One of course is we could dismiss the case and send North River and all the other insurers back to the tort system and North River will continue defending claims and incurring all those defense costs it is complaining about.

The other alternative is what's known as the closed system. In the closed system the insurance rights are assigned to the asbestos trust, the asbestos trust pays eligible claims under the TDP and then the asbestos trust turns around and tenders the -- a reimbursement claim to the insurer for reimbursement under the policy. And the usual response, and Mr. Fitzpatrick testified to this, is the insurer usually says, My policy doesn't cover reimbursement for trust payments under TDPs. Where in my policy does it say trust or TDP?

And so at that point the trust is faced with a very practical problem in which it has to press litigation against the recalcitrant insurer in order to get the benefits of the insurance coverage. And it's strange too that for many years

in our experience with closed systems, the insurers have complained that the closed system deprives them of their right under their policies to defend against tort claims. So it is ironic that when we have the open system or pass through system under our plan, the non-settling insurers now complaining about the fact that it has to defend claims and therefore pay defense costs.

So what we've decided to do in this case as a practical matter is to go with the open system. That was the terminology used in the Plan Insulation case we've been referring to as a pass through in this case, but it's an open system. And there was a question yesterday as to which cases there are open systems. And open systems are the exception, not the rule. We know of three cases in which open systems have been used and those cases are Burn and Roe, Plan Insulation, and Fraser's Boiler, which is out in the Western District of Washington and we discussed that case in our response brief.

Burns and Roe, the open system was consensual, that's why we weren't able to find any opinions along those lines, even though Burns and Roe was in the District of New Jersey. It was a consensual arrangement with the insurer in that case, CAN.

So what the open system does is it gives the asbestos claimants a shot at the non-settled coverage, rather than

putting the burden on the trust to do so with its limited resources. But with the open system there is basically two hurdles that a claimant has to go through. First is what we call under Section 4.13 of the plan the underlying tort action. And essentially the plaintiff has to prove up its case as it would normally in the tort system and get a favorable verdict and a judgment. And after it has its judgment then it has to prosecute another case which we call -- it can be called a direct action or judgment enforcement action but this is the proceeding that we contemplate under 4.14 of the plan.

And in the direct action or judgment enforcement action, the insurer has a right to raise coverage defenses. Basically the plaintiff has to put on a coverage case in which North River would be free to extol the virtues of what it sees in the Keyspan case. So this is not an easy win for the plaintiff if it wants to go after the insurance coverage.

Now we could have stopped there under our plan. But in the Plan Insulation case the judge during a summary motion practice demanded that two things be given to the non-settling insurers in that case, and that was the trust payment credit which we have here under Section 4.15(b) as in boy in the plan, and the judgment reduction credit which appears in Section 4.14(a) of the plan.

So the trust payment credit we have described before in our brief. If the claimant receives a distribution from the

trust then that distribution, the amount of that distribution dollar-for-dollar has to be credited against any judgment that the plaintiff recovers in the tort system. It's not cash, but it is value because it's -- it either is analogous or it is a setoff right. It's --

THE COURT: Doesn't Mr. Calhoun argue that either we get that anyway as a matter of law, it's --

Mr. LIESEMER: You don't get what anyway --

THE COURT: That you would get the contribution, that the -- I think the argument was that the plaintiff only gets one recovery.

MR. LIESEMER: Well, that's a bit different. That's a bit different. What often is the case is that because asbestos was so ubiquitous in American industry for a long period of time, decades, claimants were exposed to asbestos or asbestos containing products from many different companies. And so at that point its just like any other case in which o have multiple tortfeasors. The claimant has a right to bring a tort action against all those multiple tortfeasors. And just as if somebody were mugged by six people, that person can then sue each of those six people. And whatever that person would recover from each of the tortfeasors, that would be basically the amount of the claim. That would be the amount of the claim.

And of course --

THE COURT: So you're saying that the trust payment credit that's being offered in this type of plan is something that's unavailable outside of a bankruptcy in the court system?

MR. LIESEMER: Well, we're talking about -- we're positing a tort system defendant in which there's no 524(g) trust, and the answer is, yes. I mean if there is a recovery against, you know, two defendants, there's a judgment against two defendants, and we're only talking about one of those defendants' settled share, then the judgment should be reduced to reflect that settled share. Sometimes that's called molding the judgment. But that's different.

What we're talking about here is that as result of a judgment being entered, the amount of that judgment is being reduced to reflect the payment that the claimant received from the trust.

THE COURT: Received from the trust.

MR. LIESEMER: Now there's also -- now there's, you know, discussion about equal treatment. What the judgment credit does is put the non-settling insurer, North River, in the same position but I would submit in an even better position than a normal indirect claimant. And I'm thinking when I say indirect claimant, probably the most prominent example would be a co-defendant in the tort system. And the procedures in the TDP for indirect claimants are set forth in Section 5.5.

And under Section 5.5 there's a number of hurdles

that the indirect claimant has to go through in order to receive a claim, an approved claim and distribution under the TDP. For example the indirect claimant has to pay its share of the liability in full and it would have to pay the Debtor's settled share in full, and have to obtain a release in the event of a settlement, and then it would have the opportunity because the indirect claimant is virtually stepping into the shoes of the direct claimant to submit a claim under the TDP, and the indirect claimant in that instance would be treated just like a direct claimant in terms of -- in particular the indirect claimant would be receiving payment percentage dollars.

Now with the trust payment credit North River doesn't have to go through any of those hoops. If there's a distribution to a direct claimant, North River gets the benefit of it in any judgment.

Now the second benefit is the judgment reduction credit in 14.14(a), and this is the credit for the lost contribution rights against the settling insurers. And I wanted to -- I want to clarify something because I think there's been a mistake that Mr. Calhoun was emphasizing during his argument this morning, and that's the fact that the position of the plan proponents as reflected on Page 77 of the brief, is that the judgment reduction credit would include the defense costs to the extent that the non-settling insurer has

an equitable contribution claim for defense costs against the settling insurer. So both indemnity and defense costs. And that is our position that we put on Page 77 of our brief.

Now North River says that that's not enough. It's entitled to adequate protection, it's --

THE COURT: Well, let me back up.

MR. LIESEMER: Sure.

THE COURT: It says it's not feasible because how do they establish that contribute rate, how does the -- what's the mechanism since no one can sue a settling insured?

MR. LIESEMER: Because what happens is --

THE COURT: What's contemplated?

MR. LIESEMER: -- North River would raise its coverage defenses in the judgment enforcement action and that would include -- I have equitable contribution claims both for indemnity defense costs against these other settling insurers and that has to -- any judgment recovered would have to be reduced to reflect those claims. And the court would adjudicate that. Now we have also something in the plan that says that the claimant, the plaintiff has the right to basically assert the rights of what the settling insurers would be able to assert if they were in the courtroom, and that's how the argument would be shaped to come to a fixed dollar amount as to what the credit should be.

THE COURT: So just again walking through this, in

the tort system the -- North River would argue, We're entitled to contribution of, I think it was 70 percent, whatever number. The other -- the settling insurers aren't there, so the burden is on plaintiff's attorney to contest that.

MR. LIESEMER: That's correct. That's correct. And the plan gives the plaintiff's attorney the right to do so.

THE COURT: Okay.

MR. LIESEMER: Because North River's saying, Look, I'm being -- the demand is to make me pay more than my allocated share, and so the shares that are not mine need to be reduced --

THE COURT: Okay.

MR. LIESEMER: -- to reflect that.

Back to adequate protection and full compensation. I think a lot of us who started our careers as lawyers in the bankruptcy world know that adequate protection is a specific term going to a specific problem. And what adequate protection speaks to is diminution in collateral in which you usually have a lienholder, there's probably, you know, some restrictive covenant examples in which, you know, that's an interest in property, but adequate protection is a right that the secured creditor has in order to prevent the diminution in the value of an asset.

And for example, if, because of the stay, the creditor is facing diminution in value but cannot reach the

collateral because of the stay, then the Court can lift th stay. And that's a very common phenomenon. And also with respect to 363 sales, the creditor is basically with a lien on the property is watching the property disappear in connection with a 363 sale and so 363 says -- (e) says this requires adequate protection. Basically there has to be replacement value in the form of the lien attaching to the proceeds. And that's what adequate protection accomplishes.

