**No. 19-35269**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

FRASER'S BOILER SERVICE, INC.,
*Appellant*,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON, et al.,
*Appellees*.

---

Appeal from the United States District Court
for the Western District of Washington
No. 3:18-cv-05637-RBL (Hon. Ronald B. Leighton)

---

# APPELLANT'S OPENING BRIEF

---

Darren R. Krattli, WSBA # 39128
Katrina F. Self, WSBA # 52359
EISENHOWER CARLSON PLLC
1201 Pacific Ave., Ste. 1200
Tacoma, WA 98402
Phone: (206) 572-4500
Email: Dkrattli@eisenhowerlaw.com
Email: Kself@eisenhowerlaw.com

Craig Litherland, Admitted *Pro Hac Vice*
Daniel I. Wolf, Admitted *Pro Hac Vice*
GILBERT LLP
1100 New York Ave, NW, Suite 700
Washington, DC 20005
Phone: (202) 772-2264

Email: litherlandc@gilbertlegal.com
Email: wolfd@gilbertlegal.com

*Attorneys For Appellant* - Fraser's Boiler Service, Inc.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ........ vii

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

I. The Debtor and Asbestos-Related Claims ........ 3

II. The Debtor's Insurance Coverage ........ 3

III. Receivership Proceedings ........ 5

IV. Bankruptcy Proceedings ........ 6

A. Motions to Approve § 363 Sale ........ 6

B. The Bankruptcy Court Rulings ........ 7

C. The District Court Rulings ........ 9

SUMMARY OF THE ARGUMENT ........ 11

STANDARD OF REVIEW ........ 12

ARGUMENT ........ 13

I. The Bankruptcy Court had "core" and "non-core" jurisdiction to approve the Settlement Agreements and issue the limited injunction. ........ 13

A. The District Court erred in concluding that "it was not within the Bankruptcy Court's core jurisdiction to approve the sale and enjoin the Inter-Insurer Claims." ........ 13

B. In addition to "core" jurisdiction, the Bankruptcy Court had "related to" jurisdiction over the sale of the policies. ........ 16

II. Section 363(b) and (f) provided the Bankruptcy Court with the power to approve the Debtor's sale of the insurance policies "free and clear" of "any interest," effectively releasing the Non-Settling Insurers' contribution claims since such claims are "interests" derived from the Debtor's property. ........ 17

A. The sale of the insurance policies was proper under § 363(b) and (f). ........ 17

1. The Non-Settling Insurers' contribution claims are an "interest" in the Debtor's property. ........ 18

2. The District Court's conclusion that the contribution claims were not an "interest" in the Debtor's property rests on inapplicable caselaw. ....24

3. The sale was proper under § 363(f)(1). ....27

III. To provide teeth to the "free and clear" sale, the Bankruptcy Court had the power "to carry out" the sale and issue a limited injunction pursuant to its powers under § 105(a). ....32

A. The limited injunction is consistent with the provisions of § 105(a) and simply provides a mechanism to enforce the "free and clear" sale. ....32

B. The limited injunction is not inconsistent with other provisions of the Bankruptcy Code and "carr[ies] out" the provisions of § 363(f). ....33

CONCLUSION ....37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Communications Corp.*,
364 B.R. 518 (Bankr. S.D.N.Y 2007)....................................................25

*Am. Hardwoods, Inc. v. Deutsche Credit Corp.* (*In re Am. Hardwoods, Inc.*),
885 F.2d 621 (9th Cir. 1989) ....................................................33, 34

*American Hardwoods*, *Resorts Int'l, Inc. v. Lowenschuss* (*In re Lowenschuss*),
67 F.3d 1394 (9th Cir. 1995) ....................................................34, 35

*Axis Surplus Ins. Co. v. St. Paul Fire & Marine Ins. Co.*,
947 F. Supp. 2d 1129 (W.D. Wash. 2013) ....................................18, 21

*Bank of Am. v. Travelers Indem. Co.*,
No. C07-0322-RSL, 2009 WL 529227 (W.D. Wash. Mar. 2, 2009) ...........27, 28

*Battle Ground Plaza, LLC v. Ray* (*In re Ray*),
624 F.3d 1124 (9th Cir. 2010) ....................................................13

*Berg v. First State Ins. Co.*,
915 F.2d 460 (9th Cir. 1990) ....................................................17

*Best Western Int'l Inc. v. Paradise Hosp. Inc.*,
No. CV-14-00337-PHX-DGC, 2014 WL 4209246 (D. Ariz. Aug. 26, 2014) ....................................................15

*Bethlahmy v. Kuhlman* (*In re ACI-HDT Supply Co.*),
205 B.R. 231 (B.A.P. 9th Cir. 1997) ....................................................14

*Canal Indem. Co. v. Global Dev., LLC*,
No. 2–14–CV–00823–RSM, 2015 WL 347753 (W.D. Wash. Jan. 26, 2015) ....................................................27, 31

*In re Eastport Assocs.*,
935 F.2d 1071 (9th Cir. 1991) ....................................................14

*Ewell v. Diebert* (*In re Ewell*),
958 F.2d 276 (9th Cir. 1992) ....................................................................12

*Fietz v. Great Western Savings* (*In re Fietz*),
852 F.2d 455 (9th Cir. 1988) ....................................................................16

*In re Forty-Eight Insulations, Inc.*,
133 B.R. 973 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992) ....................................................................26

*Franklin v. Kaypro Corp.*,
884 F.2d 1222 (9th Cir. 1989) .................................................................... 30

*King Cnty. v. Travelers Indem. Co.*,
No. 14-CV-1957 BJR, 2018 WL 1792189 (W.D. Wash. Apr. 16, 2018) ....................................................................27, 28, 29

*Klestadt & Winters, LLP v. Cangelosi*,
672 F.3d 809 (9th Cir. 2012) ....................................................................2

*MacArthur v. Johns-Manville Corp.*,
837 F.2d 89 (2d Cir. 1988) ....................................................................24, 25

*Maitland v. Mitchell* (*In re Harris Pine Mills*),
44 F.3d 1431 (9th Cir. 1995) ....................................................................15

*Minoco Grp. of Cos., Ltd. v. First State Underwriters Agency of New England Reinsurance Corp.* (*In re Minoco Grp. of Cos., Ltd.*),
799 F.2d 517 (9th Cir. 1986) ....................................................................17

*In re Motors Liquidation Co.*,
829 F.3d 135 (2d Cir. 2016) ....................................................................18

*Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*,
191 P.3d 866 (Wash. 2008) (en banc) ....................................................................19, 20, 21

*Pacor, Inc. v. Higgins*,
743 F.2d 984 (3d Cir. 1984) ....................................................................16

*Preblich v. Battley*,
181 F.3d 1048 (9th Cir. 1999) ....................................................................12, 13

*Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*,
327 F.3d 537 (7th Cir. 2003) ....................................................................19

*Puget Sound Energy v. Certain Underwriters at Lloyd's*,
138 P.3d 1068 (Wash. Ct. App. 2006)...........................................................27

*In re Roman Catholic Bishop of Stockton*,
No. 14-20371, 2017 WL 118013 (Bankr. E.D. Cal. Jan. 10, 2017).......14, 33, 36

*In re SoyNut Butter Co.*,
No. 17 B 14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1,
2018) ..........................................................................................................25

