Margaret F. Catalano
Christina R. Salem
570 Lexington Avenue – 8th Floor
New York, New York 10022
(212) 252-0004
meg.catalano@kennedyscmk.com
christina.salem@kennedyscmk.com

IFRAH PLLC
George R. Calhoun, V (*pro hac vice* pending)
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 525-4147
george@ifrahlaw.com

*Attorneys for The North River Insurance Company*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>DURO DYNE NATIONAL CORP., *et al.*,<br><br>Debtors. | Chapter 11<br><br>**Case No. 3:19-cv-15433-MAS** |

**THE NORTH RIVER INSURANCE COMPANY'S REPLY TO THE PLAN PROPONENTS' BRIEF (I) IN SUPPORT OF (A) APPROVAL AND ADOPTION OF THE BANKRUPTCY COURT'S REPORT AND RECOMMENDATION, (B) CONFIRMATION OF THE THIRD AMENDED PRENEGOTIATED PLAN OF REORGANIZATION, AND (C) APPROVAL OF ASBESTOS INSURANCE SETTLEMENTS; AND (II) IN RESPONSE TO NORTH RIVER'S OBJECTIONS**

## TABLE OF CONTENTS

I. Introduction ........................................................................................................ 1
II. Argument ........................................................................................................ 2
A. The Plan Proponents Mischaracterize North River's Claims ........................................ 2
B. The Plan's Hypothetical Credits to North River Are Illusory ........................................ 3
C. The Plan Violates Section 524(g) ........................................................................ 8
1. The Plan Cannot Enjoin North River's Claims ........................................................ 8
2. The Plan Does Not Allow the Trust To Own A Majority of Voting Stock ................ 9
D. The Court Should Disregard The Plan Proponents' Late Evidence ............................ 10
E. The Plan Fails the Best Interest of Creditors Test .................................................. 12
F. The Plan Was Not Filed In Good Faith ................................................................ 13
CONCLUSION ........................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**

*AAA Mid-Atl. Ins. Co. v. Ryan*,
84 A.3d 626 (Pa. 2014)....3
*Bittner v. Borne Chem. Co.*,
691 F.2d 134 (3d Cir. 1982)....2
*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004)....7
*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005)....10
*In re New Valley Corp.*,
168 B.R. 73 (Bankr. D.N.J. 1994)....7
*In re Plant Insulation Co.*,
734 F.3d 900 (9th Cir. 2013)....6, 10
*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999)....14
*North River Ins. Co. v. Duro Dyne Nat'l Corp.*,
61 N.Y.S.3d 78 (N.Y. App. Div. 2017)....2
*Ptaszynski v. Atl. Health Sys.*,
440 N.J. Super. 24 (App. Div. 2015)....3
*Raleigh v. Ill. Dep't of Revenue*,
530 U.S. 15 (2000)....2
*Robichaux v. Nationwide Mut. Fire Ins. Co.*,
81 So. 3d 1030 (Miss. 2011)....3
*State of Cal. v. Continental Ins. Co.*, 281 P.3d 1000 (Cal. 2012)....6

**Statutes**

11 U.S.C. § 524....7, 8, 9, 10

**Other Authorities**

12 *Couch on Insurance* § 175....4

## I. Introduction

The Plan Proponents attack the motives of The North River Insurance Company ("North River"), falsely suggesting that it is attempting to escape its policy obligations.[1] North River does not, and has not, sought to escape any of its policy obligations. North River successfully defended the Debtors in the tort system pre-petition and had no objection to continuing to do so. North River seeks only to have its contractual, legal, and equitable rights treated fairly in accordance with existing law. The Plan Proponents seek expressly to curtail those rights by eliminating North River's claims against Settling Insurers and providing that North River's claims against those Settling Insurers and the estate are ineligible for any payment whatsoever.