Now there's been a lot of development in the case law with respect to 363(f) in terms of construing the word interest in 363(f) very broadly and very elastically, but that still doesn't mean that those interests that are affected are entitled to adequate protection under 363(e). Adequate protection is a very specific term of art. And even 363 is expressed in a way that says that, you know, the court can provide as necessary to provide adequate protection. So it's not every interest in the world, it's not every claim that is entitled to adequate protection. The bankruptcy system wouldn't be able to work if it were.

THE COURT: So in this case there's a sale of a policy as part of the settlement for X dollars. Is it the plan proponent's position that North River has an interest in that policy?

MR. LIESEMER: No, North River has a claim as arising from those policies, like the equitable contribution claims

against --

THE COURT: A claim against --

Mr. LIESEMER: Against the settling insurers.

THE COURT: -- its own insurers.

MR. LIESEMER: But that claim arises from equity, it doesn't arise from the policy.

THE COURT: But it's not an interest in -- that's what I'm trying to --

Mr. LIESEMER: No.

THE COURT: -- to glean, it's not --

Mr. LIESEMER: No.

THE COURT: -- an interest in the policy, in the subject -- in the asset of a bankruptcy estate that's being sold for -- as part of the compromise.

MR. LIESEMER: It is an interest -- as I think 363(f) would be construed, it would be an interest in that sense. But it's not an interest that's entitled to adequate protection.

THE COURT: Is there any citation, or has this been addressed at all to your knowledge?

MR. LIESEMER: I think we could find it for you.

THE COURT: Okay.

MR. LIESEMER: In fact, no one in Class 7 is getting full compensation. For example, with respect to the asbestos tort victims, the asbestos tort victims are looking at liquidated matrix values in the TDP, not million dollar plus

homerun judgments. And even those matrix values, to the extent that they're eligible and receive that matrix value, is subject to a payment percentage in order to establish that pro rata distribution. So again, it's not full value.

Claimants aren't entitled to punitive damages. That's sometimes a significant piece of the verdict. But Section 7.4 of the TDP says no punitive damages. There is no separate break out for compensation for pain and suffering, there's no separate break out for compensation, for loss of consortium claims. So everybody's getting a hair cut here, it's not just North River.

Mr. Fitzpatrick yesterday testified that normally a TDP has eight eligible disease categories. This TDP has five from severe asbestos up. One example being asbestos pleural disease is missing. Once again, claimants, not all claimants, are -- not all claimants are being compensated, number one, and even the claimants that are eligible for compensation are not receiving anything.

And Section 524(g) doesn't call for full compensation or adequate protection, and we can see this by comparing sort of a normal non-asbestos Chapter 11 case with what happens under 524(g). In the so-called normal case in which we're not dealing with asbestos liability long tail, the descending classes have cram down protections under 1129(b), and the plan -- and 1129(b) says the plan must be fair and equitable to

the dissenters. If we have a secured creditor involved that's a dissenter, then there's the requirement of receiving the indubitable equivalent of the secured claim. And of course there is the absolute priority rule in which basically the shareholders of the financially distressed company can't get a plan approved that pays nothing to creditors and allows them to keep their equity interests.

And so those are protections given to dissenters. But in 524(g) there can be no cram down of the asbestos class because 524(g), in order to have that remedy of a channel injunction requires the acceptance of 75 percent of the asbestos class that's voting on the plan to vote to accept the plan. So there's no cram down in that situation.

So what standard do we look to in that case. And Congress provided a specific standard for analyzing the situation in Section 524(g). And interestingly enough, it's also called a fair and equitable standard, but it's different from 1129. This one is in 524(g)(4)(B)(ii) and this standard doesn't call for full compensation, it merely says that the injunction and the channeling have to be fair and equitable only with respect to one constituency, and those are the futures, the demand holders, persons who might subsequently assert a demand I think is the more premise language tracking the statute.

Now, interestingly enough, I was gathering from some

of the examination yesterday, particularly since North River was asking whether Mr. Fitzpatrick was considering its interest in fair and equitable that North River felt that it was a demand holder. I would guess partly based on the fact that it does have contingent claims that would arise in the event that it incurred indemnity and defense costs in the future. But there is a difference.

In Grossmans, that Third Circuit decision that overruled Frenville, the Third Circuit held that people who are exposed to asbestos but haven't become symptomatic in terms of disease had a contingent claim under Section 101(5) of the Bankruptcy Code and that's just excluding 524(g).

But these exposure only claimants with contingent claims are different from the North Rivers of the world because the exposure-only claimants cannot be ascertained. They are unknown and they are more importantly unknowing. They don't have the information that's necessary to protect their rights. And that's why 524(g) requires among other things the appointment of a legal representative to do just that.

And 524(g) also says that one of the requirements that this Court has to find in order to award a challenge injunction is that the amount of the demands cannot be, or the value or the proportion just can't be ascertained, it's unable to do so.

Now we have people like Mr. Scarcella who estimate

future asbestos liability, but it's not an estimation with any certainty. It's not the kind of estimation that would provide for a reliable claims reserve. Because even Mr. Scarcella's report which is I believe Exhibit C-1, and once again, we don't embrace Mr. Scarcella's numbers but I think his numbers do help to illustrate a point. And this is figure 36 in his report. He sees a minimum scenario of indemnity payments of $12.6 million. The maximum scenario of indemnity payments is 34.7 million which is a $22.1 million difference. That's a big swing.

And because these non-ascertainable people can't be figured out who they are and what kind of claims they would have, that's an overhang against the company that 524(g) alleviates by providing for channeling to a compensation trust.

So North River is not a demand holder by definition. Why aren't we giving North River cash? Well, as I think Your Honor found yesterday, there is a little nuance going on with respect to the credit and the cash. Because in the event that there's a judgment against North River that pays in full before the tort claimant receives any distribution from the trust or providing for that contingency, that right to receive the distribution is a sign by operation of the TDP and also the plan to North River. So we're not leaving North River holding the bag in the event that somehow claimant first sues and then seeks recovery from the trust later which is an unlikely

scenario. But we're not saying tough luck to North River in that event.

THE COURT: So in the event North River has to pay out under the tort system --

MR. LIESEMER: Yes.

THE COURT: -- prior to that claimant proceeding against the trust, North River stands in the shoes of the claimant and receives --

MR. LIESEMER: That's right.

THE COURT: So Mr. Fitzpatrick's testimony that he can never see North River receiving anything was just off with respect to that provision?

MR. LIESEMER: I don't think it captured that nuance that's reflected in the plan. The intent here is to give North River the full benefit of the trust payment credit, even if the timing seems to, we anticipate the timing will be trust payment first, any recovery in the tort system second. But just in case that reverses or if the trust is paying out a stream of payments and it hasn't completed those stream payments to the tort plaintiff, then North River will have the remainder of those payments assigned to it.

But what this is really designed to do is to preserve resources for the trust. And the trust has limited resources that we want to be paid out to the disease victims. And as we pointed out in our response brief, it would be absurd to set up

a system in which basically the people who choose only to go against the trust are basically subsidizing in defense dollars North River's defense against claimants who choose to opt for the tort system.

And I would also suggest that there is an element of a moral hazard here. Because North River is the master of its own destiny with respect to defense costs. It can choose to litigate its case how it wants and to spend defense dollars in accordance with its discretion. But if it's receiving defense dollars from the trust, that might not, that might change the analysis, it might be seen as free money and we don't want to, we don't want to encourage that kind of situation.

So that's why North River is receiving credits rather than dollars except in that nuance I told you about, receiving credits to avoid an absurd result.

North River complains that the credits only apply in the case of judgments. Well, that's not true. Because what we're doing is we're setting out requirements that would apply if a case went the distance to judgment and that has to factor into settlement discussions. And in fact the bankruptcy courts and district courts in Plant Insulation acknowledged that they would have to. Because North River would say, look, if you've got a home run and you won everything Mr. Plaintiff, these credits wold apply. And if you make us expend enough defense dollars to do that, you're going to watch, you know, the amount

of your recovery go down and down and down and down. And that has to inform the settlement discussions.

And if the plaintiff as Mr. Calhoun anticipates, I don't think it's correct. But let's say the plaintiff says, nope, I want to take it all the way. Well then that's your judgment scenario. It will have to happen in the judgment scenario if it goes that far.