*In re Sunland, Inc.*,
No. 13-13301-tr7, 2014 WL 7011747 (Bankr. D.N.M. Dec. 11,
2014) ..................................................................................................19, 32

*Telluride Asset Resolution, LLC v. Telluride Global Dev., LLC* (*In re Telluride Income Growth, LP*),
364 B.R. 390 (B.A.P. 10th Cir. 2007) ..........................................................19

*In re Trans World Airlines, Inc.*,
322 F.3d 283 (3d Cir. 2003) .......................................................................19

*In re Weisman*,
5 F.3d 417 (9th Cir. 1993) ..........................................................................13

*In re Yellowstone Mountain Club, LLC*,
460 B.R. 254 (Bankr. D. Mont. 2011)..........................................................36

**Statutes**

11 U.S.C. § 105(a) ...................................................................................*passim*

11 U.S.C. § 363.........................................................................................*passim*

11 U.S.C. § 524.........................................................................................*passim*

28 U.S.C. § 157.........................................................................................*passim*

28 U.S.C. § 1291............................................................................................2

28 U.S.C. § 2107............................................................................................2

**Other Authorities**

14 Steven Plitt et al., *Couch on Insurance* § 200:37 (3d ed. 2019)..........................20

15 Steven Plitt et al., *Couch on Insurance* § 217:4 (3d ed. 2019)............................19

Case: 19-2520, 06/10/2019, ID: 11326804, DktEntry: 5, Page 9 of 49

## CORPORATE DISCLOSURE STATEMENT

Fraser's Boiler Services, Inc. is a wholly-owned subsidiary of DJO Services, LLC.

## INTRODUCTION

Appellant Fraser's Boiler Service, Inc. ("Fraser's" or the "Debtor") asks this Court to affirm the Bankruptcy Court's orders approving two settlement agreements between the Debtor and certain insurers (the "Settling Insurers"). The settlement agreements provide for the sale of the Debtor's insurance policies back to the Settling Insurers for an aggregate amount in excess of $13 million. This money will create the bulk of a liquidating trust, created to handle asbestos-related claims previously asserted against the Debtor.

The Bankruptcy Court found that it had the jurisdiction and power to approve the sale of the insurance policies under 11 U.S.C. § 363 "free and clear" of any contribution and breach of contract claim of Appellees National Union Fire Insurance Company of Pittsburgh, Pa. and Certain Underwriters at Lloyd's, London and Certain London Market Companies (the "Non-Settling Insurers"). The Bankruptcy Court concluded the claims were "interests" in the Debtor's property, since these claims derive and are inseparable from that property. The Bankruptcy Court further held that the sale complied with § 363(f) because, among other things, "applicable nonbankruptcy law permits sale of such property free and clear of such interest." *See* § 363(f)(1). To effectuate and enforce the provisions of the "free and clear" sale of the Debtor's insurance policies, the court also enjoined the Non-Settling Insurer claims under 11 U.S.C. § 105(a).

The District Court reversed the Bankruptcy Court's orders in an order that, in part, seemingly misunderstood under which statute the Bankruptcy Court derived its powers to approve the sale of the policies. The District Court order also ignored that there is an inseverable connection between the Non-Settling Insurers' claims and the Debtor's insurance policies, such that the Non-Settling Insurers' claims cannot exist but for the Debtor's policies. The Debtor now appeals, requesting that this Court reverse the District Court and affirm the Bankruptcy Court's orders approving the two settlement agreements.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction under 28 U.S.C. § 1291. *See, e.g., Klestadt & Winters, LLP v. Cangelosi*, 672 F.3d 809, 813 (9th Cir. 2012) ("We have jurisdiction over appeals from a district court sitting in bankruptcy . . . ."). The District Court issued a final order on March 8, 2019, which was followed by a supplemental order on March 22, 2019. The March 8 and March 22 orders are appealable final decisions. The Debtor filed its notice of appeal on April 2, 2019, making the appeal timely under 28 U.S.C. § 2107(b).

## STATEMENT OF THE ISSUES

1. Did the Bankruptcy Court err when it (a) approved settlement agreements that provided for the sale of insurance policies free and clear of any interests as permitted under 11 U.S.C. § 363(b) and (f) of the Bankruptcy Code, and

(b) issued an injunction to effectuate that sale pursuant to the Court's power under 11 U.S.C. § 105(a) of the Bankruptcy Code?

## STATEMENT OF THE CASE

### I. The Debtor and Asbestos-Related Claims

Fraser's was formerly a company engaged in erecting and repairing marine, industrial, and commercial boilers. ER 112.[1] During the 1990s, individuals with asbestos-related diseases began making claims against Fraser's. ER 113. Since that time, over 1,200 claims have been filed against Fraser's in California, Oregon, and Washington. *Id*. Of these claims, Fraser's was dismissed in more than 600 cases and settled over 500. *Id.* Approximately 50 cases remain pending. *Id.* In the course of litigating these claims, Fraser's and its insurers have paid over $18 million in settlements and over $18 million in defense costs. *Id.*

### II. The Debtor's Insurance Coverage

Fraser's is insured under primary and excess (including umbrella excess) Comprehensive General Liability insurance policies, which obligate insurers to pay, *inter alia*, for liability in connection with claims alleging bodily injury. *Id*. The

---

[1] Included in the excerpts of record is the Debtor's Second Amended Disclosure Statement, which includes the First Amended Plan of Reorganization. ER 145–72. The most recent plan of reorganization is the Fourth Amended Plan of Reorganization. For the purposes of this appeal, the Fourth Amended Plan of Reorganization is not materially different from the First Amended Plan of Reorganization.

policies also generally obligate insurers to pay attorneys' fees and costs to defend asbestos-related claims. *Id*.

In August 2015, certain of Fraser's insurers entered into a two-year long Cost-Sharing Agreement ("CSA") related to their obligations for the defense and indemnity of asbestos-related claims. ER 878. The Debtor was not a party to the CSA. The CSA provided for a two-year term of duration. ER 12. Two years later, the insurers agreed to extend the CSA's term to August 18, 2019. ER 12, 452. For the CSA to be further extended, all participating insurers would have to agree to renew the CSA—including the Settling Insurers who have already entered into the settlement agreements that are the subject of this appeal. If approved, these agreements would terminate the Settling Insurers' obligations to the Debtor for paying and defending asbestos-related claims.

Although the CSA sets forth an interim allocation among Fraser's insurers, it does not provide the Debtor with any meaningful assurance that asbestos-related claims will be adequately addressed indefinitely. For instance, nothing in the CSA prevents any insurer who initially contributed to the defense or indemnity costs related to any claim from later seeking to recover those costs from the Debtor. In fact, at least one insurer who was previously a party to the CSA has done exactly that—that is, sued the Debtor to recover costs paid in connection with the defense and indemnity of asbestos-related claims. ER 422.