To manufacture this result, the Plan Proponents put a profitable business into bankruptcy, attempted to "leverage" insurers to settle, artificially created an impaired, accepting class, and otherwise have violated numerous provisions of the Bankruptcy Code. In their briefing ("Plan Proponents Brief"), Dkt. 5, the Plan Proponents focus on addressing matters not at issue. Rather than address North River's arguments directly, the Plan Proponents attack straw men and manufacture self-serving evidence from lawyer argument and late-filed, but self-serving, calculations. Notwithstanding their attacks and straw men, the Plan Proponents do not address North River's arguments squarely and fail to show why the Plan should be confirmed over North River's objections. North River respectfully asks the Court to look beyond such tactics to focus on the actual record and controlling law. Although the majority of the issues are appropriately framed by North River's Objections, Dkt. 3, North River submits this Reply to address misleading and/or unsupported arguments in the Plan Proponents' Brief.

---

[1] Capitalized terms have the meaning ascribed in North River's Objections, Dkt. 3.

## II. Argument

### A. The Plan Proponents Mischaracterize North River's Claims.

The Plan Proponents argue that North River's claims "fly in the face" "of longstanding New York doctrine." Plan Prop. Br. at 23. In so arguing, they do not inform the Court that: (1) the Bankruptcy Court already temporarily allowed North River's claims for voting purposes over the Plan Proponents' objection where it raised the very same arguments, *see* Bankr. Dkt. 448; (2) the New York state court and appellate court hearing the underlying coverage action already have determined that pro rata allocation applies; and (3) the New York state court and appellate court already have held that North River is entitled to reimbursement of defense costs from to the Debtors. In particular, in an order dated July 10, 2014, the court in the New York State Court Action made several rulings regarding the parties' respective rights and obligations, including that New York law applies a pro rata allocation for indemnity costs among successive insurance carriers, including to the policyholder for a period where no coverage exists. *See* New York State Court Judgment, attached as Ex. 3 to Decl. of Christina R. Salem, Bankr. Dkt. 92-2.[2] The New York Appellate Division affirmed these rulings on August 23, 2017. *See North River Ins. Co. v. Duro Dyne Nat'l Corp.*, 61 N.Y.S.3d 78 (N.Y. App. Div. 2017). The Debtors did not appeal those rulings.[3] The trial court and intermediate appellate court rulings on allocation are controlling on this issue.[4] The Plan Proponents' coverage arguments are wrong and they are an

---

[2] In addition, the New York court held that "the insurers may seek contribution from Duro Dyne [for defense costs] to the extent that claims in the underlying actions clearly occurred during the periods it lacked insurance." *Id.*

[3] The Debtors have filed a new motion in the state court seeking to revisit those rulings, but the motion is out of time and wrong in any event.

[4] This Court is bound to apply the New York courts' substantive rulings in the coverage action for bankruptcy purposes because state law governs the validity and amount of a claim. *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *see also Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982).

effort to persuade this Court to disregard the serious violations of North River's rights under the Bankruptcy Code and state law.

**B. The Plan's Hypothetical Credits to North River Are Illusory.**

There is no dispute that the Plan proposes to treat North River's claims differently than other Class 7 claims in violation of Section 1123(a)(4). The Debtors' witness admitted this fact explicitly. *See* March 6, 2019 Confirmation Hrn'g Tr. ("Mar. 6 Tr."), Dkt. 3-1, at 74. Much of the Plan Proponents' case hinges, therefore, upon the dubious proposition that the so-called Trust-Payment Credits and Judgment-Reduction Credits provide "value" to North River and are legally sufficient treatment of North River's claims. They do neither. In making this argument, the Plan Proponents misrepresent the effect of these proposed credits in an effort to paste a veneer over their efforts to subvert the Bankruptcy Code. Neither of the two credits provides "value" – much less payment – for North River's claims and the credits do not support approval of the Plan or of the proposed insurer settlements.