So what about the scenario in which as North River has pointed out there are numerous dismissals without payment and is left with all these orphaned defense costs. Well, that's true. We don't directly address that. And once again, people are not getting everything that they can in Class 7. But what we would anticipate is those receiving an indirect benefit. And the indirect benefit is that the trust will be basically stop number one for tort claimants, and it would be processing claims from the dollars that it receives from the debtors and the settled insurers, and that is, those are claims in processing that North River would otherwise have to do in the first instance without a 524(g) plan.

And because plaintiffs who shot for the tort system in order to go after the non-coverage have to win not only one case but two. They have to win a tort action and they have to win a coverage action. That's going to diminish the incentive for those with marginal low value claims to opt for the tort system. They'll prefer the more hassle free process under the

TDP and just getting a recovery there and being satisfied with that.

So as Mr. Fitzpatrick testified yesterday, it would be the higher value claims that would avail themselves through the passthrough and the open system, and so we would expect that there would be less of the phenomenon of dismissals without payments.

Let me talk about classification. Everything about North River's claims are routed in asbestos exposure from its claims for indemnity costs to its claims for defense costs because if it weren't for asbestos exposure for which Dura Dyne is responsible for, it wouldn't be incurring those costs in the first place.

And the Third Circuit, in in Re WR Grace, report at 729 F.3d 311, this was the case involving the governments of Montana and Canada asserting claims for contribution indemnity that they said were outside the channeling. And the Third Circuit said nonsense. And I quote at page 323, says the Third Circuit, "the relevant question is instead whether an action seeks recovery that stems from the debtor's asbestos related liabilities. If it does, then it falls somewhere within the broad category of any claim or demand and can be subject to the channeling injunction." So does it stem from the debtor's asbestos liabilities? The Third Circuit in this opinion says that the breadth, the scope of claims and demands is very broad

enough. It has to be broad or else the settling insurers and debtors won't be getting complete peaks. It has to be channeled. And if it's subject to channeling, then 524(g) says there has to be a separate class of claims for that channeling. And so North River's claims belong in Class 7.

Let's talk about equal treatment under section 1123(a)(4). In the same Grace opinion that I was just quoting on page 327, the Third Circuit says, you just need approximate equality, not precise equality. There can be differences in timing of payments, there can be procedural variations. And as I said before, through the trust payment credit, we're putting North River on par or if even better, because of the low threshold on par with the holders of indirect trust claims who have to proceed under Section 5.5 of the TDP. These indirect trust claims are receiving payment percentage dollars just as the trust payment credit would be payment percentage dollars.

North River has argued in its papers that it's exempt from challenging and we responded to that based on 524(g)(4)(B) which talks about the fact that if you have claims trying to collect indirectly --

THE COURT: I'm sorry, what was that cite?

MR. LIESEMER: I'm sorry. 524(g)(4)(B).

THE COURT: Okay.

MR. LIESEMER: And this talks about you can channel claims that are seeking an indirect recovery with respect to

claims or demands that are to be paid in whole in part by a trust. And the Ninth Circuit in Plant Insulation said with respect to means relating to. North River's claims are relating to, and I think that means that they are subject to channeling and I think the WR Grace opinion that I just cited to bolsters that.

Absolute priority rules. Well as this Court has noted, Class 6 is being paid in full, albeit over time and with interest. And the only requirement to satisfy the absolute priority rule is the plan has to provide for such full payment and it does. Therefore, the treatment in Class 6 satisfies the absolute priority rule.

Now let's talk about the pledge of the voting stock. 524(g) says that the trust has to be entitled to own if specified contingencies occur a majority of the voting shares. And North River talks, uses the word evergreen a lot. Evergreen doesn't appear in the statute, it appeared in the legislative history. We know what the Supreme Court of the United States thinks about legislative history. A number of courts like the Third Circuit have picked up on the colorful metaphor and have used it but it doesn't drive the requirements of section 524(g). Evergreen mean payments over time, not payments in perpetuity. And that's, and I say that because of what the statute says. So let me break it down for this Court.

The Trust has to receive a security or securities

from the debtor. In section 101, the word security is defined. And it's a broad definition. It includes a note and it goes on and on to talk about stock and debentures and even certificates of deposit, and voting trust stock. It's a broad definition. And here we satisfy that definition of security because the trust is receiving a promissory note.

Section 524(g) as I was touching on also says that there has to be rights to certain contingencies occur, rights to own 50.1 percent of the voting shares. Now, there is inherent risk in voting shares. Congress specified voting shares. And that just can't be gotten around. Because with voting shares which is usually synonymous with common stock, but not always, there's inherent risk that the stock might be worthless. There's also an upside too. And we try to build in an upside economically through the earn out payments. So if the debtor, reorganized debtor hits some you know EBIDTA milestones, then the trust receives part of the upside in the form of the $2 million earn out.

But there's also the downside. And the downside exists just as like the sun, there's a possibility the sun won't rise tomorrow, there's a possibility that stock, even if the trust received it on day one, that the stock would be worthless.

What the Court in Congoleum was worried about was it didn't want the trust to receive stock and then that stock to

become worthless because, because the debtor was just past the financial point of no return. And we distinguish Congoleum by saying, look, in Congoleum there was rights to own a stock based on a payment default. And here there are a number of events of default that are other than just payment.

And what I would also say as a way of reconciling the Congoleum decision as well is that a lot of those defense, events of default which is usually noncompliance with a covenant, if this Court were to look at, we haven't talked about this much, but there is a note issuance agreement as one of the exhibits to the plan, and we have a set of affirmative and negative covenants in that. And these covenants basically say, for example, that the debtor has to promptly report to the trust any material adverse event. The covenants also impose restrictions on the amount of funded debt that the reorganized debtor can carry.

There is also limitations on the amount of transfers that the debtor can do so if the insiders see a sinking ship, they're not going to be just transferring value out.

THE COURT: Are there any, just as you touched on milestones for the earn out --

MR. LIESEMER: Right.

THE COURT: Any financial milestones as a floor? In other words, the obligation to transfer the stock occurs on the basis of 3/4 of negative or reduced earnings, or whatever

calculus you want to avoid any, to avoid the concern by the time there's a trigger, the company has as you said past the point of return?

MR. LIESEMER: Right. Well, it's sort of, you know, it's very abstract, and it's fine in the abstract, but pinpointing when that point of no return is is very difficult. And the way we decided to deal with it in the deal documents was to basically give the trust notice on what's going on so the trust can at least address the situation from the outside. If they don't comply with those covenants, then the trust has the right to clear an event of default and exercise it's rights against the stock.

THE COURT: Is there a financial report in covenants?

MR. LIESEMER: Yes. Yes.

THE COURT: Periodic?

MR. LIESEMER: Yes. Yes, in fact, I think the way we structured it was that whatever the exit lender is getting in terms of financial reporting under its documents and covenants, the trust receives the same thing.

So what I also want to emphasize is when Congress says a specific contingencies occur, I mean that's very broad. And I think what Congress is trying to do as it's trying to do in other parts of chapter 11, is to give the participants enough, the stakeholders enough flexibility to build deals and put together deals as they can. Because for example in WR

Grace, one of the ways we satisfy with this requirement was the trust got warned for you know with a very generous strike price and so we were able to get Grace common stock that way, and the trust was able to you know sell it in the market because it was publicly traded.

Here we have a family business held by a family for decades. This is a family that knows the industry and has the customer relationships and has been managing as North River has to concede a profitable business. So we don't think under those circumstances that it's up to our trustee to say, no, I know better than you, you're going to have to check with me to sign off on this, and I want a representative on your board of directors. That's not the deal that we reached.

I want to get to, North River has also made this technical UCC argument, well, you know, if there is a default and you exercise, you know, your possessory security interest against the stock, you know, you're not really get ownership. Well, of course we are if specified contingencies occur, the trust can always credit bid and then would be an absolute owner. But we're not. The deal that was struck and what we are interested in for the benefit of claimants is not a trustee weilding voter rights, it's getting value from those securities. And the way we structured it, it doesn't have to be dividends. Of course, if there's a default, there will be an acceleration. And if the trust is able to sell the note at

such a value that there is, you know, a residual amount that's above the remaining balance, then, yes of course, we have provisions that would allow the debtor, the reorganized debtor under certain circumstances to recover. But the trust could still own the stock, that's not outside the realm of possibility.