### III. Receivership Proceedings

In 2014, Fraser's petitioned for the appointment of a receiver in the Superior Court of Washington for King County ("Receivership Court"). ER 112. The petition was granted, and a receiver was appointed. *Id.*

While in receivership, Fraser's reached two settlement agreements with certain insurers. First, Fraser's reached an agreement with Providence Washington Insurance Company ("PWIC"), who had previously asserted its policies were exhausted, wherein PWIC would make a lump sum payment (and dismiss claims against Fraser's seeking recovery for amounts previously paid to Fraser's under PWIC policies) in exchange for a release of its continuing obligations related to asbestos-related claims. ER 114, 385. The Receivership Court approved this settlement agreement on January 31, 2018.[2] ER 114. Second, Fraser's reached a similar agreement (the "January 2018 Settlement Agreement") with certain other insurers: (1) Allianz Underwriters Insurance Company and Chicago Insurance Company (collectively, "Allianz"); (2) Century Indemnity Company (successor to Insurance Company of North America) and Pacific Employers Insurance Company (collectively, "Century"); (3) Hartford Accident and Indemnity Company ("Hartford"); and (4) Zurich American Insurance Company (as successor-in-interest to Maine Bonding and Casualty Company) ("Zurich"). ER 114, 385.

---

[2] This settlement agreement is currently on appeal in state court.

Under the January 2018 Settlement Agreement, Allianz, Century, Hartford, and Zurich agreed to repurchase the insurance policies they issued to Fraser's for a lump sum of over $11.6 million. ER 114, 385. As a condition of the Agreement, Fraser's agreed to go through bankruptcy proceedings so that the Settling Insurers could receive the benefits of a § 363 sale and an accompanying injunction pursuant to § 105(a). ER 116.

## IV. Bankruptcy Proceedings

### A. Motions to Approve § 363 Sale

Fraser's filed a voluntary petition for relief under Chapter 11 on April 9, 2018. ER 1112–15. On April 27, 2018, Fraser's moved for the court to (1) approve an amended version of the January 2018 Settlement Agreement; (2) authorize the sale under the January 2018 Settlement Agreement of the policies to the Settling Insurers pursuant to § 363(f) free and clear of all liens, claims, and interests; and (3) enjoin various claims against the Settling Insurers pursuant to § 105(a). ER 840–62. A hearing on this motion was held on June 21, 2018.

During the bankruptcy case, Fraser's struck a similar settlement agreement (the "Travelers Settlement Agreement") with Travelers Indemnity Company ("Travelers") and moved for its approval on June 28, 2018. ER 357–71. A hearing on this motion was held on July 19, 2018.

### B. The Bankruptcy Court Rulings

The U.S. Bankruptcy Court for the Western District of Washington issued a Memorandum Decision on July 18, 2018, approving the January 2018 Settlement Agreement and the Travelers Settlement Agreement (collectively, the "Settlement Agreements"). ER 88.[3]

The Memorandum Decision outlined the Bankruptcy Court's subject matter jurisdiction and authority to approve the "free and clear" sale under § 363 and issue an injunction under § 105(a), enjoining the Non-Settling Insurers' contribution and breach of contract claims. The court found it had "core" subject matter jurisdiction under 28 U.S.C. §§ 157(b)(2)(A), (N), and (O). ER 92–93. That is, the court found that the proceedings were "matters concerning the administration of the estate, orders approving the sale of property, and other proceedings affecting the liquidation [of the assets] of the estate or the adjustment of the debtor-creditor relationship." *Id.*

The court found grounds existed to sell the insurance policies "free and clear" of all "interests" under § 363. ER 95–97. The court determined that the Non-Settling Insurers' claims "derive[] entirely from the policies being sold and exist[] solely because Fraser's purchased and maintained the policies," and that the "free

---

[3] The court followed the Memorandum Decision with two orders on July 25, 2018, approving the January 2018 Settlement Agreement (as amended) and the Travelers Settlement Agreement, respectively. ER 71, 79. Both orders refer back to and incorporate the ruling in the Memorandum Decision.

and clear" sale was proper under § 363(f)(1), (2), and (5). ER 96–97. The court further concluded that an "injunction [wa]s necessary and appropriate to carry out the sale under Section 363(f) pursuant to Section 105(a)." ER 102. Without an injunction, the court reasoned, "the idea of a sale free and clear would be denuded of its meaning." *Id.* The Settling Insurers "would not be willing to purchase the insurance policies, as they would continue to have potential liability to the non-settling insurers." *Id.*

In approving the injunction, the court distinguished between enjoining the contribution claims here and global third-party releases prohibited in the Ninth Circuit. The court explained, "[t]he crux of the difference is that, unlike releases of all claims against a third party, the supplemental injunction is narrowly tailored to only apply to derivative claims." ER 100. The contribution claims, the court reasoned, are "derived from the insurance policies being sold back to the [Settling] Insurers free and clear pursuant to the Settlement Agreement." *Id.* The contribution claims are thus "[d]erivative claims [and] are inseparable from the debtor's own insurance policies." *Id.* The court determined that because the injunction only impacts derivative claims, it is "not the equivalent of a discharge of a third party." *Id.* Furthermore, the "injunction does not provide for retention of the asset by the debtor or a purchasing third party, but rather the payment of the cash value of those assets into a liquidating trust that is essential to Fraser's plan of reorganization." *Id.*

Last, the court determined that the sale had a valid business justification and was proposed in good faith. ER 96. Specifically, the court found the "sale resolve[d] several insurance coverage disputes that risk[ed] leaving the asbestos-related tort claimants with no access to insurance proceeds from some insurers and no entity providing overreaching administration of claims for the benefit of Fraser's claimants." *Id.* The sale further "will effectuate the orderly administration of asbestos-related tort claims in accordance with Fraser's plan of reorganization, including allowing claimants to pursue other insurance coverage for their claims where appropriate." *Id.* The sale also "was negotiated in good faith at arms-length by sophisticated counsel." *Id.*

### C. The District Court Rulings

The Non-Settling Insurers appealed the sale orders. The District Court issued an order on March 8, 2019, reversing the decision of the Bankruptcy Court. ER 11–30. The District Court determined that although the Bankruptcy Court had "related to" jurisdiction over the Non-Settling Insurers' claims, it did not have "core" jurisdiction because the Non-Settling Insurers' claims were "the types of claims [that] are regularly brought outside of bankruptcy court and therefore do not arise in or under the Bankruptcy Code." ER 13–15.

In analyzing the sale and accompanying injunction, the District Court first considered whether the Bankruptcy Court could enjoin the Non-Settling Insurers'

claims under § 105(a). The District Court broadly declared that in the Ninth Circuit there were no "exceptions to § 524(e)'s prohibition of enjoining third-party claims," including "derivative" claims, and that therefore the injunction was impermissible. ER 17.

The District Court then considered whether the Bankruptcy Court could sell the insurance policies under § 363(f). It concluded that the Non-Settling Insurers' claims were not an "interest" in the policies because the claims "d[id] not fit within any existing definition or application of the term," and because "allowing sales free and clear of the claims between third parties would be inconsistent with existing Ninth Circuit precedent regarding bankruptcy courts' power over third-party claims." ER 23. Even if the Non-Settling Insurers' claims were an "interest" under § 363(f), the District Court determined that the policies could not be sold in accordance with § 363(f)(1) because the settlement "d[id] not adequately protect the interests of the Non-Settling Insurers," implying that the Non-Settling Insurers interests could be only protected if Non-Settling Insurers were "compelled to pay 'the percentage of the total amount for which they are responsible.'" ER 27–28 (citation omitted).

The Debtor appealed the decision of the District Court.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court did not err in approving the sale of the insurance policies under § 363(f) and in issuing an injunction to effectuate the sale under § 105(a). The District Court opinion reflects a fundamental misunderstanding of the statutory authority under which the Bankruptcy Court had the power to approve the sale of the insurance policies and the connection between the insurance policies and the Non-Settling Insurers' claims.