The Trust-Payment Credit would require a claimant to reduce any judgment by the amount that the claimant already has been paid by the Trust. In doing so, it does nothing more than give effect to existing law. As the Plan Proponents admit, the "credit" is designed to eliminate the possibility of "double recovery." *See* Plan Prop. Br. at 28. The law already prohibits double payment and the proffered "credit" does not add any substantive protection to North River or provide it with any value on account of its claims.[5] Indeed, the so-called credit

[5] It is axiomatic that a tort claimant is entitled to only one recovery for his or her claim. *Ptaszynski v. Atl. Health Sys.*, 440 N.J. Super. 24 (App. Div. 2015) ("[I]t is fundamental that no matter under what theories liability may be established, there cannot be any duplication of damages.")(internal quotation omitted); *AAA Mid-Atl. Ins. Co. v. Ryan*, 84 A.3d 626, 634 (Pa. 2014) (recognizing a "long-standing prohibition" on "double recovery" for the same injury); *Robichaux v. Nationwide Mut. Fire Ins. Co.*, 81 So. 3d 1030, 1038 (Miss. 2011) (stating that "double recovery for the same harm is not permissible"); 12 *Couch on Insurance* § 175:6

does not depend in any way on North River's claims; it is 100% a function of payments made by the Trust. Because the Trust-Payment Credit does not even address North River's claims, it cannot be a value that is given in exchange for those claims.

The Plan Proponents similarly contend the so-called Judgment-Reduction Credit provides value to North River on account of its claims and provide "protection" to North River that render the proposed insurer settlements "fair" and "equitable" as to North River. It does neither. North River's claims consist primarily of defense costs. *See* Temporary Allowance Order, Bankr. Dkt. 448; *see also* Trial Ex. C-1, Rpt. Of Marc C. Scarcella. M.A. ("Scarcella Rpt."), Bankr. Dkt. 368-5. The Plan Proponents attempt to hide the fact that the Judgment-Reduction Credit does not apply to defense costs. In their Brief, they state that "a claimant must agree that any judgment obtained against North River will be reduced to account for *any* lost contribution rights that North River will have against the Settling Asbestos Insurers." Plan Prop. Br. at 28 (emphasis added). This statement is misleading at best. Contrary to the Plan Proponents' insinuation, the Plan does not give North River a credit for defense cost claims. Under the Plan, North River's claims for defense costs simply disappear. As admitted by counsel for the Official Committee of Asbestos Claimants, the Plan does not address "orphaned defense costs." March 7, 2019 Confirmation Hrn'g Tr. ("Mar. 7 Tr."), Dkt. 3-3, at 130.

The actual Plan provision provides:

> If any Non-Settling Asbestos Insurer against whom a judgment-enforcement action or direct action is brought asserts as a defense that it would have an Asbestos Insurance Policy Claim as a result of contribution rights against one or more Settling Asbestos Insurers with respect to the Channeled Asbestos Claimant's claim that it could have asserted but for the Injunctions (hereinafter, "*Contribution Claims*,") the liability, if any, of the Non-Settling Insurer to the Channeled Asbestos Claimant shall be reduced dollar-for-dollar by the amount, if any, of any judgment establishing the Contribution Claims in accordance with Section 4.14(b).

(discussing when the issue of "double recovery" arises).

*See* Plan § 4.14(a). Although Section 4.14(a) could be considered ambiguous as to whether it includes contribution for defense costs incurred in connection with a claim reduced to judgment, the Plan Proponents clarified that the "credit" is not intended to address defense costs at all. The only testimony on the intent of the Plan Proponents in drafting this provision stated that the Judgment-Reduction Credit would not apply to defense costs. The Future Claims Representative ("FCR"), Lawrence Fitzpatrick, testified about this provision, and admitted that the provision would not account for North River's defense costs claims. *See* Mar. 6 Tr. at 136:22–137:18.

As with the Trust-Payment Credit provision, this provision has nothing to do with North River's claims against the Debtors. *See* Mar. 6 Tr. at 133:6–9. This provision pertains only to claims against third-party, settling insurers. Because North River's claims against the Debtors are irrelevant to the operation of this provision, the "credit" cannot act as compensation for North River's claims against the Debtors.