So again, we need to, we need the flexibility to structure the deals that we can given the situation and not be straightjacket based on words that don't appear in the statute.

I want to talk a bit about best interest. I think debtors' counsel who will be following me will also be reaching this issue. But from our perspective, a chapter 7 liquidation is a nightmare scenario, and I'm not sure it's even practical. Because, of course, assets will be sold at knock down fire sale prices, there either will be no insurance settlements or at least insurance settlements that are less favorable because these insurers will still be facing claims in the tort system. You'll have claims being, that will be flowing in past the bar date because section 726 allows those claims to be tardily filed and treated just the same as timely filed claims. And all these claims are going to have to be resolved through jury trials before the district court. And I remember Your Honor commenting about the fact when we talked about this that Your Honor thought it was very unlikely that anything could be tried in the district court just given its docket.

And the Court in the District of Delaware referred to the process as seemingly an indefinite period of time because at what point can a trustee actually figure out what the pro rata distribution is going to be when there's still all these moving parts. And, of course, we have the expenses of just the sheer expense of resolving all these claims.

And while this is going on, state law says that the insurers are still on the hook to pay under the policies. And so they are going to be facing, they're going to be facing lawsuits and claims in having to deal with them, incurring defense costs. And so that distance payout if it ever comes that's on the horizon that's time value money, that's going to dwindle down. Also, the North River wouldn't have the benefit of the trust payment credit.

So the, on balance, the nightmare scenario that would be presented here I think speaks in favor of more orderly process under chapter 11 and recovery. North River hasn't offered nothing except, oh, we have this possibility of a pro, of some pro rata recovery. I just don't think that's feasible.

Good faith. It's not bad faith as we pointed out in our papers to seek a specific bankruptcy remedy. Mr. Podgainy testified that the asbestos liabilities were becoming a deterrent for the company to be able to raise new capital. That should be sufficient. This is not about North River; this is about dealing with a legacy of longtail asbestos claims.

And just to touch on some of the arguments that Mr. Calhoun made in the beginning of his remarks, one of the great reforms as Your Honor probably knows with the 1978 bankruptcy code was there's no insolvency test. There is for involuntary cases, but not for voluntary cases. There's no insolvency test. The company can perfectly take advantage of bankruptcy remedies. And in fact, and this is reflected in the Johns-Manville opinions, Manville's business was perfectly fine by the time it entered bankruptcy. It wasn't under extraordinary pressure from present claimants. But it was projecting significant future liability. And that's why it sought the protection of chapter 11 in order to address that. And as we know from history, it was able to obtain a channeling injunction under section 105(a) and became the model for section 524(g).

Even WR Grace. WR Grace was a very profitable company. I mean this is, this is a model that repeats itself. When you look at the balance sheet and you exclude the contingent liability for asbestos, these businesses are profitable and doing great. I mean Grace was so profitable and arguably solvent that Grace was fighting with its bondholders over whether the bondholders were entitled to interest at the default rate. And nevertheless, the Court confirmed the plan with a 524(g) relief, and the Third Circuit affirmed.

So just strict solvency test and whether the debtor

is profitable is not the test because 524(g) lists the determinations that this Court has to make in order to award a channeling injunction. Profitable business is not one of them. One of those elements is the debtor has to be, have been named a defendant in asbestos tort actions. And the other element is that the future liability just can't be ascertained. And so therefore you have that overhanging liability that depresses the company's performance and long term outlook.

And so when those determinations are made in the debtor's favor, 524(g) is a permissible remedy and has been done in the past for companies like Grace and Manville who at the time they filed had very viable balance sheets.

I'm seeing if there's anything else that I need to add here.

I think part of the problem here, and I'm going to go back to adequate protection. I think part of the problem here is North River is looking toward the MacArthur vs. Johns-Manville case which is a decision of the Second Circuit. And in that case, you had an entity, MacArthur that had rights to Manville insurance coverage. And that coverage was being settled in accordance with chapter 11. There was actually an insurance settlement injunction that was entered to, that mimics 524(g).

And so this co-insured essentially had rights to the Manville coverage and the Manville coverage was disappearing.

And so it was objecting to that. And this was pre-524(g), of course. There was going to be a 105 injunction and, of course, as we all know you can't base it all just solely on 105 there has to be something else in the bankruptcy code that you could point to that 105 supports. And so what the Second Circuit said, well, the claims of this vendor endorsee is, of MacArthur, is being channeled and this is just like a situation in which you have assets sold in a 363 sale and you baiscally have interest channel to the proceeds under 363(e). So it was expressed as analogy. It didn't raise this co-insured to the rights of a lien creditor. And I think even though we have cases that sort of talk about it in that sense, it's more in the sense of a comparison. It's not an issue of adequate protection.

And I should also add because this was touched on, even though it deals directly with the insurance settlements, North River basically said we have to have basically the equivalent of lien rights to the proceeds, or else the Court doesn't have jurisdiction. And that's not true. Because the contribution claims, the equitable contribution claims against the settling insurers affected the value of the coverage, right. Because the settling insures can buy complete peace, we can get a bigger price, we can demand a bigger price for the settling insurers to pay. But if they can't achieve that, they can't get that 524(g) relief, then it's either no settlement or

settlement on a less favorable term. And because that impacts the value of the coverage this Court has jurisdiction just as if, again, here's the analogy, just as if there was a mortgage on land that was property of the estate. It's the same dynamic and Congress recognized the same dynamic in granting relief with 524(g).

I think that's all I have. So unless the Court has questions I will sit down.

THE COURT: Thank you very much.

MR. LIESEMER: Thank you.

UNIDENTIFIED SPEAKER: Your Honor, I'm going to try not to repeat anything that's been previously said by my colleagues, but I do want to address a couple of points.

These cases in this plan were filed in good faith. And for North River to suggest that this case is somehow a scam to line the pockets of the equity holders and the asbestos claimants is nothing more than a farce.

In the years leading up to the filing of this case, the company faced the situation where its insurance asset was dwindling. It was through its primary layer of coverage, one of its carriers was insolvent, the company's share indemnity payments was increasing day by day, it faced insurance coverage litigation in New York state court which seemed to be going on forever at a high cost.

As Mr. Pagani testified yesterday, the company was

unable to obtain access to the credit markets because of the asbestos overhang, and was unable to obtain additional equity investment. That is simply not a sustainable business model. To the company's credit, the board of directors and officers sought assistance while it still had resources and the ability to react and take action. As Mr. LIESEMER said, the bankruptcy code does not require a company being solvent either on a balance sheet test or on paying their debts as they come due basis. A company only needs to show that it needs to restructure or be able to reorganize.

And there are legions of cases that stand for that proposition. Mr. LIESEMER referenced the Manville case, but the seminal case in this district is the GI Holdings case. GI Holdings operated what they claim to be the world's premier roofing company. They spent over ten years in chapter 11. I think the case just closed, actually 20 years, the case for 10 years until they confirmed the plan and the case just closed. Extremely profitable company.

There was another smaller case in this district called Morello Paint filed before Judge Stern in New York, Newark. In the Morello Paint case, there was a motion filed to dismiss the cases of that filing as a two party dispute which Judge Stern vehemently denied referencing that as a lawyer's argument.

The history of this case, Your Honor, is that it took

three years of negotiations between the debtors and the claimants' representatives to cobble together the plan. You've heard a lot today about how small the trust is. And the concern that there's not enough value here was expressed that a 524(g) trust might not even be viable because the transaction costs would be too high and there wouldn't be sufficient dollars available to pay distributions. That's a function of the size of company. And unfortunately chapter 11 is expensive, operating these trusts for many many years, decades is also expensive. But this company is paying 20, over $22 million, 7 ½ million dollars in cash and a 13 ½ million dollar note, and $2 million earn out into this trust. That represents a full valuation of the company at the time that the deal was made. And in fact my client would tell you that exceeds the value of the company. We're overpaying in an effort to keep this company going.

UNIDENTIFIED SPEAKER: Your Honor, we've listened to a lot of testimony. I do think we should try to constrain ourselves to the record that we've established over the last 48 hours.

THE COURT: Fair point.

UNIDENTIFIED SPEAKER: Your Honor, to the extent that it's not on the record, you can, but I think it's in the certification of Mr. Pagani, it's in the disclosure statement, it's in the first day affidavit. But I'll move on from that

point.