The power to sell the insurance policies "free and clear" of the Non-Settling Insurers' claims derives from § 363(b) and (f), not from § 105(a). The Non-Settling Insurers' contribution claims and the breach of contracts claims are "interests" derived from the Debtor's property, as such claims would not exist but for property purchased and held by the Debtor (the policies purchased from the Settling Insurers) and will directly impact the value the Debtor's property by reducing the remaining limits of the Settling Insurers' policies. The District Court failed to acknowledge this point. The Debtor may sell its property, i.e., its insurance policies, "free and clear" of these interests under § 363(f). The policies may be sold in accordance with § 363(f)(1) because applicable non-bankruptcy law permits the sale "free and clear" of the Non-Settling Insurers' claims, and (f)(5), because the Non-Settling Insurers could be compelled to accept money satisfaction of such interests. Therefore,

through the approval of the § 363(f) sale alone, the Non-Settling Insurers would not later be able to assert contribution claims against the Settling Insurers.

The issuance of an injunction pursuant to § 105(a) in connection with the § 363(f) sale merely serves to effectuate the "free and clear" sale accomplished through § 363(f). The injunction, as required by statute, "carr[ies] out" the provisions of § 363(f). Contrary to the District Court's holdings, the vehicle for the sale is not § 105(a) but is § 363(f). A § 105(a) injunction, in this supporting context, is not inconsistent with other provisions of the Bankruptcy Code. The Ninth Circuit cases cited by the District Court that reject § 105(a) injunctions do so because those injunctions were inconsistent with another provision of the Bankruptcy Code, usually § 524(e). But § 524(e) does not apply here—as it applies only when a debtor receives a discharge, which Fraser's will not as part of these settlements. Accordingly, any associated case law is inapplicable. Therefore, the Bankruptcy Court did not err in approving the Settlement Agreements and issuing an effectuating injunction.

**STANDARD OF REVIEW**

The Ninth Circuit reviews an appeal from the bankruptcy court *de novo*. *Preblich v. Battley*, 181 F.3d 1048, 1051 (9th Cir. 1999). "The factual findings of the bankruptcy court are reviewed for clear error, and its conclusions of law are reviewed de novo." *Ewell v. Diebert* (*In re Ewell*), 958 F.2d 276, 279 (9th Cir.

1992). The Ninth Circuit "independently review[s] the bankruptcy court's decision and do[es] not give deference to the district court's determination." *Preblich*, 181 F.3d at 1051 (quoting *In re Weisman*, 5 F.3d 417, 419 (9th Cir. 1993)).

**ARGUMENT**

**I. The Bankruptcy Court had "core" and "non-core" jurisdiction to approve the Settlement Agreements and issue the limited injunction.**

The sale of property of the Debtor is one of the most fundamental acts over which the bankruptcy court exercises jurisdiction. The Bankruptcy Court had both "core" and "non-core," "related to" jurisdiction over the sale of the insurance policies.

**A. The District Court erred in concluding that "it was not within the Bankruptcy Court's core jurisdiction to approve the sale and enjoin the Inter-Insurer Claims."**

The Bankruptcy Court's jurisdiction over proceedings arising in, arising under, or related to the Bankruptcy Code originates from two statutes—28 U.S.C. §§ 157(a) and 1334. *See Battle Ground Plaza, LLC v. Ray* (*In re Ray*), 624 F.3d 1124, 1130 (9th Cir. 2010). Section 1334(a) allows district courts to refer proceedings to bankruptcy courts that "aris[e] under title 11, or arising in or related to cases under title 11." Section 157(b)(1) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11" that are referred to it by the district court. "Core proceedings" include, *inter alia*, "matters concerning the administration of the

estate," "orders approving the sale of property," and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor" relationship. § 157(b)(2)(A), (N), & (O).

The sale of a debtor's property, including insurance policies, under § 363(f) "free and clear" of "any interest" in that property and the subsequent effectuating § 105(a) injunction are "core" proceedings "arising under title 11." *See, e.g.*, *In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 WL 118013, at *1 (Bankr. E.D. Cal. Jan. 10, 2017) (finding the debtor's insurance policies to be "subject to the exclusive core jurisdiction" of the bankruptcy court, as well as the "free and clear" sale of the policies and the accompanying injunction).

The District Court erroneously believed the test to determine "core" jurisdiction was whether the "types of claims [can be] regularly brought outside of bankruptcy court." ER 15. Based on this misconception, the District Court concluded that the Non-Settling Insurers' claims do not give rise to "core" jurisdiction. ER 25. In doing so, the District Court relied upon only part of the applicable test. The full recital of this concept is "that proceedings that do not invoke substantive rights created by bankruptcy law and that could exist outside of bankruptcy are not core proceedings, although they may fall within the 'otherwise related to' jurisdiction of the court." *Bethlahmy v. Kuhlman* (*In re ACI-HDT Supply Co.*), 205 B.R. 231, 235 (B.A.P. 9th Cir. 1997) (citing *In re Eastport Assocs.*, 935

F.2d 1071, 1076 (9th Cir. 1991)). Proceedings that could be brought outside the bankruptcy context but that are "inextricably intertwined with the trustee's sale of property belonging to the bankruptcy estate" are "core" proceedings. *Maitland v. Mitchell* (*In re Harris Pine Mills*), 44 F.3d 1431, 1438 (9th Cir. 1995); *cf. Best Western Int'l Inc. v. Paradise Hosp. Inc.*, No. CV-14-00337-PHX-DGC, 2014 WL 4209246, at *3 (D. Ariz. Aug. 26, 2014) (concluding the lawsuit filed against Best Western by Paradise Hospitality alleging, among other things, breach of contract and breach of guaranty (contractual rights that exist independent of bankruptcy) was not a "core" proceeding under the subject matter jurisdiction of the bankruptcy court as defendants did not argue that the plaintiff's claims were "inextricably bound to the claims allowance process or a right created by the Bankruptcy Code" (citation omitted)).

The administration of an estate and the sale of a debtor's property are fundamental duties entrusted to the bankruptcy courts. The Non-Settling Insurers' claims are inextricably intertwined to Fraser's rights that are being sold pursuant to § 363(f) of the Bankruptcy Code. Not even the Non-Settling Insurers dispute that their claims would not exist but for the existence of the Fraser's rights in the insurance policies being sold. As discussed in more detail below, the claims are "interests" derived from the Debtor's rights in the insurance policies and cannot be untangled from the property of the estate. In concluding that the sale of insurance

policies "free and clear" of claims that would impact the limits available under those policies and thus the funds available to pay creditors did not concern "the administration of the estate" or "affect[] the liquidation of the assets of the estate or the adjustment of the debtor-creditor" relationship, the District Court ignored the basic facts regarding the sale and the inescapable connection between the policies being sold and the Non-Settling Insurers' contribution claims.

For these reasons, the Bankruptcy Court had "core" jurisdiction to approve the sale "free and clear" of these "interests" under § 363(f) and to "carry out" the sale under § 105(a). The Bankruptcy Court did not err in concluding it had core jurisdiction over the sale and injunction under § 157(b)(2)(A), (N), & (O).