Nor does this credit meaningfully address North River's rights against Settling Insurers. Over 90% of claims resolved pre-petition were resolved without any payment at all. The vast bulk of North River's claims against other insurers would constitute claims for defense costs because defense costs typically exceed indemnity payments by a considerable margin. *See* Plan Prop. Br. at 97. The Plan, however, limits contribution claims only to those arising out of or in connection with a particular claim that a claimant successfully reduces to judgment. As such, the provision cuts off almost all of North River's rights by its terms because it does not apply to costs incurred with respect to the vast majority of claims that are dismissed without payment.

Insofar as the Judgment-Reduction Credit is limited to indemnity claims against non-settling insurers, it is entirely worthless. The New York State Court already has established that pro rata allocation applies. Because pro rata allocation of claims applies, North River will not be

called to pay more than its allocable share of indemnity costs. North River is not obligated to pay the shares of other insurers, so a reduction for those shares does nothing to benefit North River. A provision allowing North River to reduce a judgment by the amount that some other insurer is obligated to pay is illusory under the facts applicable to this case.

The Plan Proponents rely on the Ninth Circuit's *Plant* opinion to support the alleged adequacy of the proposed treatment of North River's claims.[6] The Ninth Circuit's decision in *Plant* was incorrect, but even if its analysis here, the Duro Dyne plan could not be confirmed. The *Plant* court did make specific findings based on similar provisions, but it did so on an evidentiary record that was not present in this case and that involved a different underlying coverage framework.[7] This Court cannot make the requested findings because such findings would lack any evidentiary support whatsoever.

At pages 37–39 of their Brief, the Plan Proponents ask that the Court speculate as to the likely future behavior of asbestos claimants faced with the proposed "credits" without any admissible evidentiary support. The only evidence on this issue is speculation from Mr. Fitzpatrick that is mere parroting of *Plant*. *See* Plan Prop. Br. at 38–39, nn.108–109. When asked whether asbestos claimants might behave differently than predicted in *Plant*, Mr. Fitzpatrick agreed that it was perhaps "equally likely" that plaintiffs' lawyers would simply insist that they would not "settle unless you agree to pay me X?" Mar. 6 Tr. at 134. The Plan

---

[6] If the Court were to accept *Plant* as controlling, it could not confirm the Plan because the *Plant* court also rejected the secured note structure proposed in the Plan. *See In re Plant Insulation Co.*, 734 F.3d 900, 914 (9th Cir. 2013).

[7] Unlike New York, California generally applies an "all sums" allocation method whereby a single insurer may be responsible for paying a claim and then seeking contribution from other insurers. *See, e.g.*, *State of Cal. v. Continental Ins. Co.*, 281 P.3d 1000 (Cal. 2012). As a result, although North River disagrees with its conclusions, the Ninth Circuit's analysis was based on a very different underlying framework.

Proponents have the burden of proof and their only witness on these proposed findings admits that alternative outcomes are equally likely. The Court cannot accept such speculation as the basis for a determination that North River's claims are fairly treated.

The stakes in the case are not secret; the Plan is designed to strip North River of its state law rights. The Plan Proponents' arguments to the contrary are deceptive. The "leverage" that the Plan Proponents hoped to place on insurers like North River is not the threat that they would be left to defend claims in the tort system. The "leverage" is that insurers would have to defend claims and be stripped of their rights (1) to control the defense and settlement of claims, and (2) to seek contribution from the debtor and other insurers. The Judgment-Reduction Credit applies only to a tiny fraction of claims against North River. It does not address North River's separate claims for defense costs – against the Debtors or other insurers – at all.