In addition, Your Honor, the principles and related entities are also putting in additional $3 million in, and whether or not that's enough, and the collateral, that's what -- and I'll just note for Your Honor that in addition to that $3 million of cash, there were two affiliated entities that are granting mortgages, real estate, to collateral, 13 ½ million dollar note.

North River's view that the contributions being made by the company, the principles and the affiliated entities, is insufficient because claimants would do better outside of a plan or outside of bankruptcy is simply naive.

Without access to the credit markets, without access to additional capital, this company is unlikely to be successful in the long term. And it's not only money, Your Honor. The successful operation of the company requires the blood, sweat and tears of a lot of valuable people. And to the extent that there's no incentive for equity holders and officers and directors to continue to bear the burdens and to work hard to make this company successful, the company is not likely to succeed and the stream of payments that Mr. Calhoun seems to think would just flow in off the back of the company without the valuable people is unlikely to occur.

Mr. Spondor argued that the record is insufficient to support consolidation of these debtors. We beg to differ. We

believe that Mr. Pagani's testimony which is in the record indicates that through discussions with the company and his experience of five years working with the company he was familiar with the operations and that creditors did indeed view this company as a single entity. And Your Honor has, well review the record and determine that, but I don't think that that's necessarily determinative.

Owens Corning only recognized that that test is applicable in the absence of consent. And here, the only impaired class of creditors voted in favor of the plan. The only party raising the substantive consolidation issue is the Office of the United States Trustee which doesn't have an economic stake in this case. And that's not surprising, Your Honor, because subsequent consolidation here does not impair any class of creditors.

THE COURT: What's the impact without substantive consolidation? What's the prejudice or harm?

UNIDENTIFIED SPEAKER: I think the real purpose of substantive consolidation, Your Honor, is to restructure and reorganize and simplify the corporate structure of the company coming out of chapter 11. I mean we could, I suppose, with more work, come out of chapter 11 with all of these entities and then do another restructuring once we come out of chapter 11. At present, there are a holding company and four operating debtors which operate effectively as one entity. And since as

part of the overall restructuring it was determined by the company that it made sense just to streamline the operation and get rid of the parent's subsidiary structure.

THE COURT: It has been operating all these years in the current fashion, correct?

UNIDENTIFIED SPEAKER: It has. It has, Your Honor.

THE COURT: Are there any tax implications that you're aware of or other implications of the failure to consolidate?

UNIDENTIFIED SPEAKER: Not that I'm aware of, Your Honor.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: But it is a cumbersome structure that the, that the board and the management are trying to eliminate. And what we would assert to Your Honor is that there is no impact, there's no impact on creditors here, whether the case is substantively consolidated or not. This is not the situation where you've got four operating debtors and if you substantively consolidate the creditors of, you know, entity A or subsidize in the creditors of entity B. All creditors here are getting paid in full other than Class 7. And the treatment of Class 7 doesn't change whether the cases are substantively consolidated or not. So there's no prejudice to any party in interest here.

The U.S. Trustee further objects to confirmation on

the basis that the Bank of America loan is not closed, and that there's risk that that transaction may not close. Your Honor, in the best of all worlds, we would have the documents done and everybody waiting in the hallway to sign loan documents when Your Honor confirms the plan this afternoon. We didn't think that that was likely to happen today, that confirmation is going to take some time, the effective date is going to take some time. And unfortunately that's just not how banks work.

Every indication we have from Bank of America is that the loan is on track, they are anxious to do the deal, but until we can give them a closing date, we don't have closing documents. And really what we have is a chicken and egg problem there. We wouldn't be here wasting our time if we didn't think that that loan is ready, willing and able to close as soon as we get an order from Your Honor and we're able to get to the closing table.

In terms of the best interest test, Your Honor, North Ridge argues that it might be better off in a chapter 7 if they get so much as a penny in a chapter 7 because they're not getting anything on their claims under the plan. But under the plan their class 6 claim if and when allowed, is being paid in hundred percent dollars with interest. That in and of itself is more than they'll ever see in a chapter 7.

It's difficult that in an asbestos case to put together a traditional liquidation analysis. The amount of the

asbestos liability by its very nature is speculative at best and difficult to reduce to a present value number. As Mr. LIESEMER indicated, if the case is converted to a chapter 7, a bar date is established and notice goes out, there's going to be an awful lot of asbestos lawyers out there filing claims on a protective basis. And in the absence of settlements between the chapter 7 trustee and all of those claimants, the only way to liquidate the claims would be through trials in the district court which would take a significant amount of time and a substantial amount of resources.

The liquidation analysis that Mr. Pagani put together estimates that there would be approximately $8.4 million available after assets are liquidated and secured claims, chapter 11 administrative claims and priority claims are paid. That $8.4 million does not include as Mr. Pagani testified insurance proceeds. As Mr. LIESEMER indicated, the insurance carriers would continue to defend claims in the tort system and in the absence of settlements with the insurers which we think would be extremely difficult to obtain given the fact that 524(g) protection is not available in a chapter 7.

So we think, you know, in all likelihood the insurance assets would be dissipated in a chapter 7. And that eight and a half million dollars would be left to pay trustee's costs, liquidating claims.

Mr. Pagani flippantly indicated, you know, that, oh

gee, there might be something available for distribution to unsecured creditors. But we think it more likely that, you know, the resources would be utilized liquidating claims and there would be no dividend in a chapter 7.

And the bottom line here is that all creditors, Including the non-settling insurers fare better under the plan than they would in a chapter 7.

Unless Your Honor has any questions from me, I'll stop there. Thank you.

THE COURT: Any response?

UNIDENTIFIED SPEAKER: Yes, Your Honor, I do have response.

Your Honor, Mr. Wehner started his argument with a quote from Federal-Mogul and I'm going to try not to repeat my initial argument, but when I said there were certain parts of the response that were misleading, this is one of them too. There was a quote from Federal Mogul about how asbestos trusts appear to have fulfilled Congress's expectation that they would serve the interest above current and future asbestos claimants.

The paragraph before this quote in the opinion states that conflicts of interest and structural deficiencies are properly raised in proceedings to confirm the plan of reorganization. Federal-Mogul dealt with the issue of whether the rights under insurance liabilities could be transferred to a 524(g) trust. The statement in Federal-Mogul is dicta at

best and the U.S. Trustee in this case is following the instruction of the Court in Federal Mogul raising structural issues with the plan, namely the safeguards and transparency issues in the TDP at the plan stage.

And let me say, Your Honor, we're not before the Court saying that 524(g) does not work at all, it should be thrown out, asking Your Honor to legislate new law. That's not even close to what we are arguing. We're just saying that the TDP process needs more transparency and oversight to help weed out fraudulent claims and not inflate what happens in the tort system.

The U.S. Trustee is accused of taking the side of the defendants and the parties are wondering why inferring some type of negative connotation. I know I am sitting next to Mr. Calhoun in Court today, but I would ask you not to read too much into that.

(Laughter)

As I try to explain in my argument, Garlock happened, Garlock was, and, you know, I've said this but Garlock was a game changer. We did not jump in before that. We have not been taking these position for 20, 30 years. The three cases Mr. Harron was referring to are all recent cases. Yes, there has been a shift. And it's primarily motivated by what happened in Garlock. And as I said in my argument, Your Honor, parties have a fundamental difference in what that case did or

didn't say and we've made our arguments on that.

Mr. Wayner also referred to Pittsburgh Corning, fraudulent votes, not sure what he was referring to. None of the arguments that I have made include fraudulent voting. I would have to look at that case and see what was alleged there.

And as I previously said, the study of unsealed Garlock discovery does show fraud in the asbestos trust system, you know, such as an employee who had worked at two different job sites at opposite ends of the country at the same time. And, again, this is from insights and inconsistencies which did unseal a lot of the claims in Garlock and a lot of the discovery there.

Jumping into the confidentiality provision, 6.5, Mr. Harron said this is the same as in Garlock. I don't believe that's the case. And just referring to the footnote that is in the papers that we used an outdated version of the Garlock TDP, Your Honor, what we used was the version that the Court approved was taken from the docket. There have been subsequent versions that the parties have changed. I did have someone in my office pull the most recent version, redlined it against what we used, there are changes, but I don't believe there's any changes or certainly nothing significant to the provisions we have brought up before Your Honor today.

THE COURT: Mr. Hausman, let me just ask this question.