**B. In addition to "core" jurisdiction, the Bankruptcy Court had "related to" jurisdiction over the sale of the policies.**

The Bankruptcy Court also had "non-core," "related to" jurisdiction. The Ninth Circuit follows the test adopted by the Third Circuit in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984). *See Fietz v. Great Western Savings* (*In re Fietz*), 852 F.2d 455, 457 (9th Cir. 1988). Under this formulation, the test is whether "*the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy*." *Id.* Any action in state court attempting to enforce contribution claims would have an effect on the Debtor's estate. Both the Bankruptcy Court and the District Court therefore correctly concluded that there was

an "undeniable relationship" between the Non-Settling Insurers' contribution claims and the Debtor's ability to sell back the insurance policies. ER 15.

## II. Section 363(b) and (f) provided the Bankruptcy Court with the power to approve the Debtor's sale of the insurance policies "free and clear" of "any interest," effectively releasing the Non-Settling Insurers' contribution claims since such claims are "interests" derived from the Debtor's property.

The sale of the insurance policies under § 363 alone, without the aid of a § 105(a) injunction, effectively released the Non-Settling Insurers' claims.

### A. The sale of the insurance policies was proper under § 363(b) and (f).

Section 363(b)(1) and (f) permits a trustee to "sell . . . property of the estate" "free and clear of any interest in such property of an entity other than the estate" if any one of five conditions enumerated in § 363(f)(1)–(5) is met. The insurance policies are "property of the estate." *See, e.g.*, *Minoco Grp. of Cos., Ltd. v. First State Underwriters Agency of New England Reinsurance Corp.* (*In re Minoco Grp. of Cos., Ltd.*), 799 F.2d 517, 519 (9th Cir. 1986) (explaining that "insurance contracts have been said to be embraced in th[e] statutory definition of 'property'" (citations omitted)); *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 n.4 (9th Cir. 1990) ("Many courts have recognized that insurance policies are property.").

The Non-Settling Insurers' contribution claims are "interests" such that the insurance policies may be sold "free and clear" of the claims as long as one of the five enumerated conditions is met. In addition, the conditions enumerated in both

§ 363(f)(1), requiring applicable non-bankruptcy law to permit the sale "free and clear" of such interest, and (f)(5), requiring that the entity with the interest could be compelled to accept money satisfaction of such interest, are satisfied.

**1. The Non-Settling Insurers' contribution claims are an "interest" in the Debtor's property.**

The insurance policies may be sold "free and clear" of the Non-Settling Insurers' contribution claims as the claims derive and are completely inseparable from the Debtor's rights under the insurance policies. This is because an insurer cannot seek contribution from another insurer unless both insurers are liable to the Debtor for the same obligation. *See Axis Surplus Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 947 F. Supp. 2d 1129, 1137 (W.D. Wash. 2013). Here, such joint liability exists only where (1) both insurers have issued policies that by their terms obligate the insurers with respect to the same underlying tort claim, and (2) the insured has tendered the claim to both insurers. As a consequence, in seeking contribution, insurers are in effect exercising the rights to coverage granted to the Debtor, the insured, under the Debtor's insurance policies. Contribution claims may erode the insurance policy limits, which will limit the property rights of the Debtor. Essentially, the Non-Settling Insurers claim payment under the insurance policies issued to and for the benefit of the Debtor by the Settling Insurers.

The Bankruptcy Code does not define "interest," and courts continue to address the phrase "on a case-by-case basis." *In re Motors Liquidation Co.*, 829

F.3d 135, 155 (2d Cir. 2016) (citation omitted). Courts have, however, given the term a broad interpretation. *Id.*; *see also Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) ("But the Code itself does not suggest that 'interest' should be understood in a special or narrow sense; on the contrary, the use of the term 'any' counsels in favor of a broad interpretation."); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288 (3d Cir. 2003) (agreeing that "the phrase should be broadly read"). "[T]he trend [when defining 'interest'] seems to be toward a more expansive reading of interest in property as encompassing other obligations that may flow from ownership of the property." *In re Sunland, Inc.*, No. 13-13301-tr7, 2014 WL 7011747, at *4 (Bankr. D.N.M. Dec. 11, 2014) (alteration in original) (quoting *Telluride Asset Resolution, LLC v. Telluride Global Dev., LLC* (*In re Telluride Income Growth, LP*), 364 B.R. 390, 405 (B.A.P. 10th Cir. 2007)).

Under applicable law, an insurer may only receive contribution from another insurer if the insured tendered the claim to both the insurer seeking contribution and the insurer from which contribution is being sought. Specifically, the Washington Supreme Court has held that "contribution allows an insurer to recover from another insurer where both are independently obligated to indemnify or defend the same loss." *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 872 (Wash. 2008) (en banc); 15 Steven Plitt et al., *Couch on Insurance* § 217:4 (3d ed. 2019) (explaining "the right to contribution in insurance is predicated upon the principle

that all insurers are equally liable for the discharge of a common obligation"). Insurers' duties to defend and indemnify, however, "do not become *legal obligations* until a claim for defense or indemnity is tendered" by the insured. *Mut. of Enumclaw Ins. Co.*, 191 P.3d at 873. In *Enumclaw*, the Washington Supreme Court determined that because the insured chose not to tender its claim to USF, the two insurers to whom the insured did tender the claim could not seek equitable contribution from USF. *Id.* at 874. This is because "the insurer who seeks contribution does not sit in the place of the insured and cannot tender a claim to the other insurer." *Id.* at 873–84 (explaining that this rule "preserves the insured's right to invoke or not to invoke the terms of its insurance contracts" because the insured may choose not to tender a claim because it wants to avoid a premium or preserve its policy limits for another claim); *see also* 14 Steven Plitt et al., *Couch on Insurance* § 200:37 (3d ed. 2019) ("If the insured does in fact make a selective tender, the selected insurer has the sole responsibility to defend and indemnify the insured and is foreclosed from making a claim for equitable contribution from the other insurer."). Here, under the proposed plan of reorganization, the Debtor would tender future claims to the Non-Settling Insurers only. Thus, the Non-Settling Insurers' contribution claims would not exist.

Furthermore, while the Court observed that "contribution is a right of the insurer and is independent of the rights of the insured," that right is completely inseparable from the insured's rights under the policy because the right to

contribution would not exist absent the insured's invocation of its rights under the policy to tender a claim. *Mut. of Enumclaw Ins. Co.*, 191 P.3d at 872. The Court specifically noted that an insured might choose not to tender a claim to a specific insurer precisely because it might wish to preserve that policy's limits of coverage for other claims, and the Court recognized that another insurer's contribution claims would erode those limits of coverage that an insured may have chosen to preserve.

In seeking contribution, an insurer is in effect exercising the rights of the Debtor. A contribution claim occurs when more than one insurer is obligated to provide defense and indemnity to the Debtor for the same loss. *See Axis Surplus Ins. Co.*, 947 F. Supp. 2d at 1137. When this occurs, one insurer may seek contribution from the other independently-obligated insurer. *See id.* Even when seeking contribution from another insurer, there is no obligation under the policies to the other independently-obligated insurer; there is only the defense and indemnity obligations to the insured. Therefore, in seeking contribution, an insurer is effectively exercising the rights of the Debtor under the policies.