Because the proposed "credits" fail to actually do anything for North River, they cannot be considered "fair and equitable" to North River for purposes of evaluating the Plan or the insurer settlements. Perhaps recognizing this, the Plan Proponents suggest that the Court evaluate fairness only from the perspective of potential future claimants. Setting aside the fact that North River is such a future claimant,[8] the Court must nonetheless evaluate the overall fairness of the Plan. *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004); *see also In re New Valley Corp.*, 168 B.R. 73, 80–81 (Bankr. D.N.J. 1994) (A "plan must provide for fundamental fairness in dealing with creditors." (citation omitted)). Here, (1) North River's

[8] See North River's Objections, Dkt. 3, at 44 (citing controlling Third Circuit authority from *In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012) (concluding that contribution claims were both claims and demands), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013)). The Plan Proponents seek to distinguish *W.R. Grace* but cannot escape the conclusion that the Third Circuit identified future contribution claims as "demands" as discussed in Section 524(g)(4)(B)(ii). *Id.* ("[T]he Court finds that Appellants' indemnity and/or contribution requests also satisfy the definitional requirements of "demands" under the Bankruptcy Code.").

claims are ineligible for payment, and (2) the proposed "credits" offer North River no protection or value beyond that to which it is already entitled under existing law. North River is being stripped of valuable rights against the Debtors and third parties with no consideration. The Bankruptcy Code does not permit this result.

**C. The Plan Violates Section 524(g).**

**1. The Plan Cannot Enjoin North River's Claims.**

This Court is obligated to enforce Section 524(g) as it is written, and the statute permits injunctions only of claims "to be paid" by the trust. Minimally, this language requires that a claim be eligible for payment. By mandating that North River's claims *never* be paid, this Plan establishes that insurer claims are not "claims or demands to be paid in whole or in part by a trust" nor are they – to borrow the Plan Proponents' formulation – "of the kind that the plan provides are to be paid by a trust." Plan Prop. Br. at 50–51. Rather, North River's claims expressly are of a kind that the plan makes *ineligible* for payment – not because the claims are invalid, but because that is how the Plan Proponents want it. As such, the proposed Plan violates the plain language of Section 524(g) and cannot be confirmed.

The Plan Proponents assert that enforcement of Section 524(g) according to its terms would "render § 524(g) injunctions full of holes" and create future difficulty in ascertaining the scope of relief. Plan Prop. Br. at 50–51. That argument is wrong and does not address the statutory language. The Plan mandates that insurer claims are ineligible for payment.[9] The Court need go no further. As to potential problems in other cases, where perhaps there is

[9] *See* Trust Distribution Procedures, Dkt. 1-2, § 5.5 ("any claim of a Non-Settling Asbestos Insurer shall not be eligible for payment or compensation from the Asbestos Trust . . .."). The Plan also enjoins North River from seeking to recover on its reimbursement claims in court.

ambiguity as to whether a claim is to be paid by a trust, the Court need not address that hypothetical. No other plan is before this Court to present the potential issues raised by the Plan Proponents. *This* Plan unambiguously fails the statutory standard because it seeks to enjoin claims that it makes entirely ineligible for payment in any form – unlike every other type of enjoined claim.

The Plan Proponents further contend that the "with respect to" clause in Section 524(g) somehow modifies the language to mean that a Section 524(g) injunction can bar a claim even if the Trust does not treat or pay claims of that sort. That reading of the statute is twisted. This interpretation would impermissibly expand the jurisdiction of the bankruptcy court well beyond constitutional limitations, as there is no meaningful limitation of "with respect to" in this context. Surely if Congress had intended such broad relief, the language it crafted would have been clearer than an oblique reference permitting injunctions "with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust . . .." 11 U.S.C. § 524(g)(1)(B). The requirement of the statute is that the trust must assume the liabilities of the debtors. Here, in contrast, the Trust is expressly disclaiming the Debtors' liabilities to North River. The Plan does not satisfy Section 524(g).