MR. HAUSMAN: Sure.

THE COURT: We've talked about this, I'll refer to it as the new initiative by the U.S. Trustee or a renewed initiative. Certainly as recently as this morning read, it's the danger of the internet, Law 360, language that I've seen in this Court in the Marymount (phonetic) case, using the same issues. Other cases, have there been changes to TDPs as a result of U.S. Trustee objections or attorney general objections to date? Or am I lucky enough just to be in the forefront?

MR. HAUSMAN: Your Honor, I believe you're lucky enough to be in the forefront.

(Laughter)

I am not 100 percent sure of that, but I am pretty sure that I could tell you that, you know, there have been other change -- we have objected to the FCRs in other cases, and our position in that has evolved since this case that, you know, we filed motions in some of the other cases to give the Court more options and suggest other FCRs that the Court could appoint.

THE COURT: Well I took that. And that led to my thinking of expanding the TAC since you had, you offered individual recommendations, not you, your office, in other cases as far as the FCR then maybe TAC membership can be expanded.

MR. HAUSMAN: Your Honor, you know, subject to speaking with my office, I did have a quick call. We certainly think that's an idea for serious consideration.

THE COURT: Okay. Does your office, and I'm sorry again for interrupting.

MR. HAUSMAN: That's okay.

THE COURT: Does your office have any evidence, I would say apart from the studies, but even with the, on the studies, that these trusts, that there are trusts that have run out of money, that there aren't any financial prejudice? Because I'm assuming that that's really at the heart of the issue, that the trusts are not going to have sufficient funding for future claimants. At least those are the issues with the TDP and the action. So is there any evidence to suggest that there are economic concerns for these trusts?

MR. HAUSMAN: Your Honor, as I'm sure the Court, I've read various of the law review articles. Look, there is evidence that the payment percentages usually go down in a large number of these cases. That's one way of looking at the present claimants get paid more than the future claimants, that people are paid off at the beginning and then the payments percentage goes down and it hurts the futures. As we've heard, once the money goes out, it can't come back in. We're not arguing it should, I understand that's a reality of it. But that also hurts futures.

I can't cite them off the top of my heard, but I'm pretty sure if Your Honor requested it, we can come up with evidence from law review articles that shows. But I think at the heart of our argument maybe it's not even that complicated that if there are some fraudulent claims or that are paid, that hurts futures. People, money is going out the door now that should be going to futures. I don't know if it's much more complicated than that.

THE COURT: But we've got to quantify that, because there can be mistakes. There are trustees, chapter 7 trustees, I've been one of them formerly, we didn't object to claims that should have or could have. They're out there, that mistakes get made or overpayments. So is it a true problem or is it anecdotal and I'm not sure you have the answer.

MR. HAUSMAN: I don't have the answer. I would just say Garlock showed we believe that it is a true problem. But there are additional facts in the law review articles that show a lot of money is going out up front with the payment percentages and futures are the ones that suffer.

THE COURT: Okay.

MR. HAUSMAN: Just in discussion the confidentiality provisions, as Your Honor stated, why do we need this, you know, and they pointed out state courts have rules. Why put up additional roadblocks? And I assure you depending on how Your Honor rules if you force the parties to come to the table and

have a meaningful conversation, we will come up with a provision that does take into account the confidentiality provisions to a large extent. But we think there's a middle ground that could be there. But getting information out as opposed to just hiding behind this wall of confidentiality and people will be taking advantage of.

The deferral provisions, you know, there was some type of administration convenience, but as I pointed out, it allows parties time, allows them to time when they make certain disclosures. Mr. Wayner says you could discovery anything, you know, you could serve discovery. These deferral provisions have been used to not answer discovery. They are deferral, they are deferral claims filed only to toll the statute of limitations is the answer. This is discussed in the Tulane Law Review article at page 1119.

Mr. Harron says we are attacking 524(g). This is simply not true. Again, Garlock just in the tort system, I've gone over this. We have a disagreement. He brought up the payment percentage. You know, we did not object to any provision regarding the payment percentage.

Mr. Harron says, he got on a little bit of a roll that we are asking for ridiculous propositions, the payment percentage. I think he's going way beyond what we are asking for. You know, I think it's ridiculous that we didn't have meaningful conversations about these provisions beforehand but

everyone is entitled to their opinion.

Just as an example, if a claimant has denied exposure in a tort action to Dura Dyne product, that should be a factor in deciding whether to grant a claim to that person, and I don't think the TDPs take that into account. That's just one example.

Your Honor, in summary, we are asking for some changes to the TDP. We're not asking for an overhaul of 529(g) which will add some real transparency and oversight to the process, something that we feel is sorely needed.

THE COURT: All right. Thank you, Mr. Hausman.

Mr. Calhoun?

MR. CALHOUN: Thankfully I have a thick skin, Your Honor, so even if the U.S. Trustee piles on to demonize insurers, I can take it.

(Laughter)

THE COURT: They sit there all the time.

MR. CALHOUN: I know.

THE COURT: In 13 years on the bench, they've never been over there. So it's just coincidence.

(Laughter)

MR. CALHOUN: Your Honor, I'm just going to take these arguments in the order they were raised just for convenience, so of them overlap.

On the TDP issues, we did join in the U.S. Trustee's

objections. I just wanted to point out with respect to the confidentiality, you asked a question about the subpoenas. The answer that you received was actually wrong. Rule 45 was changed, all subpoenas now, federally at least, issue out of the court hearing the matter. So those provisions actually would cause a great administrative headache. I'm not sure that Delaware courts would allow someone to come in and open a miscellaneous matter to issue a subpoena because the rules actually provide for exactly the opposite now. So I actually do think that that's a practical problem, that I call to your attention.

A couple of points that Mr. Wayner and Mr. Harron made I think are worth addressing because it highlights exactly What we were saying, Your Honor.

Mr. Wayner emphasized that only expedited review is here. There's not the more detailed granular individual review where possibly defenses to a claim might be revealed.

Mr. Harron went further and stated that claimants aren't going to sign up for a trust where their claim might not be allowed, they're not going to sign up for a trust where their claims might be defended. In other words, they only agreed to this because it's easier for them to get the money. And they were pretty expressed about that. That's, from a claimant's perspective that's a perfectly understandable motivation. It makes sense. It's not, however, something that

commends the trust as a way of weeding out fraud or showing that this is a plan proposed in good faith. It actually suggests the opposite.

All of the counsel today arguing for plan proponents made a number of arguments today that were more in the nature of testimony than argument. And that's because they don't have a record on which they can rely. When you get the proposed findings of facts and conclusions of law, it's going to be more than apparent that they're going to, if they were to try to satisfy the requirements for confirmation they're not going to be able to cite to anything. They will have blanks, where instead of reference to testimony, evidence in because it's not there. They did their best to supplement an argument but that's simply not evidence, it's not before the Court properly.

And there was a lot of talk about the alleged facts in other cases, but not talk about the evidence that's in this case with respect to what happened in other trusts or what might happen with claims. It's just not before you.

There was a lot of discussion about what happens in North River's claims. And I think there's some confusion maybe intentional, maybe not with respect to what happens to our claims.

We have different kinds of claims, Your Honor. As you know, we submitted several, claims for several different things. The two claims, types of claims that we're most

concerned with today and which give grounds for the confirmation of this plan concern our defense cost claims against the debtor and our claims against other insurers. All of the claims for the most part that the plan proponents were discussing were credits or judgment production with respect to indemnity dollars that we might have to pay that would reduce an indemnity contribution claim that we might have against the debtor.

It's clear that with respect to our defense dollar request against the debtor, we get nothing. We don't get a judgment reduction, we don't get an offset, we don't get a credit. We get nothing. That violates the requirement that we receive equal treatment. We have no opportunity for payment of those claims. We don't get credit, we don't get offset, we get nothing.

With respect to our claims against other insurers, we have a contradiction. We have testimony from Mr. Fitzpatrick that we don't get even judgment reduction with respect to our defense cost claims. I believe it was Mr. LIESEMER, it may have been Mr. Wayner, so I don't know that was wrong or there was confusion on that, it's certainly not clear, Your Honor. But it appears from the terms of the trust that whatever we get that we do not get, ever get payment on behalf of those claims, whereas we would definitely get payment in the tort system. That is a significant fact in both with respect to the fairness

of this plan, with respect to the requirements of 363, and with respect to the best interest test. In all of those cases the fact that we would get paid outside of the tort system is significant. They're not proposing to pay us anything for that. But maybe if one interpretation is right and their witness is wrong, we might get an offset versus some indemnity dollars that we might owe if we lost the case, and then we establish in another separate judgment a contribution claim.