Furthermore, contribution claims erode the policy limits and impact the Debtor's property. As acknowledged in *Enumclaw*, the insured may exercise its right to choose to which insurer to tender a claim (if the insured chooses to tender the claim at all). Not every insurance policy is the same, and the insured may select

the insurer based on, among other things, the desire to preserve its policy limits. 191 P.3d at 873.

Contribution claims have the power of undermining the insured's attempt at preserving policy limits. This is because some policies have aggregate limits and some policies do not. For example, if the Debtor tenders a claim to insurer A, who has no aggregate limit, and insurer A pays the claim and seeks contribution from insurer B, who has an aggregate limit, this places insurer B closer to that aggregate limit and closer to exhaustion of its limits. Because the policies are different and operate in different ways, it is often the case that where insurer A pays the claim, seeks contribution from insurer B, and insurer B's limits are reduced but insurer A's limits are increased. Furthermore, different policies apply to claims only when there has been an injury within the policy period. Practically, that means that policy limits are more valuable to the insured in policies that have policy periods that are more often triggered by claims (such as late years of coverage). An insured would quite logically want to use only the limits of less frequently triggered policies for the rarer tort claims that do trigger such a policy and save the limits of frequently triggered policies. Contribution rights therefore absolutely impact the Debtor and the Debtor's logical utilization of its property.

The Non-Settling Insurers' breach of contract claims require no separate analysis here because any claim of breach of contract made by the Non-Settling

Insurers stemming from the CSA is functionally the same as a contribution claim. The CSA is an interim funding agreement providing for initial allocation among insurers (but not with the Debtor) to facilitate prompt payment of third parties. The parties, under the CSA, are entitled to reallocate costs later so that every insurer pays in accordance with its ultimate obligations under the policies and applicable law. The CSA does not alter the obligations insurers have under their policies, nor does it impair contribution claims insurers may have under applicable law. Under the CSA, the insurers are ultimately left with the same contribution claims they had outside of the agreement. If this was not the case, surely insurers would not have been entitled to avert the Debtor's rights under its policies by a contract that the Debtor was not a party to, did not consent to, and was not, at the time of execution, even aware of the agreements specific terms. So, here, any alleged breach of contract claim arising from the CSA is essentially a contribution claim.

To the extent that any alleged breach of contract claim concerns the Court, there is some possibility the Debtor and the Settling Insurers will come to an agreement wherein the CSA will not be renewed on its expiration on August 18, 2019.

The Non-Settling Insurers' contribution claims fall within the broad interpretation of "interest" in the Debtor's property.

### 2. The District Court's conclusion that the contribution claims were not an "interest" in the Debtor's property rests on inapplicable caselaw.

The District Court stated that "application of § 363(f) is murkier in cases involving claims between third parties," and that courts have disputed the holding in *MacArthur v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988), and "refused to allow sales of policies free and clear of contractual rights of third parties against the insurer." ER 22. While *MacArthur* provides an example of rights that may be cut off in a § 363(f) sale because they are "derivative" of the Debtor's property, the rights identified as derivative by the Second Circuit in *MacArthur* are distinct from the rights derived from the Debtor's property here. In *MacArthur*, the derivative rights at issue were contractual rights of an insured, not equitable claims by insurers that exist only because of the insured. The District Court's analysis of *MacArthur* and cases that have declined to follow *MacArthur* provide no support for the District Court's conclusion that the Non-Settling Insurers' contribution claims were not an "interest" under § 363(f).

In *MacArthur*, the Second Circuit concluded that the rights of MacArthur, a distributor of Manville's asbestos products, and an insured under the "vendor endorsements" contained in Manville's insurance policies, were "completely derivative of Manville's rights as the primary insured," "inseparable from Manville's own insurance coverage." 837 F.2d at 92–93. The court approved the

proposed settlement agreements under § 363(f) and enjoined any claims from MacArthur against Manville's insurers. *Id.* at 93.

*MacArthur*, and subsequent cases grappling with the rationale in *MacArthur*, analyze whether insurance policies may be sold "free and clear" of an *insured's interest* (not an insurer's interest) under the insurance policy. For example, in *In re SoyNut Butter Co.*, No. 17 B 14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018), the Northern District of Illinois refused to approve a § 363(f) sale and accompanying injunction, which would prohibit three additional vendor insureds under the policy for asserting claims against the insurer. *Id.* at *4. The court found the reasoning in *MacArthur* "unpersuasive," and concluded that "it ha[d] not been established [] that the [three vendor insureds'] rights [we]re derivative of SoyNut's rights [(the named insured)] under the Sentinel policy." *Id.* at *5.

The same is true in *In re Adelphia Communications Corp.*, 364 B.R. 518, 527 (Bankr. S.D.N.Y 2007). There the U.S. Bankruptcy Court for the Southern District of New York denied approval of a settlement that prohibited insureds under a directors and officers policy from proceeding directly against the insurers "to pursue claimed entitlements under the policies." *Id.* at 520. The court was concerned that the sale of the policies "would [not] provide adequate protection to the Objectors" because it would "limit the Objectors to recovery from a *corpus* less than the total remaining under the Policies." *Id.* at 527. In coming to this determination, the court

emphasized that channeling injunctions can perform "an essential role" in mass tort cases "where a reorganization plan can be confirmed if, but only if, insurers who contribute to a trust or fund to satisfy the tort claims have the comfort that they will not thereafter be sued and asked to contribute even more." *Id.* at 528–29 (explaining that in mass tort cases "it is often desirable, if not essential, to tap insurance policies to help create trusts or funds to provide a funding resource for the present and future tort claims that must be satisfied, and where addressing issues of that character is an important, if not wholly dominant, aspect of the bankruptcy case"); *see also In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 976 (Bankr. N.D. Ill. 1991) (declining to issue injunctive relief that "extends beyond that granted in the other mass tort cases" and would "enjoin a named insured . . . from asserting claims under an insurance policy that it contracted and paid for"), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992).

The Non-Settling Insurers' contribution claims are not contractual rights in the policies being sold that would be severed by the Settlement Agreements. They are instead claims derived in equity that exist only because of the Debtor's purchase and maintenance of insurance coverage from other insurers. But for the other insurer's obligations to the Debtor, there would not be the joint liability essential to the existence of a contribution claim. The Non-Settling Insurers' claims are

therefore derived from the Debtor's rights in the insurance policies to be sold and are an "interest" in the Debtor's property.

**3. The sale was proper under § 363(f)(1).**

The sale "free and clear" of the Non-Settling Insurers' contribution claims was proper under § 363(f)(1) because "applicable nonbankruptcy law permits sale of such property free and clear of such interest." The sale of insurance policies "free and clear" of contribution claims is permissible under Washington non-bankruptcy law.