**2. The Plan Does Not Allow the Trust To Own A Majority of Voting Stock.**

Section 524(g) requires that a trust be able to own, if certain contingencies occur, a majority of the voting shares of the debtor. Here, the Trust does not have such a right. In their Brief, the Plan Proponents treat the Debtors' share pledge as if it were a right to the stock. It is not. The Pledge provides only a right to foreclose on collateral securing the Trust Note. There is no realistic possibility that the Debtors would ever default on the Trust Note under any conditions that would give rise to the Trust having the right to not only foreclose on the Debtors'

shares, but to obtain a majority of them. The note/pledge mechanism is a transparent effort by lawyers to avoid Section 524(g)'s funding requirements.

The Court should follow the Third Circuit's requirement that a debtor in a Section 524(g) asbestos case provide for an evergreen source of funding and that the trust have a meaningful opportunity to own a controlling voting interest in the debtor. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 248 (3d Cir. 2004), *as amended* (Feb. 23, 2005); *Plant*, 734 F.3d at 914. The Plan Proponents contend that Mr. Fitzpatrick's "purported" admission that there was not an evergreen funding source was only a "colorful metaphor" and that the statute does not require such funding. In interpreting the statute, however, the Third Circuit has held that Section 524(g) does require an evergreen funding source. *See Combustion Eng'g*, 391 F.3d at 248 ("The implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an "evergreen" funding source for future asbestos claimants."). The "colorful metaphor" was the Third Circuit's interpretation of the statute, which is binding on this Court and which the Plan Proponents have failed to satisfy.

**D. The Court Should Disregard The Plan Proponents' Late Evidence.**

To salvage issues on which they failed to carry their burden of proof, the Plan Proponents attempt to submit new evidence in the form of a "free cash flow" analysis from their witness, Mark Podgainy. *See* Plan Prop. Br. at App. A. This late-submitted evidence, which was not subjected to cross examination or admissible as expert testimony, cannot be considered. Even if it could, the analysis does not advance the Plan Proponents' case. The Plan Proponents present this discounted cash flow projection to rebut North River's analysis that the Debtors could afford to pay their share of defense and indemnity costs and had filed their cases/the Plan in bad faith. Mr. Podgainy's cash flow projections admitted into evidence showed that the Debtors were

expected to have in *excess* of $6 million in annual *profit* by 2022, and Mr. Podgainy admitted that there was no reason for those projections to decrease. Mar. 6 Tr. at 64:23–25. The Plan Proponents do not deny that extrapolation of Mr. Podgainy's original work over the twenty-year term of the Trust Note would far exceed $100 million in gross dollars. North River's forecasting expert, Marc Scarcella, calculated the Debtors' share of defense and indemnity over the same 20-year period of the Trust Note. *See* Scarcella Rpt., Ex. C-2. Even under the worst-case scenario, the Debtors' share never exceeded $4.88 million and was usually far less. The Debtors, as profitable companies, easily could pay all of their claims in full.[10]

Recognizing that this analysis could be harmful, the Plan Proponents attempt to attack it as "lawyer math." Plan Prop. Br. at 66. Math is math; it is indisputable that $5 million annually over twenty years is $100 million. Mr. Podgainy's late-submitted calculations are not so far off of that conservative number; he projected free cash flow over that period of $87 million. But to reduce the number to *just* $87 million, Mr. Podgainy had to make multiple adjustments to his own, earlier calculations that are in evidence. For example, for 2022, Mr. Podgainy originally projected *net profit* of $6,195,426. *See* Cert. of Mark Podgainy in Support of Confirmation of the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the United States Bankruptcy Code ("Podgainy Cert."), Bankr. Dkt. 483, Ex. D. After realizing that they had proven too much, the Debtors submitted revised cash flow

[10] To compare on apples-to-apples basis, the numbers have to be examined on a gross or present value basis, but not both. North River's analysis was done on a gross basis. North River agrees that $100 million over twenty years has a present value less than $100 million. That proposition has never been at issue. In an effort to make the Debtors' anticipated income appear smaller, Mr. Podgainy applied a 14.7% discount rate, substantially in excess of any interest rate being applied under the Plan. The Bankruptcy Court erroneously believed that this projection showed that the Debtor's contribution was fair and equitable. The Bankruptcy Court compared Mr. Podgainy's revised, discounted projections to the $23 million to be paid to the Trust by the Debtors, but the Debtors' contribution was not discounted to present value.