Who knows what those provisions really say. They don't really make a whole lot of sense when you read them. I know Your Honor has asked some questions about them because they don't really tie together where there's assignments and then there's they have claimants who are supposed to indemnify the trust if we bring an indirect claim which I think is entirely circular. I think they would assign us a claim, we get paid by the trust, and then they would get reimbursed from the claimant. It didn't make sense, the 5.10.

Aside from that, it doesn't really matter because they have to respect our claim in section 363 and 105. Your Honor, what they're saying is, you heard today in argument, was we don't have an interest that's protectable. They said it's, added protection is reserved to lien holders. You can disregard the cases that say that you have to make sure that if you're going to enjoin a claim, that any claims, such claims are attached to the proceeds. They said never mind that, that

only applies to liens.

Your Honor, if we don't have a claim or interest that's subject to 363, I don't know how you can do a sale free and clear of that right. This is a claim that North River has against third parties. It's not an asset of the debtor. Their argument is that it may collaterally impact the value of the debtor. Remember, these are defense cost claims. So if we pay for defense costs and then we bring a claim against Hartford for those claims, that doesn't reduce by one cent the amount of money that's available to the debtor under the Hartford insurance policies. The defense costs under those policies are outside of limits. So what that means is that defense costs are infinity dollars as long as the insurance companies are solvent and they're just claims to defend, they can defend them.

Instead of having our claims for other insurers share that, they're saying that's going to be done away with and you get nothing. You know, that's simply not fair. I recognize that North River is an insurance company and that they don't like us, but your job is to apply the laws that's written and we have rights, they're entitled to protection.

Your Honor, with respect to the classification they brought up the Third Circuit's decision in WR Grace which was dealing with co-defendant indemnity claims which are very different than insurer defense costs claims. Unlike a co-

defendant indemnity claim, those claims would go to the indemnity dollars available under the insurance polices or they would be indirect claims that are seeking damages for the debtors' products directly. Our defense cost claims don't have anything to do with the payment of actual asbestos liabilities or the indemnity dollars that will be paid under our policies. It's a separate issue. The classification doesn't make sense.

THE COURT: Well, wasn't the reference that they all still, they still are derived from a liability arising out of the asbestos disease in claims?

MR. CALHOUN: Well, I don't think, there's an argument, Your Honor --

THE COURT: Would you have any without the asbestos issues?

MR. CALHOUN: It would depend on the type of claims. The claim arises out of our insurance policies. If you interpret the language in that decision as broadly as you possibly could, you could arrive at what you're saying. I don't dispute that.

THE COURT: But you're saying it's too broad.

MR. CALHOUN: I'm saying it's too broad, that related to the asbestos liability means the asbestos liability in some way. If it meant that you could classify defense costs claims in there the same way, what you end up having is too disparate. You could have a separate class of defense cost claims that are

channeled to the trust, I don't think that would be improper. But what they've done is they've created, what they've taken our class, which is very different from the tort claims, I don't think they really disagree that our claim is different from the tort claims. We know that because they propose to treat us differently.

Typically, if you're going to treat claimants differently you put them in different classes, that's what the bankruptcy code requires. So the only way that we're similar is that they're saying they're going to channel us both to the trust. Claimants get channeled to the trust for handling of the TDP and payment, we get channeled to the trust to go there and die and get nothing. So they're treating us differently.

THE COURT: Couldn't they not have channeled or could they not have directed your class claims into the Class 7 as also been derivative of asbestos claims?

MR. CALHOUN: Possibly they could have. Possibly they could have. It's not before us, so I haven't thought about that at great length, but it's possible.

But anyway, if they wanted to channel us to the trust, they could have done that, but they still have to put us in a separate class. So their problem is if they put us in a separate class and channeled it to the trust, they got an absolute priority problem. That's the only reason they didn't do it. So you know their rationale at the end of the day is

pretty easy to figure out, is they didn't want to put us in a separate class because if we rejected the plan they've got a big actual priority problem, this whole arrangement of letting the claimants keep their equity becomes a problem. So, you know, it's not difficult to figure out why they did it they way they did it, but it does create a problem where you're having two groups of creditors who are being treated very differently. Mr. Fitzpatrick was aghast at that idea that the trust might have to pay insurance claimants. Well, you know, I'm sorry, but we're a creditor. It's a fact of life. Sometimes you may not win a popularity contest, but our claims are entitled to fair treatment under the law. And we're not getting it.

As to the best interest of creditors test, it's not would other people work out better under this plan. We don't dispute that some creditors work out better under the plan than they would under chapter 7. It's self-evident. We don't, however, and that's all the best interest of the creditors test is concerned with. They don't really dispute that. There's no evidence before you, they didn't do a best interest of creditors test with respect to our claim. Mr. Pagani admitted that. When he was pressed by his counsel, he admitted that it's possible that we get paid. He also conceded that they haven't considered the impact of our rights outside of bankruptcy against non-debtor parties. It's just, they don't meet the best interest of creditors test, Your Honor. Couldn't

be simpler, and they don't really contest it.

I would like to briefly address the comments about the pledge and the voting stock. They rely, kind of ironically, their argument about the handling of our claims as being proper. They say look at Plant, Plant is the way to go. They approved that processing Plant. Well, Plant is very different and I'll get to that in one second. But if you take that as a given, let's look at all of Plant.

Do you know what else the Ninth Circuit said? It said, the fault division where you then have a security interest in stock doesn't meet the requirements of 524(g). So if we're going to take Plant, let's take all of it. Plant is still not confirmable. But even if you look at what Plant said with respect to, it was a different structure with respect to the offsets.

Unlike Mr. Fitzpatrick's testimony in Plant, they don't appear to have limited the contribution claims to indemnity dollars but defense costs theoretically were included. There are also findings in Plant that aren't present here and aren't possible here because there's no evidence concerning it, that the only way to persuade insurer to settle which obtain the finality from the post-settlements. There's no evidence of that in this case. Yes, you have post-settlements but you have no evidence that you can't settle without it.

There is an also argument that in Plant, the finding, that the trust will be underfunded if those settlements weren't approved. And that's not the case here. In fact, the trust argues are they over funded if you look at the only evidence that is before the Court on the amount of future claims.

So Plant is a very different case. I don't think the Court was right on its treatment of the claims. But even if it were, I don't think it's fair to cherry pick Plant. Let's take Plant, Ninth Circuit at its word with respect to what's required for funding of the trust, funding, and for ownership of shares which had to be a real opportunity, not a, and a real contingency that was meaningful and that the default provisions which are essentially identical to the ones proposed here didn't meet that requirement. It reversed confirmation, remanded that case based on that.

And the last thing I wanted to raise, Your Honor, was with respect to the funding, there was some discussions about oh, it's not really, 524(g) is not an evergreen requirement. And the word evergreen doesn't apply, doesn't appear in 524(g). But the statute does say that it's to be funded in whole or in part of securities for the debtors involving such plan, and by the obligation of the debtors to make future payments including dividends. There are no dividends being made to this trust. So if we just want to take the statute at its face, Mr. Harron complained that it would be unfair to make the plan proponents

strictly comply with all this sort of artificial structure, statute and the statute has words that have meaning and it has requirement that there be ongoing future payments and dividends that aren't present here.

Your Honor, again, I would urge you to deny confirmation of the plan.

THE COURT: All right. Thank you, Mr. Calhoun.

Are there any other counsel who wish to be heard?

MR. WEINBERG: Good afternoon, Joshua Weinberg on behalf of Hartford Accident Indemnity Company. Hartford, as you know, Your Honor, is one of the settling insurers. I'm mindful of the comments that Your Honor made at the start of the hearing yesterday morning, so I really have nothing to add other than to state that we are continuing to reserve our right to join in the objections pending resolution fo the motion to settlement.

THE COURT: Absolutely.

MR. WEINBERG: Thank you.

THE COURT: And that will hold true for all insurers, settling insurers.

MR. LIESEMER: Your Honor, if I may very briefly.

THE COURT: Go ahead.