Under Washington law, courts have "inherent equitable power to enter an order precluding subsequent claims for contribution . . . by non-settling parties." *King Cnty. v. Travelers Indem. Co.*, No. 14-CV-1957 BJR, 2018 WL 1792189, at *2 (W.D. Wash. Apr. 16, 2018) (alteration in original) (quoting *Bank of Am. v. Travelers Indem. Co.*, No. C07-0322-RSL, 2009 WL 529227, at *1 (W.D. Wash. Mar. 2, 2009)). "Washington courts . . . recognize contribution bar orders as 'consistent with the public policy in Washington of encouraging settlement'" and further recognize that contribution bar orders "can be [] essential to multi-party litigation." *Canal Indem. Co. v. Global Dev., LLC*, No. 2–14–CV–00823–RSM, 2015 WL 347753, at *3 (W.D. Wash. Jan. 26, 2015) (quoting *Puget Sound Energy v. Certain Underwriters at Lloyd's*, 138 P.3d 1068, 1079 (Wash. Ct. App. 2006)). The court may enter such an order when (1) "the proposed settlement is reasonable";

and (2) "the interests of non-settling defendants are protected." *Id.* The reasonableness requirement "is not a high hurdle" and "the Court 'must simply ensure that the settlement is not patently collusive or inadequate.'" *Id.* (quoting *Bank of Am.*, 2009 WL 529227, at *1). To ensure the interests of non-settling defendants are protected, the settlement cannot leave the non-settling defendants "with[out] adequate protection against an unfair allocation of liability." *King Cnty.*, 2018 WL 1792189, at *2.

The Settlement Agreements were reasonable and "not patently collusive or inadequate." The Bankruptcy Court found, and the District Court made no alternative determination, that the sale "was negotiated in good faith at arms-length by sophisticated counsel" and was "fair and equitable and in the best interests of the estate and the creditors." ER 95–96. The Bankruptcy Court further found that "[t]he sale w[ould] effectuate the orderly administration of asbestos-related tort claims" and "resolve[] considerable risk, expense, and delay from likely further litigation." ER 94, 96.

The District Court erred in concluding that the Non-Settling Insurers' interests were not adequately protected by the Settlement Agreements. The Settlement Agreements provide "adequate protection against an unfair allocation of liability"

through their judgment reduction provisions[4] and through the creation of the Liquidating Trust. *King Cnty.*, 2018 WL 1792189, at *2. The judgment reduction clauses provide that the judgment a claimant may receive for an asbestos-related injury payable by a Non-Settling Insurer shall be reduced by the amount of contribution claims that the Non-Settling Insurers would, absent the injunction, have been able to recover from the Settling Insurers. The Non-Settling Insurers also receive protection in that the Liquidating Trust will directly handle certain historically settled asbestos-related claims and substantially underinsured claims without tendering those claims to the Non-Settling Insurers, alleviating the Non-Settling Insurers' cost and risk of defense and indemnity obligations associated with these claims.

---

[4] Paragraph 6.8 of the Settlement Agreements (the "judgment reduction clause") states:

> The Parties agree that any plan proposed in the Bankruptcy Case shall not bar any holder of an Asbestos-Related Claim from pursuing any such Claim against any of the debtor, the reorganized debtor, or any Non-Settled Insurer. However, the plan shall provide any judgment on any Claim against one or more Non-Settled Insurers shall be reduced by the adjudicated amount of any Contribution Claim such Non-Settled Insurer would have been able to successfully assert against the Insurers. The purpose of this provision is to ensure that the Insurers pay their respective portions of the Settlement Amount and no more on account of Asbestos-Related Claims or Contribution Claims.

ER 98.

Any suggestion by the District Court that non-settling parties are protected only if they "may only be compelled to pay 'the percentage of the total amount for which they are responsible'" is error. ER 27 (citation omitted). In the insurance context, no case analyzing Washington state law has come to this determination. Indeed, this conclusion by the District Court conflicts with the recognition of the Washington Courts that the insured has considerable right to impact contribution rights by exercising its right to selectively tender claims to insurers. The language cited by the District Court comes from *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1231 (9th Cir. 1989), a federal securities action. There, the Ninth Circuit contemplated whether a settlement agreement entered into by a portion of alleged joint tortfeasor defendants, requiring an order that the non-settling defendants' right to contribution, which is statutorily provided, be barred, was permissible. *Id.* at 1224–25. The court determined that a partial settlement may be approved by the district court, but that at trial, the jury would determine "the percentage of culpability of each of the non[-]settling defendants as well as that of the settling defendants," and that the non-settling defendants "as a whole will then be required to pay the percentage of the total amount for which they are responsible," and will be jointly and severally liable for that percentage. *Id.* at 1231.

Although the formulation of adequate protection in *Franklin* may be appropriate in the securities action context that was addressed, this mechanism

would be neither appropriate nor workable here where (1) the Non-Settling Insurers and the Settling Insurers are not joint tortfeasors; (2) contribution claims might arise with respect to multiple tort claims each with different policy implications; and (3) the Debtor has rights that will materially impact potential contribution claims. *See Canal Indem. Co.*, 2015 WL 347753, at *3 ("There is no single formula for determining whether non-settling parties' rights are protected when a bar order is entered.").[5] Here, there simply is no "percentage of culpability" that can be determined that will fix the Non-Settling Insurers' liability. Indeed, the suggestion that the Non-Settling Insurers should be obligated to pay only a percentage of tort claims that trigger their policies would re-write their policy obligations that specifically provide that such insurers will pay "all sums" that the insured is obligated to pay with respect the tort claim. The Debtor's right to selectively tender claims is the most advantageous move.

In sum, the sale satisfies all the requirements of applicable non-bankruptcy law for a "free and clear" sale, and thus comports with § 363(f).

---

[5] The District Court also erred by erroneously concluding that the "only basis identified by the Bankruptcy Court for releasing the Inter-Insurer Claims was § 363(f)(1)" when the Bankruptcy Court also found the sale proper under § 363(f)(5). ER 16; ER 96. Section 363(f)(5) provides for the sale "free and clear of any interest . . . of an entity" if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

## III. To provide teeth to the "free and clear" sale, the Bankruptcy Court had the power "to carry out" the sale and issue a limited injunction pursuant to its powers under § 105(a).

Section 105(a) merely effectuates the § 363 sale, and the conclusion by the District Court that § 105(a) was the vehicle for approving the sale is error. *See* ER 26 ("[T]he Repurchased Policies cannot be sold free and clear of the Inter-Insurer Claims, regardless of whether the vehicle is § 105(a) or § 363(f).").

### A. The limited injunction is consistent with the provisions of § 105(a) and simply provides a mechanism to enforce the "free and clear" sale.

Section 105(a) provides the Bankruptcy Court with the power to "issue an order, process, or judgment that is necessary or appropriate to *carry out* the provisions of [title 11]." (emphasis added). The limited injunction is consistent with the provisions of § 105(a)—it merely "carr[ies] out the provisions of" § 363. *See In re Sunland, Inc.*, 2014 WL 7011747, at *5–6 ("A channeling injunction is permissible because it compliments and carries out, rather than contradicts, an explicit provision of the Bankruptcy Code.").

Notwithstanding the authority under § 363(f) to sell property "free and clear" of "any interest," "courts have often found it necessary to provide 'more explicit protection'" such that an injunction commonly accompanies a § 363 sale. *See, e.g.*, *In re Sunland, Inc.*, 2014 WL 7011747, at *5 (citation omitted) (citing eight cases to conclude that limited injunctions are "relatively common with 363(f) sale orders");

*see also In re Roman Catholic Bishop of Stockton*, 2017 WL 118013, at *9. An injunction following the "free and clear" sale is not an atypical occurrence.

**B. The limited injunction is not inconsistent with other provisions of the Bankruptcy Code and "carr[ies] out" the provisions of § 363(f).**

The District Court erred in concluding that the Non-Settling Insurers' contribution claims cannot be enjoined due to § 524(e). There is no § 524(e) discharge in this case and there will not later be any such discharge. Section 524(e) is simply inapplicable. Nor is the § 105(a) injunction inconsistent with other provisions of the Bankruptcy Code. Further, the Debtor does not rely solely on § 105(a) to prohibit the Non-Settling Insurers' claims; § 105(a) complements the functions already achieved through the § 363(f) sale.