projections in which Mr. Podgainy contends that "free cash flow" for 2022 will be $3,585,253. He did so despite the fact that Debtors' 2017 and 2018 EBITDA, *after* adjusting for asbestos and bankruptcy expenses, was in excess of $5 million. *See* Second Amended Disclosure Statement for Second Amended Prenegotiated Plan of Reorganization for Durodyne [sic] National Corp., *et al.*, ("Second Amended Disclosure Statement"), Bankr. Dkt. 278, at 8.

The Debtors do not explain how Mr. Podgainy's projections changed so radically, but suggest it is due to "non-cash items and working capital requirements" and "capital expenditures and income taxes."[11] Shareholders are not entitled, however, to distributions ahead of creditors and the company would not have taxable income to the extent income was offset by paying legitimate debts of the company. That explanation does not hold up to scrutiny in any case. Mr. Podgainy's earlier projections (which were admitted into evidence) rebut his after-the-fact calculations. In Exhibit D of his certification, Mr. Podgainy also projected "Total Cash Flow" for 2022. In that projection, he calculated that the total cash flow for 2022 would be $5,690,568 (after deducting payments on notes that will be payable only if the Plan is confirmed). That figure accounted for capital expenditures and tax payments, just as did his conveniently revised calculations.

Mr. Podgainy's late-submitted projection is unreliable and self-serving. It is, nonetheless, illustrative. Without the drastic reductions to Mr. Podgainy's prior projections, the resulting gross numbers would be substantially higher than North River's conservative $100 million estimate based on the projections that were admitted into evidence and Mr. Podgainy's

[11] The only "non-cash item" included in Mr. Podgainy's admitted projections was the payment to the proposed asbestos trust of $13.5 million. *See* Podgainy Cert., Ex. D. If that amount were deducted from the calculations in his late submission, which is impossible to tell since he did not itemize his adjustments, the total of his projection would be $101,350,729, exceeding North River's allegedly flawed calculation.

testimony. The "free cash flow projection," to the extent properly before the Court at all, validates North River's claims that the Debtors are not insolvent and could afford to pay the claims against them, including North River's.

**E. The Plan Fails the Best Interest of Creditors Test.**

The Debtors' "best interest of creditors" argument relies on speculation and has no evidentiary support. The Debtors are responsible for providing *evidence* to satisfy the best interest test. They have not done so. The arguments advanced by the Plan Proponents were made by the Debtors' counsel, but have no support in the record. When North River objected to counsel's continued effort to give evidence during argument, Judge Kaplan agreed that it was a "fair point" that counsel should constrain his argument to the record, not attempt to create one. *See* Mar. 7 Tr. at 145. The Plan Proponents obligation to submit admissible evidence "goes without saying," Plan Proponents' Brief at 96, but the unsupported speculation of its counsel does not. While a Chapter 7 case very well could be an expensive proposition, it could proceed in many different ways. The witness that the Debtors hired to evaluate that process concluded that North River could be eligible for a distribution in a Chapter 7 liquidation. That is the *only* evidence before the Court on the best interest test. The Court cannot substitute the Plan Proponents' – or its own – speculation for that evidence.