MR. LIESEMER: With respect to the defense costs being a part of the judgment reduction credit, as we said, we made that clear in our brief. Now, Mr. Calhoun is trying to

capitalize on the fact that Mr. Fitzpatrick might have been a mistake. And this Court is the trier of fact. And this Court sees the demeanor of witnesses and has the advantage of that. But what I saw yesterday from my perspective was a lot of badgering of the witness. And I think Mr. Calhoun just can't have his ah-ha moment when we've made very clear in our papers that defense costs are included within the judgment reduction credit.

Now, Mr. Calhoun also talks about the fact that, well, they're not covering this, and they're not covering that. As I said again, we're not covering anything, we're not covering everything for the people in Class 7. It really comes down to the test, the fair and equitable test as to the future demand holders. And North River just isn't in that equation for the future demand holders.

With respect to the liquidation tests, North River just speculates and says it's possible that it might have a recovery. That's not, that's not certainty. It's possible that the sun won't rise tomorrow. That doesn't speak to anything. I think we've laid out the reasoning as to why they would have a big problem under the liquidation test.

And with respect to Plant industries, or Plant Insulation, yes, it went against us with respect to it upheld basically the credit that we have here but went against us with respect to the specified contingencies. It followed Congoleum,

and I explained our reasoning for distinguishing Congoleum, and for also reconciling that. And this Court has, should give us the flexibility to put the deals together that we can. And I think that's important rather than reading straight jackets into the language of the statute.

With respect to dividends, Mr. Calhoun suggests that dividends are mandatory since it says including. When you look at section 102 of the code which is the rules of constructions, rule construction including is including without limitations. So what it's talking about is a stream of payments which may be dividends but it could be something else. We opted for something else. Thank you, Your Honor.

THE COURT: Thank you. Thanks to all counsel. The past two days you've done an extraordinary job advocating on behalf of your constituencies.

At this juncture, I am going to be in need of your assistance in respect to the preparation of proposed findings and fact and conclusions of law. As I indicated, the plan proponents have the burden of setting forth all the elements necessary to confirm a plan. I would expect from the objecting parties proposed findings and conclusions at a minimum of supporting their objections. To the extent they wish to tackle other issues, that's their, within your discretion.

During the time it takes, and we'll talk about that, and I'm going to take Mr. Hausman up on one of this comments

that the U.S. Trustee is still prepared to talk about their various provisions. It would be foolhardy for the parties to think that this is just a fait accompli one way or the other today. There is an opportunity to continue discussions whether it be the terms of the TDP or the, or more global issues.

You've heard my comments, my concerns, my questions. Every Judge raises questions in an effort to send signals. I am no different. So take them to heart or at least consider them. And as you're working, I would urge you, I would urge the plan proponents to sit down with the U.S. Trustee, and I would urge the plan proponents to sit down again with North River to the extent it's possible.

Let me know, tell me what do you all need as far as timing? I am contemplating contemporaneous submissions and then if you would like an opportunity to respond. That's usually how everybody wants the last word. But rather than have a series of submissions contemporaneous proposals and then an opportunity to respond. Give me a timeframe.

UNIDENTIFIED SPEAKER: Your Honor, maybe it would be helpful to have five minutes to confer.

THE COURT: I think it would be great. It's, at this point I want to make sure Ms. Feeley can get out of here by 4:30. Is that doable, that I'll give you about ten minutes?

UNIDENTIFIED SPEAKER: Yeah. I mean some of it's scheduling, Your Honor. I think, you know, parties have

fruitful talks, maybe if we didn't have the, you know, the pressure of having to get these in right away, you know, timing. But --

THE COURT: I'm all for working out. I'm not sure, the debtor would like to be out of bankruptcy as soon as possible. We know that.

(Laughter)

But whether it's I want it to be in November or I think the first date was in October. But we're here, it's March, whether it's March, April, the first week in May and we know it has to go to the District Court which was something the Plant, I still don't understand how the Ninth Circuit said it was appropriate to have the bankruptcy court issue the final judgment and then go up on appeal to a district court, but that's another issue.

UNIDENTIFIED SPEAKER: The Ninth Circuit says a lot of things, Your Honor.

THE COURT: They do. But take the ten minutes, talk about what's workable and then I'll come back out. Okay?

UNIDENTIFIED SPEAKER: Your Honor, can I ask, maybe it's a question for Ms. Felik. How quickly can we get the transcript, because that may factor also in.

THE COURT: Cathy, what's your -- oh, it's Ms. Felik. See they changed up on me.

UNIDENTIFIED SPEAKER: It's really not -- they send

the take out to court reporter.

THE COURT: To a transcription service.

UNIDENTIFIED SPEAKER: So I mean if you can answer that, please --

THE CLERK: That's the truth

UNIDENTIFIED SPEAKER: You're right. How quickly can you get the --

THE COURT: We could tag it. All these hearings could be tagged so that they could appear on the docket and you can listen to them, but that's not really what you need.

UNIDENTIFIED SPEAKER: Can it be tagged because --

THE CLERK: J&J Transcribers, you call them.

THE COURT: But we can have these tagged. We'll tag for two days.

UNIDENTIFIED SPEAKER: If you tag them because that allows us, then we don't have to get the tape from you to send it to the transcriber which just adds a little time.

THE COURT: We'll tag it, but you do need to reach out to J&J directly for a timeframe. So I'll let you talk and then I'll come back out in 10 minutes.

(Break 4:10 p.m. to 4:19 p.m.)

MR. HAUSMAN: So, Your Honor, I think we've agreed to simultaneous submissions of post findings of fact and conclusions on April 15th, and then applies by May 3rd.

THE COURT: Applies by May 3rd. That gives enough

time to get the transcripts, you're building in a few weeks for transcripts?

MR. HAUSMAN: Yes.

THE COURT: A couple of weeks.

All right. I assure you I'll have a decision within May. So anything else from a housekeeping prospective?

UNIDENTIFIED SPEAKER: I think there's also a brief due on -- reply brief?

THE COURT: So actually we need to pick a holding day because the settlements were scheduled for the confirmation hearing yesterday. Correct? The first day.

UNIDENTIFIED SPEAKER: They were. Yes.

THE COURT: So, Wendy, yesterday all of the, the Court decided the motions to seal, so I assume I can enter those orders. I will probably just reflect that for the reasons set forth on record, I'll take a look at the proposed orders, but I'll reference my comments on record with respect to the sealing.

With respect to the motions for compromise, let me pick a date to carry them in May. I will carry them to May 3rd, it also gives me a target date to get an opinion done. May 22nd at 10:00 I think, it doesn't really matter, so we don't lose track of them. Because they were all brought on shortened time without any opportunity to object, if the parties can't file objections to the motions to approve, any

objections would have to be in April 30th. I'm not going to be addressing them, but that gives you ample time. All right?

MR. HAUSMAN: Your Honor, we would like the opportunity to be able to reply then.

THE COURT: Well, it gives you three weeks. The hearing is on for the 22nd.

UNIDENTIFIED SPEAKER: Well, he already objected.

UNIDENTIFIED SPEAKER: Well, I've objected to two of them on one day's notice.

UNIDENTIFIED SPEAKER: They're exactly the same.

UNIDENTIFIED SPEAKER: I wouldn't mind actually having the option to object to them, actually have time to object --

THE COURT: Well, you could supplement your objections. I mean we're talking about March 7th now. I can move up the deadline for objections to, well, April 24th. And then any replies can be in through may 15th. All right? And you're writing this down because I'm not.

All right. Thanks again, folks.

ALL: thank you, Your Honor.

THE COURT: Exhibits, I have what's been marked, P-1 through P-7, C-1, C-2. The cards disappeared, you took them back or are they still here?

UNIDENTIFIED SPEAKER: You want copies of them?

THE COURT: I don't need, they're just blow ups of

what's in the document.

* * * * *

CERTIFICATION

We, DIPTI PATEL, TERRI STARKEY and THERESA PULLAN, a certified electronic transcriber, certify that the foregoing is a correct transcript, to the best of the transcriber's ability, from the official electronic sound recording of the partial proceedings in the above-entitled matter.

/s/ Dipti Patel

DIPTI PATEL

/s/ Terri Starkey

TERRI STARKEY

/s/ Theresa Pullan

THERESA PULLAN

J&J COURT TRANSCRIBERS, INC. Date: March 12, 2019