Section 524(e) provides that the "*discharge of a debt of the debtor* does not affect the liability of any other entity on, or the property of any other entity for, *such debt*." (emphasis added). *See also Am. Hardwoods, Inc. v. Deutsche Credit Corp.* (*In re Am. Hardwoods, Inc.*), 885 F.2d 621 (9th Cir. 1989) ("Section 524(e) . . . states that discharge of a debtor does not affect the *liability* of third parties on an obligation." (alteration in original) (emphasis added) (citation omitted)). In other words, § 524(e) only applies when a debtor is discharged. Here, the Debtor is not receiving a discharge of any debt. It is virtually certain the Debtor, a non-operating corporation, will never receive a discharge of debt in this case.

Nor are the Settling Insurers being discharged from a liability. The Settling Insurers are purchasing back the policies that they issued to the Debtor, paying to acquire that asset of the Debtor. Only the claims of the Non-Settling Insurers that are derivative of the Debtor's rights, the claims that would not exist but for the Debtor's policy rights that are being sold, are being impacted. Therefore, the District Court's entire analysis of *American Hardwoods* and *Resorts Int'l, Inc. v. Lowenschuss* (*In re Lowenschuss*), 67 F.3d 1394 (9th Cir. 1995), and other related cases is misplaced.

Further examination of these cases proves the point. In *American Hardwoods*, the debtor, American Hardwoods, sought a permanent injunction, after confirmation of a plan of reorganization under Chapter 11, of claims brought by Deutsche Credit Corporation against the Keelers, president and vice president of American Hardwoods. *Am. Hardwoods*, 885 F.2d at 622. American Hardwoods sought to enjoin an action in state court permitting Deutsche to seize American's machinery, of which the Keelers were non-debtor guarantors. *Id.* at 622. The court held, *inter alia*, that it could not issue the § 105(a) injunction because such an injunction would be in contravention of another provision of the Bankruptcy Code—§ 524(e). *Id.* at 626 ("[T]he specific provisions of section 524 displace the court's equitable powers under section 105 to order the permanent relief sought by American.").

The same is true in *Lowenschuss*. There, the court concluded that § 524(e) prohibited, in a plan confirmation context, global releases of all claims against the debtor's children and other connected persons and entities. 67 F.3d at 1401 (stating that "§ 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors"). The claims that would have been enjoined in *American Hardwoods* and *Lowenschuss* had no connection to any property of the Debtor. The assertion of the enjoined claims would have had no obvious direct impact on the Debtor's property or its estate.

Additionally, In *American Hardwoods*, the debtor relied solely on the powers of the court under § 105(a) to seek a discharge of non-debtor third parties. This is unlike the present situation. Here, the authority to enjoin the contribution claims derives from § 363(f), and such action does not run afoul of any provision of the Bankruptcy Code. In fact, the injunction operates consistent with the purposes of § 105(a). Here, the proposed injunction "carr[ies] out" another provision of the Bankruptcy Code—§ 363(f).

Moreover, the District Court's overbroad holding that "the Ninth Circuit's interpretation of § 524(e) prohibits not just 'global third-party releases' but all third-party releases" would effectively eliminate the power specifically granted by § 363(f). ER 18. A sale of the Debtor's property "free and clear" would accomplish nothing if it did not shield the purchaser from some claims that might otherwise have

been asserted by a third party. The District Court essentially applies an inapplicable Code provision to gut the specifically applicable Code provision.

Furthermore, the District Court's holding is inconsistent with a litany of plans previously approved in the Ninth Circuit that used limited injunctions of third-party claims in instances where they were essential to confirm a plan. ER 17–20. For instance, in *In re Roman Catholic Bishop of Stockton*, under the District Court's reasoning, the Diocese could not have confirmed its plan because the Diocese's insurance policies could not have been sold "free and clear" of tort claimant's direct claims against those insurers. 2017 WL 118013 at *8. And in *In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 275 (Bankr. D. Mont. 2011), the debtor similarly could not have provided exculpation for bankruptcy-related conduct to a stalking horse bidder and the largest creditor, even if such exculpation was the only way to obtain their participation in a plan. Essentially, under the District Court's analysis, a § 363(f) sale would be impossible and there would be no way to cut off claims in the mass tort situation and create a liquidating trust for the benefit of claimants with asbestos-related injuries.

The Bankruptcy Court did not err in approving the limited injunction as an enforcement mechanism to protect the "free and clear" sale.

## CONCLUSION

The District Court's ruling should be reversed, and the Bankruptcy Court's rulings should be affirmed.

RESPECTFULLY SUBMITTED this 10th day of June, 2019.

EISENHOWER CARLSON PLLC

By: */s/ Darren R. Krattli*___________
Darren R. Krattli, WSBA # 39128
Katrina F. Self, WSBA # 52359
Attorneys for Appellant Fraser's Boiler Service, Inc.

Craig J. Litherland
TX SBN 12415350
*(Admitted Pro Hac Vice)*
litherlandc@gilbertlegal.com

Daniel L. Wolf
NY SBN 4904892
*(Admitted Pro Hac Vice)*
wolfd@gilbertlegal.com

GILBERT LLP
1100 New York Avenue NW
Washington DC 2005
Tel: 202-772-2428
Facsimile: 202-772-3333
Attorneys for Appellant Fraser's Boiler Service, Inc.

## VII. STATEMENT OF RELATED CASES

In accordance with Ninth Circuit Rule 28-2.6, Appellant Fraser's Boiler Service, Inc. is aware of one related case, Certain Underwriters at Lloyd's London, et al. v. Fraser's Boiler Service, Inc., Ninth Circuit Court of Appeals Case No. 19-35320. Case No. 19-35320 is a cross-appeal that arises out of the consolidated cases in the United States District Court of the Western District of Washington.

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED.R.APP.P. 32(a)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NUMBER 19-35269**

I certify that:

1. Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached Appellant's Opening Brief is

☑ Proportionately spaced, has a typeface of 14 points or more and contains 10,060 words.

**or is**

☐ Monospaced, has 10.5 or fewer characters per inch and contains _____ words or _____ lines of text).

Dated this 10th day of June, 2019.

EISENHOWER CARLSON PLLC

By: *<u>/s/ Darren R. Krattli</u>*____________
Darren R. Krattli, WSBA # 39128
Katrina F. Self, WSBA # 52359
Attorneys for Appellant Fraser's Boiler Service, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that my office electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 10, 2019. I certify that all participants in the case (as listed below) are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Miss Dominica C. Anderson, Attorney
Ms. Barbara Brady, Attorney
Mr. Michael M. Feinberg, Attorney
Mr. Jeff D. Kahane, Attorney
Mr. Darren R. Krattli
Aron Mark Oliner
Mr. Russell Webb Roten
Katrina F. Self
Mr. Daniel Isaac Wolf, Attorney
Mrs. Diana K. Carey (*daily summary*)

*/s/ Darren R. Krattli*____________
Darren R. Krattli, WSBA # 39128
Katrina F. Self, WSBA # 52359
Attorneys for Appellant Fraser's Boiler Service, Inc.