**F. The Plan Was Not Filed In Good Faith.**

Nowhere in their 122-page brief do the Plan Proponents deny that this Plan was filed to obtain leverage over insurers in the pending coverage action. That fact is undisputed. The Plan Proponents contend, instead, that they have a duty to maximize insurance assets. Even if that were so, they may not use the bankruptcy courts as a sword to do so. In admitting that they filed the Plan to obtain a negotiating advantage, the Plan Proponents concede too much. This case is

not materially distinguishable from *SGL Carbon* in which the Third Circuit approved dismissal of a case that was filed to "change the negotiating platform" with plaintiffs and "increase the pressure on . . . plaintiffs to settle." *In re SGL Carbon Corp*., 200 F.3d 154, 158 (3d Cir. 1999). As the Third Circuit held, "filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within "the legitimate scope of the bankruptcy laws." *Id*. at 165. Here, the Court is faced with a case where the Plan Proponents admit that obtaining a tactical litigation advantage was the purpose of the Plan. Denial of confirmation is the appropriate response.

Seeking to concoct some other reason for the bankruptcy filing by this profitable companies that had been successfully defending claims in the tort system, the Plan Proponents contend that the Debtors needed to seek bankruptcy to obtain capital financing, which their lawyers now seek to cast as having a "crippling effect." Plan Prop. Br. at 96–97. That contention is not, however, supported by the evidence. Mr. Podgainy did not describe any difficulty raising outside capital as crippling. *See* Mar. 6 Tr. at 86–87. In his projections, he identified approximately $3 million in anticipated capital expenditures. *See* Podgainy Cert., Ex. D. That sum is significantly less than the projected "profit" of the company during that period. *Id.* Nor did the Debtors contend that the need for capital financing drove them into bankruptcy. Rather, they contend that "the primary reason" for bankruptcy was "to address the Company's liability for asbestos related claims" and its "increasing share of settlements and defense costs . . .." Second Amended Disclosure Statement at 13–14. The need for capital financing amounts to a ruse on which the Plan Proponents have attached in an effort to justify this bankruptcy and has no support in the record.

The Debtors continue to operate profitable operations and to make distributions to shareholders. Just this past week, on August 16, 2019, the Debtors filed a motion seeking

permission to pay dividends to shareholders to offset taxes generated by pass through taxes. *See* Bankr. Dkt. 823. The Debtors are not in financial distress. Although they propose not to pay North River's claims, they are perfectly content to pay dividends to their shareholders. The asbestos creditors accepted this scheme because instead of facing a challenging defense from the Debtors, they would instead have a "claimant trust" that would settle, but not defend claims.[12] They concocted this agreement and expressly agreed to "put leverage" on insurers in the coverage litigation. This scenario is exactly the sort of bad faith use of bankruptcy that lead the Third Circuit to dismiss the *SGL Carbon* case.

## CONCLUSION

The Plan before this Court is the result of a bankruptcy filed with an improper purpose to gain a litigation advantage over the Debtors' insurers. To gain the claimants' support, the Debtors signed on to a process that would create a trust that settled, but did not defend, claims that have been dismissed at a 90% rate historically. At the same time, the Plan seeks to strip North River of valuable claims against both the Debtors and non-debtor third parties with no compensation. Unlike every other type of creditor in this case, and violating Bankruptcy Code requirements that creditors in a class receive the same treatment, only the claims of North River – an insurer over whom the Plan Proponents sought to manufacture leverage – are made ineligible for payment. That circumstance is the definition of unfairness and bad faith. The Court should refuse to adopt the Bankruptcy Court's Proposed Findings and Conclusions and should instead enter an order denying confirmation of the Plan.

[12] Counsel for the FCR claimed in argument that they would not agree to a Trust that defended claims. Mar. 7 Tr. at 99 ("[T]he trust isn't in the business of defending claims. Rather it's a *claimant* trust funded by claimant indemnity dollars.")

Dated: August 26, 2019

Respectfully submitted,

KENNEDYS CMK LLP

*/s/ Christina R. Salem*

Margaret F. Catalano
Christina R. Salem
570 Lexington Avenue, 8th Floor
New York, N.Y. 10022
(212) 252-0004
Emails: meg.catalano@ kennedyscmk.com
christina.salem@kennedyscmk.com

-and-

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
Ifrah PLLC
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
202.525.4147
Email: george@ifrahlaw.com

*Attorneys for The North River Insurance Company*